IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § <br> Plaintiff, § § <br> v. § <br> § <br> STANFORD INTERNATIONAL BANK, LTD., § <br> STANFORD GROUP COMPANY, § <br> STANFORD CAPITAL MANAGEMENT, LLC, § <br> R. ALLEN STANFORD, JAMES M. DAVIS, and § <br> LAURA PENDERGEST-HOLT, § § <br> Defendants, § § <br> and JAMES A. ALGUIRE, ET AL., § § <br> Relief Defendants. § § | Case No. 3-09-CV-0724-N |

### RECEIVER'S FIRST SUPPLEMENTAL COMPLAINT NAMING ADDITIONAL RELIEF DEFENDANTS

### SUMMARY

1.   On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (collectively "Stanford Defendants"). On the same date, the Court entered an Order appointing a Receiver, Ralph S. Janvey ("Receiver"), over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

2. Receiver Ralph S. Janvey ("Receiver") files this First Supplemental Complaint to name as additional Relief Defendants the following investors who received proceeds from fraudulent certificates of deposit issued by Stanford International Bank, Ltd. ("SIB"): Jay Stuart Bell, Gregory Alan Maddux, David Jonathan Drew, Andruw Rudolf Bernardo Jones, Carlos Felipe Pena, Johnny David Damon and Bernabe Williams.

3. The fraudulent proceeds, totaling over $9.5 million, were received into the Relief Defendants' accounts at Pershing LLC, the primary clearing broker used by Defendant Stanford Group Company ("SGC") in the conduct of its brokerage business. Pursuant to agreement between the Relief Defendants and the Receiver, the proceeds were subsequently transferred into a segregated escrow account in the name of the Receiver pending final adjudication of the rights to those funds.

4. The Receiver does not allege that the Relief Defendants participated in the fraudulent schemes at issue in this case or otherwise committed any wrongdoing. Rather, the Relief Defendants are added in a nominal capacity solely to facilitate relief. *See SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998).

5. The Receiver must assemble assets of the Stanford Defendants into a pool from which distributions ultimately will be made to victims of the Stanford Defendants' fraudulent scheme, and such assets include monies paid out pursuant to the fraudulent scheme. In fraud cases such as this where investors' funds are commingled, all defrauded persons are similarly situated with respect to those who perpetrated the scheme and are to be treated equally with respect to the ultimate distribution plan that the Receiver implements using funds and assets recovered. *See e.g., S.E.C. v. Credit Bancorp*, 290 F.3d 80, 88-89 (2d Cir. 2001).

6. "As the Supreme Court explained in the litigation that gave the Ponzi scheme its name, 'equality is equity' as between 'equally innocent victims.'" *SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005) (*quoting Cunningham v. Brown*, 265 U.S. 1, 13, 44 S. Ct. 424 (1924)). Allowing some innocent investors, such as the Relief Defendants, to keep proceeds from the fraudulent scheme when other investors received none, would violate this principle. *See United States v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996)(district court did not abuse its discretion by rejecting plaintiff's request to trace and recover investment funds and holding that "all the fraud victims were in equal positions and should be treated as such"). "The mere coincidence that the defendants chose the relief defendants (instead of others) to receive funds contributed by other investors in order to delay the discovery of this scheme does not entitle the relief defendants to preferential treatment." *George*, 426 F.3d at 799; *see SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (noting that "the facts did not support a remedy that would elevate the [relief defendants'] claim above the other victims" even though the relief defendants *could* trace the funds they received to a segregated account containing only their investment); *SEC v. Infinity Group Co.*, 226 Fed. Appx. 217, 219 (3rd Cir. 2007) (upholding a pro rata distribution plan and refusing to let an investor keep 100% of his principal even though his money was directly traceable because "there is no equitable basis to distinguish between early investors and those, like Roberts, who invested shortly before TIGC's account was frozen, and that all investors should thus be treated the same").

7. The Receiver therefore seeks an order (a) establishing that proceeds received by the Relief Defendants from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate and (b) allowing the Receiver to

withdraw the proceeds from the segregated escrow account and add them to the assets of the Receivership Estate.

## JURISDICTION & VENUE

8. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

9. Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties. *Reneker v. Offill*, Civil Action No. 3:08-CV-1394-D, 2009 WL 804134, at *4 (N.D. Tex. 2009).

10. This Court further has jurisdiction pursuant to agreements signed by each of the Relief Defendants upon filing applications for release of their Pershing brokerage accounts, in which each Relief Defendant stated that "By filing this application, I submit to the exclusive jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division and irrevocably waive any right I or any entity I control may otherwise have to object to any action being brought in the Court or to claim that the Court does not have jurisdiction over the matters relating to my account."

## RELIEF DEFENDANTS

11. Jay Stuart Bell can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

12. Gregory Alan Maddux can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

13. David Jonathan Drew can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

14. Andruw Rudolf Bernardo Jones can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

15. Carlos Felipe Pena can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

16. Johnny David Damon can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

17. Bernabe Williams can be served by and through his counsel of record in this action, Gene R. Besen, Sonnenschein, Nath & Rosenthal, LLP, 2000 McKinney Avenue, Suite 1900, Dallas, TX 75201.

## STATEMENT OF FACTS

*Stanford Defendants Operated a Fraudulent Scheme*

18. The factual allegations set forth in the SEC's First Amended Complaint are incorporated herein. *See* First Amended Complaint, Doc. 48.

19. As alleged by the SEC, the Stanford Defendants marketed a fraudulent CD to investors in the United States exclusively through SGC financial advisers pursuant to a Regulation D private placement. *Id.* ¶ 23. The CDs were sold by Stanford International Bank, Ltd. ("SIB" or "the Bank"). *Id.*

20. In selling the CD to investors, the Stanford Defendants repeatedly touted the CD's safety and security and SIB's consistent, double-digit returns on its investment portfolio. *Id.* ¶ 31.

21. In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers." *Id.* ¶ 32. Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors." *Id.*

22. In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id.* ¶ 44. More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

23. Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 46. In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 24.

24. Contrary to the Stanford Defendants' representations regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by Defendant Allen Stanford and used by him to acquire private equity and real estate. In fact, at year-end 2008, the

largest segments of the Bank's portfolio were: (i) at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford; (ii) private equity; and (iii) over-valued real estate. *Id.* ¶¶ 24, 48.

25. In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 5.

26. SIB's financial statements, including its investment income, are fictional. *Id.* ¶ 37. In calculating SIB's investment income, Defendants Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.* Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

27. For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent scheme collapsed.

***The Stanford Defendants Transferred Proceeds from the Fraudulent Scheme to the Relief Defendants' Accounts at Pershing***

28. SGC is a registered broker dealer and investment advisor headquartered in Houston, Texas. *Id.* ¶ 13. SGC used Pershing LLC as its clearing broker, and in that capacity, Pershing holds in its custody the customer accounts introduced by SGC.

29. The Stanford Defendants used an elaborate and sophisticated incentive program to keep SGC financial advisors highly motivated to sell SIB CDs to brokerage customers. *Id.* ¶¶ 27-28. The program included high commission rates, bonuses, and forgivable loans, all closely tied to maintaining the Stanford Defendants' portfolio of CDs. In 2007, SIB paid SGC and its

affiliates more than $291 million in management fees and CD sales, up from $211 million in 2006. *Id.* ¶ 29.

30. As a result of SGC's aggressive sales tactics, a significant percentage of SGC customers, including the Relief Defendants, bought CDs from SIB. *Id.* ¶ 22. Many such customers, including the Relief Defendants, received interest payments or were able to cash out CDs directly or in the form of loans prior to the date of the Order Appointing Receiver and the TRO. As the SEC alleges, these customers were paid, not from actual returns on any underlying investments, but from money contributed by new victims of the fraud. *See id.* ¶ 1.

31. The proceeds from fraudulent SIB CDs received by the Relief Defendants are as follows:

- Jay Stuart Bell - On or about November 11, 2008, Mr. Bell received a total of $1,288,684.57 in SIB CD proceeds, consisting of $1,250,000 in principal and $38,684.97 in interest;

- Gregory Alan Maddux - On or about January 23, 2009, Mr. Maddux received a total of $3,669,735.10 in SIB CD proceeds, consisting of $3,500,000 in principal and $169,735.10 in interest;

- David Jonathan Drew - On or about November 10, 2008, Mr. Drew received a total of $1,299,424.01 in SIB CD proceeds, consisting of $1,250,000 in principal and $49,424.01 in interest;

- Andruw Rudolf Bernardo Jones - On or about October 29, 2008, Mr. Jones received a total of $1,033,732.08 in SIB CD proceeds, consisting of $1,000,000 in principal and $33,732.08 in interest;

- Carlos Felipe Pena - On or about November 12, 2008, Mr. Pena received a total of $303,635.39 in SIB CD proceeds, consisting of $300,000 in principal and $3,635.39 in interest;

- Johnny David Damon - On or about October 29, 2008, Mr. Damon received a total of $400,069.84 in SIB CD proceeds, consisting of $400,000 in principal and $69.84 in interest; and

- Bernabe Williams - On or about October 28, 1998, Mr. Williams received a total of $1,542,962.22 in SIB CD proceeds, consisting of $1,500,000 in principal and $42,962.22 in interest.

32.   At the time this lawsuit was commenced, the above-referenced proceeds received by the Relief Defendants were located in their Pershing accounts. Since that time, each of the Relief Defendants have entered into a stipulation with the Receiver allowing for the transfer of the proceeds to a segregated interest-bearing account that the Receiver has opened for the purpose of holding such funds pending further order of the Court.

33.   Proceeds from the fraudulent scheme described above – including the interest and principal redemptions received by the Relief Defendants – were transferred by the Stanford Defendants to the Relief Defendants' accounts at Pershing solely for the purpose of concealing and perpetuating the fraudulent scheme. The Relief Defendants did not perform services in exchange for these payments. Therefore, the Relief Defendants do not have any rightful ownership interest that could justify their retaining possession of these funds, which are properly considered assets of the Receivership Estate. *See George*, 426 F.3d 786, 799 (6th Cir. 2005) (Assets held by a third party can be considered property of the receivership estate if (1) the assets are traceable to the fraudulent activity and (2) the non-party has no legitimate claim to ownership

of the assets.); *see also CFTC v. Kimberlynn Creek Ranch*, 276 F.3d 187, 191-92 (4th Cir. 2002) (recipient of proceeds of fraud had no ownership interest in the funds); *SEC v. Cavanagh*, 155 F.3d 129, 136-37 (2nd Cir. 1998) (recipient of "gift" that constituted proceeds of fraud had no legitimate claim of ownership); *SEC v. Elfindepan*, 2002 WL 31165146, at *4 (M.D.N.C. Aug, 30, 2002) (money deposited in third party's checking account as proceeds of "Note Transaction" with defendant was recoverable as asset of receivership estate).

34.     The fact that the Relief Defendants are innocent investors and committed no wrongdoing does not entitle them to retain proceeds received from the fraudulent SIB CDs. *See Warfield v. Byron,* 436 F.3d 551, 559-60 (5th Cir. 2006) (two investors ordered to give back proceeds of Ponzi scheme under fraudulent transfer statute); *Quilling v. 3D Marketing, LLC,* 2007 WL 1058217, at *3 (N.D. Tex. 2007) (investor who invested $100,000 in Ponzi scheme ordered to give up 100% of proceeds received, for a total of $150,000); *Mays v. Lombard,* 1998 WL 386159, at *3 (N.D. Tex. 1998) (investor had to pay back money received in excess of original investment as fraudulent transfer); *see also Donell v. Kowell,* 533 F.3d 762, 779-80 (9th Cir. 2008) (receiver won summary judgment on fraudulent transfer theory against investor to recover false profits); *Scholes v. Lehmann,* 56 F.3d 750, 757, 759 (7th Cir. 1995) (receiver recovered from investor amounts received in excess of his principal investment as fraudulent transfers; receiver recovered from charity 100% of amounts received as fraudulent transfers); *Wing v. Harrison,* 2004 WL 966298, at *5 (D. Utah 2004) (investors had to pay back 100% of proceeds – including their initial investment – as fraudulent transfer).

***Receiver Entitled to Disgorgement of Assets from the Relief Defendants***

35.     Paragraph 4 of the Order Appointing Receiver, entered by the Court on February 16, 2009, authorizes Receiver Janvey "to immediately take and have complete and exclusive

control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver, Doc. 10, ¶ 4; Amended Order Appointing Receiver, Doc. 157, ¶ 4. Paragraph 5(c) of the Order specifically authorizes Receiver Janvey to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Doc. 10, ¶ 5(c); Doc. 157, ¶ 5(c).

36. As alleged above, the proceeds received by the Relief Defendants are assets of the Receivership Estate, and it is necessary to name the Relief Defendants as nominal defendants to effect full relief in the marshaling of assets that are the fruit of the underlying fraud. *SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998).

37. In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession and custody of the SIB CD proceeds received by the Relief Defendants.

## RELIEF SOUGHT

38. The Relief Defendants neither have nor assert any legitimate ownership claim to the proceeds from fraudulent SIB CDs. Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that proceeds received by the Relief Defendants from fraudulent SIB CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate and (b) allowing the Receiver to withdraw the proceeds from the segregated escrow account and add them to the assets of the Receivership Estate.

## PRAYER

Receiver Janvey respectfully requests the following:

(a) A summary adjudication that payments made to the Relief Defendants in connection with the sale of fraudulent SIB CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate;

(b) An order allowing the Receiver to withdraw the proceeds from fraudulent SIB CDs related to the Relief Defendants from the segregated escrow account and add such proceeds to the assets of the Receivership Estate; and

(c) Such other and further relief as the Court deems proper under the circumstances.

Dated: June 22, 2009                      Respectfully submitted,

BAKER BOTTS L.L.P.

By: /s/ Kevin M. Sadler
    Kevin M. Sadler
Richard B. Roper, III                   Texas Bar No. 17512450
Texas Bar No. 17233700             kevin.sadler@bakerbotts.com
richard.roper@tklaw.com             Robert I. Howell
THOMPSON & KNIGHT LLP            Texas Bar No. 10107300
1722 Routh Street                       robert.howell@bakerbotts.com
Dallas, Texas 75201                    David T. Arlington
(214) 969-1700                           Texas Bar No. 00790238
(214) 969-1751 (Facsimile)          david.arlington@bakerbotts.com
                                           1500 San Jacinto Center
                                           98 San Jacinto Blvd.
                                           Austin, Texas 78701-4039
                                           (512) 322-2500
                                           (512) 322-2501 (Facsimile)

                                           Timothy S. Durst
                                           Texas Bar No. 00786924
                                           tim.durst@bakerbotts.com
                                           2001 Ross Avenue
                                           Dallas, Texas 75201
                                           (214) 953-6500
                                           (214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On June 22, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the Court-appointed Receiver, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler