## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Plaintiff, | | Case No. 03:09-CV-0724-N |
| v. | | |
| JAMES R. ALGUIRE, ET AL. | | |
| Relief Defendants. | | |

## RECEIVER'S AMENDED COMPLAINT
## NAMING RELIEF DEFENDANTS

## SUMMARY

1.      The ultimate purpose of this Receivership is to make the "maximum disbursement to claimants." This requires the Receiver to maximize the pool of assets that will be available for distribution. To accomplish this, the Receiver must take control of all assets of the Estate and traceable to the Estate, "wherever located," including money stolen from investors through fraud.

2.      The Receiver's investigation to date reveals that CD sales generated substantially all of the income for the Stanford Defendants and the many related Stanford entities. Revenue, let alone any profit, from all other activities and investments was miniscule in comparison. Money that new investors were deceived into paying to purchase CDs funded the Stanford network; lavish offices and appointments; extravagant lifestyles for the individual defendants and their families; employees' salaries; loans, commissions, and bonuses to financial advisors; and purported CD Proceeds in the form of interest and redemptions to unwitting investors. This fraud endured, in part, by incentivizing a sales force with big commissions and paying CD

Proceeds to a minority of investors in order to maintain the façade of a legitimate financial business.

3.      However, money stolen from CD purchasers through trickery and deceit retains its character as ill-gotten gain regardless of where, when, how, and why the Stanford Defendants spent it.  When Stanford paid commissions to his brokers, or CD Proceeds to a few investors, he did no more than take money out of one investor's pocket and put it into the hand of another investor or a broker selling the fraudulent CDs.  For the more than 20,000 investors who have thus far received little or nothing from their investment in Stanford CDs, money recovered from wherever it resides today is likely the only money they will ever receive in restitution.  CD Proceeds – loans, commissions, bonuses or other compensation paid to financial advisors for selling CDs, and interest or redemptions to investors – are little more than stolen money and do not belong to persons who received such funds but belong instead to the Receivership Estate.

4.      The recipients of new CD purchase money fall into four categories: (1) those who were complicit in, or at least knowledgeable about, the Stanford Defendants' scheme; (2) financial advisors who received compensation to sell fraudulent CDs; (3) a minority of investors who received both a supposed return of their initial investment in the form of a purported redemption, and a false profit in the form of purported interest payments; and (4) investors who received CD Proceeds in an amount less than their initial investment.

5.      The Receiver's investigation to identify those who were actively or passively complicit in the fraud is on-going.  When such persons are identified, the Receiver will fulfill his duty to pursue claims against any such persons who received money taken from those who purchased CDs.  At this stage of the Receivership, the Receiver has identified substantial sums of money paid to brokers and to a minority of investors, and through this Complaint seeks the

return of those funds to the Receivership Estate in order to make an equitable distribution to claimants.

6.     The monies paid by Stanford Defendants to financial advisors for the sale of CDs were not in payment for legitimate services rendered by the financial advisors.  The Stanford Defendants kept their fraudulent scheme going by using the financial advisors to lure new investors and then diverting the investors' funds for the Stanford Defendants' own illicit purposes.  The commissions, loans, and other compensation paid to financial advisors came not from revenue generated by legitimate business activities, but from monies contributed by defrauded investors.  The financial advisors are in possession of assets traceable to the Stanford Defendants' fraudulent scheme.  They have no legitimate ownership interest in these assets; they necessarily hold the assets in trust for the Receivership Estate for the benefit of defrauded investors.

7.     Stanford investors received money that they may have believed was a return on an investment placed with what they thought was a legitimate bank, Stanford International Bank Ltd. ("SIB").  In reality, the money the investors received was not their money, was not a return on their investment, and was not generated by any of SIB's other business ventures.  The funds used to pay purported CD interest and redemptions was simply money that came from the more than 20,000 CD holders who were deceived into purchasing CDs and who by chance, or as the result of sales tactics by brokers, had not withdrawn funds from SIB as of the date the Receivership was put in place.  CD Proceeds must be returned to the Receiver to compensate victims of the Stanford fraud according to principles of law and equity, rather than according to the vagaries of luck or chance.  The Receiver cannot fulfill his duty to compensate victims according to long-standing principles of law and equity if some who received stolen money,

through luck, chance or complicity, are allowed to keep stolen money.  Such preferential treatment of a few would only come at the expense of thousands of others who currently hold – not funds withdrawn from the fraud scheme – but only the worthless CDs which were the engine of this massive fraud.

8.      The fraudulent proceeds received by the financial advisors and investors (collectively, the "Relief Defendants") totaled over $800 million, and was delivered, either to brokerage and trust accounts, or to depository banks, or directly to the investors and brokers.  A substantial portion of the fraudulent proceeds were received into accounts in the name of or controlled by the Relief Defendants in the custody of (a) Pershing LLC ("Pershing"), the primary clearing broker used by Defendant Stanford Group Company ("SGC") in the conduct of its brokerage business or (b) SEI Private Trust Company ("SEI"), which holds Stanford Trust Company customer accounts.[1]  The investor and financial advisor Relief Defendants named herein include: (1) Stanford customers or financial advisors who have a frozen account(s) at Pershing, SEI or JP Morgan; (2) Stanford customers who, pursuant to stipulation, have transferred assets to the Receiver's escrow account; and (3) Stanford customers and financial advisors who do not presently have any frozen accounts or funds in escrow.  Pershing and SEI ("Custodian Relief Defendants") are also named herein as relief defendants solely to facilitate final relief upon an adjudication that the money in the frozen accounts should be disgorged and delivered to the Receiver's exclusive control.

9.      The Receiver does not allege at this time that any of the Relief Defendants participated in the fraudulent scheme at issue in the SEC's case or otherwise committed any wrongdoing.  Rather, the Relief Defendants are added in a nominal capacity solely to facilitate

---

[1] In some instances, the fraudulent proceeds were received into accounts in the name of or controlled by the Relief Defendants in the custody of JP Morgan.

return of assets to the Receivership Estate.  *See SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir. 1998).

10.    In fraud cases such as this where investors' funds are commingled, all defrauded persons are similarly situated with respect to those who perpetrated the scheme and are to be treated equally with respect to the ultimate distribution plan that the Receiver implements using funds and assets recovered.  *See e.g., SEC v. Credit Bancorp*, *Ltd.* 290 F.3d 80, 88-89 (2d Cir. 2002).  All Stanford claimants, including the investors named herein, will have the opportunity to assert a claim for recovery during the Receiver's distribution process.

11.    "As the Supreme Court explained in the litigation that gave the Ponzi scheme its name, 'equality is equity' as between 'equally innocent victims.'"  *SEC v. George*, 426 F.3d 786, 799 (6th Cir. 2005) (*quoting Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).  Allowing some innocent investors, such as the Relief Defendants, to keep proceeds from the fraudulent scheme when other investors received none, would violate this principle.  *See United States v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996) (district court did not abuse its discretion by rejecting plaintiff's request to trace and recover investment funds and holding that "all the fraud victims were in equal positions and should be treated as such").  "The mere coincidence that the defendants chose the relief defendants (instead of others) to receive funds contributed by other investors in order to delay the discovery of this scheme does not entitle the relief defendants to preferential treatment."  *George*, 426 F.3d at 799; *see SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) ("noting that 'the facts did not support a remedy that would elevate the [relief defendants'] claim above the other victims' even though the relief defendants *could* trace the funds they received to a segregated account containing only their investment"); *SEC v. Infinity Group Co.*, 226 Fed. Appx. 217, 219 (3rd Cir. 2007) (upholding a pro rata distribution plan and

refusing to let an investor keep 100% of his principal even though his money was directly traceable because "there is no equitable basis to distinguish between early investors and those, like Roberts, who invested shortly before TIGC's account was frozen, and that all investors should thus be treated the same").

12.     The Receiver therefore seeks an order that (a) proceeds or funds received directly or indirectly by the Relief Defendants from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) each of the Relief Defendants is liable to the Receivership Estate for an amount equaling the amount of proceeds he or she received from fraudulent CDs; (c) the Receiver may withdraw the assets contained in Pershing, SEI and JP Morgan accounts in the names of or controlled by the Relief Defendants and add those assets, up to the amounts of fraudulent CD Proceeds received by the Relief Defendants, to the assets of the Receivership Estate; (d) the escrow account at JP Morgan holding CD Proceeds pursuant to stipulations with investors is property of the Receivership Estate available for distribution to claimants; and (e) Relief Defendants (excluding the Custodian Relief Defendants) must pay to the Receiver the difference, if any, between the amounts contained in their Pershing, SEI and JP Morgan accounts, if any, and the total amount of fraudulent CD Proceeds received.

13.     If the Receiver does not pursue these claims against Relief Defendants, then an investor who redeemed millions of dollars in CDs just before the Receivership began could recover 100%, or more, of his initial investment – despite the absolute certainty that what he received was money stolen from other investors.  For example, on or about January 23, 2009 Relief Defendant Gregory Alan Maddux received $3,669,735.10 in SIB CD Proceeds, consisting of $3,500,000 in principal and $169,735.10 in purported interest.  On December 19, 2008, Relief

Defendant Regions Bank received over $13 million in CD Proceeds.  Had Mr. Maddux or Regions Bank waited only a few more weeks and tried cash out after the Receivership began, they would have received nothing.  Through no fault of their own, more than 20,000 other investors who did not cash out before the Receivership are waiting, and will continue to wait for some time, to receive pennies on the dollar.  There is no legal authority to support such inequity.

## JURISDICTION & VENUE

14.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

15.     Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

16.     Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 26 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed.

17.     Further, each account holder who submitted an Application for Review and Potential Release of Stanford Group Company Brokerage Accounts made the following declaration: "By filing this application, I submit to the exclusive jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division and irrevocably waive any right I or any entity I control may otherwise have to object to any action being brought in the Court or to claim that the Court does not have jurisdiction over the matters relating to my account."

18.     Further, a number of the Relief Defendants have filed motions to intervene in *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-cv-298-N.  By filing a motion to

intervene they have consented as a matter of law to the Court's personal jurisdiction.  *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006); *County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002); *Pharm. Research & Mfrs. v. Thompson*, 259 F. Supp. 2d 39, 59 (D.D.C. 2003); *City of Santa Clara v. Kleppe*, 428 F. Supp. 315, 317 (N.D. Ca. 1976).

RELIEF DEFENDANTS

19.     Each of the Relief Defendants named herein will be served pursuant to the Federal Rules of Civil Procedure, through their attorney of record, or by other means approved by this Court's order.

A.      THE FINANCIAL ADVISORS

20.     The Receiver names the Stanford Financial Group financial advisors listed on App. 1-11 as Relief Defendants.  Over just a two-year period, these financial advisors received commissions ranging in amounts from $2.6 million to $200,000, along with other incentive compensation, to promote the sales of CDs.  Collectively, these financial advisors received more than  $40 million in such compensation during that period.

B.      THE INVESTORS WITH FROZEN ACCOUNTS

21.     The Receiver names the people and entities listed on App. 12-25 as Relief Defendants.  These people and entities received CD Proceeds in the amounts reflected on App. 12-25 and have one or more accounts currently frozen at Pershing, JP Morgan or SEI.  Collectively, these people and entities received approximately $373 million in CD Proceeds, of which approximately $300 million is recoverable to the Receivership Estate from the frozen accounts.

### C.     THE INVESTORS WITH FUNDS IN THE RECEIVER'S ESCROW ACCOUNT

22.     The Receiver names the people and entities listed on App. 26 as Relief Defendants.  These people and entities received CD Proceeds in the amounts reflected on App. 26 and wired funds into the Receiver's escrow account, following the execution of a Stipulation Regarding Release of Accounts.  Collectively, these people and entities received approximately $18.5 million in CD Proceeds.

### D.     THE INVESTORS WITHOUT FROZEN ACCOUNTS OR FUNDS IN ESCROW

23.     The Receiver names the people and entities listed on App. 27-28 as Relief Defendants.  These people and entities received CD proceeds in the amounts reflected on App. 27-28 but do not have an account currently frozen and have not wired funds into the Receiver's escrow account.  Collectively, these people and entities received almost $494 million in CD Proceeds.

### E.     THE CUSTODIAN RELIEF DEFENDANTS

24.     Pershing LLC is a limited liability company formed under the laws of the state of Delaware.  Pershing is headquartered at One Pershing Plaza, Jersey City, New Jersey 07399.

25.     SEI Private Trust Company is a nationally chartered thrift institution regulated by the Office of Thrift Supervisions.  SEI is incorporated in Pennsylvania and is headquartered at One Freedom Valley Drive, Oaks, PA 19456.

### STATEMENT OF FACTS

26.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd., Stanford Group Company, and Stanford Capital Management, LLC (collectively "Stanford Defendants").  On the same date, the Court entered an Order appointing a Receiver, Ralph S.

Janvey ("Receiver"), over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

27.     The factual allegations set forth in the SEC's First Amended Complaint are incorporated herein. *See* First Amended Complaint, Doc. 48.[2]

***Stanford Defendants Operated a Fraudulent Scheme***

28.     As alleged by the SEC, the Stanford Defendants marketed a fraudulent CD to investors exclusively through SGC financial advisors pursuant to a Regulation D private placement. *Id*. ¶ 23.  The CDs were sold by Stanford International Bank, Ltd. ("SIB" or "the Bank"). *Id*.

29.     In marketing, selling, and issuing the CD to investors, the Stanford Defendants repeatedly touted the CD's safety and security and SIB's consistent, double-digit returns on its investment portfolio. *Id*. ¶ 31.

30.     In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."  SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers." *Id*. ¶ 32.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors." *Id*. ¶ 45.

31.     In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id*. ¶ 44.  More specifically, SIB

---

[2] Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

32.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 46.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 24.

33.     Contrary to the Stanford Defendants' representations regarding the liquidity of its portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by Defendant Allen Stanford and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" - *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.).  In fact, at year-end 2008, the largest segments of the Bank's portfolio were: (i) at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford; (ii) private equity; and (iii) over-valued real estate. *Id.* ¶¶ 24, 48.

34.     In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 5.

35.     SIB's financial statements, including its investment income, were fictional. *Id.* ¶ 37.  In calculating SIB's investment income, Defendants Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.*

Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

36.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent scheme collapsed.

***The Stanford Defendants Transferred Proceeds from the Fraudulent Scheme to the Relief Defendants***

37.     SGC is a registered broker dealer and investment advisor headquartered in Houston, Texas. *Id.* ¶ 13. SGC used Pershing LLC as its clearing broker, and in that capacity, Pershing holds in its custody certain customer accounts introduced by SGC. Pershing did not have custody of SIB-issued CDs, nor did it reflect such CDs on any Pershing brokerage account statement. SEI Private Trust Company holds in its custody Stanford Trust Company customer accounts.

38.     The Stanford Defendants used an elaborate and sophisticated incentive program to keep SGC financial advisors highly motivated to sell SIB CDs to brokerage customers. *Id.* ¶¶ 27-28. The program included high commission rates, bonuses, and forgivable loans, all closely tied to maintaining the Stanford Defendants' portfolio of CDs. In 2007, SIB paid SGC and its affiliates more than $291 million in management fees for CD sales, up from $211 million in 2006. *Id.* ¶ 29.

39.     As a result of SGC's aggressive sales tactics, a significant percentage of SGC customers, including the investor Relief Defendants, bought CDs from SIB. *Id.* ¶ 22. Some of them received interest payments or were able to cash out CDs directly or in the form of loans

prior to the date of the Order Appointing Receiver and the TRO.  As the SEC alleges, these customers were paid, not from actual returns on any underlying investments, but from money contributed by new victims of the fraud.  *See id.* ¶ 1.

40.     Based on information available to the Receiver to date, the proceeds from fraudulent SIB CDs received directly or indirectly by the Relief Defendants are set forth in the appendix hereto.

41.     At the time the SEC's lawsuit was commenced, a substantial portion of the above-referenced CD Proceeds received by the Relief Defendants were located in their Pershing, SEI and JP Morgan accounts.  They remain there today.

42.     Proceeds from the fraudulent scheme described above – including the purported interest and principal redemptions received by the investor Relief Defendants – were transferred by the Stanford Defendants to the Relief Defendants solely for the purpose of concealing and perpetuating the fraudulent scheme.  Such proceeds were not legitimate investment returns or returns of principal but were paid from funds supplied by other investors who bought new CDs after the investor Relief Defendants purchased their CDs.  The Relief Defendants did not perform services (or performed only services that were in furtherance of the fraudulent scheme) in exchange for these payments.  Therefore, the Relief Defendants do not have any rightful ownership interest that could justify their retaining possession of these funds, which are properly considered assets of the Receivership Estate.  *See George*, 426 F.3d at 799-800 (Assets held by a third party can be considered property of the receivership estate if (1) the assets are traceable to the fraudulent activity and (2) the non-party has no legitimate claim to ownership of the assets.); *see also Commodity Futures Trading Comm'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002) (recipient of proceeds of fraud had no ownership interest in the funds);

*SEC v. Cavanagh*, 155 F.3d 129, 136-37 (2d Cir. 1998) (recipient of "gift" that constituted proceeds of fraud had no legitimate claim of ownership); *SEC v. Elfindepan, S.A.*, No. 1:00cv00742, 2002 WL 31165146, at *4 (M.D.N.C. Aug, 30, 2002) (money deposited in third party's checking account as proceeds of "Note Transaction" with defendant was recoverable as asset of receivership estate).

43.     The fact that the Relief Defendants are innocent and committed no wrongdoing does not entitle them to retain proceeds received from the fraudulent SIB CDs.  *See Quilling v. 3D Mktg., LLC,* No. 3-06-CV-0296-L, 2007 WL 1058217, at *3-4 (N.D. Tex. Feb. 8, 2007) (investor who invested $100,000 in Ponzi scheme ordered to give up 100% of proceeds received, for a total of $150,000);  *Wing v. Harrison,* No. 2:03 CV 26DAK, 2004 WL 966298, at *5 (D. Utah April 29, 2004) (investors had to pay back 100% of proceeds – including their initial investment).

### *Receiver Entitled to Disgorgement of Assets from the Relief Defendants*

44.     One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.[3]  *See* Amended Order Appointing Receiver at ¶ 5(g), (j) (Doc. 157) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004).  But before the Receiver can attempt to make victims whole, he must locate

---

[3]     This is, of course, very similar to the trustee's role in bankruptcy.  *See, e.g., In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 708 (S.D.N.Y. 1991) ("A trustee in bankruptcy, under the Act and the Code, is under a duty to maximize the realization of estate liquidation. To that end a trustee must marshal the estate's assets and, if necessary to achieve that end, institute all necessary litigation.").

and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. Doc. 157 ¶ 5(b).

45.     Paragraph 4 of the Order Appointing Receiver, entered by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." Order Appointing Receiver, Doc. 10, ¶ 4; Amended Order Appointing Receiver, Doc. 157, ¶ 4. Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." Doc. 10, ¶ 5(c); Doc. 157, ¶ 5(c).

46.     As alleged above, the CD Proceeds received by the Relief Defendants are assets of the Receivership Estate, and it is necessary to name the Relief Defendants as nominal defendants to effect full relief in the marshaling of assets that are the fruit of the underlying fraud. *Colello*, 139 F.3d at 676-77.

47.     Claw-back claims, even against innocent investors, are one of the most important ways the Receiver fulfills his duty to maximize Estate assets for ultimate distribution.[4] By eliminating the sources of inequity, claw-back claims play a vital role in the Receiver's efforts to mitigate the damage caused by the Defendants' fraud.

48.     Case law amply supports the power of a receiver to seek disgorgement of tainted funds from relief defendants who receive proceeds from a Ponzi scheme.[5] When the relief

---

[4]     *See Quilling v. 3D Mktg., LLC,* No. 3-06-CV-0296-L, 2007 WL 1058217, at *3 (N.D. Tex. Feb. 8, 2007) (investor who invested $100,000 in Ponzi scheme ordered to give up 100% of proceeds received, for a total of $150,000); *Wing v. Harrison,* No. 2:03 CV 26DAK, 2004 WL 966298, at *5 (D. Utah April 29, 2004) (investors had to pay back 100% of proceeds – including their initial investment).

[5]     *SEC v. George*, 426 F.3d 786, 798-99 (6th Cir. 2005); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1116 (9th Cir. 2006); *SEC v. Infinity Group Co.*, 212 F.3d 180, 193 (3rd Cir. 2000); *Quilling,*

defendant is an investor, proceeds of the fraud can include both the "profit" and the principal amount of the third party's original investment in the fraudulent scheme. *See George*, 426 F.3d at 799.

49.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession and custody of the SIB CD Proceeds received by the Relief Defendants.

## RELIEF SOUGHT

50.     As alleged above, Pershing and SEI are custodians of proceeds from a massive fraudulent scheme, and Pershing and SEI neither have nor assert any legitimate ownership claim to such funds. Pursuant to the equity powers of this Court, Pershing and SEI should be ordered to transfer to the Receiver all such proceeds of the fraudulent scheme alleged to have occurred in this case.

51.     The Relief Defendants cannot establish any legitimate ownership claim to the proceeds from fraudulent SIB CDs. Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that proceeds received directly or indirectly by the Relief Defendants from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) ordering that each of the Relief Defendants is liable to the Receivership Estate for an amount equaling the amount of proceeds he

---

2007 WL 1058217, at *4; *SEC v. Alanar, Inc.*, No. 1:05-cv-1102, 2008 WL 1994854, at *5-6 (S.D. Ind. May 6, 2008); *SEC v. Cross Fin. Servs., Inc.,* 908 F. Supp. 718, 730 (C.D. Cal. 1995); *Commodity Futures Trading Comm'n v. Bolze*, No. 3:09-CV-88, 2009 WL 1313249, at *2 (M.D. Tenn. April 1, 2009); *SEC v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008); *Commodity Futures Trading Comm'n v. Foreign Fund*, 549 F. Supp. 2d 1005, 1008 (M.D. Tenn. 2008); *Commodity Futures Trading Comm'n v. Foreign Fund*, No. 3:04-0898, 2007 WL 1850007, at *5 (M.D. Tenn. June 25, 2007); *SEC v. Dowdell,* No. Civ. A. 3:01CV00116, 2002 WL 31357059, at *4-5 (W.D. Va. Oct. 11, 2002); *SEC v. Chem. Trust,* No. 00-8015-CIV, 2000 WL 33231600, at *11-12 (S.D. Fla. Dec. 19, 2000); *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 184 (D.D.C. 1998); *SEC v. Infinity Group Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998).

or she received from fraudulent CDs; (c) allowing the Receiver to withdraw the assets contained in Pershing, SEI and JP Morgan accounts in the names of or controlled by the Relief Defendants and add those assets, up to the amounts of fraudulent CD Proceeds received by the investor Relief Defendants, to the assets of the Receivership Estate; and (d) ordering the investor Relief Defendants to pay to the Receiver the difference, if any, between the amounts contained in their Pershing, SEI and JP Morgan accounts and the total amount of fraudulent CD Proceeds received by the Relief Defendants.

## PRAYER

52.     The Receiver respectfully requests the following

(a)     A summary adjudication that payments made directly or indirectly to SGC, SGC financial advisors and investors in connection with the sale of fraudulent SIB CDs are subject to a constructive trust for the benefit of the Receivership Estate;

(b)     A summary adjudication of the amount of ill-gotten proceeds transferred by Defendants to each Relief Defendant (excluding the Custodian Relief Defendants) in connection with the sale of fraudulent SIB CDs;

(c)     An order providing that each of the Relief Defendants (excluding the Custodian Relief Defendants) is liable to the Receivership Estate for an amount equaling the amount of proceeds he or she received from fraudulent CDs;

(d)     An Order allowing the Receiver to withdraw the assets contained in the Pershing, SEI and JP Morgan accounts in the names of or controlled by the Relief Defendants and add those assets, up to the amounts of fraudulent CD

Proceeds received by the Relief Defendants, to the assets of the Receivership
Estate;

(e) An order that the escrow account at JP Morgan holding CD Proceeds pursuant
to stipulations with investors is property of the Receivership Estate available
for distribution to claimants;

(f) An Order requiring the Relief Defendants (excluding the Custodian Relief
Defendants) to pay to the Receiver the difference between the amounts
contained in their Pershing, SEI and JP Morgan accounts and the total
amount of fraudulent CD Proceeds received by the Relief Defendants
(excluding the Custodian Relief Defendants); and

(g) Such other and further relief as the Court deems proper under the
circumstances.

Dated:  July 28, 2009                              Respectfully submitted,

                                                   BAKER BOTTS L.L.P.

                                                   By: /s/ Kevin M. Sadler
                                                       Kevin M. Sadler
                                                       Texas Bar No. 17512450
                                                       kevin.sadler@bakerbotts.com
                                                       Robert I. Howell
                                                       Texas Bar No. 10107300
                                                       robert.howell@bakerbotts.com
                                                       David T. Arlington
                                                       Texas Bar No. 00790238
                                                       david.arlington@bakerbotts.com
                                                       1500 San Jacinto Center
                                                       98 San Jacinto Blvd.
                                                       Austin, Texas 78701-4039
                                                       (512) 322-2500
                                                       (512) 322-2501 (Facsimile)

                                                       Timothy S. Durst
                                                       Texas Bar No. 00786924
                                                       tim.durst@bakerbotts.com
                                                       2001 Ross Avenue
                                                       Dallas, Texas 75201
                                                       (214) 953-6500
                                                       (214) 953-6503 (Facsimile)

                                                   ATTORNEYS FOR RECEIVER RALPH S. JANVEY

## CERTIFICATE OF SERVICE

On July 28, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve the Relief Defendants individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler