**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § | Case No. 03:09-CV-0724-N |
| | § | |
| v. | § | |
| | § | |
| JAMES R. ALGUIRE, ET AL. | § | |
| | § | |
| Relief Defendants. | § | |

_____

**RECEIVER'S FIRST AMENDED COMPLAINT
AGAINST FORMER STANFORD EMPLOYEES**

_____

The Receiver, Ralph S. Janvey, (the "Receiver") hereby files his First Amended Complaint Against Former Stanford Employees (the "First Amended Complaint"), stating as follows:

**SUMMARY**

1.      The ultimate purpose of this Receivership is to make the "maximum disbursement to claimants."  This requires the Receiver to maximize the pool of assets that will be available for distribution.  To accomplish this, the Receiver must take control of all assets of the Estate and traceable to the Estate, "wherever located," including money stolen from investors through fraud.

2.      The Receiver's investigation to date reveals that CD sales generated substantially all of the income for the Stanford Defendants and the many related Stanford entities.  Revenue, let alone any profit, from all other activities and investments was miniscule in comparison.  Money that new investors were deceived into paying to purchase CDs funded the Stanford

network; lavish offices and appointments; extravagant lifestyles for the individual defendants and their families; employees' salaries; Loans, SIBL CD commissions, SIBL Quarterly Bonuses, Performance Appreciation Rights Plan ("PARS") Payments, Branch Managing Director Quarterly Compensation, and Severance Payments (collectively, "CD Proceeds") to the financial advisors, managing directors, and other Stanford employees named herein (collectively, the "Former Stanford Employees"); and purported CD payments in the form of interest and redemptions to unwitting investors.  This fraud endured, in part, by incentivizing a sales force and its support staff with big commissions and other compensation relating to the sale of CDs.

3.     However, money stolen from CD purchasers through trickery and deceit retains its character as ill-gotten regardless of where, when, how, and why the Stanford Defendants spent it. When Stanford paid CD Proceeds to the Former Stanford Employees, he did no more than take money out of investors' pockets and put it into the hands of the Former Stanford Employees.  For the more than 20,000 investors who have thus far received little or nothing from their investment in Stanford CDs, money recovered from wherever it resides today is likely the only money they will ever receive in restitution.  CD Proceeds — comprising Loans, SIBL CD Commissions, SIBL Quarterly Bonuses, PARS Payments, Branch Managing Director Quarterly Compensation, and Severance Payments paid to the Former Stanford Employees — are little more than stolen money and do not belong to the Former Stanford Employees who received such funds but belong, instead, to the Receivership Estate.

4.     At this stage of the Receivership, the Receiver has identified substantial sums of CD Proceeds paid to the Former Stanford Employees and, through this First Amended Complaint, seeks the return of those funds to the Receivership Estate in order to make an equitable distribution to claimants.

5.      The CD Proceeds paid by Stanford Defendants to the Former Stanford Employees were not in payment for legitimate services rendered by the Former Stanford Employees.  The Stanford Defendants kept their fraudulent scheme going by employing the Former Stanford Employees to lure new investors and then divert the investors' funds for the Stanford Defendants' own illicit purposes.  The CD Proceeds paid to the Former Stanford Employees came not from revenue generated by legitimate business activities, but from monies contributed by defrauded investors.  The Former Stanford Employees received assets traceable to the Stanford Defendants' fraudulent scheme.  They have no legitimate ownership interest in these assets; they necessarily hold the assets in trust for the Receivership Estate for the benefit of defrauded investors.

6.      At a minimum, the fraudulent CD Proceeds received by the Former Stanford Employees total over $217 million.  A substantial portion of the fraudulent proceeds were received into accounts in the name of or controlled by the Former Stanford Employees in the custody of Pershing LLC ("Pershing").[1]  The Former Stanford Employees named herein include: (1) Former Stanford Employees who have frozen accounts at Pershing, JP Morgan, and SEI; and (2) Former Stanford Employees who do not presently have any frozen accounts.

7.      The Receiver seeks an order that: (a) CD Proceeds received directly or indirectly by the Former Stanford Employees from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) each of the Former Stanford Employees is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received from fraudulent CDs; (c) the Receiver may withdraw the assets contained in Pershing, JP Morgan, and SEI accounts in the names of or controlled by

---

[1]      In some instances, the CD Proceeds were received into accounts in the name of or controlled by the Former Stanford Employees in the custody of JP Morgan or SEI Private Trust Company ("SEI").

the Former Stanford Employees and add those assets, up to the amounts of fraudulent CD

Proceeds received by the Former Stanford Employees, to the assets of the Receivership Estate;

and (d) the Former Stanford Employees must pay to the Receiver the difference, if any, between

the amounts contained in their Pershing, JP Morgan, and SEI accounts, if any, and the total

amount of fraudulent CD Proceeds received.

## PARTIES

8.      The parties to this complaint are the Receiver and the Former Stanford Employees

named below and in the Appendix filed concurrently herewith.

9.      Each of the named Former Stanford Employees will be served pursuant to the

Federal Rules of Civil Procedure, through their attorney of record, or by other means approved

by this Court's order.

## PROCEDURAL HISTORY

10.     On April 21, 2009, the Receiver filed a Complaint Naming Stanford Financial

Group Advisors as Relief Defendants (Doc. 2).   On July 28, 2009, the Receiver filed an

Amended Complaint Naming Relief Defendants (Doc. 14) and an Appendix in support thereof

(Doc. 15).  On August 26, 2009, the Receiver filed a Supplemental Complaint against Stanford

Financial Group Advisors (Doc. 52) and an Appendix in support thereof (Doc. 53).   On

September 29, 2009, the Receiver filed a Second Supplemental Complaint against Stanford

Managing Directors and Additional Stanford Financial Group Advisors (Doc. 95) and an

Appendix in support thereof (Doc. 96).  The Receiver now respectfully files this First Amended

Complaint, as well as an Appendix in support, in regard to the Former Stanford Employees

named below and in the Appendix filed concurrently herewith.

## JURISDICTION & VENUE

11.     This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

12.     Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

13.     Further, within 10 days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in 29 United States district courts pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed.

14.     Further, each of the Former Stanford Employees who submitted an Application for Review and Potential Release of Stanford Group Company ("SGC") Brokerage Accounts made the following declaration: "By filing this application, I submit to the exclusive jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division and irrevocably waive any right I or any entity I control may otherwise have to object to any action being brought in the Court or to claim that the Court does not have jurisdiction over the matters relating to my account."

15.     Further, a number of the Former Stanford Employees have filed motions to intervene in *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-cv-298-N.  By filing motions to intervene, they have consented as a matter of law to the Court's personal jurisdiction. *See In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006); *County Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002); *Pharm. Research &*

*Mfrs. v. Thompson*, 259 F. Supp. 2d 39, 59 (D.D.C. 2003); *City of Santa Clara v. Kleppe*, 428 F. Supp. 315, 317 (N.D. Ca. 1976).

## STATEMENT OF FACTS

16.    On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), SGC, and Stanford Capital Management, LLC (collectively, the "Stanford Defendants").   On the same date, the Court entered an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

## I.    *Stanford Defendants Operated a Fraudulent Ponzi Scheme*

17.    As alleged by the SEC, the Stanford Defendants marketed fraudulent SIBL CDs to investors exclusively through SGC financial advisors pursuant to a Regulation D private placement.   SEC's First Amended Complaint (Doc. 48), ¶ 23.[2]   The CDs were sold by Stanford International Bank, Ltd.   *Id.*

18.    Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.   Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").

---

[2]      Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

19.     In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIBL's consistent, double-digit returns on its investment portfolio.  *Id.* ¶ 31.

20.     In its brochure, SIBL told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."   SIBL also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id.* ¶ 32.  Further, SIBL stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id.* ¶ 45.

21.     In its 2006 and 2007 Annual Reports, SIBL told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  *Id.* ¶ 44.  More specifically, SIBL represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.  *Id.*

22.     Consistent with its Annual Reports and brochures, SIBL trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."  *Id.* ¶ 46.  In training materials, the Stanford Defendants also claimed that SIBL had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993).  *Id.* ¶ 24.

23.     Contrary to the Stanford Defendants' representations regarding the liquidity of its portfolio, SIBL did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by Defendant Allen Stanford and were either placed in speculative investments (many of them illiquid, such as

private equity deals), diverted to other Stanford Entities "on behalf of shareholder" - *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.).  In fact, at year-end 2008, the largest segments of the Bank's portfolio were: (i) at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford; (ii) private equity; and (iii) over-valued real estate.  *Id.* ¶¶ 24, 48.

24.     In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIBL's investment portfolio.  *Id.* ¶ 5.

25.     SIBL's financial statements, including its investment income, were fictional.  *Id.* ¶ 37.  In calculating SIBL's investment income, Defendants Stanford and James Davis provided to SIBL's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.*   Using this pre-determined number, SIBL's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIBL did not actually earn.  *Id.*

26.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIBL CDs to make purported interest and redemption payments on pre-existing CDs.  *See id.* ¶ 1.  However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

## II.     *The Stanford Defendants Transferred CD Proceeds from the Fraudulent Ponzi Scheme to the Former Stanford Employees*

27.     The Stanford Defendants used an elaborate and sophisticated incentive program to keep the Former Stanford Employees highly motivated to sell SIBL CDs to brokerage customers. *Id.* ¶¶ 27-28.  The program included Loans, high SIBL CD Commission rates, SIBL Quarterly

Bonuses, PARS Payments, Branch Managing Director Quarterly Compensation, and Severance Payments all closely tied to maintaining the Stanford Defendants' portfolio of CDs.  In 2007, SIB paid SGC and its affiliates more than $291 million in management fees for CD sales, up from $211 million in 2006.  *Id*. ¶ 29.  As a result of SGC's aggressive sales tactics, a significant percentage of SGC customers bought CDs from SIBL.  *Id*. ¶ 22.

28.     In addition to the other categories of CD Proceeds, Former Stanford Employees who were managing directors received Branch Managing Director Quarterly Compensation payments for their respective branches' sales of SIBL CDs.  These Branch Managing Director Quarterly Compensation payments were based upon each branch's gross CD revenue and upon any profits from the sales of CDs.

29.     CD Proceeds from the fraudulent Ponzi scheme described above were transferred by the Stanford Defendants to the Former Stanford Employees solely for the purpose of concealing and perpetuating the fraudulent scheme.  Such CD Proceeds were paid to the Former Stanford Employees from funds supplied by investors who bought the fraudulent CDs.  The Former Stanford Employees did not perform services (or performed only services that were in furtherance of the Ponzi scheme) in exchange for the CD Proceeds.  Therefore, the Former Stanford Employees do not have any rightful ownership interest that could justify their retaining possession of the CD Proceeds, which are properly considered assets of the Receivership Estate. *See SEC v. George*, 426 F.3d 786, 799-800 (6th Cir. 2005) (Assets held by a third party can be considered property of the receivership estate if (1) the assets are traceable to the fraudulent activity and (2) the non-party has no legitimate claim to ownership of the assets.); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002) (recipient of proceeds of fraud had no ownership interest in the funds); *see also Warfield v. Byron*, 436 F.3d 551, 558-60

(5th Cir. 2006) (transfers made from Ponzi scheme are made with intent to defraud; broker who worked for Ponzi scheme did not provide reasonably equivalent value in return for fraudulent transfers); *In re Randy*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995) (as illegal services premised on illegal contracts, broker services provided in furtherance of a Ponzi scheme do not provide reasonably equivalent value).

## REQUESTED RELIEF

30.     This Court appointed Ralph S. Janvey as Receiver for the "assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities), of the Defendants and all entities they own or control," including those of the Stanford Group Company brokerage firm.   Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2.  The Receiver seeks the relief described below in this capacity.

31.     Paragraph 4 of the Order Appointing Receiver, entered by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4.  Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c).

32.     One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  *See* Amended Order Appointing Receiver (Doc. 157) at ¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004).  But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. Doc. 157 ¶ 5(b).

## I.     The Receiver is Entitled to Disgorgement of Assets from the Former Stanford Employees as Relief Defendants

33.     As alleged above, the CD Proceeds received by the Former Stanford Employees are assets of the Receivership Estate, and the Former Stanford Employees are named as relief defendants to effect full relief in the marshaling of assets that are the fruit of the underlying fraud.  *See SEC v. Colello*, 139 F.3d 674, 676-77 (9th Cir. 1998).  For purposes of this relief-defendant claim, it is not necessary that the Receiver plead or prove any wrongdoing.

34.     Case law amply supports the power of a receiver to seek disgorgement of tainted funds from relief defendants who receive proceeds from a Ponzi scheme.[3]  The Former Stanford

---

[3]     *SEC v. George*, 426 F.3d 786, 798-99 (6th Cir. 2005); *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1116 (9th Cir. 2006); *SEC v. Infinity Group Co.*, 212 F.3d 180, 193 (3d Cir. 2000); *Quilling v. 3D Marketing, LLC*, No. 3-06-CV-0293-L, 2007 WL 1058217, at *4 (N.D. Tex. Feb. 8, 2007); *SEC v. Alanar, Inc.*, No. 1:05-cv-1102, 2008 WL 1994854, at *5-6 (S.D. Ind. May 6, 2008); *SEC v. Cross Fin. Servs., Inc.*, 908 F. Supp. 718, 730 (C.D. Cal. 1995); *Commodity Futures Trading Comm'n v. Bolze*, No. 3:09-CV-88, 2009 WL 1313249, at *2 (M.D. Tenn. April 1, 2009); *SEC v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008); *Commodity Futures Trading Comm'n v. Foreign Fund*, 549 F. Supp. 2d 1005, 1008 (M.D. Tenn. 2008); *Commodity Futures Trading Comm'n v. Foreign Fund*, No. 3:04-0898, 2007 WL 1850007, at *5 (M.D. Tenn. June

Employees who received CD Proceeds in the form of Loans, SIBL CD Commissions, SIBL Quarterly Bonuses, PARS Payments, Branch Managing Director Quarterly Compensation, and Severance Payments lack legitimate claims to such CD Proceeds because either they provided no services for the compensation paid to them or because their "services" were rendered in furtherance of the fraud.  *See SEC v. Infinity Group Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998); *see also SEC v. AmeriFirst Funding, Inc.*, Civil Action No. 3:07-CV-1188-D, 2008 WL 1959843, at *5 (N.D. Tex. May 5, 2008) (relief defendant had no legitimate claim to proceeds of securities fraud despite having provided consulting services to defendant).  In *Infinity Group*, a relief defendant claimed to have rendered administrative and clerical services to one of the defendants.  993 F. Supp. at 331.  According to the relief defendant, these services constituted consideration for any proceeds she received.  *Id.*  But the court disagreed:

> [T]o the extent that [the relief defendant] earned any of the funds which were transferred into these trusts, **she did so in the service of the very unlawful offering and sale of securities which is the subject of these proceedings.**  It would be contrary to the securities law to allow [the relief defendant] to launder the proceeds of a securities fraud by billing bilked investors for services rendered in furtherance of that fraud.  **Illegal consideration is invalid consideration and thus cannot shield ill-gotten gains from disgorgement.**

*Id.* (emphasis added).  Although the Former Stanford Employees may have performed "services," the "services" were in furtherance of the Ponzi fraud.  As a result, any claim the Former Stanford Employees have to the ill-gotten CD Proceeds is illegitimate.

---

25, 2007); *SEC v. Dowdell,* No. Civ. A. 3:01-CV-00116, 2002 WL 31357059, at *4-5 (W.D. Va. Oct. 11, 2002); *SEC v. Chem. Trust*, No. 00-8015-CIV, 2000 WL 33231600, at *11-12 (S.D. Fla. Dec. 19, 2000); *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 184 (D.D.C. 1998); *SEC v. Infinity Group Co.*, 993 F. Supp. 324, 331 (E.D. Pa. 1998), *aff'd*, 212 F.3d 180 (3d Cir. 2000).

35.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the Former Stanford Employees.

36.     The Former Stanford Employees cannot establish any legitimate ownership claim to the CD Proceeds.  Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that the CD Proceeds received directly or indirectly by the Former Stanford Employees from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) ordering that each of the Former Stanford Employees is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received; (c) allowing the Receiver to withdraw the assets contained in Pershing, JP Morgan, and SEI accounts in the names of or controlled by the Former Stanford Employees and add those assets, up to the amounts of CD Proceeds received by the Former Stanford Employees, to the assets of the Receivership Estate; and (d) ordering the Former Stanford Employees to pay to the Receiver the difference, if any, between the amounts contained in their Pershing, JP Morgan, and SEI accounts and the total amount of CD Proceeds received by the Former Stanford Employees.

## II.     *In the Alternative, the Receiver is Entitled to Disgorgement of Assets Fraudulently Transferred to the Former Stanford Employees*

37.     In the alternative, the Receiver is entitled to disgorgement of the CD Proceeds paid to the Former Stanford Employees because such payments constitute fraudulent transfers under applicable law.  The Stanford Defendants transferred the CD Proceeds to the Former Stanford Employees with actual intent to hinder, delay, or defraud their creditors; as a result, the Receiver is entitled to the disgorgement of those CD Proceeds from the Former Stanford Employees.

38.     The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors.  "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).  The uncontroverted facts establish that the Stanford Defendants were running a Ponzi scheme and, to keep the scheme going, paid the Former Stanford Employees with CD Proceeds taken from unwitting CD investors.  The Receiver is, therefore, entitled to disgorgement of the fraudulently transferred CD Proceeds that the Former Stanford Employees received.

39.     Consequently, the burden is on the Former Stanford Employees to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.  *See, e.g., Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").  The Fifth Circuit has held that providing brokerage services in furtherance of a Ponzi scheme does not confer reasonably equivalent value and that a receiver can recover from brokers the commissions they received for recruiting other investors into the scheme.  *Warfield*, 436 F.3d at 555, 560.  The *Warfield* court eloquently observed that "[i]t takes cheek to contend that in exchange for payments he received, the . . . Ponzi scheme benefited from [the broker's] efforts to extend the fraud by securing new investments."  *Id.* at 560 (citing *Randy*, 189 B.R. at 438-39, for the proposition that "as illegal services premised on illegal contracts, broker services provided in furtherance of a Ponzi scheme do not provide reasonably equivalent value").  The Former Stanford Employees cannot now claim that, in return for furthering the Ponzi scheme and helping it endure, they should be entitled to keep the Loans, SIBL CD Commissions, SIBL

Quarterly Bonuses, PARS Payments, Branch Managing Director Quarterly Compensation, and Severance Payments taken from the defrauded victims who invested in SIBL CDs.  Because the Former Stanford Employees cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds, the Receiver is entitled to the disgorgement of those funds.

40.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the Former Stanford Employees.

41.     The Stanford Defendants, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the Former Stanford Employees with actual intent to hinder, delay, or defraud their creditors.  Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that the CD Proceeds received directly or indirectly by the Former Stanford Employees from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) ordering that each of the Former Stanford Employees is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received; (c) allowing the Receiver to withdraw the assets contained in Pershing, JP Morgan, and SEI accounts in the names of or controlled by the Former Stanford Employees and add those assets, up to the amounts of CD Proceeds received by the Former Stanford Employees, to the assets of the Receivership Estate; and (d) ordering the Former Stanford Employees to pay to the Receiver the difference, if any, between the amounts contained in their Pershing, JP Morgan, and SEI accounts and the total amount of CD Proceeds received by the Former Stanford Employees.

### III.     In the Alternative, the Receiver is Entitled to Disgorgement of Assets from the Former Stanford Employees under the Doctrine of Unjust Enrichment

42.     In the alternative, the Receiver is entitled to disgorgement of the CD Proceeds paid to the Former Stanford Employees pursuant to the doctrine of unjust enrichment under applicable law.

43.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the Former Stanford Employees.

44.     The Former Stanford Employees have been unjustly enriched by their receipt of the CD Proceeds.  Pursuant to the equity powers of this Court, the Receiver therefore seeks an order (a) establishing that the CD Proceeds received directly or indirectly by the Former Stanford Employees from fraudulent CDs are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (b) ordering that each of the Former Stanford Employees is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received; (c) allowing the Receiver to withdraw the assets contained in Pershing, JP Morgan, and SEI accounts in the names of or controlled by the Former Stanford Employees and add those assets, up to the amounts of CD Proceeds received by the Former Stanford Employees, to the assets of the Receivership Estate; and (d) ordering the Former Stanford Employees to pay to the Receiver the difference, if any, between the amounts contained in their Pershing, JP Morgan, and SEI accounts and the total amount of CD Proceeds received by the Former Stanford Employees.

### THE FORMER STANFORD EMPLOYEES' CD PROCEEDS

45.     The Former Stanford Employees named below and in the Appendix were employed as  financial advisors, as managing directors, or in other positions with the Stanford

Defendants.[4]   These Former Stanford Employees received CD Proceeds ranging in amounts from $50,000 to over $4.5 million.   *See* App. 1-10.   Each of these Former Stanford Employees received, at a minimum, the CD Proceeds amounts associated with his or her name in the Appendix.   *See id.*   Collectively, the Former Stanford Employees received more than $217 million in such payments, at least.   *Id.* at 10.

46.   The Former Stanford Employees who received each category of CD Proceeds — namely Loans, SIBL CD Commissions, SIBL Quarterly Bonuses, PARS Payments, Branch Managing Director Quarterly Compensation, and Severance Payments — are named below.

47.   The Receiver is entitled to disgorgement of all of these CD Proceeds from the Former Stanford Employees as relief defendants, since they cannot establish a legitimate claim to such ill-gotten funds.   For purposes of this relief defendant claim, it is not necessary that the Receiver plead or prove any wrongdoing.

48.   In the alternative, the Receiver is entitled to disgorgement of all of these CD Proceeds fraudulently transferred to the Former Stanford Employees, since the Stanford Defendants transferred the CD Proceeds to them with actual intent to hinder, delay, or defraud the Stanford Defendants' creditors.

49.   In the alternative, the Receiver is entitled to disgorgement of all of these CD Proceeds from the Former Stanford Employees because they have been unjustly enriched by such funds.

## I.   *Former Stanford Employees Who Received Loans*

50.   The following Former Stanford Employees received CD Proceeds in the form of Loans: Paul Adkins; James R. Alguire; John Michael Arthur; Donald Bahrenburg; Brown Baine;

---

[4]      In his First Supplemental Complaint, the Receiver brought relief-defendant and, alternatively, fraudulent-transfer claims against Elsida Prieto.   But because Elsida Prieto has since filed for bankruptcy, the Receiver is not amending his claims as to her at this time.

Timothy Bambauer; Stephen R. Barber; Jonathan Barrack; Teral Bennett; Andrea Berger; Norman Blake; Stephen G. Blumenreich; Michael Bober; Nigel Bowman; Brad Bradham; Charles Brickey; Alan Brookshire; Nancy Brownlee; Richard Bucher; George Cairnes; Robert Bryan Cannon; Frank Carpin; James C. Chandley; Naveen Chaudhary; Susana Cisneros; Ron Clayton; Neal Clement; Christopher Collier; Jay Comeaux; Michael Conrad; James Cox; John Cravens; Ken Crimmins; Shawn M. Cross; Patrick Cruickshank; Greg R Day; William S. Decker; Michael DeGolier; Ray Deragon; Arturo R. Diaz; Matthew Drews; Sean Duffy; Christopher Shannon Elliotte; Jason Fair; Nolan Farhy; Evan Farrell; Bianca Fernandez; John Fry; Roger Fuller; Attlee Gaal; David Braxton Gay; Mark Gensch; Gregory C. Gibson; Michael D. Gifford; Steven Glasgow; John Glennon; Susan Glynn; Larry Goldsmith; Russell Warden Good; John Grear; Stephen Greenhaw; Billy Ray Gross; Donna Guerrero; John Gutfranski; Rodney Hadfield; David Haggard; Gary Haindel; Charles Hazlett; Robert Hogue; John Holliday; Charles Hughes; Wiley Hutchins, Jr.; David Innes; Allen Johnson; David Wayne Krumrey; Bruce Lang; Grady Layfield; James LeBaron; William Leighton; Robert Lenoir; Gary Lieberman; Jason Likens; Trevor Ling; Robert Long, Jr.; Christopher Long; Humberto Lopez; David Lundquist; Michael MacDonald; Anthony Makransky; Michael Mansur; Bert Deems May, Jr.; Carol McCann; Douglas McDaniel; Matthew McDaniel; Lawrence Messina; Nolan N. Metzger; William J. Metzinger; Donald Miller; Trenton Miller; Brent B. Milner; Peter Montalbano; David Morgan; Shawn Morgan; Jonathan Mote; Carroll Mullis; Spencer Murchison; Jon Nee; Aaron Nelson; Scott Notowich; Monica Novitsky; Kale Olson; John D. Orcutt; Zack Parrish; Tim Parsons; William Peerman; Lou Perry; Brandon R. Phillips; Randall Pickett; Christopher Prindle; A. Steven Pritsios; Michael Ralby; David Rappaport; Charles Rawl; Steven Restifo; Walter Ricardo; Jeffrey Ricks; Alan Riffle; Randolph E. Robertson; Steve

Robinson; Timothy D. Rogers; Eddie Rollins; John Santi; Christopher K. Schaefer; Harvey Schwartz; William Scott; Haygood Seawell; Leonard Seawell; Doug Shaw; Nick Sherrod; Jordan Sibler; Brent Simmons; Edward Simmons; Steve Slewitzke; Sanford Steinberg; Heath Stephens; William O. Stone Jr.; David M. Stubbs; Mark V. Stys; Paula S. Sutton; William Brent Sutton; Scot Thigpen; Christopher Thomas; Mark Tidwell; Jose Torres; Al Trullenque; Audrey Truman; Eric Urena; Miguel Valdez; Tim Vanderver; Ettore Ventrice; Chris Villemarette; Charles Vollmer; Charles Weiser; James Weller; Bill Whitaker; Donald Whitley; Charles Widener; John Whitfield Wilks; Thomas Woolsey; Michael Word; Ryan Wrobleske; and Bernerd E. Young.  Each of these Former Stanford Employees received, at a minimum, the Loan amount associated with his or her name in the Appendix.

## II.    *Former Stanford Employees Who Received SIBL CD Commissions*

51.    The following Former Stanford Employees received CD Proceeds in the form of SIBL CD Commissions: Paul Adkins; Jeannette Aguilar; James R. Alguire; Peggy Allen; Orlando Amaya; Victoria Anctil; Tiffany Angelle; Susana Anguiano; Sylvia Aquino; George Arnold; John Michael Arthur; Donald Bahrenburg; Brown Baine; Timothy Bambauer; Elias Barbar; Jonathan Barrack; Robert Barrett; Marie Bautista; Teral Bennett; Andrea Berger; Norman Blake; Michael Bober; Nigel Bowman; Brad Bradham; Alexandre Braune; Charles Brickey; Nancy Brownlee; Fausto Callava; Scott Chaisson; Susana Cisneros; Ron Clayton; Neal Clement; Christopher Collier; Jay Comeaux; Michael Conrad; Don Cooper; Jose Cordero; James Cox; John Cravens; Ken Crimmins; Patrick Cruickshank; Michael DeGolier; Ray Deragon; Arturo R. Diaz; Matthew Drews; Abraham Dubrovsky; Thomas Espy; Jason Fair; Nolan Farhy; Evan Farrell; Rosalia Fontanals; James Fontenot; John Fry; Roger Fuller; Attlee Gaal; Miguel A. Garces; Gregg Gelber; John Glennon; Larry Goldsmith; Joaquin Gonzalez; Russell Warden Good; Jason Green; Mark Groesbeck; Vivian Guarch; David Haggard; Gary Haindel; Jon Hanna;

Dirk Harris; Virgil Harris; Daniel Hernandez; Patrica Herr; Steven Hoffman; Robert Hogue; John Holliday; Charles Hughes; Charles Jantzi; Allen Johnson; Joseph L. Klingen; Bruce Lang; Grady Layfield; James LeBaron; Jason LeBlanc; William Leighton; Robert Lenoir; Trevor Ling; Christopher Long; Humberto Lopez; Michael MacDonald; Anthony Makransky; Manuel Malvaez; Maria Manerba; Michael Mansur; Janie Martinez; Claudia Martinez; Aymeric Martinoia; Douglas McDaniel; Matthew McDaniel; Pam McGowan; Gerardo Meave-Flores; Lawrence Messina; Donald Miller; Trenton Miller; Hank Mills; Peter Montalbano; Rolando H. Mora; David Morgan; Shawn Morgan; Spencer Murchison; David Nanes; Jon Nee; Aaron Nelson; Russell C. Newton, Jr.; Norbert Nieuw; Lupe Northam; Scott Notowich; Monica Novitsky; Tim Parsons; William Peerman; Roberto Pena; Roberto A. Pena; Dulce Perezmora; Saraminta Perez; Tony Perez; Lou Perry; Randall Pickett; Edward Prieto; Christopher Prindle; A. Steven Pritsios; Judith Quinones; Sumeet Rai; Michael Ralby; Leonor Ramirez; Nelson Ramirez; Charles Rawl; Steven Restifo; Walter Ricardo; Jeffrey Ricks; Alan Riffle; Steve Robinson; Eddie Rollins; Rocky Roys; John Santi; Louis Schaufele; John Schwab; Harvey Schwartz; William Scott; Haygood Seawell; Leonard Seawell; Doug Shaw; Brent Simmons; Steve Slewitzke; Paul Stanley; Sanford Steinberg; Heath Stephens; William O. Stone Jr.; Christopher Thomas; Mark Tidwell; Jose Torres; Al Trullenque; Audrey Truman; Roberto Ulloa; Eric Urena; Miguel Valdez; Tim Vanderver; Jaime Vargas; Pete Vargas; Ettore Ventrice; Maria Villanueva; Charles Vollmer; Bill Whitaker; David Whittemore; Charles Widener; Thomas Woolsey; Michael Word; and Ryan Wrobleske.  Each of these Former Stanford Employees received, at a minimum, the SIBL CD Commissions associated with his or her name in the Appendix.

### III.    *Former Stanford Employees Who Received SIBL Quarterly Bonuses*

52.    The following Former Stanford Employees received CD Proceeds in the form of SIBL Quarterly Bonuses: Jeannette Aguilar; James R. Alguire; Peggy Allen; Orlando Amaya; Susana Anguiano; Sylvia Aquino; Juan Araujo; Monica Ardesi; George Arnold; John Michael Arthur; Mauricio Aviles; Timothy Bambauer; Isaac Bar; Elias Barbar; Jonathan Barrack; Robert Barrett; Oswaldo Bencomo; Teral Bennett; Andrea Berger; Norman Blake; Michael Bober; Nigel Bowman; Fabio Bramanti; Fernando Braojos; Charles Brickey; Fausto Callava; Rafael Carriles; Jane Chernovetzky; Susana Cisneros; Ron Clayton; Neal Clement; Christopher Collier; Jay Comeaux; Michael Conrad; Don Cooper; Jose Cordero; Oscar Correa; James Cox; John Cravens; James Cross; Patrick Cruickshank; Andres Delgado; Pedro Delgado; Ray Deragon; Arturo R. Diaz; Ana Dongilio; Matthew Drews; Abraham Dubrovsky; Torben Garde Due; Neil Emery; Thomas Espy; Jason Fair; Marina Feldman; Ignacio Felice; Freddy Fiorillo; Rosalia Fontanals; James Fontenot; John Fry; Roger Fuller; Attlee Gaal; Gregg Gelber; Eric Gildhorn; Luis Giusti; Ramiro Gomez-Rincon; Joaquin Gonzalez; Juan Carlos Gonzalez; Jason Green; Mark Groesbeck; Vivian Guarch; David Haggard; Gary Haindel; Virgil Harris; Luis Hermosa; Daniel Hernandez; Martine Hernandez; Alfredo Herraez; Marcos Iturriza; Charles Jantzi; Allen Johnson; Faran Kassam; Grady Layfield; James LeBaron; Jason LeBlanc; William Leighton; Robert Lenoir; Humberto Lepage; Francois Lessard; Trevor Ling; Humberto Lopez; Luis Felipe Lozano; Maria Manerba; Michael Mansur; Iris Marcovich; Janie Martinez; Claudia Martinez; Douglas McDaniel; Matthew McDaniel; Gerardo Meave-Flores; Lawrence Messina; Donald Miller; Trenton Miller; Hank Mills; Peter Montalbano; Alberto Montero; David Morgan; Spencer Murchison; David Nanes; Jon Nee; Lupe Northam; Scott Notowich; Monica Novitsky; Walter Orejuela; Alfonso Ortega; Tim Parsons; Beatriz Pena; Ernesto Pena; Roberto Pena; Roberto A. Pena; Saraminta Perez; Lou Perry; Randall Pickett; Eduardo Picon; Arturo Prum;

Maria Putz; Sumeet Rai; Michael Ralby; Leonor Ramirez; Nelson Ramirez; Walter Ricardo; Alan Riffle; Steve Robinson; Eddie Rollins; Julio Ruelas; Tatiana Saldivia; John Santi; Louis Schaufele; John Schwab; Morris Serrero; Doug Shaw; Rochelle Sidney; Peter Siragna; Steve Slewitzke; Nancy Soto; Sanford Steinberg; Heath Stephens; William O. Stone Jr.; Ana Tanur; Juan Carlos Terrazas; Christopher Thomas; Mark Tidwell; Yliana Torrealba; Jose Torres; Al Trullenque; Audrey Truman; Roberto Ulloa; Eric Urena; Miguel Valdez; Nicolas Valera; Tim Vanderver; Pete Vargas; Ettore Ventrice; Mario Vieira; Evely Villalon; Maria Villanueva; Frans Vingerhoedt; Daniel Vitrian; Charles Vollmer; Bill Whitaker; David Whittemore; Charles Widener; Michael Word; Ryan Wrobleske; Ihab Yassine; and Leon Zaidner.  Each of these Former Stanford Employees received, at a minimum, the SIBL Quarterly Bonuses associated with his or her name in the Appendix.

### IV.   *Former Stanford Employees Who Received PARS Payments*

53.   The following Former Stanford Employees received CD Proceeds in the form of PARS Payments: Virgil Harris; Zack Parrish; Louis Schaufele; and Mark V. Stys.  Each of these Former Stanford Employees received, at a minimum, the PARS Payments associated with his or her name in the Appendix.

### V.   *Former Stanford Employees Who Received Branch Managing Director Quarterly Compensation*

54.   The following Former Stanford Employees received CD Proceeds in the form of Branch Managing Director Quarterly Compensation: Lori Bensing; Brad Bradham; Scott Chaisson; Jay Comeaux; John Glennon; Jason Green; Marty Karvelis; Grady Layfield; Carol McCann; Scott Notowich; and Al Trullenque.  Each of these Former Stanford Employees received, at a minimum, the Branch Managing Director Quarterly Compensation associated with his or her name in the Appendix.

VI.    *Former Stanford Employees Who Received Severance Payments*

55.    The following Former Stanford Employees received CD Proceeds in the form of Severance Payments: Jeffrey E. Adams; James F. Anthony; Patricio Atkinson; Jane E. Bates; Timothy W. Baughman; Marc H. Bettinger; Michael Contorno; Bernard Cools-Lartigue; Carter W. Driscoll; Jordan Estra; Lori J. Fischer; Juliana Franco; Gustavo A. Garcia; Kelley L. Hawkins; Roberto T. Helguera; Helena M. Herrero; Nancy J. Huggins; Susan K. Jurica; Marty Karvelis; Joseph L. Klingen; Robert A. Kramer; Mayra C. Leon De Carrero; James C. Li; Megan R. Malanga; Francesca McCann; Gail Nelson; Russell C. Newton, Jr.; Zack Parrish; James D. Perry; Nelson Ramirez; Syed H. Razvi; Kathleen M. Reed; Giampiero Riccio; Juan C. Riera; Peter R. Ross; Thomas G. Rudkin; Nicholas P. Salas; Jon C. Shipman; Mark V. Stys; and Timothy W. Summers.  Each of these Former Stanford Employees received, at a minimum, the Severance Payments associated with his or her name in the Appendix.

## PRAYER

56.    The Receiver respectfully requests the following:

(a)    A summary adjudication that CD Proceeds received directly or indirectly by the Former Stanford Employees from fraudulent CDs are subject to a constructive trust for the benefit of the Receivership Estate;

(b)    A summary adjudication of the amount of CD Proceeds each of the Former Stanford Employees received in connection with the sale of fraudulent CDs;

(c)    An Order providing that each of the Former Stanford Employees is liable to the Receivership Estate for an amount equaling the amount of CD Proceeds he or she received from fraudulent CDs;

(d)    An Order allowing the Receiver to withdraw the assets contained in the Pershing, JP Morgan, and SEI accounts in the names of or controlled by the

Former Stanford Employees and add those assets, up to the amounts of CD Proceeds received by the Former Stanford Employees, to the assets of the Receivership Estate;

(e) An Order requiring the Former Stanford Employees to pay to the Receiver the difference between the amounts contained in their Pershing, JP Morgan, and SEI accounts and the total amount of fraudulent CD Proceeds received by the Former Stanford Employees; and

(f) Such other and further relief as the Court deems proper under the circumstances.

Dated: November 13, 2009

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler

    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Robert I. Howell
    Texas Bar No. 10107300
    robert.howell@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    1500 San Jacinto Center
    98 San Jacinto Blvd.
    Austin, Texas 78701-4039
    (512) 322-2500
    (512) 322-2501 (Facsimile)

    Timothy S. Durst
    Texas Bar No. 00786924
    tim.durst@bakerbotts.com
    2001 Ross Avenue
    Dallas, Texas 75201
    (214) 953-6500
    (214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

**CERTIFICATE OF SERVICE**

On November 13, 2009, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve the Former Stanford Employees individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler