IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| | § | Case No. 03:09-CV-0724-N |
| Plaintiff, | § § | |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § | |

---

**APPENDIX TO RECEIVER'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND IN THE ALTERNATIVE, WRIT OF ATTACHMENT, CONCERNING ACCOUNTS OF FORMER STANFORD EMPLOYEES**

---

Dated:  April 19, 2010                    Respectfully submitted,

                                          BAKER BOTTS L.L.P.


                                          By: /s/ Kevin M. Sadler
                                              Kevin M. Sadler
                                              Texas Bar No. 17512450
                                              kevin.sadler@bakerbotts.com
                                              One Shell Plaza
                                              910 Louisiana
                                              Houston, Texas  77002
                                              (713) 229-1234
                                              (713) 229-1522 (Facsimile)

                                              1500 San Jacinto Center
                                              98 San Jacinto Blvd.
                                              Austin, Texas 78701-4039
                                              (512) 322-2500
                                              (512) 322-2501 (Facsimile)

                                              Timothy S. Durst
                                              Texas Bar No. 00786924
                                              tim.durst@bakerbotts.com
                                              2001 Ross Avenue
                                              Dallas, Texas 75201
                                              (214) 953-6500
                                              (214) 953-6503 (Facsimile)


                   **ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

**Certificate of Service**

On April 19, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served the Court-appointed Examiner, all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


/s/ Kevin M. Sadler_____
Kevin M. Sadler

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| | § | Case No. 03:09-CV-0724-N |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES R. ALGUIRE, ET AL. | § | |
| | § | |
| Defendants. | § | |

---

**DECLARATION OF
KARYL VAN TASSEL**

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

**EXPERIENCE, EXPERTISE, WORK IN THIS CASE**

1.      A copy of my resume is attached to Doc. 18 as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 24 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have

also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.     The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work I and my team have performed in the course of FTI's investigation on behalf of the Receiver.

3.     Based on FTI's analysis and review of the accounting and payroll records of the Stanford entities, as well as the bank records from the Stanford-controlled bank accounts, the former Stanford employees named in **Exhibit A** received loans, SIBL quarterly bonuses, Performance Appreciation Rights ("PARS" or "PAR") payments, SIBL CD commissions, branch managing director quarterly compensation, and severance payments in the amounts reflected in **Exhibit A**.

4.     Based on FTI's analysis and review of the accounting and payroll records of the Stanford entities, as well as bank records from Stanford-controlled bank accounts, the former Stanford employees named in **Exhibit B** received purported SIBL CD principal and interest payments in the amounts reflected in **Exhibit B**.

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746. Executed this 26 day of March 2010.

Karyl Van Tassel

# EXHIBIT A

**to Van Tassel Declaration**

## Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 1 | Jeffrey E. Adams | $ - | $ - | $ - | $ - | $ - | $ 50,000 | $ 50,000 |
| 2 | Paul Adkins | 510,000 | 322 | - | - | - | - | 510,322 |
| 3 | Jeannette Aguilar | - | 77,751 | 77,390 | - | - | - | 155,141 |
| 4 | James R. Alguire | 764,610 | 273,669 | 223,119 | - | - | - | 1,261,398 |
| 5 | Peggy Allen | - | 1,566 | 99,716 | - | - | - | 101,282 |
| 6 | Orlando Amaya | - | 1,380,836 | 68,396 | - | - | - | 1,449,232 |
| 7 | Victoria Anctil | - | 519,408 | - | - | - | - | 519,408 |
| 8 | Tiffany Angelle | - | 742,524 | - | - | - | - | 742,524 |
| 9 | Susana Anguiano | - | 429,825 | 92,255 | - | - | - | 522,080 |
| 10 | James F. Anthony | - | - | - | - | - | 80,000 | 80,000 |
| 11 | Sylvia Aquino | - | 2,124,534 | 310,497 | - | - | - | 2,435,031 |
| 12 | Juan Araujo | - | - | 305,754 | - | - | - | 305,754 |
| 13 | Monica Ardesi | - | - | 293,619 | - | - | - | 293,619 |
| 14 | George Arnold | - | 190,601 | 82,133 | - | - | - | 272,734 |
| 15 | John Michael Arthur | 417,564 | 63,773 | 39,051 | - | - | - | 520,388 |
| 16 | Patricio Atkinson | - | - | - | - | - | 300,000 | 300,000 |
| 17 | Mauricio Aviles | - | - | 148,933 | - | - | - | 148,933 |
| 18 | Donald Bahrenburg | 92,969 | 16,874 | - | - | - | - | 109,843 |
| 19 | Brown Baine | 274,808 | 67,808 | - | - | - | - | 342,616 |
| 20 | Timothy Bambauer | 930,000 | 83,351 | 130,041 | - | - | - | 1,143,392 |
| 21 | Isaac Bar | - | - | 94,780 | - | - | - | 94,780 |
| 22 | Elias Barbar | - | 3,665,691 | 308,566 | - | - | - | 3,974,257 |
| 23 | Stephen R. Barber | 160,000 | - | - | - | - | - | 160,000 |
| 24 | Jonathan Barrack | 154,577 | 384,415 | 36,808 | - | - | - | 575,800 |
| 25 | Robert Barrett | - | 26,682 | 31,360 | - | - | - | 58,042 |
| 26 | Jane E. Bates | - | - | - | - | - | 102,083 | 102,083 |
| 27 | Timothy W. Baughman | - | - | - | - | - | 157,500 | 157,500 |
| 28 | Marie Bautista | - | 679,283 | - | - | - | - | 679,283 |
| 29 | Oswaldo Bencomo | - | - | 600,168 | - | - | - | 600,168 |
| 30 | Teral Bennett | 43,910 | 478,186 | 38,341 | - | - | - | 560,437 |
| 31 | Lori Bensing | - | - | - | - | 485,122 | - | 485,122 |
| 32 | Andrea Berger | 440,152 | 312,519 | 41,494 | - | - | - | 794,165 |
| 33 | Marc H. Bettinger | - | - | - | - | - | 113,333 | 113,333 |
| 34 | Norman Blake | 991,215 | 247,432 | 123,478 | - | - | - | 1,362,125 |
| 35 | Stephen G. Blumenreich | 856,053 | - | - | - | - | - | 856,053 |
| 36 | Michael Bober | 1,133,169 | 80,344 | 93,601 | - | - | - | 1,307,114 |

## Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 37 | Nigel Bowman | 520,936 | 202,005 | 199,216 | - | - | - | 922,157 |
| 38 | Brad Bradham | 200,000 | 15,695 | - | - | 119,309 | - | 335,004 |
| 39 | Fabio Bramanti | - | - | 239,010 | - | - | - | 239,010 |
| 40 | Fernando Braojos | - | - | 93,001 | - | - | - | 93,001 |
| 41 | Alexandre Braune | - | 245,363 | - | - | - | - | 245,363 |
| 42 | Charles Brickey | 264,109 | 213,098 | 175,034 | - | - | - | 652,241 |
| 43 | Alan Brookshire | 599,129 | - | - | - | - | - | 599,129 |
| 44 | Nancy Brownlee | 95,793 | 259,352 | - | - | - | - | 355,145 |
| 45 | Richard Bucher | 80,701 | - | - | - | - | - | 80,701 |
| 46 | George Cairnes | 290,000 | - | - | - | - | - | 290,000 |
| 47 | Fausto Callava | - | 450,160 | 153,131 | - | - | - | 603,291 |
| 48 | Robert Bryan Cannon | 80,000 | - | - | - | - | - | 80,000 |
| 49 | Frank Carpin | 503,500 | - | - | - | - | - | 503,500 |
| 50 | Rafael Carriles | - | - | 100,020 | - | - | - | 100,020 |
| 51 | Scott Chaisson | - | 29,480 | - | - | 215,625 | - | 245,105 |
| 52 | James C. Chandley | 800,117 | - | - | - | - | - | 800,117 |
| 53 | Naveen Chaudhary | 50,000 | - | - | - | - | - | 50,000 |
| 54 | Jane Chernovetzky | - | - | 140,748 | - | - | - | 140,748 |
| 55 | Susana Cisneros | 12,390 | 384,838 | 86,436 | - | - | - | 483,664 |
| 56 | Ron Clayton | 1,151,598 | 439,462 | 193,644 | - | - | - | 1,784,704 |
| 57 | Neal Clement | 639,506 | 270,347 | 163,882 | - | - | - | 1,073,735 |
| 58 | Christopher Collier | 656,519 | 90,234 | 64,708 | - | - | - | 811,461 |
| 59 | Jay Comeaux | 289,010 | 1,133,187 | 62,584 | - | 2,191,204 | - | 3,675,985 |
| 60 | Michael Conrad | 1,146,000 | 63,627 | 81,500 | - | - | - | 1,291,127 |
| 61 | Michael Contorno | - | - | - | - | - | 165,000 | 165,000 |
| 62 | Bernard Cools-Lartigue | - | - | - | - | - | 72,419 | 72,419 |
| 63 | Don Cooper | - | 27,404 | 33,357 | - | - | - | 60,761 |
| 64 | Jose Cordero | - | 178,360 | 202,816 | - | - | - | 381,176 |
| 65 | Oscar Correa | - | - | 607,041 | - | - | - | 607,041 |
| 66 | James Cox | 989,429 | 28,167 | 31,650 | - | - | - | 1,049,246 |
| 67 | John Cravens | 253,081 | 114,343 | 121,500 | - | - | - | 488,924 |
| 68 | Ken Crimmins | 296,000 | 305 | - | - | - | - | 296,305 |
| 69 | Shawn M. Cross | 1,290,394 | - | - | - | - | - | 1,290,394 |
| 70 | James Cross | - | - | 77,063 | - | - | - | 77,063 |
| 71 | Patrick Cruickshank | 1,712,500 | 727,477 | 483,770 | - | - | - | 2,923,747 |
| 72 | Greg R Day | 1,004,619 | - | - | - | - | - | 1,004,619 |

# Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 73 | William S. Decker | 1,700,000 | - | - | - | - | - | 1,700,000 |
| 74 | Michael DeGolier | 751,126 | 351 | - | - | - | - | 751,477 |
| 75 | Andres Delgado | - | - | 439,162 | - | - | - | 439,162 |
| 76 | Pedro Delgado | - | - | 82,083 | - | - | - | 82,083 |
| 77 | Ray Deragon | 817,047 | 175,400 | 159,297 | - | - | - | 1,151,744 |
| 78 | Arturo R. Diaz | 469,556 | 453,829 | 265,134 | - | - | - | 1,188,519 |
| 79 | Ana Dongilio | - | - | 85,632 | - | - | - | 85,632 |
| 80 | Matthew Drews | 224,989 | 426,190 | 92,990 | - | - | - | 744,169 |
| 81 | Carter W. Driscoll | - | - | - | - | - | 87,500 | 87,500 |
| 82 | Abraham Dubrovsky | - | 267,245 | 56,549 | - | - | - | 323,794 |
| 83 | Torben Garde Due | - | - | 344,492 | - | - | - | 344,492 |
| 84 | Sean Duffy | 455,721 | - | - | - | - | - | 455,721 |
| 85 | Christopher Shannon Elliotte | 50,000 | - | - | - | - | - | 50,000 |
| 86 | Neil Emery | - | - | 206,598 | - | - | - | 206,598 |
| 87 | Thomas Espy | - | 3,022,244 | 932,105 | - | - | - | 3,954,349 |
| 88 | Jordan Estra | - | - | - | - | - | 58,333 | 58,333 |
| 89 | Jason Fair | 20,000 | 211,842 | 36,173 | - | - | - | 268,015 |
| 90 | Nolan Farhy | 191,475 | 36,803 | - | - | - | - | 228,278 |
| 91 | Evan Farrell | 720,000 | 108,560 | - | - | - | - | 828,560 |
| 92 | Marina Feldman | - | - | 78,033 | - | - | - | 78,033 |
| 93 | Ignacio Felice | - | - | 86,707 | - | - | - | 86,707 |
| 94 | Bianca Fernandez | 50,000 | - | - | - | - | - | 50,000 |
| 95 | Freddy Fiorillo | - | - | 311,414 | - | - | - | 311,414 |
| 96 | Lori J. Fischer | - | - | - | - | - | 70,000 | 70,000 |
| 97 | Rosalia Fontanals | - | 128,087 | 135,623 | - | - | - | 263,710 |
| 98 | James Fontenot | - | 583,392 | 116,986 | - | - | - | 700,378 |
| 99 | Juliana Franco | - | - | - | - | - | 61,250 | 61,250 |
| 100 | John Fry | 91,295 | 55,340 | 20,970 | - | - | - | 167,605 |
| 101 | Roger Fuller | 747,380 | 26,961 | 31,286 | - | - | - | 805,627 |
| 102 | Attlee Gaal | 12,500 | 362,796 | 20,036 | - | - | - | 395,332 |
| 103 | Miguel A. Garces | - | 51,995 | - | - | - | - | 51,995 |
| 104 | Gustavo A. Garcia | - | - | - | - | - | 247,500 | 247,500 |
| 105 | David Braxton Gay | 738,213 | - | - | - | - | - | 738,213 |
| 106 | Gregg Gelber | - | 201,687 | 73,007 | - | - | - | 274,694 |
| 107 | Mark Gensch | 110,000 | - | - | - | - | - | 110,000 |
| 108 | Gregory C. Gibson | 1,275,425 | - | - | - | - | - | 1,275,425 |

# Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 109 | Michael D. Gifford | 120,000 | - | - | - | - | - | 120,000 |
| 110 | Eric Gildhorn | - | - | 208,790 | - | - | - | 208,790 |
| 111 | Luis Giusti | - | - | 261,061 | - | - | - | 261,061 |
| 112 | Steven Glasgow | 722,000 | - | - | - | - | - | 722,000 |
| 113 | John Glennon | 403,900 | 3,436 | - | - | 1,706 | - | 409,042 |
| 114 | Susan Glynn | 50,000 | - | - | - | - | - | 50,000 |
| 115 | Larry Goldsmith | 473,704 | 20,458 | - | - | - | - | 494,162 |
| 116 | Ramiro Gomez-Rincon | - | - | 272,563 | - | - | - | 272,563 |
| 117 | Joaquin Gonzalez | - | 439,450 | 49,977 | - | - | - | 489,427 |
| 118 | Juan Carlos Gonzalez | - | - | 51,299 | - | - | - | 51,299 |
| 119 | Russell Warden Good | 671,000 | 100 | - | - | - | - | 671,100 |
| 120 | John Grear | 481,541 | - | - | - | - | - | 481,541 |
| 121 | Jason Green | - | 554,929 | 38,648 | - | 2,019,929 | - | 2,613,506 |
| 122 | Stephen Greenhaw | 572,164 | - | - | - | - | - | 572,164 |
| 123 | Mark Groesbeck | - | 1,244,357 | 126,839 | - | - | - | 1,371,196 |
| 124 | Billy Ray Gross | 100,000 | - | - | - | - | - | 100,000 |
| 125 | Vivian Guarch | - | 120,653 | 70,143 | - | - | - | 190,796 |
| 126 | Donna Guerrero | 85,000 | - | - | - | - | - | 85,000 |
| 127 | John Gutfranski | 60,000 | - | - | - | - | - | 60,000 |
| 128 | Rodney Hadfield | 113,431 | - | - | - | - | - | 113,431 |
| 129 | Gary Haindel | 113,058 | 444,484 | 22,674 | - | - | - | 580,216 |
| 130 | Jon Hanna | - | 66,670 | - | - | - | - | 66,670 |
| 131 | Dirk Harris | - | 186,298 | - | - | - | - | 186,298 |
| 132 | Virgil Harris | - | 155,828 | 123,256 | 1,750,506 | - | - | 2,029,590 |
| 133 | Kelley L. Hawkins | - | - | - | - | - | 66,667 | 66,667 |
| 134 | Charles Hazlett | 100,000 | - | - | - | - | - | 100,000 |
| 135 | Roberto T. Helguera | - | - | - | - | - | 90,000 | 90,000 |
| 136 | Luis Hermosa | - | - | 64,817 | - | - | - | 64,817 |
| 137 | Daniel Hernandez | - | 437,577 | 188,052 | - | - | - | 625,629 |
| 138 | Martine Hernandez | - | - | 145,490 | - | - | - | 145,490 |
| 139 | Patrica Herr | - | 633,582 | - | - | - | - | 633,582 |
| 140 | Alfredo Herraez | - | - | 59,764 | - | - | - | 59,764 |
| 141 | Helena M. Herrero | - | - | - | - | - | 171,875 | 171,875 |
| 142 | Steven Hoffman | - | 114,439 | - | - | - | - | 114,439 |
| 143 | Robert Hogue | 820,125 | 2,129 | - | - | - | - | 822,254 |
| 144 | John Holliday | 597,503 | 33,358 | - | - | - | - | 630,861 |

# Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 145 | Nancy J. Huggins | - | - | - | - | - | 50,000 | 50,000 |
| 146 | Charles Hughes | 44,274 | 424,806 | - | - | - | - | 469,080 |
| 147 | Wiley Hutchins, Jr. | 573,033 | - | - | - | - | - | 573,033 |
| 148 | David Innes | 376,500 | - | - | - | - | - | 376,500 |
| 149 | Marcos Iturriza | - | - | 162,940 | - | - | - | 162,940 |
| 150 | Charles Jantzi | - | 311,229 | 41,908 | - | - | - | 353,137 |
| 151 | Allen Johnson | 1,502,757 | 50,663 | 63,090 | - | - | - | 1,616,510 |
| 152 | Susan K. Jurica | - | - | - | - | - | 50,000 | 50,000 |
| 153 | Marty Karvelis | - | - | - | - | 544,240 | 37,500 | 581,740 |
| 154 | Faran Kassam | - | - | 273,849 | - | - | - | 273,849 |
| 155 | Joseph L. Klingen | - | 8,433 | - | - | - | 75,000 | 83,433 |
| 156 | Robert A. Kramer | - | - | - | - | - | 250,000 | 250,000 |
| 157 | David Wayne Krumrey | 507,434 | - | - | - | - | - | 507,434 |
| 158 | Bruce Lang | 253,644 | 51,245 | - | - | - | - | 304,889 |
| 159 | Grady Layfield | 20,000 | 1,037,958 | 234,111 | - | 646,917 | - | 1,938,986 |
| 160 | James LeBaron | 220,923 | 290,263 | 121,061 | - | - | - | 632,247 |
| 161 | Jason LeBlanc | - | 169,714 | 46,825 | - | - | - | 216,539 |
| 162 | William Leighton | 150,000 | 65,513 | 71,416 | - | - | - | 286,929 |
| 163 | Mayra C. Leon De Carrero | - | - | - | - | - | 185,625 | 185,625 |
| 164 | Robert Lenoir | 645,822 | 158,026 | 85,001 | - | - | - | 888,849 |
| 165 | Humberto Lepage | - | - | 328,473 | - | - | - | 328,473 |
| 166 | Francois Lessard | - | - | 53,597 | - | - | - | 53,597 |
| 167 | James C. Li | - | - | - | - | - | 66,667 | 66,667 |
| 168 | Gary Lieberman | 100,000 | - | - | - | - | - | 100,000 |
| 169 | Jason Likens | 300,856 | - | - | - | - | - | 300,856 |
| 170 | Trevor Ling | 899,474 | 1,095,371 | 438,957 | - | - | - | 2,433,802 |
| 171 | Christopher Long | 215,000 | 128 | - | - | - | - | 215,128 |
| 172 | Robert Long, Jr. | 600,000 | - | - | - | - | - | 600,000 |
| 173 | Humberto Lopez | 412,500 | 233,333 | 33,687 | - | - | - | 679,520 |
| 174 | Luis Felipe Lozano | - | - | 66,403 | - | - | - | 66,403 |
| 175 | David Lundquist | 100,000 | - | - | - | - | - | 100,000 |
| 176 | Michael MacDonald | 243,963 | 1,781 | - | - | - | - | 245,744 |
| 177 | Anthony Makransky | 105,317 | 1,822 | - | - | - | - | 107,139 |
| 178 | Megan R. Malanga | - | - | - | - | - | 50,000 | 50,000 |
| 179 | Manuel Malvaez | - | 1,121,877 | - | - | - | - | 1,121,877 |
| 180 | Maria Manerba | - | 1,017,573 | 30,165 | - | - | - | 1,047,738 |

# Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 181 | Michael Mansur | 331,770 | 230,013 | 122,188 | - | - | - | 683,971 |
| 182 | Iris Marcovich | - | - | 81,309 | - | - | - | 81,309 |
| 183 | Janie Martinez | - | 1,263,652 | 123,165 | - | - | - | 1,386,817 |
| 184 | Claudia Martinez | - | 784,705 | 404,216 | - | - | - | 1,188,921 |
| 185 | Aymeric Martinoia | - | 61,003 | - | - | - | - | 61,003 |
| 186 | Bert Deems May, Jr. | 465,000 | - | - | - | - | - | 465,000 |
| 187 | Carol McCann | 375,000 | - | - | - | 66,925 | - | 441,925 |
| 188 | Francesca McCann | - | - | - | - | - | 75,000 | 75,000 |
| 189 | Douglas McDaniel | 1,314,168 | 134,767 | 84,358 | - | - | - | 1,533,293 |
| 190 | Matthew McDaniel | 422,686 | 103,881 | 68,869 | - | - | - | 595,436 |
| 191 | Pam McGowan | - | 90,629 | - | - | - | - | 90,629 |
| 192 | Gerardo Meave-Flores | - | 532,368 | 155,839 | - | - | - | 688,207 |
| 193 | Lawrence Messina | 1,181,689 | 230,013 | 122,188 | - | - | - | 1,533,890 |
| 194 | Nolan N. Metzger | 826,165 | - | - | - | - | - | 826,165 |
| 195 | William J. Metzinger | 1,232,000 | - | - | - | - | - | 1,232,000 |
| 196 | Donald Miller | 253,634 | 277,129 | 77,007 | - | - | - | 607,770 |
| 197 | Trenton Miller | 2,217,854 | 381,912 | 189,684 | - | - | - | 2,789,450 |
| 198 | Hank Mills | - | 2,054,793 | 1,002,275 | - | - | - | 3,057,068 |
| 199 | Brent B. Milner | 3,500,000 | - | - | - | - | - | 3,500,000 |
| 200 | Peter Montalbano | 720,000 | 110,958 | 123,630 | - | - | - | 954,588 |
| 201 | Alberto Montero | - | - | 88,688 | - | - | - | 88,688 |
| 202 | Rolando H. Mora | - | 78,236 | - | - | - | - | 78,236 |
| 203 | David Morgan | 425,000 | 153,381 | 117,828 | - | - | - | 696,209 |
| 204 | Shawn Morgan | 331,715 | 93,890 | - | - | - | - | 425,605 |
| 205 | Jonathan Mote | 1,024,759 | - | - | - | - | - | 1,024,759 |
| 206 | Carroll Mullis | 1,056,815 | - | - | - | - | - | 1,056,815 |
| 207 | Spencer Murchison | 441,521 | 203,170 | 24,270 | - | - | - | 668,961 |
| 208 | David Nanes | - | 1,008,703 | 617,719 | - | - | - | 1,626,422 |
| 209 | Jon Nee | 500,000 | 116,980 | 67,800 | - | - | - | 684,780 |
| 210 | Aaron Nelson | 384,000 | 629 | - | - | - | - | 384,629 |
| 211 | Gail Nelson | - | - | - | - | - | 75,000 | 75,000 |
| 212 | Russell C. Newton, Jr. | - | 3,405 | - | - | - | 54,000 | 57,405 |
| 213 | Norbert Nieuw | - | 78,702 | - | - | - | - | 78,702 |
| 214 | Lupe Northam | - | 1,548,839 | 164,589 | - | - | - | 1,713,428 |
| 215 | Scott Notowich | 438,859 | 938,813 | 377,441 | - | 230,146 | - | 1,985,259 |
| 216 | Monica Novitsky | 12,500 | 362,796 | 20,036 | - | - | - | 395,332 |

## Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|----|------|---------|---------------------|------------------------|---------------|------------------------------------------------|--------------------|-------------------|
| 217 | Kale Olson | 168,014 | - | - | - | - | - | 168,014 |
| 218 | John D. Orcutt | 834,157 | - | - | - | - | - | 834,157 |
| 219 | Walter Orejuela | - | - | 175,355 | - | - | - | 175,355 |
| 220 | Alfonso Ortega | - | - | 346,757 | - | - | - | 346,757 |
| 221 | Zack Parrish | 100,000 | - | - | 146,202 | - | 1,225,000 | 1,471,202 |
| 222 | Tim Parsons | 60,000 | 483,659 | 20,508 | - | - | - | 564,167 |
| 223 | William Peerman | 713,625 | 9,649 | - | - | - | - | 723,274 |
| 224 | Beatriz Pena | - | - | 86,671 | - | - | - | 86,671 |
| 225 | Ernesto Pena | - | - | 193,260 | - | - | - | 193,260 |
| 226 | Roberto Pena | - | 331,261 | 307,555 | - | - | - | 638,816 |
| 227 | Roberto A. Pena | - | 410,535 | 188,052 | - | - | - | 598,587 |
| 228 | Dulce Perezmora | - | 170,889 | - | - | - | - | 170,889 |
| 229 | Saraminta Perez | - | 576,392 | 20,241 | - | - | - | 596,633 |
| 230 | Tony Perez | - | 4,153,297 | - | - | - | - | 4,153,297 |
| 231 | James D. Perry | - | - | - | - | - | 100,000 | 100,000 |
| 232 | Lou Perry | 225,980 | 51,454 | 20,970 | - | - | - | 298,405 |
| 233 | Brandon R. Phillips | 70,000 | - | - | - | - | - | 70,000 |
| 234 | Randall Pickett | 1,283,962 | 93,033 | 100,555 | - | - | - | 1,477,550 |
| 235 | Eduardo Picon | - | - | 89,515 | - | - | - | 89,515 |
| 236 | Edward Prieto | - | 118,181 | - | - | - | - | 118,181 |
| 237 | Christopher Prindle | 720,000 | 108,513 | - | - | - | - | 828,513 |
| 238 | A. Steven Pritsios | 510,000 | 322 | - | - | - | - | 510,322 |
| 239 | Arturo Prum | - | - | 304,987 | - | - | - | 304,987 |
| 240 | Maria Putz | - | - | 87,912 | - | - | - | 87,912 |
| 241 | Judith Quinones | - | 528,072 | - | - | - | - | 528,072 |
| 242 | Sumeet Rai | - | 188,162 | 102,095 | - | - | - | 290,257 |
| 243 | Michael Ralby | 900,165 | 203,406 | 93,007 | - | - | - | 1,196,578 |
| 244 | Leonor Ramirez | - | 1,870,064 | 145,920 | - | - | - | 2,015,984 |
| 245 | Nelson Ramirez | - | 577,353 | 55,981 | - | - | 140,327 | 773,661 |
| 246 | David Rappaport | 98,500 | - | - | - | - | - | 98,500 |
| 247 | Charles Rawl | 707,281 | 25,665 | - | - | - | - | 732,946 |
| 248 | Syed H. Razvi | - | - | - | - | - | 62,500 | 62,500 |
| 249 | Kathleen M. Reed | - | - | - | - | - | 141,667 | 141,667 |
| 250 | Steven Restifo | 357,984 | 2,763 | - | - | - | - | 360,747 |
| 251 | Walter Ricardo | 1,150,000 | 398,167 | 211,174 | - | - | - | 1,759,341 |
| 252 | Giampiero Riccio | - | - | - | - | - | 206,250 | 206,250 |

## Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 253 | Jeffrey Ricks | 692,904 | 351 | - | - | - | - | 693,255 |
| 254 | Juan C. Riera | - | - | - | - | - | 180,000 | 180,000 |
| 255 | Alan Riffle | 607,950 | 158,815 | 128,706 | - | - | - | 895,471 |
| 256 | Randolph E. Robertson | 370,958 | - | - | - | - | - | 370,958 |
| 257 | Steve Robinson | 2,995,526 | 381,912 | 189,684 | - | - | - | 3,567,122 |
| 258 | Timothy D. Rogers | 1,275,425 | - | - | - | - | - | 1,275,425 |
| 259 | Eddie Rollins | 232,034 | 36,146 | 20,000 | - | - | - | 288,180 |
| 260 | Peter R. Ross | - | - | - | - | - | 133,333 | 133,333 |
| 261 | Rocky Roys | - | 2,259,210 | - | - | - | - | 2,259,210 |
| 262 | Thomas G. Rudkin | - | - | - | - | - | 100,000 | 100,000 |
| 263 | Julio Ruelas | - | - | 59,615 | - | - | - | 59,615 |
| 264 | Nicholas P. Salas | - | - | - | - | - | 85,002 | 85,002 |
| 265 | Tatiana Saldivia | - | - | 70,608 | - | - | - | 70,608 |
| 266 | John Santi | 632,445 | 23,268 | 47,343 | - | - | 600,000 | 1,303,056 |
| 267 | Christopher K. Schaefer | 114,250 | - | - | - | - | - | 114,250 |
| 268 | Louis Schaufele | - | 203,143 | 123,256 | 713,755 | - | - | 1,040,154 |
| 269 | John Schwab | - | 1,428,940 | 502,995 | - | - | - | 1,931,935 |
| 270 | Harvey Schwartz | 561,214 | 32,948 | - | - | - | - | 594,162 |
| 271 | William Scott | 460,000 | 322 | - | - | - | - | 460,322 |
| 272 | Haygood Seawell | 1,102,000 | 1,926 | - | - | - | - | 1,103,926 |
| 273 | Leonard Seawell | 384,000 | 629 | - | - | - | - | 384,629 |
| 274 | Morris Serrero | - | - | 112,475 | - | - | - | 112,475 |
| 275 | Doug Shaw | 847,395 | 1,611,705 | 678,476 | - | - | - | 3,137,576 |
| 276 | Nick Sherrod | 302,430 | - | - | - | - | - | 302,430 |
| 277 | Jon C. Shipman | - | - | - | - | - | 67,500 | 67,500 |
| 278 | Jordan Sibler | 50,000 | - | - | - | - | - | 50,000 |
| 279 | Rochelle Sidney | - | - | 259,325 | - | - | - | 259,325 |
| 280 | Brent Simmons | 156,938 | 45,366 | - | - | - | - | 202,304 |
| 281 | Edward Simmons | 219,047 | - | - | - | - | - | 219,047 |
| 282 | Peter Siragna | - | - | 1,901,338 | - | - | - | 1,901,338 |
| 283 | Steve Slewitzke | 250,000 | 336,543 | 193,267 | - | - | - | 779,810 |
| 284 | Nancy Soto | - | - | 585,808 | - | - | - | 585,808 |
| 285 | Paul Stanley | - | 66,843 | - | - | - | - | 66,843 |
| 286 | Sanford Steinberg | 584,729 | 3,207 | 21,063 | - | - | - | 608,999 |
| 287 | Heath Stephens | 198,808 | 46,534 | 28,496 | - | - | - | 273,838 |
| 288 | William O. Stone Jr. | 820,657 | 57,953 | 20,000 | - | - | - | 898,610 |

# Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|----|------|---------|---------------------|------------------------|---------------|-------------------------------------------------|--------------------|-------------------|
| 289 | David M. Stubbs | 1,095,350 | - | - | - | - | - | 1,095,350 |
| 290 | Mark V. Stys | 200,000 | - | - | 328,417 | - | 1,060,000 | 1,588,417 |
| 291 | Timothy W. Summers | - | - | - | - | - | 165,083 | 165,083 |
| 292 | Paula S. Sutton | 1,000,000 | - | - | - | - | - | 1,000,000 |
| 293 | William Brent Sutton | 50,000 | - | - | - | - | - | 50,000 |
| 294 | Ana Tanur | - | - | 95,725 | - | - | - | 95,725 |
| 295 | Juan Carlos Terrazas | - | - | 96,755 | - | - | - | 96,755 |
| 296 | Scot Thigpen | 401,758 | - | - | - | - | - | 401,758 |
| 297 | Christopher Thomas | 259,623 | 64,116 | 46,471 | - | - | - | 370,210 |
| 298 | Mark Tidwell | 436,037 | 508,972 | 108,438 | - | - | - | 1,053,447 |
| 299 | Yliana Torrealba | - | - | 283,174 | - | - | - | 283,174 |
| 300 | Jose Torres | 162,778 | 185,403 | 75,073 | - | - | - | 423,254 |
| 301 | Al Trullenque | 289,010 | 1,126,027 | 62,584 | - | 1,014,842 | - | 2,492,463 |
| 302 | Audrey Truman | 187,500 | 146,321 | 125,853 | - | - | - | 459,674 |
| 303 | Roberto Ulloa | - | 3,585,168 | 987,973 | - | - | - | 4,573,141 |
| 304 | Eric Urena | 312,500 | 164,845 | 33,687 | - | - | - | 511,032 |
| 305 | Miguel Valdez | 284,250 | 283,665 | 167,225 | - | - | - | 735,140 |
| 306 | Nicolas Valera | - | - | 404,294 | - | - | - | 404,294 |
| 307 | Tim Vanderver | 980,000 | 510,819 | 208,168 | - | - | - | 1,698,987 |
| 308 | Jaime Vargas | - | 188,569 | - | - | - | - | 188,569 |
| 309 | Pete Vargas | - | 1,606,461 | 34,862 | - | - | - | 1,641,323 |
| 310 | Ettore Ventrice | 1,134,703 | 80,344 | 93,601 | - | - | - | 1,308,648 |
| 311 | Mario Vieira | - | - | 118,331 | - | - | - | 118,331 |
| 312 | Evely Villalon | - | - | 126,106 | - | - | - | 126,106 |
| 313 | Maria Villanueva | - | 3,764,370 | 281,814 | - | - | - | 4,046,184 |
| 314 | Chris Villemarette | 60,000 | - | - | - | - | - | 60,000 |
| 315 | Frans Vingerhoedt | - | - | 220,657 | - | - | - | 220,657 |
| 316 | Daniel Vitrian | - | - | 83,277 | - | - | - | 83,277 |
| 317 | Charles Vollmer | 1,498,538 | 522,580 | 165,930 | - | - | - | 2,187,048 |
| 318 | James Weller | 75,000 | - | - | - | - | - | 75,000 |
| 319 | Bill Whitaker | 857,350 | 118,783 | 51,250 | - | - | - | 1,027,383 |
| 320 | Donald Whitley | 267,000 | - | - | - | - | - | 267,000 |
| 321 | David Whittemore | - | 205,059 | 73,789 | - | - | - | 278,848 |
| 322 | Charles Widener | 237,500 | 107,976 | 57,859 | - | - | - | 403,335 |
| 323 | John Whitfield Wilks | 500,000 | - | - | - | - | - | 500,000 |
| 324 | Thomas Woolsey | 350,000 | 434 | - | - | - | - | 350,434 |

## Former Stanford Employees

| ID | Name | Loan(s) | SIBL CD Commissions | SIBL Quarterly Bonuses | PARS Payments | Branch Managing Director Quarterly Compensation | Severance Payments | Total CD Proceeds |
|---|---|---|---|---|---|---|---|---|
| 325 | Michael Word | 194,681 | 2,017,698 | 352,333 | - | - | - | 2,564,712 |
| 326 | Ryan Wrobleske | 986,859 | 70,562 | 47,608 | - | - | - | 1,105,029 |
| 327 | Ihab Yassine | - | - | 50,268 | - | - | - | 50,268 |
| 328 | Bernerd E. Young | 75,000 | - | - | - | - | - | 75,000 |
| 329 | Leon Zaidner | - | - | 552,740 | - | - | - | 552,740 |
| | | | | | | | | |
| | | | | **Total CD Proceeds** | | | | $   215,406,017 |

# EXHIBIT B
**to Van Tassel Declaration**

| ID[1] | Name | Total Proceeds from Former Stanford Employee's CD(s) | Proceeds from Former Stanford Employee's CD(s) Received in Excess of Investments |
|---|---|---|---|
| 13 | Monica Ardesi | $ 3,294,765.72 | |
| 17 | Mauricio Aviles | $ 35,998.48 | |
| 21 | Isaac Bar | $ 50,000.00 | |
| 26 | Jane E. Bates | $ 367,733.64 | |
| 29 | Oswaldo Bencomo | $ 548,894.32 | |
| 32 | Andrea Berger | $ 106,167.85 | |
| 36 | Michael Bober | $ 394,254.02 | $ 28,511.02 |
| 38 | Brad Bradham | $ 25,000.00 | |
| 39 | Fabio Bramanti | $ 564,212.37 | |
| 40 | Fernando Braojos | $ 89,847.91 | |
| 50 | Rafael Carriles | $ 41,416.06 | |
| 54 | Jane Chernovetzky | $ 223,641.91 | |
| 57 | Neal Clement | $ 345,515.03 | $ 10,515.03 |
| 62 | Bernard Cools-Lartigue | $ 41,198.14 | $ 7,166.06 |
| 70 | James Cross | $ 469,313.55 | |
| 71 | Patrick Cruickshank | $ 150,000.00 | |
| 75 | Andres Delgado | $ 503,289.95 | |
| 76 | Pedro Delgado | $ 95,105.37 | |
| 78 | Arturo R. Diaz | $ 294,708.05 | $ 44,708.05 |
| 79 | Ana Dongilio[2] | $ 1,863,888.32 | $ 28,301.09 |
| 80 | Matthew Drews | $ 199,882.02 | $ 49,882.02 |
| 83 | Torben Garde Due | $ 1,279,921.02 | $ 6,150.03 |
| 86 | Neil Emery | $ 884,273.12 | |
| 92 | Marina Feldman | $ 28,565.60 | |
| 93 | Ignacio Felice[2] | $ 1,863,888.32 | $ 28,301.09 |
| 95 | Freddy Fiorillo | $ 2,071,774.44 | |
| 97 | Rosalia Fontanals | $ 177,335.29 | |
| 98 | James Fontenot | $ 513,559.68 | |
| 109 | Michael D. Gifford | $ 41,000.00 | |
| 110 | Eric Gildhorn | $ 240,279.40 | |
| 111 | Luis Giusti | $ 2,188,554.27 | |
| 115 | Larry Goldsmith | $ 192,381.46 | |
| 116 | Ramiro Gomez-Rincon | $ 28,212.20 | |
| 118 | Juan Carlos Gonzalez | $ 86,188.25 | |
| 125 | Vivian Guarch | $ 10,719.01 | |
| 132 | Virgil Harris | $ 1,091,487.71 | $ 71,361.06 |
| 136 | Luis Hermosa | $ 1,370,918.82 | |
| 137 | Daniel Hernandez | $ 480,600.51 | $ 50,600.51 |
| 138 | Martine Hernandez | $ 468,818.18 | |
| 139 | Patrica Herr | $ 159,018.54 | |
| 140 | Alfredo Herraez | $ 628,918.45 | $ 1,201.55 |
| 144 | John Holliday | $ 58,614.09 | |
| 149 | Marcos Iturriza | $ 374,227.65 | |
| 154 | Faran Kassam | $ 1,274,740.96 | |
| 155 | Joseph L. Klingen | $ 60,435.36 | $ 10,435.36 |
| 163 | Mayra C. Leon De Carrero | $ 10,215.87 | |
| 164 | Robert Lenoir | $ 34,515.06 | |

| ID[1] | Name | Total Proceeds from Former Stanford Employee's CD(s) | Proceeds from Former Stanford Employee's CD(s) Received in Excess of Investments |
|---|---|---|---|
| 165 | Humberto Lepage | $ 3,133,671.45 | $ 46,746.09 |
| 170 | Trevor Ling | $ 1,583,893.44 | |
| 173 | Humberto Lopez | $ 575,600.81 | |
| 174 | Luis Felipe Lozano | $ 72,011.26 | $ 10,214.89 |
| 176 | Michael MacDonald | $ 86,601.43 | $ 6,601.43 |
| 180 | Maria Manerba | $ 85,145.39 | |
| 182 | Iris Marcovich | $ 209,923.91 | $ 87,990.23 |
| 185 | Aymeric Martinoia | $ 105,238.33 | |
| 193 | Lawrence Messina | $ 70,691.61 | |
| 197 | Trenton Miller | $ 219,982.03 | |
| 198 | Hank Mills | $ 354,431.68 | |
| 200 | Peter Montalbano | $ 542,117.58 | $ 42,117.58 |
| 201 | Alberto Montero | $ 366,079.00 | |
| 203 | David Morgan | $ 226,291.99 | |
| 209 | Jon Nee | $ 148,025.72 | |
| 213 | Norbert Nieuw | $ 89,212.30 | |
| 220 | Alfonso Ortega | $ 1,361,926.63 | |
| 225 | Ernesto Pena | $ 677,881.00 | |
| 227 | Roberto A. Pena | $ 100,000.00 | |
| 229 | Saraminta Perez | $ 9,904.96 | |
| 234 | Randall Pickett | $ 266,097.36 | $ 16,097.36 |
| 235 | Eduardo Picon | $ 124,938.41 | |
| 236 | Edward Prieto | $ 11,300.00 | |
| 240 | Maria Putz | $ 10,000.00 | |
| 244 | Leonor Ramirez | $ 151,067.74 | |
| 245 | Nelson Ramirez | $ 14,545.43 | $ 4,545.43 |
| 252 | Giampiero Riccio | $ 50,000.00 | |
| 254 | Juan C. Riera | $ 61,012.73 | |
| 263 | Julio Ruelas | $ 21,181.81 | |
| 265 | Tatiana Saldivia | $ 105,072.37 | |
| 266 | John Santi | $ 799,037.85 | $ 28,797.34 |
| 268 | Louis Schaufele | $ 386,826.18 | |
| 281 | Edward Simmons | $ 3,357.26 | |
| 282 | Peter Siragna | $ 2,394,622.67 | $ 116,050.56 |
| 284 | Nancy Soto | $ 1,130,488.20 | |
| 286 | Sanford Steinberg | $ 171,534.05 | $ 21,534.05 |
| 288 | William O. Stone Jr. | $ 100,000.00 | |
| 294 | Ana Tanur | $ 406,936.31 | |
| 298 | Mark Tidwell | $ 527,048.26 | $ 61,507.19 |
| 299 | Yliana Torrealba | $ 26,238.11 | |
| 303 | Roberto Ulloa | $ 267,552.52 | |
| 305 | Miguel Valdez | $ 464,687.78 | |
| 306 | Nicolas Valera | $ 313,863.62 | |
| 310 | Ettore Ventrice | $ 440,953.53 | $ 31,569.53 |
| 311 | Mario Vieira | $ 23,615.15 | |
| 312 | Evely Villalon | $ 1,187,053.63 | |
| 313 | Maria Villanueva | $ 1,826,422.86 | $ 248,718.58 |
| 315 | Frans Vingerhoedt | $ 1,685,058.95 | |

| ID[1] | Name | Total Proceeds from Former Stanford Employee's CD(s) | Proceeds from Former Stanford Employee's CD(s) Received in Excess of Investments |
|---|---|---|---|
| 316 | Daniel Vitrian | $ 606,180.98 | |
| 321 | David Whittemore | $ 285,783.43 | $ 35,783.43 |
| 327 | Ihab Yassine | $ 643,267.59 | |
| 329 | Leon Zaidner | $ 2,003,561.64 | |

**Notes:**

1. "ID" corresponds to the ID number listed in Appendix in Support of the Receiver's Second Amended Complaint Against Former Stanford Employees (Doc. 157).

2. Ana Dongilio's and Ignacio Felice's names are listed on the same SIBL account.  As a result, their "Total Proceeds from Former Stanford Employee's CD(s)" and "Proceeds from Former Stanford Employee's CD(s) Received in Excess of Investments" amounts are included twice: once for Dongilio, and once for Felice.

# EXHIBIT 2

| Appendix No. (see Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 4 | IRA FBO JAMES R ALGUIRE | 5LW700082 | Pershing | $ 580.02 |
| 4 | JAMES R ALGUIRE / DEANNA S ALGUIRE JT TEN | 5LW900039 | Pershing | $ 250,388.71 |
| 7 | VICTORIA ANCTIL & DONALD ANCTIL JTWROS | NMZ001221 | Pershing | $ 3,604.24 |
| 7 | VICTORIA ANCTIL & JUSTIN ANCTIL JTWROS | NMZ001239 | Pershing | $ 98.26 |
| 8 | TIFFANY ANGELLE | NMW004681 | Pershing | $ 263,263.71 |
| 8 | IRA FBO TIFFANY ANGELLE | NMW024192 | Pershing | $ 2,963.16 |
| 11 | IRA FBO SYLVIA AQUINO | NYQ001506 | Pershing | $ 143,479.46 |
| 11 | SYLVIA AQUINO / RAUL GUILLERMO PEREZ JT TEN | NYQ001530 | Pershing | $ 79,788.23 |
| 14 | GEORGE ARNOLD | NMY105478 | Pershing | $ 8,942.52 |
| 15 | IRA FBO JOHN M ARTHUR | 0C9700109 | Pershing | $ 102,177.92 |
| 18 | DONAL B BAHRENBURG REV TRUST / DONAL B BAHRENBURG TTEE | NMZ008630 | Pershing | $ 17,298.73 |
| 19 | IRA FBO BROWN B BAINE | NJM090043 | Pershing | $ 68,887.88 |
| 20 | TIMOTHY L BAMBAUER | NNC090201 | Pershing | $ 10,773.30 |
| 20 | TIMOTHY L BAMBAUER / LORA M BAMBAUER JT TEN | NNC090219 | Pershing | $ 142,663.43 |
| 24 | IRA FBO J A BARRACK | NJM032847 | Pershing | $ 191,344.30 |
| 24 | J A BARRACK & CINDY C BARRACK JTWROS | NJM020131 | Pershing | $ 812.54 |
| 28 | MARIE BAUTISTA NIEVES / DAVID NIEVES JT TEN | NYQ001696 | Pershing | $ 4,949.86 |
| 29 | OSWALDO JESUS BENCOMO JIMENEZ / MARIA A ROMAN BARICELLI JTWROS | NWR003810 | Pershing | $ 617,356.12 |
| 32 | ANDREA BERGER & KENNETH FREEDMAN JTWROS | NMY105502 | Pershing | $ 75,180.95 |
| 32 | IRA FBO ANDREA FREEDMAN | NMY134098 | Pershing | $ 109,521.57 |
| 32 | ANDREA K FREEDMAN & KENNETH A FREEDMAN JTWROS | NMY105361 | Pershing | $ 181,088.47 |
| 34 | NORMAN H BLAKE | NJM090308 | Pershing | $ 3,461.19 |
| 34 | NORMAN H BLAKE III / CAMILLE R BLAKE JT TEN | NJM090001 | Pershing | $ 161,577.08 |
| 34 | IRA FBO NORMAN H BLAKE III | NJM090274 | Pershing | $ 311,614.11 |
| 34 | NORMAN H BLAKE III / CAMILLE R BLAKE JT TEN | NJM090316 | Pershing | $ 86,557.99 |
| 36 | MICHAEL A BOBER / KAREN BOBER TEN ENT | 5LW700066 | Pershing | $ 173,946.47 |
| 37 | NIGEL J BOWMAN / MARGARET J BOWMAN JT TEN | NMX090580 | Pershing | $ 317,154.98 |
| 37 | IRA FBO NIGEL JOHN BOWMAN | NJH360236 | Pershing | $ 87,898.01 |
| 42 | CHARLES LEE BRICKEY / MARGARET ANNE BRICKEY JT TEN | NJM090258 | Pershing | $ 195,365.96 |
| 44 | IRA FBO NANCY BROWNLEE RLVR | NMY133934 | Pershing | $ 81,476.88 |
| 51 | SCOTT CHAISSON / JANE CHAISSON JT TEN | N13001057 | Pershing | $ 244,688.68 |
| 55 | SUSANA CISNEROS / AYMERIC MARTINOIA JT TEN | NJL004623 | Pershing | $ 21,907.97 |
| 56 | RONALD J CLAYTON & KRISTIN R CLAYTON TIC | NMW004582 | Pershing | $ 8,937.48 |
| 57 | NEAL J CLEMENT | NGW003066 | Pershing | $ 331,582.53 |
| 57 | NEAL JOHN CLEMENT & DONNA WILDMON CLEMENT JTWROS | NGW125034 | Pershing | $ 102,646.55 |
| 58 | IRA FBO CHRISTOPHER J COLLIER | 5LW701346 | Pershing | $ 1,145.02 |
| 58 | CHRISTOPHER J COLLIER | 5LW900047 | Pershing | $ 55.84 |

| Appendix No. (see Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 59 | IRA FBO JAY T COMEAUX | NJL006834 | Pershing | $ 210,513.74 |
| 59 | JAY T COMEAUX / LINDA C COMEAUX JT TEN | NJL010380 | Pershing | $ 968,715.83 |
| 59 | JAY T COMEAUX & LINDA C COMEAUX TIC | NMY134403 | Pershing | $ 12.39 |
| 59 | JAY T COMEAUX & LINDA C COMEAUX TIC | NMY134411 | Pershing | $ - |
| 59 | JAY T COMEAUX & LINDA C COMEAUX JTWROS | NMY134718 | Pershing | $ 121,040.24 |
| 59 | JAY COMEAUX | SCB0001525 | SCB | $ 43,240.00 |
| 60 | MICHAEL V. CONRAD | NJA090103 | Pershing | $ 145,178.70 |
| 67 | IRA FBO JOHN B CRAVENS | NM4060403 | Pershing | $ 16,859.37 |
| 67 | JOHN B CRAVENS / JULIE L CRAVENS TEN COM | NM4090244 | Pershing | $ 612.89 |
| 71 | IRA FBO PATRICK J CRUICKSHANK | NMX090283 | Pershing | $ 111,616.08 |
| 71 | MAPLE LEAF CAPITAL, LLC | NMX090564 | Pershing | $ 536,863.55 |
| 71 | MAPLE LEAF CAPITAL, LLC | NMX990151 | Pershing | $ (316,336.93) |
| 71 | PATRICK CRUICKSHANK | SCB0000120 | SCB | $ 73,060.00 |
| 77 | RAYMOND A DERAGON & ROSE A DERAGON JT TEN | NMX090028 | Pershing | $ 334,723.75 |
| 78 | ARTURO J RODRIGUEZ DIAZ / CATALINA PALERM JT TEN | NMZ023381 | Pershing | $ 163,984.16 |
| 78 | IRA FBO ARTURO RODRIGUEZ | NMZ008549 | Pershing | $ 122,589.87 |
| 78 | IRA FBO ARTURO RODRIGUEZ DIAZ | NMZ008556 | Pershing | $ 128,590.69 |
| 80 | MATTHEW R DREWS REV TRUST | NMZ008697 | Pershing | $ (286,854.70) |
| 80 | MATTHEW R DREWS REV TRUST | NMZ016963 | Pershing | $ 558,784.39 |
| 87 | TOM P ESPY | N2C001162 | Pershing | $ 81,524.91 |
| 89 | JASON JOHNSON FAIR & MEREDITH KOEHN FAIR JTWROS | NJM020057 | Pershing | $ 3,551.46 |
| 90 | NOLAN FARHY | NMZ020080 | Pershing | $ 36,933.35 |
| 91 | EVAN J FARRELL / JORI J FARRELL JT TEN | NM2090055 | Pershing | $ 108,588.92 |
| 93 | IGNACIO JOSE FELICE / ANA LUCIA DONGILIO JT TEN | NWR008280 | Pershing | $ 361,386.73 |
| 95 | FREDDY FIORILLO / MARIA ALEXANDRA OTTATI JT TEN | NWR007068 | Pershing | $ 10,185.64 |
| 98 | JAMES K FONTENOT | NMW004111 | Pershing | $ 35,576.75 |
| 98 | SEP FBO JAMES K FONTENOT | NMW023657 | Pershing | $ 7,192.45 |
| 101 | ROGER L FULLER / HALEY G FULLER JT TEN | NJK511495 | Pershing | $ 118.98 |
| 101 | ROGER L FULLER / HALEY G FULLER JT TEN | NNC012759 | Pershing | $ 31,334.03 |
| 106 | GREGG GELBER / CAROLINA GELBER JT TEN | NM2001425 | Pershing | $ 6,374.73 |
| 106 | IRA FBO GREGG GELBER | NM2003280 | Pershing | $ 5,044.82 |
| 113 | JOHN J GLENNON / DEBORA P GLENNON TEN COM | NYN090080 | Pershing | $ 5,143.41 |
| 115 | LARRY J GOLDSMITH | NJM020065 | Pershing | $ 20,461.88 |
| 121 | JASON GREEN | NJG009008 | Pershing | $ 103,418.31 |
| 123 | IRA FBO MARK A GROESBECK | NMY136895 | Pershing | $ 33,057.88 |
| 123 | MARK A GROESBECK & KARENE GROESBECK | NMY134445 | Pershing | $ 37,800.20 |
| 129 | IRA FBO GARY P HAINDEL | NMW023681 | Pershing | $ 39,731.80 |

| Appendix No. (see Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 129 | GARY P HAINDEL & ASHLEY R HAINDEL TIC | NMW004418 | Pershing | $ 9,366.21 |
| 131 | DIRK J HARRIS & ERIN C HARRIS TIC | NMW004400 | Pershing | $ 1,523.24 |
| 143 | ROBERT D HOGUE | 6QK008305 | Pershing | $ 2,147.82 |
| 144 | JOHN MARK HOLLIDAY | NGW068648 | Pershing | $ 33,358.04 |
| 146 | CHARLES G HUGHES | NJM020081 | Pershing | $ 5,737.88 |
| 146 | IRA FBO CHARLES G HUGHES | NJM032839 | Pershing | $ 5,798.15 |
| 150 | CHARLES L JANTZI / TRACY JANTZI TEN COM | NMW027070 | Pershing | $ 33,707.20 |
| 151 | ALLEN H JOHNSON JR | NJB090318 | Pershing | $ 1,394.24 |
| 151 | ALLEN H JOHNSON JR / SUSAN S JOHNSON JT TEN | NJB090326 | Pershing | $ 1,459.35 |
| 151 | IRA FBO ALLEN H JOHNSON JR | NJB090458 | Pershing | $ 80,416.79 |
| 158 | IRA FBO BRUCE E LANG | NMZ016567 | Pershing | $ 56,964.12 |
| 159 | IRA FBO GRADY J LAYFIELD | NMW028615 | Pershing | $ 38,526.26 |
| 159 | GRADY J LAYFIELD / BRANDIE T LAYFIELD TEN COM | NMW028706 | Pershing | $ 97,087.82 |
| 160 | JAMES S LEBARON | NMZ008648 | Pershing | $ 17,071.40 |
| 160 | IRA FBO JAMES S LEBARON | NMZ016633 | Pershing | $ 21,925.24 |
| 161 | IRA FBO JASON H LEBLANC | NMY015461 | Pershing | $ 2,355.69 |
| 161 | JASON H LEBLANC | NMY134429 | Pershing | $ 1.87 |
| 161 | IRA FBO JASON H LEBLANC | NMY137000 | Pershing | $ 28.37 |
| 161 | MELISSA PEREZ | NMY104687 | Pershing | $ 8,443.95 |
| 161 | IRA FBO MELISSA PEREZ | NMY133744 | Pershing | $ 27,692.76 |
| 161 | JASON H. LEBLANC | NMY008425 | Pershing | $ 45.09 |
| 161 | JASON LEBLANC / MELISSA PEREZ-LEBLANC JT TEN | NMY015909 | Pershing | $ 14,010.32 |
| 164 | IRA FBO ROBERT O LENOIR | NUJ002245 | Pershing | $ 184,307.16 |
| 170 | IRA FBO TREVOR D LING | NJL001488 | Pershing | $ 273,310.02 |
| 170 | TREVOR D LING | NMY002493 | Pershing | $ 1,688.26 |
| 170 | TREVOR D LING | NMY104950 | Pershing | $ 131,088.28 |
| 170 | IRA FBO TREVOR D LING | NMY134155 | Pershing | $ 158,692.57 |
| 173 | HUMBERTO J LOPEZ / MIGDALIA LOPEZ TEN ENT | NMZ021112 | Pershing | $ 6,608.05 |
| 173 | IRA FBO HUMBERTO J LOPEZ | NMZ021252 | Pershing | $ 78,043.87 |
| 176 | MICHAEL S MACDONALD / SERAFINA R MACDONALD JT TEN | 5LW903132 | Pershing | $ 1,781.00 |
| 179 | MANUEL MALVAEZ | NMY104398 | Pershing | $ 186.63 |
| 179 | IRA FBO MANUEL MALVAEZ | NMY133611 | Pershing | $ 31,657.59 |
| 181 | MICHAEL MANSUR | NJE090075 | Pershing | $ 45.95 |
| 181 | IRA FBO MICHAEL MANSUR | NM4090459 | Pershing | $ 59,078.66 |
| 181 | MICHAEL MANSUR | NM4090509 | Pershing | $ 61,654.90 |
| 184 | CLAUDIA VICTORIA MARTINEZ | NJL021627 | Pershing | $ 51,074.13 |
| 187 | IRA FBO CAROL MCCANN | NMX090069 | Pershing | $ 78,813.80 |

| Appendix No. (*see* Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 189 | DOUGLAS M MCDANIEL & ANNE H MCDANIEL (JTWROS) | NGW616255 | Pershing | $ 19,590.33 |
| 190 | MATTHEW MCDANIEL & HEATHER MCDANIEL JT TEN | 0C9007752 | Pershing | $ 70,507.28 |
| 190 | IRA FBO MATTHEW MCDANIEL | 0C9603451 | Pershing | $ 68,147.38 |
| 190 | IRA FBO MATTHEW MCDANIEL | 5LW700025 | Pershing | $ 1,613.41 |
| 190 | MATTHEW MCDANIEL / HEATHER MCDANIEL JT TEN | 5LW900054 | Pershing | $ 1,802.02 |
| 191 | PAMELA M MCGOWAN | N2C001071 | Pershing | $ 2,120.03 |
| 191 | IRA FBO PAMELA M MCGOWAN | N2C005593 | Pershing | $ 6,915.54 |
| 193 | IRA FBO LAWRENCE J MESSINA | NJE262765 | Pershing | $ 121,084.34 |
| 193 | LAWRENCE J MESSINA | NM4011901 | Pershing | $ 210,395.16 |
| 193 | IRA FBO LAWRENCE J MESSINA | NM4090442 | Pershing | $ 32,427.19 |
| 196 | IRA FBO DONALD R MILLER | NMY134130 | Pershing | $ 209,516.26 |
| 196 | IRA FBO DONALD R MILLER | NMY105106 | Pershing | $ 166,423.12 |
| 197 | M TRENT MILLER | NJE290006 | Pershing | $ 267,881.66 |
| 197 | M TRENT MILLER / RENE MILLER JT TEN | NM4090210 | Pershing | $ 978.64 |
| 197 | IRA FBO M TRENT MILLER | NM4090285 | Pershing | $ 352,292.83 |
| 197 | M TRENT MILLER | NM4090319 | Pershing | $ 52,307.53 |
| 198 | HENRY J MILLS | NMW004095 | Pershing | $ 39,626.79 |
| 200 | PETER MONTALBANO | NM2090063 | Pershing | $ 234,630.74 |
| 203 | DAVID J MORGAN / MARYANGELA C MORGAN JT TEN | NNC090078 | Pershing | $ 271,209.00 |
| 204 | SHAWN F MORGAN | NMX090036 | Pershing | $ 93,890.80 |
| 207 | IRA FBO SPENCER F MURCHISON | NMY007070 | Pershing | $ 54,259.63 |
| 208 | DAVID M NANES & H ELIZABETH A DE NANES | NWR001137 | Pershing | $ 738,368.45 |
| 209 | JON NEE / MONICA NEE JT TEN | NNC090128 | Pershing | $ 188,643.08 |
| 213 | NORBERT G NIEUW | NMZ019132 | Pershing | $ 78,634.61 |
| 214 | LUPE NORTHAM | NMY104455 | Pershing | $ 67,918.24 |
| 214 | IRA FBO LUPE NORTHAM | NMY133645 | Pershing | $ 16,264.47 |
| 214 | LUPE NORTHAM & BENNIE L NORTHAM JTWROS | NMY104422 | Pershing | $ 21,408.75 |
| 214 | MARIA CRUZ SALGADO & MA GUADALUPE NORTHAM JTWROS | NMY105346 | Pershing | $ 428,738.11 |
| 215 | IRA FBO SCOTT E NOTOWICH | NJM032938 | Pershing | $ 890.48 |
| 215 | SCOTT E NOTOWICH & JILL L NOTOWICH JTWROS | NJM020271 | Pershing | $ 77,441.39 |
| 223 | WILLIAM W PEERMAN | NJW090000 | Pershing | $ 9,650.52 |
| 225 | ERNESTO H PENA | NWR003828 | Pershing | $ 169,529.92 |
| 225 | ERNESTO PENA | NMZ005081 | Pershing | $ 5,602.33 |
| 229 | IRA FBO SARAMINTA PEREZ | NYQ001993 | Pershing | $ 88,528.46 |
| 230 | CARLOS A PEREZ | NJL002676 | Pershing | $ 449,869.67 |
| 230 | IRA FBO CARLOS A PEREZ | NMY105767 | Pershing | $ 8,655.50 |
| 230 | CARLOS A PEREZ | NMY004390 | Pershing | $ 672,971.33 |

| Appendix No. (see Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 232 | IRA FBO LOUIS M PERRY | NMY133884 | Pershing | $ 4,995.20 |
| 232 | LOUIS M PERRY & MARLENE F PERRY TIC | NMY104760 | Pershing | $ 9,677.47 |
| 234 | RANDALL AND EMILY PICKETT | 6QK402565 | Pershing | $ 193,589.85 |
| 237 | CHRISTOPHER ROBERT PRINDLE | NJF090041 | Pershing | $ 114,189.86 |
| 241 | IRA FBO JUDITH QUINONES | NYQ002165 | Pershing | $ 121,054.41 |
| 242 | SUMEET K RAI | NMY104737 | Pershing | $ 80,270.26 |
| 243 | MICHAEL B RALBY TRUST | NM2002050 | Pershing | $ 4,897.02 |
| 243 | IRA FBO MICHAEL RALBY | NM2003272 | Pershing | $ 2,740.53 |
| 250 | STEVEN B RESTIFO / ANDREA L RESTIFO JT TEN | NJB090599 | Pershing | $ 2,510.71 |
| 251 | IRA FBO SANTOS W RICARDO | NMZ020445 | Pershing | $ 2,055.08 |
| 255 | RIFFLE FAMILY TRUST - VICTORIA L RIFFLE & ALAN RIFFLE | NMY016469 | Pershing | $ 287,521.01 |
| 257 | STEPHEN D ROBINSON | NM4090186 | Pershing | $ 571,647.71 |
| 259 | EDDIE T ROLLINS | NNC003253 | Pershing | $ 56,158.34 |
| 268 | LOUIS J SCHAUFELE III & ANNIE LEE SCHAUFELE TIC | 887-60002 | JPMCC | $ 326,389.06 |
| 269 | IRA FBO JOHN W SCHWAB | NMW023673 | Pershing | $ 98,691.56 |
| 272 | IRA FBO HAYGOOD P SEAWELL SR | NJB002081 | Pershing | $ 2,026.04 |
| 275 | IRA FBO DOUGLAS B SHAW | NJL025271 | Pershing | $ 36,060.95 |
| 275 | IRA FBO DOUGLAS B SHAW | NMY060582 | Pershing | $ 90,231.40 |
| 275 | DOUGLAS B SHAW / MARTHA A SHAW TEN COM | NMY090027 | Pershing | $ 1,287,313.41 |
| 275 | DOUGLAS B SHAW | NMY090084 | Pershing | $ 5,747.50 |
| 280 | IRA FBO BRENT S SIMMONS | NMY133710 | Pershing | $ 129,704.00 |
| 280 | BRENT S SIMMONS & BONNIE L SIMMONS JTWROS | NMY104588 | Pershing | $ 47,561.32 |
| 283 | IRA FBO STEPHEN B SLEWITZKE | NJA001167 | Pershing | $ 230,269.46 |
| 285 | IRA FBO PAUL R STANLEY | NJM061911 | Pershing | $ 14,694.22 |
| 285 | PAUL STANLEY | NJM020412 | Pershing | $ 2,278.35 |
| 286 | SANFORD STEINBERG IRA | STSGC40942 | SEI | $ 24,270.00 |
| 287 | DAVID H STEPHENS / APRIL C STEPHENS JT TEN | 5LW900070 | Pershing | $ 75,030.00 |
| 297 | IRA FBO CHRISTOPHER B THOMAS | NMY134254 | Pershing | $ 4,582.67 |
| 297 | CHRISTOPHER B THOMAS & REBECCA THOMAS JTWROS | NMY105288 | Pershing | $ 6,199.15 |
| 300 | IRA FBO JOSE E TORRES | NMZ008580 | Pershing | $ 4,935.61 |
| 300 | JOSE E TORRES & SAYMARA RODRIGUEZ | NMZ001460 | Pershing | $ 14,227.69 |
| 301 | 00004 / CONFIDENTIAL II | NMY134619 | Pershing | $ 2,057,076.60 |
| 302 | AUDREY K TRUMAN | NNC010662 | Pershing | $ 102,300.82 |
| 302 | IRA FBO AUDREY KRODEL TRUMAN | NJK001034 | Pershing | $ 184,274.55 |
| 305 | MIGUEL R VALDEZ | NMY019422 | Pershing | $ 8,126.19 |
| 307 | IRA FBO TIMOTHY A VANDERVER III | NJB090086 | Pershing | $ 196,053.36 |
| 307 | TIMOTHY A VANDERVER III | NJB090094 | Pershing | $ 171,378.53 |

| Appendix No. (*see* Doc. 157) | Account Name(s) | Account Number | Institution | Net Worth as of April 14, 2010 |
|---|---|---|---|---|
| 310 | ETTORE VENTRICE / MARIA VENTRICE TEN ENT | 5LW903124 | Pershing | $ 173,945.01 |
| 313 | MARIA C VILLANUEVA / CARLOS J VILLANUEVA SR JT TEN | NMZ022946 | Pershing | $ 703,533.33 |
| 317 | IRA FBO CHARLES J VOLLMER | NMZ017292 | Pershing | $ 256,284.00 |
| 317 | CHARLES J VOLLMER REV TR | NMZ008614 | Pershing | $ 262,975.73 |
| 319 | WILLIAM A WHITAKER | NJB090201 | Pershing | $ 171,025.18 |
| 321 | IRA FBO DAVID S WHITTEMORE | NMY134189 | Pershing | $ 306,908.36 |
| 322 | C HUNTER WIDENER | NJK001018 | Pershing | $ 42,898.04 |
| 322 | IRA FBO C HUNTER WIDENER | NJK560302 | Pershing | $ 21,214.17 |
| 322 | C HUNTER WIDENER | NNC090003 | Pershing | $ 7,058.61 |
| 322 | IRA FBO C HUNTER WIDENER | NNC090037 | Pershing | $ 71,515.45 |
| 325 | MICHAEL W WORD | NMW004384 | Pershing | $ 4,003.36 |
| 325 | SEP FBO MICHAEL W WORD | NMW023855 | Pershing | $ 1,047.00 |
| 326 | ROBERT RYAN WROBLESKE / KATHLEEN S WROBLESKE TEN COM | NMY090191 | Pershing | $ 90,183.33 |
| 266 | IRA FBO JOHN D SANTI | NJM032789 | Pershing | $ 506,426.50 |

21

# EXHIBIT 3

From: Green, Jason
Sent: Tuesday, November 29, 2005 8:27 PM
To: Stanford, Allen; Bogar, Danny; Rollins, Eddie T.; Tello, Ana; Hodge, Julie
Cc: Green, Jason
Subject: GOOD NEWS: M5 Consulting Group

Allen,

I just wanted to share what I thought was some really good news and put my 2 cents in on this group. At Eddie's request, I met with four of the five team principals yesterday in Houston. Wow, I don't think I could have been more impressed. I really think you should meet with them.

Together they manage somewhere north of $10Billion, with revenues of over $20MM (Eddie has the exact figures). Of the 13,000 FAs at Citigroup, these folks are all in the top 30, and to our good fortune, it sounds like they're not treated much better than a mediocre FA is treated there.

Thinking that most of their business was institutional, I was not too optimistic with the possibility of them generating SIB deposits, although still excited about their potential contribution to SGC. However, I was very pleasantly suprised, after speaking with them. I did a brief presentation on SIB, which was very well received.

Over dinner, I sat next to Chris. He said that, not counting his $2B plus in institutional assets, he had over $1B in high net worth client assets (they get these folks as fallout from their institutional business - board members, philanthropists, etc). Of that $1B, he could easily see 10% of those funds going to SIB (i.e., $100mm just from him - he's 1 of 5). Basically, if all goes well, they could be an important part of helping you hit your $6.5B goal for SIB at end of 2006.

Now, I know there are a lot of considerations involved in putting a deal together that makes sense for everyone (I'm not involved in that, thankfully), and they still want to meet with Laura on the bank's portfolio, etc. But, my gut tells me that all that can all be worked out favorably.

If we get them, I think it will send shock waves through the financial advisory community, allowing us to pick and choose from an even higher caliber FA going forward. Chris said he could refer a bunch of people he knows to us for starters, as I'm sure the others could.

Finally, I have to tell you that ALL of the Stanford people were brilliant in my opinion . Ben never looked better- they loved him. The OFN guy (Greg Leakly) also knocked the cover off the ball, as did Jason DAmato, David Fontenot, Syed, AJ, Keith Roberts, Helen Durskin,....

This is a good time to tell you that I think that Danny, Eddie, and Rocky are doing a tremendous job under Jim's direction and your leadership of taking Stanford Group Holdings forward.

The quality of the people we're bringing into the firm and talking to weekly gets better and better (not just M5). With that and the evolution of the Stanford Investment Plan, I feel like I'm seeing your dream of building the best financial services firm in the world take shape before my eyes. It's exciting to see it!

Best regards,
Jason

Sent from my GoodLink synchronized handheld (www.good.com)

# EXHIBIT 4

**From:** Clement, Neal John
**Sent:** Thursday, March 27, 2008 8:22 PM
**To:** Thigpen, Scot A.
**Subject:** RE: Stanford CD

Yes, I show them one that is for 50K. I would suggest opening up one yourself. If the client sees you have invested in the product, it might make it easier for you to sell.


Neal Clement
Vice President, Financial Advisor

Stanford Group Company
110 E. Main Street
1st Floor
Tupelo, MS 38804

662-841-0254 Main
888-841-0254 Toll Free
662-842-0254 Fax

nclement@stanfordeagle.com

---

**From:** Thigpen, Scot A.
**Sent:** Thursday, March 27, 2008 3:19 PM
**To:** Clement, Neal John
**Subject:** RE: Stanford CD


But you will show it to a client?


Scot Thigpen, CPA/PFS, CFP®
*Vice President, Financial Advisor*
_____

**Stanford Group Company**
  1400 Meadowbrook Road, 1st Floor
  Jackson, MS 39211

   Voice: 601.364.7300
   Fax: 601.364.7307
   Cell: 601.842.2606

www.stanfordfinancial.com

---

**From:** Clement, Neal John
**Sent:** Thursday, March 27, 2008 3:17 PM
**To:** Thigpen, Scot A.
**Subject:** RE: Stanford CD


Homey don't think so. It has the amount on it.


Neal Clement
Vice President, Financial Advisor

Stanford Group Company
110 E. Main Street
1st Floor
Tupelo, MS 38804

662-841-0254 Main
888-841-0254 Toll Free
662-842-0254 Fax

nclement@stanfordeagle.com

---

**From:** Thigpen, Scot A.
**Sent:** Thursday, March 27, 2008 3:15 PM
**To:** Clement, Neal John
**Subject:** RE: Stanford CD

Please send me your CD so I can show it to some prospects

Scot Thigpen, CPA/PFS, CFP®
*Vice President, Financial Advisor*
_____

**Stanford Group Company**
   1400 Meadowbrook Road, 1st Floor
   Jackson, MS 39211

      Voice: 601.364.7300
      Fax: 601.364.7307
      Cell: 601.842.2606

www.stanfordfinancial.com

---

**From:** Clement, Neal John
**Sent:** Thursday, March 27, 2008 3:07 PM
**To:** Thigpen, Scot A.
**Subject:** RE: Stanford CD

Scot,

I never talk about the SIB portfolio to any of my clients. I mention that the portfolio is managed by a large number of managers with large minimums (50M and more). I sell the CD just like a AAA bond. I never use the word guarantee or anything close to that. I tell them a fixed rate of a certain amount.  I let them know that the bank has been around for almost twenty-two years and has never missed an interest payment and is fully backed by a multi-billion dollar company (Stanford). I show them my personal certificate with the fixed rate and yield and it does the selling for me. I also show them my personal monthly statements. I think most of them want to know how common it is to a U. S. Domestic CD or investment in the states rather than the portfolio backing it.  If I have a client that has to see the portfolio, the SIB is not for them!!!!! This investment isn't meant to compete with a U.S. CD, it is meant to give a fixed rate to a client as an alternative to a low yield on munis or some other investment in the market that might be yielding less.

Neal Clement

**24**

Vice President, Financial Advisor

Stanford Group Company
110 E. Main Street
1st Floor
Tupelo, MS 38804

662-841-0254 Main
888-841-0254 Toll Free
662-842-0254 Fax

nclement@stanfordeagle.com

---

**From:** Thigpen, Scot A.
**Sent:** Thursday, March 27, 2008 2:49 PM
**To:** Clement, Neal John
**Subject:** RE: Stanford CD

Neal,

Accredited Investors are pretty savvy investors lots of times. How do you show them these available CD rates and not have the info about the investment performance of the portfolio that you can discuss with them. If the CD is backed by the portfolio, seems like we could show the portfolio returns. Nobody ever needs to see a report on FDIC insurance because the perception of that strength is already there. How do we get assurance that this portfolio / product is guaranteed and only have a "I have been told it is a strong portfolio" rationale to share. Make sense?

This is an incredible time to be sharing this with accredited investors but it just seems that we need to be well equipped for the presentation.

HELP!!!!

Scot


Scot Thigpen, CPA/PFS, CFP®
*Vice President, Financial Advisor*
_____

**Stanford Group Company**
  1400 Meadowbrook Road, 1st Floor
  Jackson, MS 39211

   Voice: 601.364.7300
   Fax: 601.364.7307
   Cell: 601.842.2606

www.stanfordfinancial.com

---

**From:** Clement, Neal John
**Sent:** Thursday, March 27, 2008 2:40 PM
**To:** Thigpen, Scot A.
**Subject:** RE: Stanford CD

Laura has that info because she manages the global managers who are in charge of the portfolio at the bank.

There are about 17 to 19 managers in the U.S. and abroad. Doug has a lot of this because he was in on the meeting with Laura back at the end of Dec. 07 in Memphis. Also, I think Chris was there too. The managers have targeted performance vs. trying to make as much money for the bank as they can in any one good year. The money at the bank is more diversified than any portfolio that Stanford offers. They target 11 to 13% a year vs. other managers making as much as they can.


Neal Clement
Vice President, Financial Advisor

Stanford Group Company
110 E. Main Street
1st Floor
Tupelo, MS 38804

662-841-0254 Main
888-841-0254 Toll Free
662-842-0254 Fax

nclement@stanfordeagle.com

---

**From:** Thigpen, Scot A.
**Sent:** Thursday, March 27, 2008 2:21 PM
**To:** Clement, Neal John
**Subject:** RE: Stanford CD

Neal,

1)   How did you get that
2)   How do that do it?
3)   What info can be shared with prospects?

Thanks Neal,

Scot


Scot Thigpen, CPA/PFS, CFP®
*Vice President, Financial Advisor*
_____

**Stanford Group Company**
  1400 Meadowbrook Road, 1st Floor
  Jackson, MS 39211

   Voice: 601.364.7300
   Fax: 601.364.7307
   Cell: 601.842.2606

www.stanfordfinancial.com

---

**From:** Clement, Neal John
**Sent:** Thursday, March 27, 2008 2:18 PM
**To:** Thigpen, Scot A.
**Subject:** RE: Stanford CD

All I can tell you is what Laura has told me in the past week. She said that the safest investment Stanford has right now if you are looking for interest is the SIB. It is barely positive for the YTD performance..5 to 1% up.


Neal Clement
Vice President, Financial Advisor

Stanford Group Company
110 E. Main Street
1st Floor
Tupelo, MS 38804

662-841-0254 Main
888-841-0254 Toll Free
662-842-0254 Fax

nclement@stanfordeagle.com

---

**From:** Thigpen, Scot A.
**Sent:** Thursday, March 27, 2008 2:15 PM
**To:** Clement, Neal John; Holliday, John M.
**Subject:** Stanford CD

Neal and John Mark,

I have been searching to see if there is a way to find out how the CD portfolio is doing in these difficult markets. If it is holding up as well as it supposedly done in the past, then we have a good story to tell prospective clients.

It is difficult to find "presentable facts" to show how unique this product is and to show how we are able to provide positive returns even in light of horrible market conditions.

Where, if anywhere do you get info on this?

Scot


Scot Thigpen, CPA/PFS, CFP®
*Vice President, Financial Advisor*
_____

**Stanford Group Company**
  1400 Meadowbrook Road, 1st Floor
  Jackson, MS 39211

   Voice: 601.364.7300
   Fax: 601.364.7307
   Cell: 601.842.2606

www.stanfordfinancial.com

# EXHIBIT 5

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## OFFICE OF INSPECTOR GENERAL

### Case No. OIG-526

### Investigation of the SEC's Response to Concerns
### Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### March 31, 2010

**<u>REDACTION KEY</u>**

AC = Attorney-Client Privilege

DPP = Deliberative Process Privilege

LE = Law Enforcement Privilege

PII = Personal Identifying Information

PP = Personal Privacy

WP = Attorney Work Product

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# Report of Investigation

### Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### Case No. OIG-526

# Table of Contents

INTRODUCTION AND BACKGROUND ........................................................................ 1

SCOPE OF THE OIG INVESTIGATION ..................................................................... 2

    I.    E-MAIL SEARCHES AND REVIEW OF E-MAILS ......................................... 2

    II.    DOCUMENT REQUESTS AND REVIEW OF RECORDS ............................. 3

    III.    TESTIMONY AND INTERVIEWS ................................................................. 4

RELEVANT STATUTES, RULES AND REGULATIONS ........................................... 10

EXECUTIVE SUMMARY ........................................................................................... 16

RESULTS OF THE INVESTIGATION ........................................................................ 29

    I.    IN 1997, THE FWDO EXAMINATION STAFF REVIEWED STANFORD'S BROKER-DEALER OPERATIONS AND MADE A REFERRAL TO ENFORCEMENT DUE TO A CONCERN THAT ITS SALES OF CDs CONSTITUTED A PONZI SCHEME ........................................................................................ 29

        A.    Two Years After Stanford Group Company Began Operations, the SEC Identified It as a Risk and a Target For an Examination Based on Suspicions That Its CD Sales Were Fraudulent ....................................................................... 29

        B.    After Conducting a Short Examination, the Examination Staff Concluded That Stanford Was Probably Operating a Ponzi Scheme ................................................................................ 30

        C.    As a Result of Their Concerns That Stanford Was Operating a Ponzi Scheme, the Examination Staff Referred Their Stanford Findings to the Enforcement Staff ................................... 33

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

II.   EIGHT MONTHS AFTER THE EXAMINATION STAFF
      REFERRED STANFORD, THE ENFORCEMENT STAFF
      OPENED, AND QUICKLY CLOSED, A MATTER UNDER
      INQUIRY ................................................................................ 34

      A.   The 1998 Stanford MUI Was Likely Not Even Opened in
           Response to the Examination Staff's Referral, But in
           Response to a Concern From the U.S. Customs Department
           That Stanford Was Laundering Money ...................................... 34

      B.   After Stanford Refused to Produce Documents, No Further
           Investigative Steps Were Taken ............................................... 36

      C.   The Enforcement Staff Closed the 1998 Stanford MUI
           Three Months After It Was Opened ........................................... 37

           1.   The Enforcement Staff Told the Examination Staff
                That an Investigation of Stanford Was Not Warranted
                Because of the Lack of U.S. Investors ............................... 38

           2.   The Enforcement Staff Told the Examination Staff
                That an Investigation of Stanford Would Be Too
                Difficult Because of the Staff's Inability to Obtain
                Records From Antigua ...................................................... 39

           3.   SGC's Outside Counsel, a Former Head Of The
                SEC's Fort Worth Office, May Have Assured
                Barasch That "There Was Nothing There" ........................... 40

III.  IN 1998, THE FWDO EXAMINATION STAFF EXAMINED
      SGC'S INVESTMENT ADVISER OPERATIONS AND
      REACHED THE SAME CONCLUSION AS THE BROKER-
      DEALER EXAMINERS:  STANFORD'S CD SALES WERE
      PROBABLY FRAUDULENT ...................................................... 42

      A.   The 1998 Examination Concluded That SGC's Sales of SIB
           CDs Were Not Consistent With SGC's Fiduciary
           Obligation to Its Clients Under the Investment Advisers
           Act .................................................................................... 44

      B.   The Enforcement Staff Failed to Consider the Investment
           Adviser Examiners' Concerns in Deciding Not to
           Investigate Stanford Further .................................................. 46

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

IV.   IN 2002, THE SEC EXAMINERS EXAMINED SGC'S
      INVESTMENT ADVISER OPERATIONS AGAIN AND
      REFERRED STANFORD TO ENFORCEMENT ........................................... 47

      A.   In the 2002 Examination, the Examiners Found That
           Stanford's CD Sales Had Increased Significantly, Which
           Led to Concerns That the Potential Ponzi Scheme Was
           Growing ................................................................................. 47

      B.   The 2002 Examination Found That SGC Was Violating the
           Investment Advisers Act By Failing to Conduct Any Due
           Diligence Related to the SIB CDs ........................................... 50

      C.   During the 2002 Examination, the FWDO Enforcement
           Staff Received a Letter From the Daughter of an Elderly
           Stanford Investor Concerned That the Stanford CDs Were
           Fraudulent ............................................................................ 53

      D.   The FWDO Did Not Respond to the [Complainant 1] Letter and
           Did Not Take Any Action to Investigate Her Claims .............................. 55

      E.   Although a Decision Was Made to Forward the [Complainant 1]
           Letter to the Texas State Securities Board, the Letter Was
           Never Forwarded .................................................................... 56

      F.   In December 2002, the Examination Staff Referred Their
           Stanford Findings to the Enforcement Staff ........................................... 56

      G.   Based on the Earlier Decision to Forward the [Complainant 1]
           Letter to the TSSB, the "Matter" Was Considered Referred
           to the TSSB Even Before the 2002 Examination Report
           Was Sent to Enforcement ......................................................... 57

      H.   The Enforcement Staff Did Not Open an Inquiry Into
           Stanford and Did Not Even Review the 2002 Examination
           Report .................................................................................... 58

      I.   The Enforcement Staff Did Not Refer the 2002
           Examination Report Findings to the TSSB .............................................. 59

      J.   In December 2002, the SEC Examination Staff Attempted
           to Interest the Federal Reserve in Investigating Stanford,
           But Concluded That the Federal Reserve Had [DPP]
           [DPP] of Stanford ............................................................... 60

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

V.   IN 2003, THE SEC ENFORCEMENT STAFF RECEIVED
     TWO COMPLAINTS THAT STANFORD WAS A PONZI
     SCHEME, BUT NOTHING WAS DONE TO PURSUE THOSE
     COMPLAINTS ................................................................................. 63

     A.   [Confidential Source] in a Ponzi Scheme Case Filed By the SEC
          Noted Several Similarities Between That Case and
          Stanford's Operations ................................................................. 63

     B.   An Anonymous Insider Warned That Stanford Was
          Operating "a Massive Ponzi Scheme" ...................................... 65

VI.  IN OCTOBER 2004, THE EXAMINATION STAFF
     CONDUCTED A FOURTH EXAMINATION OF SGC IN
     ORDER TO REFER STANFORD TO THE ENFORCEMENT
     STAFF AGAIN .................................................................................. 70

     A.   The Examination Staff Was Alarmed at the Increasing Size
          of the Apparent Ponzi Scheme, and Accordingly, Made
          Another Enforcement Referral of Stanford a "Very High
          Priority" ...................................................................................... 70

     B.   The 2004 Examination Report Concluded That the SIB
          CDs Were Securities and Were Part of a "Very Large Ponzi
          Scheme" ....................................................................................... 72

     C.   The Examination Staff Conducted Significant Investigative
          Work During the Six Months From October 2004 Through
          March 2005 to Bolster Its Anticipated Enforcement
          Referral ........................................................................................ 74

     D.   In March 2005, Barasch and Degenhardt Learned of the
          Examination Staff's Work on Stanford and Told Them That
          it Was Not a Matter That Enforcement Would Pursue ............ 79

VII. IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT
     THE SEC, THE EXAMINATION STAFF REFERRED
     STANFORD TO ENFORCEMENT ................................................. 80

     A.   The Enforcement Staff Initially Reacted Enthusiastically to
          the Referral and Opened a MUI ................................................ 83

     B.   By June 2005, the Enforcement Staff Had Decided to Refer
          the Matter to the NASD, Apparently as a Precursor to
          Closing the Matter ...................................................................... 86

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

C. In September 2005, the Enforcement Staff Decided to Close the Stanford Investigation, But the Examination Staff Fought to Keep the Matter Open ............................................................. 90

D. In November 2005, the Head of the FWDO Enforcement Group Overruled Her Staff's Objections to Continuing the Stanford Investigation and Decided to Seek a Formal Order in Furtherance of That Investigation ........................................................ 95

VIII. THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN "EMERGENCY ACTION" AGAINST SIB BASED ON CIRCUMSTANTIAL EVIDENCE THAT IT WAS OPERATING A PONZI SCHEME ........................................ 98

IX. THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN ACTION AGAINST SGC'S BROKER-DEALER FOR VARIOUS VIOLATIONS OF THE FEDERAL SECURITIES LAWS ..................................................................... 103

X. THE ENFORCEMENT STAFF DID NOT CONSIDER FILING AN ACTION UNDER THE INVESTMENT ADVISERS ACT THAT COULD HAVE POTENTIALLY SHUT DOWN SGC'S SALES OF THE SIB CDs ............................................................................ 109

A. The Issue of Whether the Stanford CDs Were Securities Was Irrelevant to an Action Against SGC For Violations of the Anti-Fraud Provisions of the Investment Advisers Act .................... 110

B. The Enforcement Staff Did Not Consider Filing a Section 206 Case or Conducting a Section 206 Investigation ............................. 112

1. The 2005 Referral Did Not Mention Section 206 ........................... 112

2. Neither Cohen's nor Preuitt's November 2005 Memorandum Discussed a Section 206 Violation .......................... 113

3. When the FWDO Staff Met With Addleman, She Was Unaware That SGC Was an Investment Adviser ................... 114

C. The Enforcement Staff Could Have Filed a Section 206 Case With the Potential For Shutting Down SGC's Sales of the SIB CDs and/or Discovering Evidence of the Ponzi Scheme ................. 115

XI. HAD THE SEC FILED AN ACTION EARLIER, SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY HAVE BEEN AVOIDED .............................................................................. 118

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

XII.   THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING
AN ACTION AGAINST STANFORD EARLIER WAS DUE,
IN PART, TO THE STAFF'S PERCEPTION THAT THE
CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF
CASE FAVORED BY THE COMMISSION ................................................... 121

    A.   Senior Enforcement Management Emphasized the Need
For "Stats" ................................................................................................ 121

    B.   The Pressure For "Stats" May Have Discouraged the Staff
From Pursuing Difficult Cases ................................................................ 124

    C.   Ponzi Scheme Cases Were Disfavored by Senior
Enforcement Officials ............................................................................. 128

    D.   The SEC Bureaucracy May Have Discouraged the Staff
From Pursuing Novel Legal Cases ......................................................... 129

XIII. AFTER LEAVING THE SEC, BARASCH SOUGHT TO
REPRESENT STANFORD IN CONNECTION WITH THE
SEC INVESTIGATION ON THREE SEPARATE OCCASIONS
AND DID REPRESENT STANFORD FOR A LIMITED
PERIOD OF TIME ........................................................................................... 131

    A.   In June 2005, Two Months After Leaving the SEC, Barasch
Sought to Represent Stanford and Was Advised He Could
Not Do So ................................................................................................ 131

    B.   In September 2006, Stanford Retained Barasch to
Represent it in Connection With the SEC's Investigation of
Stanford, and Barasch Performed Legal Work on Behalf of
Stanford ................................................................................................... 137

    C.   In Late November 2006, After He Had Already Performed
Legal Work on Stanford's Behalf, Barasch For the Second
Time Sought SEC Approval to Represent Stanford and Was
Again Told He Could Not Do So ............................................................ 142

    D.   Immediately After the SEC Sued Stanford on February 17,
2009, Barasch Again Sought to Represent Stanford, This
Time in the Litigation ............................................................................. 145

CONCLUSION ......................................................................................................... 149

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## INTRODUCTION AND BACKGROUND

On February 17, 2009, the Securities and Exchange Commission ("SEC" or "Commission") filed an action in the U.S. District Court for the Northern District of Texas alleging that Robert Allen Stanford and his companies (collectively, hereinafter, referred to as "Stanford") orchestrated an $8 billion fraud based on false promises of guaranteed returns related to certificates of deposit ("CDs") issued by the Antiguan-based Stanford International Bank ("SIB"). The SEC's Complaint alleged that SIB sold approximately $8 billion of CDs to investors by promising returns that were "improbable, if not impossible." Complaint, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-09CV0298-L (N.D. Tex. filed February 17, 2009), attached as Exhibit 1, at ¶ 30. Pursuant to the SEC's request for emergency relief, the Court immediately issued a temporary restraining order, froze the defendants' assets, and appointed a receiver to marshal those assets.[1] After reviewing documents obtained from the court-appointed receiver, the SEC filed an amended complaint on February 27, 2009, further alleging that Stanford was conducting a Ponzi scheme.[2]

Shortly after the SEC filed its action against Stanford, the SEC's Office of Inspector General ("OIG") received several complaints alleging that the SEC's Fort Worth District Office ("FWDO")[3] had not diligently pursued its investigation of Stanford until the Madoff Ponzi scheme collapsed in December 2008. The complaints also criticized the SEC for "standing down" from its investigation at some point in response to a request from another federal law enforcement entity.

The OIG investigated those specific allegations and issued a report on June 19, 2009. *See* Report of Investigation ("ROI"), Case No. OIG-516, entitled, "Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation."[4] The OIG

---

[1]    *See* Temporary Restraining Order, Order Freezing Assets, Order Requiring An Accounting, Order Requiring Preservation of Documents, and Order Authorizing Expedited Discovery, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-09CV0298-L (N.D. Tex. filed February 17, 2009), attached as Exhibit 2; Order Appointing Receiver, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-09CV0298-L (N.D. Tex. filed February 17, 2009), attached as Exhibit 3.

[2]    *See* First Amended Complaint, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-09CV0298-L (N.D. Tex. filed February 27, 2009), attached as Exhibit 4.

[3]    The Fort Worth office of the SEC was elevated to a Regional Office on April 2, 2007. Since then, the Fort Worth office has reported directly to the SEC's Headquarters Office in Washington, DC. Prior to April 2007, the Fort Worth office was a District Office that reported to the SEC's Central Regional Office in Denver.

[4]    The OIG investigation found that the FWDO staff had investigated Stanford before the December 2008 revelations about Madoff's Ponzi scheme, but that its efforts to pursue its suspicions of a Ponzi scheme had been hampered by:  1) a lack of cooperation on the part of Stanford and his counsel; 2) certain jurisdictional obstacles; and 3) according to a U.S. Department of Justice ("DOJ") indictment, criminal obstruction of the FWDO's Stanford investigation by several individuals including the head of Antigua's Financial Services Regulatory Commission. *See* Report of Investigation, Case No. OIG-516, entitled "Investigation of Fort

(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

received a letter, dated October 9, 2009, from the Honorable David Vitter, United States Senate, and the Honorable Richard Shelby, United States Senate, requesting "a more comprehensive and complete investigation of the handling of the investigation into Robert Allen Stanford and his various companies.…"  The letter specifically requested that the OIG review, *inter alia*, the "history of all of the SEC's investigations and examinations (conducted either by the Division of Enforcement or by the Office of Compliance Inspections and Examinations) regarding Stanford."  Accordingly, the OIG opened this investigation on October 13, 2009.  This investigation focused on any indications that the SEC had received prior to 2006 that Stanford was operating a Ponzi scheme or other similar fraud and what actions, if any, the SEC took in response.

## SCOPE OF THE OIG INVESTIGATION

## I.      E-MAIL SEARCHES AND REVIEW OF E-MAILS

Between October 13, 2009, and February 16, 2010, the OIG made numerous requests to the SEC's Office of Information Technology ("OIT") for the e-mails of current and former SEC employees for various periods of time pertinent to the investigation.  The e-mails were received, loaded onto computers with specialized search tools and searched on a continuous basis throughout the course of the investigation.

In all, the OIG received from OIT e-mails for a total of 42 current and former SEC employees for various time periods pertinent to the investigation, ranging from 1997 to 2009.  These included:  35 current or former FWDO employees, two current or former Headquarters Office of Compliance Inspections and Examinations ("OCIE") employees, two current or former Headquarters Division of Trading and Markets employees, one current Headquarters Division of Enforcement ("Enforcement") employee, one current Headquarters Ethics Office employee, and one former Office of Economic Analysis ("OEA") employee.  The OIG estimates that it obtained and searched over 2.7 million e-mails during the course of its investigation.

---

Worth Regional Office's Conduct of the Stanford Investigation." at http://www.sec.gov/foia/docs/oig-516-redacted.pdf.

The OIG investigation also found that in April 2008, the FWDO staff had referred its suspicion that Stanford was operating a Ponzi scheme to DOJ, and that subsequently, the FWDO staff, at DOJ's request, had effectively halted its Stanford investigation.  *Id.*  Immediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation had become more urgent for the FWDO staff and, after ascertaining that the DOJ investigation was in its preliminary phase, the FWDO staff had moved forward with its Stanford investigation.  *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## II.      DOCUMENT REQUESTS AND REVIEW OF RECORDS

On October 27, 2009, the OIG sent comprehensive document requests to both Enforcement and OCIE, specifying the documents and records we required to be produced for the investigation.  The OIG had numerous e-mail and telephonic communications with Enforcement and OCIE regarding the scope and timing of the document requests and responses, as well as meetings to clarify and expand the document requests, as necessary.

We carefully reviewed and analyzed the information received as a result of our document production requests.  These documents included, but were not limited to, those relating to:  (1) a 1998 Stanford inquiry (MFW-00894); (2) a Stanford inquiry and investigation opened in 2005 (MFW-02973 and FW-02973); (3) a 1997 Broker-Dealer ("B-D") examination of Stanford (Examination No. 06-D-97-037); (4) a 1998 Investment Adviser ("IA") examination of Stanford (Examination No. 98-F-71); (5) a 2002 IA examination of Stanford (Examination No. IA 2003 FWDO 012); and (6) a 2004 B-D examination of Stanford (Examination No. BD 2005 FWDO 001).  In instances when documents were not available concerning a relevant matter, the OIG sought testimony and conducted interviews of current and former SEC personnel with possible knowledge of the matter.

The OIG also requested documents from the Financial Industry Regulatory Authority ("FINRA"), including documents concerning communications between FINRA or its predecessor, the National Association of Securities Dealers ("NASD") and the SEC concerning Stanford, and documents concerning the SEC's examinations and inquiries of Stanford.  The OIG also received and reviewed documents provided by the Stanford Victims Coalition, including the results of surveys of Stanford investors conducted by the Stanford Victims Coalition.

The OIG also reviewed numerous other publicly available documents, including: (1) Complaints filed by the SEC against Stanford and related parties in 2009; (2) the 2009 indictment of Robert Allen Stanford and others; (3) articles in various news media concerning Stanford; and (4) SEC Litigation Releases and an Administrative Proceeding Release concerning ▮▮▮▮▮▮[?]

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## III.   TESTIMONY AND INTERVIEWS

The OIG conducted 51 testimonies and interviews of 48 individuals with knowledge of facts or circumstances surrounding the SEC's examinations and/or investigations of Stanford and his companies.

SEC Inspector General H. David Kotz personally led the questioning in the testimony and interviews of nearly all the witnesses in the investigation.  Kotz also led the investigative team for this ROI, which included [PII] [PII] [PII].[5]

The OIG conducted testimony on-the-record and under oath of the following 28 individuals:

1)   Julie Preuitt, Assistant Director (former Branch Chief), FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on December 14, 2009 ("December 14, 2009 Preuitt Testimony Tr."), and January 26, 2010 ("January 26, 2010 Preuitt Testimony Tr.").  Excerpts of Testimony Transcripts attached as Exhibits 5 and 6, respectively.

2)   [ENF Staff Atty 1], former Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; taken on December 14, 2009 ("[ENF Staff Atty 1] Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 7.

3)   Mary Lou Felsman, former Assistant District Administrator, FWDO Examination program, Securities and Exchange Commission; taken on December 15, 2009 ("Felsman Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 8.

4)   [Staff Acct 1] Staff Accountant, FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on December 15, 2009 ("[Staff Acct 1] Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 9.

5)   Unidentified former Branch Chief, FWDO Enforcement program, Securities and Exchange Commission; December 15, 2009 ("Unidentified Former FWDO Enforcement Branch Chief Testimony Tr.").  Excerpts of Interview Transcript attached as Exhibit 10.

---

[5]   Significant assistance in this investigation was also provided by [PII] [PII].

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

6)    █ IA Examiner 3 █ Examiner, FWDO Investment Adviser Examination group, Securities and Exchange Commission; taken on January 11, 2010 ("█ IA Examiner 3 █ Testimony Tr."). Excerpts of Interview Transcript attached as Exhibit 11.

7)    █ IA Examiner 1 █ Examiner, FWDO Investment Adviser Examination group, Securities and Exchange Commission; taken on January 11, 2010 █ IA Examiner 1 █ Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 12.

8)    █ ENF BC 4 █, Branch Chief, FWDO Enforcement program, Securities and Exchange Commission; taken on January 11, 2010 ("█ ENF BC 4 █ Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 13.

9)    █ ENF Staff Atty 6 █, Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; taken on January 11, 2010.

10)    █ ENF Staff Atty 4 █ Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission, █ PII █ █ PII █ taken on January 11, 2010 █ ENF Staff Atty █ Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 14.

11)    █ ENF BC 2 █, Branch Chief, FWDO Enforcement program, Securities and Exchange Commission; taken on January 12, 2010 ("█ ENF BC 2 █ Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 15.

12)    Unidentified former Branch Chief, FWDO Examination group, Securities and Exchange Commission; taken on January 12, 2010 ("Unidentified Former FWDO Examination Branch Chief Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 16.

13)    █ IA Examiner 2 █ Examiner, FWDO Investment Adviser Examination group, Securities and Exchange Commission; taken on January 13, 2010 ("█ IA Examiner 2 █ Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 17.

14)    █ BD Exam BC 3 █ █ PII █ Branch Chief, FWDO Broker-Dealer Examination group and former Examiner, FWDO Investment Adviser Examination group, Securities and Exchange Commission; taken on January 26, 2010.

15)    Victoria Prescott, Special Senior Counsel, FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on

**40**

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

January 27, 2010 ("Prescott Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 18.

16) [ENF Asst Dir 1], Assistant Director, FWDO Enforcement program, Securities and Exchange Commission; taken on January 27, 2010[ENF Asst Dir 1]estimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 19.

17) Hugh Wright, former Assistant District Administrator, FWDO Examination group (former Assistant Director, FWDO Enforcement program), Securities and Exchange Commission; taken on January 27, 2010 ("Wright Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 20.

18) [Exam Sr Cnsl] Senior Counsel, FWDO Examination program, Securities and Exchange Commission; taken on January 27, 2010 ("[Exam Sr Cnsl] Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 21.

19) Katherine Addleman, former Associate District Director, FWDO Enforcement group, Securities and Exchange Commission; taken on January 28, 2010 ("Addleman Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 22.

20) [BD Exam BC 2] Branch Chief [PII], FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on January 28, 2010[BD Exam BC 2]Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 23.

21) [BD Exam BC 1] Branch Chief, FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on January 28, 2010 [BD Exam BC 1] Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 24.

22) Jeffrey Cohen, Assistant Director, FWDO Enforcement program, Securities and Exchange Commission; taken on February 16, 2010 ("Cohen Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 25.

23) [ENF Staff Atty 5] Trial Counsel, FWDO[PII], FWDO Enforcement program), Securities and Exchange Commission; taken on February 16, 2010 ([ENF Staff Atty]Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 26.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

24)     [ENF Staff Atty 2] Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; taken on February 16, 2010 [ENF Staff Atty] Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 27.

25)     Richard Connor, Assistant Ethics Counsel, Securities and Exchange Commission; taken on February 23, 2010 ("Connor Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 28.

26)     [BD Examiner 1] Examiner, FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on February 26, 2010 [BD Examiner 1] Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 29.

27)     [ENF BC 3] Branch Chief, FWDO Enforcement program, Securities and Exchange Commission; taken on March 2, 2010 [ENF BC 3] Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit 30.

28)     [Sen Cnsl] Senior Counsel, [PII] Securities and Exchange Commission; taken on March 11, 2010.

   The OIG also conducted interviews of the following 20 persons with relevant expertise and/or knowledge of information pertinent to the investigation:

1)     Julie Preuitt, Assistant Director (former Branch Chief), FWDO Broker-Dealer Examination group; conducted on October 2, 2009 ("Preuitt Interview Tr."), and November 2, 2009 ("Preuitt Interview Memorandum"), attached as Exhibits 31 and 32, respectively.

2)     Victoria Prescott, Special Senior Counsel, FWDO Broker-Dealer Examination program, Securities and Exchange Commission; conducted on October 29, 2009 ("Prescott Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 33.

3)     [ENF Staff Atty 4] Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; conducted on November 3, 2009 ("[ENF Staff Atty 4] Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 34.

4)     [ENF Staff Atty 3] former Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; conducted on November 9, 2009.

5)     [OEA 1] [PII] SEC Office of Economic Analysis, Securities and Exchange Commission; conducted on February 3 and 5, 2010 [OEA 1] Interview Memorandum").  Memorandum of Interview attached as Exhibit 35.

**42**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

6)      Harold Degenhardt, former District Administrator, FWDO, Securities and Exchange Commission; conducted on February 17, 2010 ("Degenhardt Interview Memorandum").  Memorandum of Interview attached as Exhibit 36.

7)      Wayne Secore, Partner, Secore & Waller LLP; former District Administrator, FWDO; conducted February 17, 2010 ("Secore Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 37.

8)      Jack Ballard, Partner, Ballard & Littlefield, L.L.P.; former Partner, Ogden Gibson White & Broocks, L.L.P.; conducted February 19, 2010 ("Ballard Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 38.

9)      TSSB Empl 1 PII Texas State Securities Board; conducted on February 24, 2010 TSSB Empl 1 Interview Memorandum").  Memorandum of Interview attached as Exhibit 39.

10)     Denise Crawford, Texas Securities Commissioner, Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum").  Memorandum of Interview attached as Exhibit 40.

11)     TSSB Empl 2 PII Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum").  Memorandum of Interview attached as Exhibit 40.

12)     TSSB Empl 3 PII Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum").  Memorandum of Interview attached as Exhibit 40.

13)     Spencer Barasch, Partner, Andrews Kurth LLP; former Assistant Director, FWDO Enforcement program, Securities and Exchange Commission; conducted on March 2, 2010 ("Barasch Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 41.

14)     Leyla [Basagoitia] Wydler, former registered representative of Stanford Group Company; conducted on March 3, 2010 ("Wydler Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 42.

15)     Charles Rawl, President, Zenith Wealth Management, LLC; former Financial Advisor, Stanford Group Company; conducted on March 9, 2010 ("Rawl and Tidwell Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 43.

16)     Mark Tidwell, CEO, Zenith Wealth Management, LLC; former Financial Advisor, Stanford Group Company; conducted on March 9, 2010 ("Rawl

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

and Tidwell Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 43.

17) ███████████████████████████ Division of Risk, Strategy, and Financial Innovation; conducted on March 22, 2010 ████████ Interview Memorandum").  Memorandum of Interview attached as Exhibit 44.

18) ███████████████████████████, Division of Risk, Strategy, and Financial Innovation; conducted on March 23, 2010 ████████ and Berman Interview Memorandum").  Memorandum of Interview attached as Exhibit 45.

19) Gregg Berman, Senior Policy Advisor, Division of Risk, Strategy, and Financial Innovation; conducted on March 23, 2010 ████████ and Berman Interview Memorandum").  Memorandum of Interview attached as Exhibit 45.

20) Stanford Victim; conducted on March 26, 2010 ("Stanford Victim Interview Memorandum").  Memorandum of Interview attached as Exhibit 46.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## RELEVANT STATUTES, RULES AND REGULATIONS

### The Commission's Conduct Regulation and Canons of Ethics

The Commission's Regulation Concerning Conduct of Members and Employees and Former Members and Employees of the Commission (hereinafter "Conduct Regulation"), at 17 C.F.R. §§ 200.735-1 *et seq*., sets forth the standards of ethical conduct required of Commission members and current and former employees of the SEC (hereinafter, referred to collectively as "employees"). The Conduct Regulation states in part:

> The Securities and Exchange Commission has been entrusted by Congress with the protection of the public interest in a highly significant area of our national economy. In view of the effect which Commission action frequently has on the general public, it is important that . . . employees . . . maintain unusually high standards of honesty, integrity, impartiality and conduct. . . .

17 C.F.R. § 200.735-2.

Rule 8 of the Conduct Regulation prohibits a former Commission employee from appearing before the Commission in a representative capacity in a particular matter in which he or she participated personally and substantially while an employee of the Commission. 17 C.F.R. § 200.735-8 (a)(1).[6] For purposes of Rule 8, a matter is defined as a "discrete and isolatable transaction or set of transactions between identifiable parties." 17 C.F.R. § 200.735-8(a)(1).

The Commission's staff has the obligation to continuously and diligently examine and investigate instances of securities fraud, as set forth in the Commission's Canons of Ethics. 17 C.F.R. §§ 200.50, *et seq*. The Canons of Ethics state that "[i]t is characteristic of the administrative process that the Members of the Commission and their place in public opinion are affected by the advice and conduct of the staff, particularly the professional and executive employees." 17 C.F.R. § 200.51. Hence, "[i]t [is] the policy of the Commission to require that employees bear in mind the principles in the Canons." *Id*.

---

[6]   Rule 8 also imposes a two-year restriction on a former employee from appearing before the Commission in a representative capacity in any matter that was under his or her official responsibility as an employee of the Commission "at any time within a period of [one] year prior to the termination of such responsibility." 17 C.F.R. § 200.735-8(a)(3).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The Canons provide that "[i]n administering the law, members of this Commission should vigorously enforce compliance with the law by all persons affected thereby." 17 C.F.R. § 200.55. The Canons acknowledge that Members of the Commission "are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people," and that "[i]t is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens." 17 C.F.R. § 200.53. According to the Canons, "[t]heir success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions." *Id.* The Canons also affirm, "A member should not be swayed by partisan demands, public clamor or considerations of personal popularity or notoriety; so also he should be above fear of unjust criticism by anyone." 17 C.F.R. § 200.58. The Canons further state, "A member should not, by his conduct, permit the impression to prevail that any person can improperly influence him, or that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person." 17 C.F.R. § 200.61.

## Government-Wide Standards of Ethical Conduct

The Standards of Ethical Conduct for Employees of the Executive Branch include the following general principles that apply to every federal employee:

> (1)     Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.

* * *

> (5)     Employees shall put forth honest effort in the performance of their duties.

* * *

> (14)     Employees shall endeavor to avoid any actions creating the appearance that they are violating the law of the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

5 C.F.R. § 2635.101(b).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## Federal Post-Employment Statutes and Rules

Federal conflict-of-interest laws impose on former government employees a lifetime ban on making a communication to or appearance before a federal agency or court as follows:

> Any person who is an officer or employee . . . of the executive branch of the United States (including any independent agency of the United States) . . . and who, after termination of his or her service or employment with the United States . . ., knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department agency [or] court . . . on behalf of any other person (except the United States . . . ) in connection with a particular matter –
>
> > (A)   in which the United Sates . . . is a party or has a direct and substantial interest,
> >
> > (B)   in which the person participated personally and substantially as such officer or employee, and
> >
> > (C)   which involved a specific party or specific parties at the time of such participation,
>
> shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a)(1).[7]

The statute defines "the term 'participated' [as] an action taken as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or other such action…."  18 U.S.C. § 207(i)(2).  *See also* 5 C.F.R. § 2641.201(i)(1).  Under the implementing ethics regulations, "[t]o participate 'personally' means to participate:  (i) Directly, either individually or in combination with other persons; or (ii) Through direct and active supervision of the participation of any person [the employee] supervises, including a subordinate."  5 C.F.R. § 2641.201(i)(2). "To participate 'substantially' means that the employee's involvement is of significance to the matter."  5 C.F.R. § 2641.201(i)(3).  Participation may be substantial even if "it is not determinative of the outcome of a particular matter."  *Id.*

---

[7]     In addition, like Rule 8(a)(3), 18 U.S.C. § 207(a)(2) contains a two-year restriction pertaining to particular matters which a former employee "knows or reasonably should know [were] actually pending under his or her official responsibility as [a government] officer or employee within a period of [one] year before the terminating of his or her service or employment with the United States . . . ."

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Further, the statute defines "the term 'particular matter' [as] any investigation, application, request for a ruling or determination, rulemaking, contract, controversy, claim, charge, accusation, arrest, or judicial or other proceeding." 18 U.S.C. § 207(i)(3). The implementing regulations clarify the statutory prohibition as follows:

> The prohibition applies only to communications or appearances in connection with the same particular matter involving specific parties in which the former employee participated as a Government employee. The same particular matter may continue in another form or in part. In determining whether two particular matters involving specific parties are the same, all relevant factors should be considered, including the extent to which the matters involve the same basic facts, the same or related parties, related issues, the same confidential information, and the amount of time elapsed.

5 C.F.R. § 2641.201(h)(5)(i).

The regulations also make clear that "[w]hen a particular matter involving specific parties begins depends on the facts," and provide, in part, as follows:

> A particular matter may involve specific parties prior to any formal action or filings by the agency or other parties. Much of the work with respect to a particular matter is accomplished before the matter reaches its final stage, and preliminary or informal action is covered by the prohibition, provided that specific parties of the matter actually have been identified.

5 C.F.R. § 2641.201(h)(4). One of the examples contained in the regulations provides as follows:

> A Government employee participated in internal agency deliberations concerning the merits of taking enforcement action against a company for certain trade practices. He left the Government before any charges were filed against the company for certain trade practices. He has participated in a particular matter involving specific parties and may not represent another person in connection with the ensuing administrative or judicial proceedings against the company.

Comment 1 to 5 C.F.R. § 2641.201(h)(4).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## Bar Rules of Professional Conduct

The District of Columbia Bar's Rules of Professional Conduct provide as follows:

> Rule 1.11—Successive Government and Private
> Employment
>
> (a)    A lawyer shall not accept other employment in
> connection with a matter which is the same as, or
> substantially related to, a matter in which the lawyer
> participated personally and substantially as a public
> officer or employee.  Such participation includes
> acting on the merits of a matter in a judicial or other
> adjudicative capacity.

District of Columbia Rules of Professional Conduct, Rule 1.11, attached as Exhibit 47.

Comment 4 to Rule 1.11 discusses the meaning of the term "substantially related" as used in the rule, in part, as follows:

> The leading case defining "substantially related" matters in
> the context of former government employment is *Brown v.*
> *District of Columbia Board of Zoning Adjustment*, 486
> A.2d 37 (D.C. 1984)(en banc).  There the D.C. Court of
> Appeals, *en banc*, held that in the "revolving door" context,
> a showing that a reasonable person, could infer that,
> through participation in one matter as a public officer of
> employee, the former government lawyer "may have had
> access to information legally relevant to, or otherwise
> useful in" a subsequent representation, is *prima facie*
> evidence that the two matters are substantially related.  If
> this *prima facie* showing is made, the former government
> lawyer must disprove any ethical impropriety by showing
> that the lawyer "could not have gained access to
> information during the first representation that might be
> useful in the later representation."

*Id.*

The Texas Disciplinary Rules of Professional Conduct provide as follows:

> Rule 1.10 Successive Governments and Private
> Employment
>
> (a)    Except as law may otherwise expressly permit, a
> lawyer shall not represent a private client in

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

connection with a matter in which the lawyer
participated personally and substantially as a public
officer or employee, unless the appropriate
government agency consents after consultation.

*See* Texas Disciplinary Rules of Professional Conduct, Rule 1.10, attached as Exhibit 48.

For purposes of the above rule, the term "matter" includes:

(1)     Any adjudicatory proceeding, application, request
        for a ruling or other determination, contract, claim,
        controversy, investigation, charge accusation, arrest
        or other similar, particular transaction involving a
        specific party or parties; and

(2)     any other action or transaction covered by the
        conflict of interest rules of the appropriate
        government agency.

*Id*. at Rule 1.10(f).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## EXECUTIVE SUMMARY

The OIG investigation found that the SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to that conclusion a mere two years after Stanford Group Company ("SGC"), Stanford's investment adviser, registered with the SEC in 1995. We found that over the next 8 years, the SEC's Fort Worth Examination group conducted four examinations of Stanford's operations, finding in each examination that the CDs could not have been "legitimate," and that it was "highly unlikely" that the returns Stanford claimed to generate could have been achieved with the purported conservative investment approach. Fort Worth examiners dutifully conducted examinations of Stanford in 1997, 1998, 2002 and 2004, concluding in each case that Stanford's CDs were likely a Ponzi scheme or a similar fraudulent scheme. The only significant difference in the Examination group's findings over the years was that the potential fraud grew exponentially, from $250 million to $1.5 billion.

While the Fort Worth Examination group made multiple efforts after each examination to convince the Fort Worth Enforcement program ("Enforcement") to open and conduct an investigation of Stanford, no meaningful effort was made by Enforcement to investigate the potential fraud or to bring an action to attempt to stop it until late 2005. In 1998, Enforcement opened a brief inquiry, but then closed it after only 3 months, when Stanford failed to produce documents evidencing the fraud in response to a voluntary document request from the SEC. In 2002, no investigation was opened even after the examiners specifically identified multiple violations of securities laws by Stanford in an examination report. In 2003, after receiving three separate complaint letters about Stanford's operations, Enforcement decided not to open an investigation or even an inquiry, and did not follow up to obtain more information about the complaints.

In late 2005, after a change in leadership in Enforcement and in response to the continuing pleas by the Fort Worth Examination group, who had been watching the potential fraud grow in examination after examination, Enforcement finally agreed to seek a formal order from the Commission to investigate Stanford. However, even at that time, Enforcement missed an opportunity to bring an action against SGC for its admitted failure to conduct any due diligence regarding Stanford's investment portfolio, which could have potentially completely stopped the sales of the Stanford International Bank ("SIB") CDs though the SGC investment adviser, and provided investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent. The OIG investigation found that this particular action was not considered, partially because the new head of Enforcement in Fort Worth was not apprised of the findings in the investment advisers' examinations in 1998 and 2002, or even that SGC had registered as an investment adviser, a fact she learned for the first time in the course of this OIG investigation in January 2010.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The OIG did not find that the reluctance on the part of the SEC's Fort Worth Enforcement group to investigate Stanford was related to any improper professional, social or financial relationship on the part of any former or current SEC employee.  We found evidence, however, that SEC-wide institutional influence within Enforcement did factor into its repeated decisions not to undertake a full and thorough investigation of Stanford, notwithstanding staff awareness that the potential fraud was growing.  We found that senior Fort Worth officials perceived that they were being judged on the numbers of cases they brought, so-called "stats," and communicated to the Enforcement staff that novel or complex cases were disfavored.  As a result, cases like Stanford, which were not considered "quick-hit" or "slam-dunk" cases, were not encouraged.

The OIG investigation also found that the former head of Enforcement in Fort Worth, who played a significant role in multiple decisions over the years to quash investigations of Stanford, sought to represent Stanford on three separate occasions after he left the Commission, and in fact represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

The first SEC examination of Stanford occurred in 1997, two years after SGC began operations and registered with the SEC, when the SEC Fort Worth Examination staff identified SGC as a risk and target for examination.  After reviewing SGC's annual audit in 1997, a former branch chief in the Fort Worth Broker-Dealer Examination group noted that, based simply on her review of SGC's financial statements, she "became very concerned" about the "extraordinary revenue" from the CDs and immediately suspected the CD sales were fraudulent.

In August 1997, after six days of field work in an examination of Stanford, the examiners concluded that SIB's statements promoting the CDs appeared to be misrepresentations.  The examiners noted that while the CD products were promoted as being safe and secure, with investments in "investment-grade bonds, securities and Eurodollar and foreign currency deposits" to "ensure safety of assets," the interest rate, combined with referral fees of between 11% and 13.75% annually, was simply too high to be achieved through the purported low-risk investments.

The branch chief concluded after the 1997 examination that the SIB CDs purported above-market returns were "absolutely ludicrous," and that the high referral fees SGC was paid for selling the CDs indicated they were not "legitimate CDs."  The Assistant District Administrator for the Fort Worth Examination program concurred, noting that there were "red flags" about Stanford's operations that caused her to believe it was a Ponzi scheme, specifically the fact that the "interest that they were purportedly paying on these CDs was significantly higher than what you could get on a CD in the United States."  She further concluded that it was "highly unlikely" that the returns Stanford claimed to generate could be achieved with the purported conservative investment approach.

**52**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The examiners also were concerned about the recurring annual "trailer" or "referral" fee that SGC received from SIB for referring CD investors to SIB, which they viewed to be "oddly high" and suspicious.  This suspicion was heightened because the examiners found that SGC did not maintain books and records for the CD sales, and purported to have no actual information about SIB or the bases for the generous returns that the CDs generated, notwithstanding the fact that they were recommending the CDs to their clients and receiving these annual recurring fees for their referrals.

Further, the examiners made the surprising discoveries of a $19 million cash contribution that Robert Allen Stanford made personally to SGC in 1996, and of significant loans from SIB to Stanford personally, discoveries which the branch chief testified were red flags that made her assume that Stanford "was possibly stealing from investors."  In the SEC's internal tracking system, in which it recorded data about its examinations, the Broker-Dealer Examination group characterized its conclusion from the 1997 examination of SGC as "Possible misrepresentations.  Possible Ponzi scheme."

The OIG investigation found that in 1997, the examination staff determined that as a result of their findings, an investigation of Stanford by the Enforcement group was warranted, and referred a copy of their examination report to Enforcement for review and disposition.  In fact, when the former Assistant District Administrator for the Fort Worth Examination program retired in 1997, her parting words to the branch chiefwere, "keep your eye on these people [referring to Stanford] because this looks like a Ponzi scheme to me and some day it's going to blow up."

Despite the examiners' referral of their serious concern that SGC was part of a Ponzi scheme, the Enforcement staff did not open a matter under inquiry ("MUI") into the Stanford case until eight months later, in May 1998, and did so only after learning that another federal agency suspected Stanford of money laundering.  The OIG investigation further found the only evidence of any investigative action taken by Enforcement in connection with this MUI was a voluntary request for documents that the SEC sent SGC in May 1998.  We found that after Stanford refused to voluntarily produce numerous documents relating to SGC's referrals of investors to SIB, no further investigative steps were taken; after being opened for only three months, in August 1998, the MUI was closed.

Reasons provided by Enforcement as to why the inquiry was closed related to the lack of U.S. investors affected by the potential fraud and the difficulty of the investigation because it would have to obtain records from Antigua.  However, we found other, larger, SEC-wide reasons why the Stanford matter was not pursued, including the preference for "quick hit" cases as a result of internal SEC pressure, and the perception that Stanford was not a "quick hit" case.

The OIG investigation also found that in June 1998, while the Stanford MUI was open, the Investment Adviser Examination group in Fort Worth began another examination of SGC.  This investment adviser examination came to the same conclusions

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

as the broker-dealer examination, finding Stanford's "extremely high interest rates and extremely generous compensation" in the form of annual recurring referral fees, and the fact that SGC was so "extremely dependent upon that compensation to conduct its day-to-day operations," very suspicious.

The investment adviser examiners also noted during the 1998 examination the complete lack of information SGC had regarding the CDs and the SIB investment portfolio that purportedly supported the CDs' unusually high and consistent returns. The examiners concluded that SGC had "virtually nothing" that "would be a reasonable basis" for recommending the CDs to its customers. In fact, the examiners found that no one at SGC even maintained a record of all advisory clients who invested in the CDs. Accordingly, the examiners identified possible violations of SGC's fiduciary duty as an investment adviser to its clients, noting the affirmative obligation on the part of an investment adviser to employ reasonable care to avoid misleading clients, and that any departure from this fiduciary standard would constitute fraud under Section 206 of the Investment Advisers Act of 1940 ("Investment Advisers Act").

The OIG investigation found, however, that the Enforcement staff completely disregarded the investment adviser examiners' concerns in deciding to close the Stanford MUI, and there was no evidence that the Enforcement staff even read the investment advisers' 1998 examination report. Notwithstanding this lack of Enforcement action, by the summer of 1998, it was clear that both the investment adviser and broker-dealer examiners "knew that [Stanford] was a fraud."

In November 2002, the SEC's investment adviser Examination group conducted yet another examination of SGC. In the 2002 examination, the investment adviser examiners found that Stanford's operations had grown significantly in the four years since the 1998 Examination, from $250 million in investments in the purported fraudulent CDs in 1998, to $1.1 billion in 2002. In 2002, these examiners identified the same red flags that had been noted in the previous two examinations: "the consistent, above-market reported returns," which were "very unlikely" to be able to be achieved with "legitimate" investments, and the high commissions paid to SGC financial advisers for selling the SIB CDs without an understanding on the part of SGC as to what they were referring.

The investment adviser examiners also found that the list of investors provided by SGC was inaccurate, as the list they received from SGC of the CD holders did not match up with the total CDs outstanding based upon the referral fees SGC received in 2001. The examiners noted that although they did follow up with SGC about this discrepancy, they never obtained "a satisfactory response, and a full list of investors."

The 2002 Examination concluded that SGC was violating Section 206 of the Investment Advisers Act by failing to conduct any due diligence related to the SIB CDs. The 2002 Examination report stated:

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> A review of SGC's "due diligence" files for the SIB [CDs] revealed that SGC had little more than the most recent SIB financial statements (year end 2001) and the private offering memoranda and subscription documents. There was no indication that anyone at SGC knew how its clients' money was being used by SIB or how SIB was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC.

When the investment adviser examiners raised this issue with SGC, SGC markedly changed its representations to the SEC concerning its due diligence regarding SIB's CDs.  Previously, SGC represented that they essentially played no role in the investment decisions by SIB, but when challenged, SGC changed its story, and stated that they regularly visited the offshore bank, participated in quarterly calls with the Chief Financial Officer of the bank, and received quarterly information regarding the bank's portfolio allocations (by sector and percentage of bonds/equity), investment strategies, and top five equity and bond holdings.  SGC also told the examiners that information regarding the portfolio allocations was included in SGC's due diligence files.  Although the investment adviser examiners were surprised and suspicious about this discrepancy, and actually contemplated "drop[ping] by unannounced [at SGC] and ask[ing] to look at [the purported documents]," the OIG investigation found that the SEC did not follow up to obtain or review the newly-claimed due diligence information.

After the examiners began this third examination of Stanford, the SEC received multiple complaints from outside entities reinforcing and bolstering their suspicions about Stanford's operations.  However, the SEC failed to follow up on these complaints or take any action to investigate them.  On December 5, 2002, the SEC received a complaint letter from a citizen of Mexico who raised concerns similar to those the examination staff had raised.  The October 28, 2002 complaint from Complainant 1 Complainant 1 to the SEC Complaint Center raised several issues, including the considerably higher interest rate of the Stanford CDs when compared with that which other banks were offering, the fact that Stanford's returns were steady while other similar investments were significantly down, and noting that SIB's auditor was in Antigua without significant regulatory oversight.

While the examiners characterized Complainant 1 concerns as "legitimate," the OIG investigation found that the SEC did not respond to the Complainant 1 complaint and did not take any action to investigate her claims.  We found that while an SEC examiner drafted a letter to Complainant 1 asking for additional information, he was told that Enforcement had decided to refer her letter to the Texas State Securities Board ("TSSB") and thus, never actually sent his draft letter to Complainant 1 .  However, the OIG investigation found that although there was an intention to forward the Complainant 1 letter to the TSSB, there is no evidence that it was sent to the TSSB, either.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In addition, the OIG investigation found that although the examiners met with Enforcement officials in late 2002 to attempt to convince Enforcement to open an investigation or even an inquiry into the 2002 Examination Report's findings, Enforcement staff declined to open a matter and likely never even read the 2002 Examination Report.  Moreover, even though the examiners were informed by Enforcement that the findings in the 2002 Examination Report were referred to the TSSB together with the [Complainant 1] letter, after interviewing officials from the Enforcement staff and the TSSB, we found that no such referral was made.

Thus, by 2003, it had been approximately six years since the SEC Examination staff had concluded that the SIB CDs were likely a Ponzi scheme.  During those six years, the SEC had conducted three examinations which concluded the Stanford fraud was ongoing and growing significantly, but no meaningful effort was made to obtain evidence related to the Ponzi scheme.

In 2003, the SEC Enforcement staff received two new complaints that Stanford was a Ponzi scheme, but the OIG investigation found that nothing was done to pursue either of them.  On August 4, 2003, the TSSB forwarded to the SEC a letter from [Confidential Source] [Confidential Source] in another Ponzi scheme action entitled [PII] [PII], which discussed several similarities between the [PII] Ponzi scheme and what was known at the time about Stanford's operations.  Before sending the letter to the SEC, the TSSB Director of Enforcement called the SEC to discuss the matter and informed the SEC that because [PII] was such a large fraud, he thought he needed to bring [Confidential Source]'s concerns regarding Stanford Group to the SEC's attention.  While the [Confidential Source]'s complaint was forwarded to a branch chief in Enforcement, no action was taken to follow up.

On October 10, 2003, the NASD forwarded a letter dated September 1, 2003, from an anonymous Stanford insider to the SEC's Office of Investor Education and Assistance ("OIEA") which stated, in pertinent part:

> STANFORD FINANCIAL IS THE SUBJECT OF A
> LINGERING CORPORATE FRAUD SCANDAL
> PERPETUATED AS A "MASSIVE PONZI SCHEME"
> THAT WILL DESTROY THE LIFE SAVINGS OF
> MANY; DAMAGE THE REPUTATION OF ALL
> ASSOCIATED PARTIES, RIDICULE SECURITIES
> AND BANKING AUTHORITIES, AND SHAME THE
> UNITED STATES OF AMERICA.

The OIG investigation found that while this letter was minimally reviewed by various Enforcement staff, Enforcement decided not to open an investigation or even an

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

inquiry, but to refer it to the Examination group for yet another examination.  The Enforcement branch chief explained his rationale as follows:

> [R]ather than spend a lot of resources on something that could end up being something that we could not bring, the decision was made to – to not go forward at that time, or at least to – to not spend the significant resources and – and wait and see if something else would come up.

It is not clear what the Enforcement staff hoped to gain by "wait[ing] [to] see if something else would come up" after the SEC had conducted three examinations of SGC finding that the SIB CDs were likely a Ponzi scheme and received three complaints about Stanford.  It is also not clear what purpose the Enforcement staff thought would be served by having the examiners conduct a fourth examination of SGC.

However, they ultimately did just that.  In October 2004, the Examination staff conducted its fourth examination of SGC.  In fact, the broker-dealer Examination staff initiated this fourth examination of Stanford solely for the purpose of making another Enforcement referral.  By October 2004, approximately seven years since the SEC's first examination of SGC, the SEC examiners found that SGC's revenues had increased four-fold, and sales of the SIB CDs accounted for over 70 percent of those revenues.  As of October 2004, SGC customers held approximately $1.5 billion of CDs with approximately $227 million of these CDs being held by U.S. investors.  The 2004 examination concluded that the SIB CDs were securities and part of a "very large Ponzi scheme."

The examiners analyzed the SIB CD returns using data about the past performance of the equity markets and found that they were improbable.  The examination staff concluded that SGC's sales of the SIB CDs violated numerous federal securities laws and rules, including NASD's suitability rule, material misstatements and failure to disclose material facts, in violation of Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"); failure to disclose to customers its compensation for securities transactions, in violation of Rule 10b-10 of the Exchange Act; and possible unregistered distribution of securities in violation of Section 5 of the Securities Act of 1933.

The 2004 Examination Report advocated that the SEC act against SGC for these violations, in part, because of the difficulties in proving that SIB was operating a Ponzi scheme.  One examiner stated that after the 2004 Examination, he believed it was incumbent on the SEC to do whatever it could to stop the growing fraud, noting, as follows, "although it may be difficult to prove that the offering itself is fraudulent, SGC has nonetheless committed numerous securities law violations which can be proved without determining the actual uses of the invested funds."

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The Examination staff also conducted significant investigative work during the seven months from October 2004 through April 2005 to bolster its anticipated Enforcement referral.  They reached out to the SEC's Office of Economic Analysis ("OEA") for assistance in taking the Examination staff's quantitative analysis of Stanford's historical returns "a step further."  However, OEA did not assist the examiners with any analysis of Stanford's returns.  The examiners also contacted an attorney in the SEC's Office of International Affairs ("OIA") for information regarding Antigua's regulation of Stanford.  In addition, they interviewed a former registered representative of SGC, who told them that the sale of SIB's CDs was a "Ponzi scheme."

However, in March 2005, senior Enforcement officials in Fort Worth learned of the Examination staff's work on Stanford and told them that it was not a matter that Enforcement would pursue.  A Special Senior Counsel in the Broker-Dealer Examination group made a presentation about her ongoing work on Stanford at a March 2005 quarterly summit meeting attended by the SEC, NASD, and state regulators from Texas and Oklahoma.  Immediately after her presentation, she recalled that she got "a lot of pushback" from both the head of the Fort Worth office and head of Enforcement who approached her and "summarily told [her] . . . [Stanford] was not something they were interested in."

As the examiners were preparing a formal referral memorandum to the Enforcement staff in an attempt to finally convince them to open an investigation, it was announced that the head of Fort Worth Enforcement was leaving the SEC.  Since he had made it "very clear … he wasn't going to accept [the Stanford referral]" at the March 2005 meeting, the examiners waited until he left the SEC to forward the referral to Enforcement.

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," noting that "from 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3% . . .[while] [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002."

The Enforcement staff initially reacted enthusiastically to the referral and opened a MUI.  They also contacted OIA to assist them in getting records from SIB in Antigua.  Further, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  However, by June 2005, the Enforcement staff had decided to refer the matter to the NASD, apparently as a precursor to closing the inquiry.  They had considered several options to obtain further evidence, including a request under the Mutual Legal Assistance in Criminal Matters Treaties, which were designed for the exchange of information in criminal matters and administered by the U.S. Department of Justice.  However, after the questionnaires revealed no valuable information, the only tangible action taken was the sending of a voluntary request for documents to Stanford.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On August 29, 2005, the Enforcement staff sent SIB its voluntary request for documents. However, requesting voluntary document production from Stanford was a completely futile exercise. Moreover, the Enforcement staff sent SIB the "standard request" six days *after* SIB's attorney "made it clear that SIB would not be producing documents on a voluntary basis." The only reason for the staff's document request to Stanford was apparent in a July 2005 e-mail from the branch chief, stating as follows:

> I feel strongly that we need to make voluntary request for docs from bank. If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.

The Enforcement staff sent the request even though it recognized that its efforts to obtain the requested documents voluntarily were "moot[]."

After Stanford refused to voluntarily produce documents that would evidence it was engaging in fraud, the SEC Enforcement staff was poised to close the Stanford investigation. However, the Examination staff fought to keep the Stanford investigation open. They appealed to the new head of Enforcement and considerable time was spent over the next few months in an internal debate in the Fort Worth office concerning whether to close the Stanford matter without investigation. While the two sides debated whether to conduct an investigation, all agreed that Stanford was probably operating a Ponzi scheme. One senior official noted, "[i]t was obvious for years that [Stanford] was a Ponzi scheme."

Finally, in November 2005, the new head of Fort Worth Enforcement overruled her staff's and her predecessor's objections to continuing the Stanford investigation and decided to seek a formal order in furtherance of that investigation. However, the Enforcement staff rejected the possibility of filing an "emergency action" against SIB based on what they deemed circumstantial evidence that it was a Ponzi scheme. They also decided that attacking Stanford's alleged Ponzi scheme indirectly by filing an action against SGC for violations of the NASD's suitability rule, or failures to disclose or other misrepresentations, would not be worthwhile. Most significantly, the Enforcement staff did not even consider bringing an action against Stanford under Section 206 of the Investment Advisers Act, which establishes federal fiduciary standards to govern the conduct of investment advisers. Such an action against SGC could have been brought for its *admitted* failure to conduct any due diligence regarding Stanford's investment portfolio based upon the complete lack of information produced by SGC regarding the SIB portfolio that supposedly generated the CDs returns.

Had the SEC successfully prosecuted an injunctive action against SGC for violations of Section 206, an anti-fraud provision, it could have completely stopped the sales of the SIB CDs though the SGC investment adviser. Further, the filing of such an action against SGC could have potentially given investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent. A Stanford

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Victims Coalition survey indicated that approximately 95% of 211 responding Stanford investors stated that knowledge of an SEC inquiry would have affected their decision to invest.  One Stanford victim, who invested the money that she "saved through several years of business, nights working late and skipping vacations [she] could have taken with [her] family," said that had she "known that Stanford Group was ever under investigation by the SEC, [she] would not have bought at all."  Indeed, the questionnaire that was sent out by Enforcement in June 2005 raised significant concerns among Stanford investors. A former vice president and financial adviser at Stanford from 2004 through 2007 who later contacted the SEC with concerns about Stanford, said that his phone "lit up like a Christmas tree the morning [the SEC questionnaire] went out."  However, after investors received the questionnaire about Stanford, many continued to invest because financial advisers told them that the fund had been given "a clean bill of health" by the SEC. Stanford officials were able to persuasively represent that Stanford had been given this "clean bill of health" because in fact, Stanford had been examined on multiple occasions and only been issued routine deficiency letters which they purportedly remedied. However, had a Section 206 action been commenced in 2005, it could have put many of Stanford's victims on notice that there were regulatory concerns about their investments.

The other significant benefit of bringing an action under Section 206 of the Investment Advisers Act (which the SEC eventually did when it filed its complaint in 2009) was that it did not require that the fraud involve a security.

The OIG investigation found that the decision not to even consider a Section 206 action was based at least partially on the fact that the new head of Enforcement was unaware that the investment adviser Examination staff had done examinations of SGC in 1998 and 2002, and was unaware that SGC was a registered investment adviser when the staff briefed her on the matter in November 2005.  In fact, she only learned that SGC had been a registered investment adviser during her OIG testimony in the course of this investigation in January 2010.  Because the Enforcement staff was not familiar with the findings of the 1998 and 2002 investment adviser examinations, they were not aware that this option had been documented by the examiners on more than one occasion.

The OIG investigation also found evidence of larger SEC-wide reasons that the Stanford matter was not pursued over the years.  We found that the Fort Worth Enforcement program's decisions not to undertake a full and thorough investigation of Stanford were due, at least in part, to Enforcement's perception that the Stanford case was difficult, novel and not the type favored by the Commission.  The former head of the Fort Worth office told the OIG that regional offices were "heavily judged" by the number of cases they brought and that it was very important for the Fort Worth office to bring a high number of cases.  This same person specifically noted that he personally had been "very outspoken" while at the SEC, but felt he was "bullet proof" because of the high number of cases that Fort Worth brought and, as a result, the Commission "could not get

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

rid of him."  The former head of Enforcement in Fort Worth also concurred that the

"number of cases [brought] were extremely important."  A Fort Worth Assistant Director who worked on the Stanford matter stated:

> Everybody was mindful of stats. … Stats were recorded internally by the SEC in Washington. … I think when I was assistant director, there was a lot of pressure to bring a lot of cases.  I think that was one of the metrics that was very important to the home office and to the regions.

The former head of the Examination program in Fort Worth testified that Enforcement leadership in Fort Worth "was pretty upfront" with the Enforcement staff about the pressure to produce numbers and communicated to the Enforcement staff, "I want numbers.  I want these things done quick."  He also testified that this pressure for numbers incentivized the Enforcement staff to focus on "easier cases" – "quick hits." Accordingly, as a result of the "pressure on people to produce numbers, … anything that didn't appear … likely … to produce a number in a very short period of time got pretty short shrift."  A former Fort Worth Examination branch chief also testified that the Enforcement staff "were concerned about the number of cases that they were making and that perhaps if it wasn't a slam-dunk case, they might not want to take it because they wanted to make sure they had enough numbers because that's what they felt the Commission wanted them to do."  The OIG investigation found that because Stanford "was not going to be a quick hit," Stanford was not considered as high priority of a case as easier cases.  The former branch chief in the Fort Worth broker-dealer Examination group testified that the Enforcement Assistant Director working on the Stanford matter "only wanted to bring cases that were slam dunk, easy cases."

In addition, according to the former head of the Fort Worth office, senior management in Enforcement at headquarters expressed concern to Fort Worth that they were bringing too many Temporary Restraining Order, Ponzi, and prime bank cases, which they referred to as "kick in the door and grab" cases, or "mainstream" cases.  Fort Worth was told to bring more Wall Street types of cases, like accounting fraud.  The former head of Enforcement in Fort Worth told the OIG that when he was hired to his position, Enforcement management in Washington, DC told him to clean up Fort Worth's inventory and repeatedly told him that Fort Worth's emphasis should be on accounting fraud cases.  He was cautioned that Fort Worth was spending way too much of its resources on "mainstream" cases, and that those resources would be better deployed on accounting fraud cases.  He specifically recalled that in November 2000, after Fort Worth brought several Ponzi scheme cases, he was told by a senior official in the Enforcement Division:  "[Y]ou know you got to spend your resources and time on financial fraud. What are you bringing these cases for?"

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The OIG investigation also found that the SEC bureaucracy may have discouraged the staff from pursuing novel legal cases.  The former head of the Fort Worth office confirmed that the arduous process of getting the SEC staff's approval in Washington, DC to recommend an Enforcement action to the Commission was a factor in deciding which investigations to pursue.  A former branch chief in the examination program stated that she believed that the desire of the Enforcement staff to avoid difficult cases was partly due to the challenges in dealing with the Commission's bureaucracy.

Finally, the OIG investigation revealed that the former head of Enforcement in Fort Worth, who played a significant role in numerous decisions by the Fort Worth office to deny investigations of Stanford, sought to represent Stanford on three separate occasions after he left the SEC, and represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

This former head of Enforcement in Fort Worth was responsible for:  (1) in 1998, deciding to close a MUI opened regarding Stanford after the 1997 broker-dealer examination; (2) in 2002, deciding to forward the Complainant 1 complaint letter to the TSSB and deciding not respond to the Complainant 1 complaint or investigate the issues it raised; (3) in 2002, deciding not to act on the Examination staff's referral of Stanford for investigation after its investment adviser examination; (4) in 2003, participation in a decision not to investigate Stanford after receiving Confidential Source 's complaint letter comparing Stanford's operations to the PII fraud; (5) in 2003, participating in a decision not to investigate Stanford after receiving the complaint letter from an anonymous insider alleging that Stanford was engaged in a "massive Ponzi scheme;" and (6) in 2005, informing senior Examination staff after a presentation was made on Stanford at a quarterly summit meeting that Stanford was not a matter they planned to investigate.

Yet, in June 2005, a mere two months after leaving the SEC, this former head of the Enforcement in Fort Worth e-mailed the SEC Ethics Office that he had been "approached about representing [Stanford] . . . in connection with (what appears to be) a preliminary inquiry by the Fort Worth office."  He further stated, "I am not aware of any conflicts and I do not remember any matters pending on Stanford while I was at the commission."

After the SEC Ethics Office denied his request in June 2005, in September 2006, Stanford retained this former head of Enforcement in Fort Worth to assist with inquiries Stanford was receiving from regulatory authorities, including the SEC.  He met with Stanford Financial Group's General Counsel in Stanford's Miami office and billed Stanford for his time.  Following the meeting, he billed 6.5 hours to Stanford on October 4, 2006, for, *inter alia*, "review[ing] documentation received from company about SEC and NASD inquiries."  On October 12, 2006, he billed Stanford 0.7 hours for a "[t]elephone conference with [Stanford Financial Group's General Counsel] regarding status of SEC and NASD matters."  In late November 2006, he called his former subordinate, the Assistant Director who was working on the Stanford matter in Fort

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Worth, who asked him during the conversation, "[C]an you work on this?" and who in fact told him, "I'm not sure you're able to work on this."  Near the time of this call, he belatedly sought permission from the SEC's Ethics Office to represent Stanford.  The SEC Ethics office replied that he could not represent Stanford for the same reasons given a year earlier and he discontinued his representation.

In February 2009, immediately after the SEC sued Stanford, this same former head of Enforcement in Fort Worth contacted the SEC Ethics Office a third time about representing Stanford in connection with the SEC matter – this time to defend Stanford against the lawsuit filed by the SEC.  An SEC Ethics official testified that he could not recall another occasion in which a former SEC employee contacted his office on three separate occasions trying to represent a client in the same matter.  After the SEC Ethics Office informed him for a third time that he could not represent Stanford, the former head of Enforcement in Fort Worth became upset with the decision, arguing that the matter pending in 2009 "was new and was different and unrelated to the matter that had occurred before he left."  When asked why he was so insistent on representing Stanford, he replied, "Every lawyer in Texas and beyond is going to get rich over this case.  Okay? And I hated being on the sidelines."

The OIG investigation found that the former head of Enforcement in Fort Worth's representation of Stanford appeared to violate state bar rules that prohibit a former government employee from working on matters in which that individual participated as a government employee.  Accordingly, we are referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Office of Bar Counsel for the District of Columbia and the Chief Disciplinary Counsel for the State Bar of Texas, the states in which he is admitted to practice law.

We are also recommending that the Chairman carefully review this report's findings and share with Enforcement management the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, if applicable) is taken, on an employee-by-employee basis, to ensure that future decisions about when to open an investigation and when to recommend that the Commission take action are made in a more appropriate manner.  We are also recommending that the Chairman and Director of Enforcement give consideration to promulgating and/or clarifying procedures with regard to seven specific areas of concerns that we identify in the report.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## RESULTS OF THE INVESTIGATION

I.   **IN 1997, THE FWDO EXAMINATION STAFF REVIEWED STANFORD'S BROKER-DEALER OPERATIONS AND MADE A REFERRAL TO ENFORCEMENT DUE TO A CONCERN THAT ITS SALES OF CDs CONSTITUTED A PONZI SCHEME**

   A.   **Two Years After Stanford Group Company Began Operations, the SEC Identified It as a Risk and a Target For an Examination Based on Suspicions That Its CD Sales Were Fraudulent**

Stanford Group Company ("SGC") registered with the Commission as an investment adviser in September 1995, and as a broker-dealer in October 1995.  *See* Exhibit 49 at 1; Exhibit 55 at 2.  SGC was owned by Robert Allen Stanford, who also owned several affiliated companies, including Stanford International Bank ("SIB"), an offshore bank located in St. John's, Antigua, West Indies.  Exhibit 49 at 1.

SGC conducted a general securities business through a fully disclosed clearing arrangement with Bear Stearns Securities Corporation, and as of 1997, had five branch offices and 66 employees, 25 of which were registered representatives.  *Id.*  At that time, the firm had approximately 2,000 (1,200 foreign) customer accounts.  *Id.*

SGC was affiliated through common ownership with SIB, an offshore investment bank.  *Id.* at 2.  SGC had a written agreement with SIB wherein SGC referred its foreign customers to SIB, in return for which SIB paid a recurring annual 3.75% referral fee to SGC on all deposits referred to SIB.  *Id.*  SIB offered these customers several types of products, including the "FlexCD Account," which comprised 96% of all cash deposits at SIB.  *Id.*

The FlexCD Account required a minimum balance of $10,000, had maturities and annual interest rates ranging from one month at 7.25% to 36 months at 10% and withdrawals of up to 25% of the principal amount were allowed without penalties with a five day advance notice.  *Id.*  As of July 31, 1997, SGC was due referral fees of $958,424 which was based on customer deposits at SIB of $306,695,545 (75% of all deposits at SIB).  *Id.*

After SGC's fiscal year ended in June 1997, Julie Preuitt, then a branch chief in the FWDO Broker-Dealer Examination group, reviewed its annual audit as part of a process to identify "target[s] for examinations."[8]  December 14, 2009 Preuitt Testimony

---

[8]   Mary Lou Felsman, Assistant District Administrator for the FWDO Examination program from 1986 through the end of 1997 and Preuitt's supervisor, described Preuitt as an "excellent" branch chief.  Felsman Testimony Tr. at 32.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Tr. at 13.  Preuitt testified that, based on her review of SGC's financial statements, she "became very concerned in terms [that SGC] had only been open for two years; and the firm had gone from very little revenue to an incredible amount of revenue in a very short time period, which [was] very unusual." *Id*.  Specifically, Preuitt explained that because SGC's revenues from CDs were "extraordinary," she scheduled an examination. *Id*. at 14.  Preuitt testified that based on the red flags she identified, she suspected the CD sales were fraudulent; "[i]t looked like … there was a problem…" *Id*. at 15.

Preuitt assigned the SGC examination to ▮Staff Acct 1▮ a FWDO staff accountant, because she had "the most confidence" in him, and believed he was "a very good examiner." *Id*. at 16.  At that point in time ▮Staff Acct 1▮ had seven years of experience conducting broker-dealer examinations at the National Association of Securities Dealers ("NASD") and five years of experience conducting broker-dealer examinations at the SEC ▮Staff Acct 1▮ Testimony Tr. at 8-9.  In addition to his experience, Preuitt testified that ▮Staff Acct 1▮ "had excellent judgment."  December 14, 2009 Preuitt Testimony Tr. at 17.

## B.   After Conducting a Short Examination, the Examination Staff Concluded That Stanford Was Probably Operating a Ponzi Scheme

The staff accountant assigned to the SGC examination ▮Staff Acct 1▮ spent six days at SGC's Houston office conducting field work for the examination.  STARS[9] Report, attached as Exhibit 50, at 1.  The examination field work was completed on August 29, 1997.  *Id*.  The Examination Report, issued on September 25, 1997 (the "1997 Examination Report"), included the following findings:

> Possible Misrepresentations -- Rule 10b-5
>
> SIB promotes its products as being safe and secure.  A brochure regarding the products offered through SIB … states that "funds from these accounts are invested in investment-grade bonds, securities and Eurodollar and foreign currency deposits."  The brochure indicates a high level of safety for customer deposits.  For example: "banking services which ensure safety of assets, privacy, liquidity and high yields", [sic] "…protects its clients' money with traditional safeguards", "placing deposits only with banks which have met Stanford's rigorous credit criteria", "depository insolvency bond", "bankers' blanket bond", and "portfolio managers follow a conservative approach". [sic]  Based on the amount of interest rate and

---

[9]   STARS is an acronym for Super Tracking and Reporting System, the SEC examination groups' internal tracking system.  This system is described in more detail below.

65

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> referral fees paid, SIB's statements indicating these
> products to be safe appear to be misrepresentations.
>
> SIB pays out in interest and referral fees between 11% and
> 13.75% annually.  To consistently pay these returns, SIB
> must be investing in products with higher risks than are
> indicated in its brochures and other written advertisements.
>
> Because SIB is a foreign entity, we were unable to gain
> access to SIB's records.

Exhibit 49 at 2-3.

Preuitt testified that she reviewed the draft examination report and the supporting documents carefully "because [the matter] was very serious, and [she] wanted to feel very comfortable with what [the examiners] were alleging…."  December 14, 2009 Preuitt Testimony Tr. at 18.  Preuitt concluded that the SIB CDs' purported above-market returns were "absolutely ludicrous" and that the high referral fees SGC was paid for selling the CDs indicated that they were not "legitimate CDs."  *Id*. at 24-25. Consequently, Preuitt concluded that "[i]t was … impossible that this was a CD."  *Id*. at 25.

Similarly, Mary Lou Felsman, Assistant District Administrator for the FWDO Examination program from 1986 through the end of 1997, testified that there were "red flags" about Stanford's operations that caused her to believe it was a Ponzi scheme. Felsman Testimony Tr. at 9, 16, 29.  Felsman recalled that the primary "red flag" was:

> [T]he interest that they were purportedly paying on these
> CDs was significantly higher than what you could get on a
> CD in the United States.  And as far as I know -- I mean, I
> wasn't an expert on foreign investments, but I was
> generally aware of the financial situation around the world
> at that time.  And whatever it was [Stanford] was offering
> was far above what anybody else offered, so that was, you
> know, kind of a red flag.

*Id*. at 14-15.

According to Felsman, her suspicions about the interest rates that Stanford's CDs purportedly paid were heightened because those rates were supposedly generated with a "safe, conservative" investment portfolio.  *Id*. at 15.  Felsman explained that it was "highly unlikely" that the returns Stanford claimed to generate could be achieved with a conservative investment approach.  *Id*.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[Staff Acct 1] was also concerned that the Stanford CDs were paying such high rates of return, while at the same time SGC represented that the CDs were invested in safe, liquid securities [Staff Acct 1] Testimony Tr. at 15-16 [Staff Acct 1] did not believe that these returns were possible for a safe, liquid investment. *Id*. at 37, 43 [Staff Acct 1] testified: "I don't know where you can find something that's safe and liquid that's going to pay 11 to almost 14 percent … It just doesn't exist." *Id*. at 16 [Staff Acct 1] testified that SGC was unable to articulate exactly how these returns were being achieved. *Id*. at 18 [Staff Acct 1] was concerned that SGC was misrepresenting to investors that the deposits were being invested in liquid, safe investments. *Id*. at 20 [Staff Acct 1] further observed that the recurring annual "trailer" fee that SGC received from SIB for referring CD investors to SIB was oddly high and did not "smell right." *Id*. at 34-35.

[Staff Acct 1] also noted SGC's failure to maintain books and records for the CD sales, stating: "[I]f you're going to recommend a particular investment, you need to know that that investment is suitable for that client. … And in this instance … they didn't have that, I guess, new account information that we would require: name, address, financial background." *Id*. at 17-18. Preuitt testified that the examiners felt like they could not get any actual information regarding SIB during their examination of SGC. December 14, 2009 Preuitt Testimony Tr. at 22.

The examiners also discovered what they identified as an "item of interest" in the 1997 Examination Report as follows:

> During 1996, Stanford made a cash contribution of $19,000,000 to Stanford Group. We are concerned that the cash contribution may have come from funds invested by customers at SIB. We noted that SIB had loaned Stanford $13,582,579. In addition, we noted that [Stanford Financial Group] had borrowed $5,447,204 from SIB for a total receivable at SIB of $19,029,783 directly and indirectly from Stanford. We contacted the general counsel for the Stanford companies regarding our concerns. The general counsel stated that the cash contribution came from personal funds and not from the above loans; however, it seems at least questionable whether Stanford has access to $19,000,000 in personal funds.

Exhibit 49 at 3.

Preuitt [Staff Acct 1] and Felsman were suspicious about these loans that SIB had made to Robert Allen Stanford and cash contributions that he, in turn, had made to SGC. Preuitt testified that these transactions were a "red flag" that made her "assume[] he was possibly stealing from investors." December 14, 2009 Preuitt Testimony Tr. at 26. [Staff Acct 1] testified, "It just baffled me that someone has 19 million dollars cash sitting on-hand to – to loan out." [Staff Acct 1] Testimony Tr. at 16-17. Felsman also described the loans from SIB

**67**

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

to Robert Allen Stanford and his $19 million cash contribution to SGC as another red flag.  Felsman Testimony Tr. at 29.

[Staff Acct 1] testified that SGC's general counsel could not satisfactorily demonstrate that Stanford's cash contribution to SGC came from personal funds. [Staff Acct 1] Testimony Tr. at 16-17.  Preuitt testified that the examiners wanted more information regarding the origins of Stanford's cash contributions, but they were unable to obtain this information.  December 14, 2009 Preuitt Testimony Tr. at 22-23.

The SEC's internal tracking system, STARS, records certain data about the SEC's examinations, including the disposition of the examinations.  December 14, 2009 Preuitt Testimony Tr., at 31-32; [A Examiner 1] Testimony Tr. at 18.  The "Violations Description" entry of the STARS report for the SGC examination stated:  "Possible misrepresentations.  Possible Ponzi scheme."  *See* Exhibit 50 at 5.

### C.    As a Result of Their Concerns That Stanford Was Operating a Ponzi Scheme, the Examination Staff Referred Their Stanford Findings to the Enforcement Staff

The 1997 Examination Report concluded that an investigation of Stanford for violations of Rule 10b-5 was warranted due to "[p]ossible misrepresentation and misapplication of customer funds."  Exhibit 49 at 1.  The conclusion of the September 25, 1997 Examination Report stated as follows:  "We will provide a copy of our report to the FWDO Division of Enforcement for their review and disposition."  Exhibit 49 at 4.  Felsman recalled the examination staff referring the matter to Enforcement before she left at the end of 1997.  Felsman Testimony Tr. at 16.  The Examination staff referred the Stanford matter to Enforcement on September 25, 1997.  *See* Exhibit 50 at 5; *see also* December 14, 2009 Preuitt Testimony Tr. at 43.  At that time, the Examination staff provided Enforcement with a copy of its 1997 Examination Report. [Staff Acct 1] Testimony Tr. at 37-38.

Felsman testified that she believed Enforcement had not taken any action to pursue the referral when she retired at the end of 1997.  Felsman Testimony Tr. at 19.  When she retired, Felsman's "parting words" to Preuitt were, "keep your eye on these people because this looks like a Ponzi scheme to me and some day it's going to blow up."  Felsman Testimony Tr. at 26.  Felsman also testified:

> I've been gone 12 years.  And during that period of time I probably have seen or talked to Julie Preuitt perhaps six times.  And every time I talk[ed] to her I'd say, "Whatever happened to Stanford?"

*Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## II.    EIGHT MONTHS AFTER THE EXAMINATION STAFF REFERRED STANFORD, THE ENFORCEMENT STAFF OPENED, AND QUICKLY CLOSED, A MATTER UNDER INQUIRY

Despite the examiners' referral of their serious concern that SGC was part of a Ponzi scheme, a Matter Under Inquiry ("MUI")[10] was not opened until May 18, 1998 (the "1998 Stanford MUI"), approximately eight months after the Examination referral. *See* 1998 MUI Form, attached as Exhibit 52 at 1.  Preuitt recalled that "it took a long time to get anybody [in Enforcement] to open something."  December 14, 2009 Preuitt Testimony Tr. at 42.

### A.    The 1998 Stanford MUI Was Likely Not Even Opened in Response to the Examination Staff's Referral, But in Response to a Concern From the U.S. Customs Department That Stanford Was Laundering Money

The OIG investigation found that Enforcement likely only opened the MUI after being contacted by the United States Customs Department regarding the possibility that Stanford was involved in money laundering.

The 1998 Stanford MUI was opened on May 18, 2008, at 5:17 p.m.  Exhibit 52 at 3.  Harold Degenhardt, District Administrator for the FWDO at that time, approved

---

[10]    According to the SEC's Enforcement Manual:

> Prior to opening a MUI, the assigned staff … should determine whether the known facts show that an Enforcement investigation would have the potential to address conduct that violates the federal securities laws. …  To determine whether to open a MUI, the staff attorney, in conjunction with the Assistant Director, should consider whether sufficiently credible sources or set of facts suggests that a MUI could lead to an enforcement action that would address a violation of the federal securities laws. Basic considerations used when making this determination may include, but are not limited to:
>
> - The statutes or rules potentially violated
> - The egregiousness of the potential violation
> - The potential magnitude of the violation
> - The potential losses involved or harm to an investor or investors
> - Whether the potentially harmed group is particularly vulnerable or at risk
> - Whether the conduct is ongoing
> - Whether the conduct can be investigated efficiently and within the statute of limitations period
> - Whether other authorities, including federal or state agencies or regulators, might be better suited to investigate the conduct

March 3, 2010 SEC Enforcement Manual, relevant excerpts attached as Exhibit 51 at 20.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

opening the MUI.[11]  *Id.* at 2.  The matter was classified as, *inter alia*, "Fraud in Offer/Sales/Purchases," "Suitability" and "Possible Organized Crime."  *Id.*  At 11:22 a.m. earlier the same day, ▮BD Examiner 2▮ a broker-dealer examiner in FWDO, had e-mailed Hugh Wright, the Assistant District Administrator for the FWDO Enforcement group until June 1998,[12] the following:

> I received note from ▮Exam Sr Cnsl▮ an attorney in the FWDO Examination group] to contact ▮ENF Atty 1▮ [an SEC Enforcement attorney in Washington, DC] re a [broker-dealer] examination. ▮ENF Atty 1▮ … explained he had received a referral from US Customs Dept regarding possible money laundering and wanted information regarding our [broker-dealer] examination of Stanford Group.  …
>
> Neither you nor Spence [Barasch] [the Assistant Director in charge of the FWDO Enforcement program] were in so I notified Hal [Degenhardt].  He was to followup with ▮ENF Atty 1▮.  I did not mail or fax any documents.  See me when you return and I'll give full details.

May 18, 1998 E-mail from ▮BD Examiner 2▮ to Hugh Wright, attached as Exhibit 53.  Preuitt testified that she believed the referral from the U.S. Department of Customs was what convinced Enforcement to finally open the 1998 Stanford MUI.  December 14, 2009 Preuitt Testimony Tr. at 48.

▮ENF Staff Atty 1▮, the staff attorney assigned to the 1998 Stanford MUI , did not recall in her testimony whether or not she ever saw the 1997 Examination Report. ▮ENF Staff Atty 1▮ Testimony Tr. at 11-12. ▮ENF Staff Atty 1▮ did recall, however, knowing about allegations of money laundering and drug trafficking concerning SGC.  *Id.* at 13-20.  In addition, the only specific aspect of the investigation that ▮ENF Staff Atty 1▮ recalled was attending a meeting in Houston, Texas with several other law enforcement agencies, including the United States Attorney's Office, the Postal Inspector, and the Secret Service, in which the agencies discussed the information they had regarding SGC's possible involvement in money laundering and drug trafficking.  *Id.* at 20-22.[13]

---

[11]    Harold Degenhardt was District Administrator for the FWDO from 1996 to 2005.  Degenhardt Interview Memorandum at 1.

[12]    In June 1998, Wright became the Assistant District Administrator for the FWDO Examination group; after his transfer, Spencer Barasch replaced Wright as the head of the FWDO Enforcement program.

[13]    Preuitt testified that ▮ENF Staff Atty▮ was not "particularly enamored with the examination process" and that she "was not an attorney I would have steered it to because she was not one that was easily approachable or particularly enthralled."  December 14, 2009 Preuitt Testimony Tr. at 50.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B.   After Stanford Refused to Produce Documents, No Further Investigative Steps Were Taken

The only evidence of any investigative action taken by Enforcement in connection with the 1998 Stanford MUI was a voluntary request for documents that the SEC sent to SGC on May 27, 1998.  *See* May 27, 1998 Letter from ███████████ to ███████████ ███████████ SGC Compliance Officer, attached as Exhibit 54.[14]  The SEC's May 27, 1998 voluntary request for documents sought, *inter alia*, information regarding individuals referred by SGC to SIB, marketing documents, and correspondence concerning SIB.  *See Id.*  The letter also requested that SGC Compliance Officer ███████████ meet with the staff on June 23, 1998 to answer questions concerning SGC.  *Id.* at 3.[15]

On June 10, 1998, Jack Ballard, a partner with Ogden, Gibson, White & Broocks, L.L.P., who represented SGC, responded by letter to the SEC's request for documents.  *See* June 10, 1998 Letter from Jack Ballard to ███████████ attached as Exhibit 56.  Ballard informed ███████████ that, instead of producing the name, address, and telephone number of each individual or entity referred by SGC to SIB, SGC would only produce two "representative referral files."[16]  *Id.* at 2.  SGC refused to produce documents reflecting the receipt, expenditure, transfer, use or allocation of funds from SIB by SGC, suggesting as an alternative that, "[m]uch of the same information is provided in a report entitled Detail of Referred Balances," which they offered to provide for January through April 1998.  *Id.* at 3-4.  SGC also refused to produce copies of SGC correspondence relating to referrals to SIB and its products.  *Id.* at 4.

On June 19, 1998, Ballard sent a follow-up letter to ███████████ and Degenhardt, expressing "serious concerns" that the SEC staff's inquiry might interfere with SGC's business.  *See* June 19, 1998 Letter from Jack Ballard to ███████████ copying Harold Degenhardt, attached as Exhibit 58 at 2-3.  In this letter, Ballard requested a meeting with Degenhardt to discuss those concerns about the staff's inquiry.  *Id.* at 3.

The OIG found no evidence that, after receiving Ballard's response, the SEC staff made further efforts to obtain documents from SGC, a registered entity that was obligated to produce documents to the SEC.  We also found that the staff did not seek a formal

---

[14]   Although the documents requested appear relevant to a securities fraud inquiry, ███████████ did not recall in testimony that the 1998 Stanford MUI concerned possible fraud or a Ponzi scheme. ███████████ Testimony Tr. at 14-15. ███████████ recalled that the matter related to allegations of money laundering and drug trafficking.  *Id.* at 14-18.  However, she acknowledged that she was not aware of any other matters in which the SEC investigated money laundering and that she did not know how or why the SEC would investigate drug trafficking.  *Id.*

[15]   According to the 1998 Examination Report on Stanford, ███████████ had not been employed by SGC since ███████████  *See* Exhibit 55 at 7.

[16]   A June 30, 1998, letter from SGC to ███████████ indicates that SGC sent "the referral files you requested" on this date.  *See* June 30, 1998 Letter from Lena Stinson to ███████████ attached as Exhibit 57.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

order in connection with this inquiry, which would have enabled it to subpoena documents and testimony.  [ENF Staff Atty 1] Testimony Tr. at 28.

The OIG investigation found that Enforcement, notwithstanding its limited investigative efforts, shared the Examination group's concerns that Stanford was operating a Ponzi scheme.  In fact, the Assistant District Administrator for the FWDO Enforcement group Hugh Wright testified that in 1998, "As far as I was concerned at that period of time, in [E]nforcement we all thought it was a Ponzi scheme to start with.  Always did."  Wright Testimony Tr. at 11.  But, as Wright testified:

> [W]e knew that the only way you're going to be able to do
> anything with regard to Stanford is if you get subpoena
> power, and at that point in time, I don't think we had
> enough facts to where we could have sent up a memo to the
> Commission to get the order that would have allowed us to
> issue subpoenas.

*Id.* at 13.

### C.    The Enforcement Staff Closed the 1998 Stanford MUI Three Months After It Was Opened

On August 6, 1998, approximately three months after the inquiry was opened, the Enforcement staff closed the Stanford MUI.  *See* MUI Closing Form, attached as Exhibit 59 at 1.  The closing form indicates that the matter was "transferred to another Federal agency."[17]  *Id.* [ENF Staff Atty 1] testified that the decision to close the MUI was made by Spencer Barasch, the Assistant Director for the FWDO Enforcement program at that time, possibly with Degenhardt's involvement. [ENF Staff Atty 1] Testimony Tr. at 31.

Barasch told the OIG that he had "a very specific recollection" that when he replaced Wright in mid-1998 as the Assistant District Administrator for the FWDO Enforcement group, he reviewed the entire case inventory in the office, and that Stanford was one of the matters he reviewed.  Barasch Interview Tr. at 10.  Barasch recalled meeting with [ENF Staff Atty 1] regarding which of her cases should be pursued and which cases should be closed.  *Id.* at 12.  Barasch told the OIG that he recalled deciding to close the Stanford MUI and to refer the Stanford matter to the NASD.[18]  *Id.*  Barasch also told the

---

[17]    The SEC staff granted access to its files concerning its 1998 Stanford inquiry to the Federal Bureau of Investigation, United States Customs Service, Office of the United States Attorney for the Southern District of Texas, and U.S. Internal Revenue Service.  *See* July 24, 1998 Letter from Harold Degenhardt to [FBI] [FBI]; August 10, 1998 Letter from Harold Degenhardt to [IRS]; August 25, 1998 Letter from Harold Degenhardt to [Customs]; and October 20, 1998 Letter from Harold Degenhardt to [DOJ] [DOJ], attached as Exhibits 60, 61, 62, and 63, respectively.

[18]    The OIG has not found any evidence that the Stanford matter was actually referred from the SEC to the NASD in 1998.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

OIG that Degenhardt may have been involved in the decision to close the Stanford MUI. *Id.* at 16.

According to Preuitt, Barasch called her into his office to tell her he was closing the MUI because he "didn't expect a very happy response" from her.  December 14, 2009 Preuitt Testimony Tr. at 51.  Preuitt testified that Barasch explained to her that although Enforcement had not "determined there was no fraud," the matter was being closed due to "some problems with the case." *Id.*[19]  Preuitt described her reaction to learning from Barasch that the Stanford inquiry was being closed as "shock and disbelief and this incredible feeling of failure and great disappointment." *Id.* █Staff Acct 1█ described Enforcement's decision to not conduct a full-blown investigation of SGC as "kind of a disappointment," and testified that both Preuitt and he were frustrated that the investigation was not going forward. █Staff Acct 1█ Testimony Tr. at 28.

1.      **The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Was Not Warranted Because of the Lack of U.S. Investors**

Preuitt testified that Enforcement's "most significant" concern about pursuing the matter was the lack of U.S. investors and that this issue caused "some folks in Enforcement [to not want] to conduct an investigation."  December 14, 2009 Preuitt Testimony Tr. at 44.  Preuitt explained that "[i]n discussions with Enforcement, they seemed to believe that [the lack of US investors] was a concern and maybe limited our interest[]."[20] *Id.* at 35, 52.  Preuitt's view of the issue was "why would it matter[?]; we have a U.S. broker-dealer engaged in fraud." *Id.* at 35.

Felsman also recalled that the staff believed that there were no U.S. citizens that had purchased Stanford CDs.  Felsman Testimony Tr. at 28.  She testified that the lack of U.S. investors created another issue for Enforcement because her understanding at the time was that "the Commission itself was [not] interested in entertaining cases not involving United States citizens." *Id.* at 20. █Staff Acct 1█ also recalled there being a concern that there were no identified U.S. investors in the Stanford CDs, and he understood this to probably be the reason why the Stanford investigation "didn't proceed as it should have." █Staff Acct 1█ Testimony Tr. at 25-26.

---

[19]    Barasch did not recall this conversation with Preuitt about closing the 1998 Stanford MUI, but said he "may have very well" had that conversation.  Barasch Interview Tr. at 18.

[20] █IA Examiner 1█   an FWDO examiner who, as discussed below, conducted a second examination of SGC in 1998, testified that while generally, the lack of U.S. investors does not "matter in terms of the SEC's ability to bring an action … it does factor into [Enforcement's] priorities." █IA Examiner 1█ Testimony Tr. at 79.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Degenhardt acknowledged that he believed the lack of U.S. investors was "a factor" in determining whether to pursue a particular matter, and noted that Barasch shared his view.  Degenhardt Interview Memorandum at 4.

## 2. The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Would Be Too Difficult Because of the Staff's Inability to Obtain Records From Antigua

Felsman recalled that Enforcement was concerned about a "major jurisdictional issue" related to the matter before she left the Commission at the end of 1997.  Felsman Testimony Tr. at 20. [IA Examiner 1] an FWDO examiner who, as discussed below, conducted a second examination of SGC contemporaneous with the 1998 Stanford MUI, testified that he learned that the staff closed the MUI without seeking a formal order because "they didn't have any clear evidence of a fraud simply because they didn't have enough information about what was going on at the offshore bank [and] they had questions about the jurisdiction and about their ability to successfully subpoena information from that offshore bank." [IA Examiner 1] Testimony Tr. at 24-25 [Staff Acct 1] also testified that it was his understanding that another reason that the investigation did not go forward was the fact that SIB was an offshore entity, which was a jurisdictional issue. [Staff Acct 1] Testimony Tr. at 26, 44.

The Enforcement branch chief assigned to the 1998 Stanford MUI, who asked the OIG not to be identified, testified that the SEC staff could not proceed with the matter because they did not have access to foreign records concerning Stanford, and they had insufficient information regarding how Stanford achieved the purported returns.  Unidentified Former FWDO Enforcement Branch Chief Testimony Tr. at 11.  Barasch also told the OIG that the fact that the CDs were issued by a foreign bank was a significant factor in his decision to close the 1998 Stanford MUI.  Barasch Interview Tr. 12-14.[21]

As discussed below in Section XII of this ROI, the OIG investigation found that there were larger SEC-wide reasons why Stanford matter was not pursued, including the message Barasch received from senior Enforcement officials to focus on accounting fraud cases; the difficulties in obtaining approval from the SEC staff in Washington, DC to pursue novel investigations; the pressure in the FWDO to bring a lot of cases; the preference for "quick hit" cases as a result of that pressure; and the fact that Stanford was not a "quick hit" case.

---

[21]     Barasch told the OIG that "at one point" he called the SEC's Office of International Affairs ("OIA") and asked how hard it would be to get documents located in Antigua, and OIA responded that it would be "almost impossible."  Barasch Interview Tr. at 35.  However, the OIG found no other evidence that any Enforcement staff contacted OIA or sought assistance or information about obtaining documents from Antigua before closing the 1998 Stanford MUI.  OIA staff has no record or recollection of any contact by the FWDO regarding Stanford before December 2004.  *See* March 22, 2010 E-mail from [OIA Atty 2] to [OIG Staff 1], attached as Exhibit 64.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

3.      **SGC's Outside Counsel, a Former Head Of The SEC's Fort Worth Office, May Have Assured Barasch That "There Was Nothing There"**

SGC was represented by two outside counsel in connection with the SEC's 1998 Enforcement MUI:  (1) Ballard, and (2) Wayne Secore, a founding partner of Secore and Waller.  *See* June 19, 1998 Letter from Jack Ballard to ENF Staff Atty 1 attached as Exhibit 65; Secore Interview Tr. at 3-4.  Secore previously had been District Administrator of the FWDO, from approximately 1981 through 1986.  Secore Interview Tr. at 3.

The June 19, 1998 letter discussed above, from Jack Ballard to ENF Staff Atty 1 copying Degenhardt, stated the following:

> As you know, Wayne Secore and I represent Stanford Group Company ("SGC"), a registered broker-dealer and investment advisor, in connection with the informal inquiry being conducted by the Fort Worth District Office. We have had several telephone discussions with you concerning the scope of the inquiry which, as you have informed us, primarily concerns the relationship of SGC with Stanford International Bank ("SIB"), a private international bank located in Antigua, West Indies.

Exhibit 65.

In his letter to ENF Staff Atty 1, Ballard expressed "serious concerns" about the SEC's inquiry interfering with SGC's operations.  *Id*. at 2.  The letter concluded with the following request for a meeting with Degenhardt:

> Wayne [Secore] and I believe the seriousness of SGC's concerns warrant a personal meeting with you and Harold Degenhardt to discuss those concerns raised in this letter. Wayne and I are available at any time on Tuesday, June 23 or Wednesday, June 24.  Please let me know at your earliest convenience when a personal meeting with you and Mr. Degenhardt can be scheduled.

*Id*. at 3.[22]

---

[22]    Although this letter and a June 10, 2008 letter to the SEC (*see* Exhibit 56) were from Ballard, Secore appears to have been the lead attorney on the matter.  An SGC document apparently created in February 2002 summarized the legal fees paid by SGC and indicated that SGC paid Secore's firm, Secore & Waller, $48,229.93 between June and October 1998 for services related to the 1998 SEC Enforcement matter.  *See*
           (Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Neither Ballard nor Secore recalled meeting with the SEC staff about Stanford. *See* Ballard Interview Tr. at 6; Secore Interview Tr. at 5, 8.  However, Secore did say that it was likely he met with senior SEC staff since the meeting was requested.  Secore Interview Tr. at 9-10.  Secore said that it was "very rare" that his request for a meeting with senior SEC staff was denied.  *Id*. at 10.

[ENF Staff Atty 1] did not recall whether Degenhardt or Barasch met with Secore, but she testified that it was very common for defense counsel in an investigation to contact Barasch or Degenhardt and discuss the investigation. [ENF Staff Atty 1] Tr. at 50-55.  [ENF Staff Atty 1] testified that she had been frustrated when this occurred.  *Id*. at 51.

During the course of this OIG investigation, Preuitt provided information alleging that in mid-2009, Barasch told her that in 1998, he had relied on a representation from Secore that the 1998 Stanford MUI should be closed.  According to Preuitt, at a restaurant in New Orleans, Louisiana, during a July 30 to August 1, 2009 social trip with her, Barasch, FWDO Enforcement staff attorney [ENF Staff Atty 4] and former FWDO Enforcement staff attorney [ENF Staff Atty 3] Preuitt asked Barasch why he had not pursued an investigation of Stanford in 1998.  December 14, 2009 Preuitt Testimony Tr. at 53-54.  Preuitt stated in her testimony that Barasch told her it was because "Wayne Secore had told him there was nothing there."  *Id*. at 53; *see also* Preuitt Interview Tr. at 4-5 (stating that Barasch told Preuitt "he asked Wayne Secore if there was a case there and Wayne Secore said that there wasn't.  So he was satisfied with that and decided not to pursue it further.")

Barasch told the OIG that he "vaguely" recalled Secore having represented Stanford.  Barasch Interview Tr. at 18-19.  However, he adamantly denied that Secore influenced his decision to close the Stanford MUI.  *Id*. at 21.  Barasch told the OIG that he recalled the trip to New Orleans in mid-2009 with Preuitt [ENF Staff Atty 4], and [ENF Staff Atty 3]  *Id*. at 19.  Barasch told the OIG that he recalled discussing the Stanford case with Preuitt during this trip, and that Preuitt may have brought up the 1998 MUI in this conversation.  *Id*. at 19-21.  Barasch, however, denied telling Preuitt that he closed the MUI because of a representation by Wayne Secore about Stanford, stating that "I would never have said that. … I would never accept an attorney's representation about anything. … [T]hat's absurd."  *Id*. at 21.[23]

---

February 28, 2002 E-mail, attached as Exhibit 66.  By comparison, SGC paid Ballard's firm $15,622.05 for work related to the matter.  *Id*.

[23]  Preuitt testified that she and [ENF Staff Atty 4] discussed Barasch's statement to her about closing the 1998 MUI based on an assurance from Wayne Secore "several times," including during a subsequent business trip on October 21-22, 2009, while she and [ENF Staff Atty 4] were having dinner at the same New Orleans restaurant.  December 14, 2009 Preuitt Testimony Tr. at 88-89; December 15, 2009 E-mail from Julie Preuitt to David Kotz, attached as Exhibit 67.  On November 3, 2009, [ENF Staff Atty 4] told the OIG that he did not recall having a conversation with anyone about whether Wayne Secore had represented Stanford at some point. [ENF Staff Atty 4] Interview Tr. at 3.  He also told the OIG on November 3, 2009, that he didn't know that Secore had ever represented Stanford.  *Id*.

(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

III.     **IN 1998, THE FWDO EXAMINATION STAFF EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AND REACHED THE SAME CONCLUSION AS THE BROKER-DEALER EXAMINERS: STANFORD'S CD SALES WERE PROBABLY FRAUDULENT**

In June 1998, while the 1998 Stanford MUI was open, the FWDO's investment adviser Examination group began an examination of SGC.  *See* Exhibit 55. [IA Examiner 1] [IA Examiner 1] and [IA Examiner 3] [24] were the examiners assigned to the matter.  *Id*.

[IA Examiner 1], the senior examiner on the matter, testified that he was aware of the B-D Examination group's concerns about "possible misrepresentations and a possible Ponzi scheme on the part of [Stanford]" when he started working on the 1998 Exam. [IA Examiner 1] Testimony Tr. at 18. [IA Examiner 1] also "understood the broker-dealer folks … were concerned that there wasn't a lot of information about what the offshore bank was doing with the money that was being raised through the sale of the CDs."  *Id*. at 19.

The resulting examination report, issued on July 16, 1998 (the "1998 Examination Report") stated:

> The area of concern involves the registrant's "referral" of customers to an affiliated offshore bank for investment in "Certificates of Deposit" ("CDs") issued by that bank.  The examiners sought to gather information about "referrals" of advisory clients.  ….
>
> The examination revealed that at least seventeen SGC advisory client accounts have also invested an as-yet undetermined amount in the CDs.  It was also represented to the examiners that these clients are non-U.S. citizens. Based upon the amount of referral fees earned by SGC in 1997, it appears that SGC brokerage and advisory clients may have invested as much as $250 million in the CDs. There is an outstanding request for the name, address and amount invested for each SGC advisory client who has also invested in the CDs.
>
> …

---

On January 11, 2010, [ENF Staff Atty 4] provided the OIG with sworn, on-the-record testimony, and reiterated his claim that he had not heard that Secore ever represented Stanford. [ENF Staff Atty 4] Testimony Tr. at 25.  He also testified that he was not "aware of any role that Spence Barasch p      the Stanford investigation" and would not "have associated Spence Barasch with Stanford."  *Id*. at 28.  Finally, [ENF Staff Atty 4] testified that he did not "recall ever having a discussion with [Preuitt] about Spence Barasch and Stanford."  *Id*. at 27.

[24]    The only substantive recollection [IA Exmnr 3] had of the 1998 Examination was that it involved CDs that paid suspiciously high returns. [IA Examiner 3] Interview Tr. at 8-9, 13.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> As of the date of this report, SGC has been unable to
> provide a complete list of the advisory clients invested in
> the CDs and the amount invested.
>
> …
>
> It was first represented to the examiners that no records
> were kept by SGC in relation to the client investments in
> the CDs.  However, SGC later represented that such
> records do exists [sic] and is compiling a list as
> requested.[25]

Exhibit 55 at 1, 4.[26]

       IA Examiner 1 agreed that he shared the B-D examiners' "concerns about the fact that
these CDs had relatively high interest rates and yet were being promoted as being very
safe and secure. IA Examiner 1 Testimony Tr. at 20.  Like the B-D examiners, he was
suspicious about "how Stanford was able to achieve these returns with such allegedly
safe investments." *Id.* at 20 IA Examiner 1 summarized his concerns as follows:

> [E]xtremely high interest rates, extremely generous
> compensation, [SGC] is extremely dependent upon that
> compensation to conduct its day-to-day operations.  It just
> smells bad.

*Id.* at 21.

---

[25] IA Examiner 1 explained, "[W]e asked the compliance personnel at Stanford have any advisory clients
invested in these CDs, and their first answer was we don't know. … And, so during the course of the exam,
maybe even after the completion of the fieldwork, they eventually got back to me and gave me a list, I
believe, of names that included 17 names. IA Examiner 1 Testimony Tr. at 36 IA Examiner 1 found SGC's initial
response that they did not know if any of SGC's clients had purchased the Stanford CDs "suspicious." *Id.*
at 37.  He testified, "That was one in many red flags.  I found it incredible that they wouldn't know who
they referred, at a minimum, to the bank." *Id.* at 44.

[26]    The 1998 Examination Report also discussed the fact that two SGC compliance officers had left within
a two-month period and discrepancies in the reasons given for their departures.  Exhibit 55 at 7.  The report
concluded that those facts "raise concerns about SGC's compliance system. …  The examiners will bring
this matter to the attention of FWDO Division of Enforcement." *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

A.    **The 1998 Examination Concluded That SGC's Sales of SIB CDs Were Not Consistent With SGC's Fiduciary Obligation to Its Clients Under the Investment Advisers Act**

IA Examiner 1 testified that one of his concerns about SGC that arose during the 1998 Examination was the complete lack of information SGC had regarding the CDs and the SIB investment portfolio that purportedly supported the CDs unusually high and consistent returns. IA Examiner 1 explained:

> We asked for all due diligence information that the adviser or the Stanford Group Company possessed concerning the CDs, whatever they had as to how the money was being invested, performance returns of the portfolio, whatever they had, and as I recall, they produced very, very little. They claimed, we don't have access to that information.
> …
>
> Well, the question is how would you sell it consistent -- in the case of an adviser, consistent with your fiduciary duty to your clients.
> …
>
> So my conclusion was, as I have asked you, give me everything you've got about that investment, and they gave me virtually nothing, certainly nothing in my mind that would be a reasonable basis for making a recommendation of an investment.  So that's why -- I think if you see the letter I sent to Stanford as a result of this report, I put in there [Section] 206[27] language about it doesn't look like you've got enough information to fulfill your fiduciary duty in making this recommendation.  … And that would have -- in my mind, have been one of the theories to bring a case against the adviser by enforcement that that was such a -- a glaring absence of basis for a recommendation that it amounted to deceit or fraud upon the client.

IA Examiner 1 Testimony Tr. at 41-44.

---

[27]    Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6, prohibits certain transactions by investment advisers.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On July 16, 1998, the SEC sent a letter to SGC that identified some of its concerns resulting from the 1998 Examination.  That letter described SGC's "[f]iduciary [o]bligation" to its clients as follows:

> An adviser has a fiduciary relationship with clients and owes them undivided loyalty. … [An] investment adviser has an … affirmative obligation to employ reasonable care to avoid misleading clients.[28] Any departure from this fiduciary standard may constitute fraud upon clients under Section 206 of the Advisers Act.
>
> During the examination, it was learned that representatives of SGC recommend to broker-dealer and advisory clients investments in a "certificate of deposit" ("CDs") issued by an affiliated bank domiciled in St. John's, Antigua, West Indies, Stanford International Bank Limited ("SIB"). … [I]t was represented that no one at SGC maintained a record of all investors in the CDs or a record of all advisory clients who invested in the CDs. …
>
> SGC may be under a mistaken understanding that … somehow these investment recommendations, or "referrals," fall outside the purview of the Advisers Act and SGC's duties thereunder.  Please be advised that the examiners do not take this position, but rather construe the adviser's duty of utmost good faith to apply to any and all dealings between SGC and its advisory clients to whom it owes a fiduciary duty. … Sections 206(1) and (2) forbid fraud and deceit by an adviser in dealing with its clients without regard to whether a security is involved.[29]

July 16, 1998 Letter from ▮IA Examiner 3▮ to Robert Glen, attached as Exhibit 69 at 3-4.

---

[28]    In its Memorandum of Law in Support of Motion for Ex Parte Temporary Restraining Order, Preliminary Injunction and Other Emergency Relief ("SEC Brief"), filed on February 17, 2009, attached as Exhibit 68, the SEC cited *SEC v. Capital Gains Research Bureau, Inc. et al.*, 375 U.S. 180, 194 (1983) for the proposition that an investment adviser has "an affirmative obligation to employ reasonable care to avoid misleading [his or her] clients."  *Id.* at 27.

[29] ▮IA Examiner 1▮ testified that Stanford's response to the deficiency letter was inadequate and did nothing to allay his concerns that Stanford's CD sales were fraudulent. ▮IA Examiner 1▮ Testimony Tr. at 55-56.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B.     The Enforcement Staff Failed to Consider the Investment Adviser Examiners' Concerns in Deciding Not to Investigate Stanford Further

[IA Examiner 1] testified that the IA Examination staff brought their concerns to Enforcement's attention while the 1998 Stanford MUI was still open. [IA Examiner 1] Testimony Tr. at 47.  In fact [IA Examiner 1] testified that the only reason the examination staff did not make a second formal Enforcement referral of Stanford in connection with the 1998 Examination was the fact that Enforcement already had an open MUI.  *Id.* at 55-56. [IA Examiner 1] testified, however, that there were no "coordination efforts" between the examiners and the Enforcement staff in connection with the 1998 Stanford MUI.  *Id.* at 29. [IA Examiner 1] explained:

> My exam was done.  I did the exam report.  I understood enforcement was looking at it.  I just thought enforcement will go out and get whatever additional information they need.

*Id.*  Enforcement staff attorney [ENF Staff Atty 1] testified that she had no recollection of an examination of SGC in July 1998, and she did not recall the investment adviser examiners referring any information to her or her branch chief about SGC. [ENF Staff Atty 1] Testimony Tr. at 29-30.

According to a former FWDO Examination branch chief, the Enforcement staff's failure to coordinate with the examiners who were conducting an examination of Stanford contemporaneous with the 1998 MUI before deciding to close that MUI was, in his opinion, "crazy … nonsensical."  Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 37; *see also id.* at 43 (The Enforcement staff's failure to coordinate with [IA Examiner 1] "doesn't make any sense.")

[IA Examiner 1] testified that he was "concerned" when Enforcement closed the 1998 Stanford MUI because "we still had the same concerns that this thing is going to continue to grow and we're not really comfortable that it's a legitimate operation." [IA Examiner 1] Testimony Tr. at 59.  Specifically [IA Examiner 1] concurred "that Stanford was operating some kind of fraud."  *Id.* at 60.  Preuitt testified that after the 1998 Examination, both the investment adviser and broker-dealer examiners "knew that it was a fraud."  December 14, 2009 Preuitt Testimony Tr. at 60.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## IV.    IN 2002, THE SEC EXAMINERS EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AGAIN AND REFERRED STANFORD TO ENFORCEMENT

In November 2002, the SEC's investment adviser examination group conducted yet another examination of SGC. *See* Exhibit 70. [IA Examiner 2] and [IA Examiner 1] were the examiners assigned to the matter. *Id*. at ii. [IA Examiner 2] testified that he selected SGC as part of his plan to examine other registered investment advisers in Houston, Texas. [IA Examiner 2] Testimony Tr. at 10-11. [IA Examiner 2] testified that he asked [IA Examiner 1] if he wanted to assist with the Houston examinations, including Stanford. *Id*. at 11-12. In response, [IA Examiner 1] told [IA Examiner 2] that [IA Examiner 1] had examined SGC in 1998 and was concerned about its operations. *Id*. at 12. [IA Examiner 2] described [IA Examiner 1] reaction to [IA Examiner 2] request for assistance as follows:

> [W]hen I mentioned Stanford [to [IA Examiner 1] he kind of had an odd look on his face and I asked him, "What's wrong with Stanford?" And he explained to me that he had been there in [1998], and that he had strongly suspected that the affiliated bank of the investment advisor had problems.
> …
>
> I asked him what type of problems, you know, what was the deal, and -- I can't remember whether he actually came out and said Ponzi scheme or fraud but he made it clear that the bank was taking in deposits and he suspected that, whenever there was a redemption, they were just taking that money out of -- new money from new investors. So like I said, I can't remember if he used the word "fraud" or "Ponzi scheme," but he made it clear that that's what he suspected.

*Id.* at 12.

### A.    In the 2002 Examination, the Examiners Found That Stanford's CD Sales Had Increased Significantly, Which Led to Concerns That the Potential Ponzi Scheme Was Growing

Stanford's operations had grown significantly in the four years since the 1998 Examination. The 1998 Examination Report stated, "Based upon the amount of referral fees earned by SGC in 1997, it appeared that SGC brokerage and advisory clients may have invested as much as $250 million in the CDs." Exhibit 55 at 1. According to the Examination report issued on December 19, 2002 (the "2002 Examination Report"), "At the time of the current examination, the amount of referral fees received by SGC would be indicative of $640 million in CDs outstanding, primarily through SGC's efforts."

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

2002 Examination Report, attached as Exhibit 70 at 2.  The 2002 Examination Report also noted:

> According to the last Form D filed with the Commission on January 29, 2002, SIB claimed to have sold $37.2 million (of $150 million offered) in CDs to an undisclosed number of U.S. resident accredited investors.  This amount reflects additional deposits of $22.3 million to U.S. investors since February 24, 2000, the date of the previous Form D, when SIB reported total sales of $14.9 million. … SIB's financial statements for the year ended December 31, 2001, … indicated total 'certificates of deposit' of $1.1 billion.

*Id*. at 10.

The 2002 Examination Report's conclusions included, "Based upon the results of this examination, the FWDO has assigned a "risk rating" of "1," the highest risk rating possible, primarily due to SGC's sales of the CDs."  Exhibit 70 at 15. [IA Examiner 2] testified that a "big factor" in the assignment of a "high" risk rating to Stanford was the "suspicions [that] the international bank was a Ponzi scheme." [IA Examiner 2] Testimony Tr. at 40.

According to the branch chief assigned to the 2002 Examination, who asked not to be identified, he and the examiners had "major concerns" about Stanford's operations. Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 46-47. [IA Examiner 2] testified that there were numerous red flags regarding the SIB CDs that caused him to conclude that Stanford had been operating a Ponzi scheme and it was growing exponentially.  *See, e.g.,* [IA Examiner 2] Testimony Tr. at 68, 96.  As [IA Examiner 2] testified, one of those red flags was the consistent, above-market reported returns, stating, "[W]hen you take the CD rates, the commission, the overhead and added them together … it just seemed very unlikely that they could invest in anything legitimate to earn a return to cover all those expenses." [IA Examiner 2] Testimony Tr. at 29-30.

[IA Examiner 2] testified that the high commissions paid to SGC financial advisers for selling the SIB CDs was another significant cause of the staff's suspicions. [IA Examiner 2] made these observations in the following exchange:

> Q:  And did it make sense to you that Stanford Group Company … [would] be able to persuade all these people to invest [in the Stanford CDs] without having any understanding as to what the product was … ?
>
> A:  It's been my experience that, when you offer a commission that high to a rep, they'll find some way to make it attractive to the customer.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

…

Q: [W]ould you agree … that the high referral fee was indicative of a possible fraud in two respects.  One is … how you make a safe investment to support [the referral fee] and the interest that you're paying?

A: Right.

Q: But two, it's indicative of a strong incentive that's being put on the reps to sell that product.  Is that also somewhat of a red flag … ?

A: Yes, that's correct.

IA Examiner 2 Testimony Tr. at 66-68.

Another red flag that concerned the examiners was SGC's claimed lack of information about which of its clients had invested in the SIB CDs  IA Examiner 2 testified that during and after the examination IA Examiner 1 and he asked SGC several times for a list of SGC's investment advisory clients that had invested in SIB CDs.  *Id.* at 30, 55.  A March 20, 2003 e-mail from IA Examiner 2 to IA Examiner 1 stated:

[SGC] sent us a list of CD investors.  The list seems awfully short.  They didn't include addresses - however, just looking at the names the majority appear to be US citizens.[30]

March 20, 2003 E-mail from IA Examiner 2 to IA Examiner 1 attached as Exhibit 71.  Approximately two months later, on May 22, 2003, IA Examiner 1 e-mailed IA Examiner 2

I was thinking about going back to confirm with [SGC's Compliance Officer] that we had a full list of CD holders that bought through SGC.  The totals from the list she gave us do not exactly match up with the total CDs outstanding that should be out there based upon the referral fees SGC received in 2001 ….

---

30 IA Examiner 2 testified that he felt the issue of whether there were U.S. investors was irrelevant, but that he understood that it was a factor for Enforcement. IA Examiner 2 Testimony Tr. at 55-57.

84

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

May 22, 2003 E-mail from ▓▓▓▓ to ▓▓▓▓▓▓▓ attached as Exhibit 72. ▓▓▓▓▓▓▓ testified that he did not believe the examiners ever got "a satisfactory response [to the request], and a full list of investors."[31] ▓▓▓▓▓ Testimony Tr. at 109.

**B.      The 2002 Examination Found That SGC Was Violating the Investment Advisers Act By Failing to Conduct Any Due Diligence Related to the SIB CDs**

The 2002 Examination Report included the following comment regarding Section 206 of the Investment Advisers Act in its summary of violations, "[SGC] failed to document adequate due diligence with respect to its clients' investments in its affiliated offshore bank's certificates of deposit." Exhibit 70 at 1. The 2002 Examination Report discussed SGC's lack of due diligence as follows:

> A review of SGC's "due diligence" files for the SIB certificates of deposit ("CDs") revealed that SGC had little more than the most recent SIB financial statements (year end 2001) and the private offering memoranda and subscription documents. There was no indication that anyone at SGC knew how its clients' money was being used by SIB or how SIB was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC.
>
> …
>
> The examiners obtained copies of the disclosure documents given to U.S. accredited investors …. [T]he document provides no disclosure of specifically how the money will be used by the issuer.

Exhibit 70 at 10.

---

[31]    As discussed below, on December 16, 2002, ▓▓▓▓ and ▓▓▓▓ learned that Enforcement had decided not to investigate Stanford before seeing the 2002 Examination Report and before that report was even finished. On December 19, 2002, ▓▓▓▓ e-mailed ▓▓▓▓ regarding their efforts to obtain information from SGC regarding its clients who had invested in SIB CDs, stating, "On other hand, if we aren't going to investigate the thing I don't see that it matters." December 19, 2002 E-mail from ▓▓▓▓ to ▓▓▓▓ , attached as Exhibit 73. ▓▓▓▓ testified that it would not have been a productive exercise to push for more information from SGC if Enforcement had already decided to not investigate the matter. ▓▓▓▓ Testimony Tr. at 90-91.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[IA Examiner 2] explained his rationale for concluding that SGC was violating Section 206 as follows:

> [F]or all of [SGC's] investment advisory clients they were
> [a] fiduciary and whenever they refer that client to some
> other investment product, whether it's a security or not,
> they were supposed to do some due diligence into doing
> that.  So we asked them:  Give us the due diligence file for
> this offshore bank.  We want to see [] everything you
> looked at before you made this recommendation to refer
> these clients over.  The only thing we got if I remember
> right was just the file with the financial statements and
> maybe a couple other things in there.  So [IA Examiner 1]
> and I took the position that that wasn't enough.

[IA Examiner 2] Testimony Tr. at 48-49 [IA Examiner 1] also testified that he considered SGC's due diligence files to have been "extremely lacking." [IA Examiner 1] Testimony Tr. at 75.

On December 19, 2002, the Examination staff sent Stanford a deficiency letter to SGC's Chief Compliance Officer, requesting that "SGC perform and document substantial additional due diligence to determine whether the use of proceeds by the issuer would indicate that the investment is suitable for its advisory clients."  *See* December 19, 2002 Letter from [IA Examiner 1] to Jane Bates, attached as Exhibit 74 at 8.  That letter explained:

> An adviser has a fiduciary relationship with clients and
> owes them undivided loyalty. … Any departure from this
> fiduciary standard may constitute fraud upon clients under
> Section 206 of the Advisers Act and subject you to
> administrative, civil and/or criminal sanctions.
> …
>
> The Examination Staff's review of SGC's due diligence file
> with respect to its clients' investments in the [SIB CDs]
> indicated that *SGC did not have adequate information upon
> which to base a recommendation to a client.*
> …
>
> The rates offered by the CDs, as compared with current
> treasury rates, would indicate that the risk involved in the
> CDs may be great.

*Id*. at 7-8 (emphasis added).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In March 2003, in addressing the deficiencies identified during the 2002 Examination, SGC markedly changed its previous representations to the SEC concerning its due diligence regarding SIB's CDs.  *See* March 13, 2003 Letter from Jane Bates to [Staff Acct 2] attached as Exhibit 75 at 4.  A March 19, 2003 e-mail from [A Examiner 2] to [IA Examiner 1] discussed SGC's latest response to the examination staff's deficiency letter as follows:

> During the fieldwork of the examination, I got the definite impression that the Registrant's staff was trying to "wash their hands" of the offshore bank and downplay the activities of the bank in their office.  We were told that once a client was referred to the bank, the adviser's personnel no longer took an active role in managing that portion of the client's assets.  Now Jane [its Chief Compliance Officer] claims that Stanford's COO and Chief Compliance Officer regularly visit the offshore bank, participate in quarterly calls with the CFO of the bank, and receive quarterly information regarding the bank's portfolio allocations (by sector and percentage of bonds/equity, etc.), investment strategies, and top five equity and bond holdings.  Jane also says that such information will now be included in its due diligence files.  I believe this to be a mistake by Jane and others at Stanford - this response should come in handy when the bank collapses and everyone there plays dumb.[32]  Also, if this information is included in the due diligence file, we should have access to it now ….  Perhaps we should drop by unannounced and ask to look at it.

Exhibit 71.  [IA Examiner 1] responded:

> On the Stanford Bank issue, I am not sure what to do.  If they have the information they gathered on these visits to Antigua, why didn't they give it to us when we asked for it?  I guess we should ask for it again.

*Id.*

Regarding SGC's new claim to have information regarding SIB's portfolio, [IA Examiner 2] testified that it was "a red flag that all of a sudden [SGC] claimed to have this information when they didn't have it before." [A Examiner 2] Testimony Tr. at 96.  In fact,

---

[32] [IA Examiner 2] testified that when he made this comment, he thought there was "about a 95 percent chance that [SIB] was going to collapse" because it was a Ponzi scheme. [A Examiner 2] Testimony Tr. at 99.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

when [IA Examiner 2] received this letter, he "knew right then, that either [SGC's Chief Compliance Officer] was a bit out of it or that she had lied." *Id.* at 96-97.

However, the OIG investigation found that the SEC never received, nor requested, the information referenced in SGC's March 13, 2003 letter. *Id.* Despite [IA Examiner 2] suggestion in his March 19, 2003 e-mail that "[p]erhaps we should drop by unannounced and ask to look at it," we found that the SEC did not follow-up to obtain the newly-claimed due diligence information. Exhibit 71 at 102-103.

> **C.      During the 2002 Examination, the FWDO Enforcement Staff Received a Letter From the Daughter of an Elderly Stanford Investor Concerned That the Stanford CDs Were Fraudulent**

On December 5, 2002, Degenhardt received a letter dated October 28, 2002, from a citizen of Mexico who raised concerns about Stanford similar to those raised by the Examination staff. *See* October 28, 2002 Letter from [Complainant 1] to SEC Complaint Center, copying Harold Degenhardt (the "[Complainant 1] Letter"), attached as Exhibit 76. The [Complainant 1] Letter stated:

> My mother is an old woman with more than 75 years of age and she has all her money my father inherited to her for his life work in CDs of Stanford Bank. This is the only money my mother has, and it is necessary for my mother, my sisters and me for living. My mother put it in the United States because of the bad situation in Mexico and because the most important thing is to look for security. …
>
> I am an accountant by profession and work for a large bank in Mexico. I know some banking regulations of my country that are very different from practices in Stanford Bank and for that reason I am very nervous. Please look at this bank and investigate if everything is honest and correct. There are many investors from Mexico in this bank.
>
> My questions and doubts are listed here.
>
> 1.        Stanford says the CDs have insurance. My mother receives two statements of accounts. One from Stanford bank in Antigua with the CDs and another one from Stanford and Bear Stearns in New York. I know Bear Stearns is a very good company, but the statement of Bear Stearns only has cash that my mother uses to take out checks. This cash is the interest that the CD pays. Is the

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

bank in Antigua truly covered by insurance of the United States Government?

2.      The CD has a higher than 9% interest and I know other big banks like Citibank pay interest of 4%.  Is this possible and secure?
…

4.      In December of 1999 the bank had a lot of investments in foreign currencies and in stocks.  In all the world many stocks and foreign currencies came down in 2000.  If a lot of money was in investments that came down, how did the bank make money to pay the interest and all of the very high expenses I imagine it has. …

5.      The accounting company that makes the audit (C.A.S. Hewlett & Co) is in Antigua and [no]body knows. I saw the case of ENRON with bad accounting and I am preoccupied with another case of fraud accounting.  Why is the auditor a company of Antigua that [no]body knows and not a good United States accounting company?

I know some investors that lost money in a United States company named InverWorld in San Antonio.  Please review very well Stanford to make sure that many investors do not get cheated.  These investors are simple people of Mexico and maybe many other places and have their faith in the United States financial system.

*Id.*[33]

---

[33]     Approximately eleven months before receipt of this letter, Barasch was forwarded another complaint from ▓Complainant 2▓▓▓▓ that stated:

> I am currently providing▓PII▓▓▓▓services to an Antigua company and have become very concerned about the unusual activities of the Stanford Financial Group, a Texas based organisation, operating though subsidiaries on the Island.
>
> …
>
> The Company has recently written off a significant, overdue interest payment as "a gift to the people of Antigua" to enable the Government to pay its public employees and has announced that it will now make further substantial loans.
>
> I draw this to your attention as these curious strategic decisions may not be reaching the shareholders of the Group and may ultimately be placing their investments at risk.
>
> I would be pleased to forward further information upon request.

(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



[IA Examiner 2] testified regarding the [Complainant 1] Letter, that "It looked like she had the same sort of concerns we had, about the higher rate of interest. … "[IA Examiner 2] Testimony Tr. at 62. [IA Examiner 2] characterized those concerns as "legitimate." *Id.*

### D.   The FWDO Did Not Respond to the [Complainant 1] Letter and Did Not Take Any Action to Investigate Her Claim

[IA Examiner 1] testified that his reaction to the letter was, "[T]his is great, we've got actually somebody complaining."[IA Examiner 1] Testimony Tr. at 93. [IA Examiner 1] also felt that "we need[ed] to get in touch with this lady," because he was "almost certain there was something to her complaint." *Id.* at 74. [IA Examiner 1] drafted a response to her letter. *Id.* at 73-74.  That draft response stated, in part:

> If the person who sold the CD to your mother is a registered representative of SGC, a registered broker dealer and investment adviser in the United States, there may be some aid we can provide.  …  If you wish your letter to be considered a complaint with regard to this registered representative's actions, we will forward your letter to SGC and ask that they respond to you and this office to explain why such an investment was suitable for your 75-year old mother.  *That response might be enlightening to all of us.* …
>
> With respect to the interest rate being paid, we share your concerns about whether it is possible to pay such a high interest rate in the current economic environment.  As I am sure you are aware, the general principal [sic] is that the higher the interest rate offered, the more risk is being taken in the investment.  …

December 2002 Draft Letter to [Complainant 1] from [IA Examiner 1] attached as Exhibit 78 (emphasis added).

The OIG investigation found that [IA Examiner 1] response letter was never sent. [IA Examiner 1] Testimony Tr. at 73-74.

---

February 5, 2002 E-mail from [OIE Atty] to Spencer Barasch, attached as Exhibit 77.  The OIG found no evidence that anything was done in response to this complaint.

34   On December 11, 2002, [IA Examiner 1] e-mailed Wright the draft response and stated, "[Staff Acct 2] and I have come up with this draft response to the lady in Mexico.  It should at least get the ball rolling on responding.  Let us know what you want us to do."  *See* December 11, 2002 E-mail from [IA Examiner 1] to Hugh Wright, attached as Exhibit 79.  The draft response was circulated to [ENF BC 4] a branch chief in Enforcement, who responded, "I want to spend more time with this.  It may make sense after we look at everything.  The letter should come from the enforcement attorney." *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

**E.     Although a Decision Was Made to Forward the** [Complainant 1] **Letter to the Texas State Securities Board, the Letter Was Never Forwarded**

[IA Examiner 1] testified that after he had drafted a response to the [Complainant 1] Letter, he was told that Barasch had decided to forward the [Complainant 1] Letter to the Texas State Securities Board ("TSSB"). *Id.* at 91-92. [IA Examiner 1] was "puzzled" by Barasch's decision "because [he] didn't see how the Texas State Securities Board could do even as much as we could potentially do, much less more. So it didn't make any sense..." *Id.* at 92. According to a tracking report and a notation that [IA Examiner 1] made on that document, the [Complainant 1] Letter was to have been forwarded to the TSSB "per Barasch" on December 10, 2002. *See* SEC Tracking Report, attached as Exhibit 80.

However, the OIG investigation found that the [Complainant 1] Letter was not sent to the TSSB. Denise Crawford, Texas State Securities Commissioner, and [TSSB Empl 1] [PII] [PII], told the OIG that the TSSB had searched its files and found no record of receiving the letter. TSSB Interview Memorandum at 4; [TSSB Empl 1] Interview Memorandum. Crawford also stated that, as a matter of procedure, if the SEC sends a letter to TSSB stating that the SEC is sending a complaint to the TSSB, the TSSB regularly keeps records of such letters. TSSB Interview Memorandum at 4. Crawford also stated that the fact that the TSSB does not have a record of such a letter in their files would indicate that the TSSB never received such a letter from the SEC. *Id.*[35] Similarly, the SEC has no record of Barasch having referred the matter to the TSSB. *See* February 23, 2010 E-mail from Julie Preuitt to [OIG Staff 2] attached as Exhibit 81.

**F.     In December 2002, the Examination Staff Referred Their Stanford Findings to the Enforcement Staff**

Before the 2002 Examination Report was completed, the Examination staff met with the Enforcement staff several times to discuss their numerous concerns regarding Stanford. [IA Examiner 2] testified that he and [IA Examiner 1] had "several meetings with [E]nforcement" after returning from their Stanford examination, but that "there were no high-level attorneys there." [IA Examiner 2] Testimony Tr. at 22. Specifically, he did not believe Degenhardt or Barasch attended any of those meetings. *Id.*

The 2002 Examination Report found the following:

> The [Stanford] website … provides all the terms and conditions of the various types of CDs … offered by SIB … A person accessing the website can easily get information about how to contact SGC representatives,

---

[35]   Crawford, [TSSB Empl 2] [PII]  of the Texas State Securities Board, and [TSSB Empl 3] [PII] of the Texas State Securities Board, all stated that they had never seen the letter before. TSSB Interview Memorandum at 4.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> either by telephone or by email.  As a result, the website
> information appears to represent a general solicitation, or
> public offering, of the CDs to U.S. persons.

Exhibit 70 at 11-12.  The 2002 Examination Report described the related Enforcement
referral of this issue as follows:

> The issue concerning the possible unregistered public
> offering of the CDs has been referred to the FWDO's
> Enforcement Division, which has decided to refer the
> matter to the Texas State Securities Board.

*Id*. at 15 (footnote omitted).

The concerns that the examiners discussed with the Enforcement staff included
the fact that there was no indication that anyone at SGC knew how its clients' money was
being used by SIB or how SIB was generating sufficient income to support the above-
market interest rates paid and the substantial annual three percent trailer commissions
paid to SGC.  The examiners' concerns fueled "suspicions [that] the international bank
was a Ponzi scheme." IA Examiner 2 Testimony Tr. at 40.

**G.     Based on the Earlier Decision to Forward the Complainant 1 Letter to the
TSSB, the "Matter" Was Considered Referred to the TSSB Even
Before the 2002 Examination Report Was Sent to Enforcement.**

On December 16, 2002, IA Examiner 1 copied two of the Enforcement attorneys with
whom he had been meeting regarding the Stanford matter on an e-mail exchange with
IA Examiner 2 IA Examiner 2 regarding Stanford.  December 16, 2002 E-mail from IA Examiner 1 to IA Examiner 2
, attached as Exhibit 82.  One of those attorneys, ENF BC 4 , a branch chief
in the Enforcement group, responded to IA Examiner 1 and copied Barasch:

> You should be aware that, before you brought this matter to
> my attention, Spence [Barasch] had already referred it to
> the TSSB based on a complaint.  Neither you nor I knew
> about this referral.  I have since conferred with Spence
> about it.  We decided to let the state continue to pursue the
> case.  When you are finished with your report, however, I
> would like to read it.  At that time, I will reevaluate our
> interest in the matter.

*Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[IA Examiner 1] forwarded [ENF BC 4] e-mail to [Staff Acct 2], Wright and [IA Examiner 2] with the following introduction:

> Here's the latest on status with ENF.  Looks like TSSB will handle the matter.  I can't wait to see Texas execute a warrant in Antigua!![36]

Exhibit 82.

### H.     The Enforcement Staff Did Not Open an Inquiry Into Stanford and Did Not Even Review the 2002 Examination Report.

[IA Examiner 1] described his surprise at learning on December 16, 2002, that Enforcement had decided to not open a MUI based on the examiners' concerns but had instead "decided to let the state continue to pursue the case," as follows:

> This was a shot out of the blue because I had sent him the draft of my response letter to the Mexican lady and was waiting to get some comment, get it cleared to get it going. And then I received this e-mail saying [IA Examiner 1] it's already been referred to the Texas State Securities Board.

[IA Examiner 1] Testimony Tr. at 103; *see also* Exhibit 82. [IA Examiner 2] testified that he was "disappointed" and "frustrated" by Enforcement's decision to refer the Stanford matter to the TSSB. [IA Examiner 2] Testimony Tr. at 91.

On December 19, 2002, [IA Examiner 2] e-mailed the 2002 Examination Report to [OCIE Exam Liaison], the FWDO Examination Liaison in the Office of Compliance Inspections and Examinations ("OCIE") in Washington, DC, and copied Barasch and

---

[36] [IA Examiner 2] testified that he "never did understand" Barasch's rationale for referring the matter to the TSSB in the following exchange:

> A:   … I'd hoped that they didn't just push this off on Texas without -- and just close the file and never look at it again.
>
> Q:   … [W]hat would be the value of Texas pursuing this versus the SEC?  What would they be able to do that you guys couldn't?
>
> A:   That I never did understand.  …  I think it's safe to say I was pretty confused, or -- just wasn't expecting a referral to the State of Texas.

[IA Examiner 2] Testimony Tr. at 84-85.

TSSB officials Crawford and [TSSB Empl 2] told the OIG that because the issuer – SIB – was overseas, it made much more sense for the SEC to pursue this matter rather than the TSSB.  TSSB Interview Memorandum at 4.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF BC 4].  *See* December 19, 2002 E-mail from [IA Examiner 2] to [OCIE Exam Liaison], attached as Exhibit 83. [IA Examiner 2] e-mail stated:

> The issue concerning the possible unregistered public offering of the CDs has been referred to the FWDO's Enforcement Division,[37] which has decided to refer the matter to the Texas State Securities Board.

*Id.*

After Barasch received [IA Examiner 2] e-mail with the 2002 Examination Report attached, he asked [ENF BC 4] "at your convenience, i.e., no rush, let me know what you think."  *See* Exhibit 83.  However, the OIG found no indication that [ENF BC 4] or Barasch ever read the 2002 Examination Report. [ENF BC 4] testified that he had no recollection of reading it. [ENF BC 4] Testimony Tr. at 20.  Similarly, Barasch told the OIG that he did not recall ever seeing the 2002 Examination Report.  Barasch Interview Tr. at 23, 35, 40.

Barasch stated that he did not recall why he decided not to open a MUI based on the [Complainant 1] Letter or the 2002 Examination Report.[38]  Barasch Interview Tr. at 35-36.  Barasch further told the OIG that he did not recall having ever seen either of those two documents.  Barasch Interview Tr. at 23-25, 35-36, 40, 43-44.

## I.     The Enforcement Staff Did Not Refer the 2002 Examination Report Findings to the TSSB

It appears that, contrary to what the Examination staff was told, the Stanford matter was not referred to the TSSB; rather Barasch just decided not to pursue the matter.  Barasch told the OIG that he does not recall referring Stanford to the TSSB around this time.  Barasch Interview Tr. at 23, 43-44.  As discussed above, the OIG found that the [Complainant 1] Letter was not forwarded to the TSSB.  [TSSB Empl 2] [PII] [PII] at that time, told the OIG that he was never informed by Barasch or anyone else at the SEC that the SEC's Examination staff had referred anything related to Stanford for an Enforcement action in December 2002.  TSSB Interview Memorandum at

---

[37]   Although the 2002 Examination Report discussed the factual predicate for a Section 206 violation, the cover page of the 2002 Examination Report, the "Conclusion" section of the 2002 Examination Report, and [IA Examiner 2] e-mail to Barasch, *et al.*, only referred "[t]he issue concerning the possible unregistered public offering f the CDs."  *See* Exhibit 70 at i and 15; Exhibit 83. [IA Examiner 2] testified, "[A]s far as I was concerned, we referred the whole thing over to enforcement and to be honest with you, I didn't care which one of these issues they wanted to take with and run, you know, we just wanted some action against the firm to try to shut them down." [IA Examiner 2] Testimony Tr. at 70.

[38]   When he reviewed the cover memorandum for the 2002 Examination Report during his OIG interview, Barasch noted that "just from a strict reading of this segment of this report, you know, again, there's no reference to any fraud here.  And there's a reference simply to an unregistered offering of CDs."  Barasch Interview Tr. at 23-24.

**94**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

4-5.  According to ▓▓▓▓▓ even if the Stanford matter had been referred to the TSSB, the 2002 Examination Report would not have been sent to the TSSB pursuant to the SEC's policy of not sharing its examination reports with "any outside agency or anyone." ▓▓▓▓▓ Testimony Tr. at 93.

### J.    In December 2002, the SEC Examination Staff Attempted to Interest the Federal Reserve in Investigating Stanford, But Concluded That the Federal Reserve Had ▓▓▓▓ of Stanford

In December 2002, as the Examination staff was completing its report, the staff contacted the Federal Reserve ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Exhibit 82 at 2.    On December 16, 2002, ▓▓▓▓▓ e-mailed ▓▓▓▓ ▓▓▓▓▓ at the Federal Reserve Board as follows:

> Thanks for your help!  …  [W]e believe that approximately $640 million in CDs are currently outstanding from SGC's sales efforts (SGC receives a 3% annual commission from Stanford International Bank for referring clients).  …  The CDs pay a higher than market rate of interest, currently ranging from 3.65% … to 8.15% ….  The financial statements of the international bank indicate approximately $1,116,454,586 in outstanding customer deposits as of 12/31/2001.  The financial statements are vague as to the investment portfolio of the bank (approximately 59% is invested in "equities", while 41% is invested in "treasury bonds, notes, corporate bonds").  … . After you get a chance to review everything, please call me and tell me what you think.

February 12, 2003 E-mail from ▓▓▓▓▓ to ▓▓▓▓▓ Exhibit 84 at 2-3.

On February 12, 2003, after not receiving a response to his December 16, 2002 e-mail, ▓▓▓▓▓ e-mailed ▓▓▓▓▓ "Is anyone at your office interested in pursuing this matter?  What is the current status?"  *See* attached as Exhibit 84 at 2.  After another three months had lapsed, on May 21, 2003, ▓▓▓▓▓ e-mailed ▓▓▓▓▓

> ▓▓▓▓▓ and I saw Hal [Degenhardt] in the hallway this morning shortly after our Stanford meeting.  Hal made the mistake of asking what I was up to and I made the mistake

---

[3] ▓▓▓▓▓ testified, "[W]e had the issue of …CDs being sold that for all intents and purposes appear[ed] to be banking activity.  We thought the banking regulators might have some say in this and might have a regulatory hook to use against Stanford." ▓▓▓▓▓ Testimony Tr. at 100.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> of telling the truth.  He now is concerned that we need to
> pursue the Stanford Bank CD issue through OCIE with the
> Federal Reserve.  He believes that there needs to be a high-
> level dialog on this between the SEC and Fed.

May 21, 2003 E-mail from  to  attached as Exhibit 85.

On May 21, 2003  contacted OCIE to address Degenhardt's concern and described the issue Degenhardt was concerned about as follows:

> Degenhardt[] has expressed an interest in our having a
> "high level" dialogue with the Federal Reserve regarding
> the "CDs" discussed in our examination report on the
> Stanford Group examination. …  He is concerned about the
> ability of Stanford International Bank (SIB) to offer these
> CDs in the US without being a bank officially subject to
> US banking regulation.  …  We have as yet received no
> reply from the Federal Reserve (.)[40]

May 21, 2003 E-mail from  to  attached as Exhibit 86 at 2.

On May 22, 2003  asked , "Did Hal [Degenhardt] say what kind of role we [the Examination staff] were going to play in investigating this further?" Exhibit 84 at 1.  explained that Degenhardt was not interested in the SEC investigating the matter; he was only interested in "mak[ing] sure we had done all we could do in alerting the banking authorities of our concerns …." *Id.*

On June 3, 2003,  updated Wright on the discussions with the Federal Reserve Board as follows:



---

40   updated  on May 22, 2003, "I have not heard a peep from ." Exhibit 84.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



June 3, 2003 E-mail from [IA Examiner 1] to Hugh Wright, attached as Exhibit 87 at 2.

Wright forwarded [IA Examiner 1] update to Degenhardt and stated:



June 3, 2003 E-mail from Hugh Wright to Harold Degenhardt, attached as Exhibit 87 at 1-2.

Degenhardt responded to Wright's update on the unproductive discussions with the Federal Reserve by querying, "This [is] all great, but what does it mean?  Is this something that we ought to go after or not?"  *Id*. at 1.  Wright responded by describing the history of the matter as follows:

> The decision not to go after it has been made in Enforcement some time back, who then referred [it] to Texas.  As mentioned below, the Fed referred the matter to the FBI ⬛DPP⬛ Nothing has changed since we referred it to Enforcement several months ago to suggest that it would be an easier case now than before.  After our exam a couple of years ago, Stanford

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> started filing Form Ds relying on Rule 506, although they did so under protest.  This would seem to make it difficult to work a case for selling unregistered securities.  If we can't go on that basis, then we would have to prove that they are operating a Ponzi scheme which would be very difficult, if not impossible, considering that, as far as I am aware, there have never been any complaints by investors, and all of the bank records and sales records are maintained offshore in Antigua.  In my opinion, there is nothing further for us to do at this point.

*Id*.

At this point in time, it had been approximately six years since the SEC Examination staff had concluded that the SIB CDs were likely a Ponzi scheme.  During that period, the SEC had conducted three examinations resulting in two Enforcement referrals; an Enforcement inquiry had been opened and closed with no meaningful effort to obtain evidence related to the Ponzi scheme; and the Examination staff had attempted to interest the Federal Reserve in investigating Stanford, to no avail.  As discussed below, it would take almost another six years, another Examination and Enforcement referral, and the collapse of the Madoff Ponzi scheme before the SEC acted to shut down Stanford's Ponzi scheme.

## V.   IN 2003, THE SEC ENFORCEMENT STAFF RECEIVED TWO COMPLAINTS THAT STANFORD WAS A PONZI SCHEME, BUT NOTHING WAS DONE TO PURSUE THOSE COMPLAINTS

### A.   [Confidential Source] in a Ponzi Scheme Case Filed By the SEC Noted Several Similarities Between That Case and Stanford's Operations

On August 4, 2003, the TSSB forwarded to Barasch a letter from [Confidential Source] that discussed [Confidential Source] concern that Stanford was operating a Ponzi scheme.  *See* August 4, 2003 Letter from [TSSB Empl 2] to Spencer Barasch, attached as Exhibit 88; *see also* July 31, 2003 Letter from [Confidential Source] to [TSSB Empl 4] (the [Confidential Source] Letter"), attached as Exhibit 8 [Confidential Source] [PII] [PII] [41] [42]  *See* Exhibit 89. [PII] Letter discussed several

---



[41]   Barasch told the OIG that he did not recall seeing the [Confidential Source] Letter.  Barasch Interview Tr. at 45-46.  Barasch said the TSSB sent virtually every complaint it received to the SEC, and the [Confidential Source] Letter would have been one of many complaints that he received from the TSSB.  Barasch Interview Tr. at 46.

[42]   [PII]

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

"striking similarities" between the ███████ Ponzi scheme and what was known at the time about Stanford's operations.  *Id.*  The ███████ Letter included the following information:

> ███████ was highly effective at avoiding regulatory oversight, through a Byzantine corporate structure where the funds from deposits were held in off shore entities, and the US entities only provided "administrative services" to the offshore entities.  Furthermore, the people that solicited the deposits were promoters employed by yet another corporate entity, and these promoters were provided little information about the financial wherewithal of the companies accepting deposits.  The ███████ depositors who thought they were investing in money markets and CD instruments were told that their money was placed in conservative interest-bearing instruments, and unbeknownst to them, their deposits were used to fund speculative investments … Beyond these speculative investments, the funds were used to pay for the elaborate corporate headquarters in San Antonio and the expense of the promoters in the four offices in Mexico.
> …
>
> Unfortunately, organizations like ███████ continue until they reach a point of illiquidity so severe that they can no longer honor client withdrawals.  At that time, the potential recovery to investors is greatly impaired.  In the case of ███████, barely $100 million of assets remained to cover obligations exceeding $425 million.  For the sake of the Mexican investors, I hope that Stanford is not constructed in the same manner as ███████

*Id*.  The letter also contained a detailed chart listing the aspects of the two companies that were deemed to be similar.  *Id.* at1.

Before sending the ███████ Letter to the SEC, ███████ called Barasch to discuss the matter.  TSSB Interview Memorandum at 5.  ███████ told the OIG that because ███████ was such a significant matter, he thought he needed to bring ███████ concerns regarding Stanford to the SEC's attention.  *Id.* ███████ stated that the SEC was a more appropriate body than the TSSB to investigate Stanford, because of the international aspect and because of the

███████

**99**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

significant amount of resources necessary to investigate the matter.  *Id.* [TSSB Empl 2] told the OIG that during his phone conversation with Barasch, Barasch did not mention the [Complainant 1] Letter that Barasch had supposedly sent to the TSSB in December 2002, nor did he mention that the SEC Examination staff had completed an examination and referred Stanford to the TSSB for enforcement action in December 2002.  *Id.*

Barasch forwarded the [Confidential Source] Letter to [ENF BC 2] a branch chief in the FWDO's Enforcement group. [ENF BC 2] Testimony Tr. at 9; *see* September 16, 2003 E-mail from [IA Examiner 1] to [ENF BC 2], Exhibit 91. [ENF BC 2] had worked on the [PII] matter. [ENF BC 2] Testimony Tr. at 16.  In his OIG testimony, [ENF BC 2] acknowledged that the [PII] matter and the Stanford matter were similar.  *Id.*  On September 16, 2003, [IA Examiner 1] e-mailed [ENF BC 2] the 2002 Examination Report.  Exhibit 91.  But, as discussed below, it appears that [ENF BC 2] did not read that report.  *See* footnote 48.

### B.    An Anonymous Insider Warned That Stanford Was Operating "a Massive Ponzi Scheme"

On October 10, 2003, the NASD forwarded a letter dated September 1, 2003, from an anonymous[43] Stanford insider to the SEC's Office of Investor Education and Assistance ("OIEA") with the introduction, "We are referring [an] anonymous tip to your attention, since the parties mentioned are outside of our jurisdiction."[44]  *See* October 10, 2003 E-mail from [OIEA Staff] to Spencer Barasch, attached as Exhibit 93.  On the same day, OIEA forwarded the anonymous letter to Barasch[45] with the introduction:

> Below please find a referral from NASD concerning Stanford Financial Group[46].  I am sending it to your office

---

[43]   The letter was sent by Leyla Basagoitia (now Leyla Wydler), a SGC financial adviser from 2000 to November 2002.  *See* Wydler Interview Tr. at 4-8.  Basagoitia told the OIG that she was fired by SGC in November 2002 because she refused to sell the SIB CDs to her clients.  *Id.* at 7.  As discussed below, Basagoitia contacted the SEC again in 2004 and was interviewed at least twice by the FWDO staff.

[44]   The NASD forwarded to the SEC the same anonymous letter a second time on October 20, 2003, with the introduction:

> Attached you will find a customer complaint submitted to NASD.  After review, it was determined the products in question are not NASD-registered.  We are forwarding this complaint to the SEC for review.

October 20, 2003 E-mail from NASD to SEC, attached as Exhibit 92.

[45]   Barasch told the OIG that he did not recall seeing the anonymous September 1, 2003 complaint.  Barasch Interview Tr. at 44-45.

[46]   SGC was a subsidiary of Stanford Financial Group ("SFG").  *See* Exhibit 70 at 3.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

for its consideration.  There is nothing in NRSI for Stanford Financial Group or Allen Stanford.

*Id*. at 1.  The letter stated:

> STANFORD FINANCIAL IS THE SUBJECT OF A LINGERING CORPORATE FRAUD SCANDAL PERPETUATED AS A "MASSIVE PONZI SCHEME" THAT WILL DESTROY THE LIFE SAVINGS OF MANY, DAMAGE THE REPUTATION OF ALL ASSOCIATED PARTIES, RIDICULE SECURITIES AND BANKING AUTHORITIES, AND SHAME THE UNITED STATES OF AMERICA.

> The Stanford Financial Group [SFG] of Houston, Texas has been selling to people of the United States and of Latin America, offshore certificates of deposit issued by Stanford International Bank, a wholly owned unregulated subsidiary. With the mask of a regulated US Corporation and by association with Wall Street giant Bear Stearns, investors are led to believe these CD's are absolutely safe investments.  Not withstanding this promise, investor proceeds are being directed into speculative investments like stocks, options, futures, currencies, real estate, and unsecured loans.

> For the past seventeen years or so, Stanford International Bank has reported to clients in perfect format and beautifully printed material of the highest quality, consistent high returns on the bank's portfolio, with never a down year, regardless of the volatile nature of the investments. …

> The questionable activities of the bank have been covered up by an apparent clean operation of a US Broker-Dealer affiliate with offices in Houston, Miami, and other cities that clears through Bear Stearns Securities Corporation. Registered Representatives of the firm, as well as many unregistered representatives that office within the B-D, are unreasonably pressured into selling the CD's.  Solicitation of these high risk offshore securities occurs from the United States and investors are misled about the true nature of the securities.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The offshore bank has never been audited by a large reputable accounting firm, and Stanford has never shown verifiable portfolio appraisals. The bank's portfolio is invested primarily in high risk securities, which is not congruent with the nature of safe CD investments promised to clients.

…

Unbelievable returns of the portfolio, non verifiable portfolio appraisals, non prudent investment strategies, information from insiders, and lavish expense management styles, suggest the portfolio is deeply underwater. <u>If true, returns and expenses are being paid out of clients' monies and by the size of the portfolio this would be one of the largest Ponzi Schemes ever discovered</u>.

This letter is being written by an insider who does not wish to remain silent, but also fears for his own personal safety and that of his family. The issue is being referred for investigation to the proper authorities, related parties, and persons whose mission is to inform the general public. <u>The key point to focus on is the real market value of Stanford International Bank's investment portfolio, which is believed to be significantly below the bank's obligations to clients</u>. Overlooking these issues and not thoroughly investigating them is becoming an accomplice to any wrongdoing.

September 1, 2003 Letter to the NASD Complaint Center, attached as Exhibit 94, (emphasis in original).

On October 10, 2003, Barasch forwarded the referral letter to ▓▓ ENF BC 2 ▓▓ and copied Jeffrey Cohen, an Assistant Director in the FWDO Enforcement group. Exhibit 93. Barasch asked ▓ ENF BC 2 ▓ "Let me know what you think of this situation. Recall, I previously sent you another rferral [sic] on this outfit." *Id.* ▓ ENF BC 2 ▓ responded on October 12, 2003:

I have the previous referral from ▓ Confidential Source ▓ ▓ PII ▓ It didn't provide much solid information about securities violations. I also spoke with ▓ IA Examiner 1 ▓ who did the most recent exam. ▓ IA Examiner 1 ▓ gave me a copy of his report. I have not reviewed it thoroughly yet. The main problem appears to be that the actual solicitations are made from representatives of an offshore bank (to purchase a CD from that bank), and NOT

**102**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> from Stanford reps (though Stanford reps refer investors to the offshore bank - not sure if there's a referral fee).  I'll read the attached referral and let you know what I find.

*Id.*[47]

On October 30, 2003, [ENF BC 2] updated Barasch, "I have [Enforcement staff attorney] [ENF Staff Atty 2] checking into it.  He and I will be speaking with [the Examination staff] [IA Examiner 1] again about their exam."  Exhibit 92.  On November 4, 2003, [ENF BC 2] e-mailed Cohen:

> I'm meeting with [ENF Staff Atty 2] and [IA Examiner 1] at 10:00 a.m. on a matter forwarded to us by Spence [Barasch], Stanford Financial (offshore CDs sold to Mexican investors, but with a Houston connection).  It may or may not become a MUI.

November 4, 2003 E-mail from [ENF BC 2] to Jeffrey Cohen, attached as Exhibit 95.

[ENF Staff Atty 2] testified that either Barasch, [ENF BC 2], or Cohen asked him to look at the anonymous letter to see what public information was available concerning Stanford. [ENF Staff Atty 2] Testimony Tr. at 11-12 [ENF Staff Atty 2] testified: "It was, as Spence Barasch used to call it, a tire kicker, something to look over" and was not a priority matter.  *Id.* [ENF Staff Atty 2] stated that he spent approximately one day reading newspaper articles and other public documents concerning Stanford.  *Id.* at 12.

[ENF Staff Atty 2] testified that when he reported to [ENF BC 2] what he had found in those public documents, [ENF BC 2] told him "pretty much right off the bat, don't worry about it, it's going to [the examinations group].  We're not going to work this [as an] enforcement [case]." [ENF Staff Atty 2] Testimony Tr. at 14-17 [ENF Staff Atty 2] testified that he believed that Barasch and/or Cohen would have made the decision not to open an enforcement inquiry for Stanford at this time. [ENF Staff Atty 2] Testimony Tr. at 15.

According to [ENF BC 2] handwritten notes, he met with [IA Examiner 1] [IA Examiner 2] and [ENF Staff Atty 2] regarding SGC on November 5, 2003.  *See* [ENF BC 2] Notes, attached as Exhibit 96 at 1. [ENF BC 2] notes also indicate that SGC was discussed again on November 7, 2003, during a meeting with Cohen and Barasch and a decision was made to "[l]et B/D exam go

---

[47] [ENF BC 2] testified that he had no recollection of ever reading the 2002 Examination Report. [ENF BC 2] Testimony Tr. at 16.  In the October 12, 2003 e-mail referenced above, he stated that he had not "reviewed [the report] thoroughly."  Exhibit 93.  He also stated that he was "not sure if there's a referral fee" for the "Stanford reps refer[rals] [of] investors to the offshore bank."  *Id.*  However, the referral fees are prominently discussed in the 2002 Examination Report.  Exhibit 70 at 1, 3, 6-7 and 11.  For example, the "Summary of Violations" section discussed the referral fees on the first page of the report.  *Id.* at 1.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

forward.  Then if nothing – Memo to file." *Id*. at 2. ███████ testified that he recalled discussing Stanford with Cohen and Barasch, and "I think we recognized, obviously, what was being represented on these CDs that were being offered by Stanford looked suspicious, just because of the – I think the consistently high returns that were being put together with the claim that it was safe and secure." ███████ Testimony Tr. at 17-18.

███████ testified that the discussions regarding Stanford primarily concerned whether the SIB CDs were securities, whether there were any U.S. investors, and whether documents could be obtained from SIB in Antigua.[48] *Id*. at 17-19 ███████ testified that Cohen had expressed his view that the SEC would not be able to prove a fraud case because the SEC could not compel documents from SIB. ███████ Testimony Tr. at 17. ███████ also recalled that Cohen had ███████[49] *Id*.

███████ explained the Enforcement staff's rationale for not investigating Stanford at that time as follows:

> [R]ather than spend a lot of resources on something that could end up being something that we could not bring, the decision was made to – to not go forward at that time, or at least to – to not spend the significant resources and – and wait and see if something else would come up.

███████ Testimony Tr. at 19.

It is not clear what the Enforcement staff hoped to gain by "wait[ing] [to] see if something else would come up" after the SEC had conducted three examinations of SGC finding that the SIB CDs were probably a Ponzi scheme; received a letter from a relative of an investor concerned about the legitimacy of those CDs; received a letter from a ███████ in another Ponzi scheme case concerned about the similarities between his case and Stanford; and received an anonymous letter from a Stanford insider telling the SEC that Stanford was operating a "massive Ponzi scheme."

It is also not clear what purpose the Enforcement staff thought would be served by having the examiners conduct a fourth examination of SGC.  But, as discussed below, a fourth examination of SGC was conducted approximately one year later.  Preuitt testified

---

[48] ███████ did not recall whether anyone from the FWDO contacted the SEC's Office of International Affairs ("OIA") at this time regarding how to obtain SIB's records in Antigua.  *Id*. at 28-29.  Neither the OIG nor OIA could confirm that OIA was ever contacted by the Enforcement staff about Stanford before Prescott's contact, discussed below, in October 2004.  *See* Exhibits 64 and 97.

[49] In addition, ███████ testified that the anonymous nature of the September 1, 2003 complaint "made it a little more difficult to prove whether what they're saying is – is true." ███████ Testimony Tr. at 19.  Wright also noted that the anonymous nature of the complaint made it difficult to obtain further information.  Wright Testimony Tr. at 37.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

that at the outset of that examination she "was very anxious about doing it because I didn't think that anything had changed so that we would necessarily be more effective than the past in terms of being able to get a case done."  January 26, 2010 Preuitt Testimony Tr. at 8.  However, that examination, combined with a change in senior management, did finally result in the opening of an Enforcement investigation.

## VI.   IN OCTOBER 2004, THE EXAMINATION STAFF CONDUCTED A FOURTH EXAMINATION OF SGC IN ORDER TO REFER STANFORD TO THE ENFORCEMENT STAFF AGAIN

### A.   The Examination Staff Was Alarmed at the Increasing Size of the Apparent Ponzi Scheme, and Accordingly, Made Another Enforcement Referral of Stanford a "Very High Priority"

By October 2004, approximately seven years since the SEC's first examination of SGC, its revenues had increased four-fold and sales of the SIB CDs accounted for over 70 percent of those revenues.  *See* Broker Dealer Examination Report for Stanford Group Company, dated December 2, 2004 (the "2004 Examination Report"), attached as Exhibit 98, at 2.  That growth, combined with the "prior examination findings," prompted the Examination staff to prepare a third Enforcement referral of Stanford.[50]  *Id.*  Wright acknowledged his frustration that his staff had examined SGC multiple times and found that the potential fraud was growing, but Enforcement would not pursue the matter.  Wright Testimony Tr. at 31.  However, according to Prescott, making another attempt to convince Enforcement to pursue Stanford was "a very high priority" for Wright in October 2004.[51]  Prescott Testimony Tr. at 84.  Moreover, Prescott testified, "Everyone [on the examination staff] wanted to see the case worked."  *Id.*

Consequently, in October 2004, the B-D Examination staff initiated another examination of Stanford solely for the purpose of making another Enforcement referral.  *See* Exhibit 98 at 2.  Preuitt assigned ▆▆BD Exam BC 2▆▆ and ▆▆BD Examiner 1▆▆ to the 2004 SGC

---

[50] ▆▆BD Exam BC 1▆▆, a branch chief assigned to the 2004 SGC exam, testified that the Examination staff was concerned about the growth in Stanford's revenues ▆▆BD Exam BC 1▆▆ Testimony Tr. at 12-13.

[51] On December 15, 2004, less than two weeks after the staff completed the 2004 Examination Report, Preuitt e-mailed the examiners who conducted the exam, "I just spoke with Hugh [Wright].  He is very concerned about Stanford and for good reason.  I need a memo prepared which provides a brief summary regarding what we believe the problems are there and what documents they have not produced."  *See* December 15, 2004 E-mail from Julie Preuitt to ▆▆BD Exam BC 2▆▆ attached as Exhibit 99.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Examination. [52]  Preuitt described the genesis of this examination as follows:

> I was having a planning meeting with Mr. Hugh Wright
> regarding what the [exam] schedule would look like for the
> 2005 fiscal year and … he thought it was very important
> that we do Stanford Financial Group in the upcoming year.
> … I was very anxious about doing it because I didn't think
> that anything had changed so that we would necessarily be
> more effective than the past in terms of being able to get a
> case done, so we had a discussion to that effect and Mr.
> Wright was adamant that it was the right thing to do and we
> needed to go do it.  And not that I disagreed with him, but
> he was sort of asking me to go to battle [with
> Enforcement], … and it was going to take a lot of energy
> and resources and so we talked a lot about that and decided
> that … the affected investors needed to be served and so
> this was how we needed to do it.

January 26, 2010 Preuitt Testimony Tr. at 8.  Preuitt testified that the Examination staff's
intention at the outset of the examination was to refer Stanford again to Enforcement.  *Id.*
at 8-9.  In fact, the sole purpose of conducting the examination was to support an
enforcement referral.  ███████ Testimony Tr. at 40.

    In October 2004, essentially at the same time that the 2004 Examination began,
Victoria Prescott joined the Examination group as Special Senior Counsel to the FWDO
B-D Examination staff.[53]  Prescott immediately began working on creating a separate
referral, tailored for Enforcement staff, while the examiners were preparing their report.
Prescott explained that the Examination staff's practice prior to her joining the group had
been to simply provide a copy of its Examination report to the Enforcement staff when
making a referral.  Prescott Testimony Tr. at 41-42.  She testified that her purpose in
creating this separate, specifically-tailored Enforcement document for the Stanford

---

[52]  Preuitt testified that in assigning ███ and ███ to conduct the Stanford exam, she "chose the two
people that I thought had the most experience and were likely the most capable examiners on staff …."
January 26, 2010 Preuitt Testimony Tr. at 13.  During her OIG testimony, Preuitt descri      th as
"extraordinarily capable staff."  *Id.*  In an April 8, 2005 e-mail to ███ Preuitt described ███ and ███ as
"awesome."  *See* April 8, 2005 E-mail from Julie Preuitt to ███, attached as Exhibit 100 at 2.
███ testified that she was "very impressed" with ███ and that she thought that ███ and ███
were a very strong team.  ███ Testimony Tr. at 9

[53]  Prescott had approximately thirteen years of experience as a branch chief and two years experience as
a staff attorney in the FWDO Enforcement group.  Prescott Testimony Tr. at 7-9.  She was appointed to the
newly-created Special Senior Counsel position to the FWDO B-D Examination staff in October 2004.  *Id.*
Her primary function as Special Senior Counsel was to assist the broker-dealer Examination staff refer
matters to Enforcement.  *Id.* at 11.  Stanford was the first matter that Prescott worked on in her new
position.  *Id.* at 12, 18.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

referral was to increase the likelihood that Enforcement would pursue the matter.  *Id*. at 42.

The Examination staff began its field examination work of Stanford on October 4, 2004, and concluded that work on October 8, 2004.  *See* Exhibit 98.  The staff completed the 2004 Examination Report on December 2, 2004.  *Id*.

### B.     The 2004 Examination Report Concluded That the SIB CDs Were Securities and Were Part of a "Very Large Ponzi Scheme"

In its 2004 Examination Report, the Examination staff concluded:

> Since the firm is engaged in the same activities [that were of concern in 1997] we believe SGC to be a high regulatory risk with regard to sales practice issues.
> …
>
> [T]he Staff is concerned that the offering of the SIB CDs may in fact be a very large ponzi scheme, designed and marketed by SIB's [sic] and SGC's [sic] to lull investors into a false sense of security by their claims that the SIB products are similar to traditional U.S. bank CDs.

*Id*. at 3, 16█ ██████ testified that there were a lot of red flags associated with SGC's sales of the SIB CDs, including the returns and the referral fees, that led him to believe they were a Ponzi scheme. ██████ Testimony Tr. at 19-20.

The Examination staff also concluded that the SIB CDs were securities.  The 2004 Examination Report discussed the Examination staff's basis for that conclusion as follows:

> The Staff believes that the SIB issued securities, which are marketed as certificates of deposit ("SIB CD" or "CD"), are CDs in name only and are claimed to be CDs as part of an overall scheme to evade federal regulation and to lull investors into believing that the safety of these securities is comparable to CDs issued by a United States bank.
>
> * * *
>
> Obviously, unlike a traditional certificate of deposit, SIB CDs are subject to risk. In fact, an SIB disclosure document makes the statements that "the ability of SIB to repay principal and interest on the CD Deposits is dependent on our ability to successfully operate by continuing to make

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> consistently profitable investment decisions" and "You may lose your entire investment (principal and interest)...."
>
> The Staff could discern no legitimate reason to refer to these investments as CDs. Instead, they appear to be referred to as CDs to lull investors into believing that the product offers the safety of a conventional certificate of deposit and to circumvent U.S. federal securities laws requiring registration.

Exhibit 98 at 3, 6 (second ellipsis in original).

The Examination staff further concluded that SGC's sales of the SIB CDs violated numerous federal securities laws.  For example, the 2004 Examination Report discussed the staff's conclusion that SGC was violating the NASD's suitability rule as follows:

> The NASD requires that in recommending to a customer the purchase of any security, the member firm shall have reasonable grounds for believing that the recommendation is suitable as to the customer's financial situation and needs.  Since SGC and its representatives do not have the information available to determine the actual investments made with the investors' funds and the risk level of the SIB CDs, it cannot know if the product is suitable as to its customer's needs.  Furthermore, not only is there no specific information available, the information that is available is highly suggestive of a fraudulent offering which would be inherently unsuitable for any investor.

*Id*. at 10-11 BD Exam BC 2 testified that he had also been "troubled" by the fact that SGC kept changing its excuses as to why it did not have information about SIB's portfolio. BD Exam BC 2 Testimony Tr. at 19-20.

In addition to possible violations of the NASD's suitability rule, the 2004 Examination Report identified several other apparent violations of the federal securities laws by SGC, including:  (1) material misstatements and failure to disclose material facts, in violation of Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"); (2) failure to disclose to customers its compensation for securities transactions, in violation of Rule 10b-10 of the Exchange Act; and (3) possible unregistered distribution of securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act"). *See* Exhibit 98 at 1.

The 2004 Examination Report advocated that the SEC act against SGC for these violations, in part, because of the difficulties in proving that SIB was operating a Ponzi scheme.  *Id*. at 3. BD Exam BC 2 testified that after the 2004 Examination he believed it was

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

incumbent on the SEC to do whatever it could to stop the growing fraud. BD Exam BC 2
Testimony Tr. at 28.  The Examination staff made its case for that course of action as
follows:

> The Staff also suspects that ultimately little, if any, of the
> funds invested into the SIB CDs may actually be invested
> as represented to investors. This suspicion is fueled by
> SGC's apparent inability and SIB's refusal to provide
> requested documents regarding the CDs, including the
> actual uses of the monies raised.  Since SIB is located in
> Antigua, and the securities in question are not registered,
> we have been unable to require SIB to provide or to
> otherwise gather the necessary documents to either verify
> or allay those suspicions.
>
> Although it may be difficult to prove that the offering itself
> is fraudulent, SGC has nonetheless committed numerous
> securities law violations which can be proved without
> determining the actual uses of the invested funds.
> Violations include making misrepresentations and
> omissions to customers, charging excessive commissions,
> and failing to disclose the amount of commissions charged.
> SGC also violated several other SEC and SRO Rules
> regarding books and records, supervision and anti-money
> laundering.

Exhibit 98 at 3.

At this juncture, the FWDO Examiners had tried without success for seven years
to persuade the Enforcement staff to investigate Stanford.  In October 2004, they
conducted a fourth examination with the sole purpose of making another Enforcement
referral.  As discussed below, this time the Examination staff took several investigative
steps beyond the examination itself hoping to make the matter more palatable for the
Enforcement staff to pursue.  Those steps, combined with a change in senior
management, did result in the opening of an Enforcement investigation in April 2005.
However, for the next six months, most of the staff's energy was spent debating about
whether to pursue the matter.

**C.      The Examination Staff Conducted Significant Investigative Work
During the Six Months From October 2004 Through March 2005 to
Bolster Its Anticipated Enforcement Referral**

Prescott had begun working on the Enforcement referral of Stanford in October
2004, and spent several months doing additional investigative work beyond that
conducted as part of the examination process while preparing the referral.  Prescott

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

testified that her purpose in doing so was to maximize the chance that Enforcement would pursue the matter.  Prescott Testimony Tr. at 41-42.

      At Prescott's request, [BD Exam BC 2] analyzed the improbability of the CDs' returns using data about the past performance of the equity markets.  Prescott Testimony Tr. at 62-63; *see also* March 14, 2005 Draft Memorandum from Victoria Prescott to Spencer Barasch (the "2005 Enforcement Referral"), attached as Exhibit 101 at 8.  Prescott also reached out to the SEC's Office of Economic Analysis ("OEA") for assistance in taking the Examination staff's quantitative analysis of Stanford's historical returns "a step further." Prescott Testimony Tr. at 63-64.  Prescott explained:

> I was interested in … trying to get a way of converting our intuitive concerns about the rates of return in light of what the markets were doing to something that could be used as evidence.  I was hoping that the Office of Economic Analysis could do some number crunching to help us with that.

*Id*. at 57.

      Prescott testified that it would have been "helpful" if OEA had done analysis, such as a macroanalysis, and confirmed that the returns seemed highly improbable or suspicious.  *Id.* at 62.  However, OEA did not assist the Enforcement staff with any analysis of Stanford's returns.  *Id.* at 64-65.

      Prescott contacted [OEA 1] [PII] in April 2005 concerning Stanford.  Prescott Testimony Tr. at 65.  According to Prescott's notes of an April 26, 2005, telephone call with [OEA 1] she provided [OEA 1] some details concerning SIB's reported earnings on investments in comparison with global equity market indices.  April 26, 2005 Prescott notes, attached as Exhibit 102; Prescott Testimony at 57, 65.  According to Prescott's notes [OEA 1] told her that he was very busy and could not say when he would get to the Stanford matter.  *See* Exhibit 102.  Prescott testified that she was unaware of any analysis ever provided by OEA on the Stanford matter.  Prescott Testimony Tr. at 64-65.

      According to an April 19, 2005 e-mail from Prescott to [ENF BC 3], a branch chief in Enforcement who, as discussed below, was assigned to the matter, [ENF BC 3] may have also had contact with [OEA 1] about the Stanford matter.  *See* April 19, 2005 E-mail from Victoria Prescott to [ENF BC 3], attached as Exhibit 103.  [ENF BC 3] testified that he did not remember OEA providing any analysis, but that it would have been helpful to have had someone in OEA give an expert opinion as to the improbability of the Stanford returns.  [ENF BC 3] Testimony Tr. at 27-28.  [OEA 1] told the OIG that he had no recollection of ever discussing the Stanford matter with FWDO Enforcement staff.  *See* [OEA 1] Interview Memorandum.

**110**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

It is possible that the Enforcement investigation may have been advanced had OEA responded to the request for some expert analysis of Stanford's claims.  After reviewing Prescott's analysis of those claims in the 2005 Enforcement referral, ███ in the Division of Risk, Strategy, and Financial Innovation ("RSFI"),    stated unequivocally that ███ Interview Memorandum. ███ stated, ███ *Id*. ███ stated that it should have been "very easy" to perform a quantitative evaluation of the plausibility of SIB's reported returns by running various computer models.  *Id*.

On October 18, 2004, Prescott contacted ███ an attorney in OIA, for information regarding Antigua's regulation of Stanford.[56]  *See* October 18, 2004 E-mail from Victoria Prescott to ███, attached as Exhibit 97 at 2-3.  Prescott sought that information because it was relevant to the jurisdictional issue of whether the Stanford CDs were securities.  *Id*.  Prescott also contacted OIA in January 2005 for information about SIB's London auditor.  *See* January 6, 2005 E-mail from Victoria Prescott to ███

---

[54]    RSFI was created as a Division in 2009 and includes the group that was formerly OEA.

[55]    The paragraph Berman referred to stated:

> Further, SIB's annual audit casts doubt upon its claims of consistent profitability over the last 20 years. For example, from 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%. This return seems remarkable when you consider that during this same time frame SIB supposedly invested at least 40% of its customers' assets into the global equity market. Ten of 12 global equity market indices were down *substantially* during the same time frame. The indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002. It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio. For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002.

Exhibit 101 at 5 (footnote omitted) (emphasis in original).

[56]    Prior to Prescott's contact, the OIG investigation found no evidence that any of the Fort Worth examination or enforcement staff had ever asked OIA for assistance in connection with the previous examinations and enforcement referrals.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[OIA Atty 3], attached as Exhibit 104.  Prescott was "suspicious" about the legitimacy of the auditor and the integrity of its audit of SIB.  *Id.*

> Preuitt testified with reference to Prescott's contact with OIA:

>> [W]e made a decision that we were going to go ahead and start with like the preliminary steps of an investigation and not end it where an examination typically did.  And Victoria [Prescott] had a lot of experience in this and she thought it was one of the places to go and basically start the investigation.

January 26, 2010 Preuitt Testimony Tr. at 38.

On December 20, 2004, Prescott interviewed Leyla Basagoitia, a former registered representative of SGC.[57]  *See* Notes of December 20, 2004 Interview, attached

---

[57]     Basagoitia first contacted the SEC on or around October 27, 2004.  On that date, [Exam Sr Cnsl], senior counsel in the FWDO's Examination group, whose duties at that time included handling complaints from the public, spoke with Basagoitia.  [Exam Sr Cnsl] Testimony Tr. at 8-9; October 27, 2004 E-mail from [Exam Sr Cnsl] to [BD Exam BC 1] attached as Exhibit 105.  According to an October 27, 2004 e-mail from [Exam Sr Cnsl] to [BD Exam BC 1] Basagoitia told him that she was terminated by SGC because she would not sell the SIB CDs and because she told SGC that the CDs were not suitable investments.  *See* Exhibit 105.  Basagoitia told [Exam Sr Cnsl] that she could identify other SGC representatives who were terminated for the same reason.  *Id.*  Basagoitia also told [Exam Sr Cnsl] that she believed that the CDs were a Ponzi scheme.  *Id.*

Basagoitia told the OIG that during her conversation with [Exam Sr Cnsl], he responded:

> … something along the way like, oh, we don't want any blood on the street.  What he meant by that I don't know, to tell you the truth.  What it seemed to me or my understanding was like maybe we're going to investigate; or maybe, you know, you can't, unless a client or a customer loses money and calls the SEC then, you know, the SEC does something about it.

Wydler Interview Tr. at 10-11.

[Exam Sr Cnsl] testified that he thought that Basagoitia was credible when he spoke to her.  [Exam Sr Cnsl] Testimony Tr. at 14.  [Exam Sr Cnsl] October 27, 2004 e-mail to [BD Exam BC 1] stated, "Based on our meeting last week and my conversation with this woman, [DPP, WP]  In addition, it's reasonable to conclude at this point that the Stanford Group is at least a co-issuer on these CD's."  *See* Exhibit 105.

On November 18, 2004, Basagoitia sent [Exam Sr Cnsl] an e-mail that stated, in part:

> Here are more observations regarding Stanford Group:

> …

> 3.   Clients never talk to people at the Bank. They only deal with their Reps and operations people in Houston. Clients are led to believe the bank is a subsidiary of a regulated US corporation.

> 4.   Management promotes contests among Reps and offices in the US to raise assets for the Bank. Winners are handsomely paid. I was offered a trip to Antigua.

> (Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

as Exhibit 107.  Prescott's notes of that interview evidence that Basagoitia told her that the sale of SIB's CDs was a "Ponzi scheme."  *Id.* at 1.  Basagoitia also told Prescott that she believed that SIB "should disclose what [its] portfolio is at any time to investors."  *Id.*  Basagoitia complained that SIB:

> Never want to show the portfolio—invest in currency, stocks bonds, options
> She asked to see the portfolio—told it was proprietary info and do not show it
> …
>
> Investors think the investment is very safe; in reality, investing in very risky investments; stocks, bonds currentcy [sic]—she saw reports

*Id.*  Prescott described the information she obtained from Basagoitia as follows:

> The most useful information that she gave was giving me [Stanford Empl 4] name, and I think there was another fellow named [Stanford Empl] I followed up and called all the people whose names she gave me, and I found them more helpful.  They were -- they had a broader understanding, and Leyla had made up her mind that this was -- that Stanford was a problem, but she couldn't really relate evidence.  I don't think she had any.  She had her conclusion, and her approach to it was sort of *ipso facto* that it must be, and I could never get details from her that I would consider really useful from an evidentiary standpoint.

Prescott Testimony Tr. at 33-34.

Prescott interviewed [Stanford Empl 4] one of the two former SGC registered representatives who Basagoitia identified, on December 28, 2004, and January 6, 2005.

---

…

7.   Some of the highest producers for the bank are unlicensed people that solicit from the B-D offices in Houston, such as [Stanford Empl 5] who offices in Houston and has no securities license.

8.   Most Clients open accounts because they believe the B-D's clearing agreement with Bear Stearns provides them with account protection. They also believe in the soundness of US laws. Should the Bank not have US representation, clients would not invest as they do at the Bank.

November 18, 2004 E-mail from Leyla Basagoitia to [Exam Sr Cnsl] , attached as Exhibit 106.  [Exam Sr Cnsl] forwarded Basagoitia's e-mail to Prescott on December 22, 2004.  *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

*See* December 28, 2004 Notes, attached as Exhibit 108; January 6, 2005 Notes, attached as Exhibit 109.  According to Prescott's notes, [Stanford Empl 4] told her that he had been "forced to offer it under extreme pressure from Stanford."  Exhibit 108 at 1. [Stanford Empl 4] also told Prescott that "[t]he firm would not reveal to registered reps how the money was invested" (*see* Exhibit 109 at 2) and that "a lot of smoke and mirrors" surrounded the SIB CDs (*see* Exhibit 108 at 1).[58] [Stanford Empl 4] told Prescott that SGC was "very touchy about [the SIB CDs] not being called a security," but that he had heard the firm had received "an opinion from a noted former NASD[] or SEC att[orne]y that it was a security."  *Id.* [Stanford Empl 4] believed that the SIB CD offering was a fund.  *Id.*

Prescott testified that [Stanford Empl 4] and [Stanford Empl 3] also did not have any concrete "evidence," but they provided "a better idea [than Basagoitia] of … how things were handled from the perspective of someone inside the firm."  Prescott Testimony Tr. at 36.  Prescott described this information as "a starting point."  *Id.*

### D.     In March 2005, Barasch and Degenhardt Learned of the Examination Staff's Work on Stanford and Told Them That it Was Not a Matter That Enforcement Would Pursue

Prescott told the OIG that Preuitt asked her to make a presentation about her ongoing work on Stanford at a March 2005 quarterly summit meeting attended by the SEC, NASD, and state regulators from Texas and Oklahoma.[59]  Prescott Interview Tr. at 9-11.  According to Preuitt, who also attended the meeting, Barasch "looked … annoyed" during Prescott's presentation.  Preuitt Interview Tr. at 7.

Immediately after her presentation, Prescott recalled that she got "a lot of pushback" from Barasch and Degenhardt.  Prescott Interview Tr. at 8.  Prescott stated

---

[58]   Prescott also interviewed [Stanford Empl 3], another former SGC registered representative who Basagoitia identified, on January 11, 2005.  *See* January 11, 2005 Notes, attached as Exhibit 110. [Stanford Empl 3] told Prescott that "[t]he operations of [SIB] are not transparent."  *Id.* at 1.

[59]   Denise Crawford, Texas State Securities Commissioner, told the OIG that she believed that the TSSB and SEC staff may have discussed their mutual concern about Stanford as early as the late 1990s at these quarterly meetings designed to foster cooperation and "share information" between the SEC and state regulators.  TSSB Interview Memorandum at 1-3.  Crawford explained that the TSSB had examined SGC in May 1997 in part because of the similarities between SGC and [PII].  *Id.* at 1.

During a Texas state budget hearing on February 20, 2009, Crawford stated that the TSSB had referred Stanford to the SEC ten years ago.  *See* Roma Khanna, *Past probes sought to tie Stanford to drugs*, February 20, 2009, attached as Exhibit 111 at 2.  We found however that, there was no referral from the TSSB to the SEC.  Crawford and [TSSB Empl 1], [PII], confirmed that the TSSB staff has no record or recollection of a referral by the TSSB to the SEC having been made before, as discussed above, the TSSB forwarded the [Confidential Source] letter to the SEC in August 2003.  TSSB Interview Memorandum at 3-4; [TSSB Empl 1] Interview Memorandum.  Crawford told the OIG that the mutual, information-sharing discussions which may have occurred at the quarterly meetings in the late-1990s were the communications between the TSSB and the SEC concerning Stanford in the 1990s, to which she was referring.  *Id.* at 3-4.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

that while she was "still standing in the room where the presentation had been made," Barasch and Degenhardt approached her and "summarily told [her] … it was not something they were interested in." *Id.* at 9-10; *see also* Prescott Testimony Tr. at 39-40. Prescott felt "blindsided" when Barasch and Degenhardt told her that Stanford "was not something that they wanted to pursue, that they had looked at [it] before." Prescott Interview Tr. at 10. She was "really taken by surprise that [Barasch and Degenhardt] would have already formed an opinion and that their minds appeared to be closed to it." *Id.* Prescott explained further:

> It was a very perfunctory conversation, and it was very -- it was not a matter for -- it was not up for discussion. I was being told. … And, you know, I just -- I felt a little bit – I don't know, I felt like I'd been put in an awkward position. … I had no idea what all had gone on, apparently, and here I though I'd turned in a good piece of work and was talking about it to significant players in the regulatory community, and I no sooner sit down, shut up and the meeting ended, but then I got pulled aside and was told this has already been looked at and we're not going to do it.

*Id.* at 12. *See also* Prescott Testimony Tr. at 44-45, 56-58. Preuitt described Degenhardt's and Barasch's "dismissive" reaction to Prescott's presentation as "very disheartening." January 26, 2010 Preuitt Testimony Tr. at 33.[60]

## VII.   IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT THE SEC, THE EXAMINATION STAFF REFERRED STANFORD TO ENFORCEMENT

Preuitt testified that because Barasch had made it "very clear … he wasn't going to accept [the Stanford referral]" at the March 2005 meeting, the Examination staff "waited till after he left the Commission … to go ahead and refer it over." Preuitt Interview Tr. at 7-8; *see also, id.* at 13 ("[W]e waited until after [Barasch] left to actually send over the enforcement memo" in order "to avoid a repeat of before.").

On April 5, 2005, Preuitt e-mailed ███████████, an Assistant Director in Enforcement, the most recent draft of Prescott's referral memorandum – a March 14, 2005 Draft Memorandum from Victoria Prescott to Spencer Barasch[61] (the "2005

---

[60]   Barasch told the OIG that he had attended the March 2005 meeting with other regulators, but that he had "no recollection" of Prescott's presentation or a conversation with her about that presentation. Barasch Interview Tr. at 49-50.

[61]   The March 14, 2005 draft referral memorandum that Preuitt sent ███████ was addressed to Barasch. *See* Exhibit 101. On March 9, 2005, the SEC announced Barasch's departure. *See* SEC Press Release No. 2005-34 (March 9, 2005), attached as Exhibit 112. Barasch's last day at the SEC was April 14, 2005. *See* SEC personnel record, attached as Exhibit 113.

(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Enforcement Referral"), attached as Exhibit 101; *see* April 5, 2005 E-mail from Julie Preuitt to ▮ENF Asst Dir 1▮, attached as Exhibit 114 at 3.  Preuitt's e-mail to ▮ENF Asst Dir 1▮ stated:

> Victoria [Prescott] put this together.  I think it does a great job of summarizing our concerns.  It has been looked at by Hugh [Wright], but not by anybody in enforcement.
>
> I don't think we can get the Bank (be clear when you read), but I do think that we can get the [broker-dealer] which will ultimately get the Bank.  A LOT of money involved.

*Id.*

The 2005 Enforcement Referral began with the following:

> An October 2004 examination of Commission-registered broker-dealer SGC, headquartered in Houston, Texas, has uncovered evidence suggesting that SGC and its affiliated company Stanford International Bank ("SIB") may be violating the securities laws.  Specifically, we are concerned that:
>
> - SGC is selling unregistered securities, possibly without a valid exemption;
>
> - SGC and SIB are making misrepresentations and/or inadequate disclosures regarding the unregistered offering(s), most notably to foreign investors;
>
> - SIB may be engaging in a fraudulent scheme (possibly either a money laundering and/or a Ponzi scheme) through the sales of the unregistered securities, and refuses to provide the staff with sufficient information to dispel this concern.

Exhibit 101 at 1.  It also stated, "As of October 2004, SGC customers held approximately $1.5 billion of CDs.  Approximately $227 million of these CDs were held by U.S. investors."  *Id.*

---

Prescott testified that when she began drafting the referral memorandum, she had intended to send it to Barasch.  Prescott Testimony Tr. at 48-49.  However, the announcement of his departure changed that intention.  *Id.* at 47-50, 54-55.  Barasch told the OIG that he did not recall receiving the 2005 Enforcement Referral, and that he was certain that he never read it.  Barasch Interview Tr. at 47-48.  Barasch explained, because he had already announced that he was leaving the SEC for private practice by the date of the 2005 Enforcement Referral, March 14, 2005, he had recused himself from all new matters by that time, and he had been out of the office on leave a lot around that time.  *Id.* at 47-49.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The 2005 Enforcement Referral also stated:

> SGC claims that it keeps no records regarding the portfolios into which SIB places investor funds and that it cannot get this information from SIB.  Indeed, SGC has related to the Staff that SIB claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and SIB's own internal "Chinese Wall" policies with SGC.

*Id*. at 2 (footnotes omitted).

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," explaining:

> SIB's high interest rates are inconsistent with its claimed portfolio.  …  Moreover, the Staff is equally suspicious of SIB's *recurring annual 3%* trailer.  We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product.
> …
>
> [F]rom 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%.  This return seems remarkable when you consider that during this same time frame … [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002.  It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002.

*Id*. at 5 (emphasis in original) (footnotes omitted).

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

### A.   The Enforcement Staff Initially Reacted Enthusiastically to the Referral and Opened a MUI

The immediate reaction from the Enforcement staff to the Stanford referral was very positive.  On April 8, 2005, [ENF Asst Dir 1] e-mailed Preuitt and Prescott:

> [T]his memo is terrific.  Very nicely done.
>
> Moreover, I agree with the preliminary legal conclusions in the memo, including the deduction that this almost certainly has to be fraudulent.
>
> I would like to get together with both of you and talk in greater depth about possible courses of action.  From a tactical standpoint, the international dimension concerns me because it limits our investigative powers.  The [broker-dealer] is domestic, of course, but I'm concerned that taking action only against the domestic [broker-dealer] will have a limited long-term effect on the whole apparently-criminal organization, most of which is overseas.  Moreover, the immediate impact on U.S. investors of an action against the domestic [broker-dealer] might not be favorable.

Exhibit 114.

Preuitt immediately responded to [ENF Asst Dir 1] observations about the "international dimension" as follows:

> The problem is very interesting. We agree with many of your concerns.  Its a difficult choice.  It seems too difficult to go after the foreign entity so nothing happens or it seems too limiting to go after the US [broker-dealer] when we know the whole thing must be a fraud.  *As a result, we've just sat around for ten years fussing about what is going on at this firm/bank.*

*Id.* (emphasis added).

Although [ENF Asst Dir 1] was very interested in the case, he did not have a staff attorney available, so on April 12, 2005, [ENF Asst Dir 1] forwarded the referral to Jeffrey Cohen and [ENF Asst Dir 2]

**118**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF Asst Dir 2] the other two Assistant Directors in FWDO Enforcement, with the following explanation:

> I've reviewed this and spoken to Victoria and Julie, and I believe this case is worth pursuing.  Victoria's memo … does a good job of laying out the apparent violations.  If, after reviewing it, you find yourself wondering why I thought the case was worth pursuing, let me know.  I don't think that will be your reaction, but I'm happy to share my impression of this if it would be helpful. … One of the obvious logistical and jurisdictional problems with this case is the location of the issuer in Antigua.[62]

April 12, 2005 E-mail from [ENF Asst Dir 1] to Jeffrey Cohen, attached as Exhibit 115.  One day later, Cohen forwarded [ENF Asst Dir 1] e-mail to [ENF BC 3] a branch chief in Cohen's group, and asked, "[W]hat's [ENF Staff Atty 5] ] handling?  Does she have time for this one?"  *Id.*

On April 14, 2005, [ENF BC 3] e-mailed Prescott:

> Your memo was fantastic.  Will be very helpful going forward. [ENF Staff Atty 5] and I are opening MUI with hope of bringing case quickly (possibly [Temporary Restraining Order]).  May need some help from you and [other members of the Examination staff] to make it happen.[64]

April 14, 2005 E-mail from [ENF BC 3] to Victoria Prescott, attached as Exhibit 116.  On April 15, 2005, Cohen responded to [ENF Asst Dir 1] April 12, 2005 e-mail, "We've opened a MUI in [ENF Staff Atty 5] name."  April 15, 2005 E-mail from Jeffrey Cohen to [ENF Asst Dir 1] [ENF Asst Dir 1] attached as Exhibit 117 at 2.  Later the same day, Cohen e-mailed [ENF Asst Dir 1] that the Stanford matter "look[ed] promising."  *Id.* at 1.

---

[62] [ENF Asst Dir 1] testified that it was "almost impossible … if you're telling people you've got a CD and it's safe like a bank CD …  I don't know how anybody can generate returns in double digits while still offering that kind of security.  I mean, all of this is implausible." [ENF Asst Dir 1] Testimony Tr. at 29.

[63] At that time, [ENF Staff Atty 5] was a FWDO Enforcement staff attorney.

[64] [ENF BC 3] explained his initial reaction to the memorandum as follows:

> [T]here was the thought that this could have been a Ponzi scheme and that if, essentially, we could get kind of bank records that would reflect, you know, the money basically going in and then not being used for legitimate investment purposes but being used to kind of pay back prior investors, that, you know, we'd be able to bring a case quickly.

[ENF BC 3] Testimony Tr. at 20 [ENF BC 3] testified that he had hoped to bring a case quickly because it seemed as though the matter was an ongoing fraud and he wanted to stop it as quickly as possible.  *Id.* at 20-21.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Early in the investigation, the Enforcement staff contacted OIA to assist them in getting records from SIB in Antigua. ███ENF BC 3███ Testimony Tr. at 24.  In May 2005, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  June 3, 2005 E-mail from ███ENF BC 3███ to Jeffrey Cohen, attached as Exhibit 118; *see also* ███ENF BC 3███ Testimony Tr. at

Charles Rawl, a financial advisor at SGC from 2005 through 2007 who raised concerns about Stanford with the SEC in 2008, told the OIG in an interview that the investor questionnaires led to "significant concerns" by investors in the CDs.  Rawl and Tidwell Interview Tr. at 6-10.  Mark Tidwell, another financial advisor at SGC from 2004 through 2007, who later raised concerns about Stanford with the SEC, told the OIG that his phone "lit up like a Christmas tree" with client concerns after the questionnaires were sent out.  *Id.* at 8.

███DPP, WP, PII████████████████████████████████████████████████████████████

███ENF BC 3███ Testimony at 36.  Of course, as ███ENF BC 3███ and ███ENF Staff Atty 5███ acknowledged, until a Ponzi scheme begins to collapse, its victims are unsuspecting and not in a position to provide the SEC staff with evidence of the ongoing Ponzi scheme. ███ENF BC 3███ testified, "[U]nlike a lot of Ponzi schemes that have collapsed when you've got investors calling you and … they can't get their money out or there's clear misrepresentations … here … we just didn't have that."  *Id.* at 34. ███ENF BC 3███ further explained that while a Ponzi scheme is ongoing, it is difficult to get investors to complain about it because they are still getting paid.  *Id.* at 35. ███ENF Staff Atty 5███ testified that it was generally hard to bring a Ponzi scheme case before the Ponzi started to unravel because:

> [Y]ou don't have any witnesses, you don't have anybody
> complaining about anything going wrong, everybody is
> happy, so they are not particularly cooperative.  In fact,
> they are usually against us when we go in and talk to them,
> as was the case with a lot of the investors in Stanford.
> They were against us even meddling.

███ENF Staff Atty 5███ Testimony Tr. at 18-19.

As demonstrated below, after the Stanford investors failed to deliver any evidence that the Enforcement staff believed would have allowed them to bring a case against Stanford, the staff attempted to close the matter and refer it to the NASD.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

### B. By June 2005, the Enforcement Staff Had Decided to Refer the Matter to the NASD, Apparently as a Precursor to Closing the Matter.

[BD Exam BC 2] testified that at a meeting with Cohen and others shortly after the referral, Cohen was "not real excited" about the Stanford matter, and that Cohen expressed [DPP, WP] [DPP, WP] [BD Exam BC 2].[65] Testimony Tr. at 24-25.  By June 2005, two months after opening the MUI, Enforcement's interest in the matter had waned.[66]  On June 14, 2005, [Sen Cnsl], an attorney [PII] who was assisting the Enforcement staff with the Stanford matter, asked [ENF Staff Atty] for a "pithy email … explaining to [the Antiguan regulator] why our case is compelling."  *See* June 14, 2005 E-mail from [Sen Cnsl] to [ENF Staff Atty 5], attached as Exhibit 124, at 2.  [ENF Staff Atty 5] forwarded [Sen Cnsl] e-mail to [ENF BC 3] with the sarcastic comment, "Uhhh--yeah….we'll send a persuasive e-mail setting out why our case is so compelling…"  *Id.* at 1 (ellipses in original).  [ENF BC 3] responded jokingly, "Apparently he hasn't seen your closing memo."  *Id.*

At June 21, 2005 quarterly regulators meeting, Cohen expressed pessimism about the viability of the SEC's investigation.  *See* Minutes of June 21, 2005 Regulatory Coordination Meeting, attached as Exhibit 125.  Attendees at the meeting included Degenhardt, Cohen, Prescott, Preuitt and a representative from NASD.  *Id.* at 5.  The minutes of that meeting memorialized Cohen's remarks as follows:

> Stanford – Jeff [Cohen] not optimistic about viable enforcement referral disclosure very cleverly crafted - impeccable for most part investors well off, enjoying returns -no concrete evidence of Ponzi

---

[65]   There is some indication that Cohen might have spoken to Barasch about Stanford a few days after Barasch left the SEC and approximately one week after Cohen opened the MUI.  As discussed above in footnote 63, Barasch's last day at the Commission was April 14, 2005.  On Friday, April 22, 2005, a social function was held in Barasch's honor.  *See* April 24, 2005 E-mail from Jeffrey Cohen to Harold Degenhardt, *et al.*, attached as Exhibit 119.  At 6:35 p.m. on Sunday, April 24, 2005, Cohen e-mailed several SEC employees the remarks he had written for Barasch's party.  *Id.*  Four hours later, at 10:34 p.m. on Sunday April 24, 2005, Cohen e-mailed [ENF BC] "Must discuss this case with both of you ASAP—critical."  April 24, 2005 E-mail from Jeffrey Cohen to [ENF BC 3], attached as Exhibit 120.

[66]   On April 19, 2005, the SEC received from the Department of Labor's Occupational Safety & Health Administration (OSHA) a copy of a Sarbanes-Oxley whistleblower complaint from an individual alleging that he was terminated in reprisal for reporting illegal financial activities.  *See* SEC Complaint/Tip/Referral database printout, Control Number 13639, attached as Exhibit 121.  On June 21, 2005, [ENF Asst Dir 1] e-mailed Degenhardt about the FWDO's receipt of this whistleblower complaint, stating, "In rare cases, the referrals contain information that does justify follow-up, and this one appears to be an example of that.  Stanford Group is a very problematic broker-dealer that has been the subject of enforcement investigations."  June 21, 2005 E-mail from [ENF Asst Dir 1] to Harold Degenhardt, attached as Exhibit 122.  [ENF Asst Dir 1] then sent an e-mail to [ENF BC] about the whistleblower complaint, stating, "This whistle blower [sic] may provide some valuable inside info on the firm that otherwise would be hard to get."  June 21, 2005 E-mail from [ENF Asst Dir 1] to [ENF BC 3], attached as Exhibit 123.  [ENF BC 3] testified that he did not recall talking to this complainant.  [ENF BC 3] Testimony Tr. at 45-46.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> Trying to reach out to some foreign investors for more
> information.
>
> Calls it a CD when it's more like a hedge fund. Telling
> foreign investors there is no risk but American investors are
> being told there is complete risk. Moneys are being held in
> Stanford's Antigua Bank. The fee is not disclosed to
> foreigners and to US they are not told fees are reoccurring.
> …

*Id*. at 1-2.

A July 8, 2005 e-mail from [Sen Cnsl] to [ENF BC 3] discussed "[o]ptions to obtain [Stanford] bank documents." July 8, 2005 E-mail from [Sen Cnsl] to [ENF BC 3], attached as Exhibit 126. [Sen Cnsl] summarized these options as follows:

> 1. MLAT[67] (Requires criminal interest, even soft interest,
> to make this request);[68]
>
> 2. Ask [the IRS attaché to Antigua] to lean on Leroy
> King;[69] and
>
> 3. Ask for the documents voluntarily from Stanford.

*Id*. at 2.

---

[67]   The SEC's intranet describes Mutual Legal Assistance in Criminal Matters Treaties ("MLATs") as follows:

> … MLATs are designed for the exchange of information in criminal matters and are
> administered by the US Department of Justice …   Despite the fact that MLATs are
> primarily arrangements to facilitate cross-border criminal investigations and
> prosecutions, the SEC may be able to use this mechanism in certain cases. …   US
> criminal interest in the matter may be required….   Notwithstanding the slowness of the
> process …, MLATs may be an effective mechanism to obtain assistance …"

*See* "Obtaining Documents And Testimony From Abroad," attached as Exhibit 127, at 3.

[68]   [ENF Staff Atty 5] testified that the staff drafted a MLAT request but it required "criminal interest, and … [t]he criminal authorities [the U.S. Department of Justice] wouldn't step up." [ENF Staff Atty 5] Testimony Tr. at 44-45. Consequently, [ENF Staff Atty 5] testified that a MLAT request was not sent while she worked on the Stanford matter [in 2005 and 2006]. *Id*.

[69]   Leroy King was the Administrator and Chief Executive Officer of the Antigua Financial Services Regulatory Commission.  As discussed below, King has been indicted for criminal obstruction of the SEC's Stanford investigation.

**122**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

███████ e-mail prompted ███████ to e-mail Prescott:

> I feel strongly that we need to make voluntary request for
> docs from bank.  If we don't and close case, and later
> Stanford implodes, we will look like fools if we didn't even
> request the relevant documents.  As for MLAT, we
> probably should discuss further.  Talked to FBI agent in
> Houston who was aware of Standford [sic].[70] ██████████
> ████████████████ As for having [the IRS attaché to
> Antigua] lean on Leroy King, can't hurt.

*Id.* at 1.

In June 2005,[71] Degenhardt directed Prescott to refer the matter to the NASD.
*See* Prescott Interview Tr. at 31-32.  The decision to refer the matter to the NASD
apparently was made within days of a meeting attended by, Degenhardt, Cohen and a
NASD representative, during which Cohen expressed that he was "not optimistic about
[a] viable enforcement referral."[72]

According to Prescott, Degenhardt did not give her "much in the way of
explanation" for why he wanted the matter referred to the NASD.  *Id.*; *see also* Prescott

---

[70] ███████ testified that he could not recall any discussions with the FBI regarding Stanford in 2005. ██████
Testimony Tr. at 52.

[71] A June 29, 2005 draft of the NASD referral letter is attached as Exhibit 128.  The final referral letter
that was sent to the NASD on July 21, 2005, is attached as Exhibit 129.  The letter included essentially the
same information contained in the 2005 Enforcement Referral.  The letter noted, "SGC's admitted inability
to get information from SIB about the investments underlying the CDs suggests that SGC may be violating
NASD Rule 2310 (Suitability)."  Exhibit 129 at 2.

According to a September 2009 FINRA report released on October 2, 2009, the NASD conducted a
routine examination of Stanford sometime in 2005.  *See* Report of the 2009 Special Review Committee on
FINRA's Examination Program in Light of the Stanford and Madoff Schemes ("FINRA Report"), attached
as Exhibit 130, at 18.  The lead examiner on FINRA's 2005 Stanford examination gave "special attention to
the CD issue [because of] … substantial concerns in the Dallas office regarding the Stanford firm and the
CD program in particular.  *Id.* at 20.  The lead examiner and his manager "decided that it made sense to
take a broad look and 'see what we reel in.'"  *Id.*

██████ the former SEC Enforcement staff attorney who had worked on the SEC's 1998 MUI
concerning Stanford, worked at FINRA ████ and "joined the discussion on the CD issue" while the
FINRA examiners prepared for their Stanford exam.  *Id.*; ████████ Tr. at 33.  "From the moment she
became involved in discussions regarding the CD aspect of the 2005 Stanford cycle exam, ████████
reportedly expressed the view that the Stanford CDs were *not* 'securities' regulated under the federal
securities laws, and were therefore outside of FINRA's jurisdiction."  Exhibit 120 at 20 (emphasis in
original).

[72] *See* Exhibit 125.  The meeting where Cohen made his pessimistic comments about the Stanford
investigation occurred on June 21, 2005.  *Id.*  By June 29, 2005, Prescott had drafted the referral letter.  *See*
Exhibit 128.

**123**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Testimony Tr. at 68 ("[T]he case was being referred to the NASD because we were instructed to do so, and my recollection is that came from Hal Degenhardt….").

Prescott testified that she had been "unhappy" about the decision to refer the Stanford matter to the NASD.  Prescott Testimony Tr. at 68.  Prescott "felt like that it was unlikely that the NASD would be able to be able to create the same kind of result that we could here at the Commission."  *Id.*  She "wanted to see [the SEC] work the case."  *Id.* at 68-69.

Prescott's "impression and understanding was that we were referring it to the NASD because we would not be working it."  *Id.* at 69.  Prescott explained that Degenhardt's "intent was probably to [shut down the investigation].  But in the meantime we kept arguing and lobbying for it here, Julie [Preuitt] taking the lead, and I was assisting her with that.  Julie [Preuitt] is pretty relentless when she decides something needs to happen.  And so she was continuing to lobby and talk to people."  Prescott Interview Tr. at 33.

Preuitt also told the OIG that the NASD referral had been made because Enforcement was "trying to get rid of it."  Preuitt Interview Tr. at 9.  As discussed in Section XII, the OIG investigation found that Enforcement was reluctant to take these types of cases for a variety of reasons, including:  the difficulties in obtaining approval from the SEC staff in Washington, DC to pursue novel investigations; the pressure in the FWDO to bring a lot of cases; the preference for "quick hit" cases as a result of that pressure; and the fact that Stanford was not a "quick hit" case.  Preuitt testified that referring the matter to the NASD was "ludicrous," and "after the referral was made I just pretended like it had never happened."  January 26, 2010 Preuitt Testimony Tr. at 44.

By mid-August 2005, the Enforcement staff had apparently conveyed to [Sen Cnsl] their intention to close the matter because Stanford was refusing to voluntarily produce documents.  In an August 17, 2005 e-mail from [Sen Cnsl] to [ENF Staff Atty 5] discussing OIA's comments regarding a draft request for documents, [Sen Cnsl]

> As this letter may mark the end of your investigation, I think it makes sense that we think long and hard about the type of letter we wish to send.

August 17, 2005 E-mail from [Sen Cnsl] to [ENF Staff Atty 5], attached as Exhibit 131.

In late August 2005, the Enforcement staff sent SIB a voluntary request for documents.  *See* September 1, 2005 E-mail from [ENF BC 3] to Jeffrey Cohen, attached as Exhibit 132.  However, requesting voluntary document production from Stanford was a completely futile exercise.  [Sen Cnsl] noted in his August 17, 2005 e-mail, the ineffectiveness of sending Stanford "a letter that relies on the good will of the recipient."  Exhibit 131.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Moreover, the Enforcement staff sent SIB this "standard" request six days *after* SIB's attorney "made it clear that SIB would not be producing documents on a voluntary basis."  *See* August 23, 2005 E-mail from ███████ to ███████, attached as Exhibit 133.  The Enforcement staff sent the request even though it recognized that its efforts to obtain the requested documents voluntarily were "moot[]."  *Id.*

The reason behind the staff's document request to Stanford was apparent in a July 10, 2005 e-mail from ███████ to Victoria Prescott as follows:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.

Exhibit 126.

It is not clear why the Enforcement staff would have expected Stanford to produce documents evidencing that it was operating a Ponzi scheme.  In this instance, the staff knew that the request was futile, but decided to send it anyway so as not to later appear foolish.  As discussed below, their decision to close the matter was overruled by new senior management in the FWDO.

### C.  In September 2005, the Enforcement Staff Decided to Close the Stanford Investigation, But the Examination Staff Fought to Keep the Matter Open

In the fall of 2005, the FWDO Enforcement staff considered closing its Stanford investigation after it had reached an impasse due to Stanford's lack of cooperation and the staff's lack of access to SIB's records in Antigua.  ███████ described this impasse in a September 1, 2005 e-mail to Cohen and ███████:

> Antigua will not compel bank to produce docs.  After much time talking with OIA, we finally received green light to issue volun[t]ary doc request to bank, care of the bank's attorney.  Letter issued last week. ███████ spoke with attorney for bank, who stated bank would not be producing docs. …



**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

September 1, 2005 E-mail from to ░░ENF BC 3░░ to Jeffrey Cohen, attached as Exhibit 132. Cohen responded, "Close the case." *Id.*

However, the examination staff, Preuitt in particular, fought to keep the Enforcement investigation open. On September 21, 2005, at 9:46 a.m., ░░ENF Staff Atty 5░░ e-mailed Cohen the following:

> On Stanford, this morning I heard that people from [the Examination staff] met with [James] Clarkson [the newly appointed Acting Director of the FWDO[74]] yesterday about it. A little annoying, eh? Do you know anything about that? I'll tell you what I know when I see you.[75]

September 21, 2005 E-mail from ░░ENF Staff Atty 5░░ to Jeffrey Cohen, attached as Exhibit 136. At virtually the same time that ░░ENF Staff Atty 5░░ sent her e-mail to Cohen, Preuitt e-mailed the examination staff's "report on Stanford" to Clarkson ░░ENF BC 3░░ and ░░ENF Staff Atty 5░░ *et al. See* September 21, 2005 E-mail from Julie Preuitt to James Clarkson, attached as Exhibit 137. Approximately one hour later, at 10:41 a.m., Cohen e-mailed ░░ENF BC 3░░ regarding Preuitt's e-mail to Clarkson, "Please call me about this." *Id.* At 11:35 a.m., Cohen responded to ░░ENF Staff Atty 5░░ e-mail telling him "that people from [the Examination staff] met with Clarkson yesterday about [Stanford]" as follows:

> Who from [the Examination staff]? How did you hear it? Where's ░░ENF BC 3░░?

Exhibit 136. Four minutes later, after receiving no response from ░░ENF Staff Atty 5░░ to his questions, Cohen e-mailed ░░ENF Staff Atty 5░░:

> Please respond (I'm not reaching ░░ENF BC 3░░). Who from [the Examination staff]…and are you talking about our office or DC?

*Id.* (ellipse in original).

---

[73] Cohen testified that he decided to close the Stanford matter "out of deference to ░░ENF BC 3░░ recommendation." Cohen Testimony Tr. at 52-53 ░░ENF BC 3░░ disputed this assertion, stating his belief that Cohen decided to close the case because he felt that it was appropriate to do so, not because Cohen was deferring to ░░ENF BC 3░░ recommendation. ░░ENF BC 3░░ Testimony Tr. at 79-80.

[74] Degenhardt's departure from the SEC was announced on August 15, 2005. *See* SEC Press Release 2005-116 (Aug. 15, 2005), attached as Exhibit 134. On August 31, 2005, James Clarkson was named as the Acting Director of the FWDO. *See* SEC Press Release 2005-123 (Aug. 31, 2005), attached as Exhibit 135.

[75] The e-mail exchange indicates that Cohen was out of the office which is supported by the fact that he responded from his blackberry. *See* Exhibit 136.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF Staff Atty 5] replied:

> …Julie [Preuitt] said they talked to Clarkson and expressed
> their frustration with the fact that enforcement didn't want
> to bring a case ….

*Id.*

However, Preuitt's efforts did not change Cohen's decision to close the case.  On October 24, 2005, [ENF Staff Atty 5] e-mailed Prescott and Preuitt:

> FYI, we have decided to recommend closing the Stanford
> investigation.  We're preparing the closing memo.  I'll keep
> you posted.

October 24, 2005 E-mail from [ENF Staff Atty 5] to Victoria Prescott, attached as Exhibit 138 at 2.[76]  Twenty minutes after receiving this message, Preuitt forwarded it to Katherine Addleman, FWDO Associate District Director for Enforcement,[77] copying Cohen and [ENF Staff Atty] and asked, "Can we discuss before closing?"  *Id.*  Preuitt testified that she also "went to Kit [Addleman] telling her how much we needed not to close this and that angered [Cohen]."  January 26, 2010 Preuitt Testimony Tr. at 56.

> Cohen responded to Preuitt's e-mail, copying Addleman and [ENF Staff Atty 5]
>
> Since our last meeting in [ENF Staff Atty 5] office last
> week [ENF Staff Atty 5] and I met to discuss with the legal intern …
> the fruits of her research. [DPP, WP, LE]
> [DPP, WP, LE]

Exhibit 138.

According to an October 26, 2005 e-mail exchange between [ENF BC 3] and [ENF Staff Atty 5] the Examination staff advocated for continuing the investigation and the [...]rcement staff continued advocating that the matter be closed.  [ENF Staff Atty 5] described the status of the matter as follows:

> Well, Stanford is kind of a goat screw.  Long story short,
> Jeff [Cohen] told me to kill it, Julie [Preuitt] was upset,
> started an e-mail battle, long talks with Julie, fight b/w Julie
> and Jeff (Julie won), now I'm researching and doing all
> kinds of stuff on it, but still am finding [DPP, WP]

---

[76]   Prescott testified that she was "unhappy" when she received [ENF Staff Atty 5] e-mail that said Enforcement was closing the Stanford investigation.  Prescott Testimony Tr. at 74.

[77]   Addleman replaced Barasch as the FWDO Associate District Director for Enforcement on August 23, 2005.  *See* SEC Press Release 2005-120 (Aug. 23, 2005), attached as Exhibit 123.  Addleman was FWDO Associate District Director for Enforcement until 2007.  Addleman Testimony Tr. at 9.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

███████ , but having to run down every possible scenario.  It's not so much fun.  That's about all.[78]

October 26, 2005 E-mail from ███████ to ███████ attached as Exhibit 141. ███████ responded, "On Stanford, agree with Jeff [Cohen].  If no offering fraud, not worth pursuing."  *Id.* ███████ replied, "I totally do agree with Jeff.  Julie is just really passionate about this and is fighting hard, going to Kit [Addleman], etc. and so we have to do all this stuff.  It's frustrating!"  *Id.*

On October 27, 2005, Clarkson e-mailed Preuitt:

> I advised Jeff [Cohen] that I understood that the exam staff
> and the folks in enforcement were wrestling with how to
> deal with the Sandford [sic] matter.  I requested that he
> prepare for me a brief memo setting out the reasons why
> enforcement feels that the case can't be made.
> I would like you to do the same from an exam staff
> perspective.  … When I return to the FWDO on November

---

[78]   It appears that until November 2005, the Enforcement staff spent more time and energy trying to close the Stanford matter than they spent investigating it.  On October 27, 2005, Wright e-mailed Clarkson regarding his concerns about Cohen's interactions with the examination staff in connection with Stanford.  *See* October 27, 2005 E-mail from Hugh Wright to James Clarkson, attached as Exhibit 140.  Specifically, Wright tried to "clarify the situation as it relates to Julie [Preuitt], Victoria [Prescott], and maybe ███████ ."  *Id.* at 1.  Wright explained:

> Basically, Julie is scared of Jeff's reactions to anything that crosses him. …  According to
> Julie, Victoria is also very concerned ███████
> ███████
> ███████  …  Whether resolving the issues about the Stanford
> case will alleviate the situation is questionable.  …  If the decision is made to close
> Stanford, that is certainly up to Kit and the enforcement staff. …  The point that I am
> trying to make clear is that at least one member of the staff, and maybe more, are
> personally concerned ███████
> ███████

*Id.* at 2.

The staff tension may have been exacerbated by the fact that Cohen had been Degenhardt's choice to replace Barasch, but on August 23, 2005, Addleman was named as Barasch's successor instead.  *See* Exhibit 139; Addleman Testimony Tr. at 55-56.  Addleman had worked in the FWDO office as a branch chief at one point.  *See* Exhibit 139.  She was serving as an Assistant Regional Director for Enforcement in the SEC's Denver Regional Office when she was promoted to Associate District Director for Enforcement in FWDO.  *Id.*  Addleman testified that Cohen had been "unhappy with my appointment to that position over him."  Addleman Testimony Tr. at 19-20.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> 7th, Kit [Addleman] and I will plan to sit down with you
> and Jeff and resolve this matter one way or the other.

October 27, 2005 E-mail from James Clarkson to Julie Preuitt, attached as Exhibit 142 at 1-2.

In response to Clarkson's request, Preuitt prepared a November 7, 2005 memorandum for Clarkson and Addleman that summarized the Examination staff's concerns about Stanford.  *See* November 7, 2005 Memorandum from Hugh Wright to James Clarkson (the "Preuitt Memorandum"), attached as Exhibit 143.  In addition to discussing the significant circumstantial evidence that the SIB CDs were a Ponzi scheme, the Preuitt Memorandum noted:

> Stanford is expanding rapidly.  From what records we can
> obtain it has increased its assets by approximately 50%
> over the last 18 to 24 months.  Per our discussions with
> current and former Stanford Group personnel, Stanford
> Bank has been in a consistent state of growth over the past
> ten years and the pressure to increase the amount of sales
> has increased over the last two or three years.  Accordingly,
> Stanford Bank has not had to undergo any period when
> withdrawals have exceeded deposits.  Such pressure to
> increase sales is frequently associated with fraudulent
> schemes.

*Id*. at 2.  The Preuitt Memorandum closed with a recommendation that the Enforcement staff obtain a formal order of investigation as follows:

> In light of the earmarks of fraud noted above, it is troubling
> to imagine the Commission failing to resolve its concerns
> regarding the legitimacy of the product offered because the
> relevant parties either refuse to or cannot provide the
> requested, necessary information to confirm or dispel those
> concerns.  Just as troubling, is to imagine the Commission
> to continue allowing a U.S. registered broker-dealer to offer
> a product about which it does not have the necessary
> information to make a reasonable basis for a
> recommendation.

*Id*. at 2.

The Preuitt Memorandum convinced senior management to overrule Cohen and continue the investigation.  This decision ultimately ended the feuding between the examiners and the Enforcement staff that had consumed most of the time spent on the matter to that point.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

**D.      In November 2005, the Head of the FWDO Enforcement Group Overruled Her Staff's Objections to Continuing the Stanford Investigation and Decided to Seek a Formal Order in Furtherance of That Investigation**

In response to Clarkson's request for a memorandum setting forth Enforcement's perspective regarding the Stanford investigation, Cohen prepared an eleven-page memorandum (the "Cohen Memorandum") that discussed the status of the investigation, the difficulties confronting the staff, and Cohen's view of the options going forward.  *See* November 14, 2005 Memorandum from Jeffrey Cohen to James Clarkson, attached as Exhibit 144.  Cohen addressed the Examination staff's recommendation for a formal order as follows:



*Id*. at 1-2.

Cohen recommended that, if the Stanford investigation continued, it should focus on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ causes of action.  *Id*. at 11.  After discussing the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Cohen made the following recommendation:



**130**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[REDACTED: DPP, WP]

*Id.*[80]

Addleman testified that she recalled that at this time there was a "disagreement" between the Examination staff and the Enforcement staff about the Stanford investigation. Addleman Testimony Tr. at 12. She recalled that the Enforcement staff "was having a difficult time getting their arms around whether it was a fraud." *Id.* She testified that the issue was framed as, "[D]oes it make sense to do a case that[] … appeared at that time to be all that the SEC could prove would be a registration violation, does it make sense for us to use scarce resources for that case versus something else[?]" *Id.* at 14.

Addleman met with the staff to discuss the disagreement. January 26, 2010 Preuitt Testimony Tr. at 62. Before she met with the staff, Addleman was aware that there had been other examinations of Stanford prior to the 2004 Examination. Addleman Testimony Tr. at 14. However, she was not aware that the examination staff had concluded as far back as 1997 that Stanford was a potential Ponzi scheme. *Id.*

Addleman recalled that during the meeting, the staff discussed the possibility of filing an action against Stanford alleging violations of the federal securities laws unrelated to a Ponzi scheme as a way to overcome Stanford's refusal to provide documents necessary to prove the SIB CDs were a Ponzi scheme. *Id.* at 14-15. Specifically, Addleman recalled a discussion about "whether it made sense to bring a Section 5 [unregistered securities] case and try and address in a court setting as opposed to a Commission investigation getting behind those documents." *Id.* at 15-16. Addleman testified that Cohen had "the strongest view" on the issue. *Id.* at 16. Despite Cohen presenting a [REDACTED: DPP, WP] charge as an option in the Cohen Memorandum, Addleman characterized Cohen's view on bringing a [REDACTED: DPP, WP]
[REDACTED: DPP, WP]

---

[79]    Addleman explained that the reason for the [REDACTED: DPP, WP] in the Cohen Memorandum which [REDACTED: DPP, WP] … [REDACTED: DPP, WP] [REDACTED: DPP, WP] was that Addleman had been "pretty direct … that we were going to continue to do what we could to obtain information" about Stanford. Addleman Testimony Tr. at 26. *See also*, Prescott Testimony Tr. at 78 ("The memorandum itself seems [REDACTED: DPP, WP] but the context in which this memorandum was created came out of the decision to close it. So I viewed this as, okay, if we're not going to close it, here is my best judgment as to how we might be able to proceed.")

[80]    Preuitt testified that working with Cohen was "extraordinarily difficult," in part because "he only wanted to bring cases that were slam dunk, easy cases." January 26, 2010 Preuitt Testimony Tr. at 42. Preuitt elaborated, "He wanted to have all of his cases so they were narrowed down to something so small and so bulletproof that you could be exempt from any sort of possible criticism that it would tend to gut your case." *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

DPP, WP                                             Exhibit 144; Addleman Testimony

At the meeting, Addleman decided to "keep the case open and to seek a formal order."  Prescott Interview Tr. at 34.  Although Cohen proposed limiting the investigation to DPP, WP Addleman decided to continue the investigation of whether Stanford was operating a Ponzi scheme.  *See* Addleman Testimony Tr. at 24-26.  Addleman made this decision because of "the possibility of a Ponzi scheme and a pretty significantly-sized one."  *Id.* at 26.  She added, "although there are some hurdles, we needed to move the investigation forward and if possible get into court."  *Id.*  Addleman testified that after the meeting, the Enforcement staff "did move [the investigation] forward and … did look for avenues to try and determine the best way to get evidence [of a Ponzi scheme]."  *Id.* at 25-26.

The staff obtained a formal order of investigation on October 26, 2006 – two years after the Examination staff began their examination of SGC in order to refer the matter to Enforcement.[81]  As discussed above, the staff's conduct of the Stanford investigation from this point forward was the subject of a previously-issued OIG Report.  That OIG Report did not substantiate the allegation that the SEC had made no effort to investigate Stanford after obtaining the formal order until Madoff's Ponzi scheme collapsed in mid-December 2008.  The OIG also found that after April 2008, when the FWDO staff referred Stanford to DOJ, the FWDO effectively halted its Stanford investigation at the request of DOJ so it could pursue its criminal case.  However, the OIG investigation also found that "[i]mmediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation became more

---

[81]   After Addleman decided to seek a formal order, it took the FWDO staff approximately seven months to prepare a formal order action memorandum because, according to Addle____ohen "worked very, very hard to get it perfect."  Addleman Testimony Tr. at 51.  On April 25, 2006, ENF Staff Atty 5 received comments to a draft of the formal order action memorandum from Cohen and ENF BC 1 , a branch chief who had replaced ENF BC R on the Stanford investigation.  *See* April 25, 2006 E-mail from ENF BC 1 to ENF Staff Atty 5 , attached as Exhibit 145.  One comment to the draft action memorandum was:

> We need right here a thorough discussion of what FWDO [Enforcement and Examination staff] have been doing with this matter since the referral – we'll stick with the 3/05 referral date rather than what I understand to be the exam date in 10/04.  List everything, including document gathering, meetings, research, whatever.  We're going to get nailed for the passage of time unless we have a good explanation here.  Be creative.

*Id.* at 4, note 1.

A draft of the formal order action memorandum was circulated by the FWDO for review and comment to various SEC offices and divisions in Washington, DC, on June 13, 2006.  *See* June 13, 2006 E-mail from Jeffrey Cohen to "Enforcement Action Memos," attached as Exhibit 146.  FWDO responded to comments received from OCIE, the Office of General Counsel and the Divisions of Investment Management, Market Regulation, and Corporation Finance.  *See* August 21, 2006 E-mail from ENF Staff Atty 5 to ENF Atty 2 and ENF Asst Ch Cnsl attached as Exhibit 147.  Four months after the draft was circulated, the request for the formal order was presented to the Commission and approved.  *See* October 11, 2006 Action Memorandum Seeking Formal Order Authority, attached as Exhibit 148.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

urgent for the FWRO," and the SEC moved forward with its Stanford investigation. Report of Investigation, Case No. OIG-516, entitled "Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation" at 10.

## VIII.   THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN "EMERGENCY ACTION" AGAINST SIB BASED ON CIRCUMSTANTIAL EVIDENCE THAT IT WAS OPERATING A PONZI SCHEME

In November 2005, the Enforcement staff considered recommending that the Commission file an "emergency action" against SIB expressly alleging that the CDs were a Ponzi scheme based solely on the circumstantial evidence available to the staff.  *See* Exhibit 144.  The Cohen Memorandum presented this option as follows:



**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



*Id*. at 2-3 (footnotes omitted).

The Cohen Memorandum stated that bringing such an action

*Id*. at 4.  *See also* Cohen Testimony Tr. at 50

The Cohen Memorandum acknowledged that there were two primary categories of circumstantial evidence that would have supported an allegation by the Commission that the SIB CDs were a Ponzi scheme –



*Id*. at 3-4 (footnotes omitted) (emphasis in original).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Cohen believed that the ████████████ that the CDs were a Ponzi scheme and the ████████████ meant that an action by the Commission would have been a ████████████

████████████████████████████████████████

████████████████████████████████████████

*Id.* at 4 (footnotes omitted) (emphasis in original).  Cohen also noted that if the Commission filed an action, ████████████ ████████████ *Id.*

Cohen testified that he met with Addleman, Clarkson and Stephen Korotash, then a FWRO trial attorney, and that those three individuals decided against filing an emergency action ████████████ ████████. Cohen Testimony Tr. 65-68.  Cohen testified that he was not "entirely comfortable with that decision" and that he "thought it was a mistake at the time we met."  *Id.* at 68, 78.[82]

In April 2006, the Enforcement staff apparently considered presenting to the Commission the issue of whether it should file an emergency action.  *See* Exhibit 145.  A draft of the formal order action memorandum that was circulated in April 2006 discussed three "special issues" as follows:

This matter raises three special issues:  (1) ████████████ ████████████ (2) whether further investigation is warranted to determine whether the CD program is a Ponzi scheme; and (3)

---

[82] However, as discussed above, approximately six weeks before the meeting, Cohen had instructed ████ to "[c]lose the case" and Addleman overruled Cohen after an appeal by Preuitt.  *See* Exhibit 132.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

AC, DPP, WP

*Id*. at 7.

After including verbatim an excerpt from AC, DPP, WP
AC, DPP, WP     the draft action memorandum concluded, AC, DPP, WP
AC, DPP, WP
*Id*. at 9.  As the draft action memorandum noted, during the five months since the
November 2005 meeting, AC, DPP, WP
AC, DPP, WP     *Id*. at 8, note 10.

However, the draft formal order action memorandum that the FWDO submitted to
Washington, DC, for review and comment on June 13, 2006 ("June Draft Action
Memorandum"), omitted the discussion of filing an "emergency action" as a "special
issue."  *See* Exhibit 146.  The June Draft Action Memorandum described the special
issues as follows:



*Id*. at 5.  The June Draft Action Memorandum did state, AC, DPP, WP
AC, DPP, WP

AC, DPP, WP     *Id*. at 6.

Ultimately, the SEC did rely, in part, on circumstantial evidence in filing an
action against Stanford on February 16, 2009.[84]  The following chart compares some of
the circumstantial evidence included in the SEC's 2009 Complaint with similar
statements from the prior examinations and referrals.

---

[83]   The discussion of the "special issues" and the statement AC, DPP, WP
AC, DPP, WP
AC, DPP, WP     in the June Draft Action
Memorandum, were AC, DPP, WP
AC, DPP, WP     *See* Exhibit 148.

[84]   The Complaint filed by the SEC in 2009 also relied on "additional evidence in 2008 that was not
available earlier."  *See* Prescott Testimony Tr. at 60.  *See also* Report of Investigation, Case No. OIG-516,
entitled "Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation."

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

| SEC ALLEGATIONS IN 2009 | EVIDENCE FROM PRIOR EXAMS |
|---|---|
| **SIB claims that its "diversified portfolio of investments" lost only 1.3% in 2008, a time during which the S&P 500 lost 39% and the Dow Jones STOXX Europe 500 Fund lost 41%**. Exhibit 1 at ¶ 3 (emphasis added).  *See also*, *id*. at ¶ 29<br><br>For almost fifteen years, SIB represented that it has experienced consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) … Since 1994, SIB claims that it has never failed to hit targeted investment returns in excess of 10%.  …  SIB's historical returns are improbable, if not impossible. After reviewing SIB's returns on investment over ten years, a performance reporting consultant hired by Stanford characterized SIB's performance as "not possible - almost statistically impossible."  Further, in 1995 and 1996, SIB reported identical returns of 15.71%, a remarkable achievement considering the bank's "diversified investment portfolio." Exhibit 149 at 7-8. | [F]rom 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%.  This return seems remarkable when you consider that during this same time frame SIB supposedly invested at least 40% of its customers' assets into the global equity market.  Ten of 12 global equity market indices were down substantially during the same time frame.  The indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002. It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  **For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002**. Exhibit 101 at 5 (emphasis added). |
| SIB's extraordinary returns have also enabled the bank to pay disproportionately large commissions to SGC for the sale of SIB CDs.  SGC receives a 3% fee from SIB on sales of CDs by SGC advisers. … SGC promoted this generous commission structure in its effort to recruit established financial advisers to the firm.  **The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to United States investors**, and aggressively expanded its number of financial advisers in the United States. Exhibit 149 at 9 (emphasis added). | **Moreover, the Staff is equally suspicious of SIB's *recurring annual 3%* trailer. We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product**. Exhibit 101 at 5 (emphasis added). |

**137**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In addition to the foregoing, Enforcement's decision not to bring a case in 2005 may have also been influenced by the following factors, discussed in Section XII:  (1) the staff bureaucracy in Washington, DC, discouraged pursuing "novel" cases; (2) the pressure for "stats" resulted in an emphasis on pursuing "slam-dunk" cases; and (3) the "feeling that the Commission was … more receptive to clear-cut cases."  *See* January 26, 2010 Preuitt Testimony Tr. at 72-74; Addleman Testimony Tr. at 27.

## IX.   THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN ACTION AGAINST SGC'S BROKER-DEALER FOR VARIOUS VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As discussed above, the Examination staff and the Enforcement staff had a fundamental disagreement for eight years regarding whether Stanford should be investigated.  However, they did agree that Stanford was probably operating a Ponzi scheme.  Cohen acknowledged that agreement and explained the staff's divergent views on the issue of whether an investigation was warranted as follows:

> Everybody, everybody believed that this was probably a Ponzi scheme.  We weren't entirely sure because there was no actual evidence of an imploding scheme.  But the examination people were very clear.  They said, "We're convinced this is a Ponzi scheme."  … [A]nd nobody in the enforcement division disagreed with them.  They just said we've got to have proof.

Cohen Testimony Tr. at 24-25.[85]

On this point, Cohen and Preuitt agreed with each other.  Preuitt testified that no one in FWDO ever said, "I think you're wrong.  It doesn't look to be a Ponzi scheme to me.  It doesn't look to be a fraud."  January 26, 2010 Preuitt Testimony Tr. at 70.  Instead, "[t]he response was this is indicia of fraud.  You can't take that into court, indicia of fraud, you must be able to prove it."  *Id.*  Wright also testified that "[i]t was obvious for years that [Stanford] was a Ponzi scheme."  Wright Testimony Tr. at 51.

In a November 7, 2005 memorandum to Addleman and Clarkson, Wright and Preuitt expressed their view about the situation as follows:

> In light of the earmarks of fraud noted above, it is troubling to imagine the Commission failing to resolve its concerns regarding the legitimacy of the product offered because the

---

[85] ENF Staff Atty 5 testified that when she became involved in the Stanford investigation, it was generally thought that the CD returns were too good to be true and it was pretty clear that there was some fraud or Ponzi scheme going on but it was a question of how to attack it. ENF Staff Atty 5 Testimony Tr. at 32-33.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> relevant parties either refuse to or cannot provide the
> requested, necessary information to confirm or dispel those
> concerns.  Just as troubling, is to imagine the Commission
> to continue allowing a U.S. registered broker-dealer to offer
> a product about which it does not have the necessary
> information to make a reasonable basis for a
> recommendation.

Exhibit 143 at 2-3.

The Examination staff advocated that the Enforcement investigation focus on SGC and that the SEC pursue any viable legal theories to support an action against SGC. As Preuitt explained:

> [M]y suggestion -- we had so many different theories.
> Instead of going after the big thing which we may not be
> able to get to in Antigua, why can't you do something
> about the broker-dealer?  We have a US-registered broker-
> dealer selling something that we don't know what it is.
> And, you know, why can't we be a little bit -- you know,
> pursue all our legal theories related to that and at least stop
> them from selling it?

Preuitt Interview Tr. at 19.

Similarly, [IA Examiner 1] described how he had envisioned Enforcement pursuing an action against SGC as follows:

> My thought at the time was -- is that we've got SEC-
> registered entities selling an investment. …  My idea …
> was … that the enforcement staff would … send out a
> voluntary request for information from the registered
> entities, we want information about what's happening to
> the money offshore, and probably they would not provide
> it.  At that point, you get a formal order.
>
> Then you subpoena the information from those regulated
> entities.  They say, we don't have it, we can't get it.  At that
> point, now you can file a public subpoena enforcement
> action in a federal court and lay out all of your suspicions
> about those CDs for the entire world to know.  It would be
> about two weeks after that you found out whether there was
> a Ponzi [scheme] or not.

[IA Examiner 1] Testimony Tr. at 57.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[IA Examiner 1] attributed the fact that the Enforcement staff never pursued that course of action to the following:

> [I]t seemed that there was a preoccupation with the fact we're dealing with an Antigua bank, and I was always saying forget the bank.  We've got a [broker-dealer] and an [investment adviser].  Focus on them.

*Id.* at 58.

Addleman agreed that filing an action against Stanford alleging violations of the federal securities laws unrelated to a Ponzi scheme would have been one way to overcome Stanford's refusal to provide documents that the staff needed to prove the SIB CDs were a Ponzi scheme.  Addleman Testimony Tr. at 14-16.  In fact, as discussed above, she decided in November 2005 to continue the investigation because of "the possibility of a Ponzi scheme and a pretty significantly-sized one."  *Id*. at 26.

The potential violations that the Examination staff advocated that Enforcement pursue included:

- Section 10(b) of the Exchange Act and Rule 10b-5:  In 1997, and again in 2005, the Examination staff argued that SGC was making misrepresentations regarding the safety of the CDs.  The Examination staff noted the consistently high returns on the SIB CDs, and observed, "Based on the amount of interest rate and referral fees paid, SIB's statements indicating these products to be safe appear to be misrepresentations. … SIB must be investing in products with higher risks than are indicated in its brochures and other written advertisements."  Exhibit 49 at 2-3.  The 2005 Enforcement Referral noted that the CD sales brochures provided by SGC included representations of a "guaranteed" interest rate and claimed that the CD "provide[d] a secure way" to participate in the growth of equity markets.  Exhibit 101 at 5-6.  The 2005 Enforcement referral stated that "[u]se of the terms CD, 'interest,' 'secure' and 'guaranteed' are misleading and suggest a degree of safety that is not inherent in the product being offered."  *Id*. at 6.

- Rule 17a-4 of the Exchange Act:  In 1997, the Examination staff referred SGC for possible violations of Rule 17a-4 of the Exchange Act for failing to maintain books and records.  Exhibit 49 at 4.  The Examination staff found that SGC recommended the SIB CDs to clients without maintaining any records pertaining to the client's financial information or investment objectives, or any records such as order tickets or confirmations relating to the CD purchase by the client.  *Id*.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

- <u>NASD Rule 2310 (Suitability)</u>:  In 2005, the Examination staff encouraged the Enforcement staff to consider bringing a suitability case against SGC.  On April 18, 2005, Prescott e-mailed Cohen the following:

  > In one of our conversations--either this morning or last Friday--I mentioned the possibility of taking a somewhat novel approach and naming Stanford for violating the NASD Rule pertaining to suitability, which seems easier to prove than our standard 10b-5 approach.  Specifically, NASD Rule 2310 "Recommendations to Customers (Suitability)" provides that

  > > "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

  > It is hard to see how Stanford the broker-dealer can, on the one hand, claim that it does not know any details about the "CDs," and on the other hand, make a determination that these are suitable investments.

  > Exchange Act Section 21, dealing with investigations and actions, is helpful with respect to charging violations of NASD rules.  Specifically, Section 21(d)(1) and Section 21(f).  I think we can make a strong argument that it is in the public interest and for the protection of investors to charge Stanford with violations of NASD Rule 2310.

  April 18, 2005 E-mail from Victoria Prescott to Jeffrey Cohen *et al.*, attached as Exhibit 150.[86]

---

[86]    Cohen testified that the SEC could not bring an action to enforce NASD rules, such as the suitability rule.  Cohen Testimony Tr. at 91.  In fact, the SEC can enforce NASD's rules, as Prescott's e-mail explained, if to do so "is in the public interest and for the protection of investors."  Exhibit 150; *see also* ENF BC 3 Testimony Tr. at 22.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

- <u>Section 5 of the Securities Act</u>:  In 2002, and again in 2005, the Examination staff referred SGC for a potential unregistered offering of securities.  Exhibit 70 at 1, 15; Exhibit 101 at 3-4.  In 2002, the Examination staff argued that SGC was generally soliciting investors for the SIB CDs in violation of its Regulation D exemption.  Exhibit 70 at 11-12.  The 2005 Enforcement Referral stated:

> [I]t appears that SIB is relying upon Regulation D Rule 506 to exempt its CD offerings from registration. Rule 506 requires SIB to comply with the prohibitions against a general solicitation and the limitations upon unaccredited investors.  The Staff has not found evidence of sales by SGC to non-accredited investors who are U.S. citizens.  It does appear that SGC sold CDs to more than 35 unaccredited foreign investors.  In fact, it appears that SGC made no attempt to limit sales to accredited foreign investors.

Exhibit 101 at 3.

- <u>Exchange Act Rule 10b-10</u>:  In 2005, the Examination staff referred potential violations of Rule 10b-10 by SGC.  The 2005 Enforcement Referral stated that the rule required SGC to disclose the source and amount of remuneration it received in connection with its referred customers' purchase of the SIB CDs.  Exhibit 101 at 6.  The 2005 Enforcement Referral observed that the SIB brochure given to foreign investors did not contain any information regarding the 3% trailer fee paid to SGC by SIB.  *Id.*

- <u>Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act")</u>:  In 2005, the Examination staff also referred potential violations of Section 7(d) of the Investment Company Act by SIB.  *Id.* at 4.  The referral noted that, "Although banks are ordinarily excluded from the registration requirements of the Investment Company Act, SIB's own disclosure documents suggest that it fails to meet the definition of a foreign bank …" *Id.*

Furthermore, Cohen recommended in November 2005, that the Stanford investigation be ████████ ██████.  However, in 2006, the Enforcement staff circulated a draft formal order action memorandum that █████████████ ████████████.  *See* Exhibit 146.  As part of the formal order action memorandum review process in 2006, the SEC's Division of Corporation Finance ████████████ ███████████████  *See* Exhibit 147 at 3.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

However, in 2005, the Enforcement staff decided that attacking Stanford's Ponzi scheme indirectly by filing an action at that time against SGC for any of the above-listed violations would not be worthwhile. ENF Staff Atty Testimony Tr. at 33-34. ENF Staff Atty explained the Enforcement staff's rationale for that decision in the following exchange:

> Q: … [W]as there any thought to trying to find any hook to bring a case against Stanford even if you didn't necessarily have all of your ducks in a row so you could kind of start the process of stopping the fraud?
> A: Yeah. … We talked to market reg. We talked to IM. We talked to – I mean, I feel like a lot of heads looked at it, and … the aim was what can we do, what can we really do to get this when we don't have what we would normally need to bring [a Ponzi scheme case] -- typically when we bring a Ponzi scheme case, we would have bank records or we would know that the money was being misappropriated.
>
> Here we had this kind of legitimate looking operation with a lawyer [Thomas Sjoblom[87]] that used to be with the SEC and he's making these representations to us, and there was just so much that we didn't have. So what kind of case could we bring? I know we talked about maybe a 10b-10 case or some kind of a sales practice case and thought it's going to be really lame. Like we looked at the remedies on some of these things, and the one in particular -- I don't remember the provision or what it was, but it was like a FINRA violation, and it just seemed like so small potatoes, who cares. So there was sort of a weighing of if we're going to get this, we should get it and not be wasting our time with a sales practice case.

*Id.*

As noted earlier, the initial Complaint filed by the SEC on February 17, 2009, did not include allegations that Stanford was operating a Ponzi scheme. However, it did attack the Ponzi scheme indirectly by asserting other claims including a claim that SGC and SIB violated Section 7(d) of the Investment Company Act. Exhibit 149 at ¶¶ 128-

---

[87]   Stanford was represented by Thomas Sjoblom, a partner at Proskauer Rose LLP, in connection with the SEC's investigation. Sjoblom was an "assistant chief litigation counsel in the SEC's enforcement division for 12 years before going into private practice." *See* Amir Efrati, *The Stanford Affair: Another Bad Day for Proskauer*, The Wall Street Journal Law Blog, August 27, 2009, attached as Exhibit 151.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

131.  The SEC's Complaint alleged that SIB was an unregistered investment company that offered or sold securities it had issued, and that SGC acted as an underwriter for SIB. *Id.*  The public revelation that the SEC failed to uncover the Madoff Ponzi scheme changed the Enforcement staff's view of the risks and benefits of filing an action against Stanford without direct evidence that he was operating a Ponzi scheme.

## X.  THE ENFORCEMENT STAFF DID NOT CONSIDER FILING AN ACTION UNDER THE INVESTMENT ADVISERS ACT THAT COULD HAVE POTENTIALLY SHUT DOWN SGC'S SALES OF THE SIB CDs

[ENF BC 3] testified that there were very significant obstacles that hampered any effort by the SEC to gather direct evidence that SIB was operating a Ponzi scheme:  "[G]etting the bank records was … an important piece of the puzzle, and to the extent we were unable to get those bank records either from the bank or from the regulator because it was a foreign bank, that it was going to make a case very difficult." [ENF BC 3] Testimony Tr. at 56. [ENF BC 3] testified that without being able to get the SIB bank records, it was "probably impossible to bring a Ponzi scheme case or extremely difficult to bring that kind of case without having some documentation about … where the money was going."  *Id.* at 57. Moreover, the FWDO Enforcement staff believed that they would have faced opposition from the staff in Washington, DC had they recommended bringing any action predicated on the argument that [DPP, WP] and would certainly have had to successfully litigate that issue had they brought such an action.

The Examination staff advocated that the SEC attack the Ponzi scheme indirectly by filing an action against SGC for violations of various securities laws, including selling unregistered securities and making inadequate disclosures to foreign investors regarding the referral fees SIB paid SGC.  However, the Enforcement staff felt that bringing an action against SGC for those violations would have been "lame."  *See* [ENF Staff Atty 5] Testimony Tr. at 34.  In addition, the legal remedies for those violations would have fallen short of stopping the CD sales.  The remedies available for the violations that the staff considered were "small potatoes."  *Id.*  Consequently, the Enforcement staff believed that if they could not bring a case for "offering fraud, [the Stanford investigation was] not worth pursuing."  Exhibit 141.

However, the greatest obstacle to the SEC's efforts to investigate its suspicions that the SIB CDs were a Ponzi scheme, *i.e.*, the complete lack of information produced by SGC regarding the SIB portfolio that supposedly generated the CDs returns, also presented the SEC with an opportunity to bring a significant "offering fraud" action against SGC for violation of Section 206.  Simply, the filing of such an action against SGC could have potentially given investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  As a practical matter, many of Stanford's victims would not have purchased the CDs with such notice.  Moreover, had the SEC successfully prosecuted such an action against SGC, SGC could have been permanently enjoined and barred from selling the CDs as an investment adviser.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

A.   **The Issue of Whether the Stanford CDs Were Securities Was Irrelevant to an Action Against SGC For Violations of the Anti-Fraud Provisions of the Investment Advisers Act**

All of the possible causes of action considered by the FDWO Enforcement staff in 2005 required that the SEC establish that the SIB CDs were securities. The Cohen Memorandum's discussion of a possible emergency action included the following assertion, [DPP, WP]
[DPP, WP]          Exhibit 144 at 4. Cohen then noted:



*Id*. at 4, n. 11 (emphasis in original).

[ENF Staff Atty 5] confirmed that there was a long period of time during which the Stanford matter was analyzed and discussed. [ENF Staff Atty 5] Testimony Tr. at 37. [ENF Staff Atty 5] described these discussions as follows:

> [A] lot of the discussion [before requesting and obtaining the formal order in October 2006] was on [DPP, WP] like how -- you know, is this going to be -- [DPP, WP] What if we get to this point and [DPP, WP] So we lose on something like that. And there was definitely, you know, a feeling that [DPP, WP]
> [DPP, WP]

*Id.*

In the context of the Enforcement staff's request for a formal order in the Stanford matter, the SEC's Office of General Counsel commented:



**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



October 24, 2006 Memorandum to the Commission from the SEC's Office of General
Counsel, attached as Exhibit 152, at 2-3.

   More recently, in response to a question from Mark Adler, Deputy Chief
Litigation Counsel in the SEC's Enforcement Division, about whether the SEC could
have filed an action against SGC earlier, Kimberly Garber, Associate District
Administrator for Examinations in FWDO, explained that the SEC had been unable to
take action against SGC because 
May 6, 2009 E-mail from Kimberly Garber to Mark Adler, attached as Exhibit 153.
Specifically, Garber stated:

>    There may be legal theories as to how we could have
> stopped them from doing business in the US, and we
> considered a number of approaches along the way, however

*Id.*

   As the SEC stated in its brief filed in support of its February 16, 2009 action
against Stanford, fraud claims brought under Section 206 of the Investment Advisers Act
do not require that the fraud involve a security.  *See* Exhibit 149 at 26.  The SEC
expressly argued:

>    Through their deceitful and fraudulent conduct in selling
> the CDs and SAS, Defendants violated the antifraud
> provisions of the Investment Advisers Act.  *This is true,*
> *even if the Court, for the sake of argument, determines that*
> *the defendants' fraud was not in connection with the offer,*
> *sale or purchase of securities for purposes of Section 17(a)*
> *of the Securities Act or Section 10(b) of the Exchange Act.*

*Id.* (emphasis added).  The SEC further argued in its brief:

>    Section 206 establishes federal fiduciary standards to
> govern the conduct of investment advisers.  The fiduciary
> duties of investment advisers to their clients include … the
> duty to employ reasonable care to avoid misleading clients.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> An adviser has "an affirmative obligation to employ
> reasonable care to avoid misleading [his or her] clients."

*Id*. at 27 (citations omitted).[88]

Had the FWDO Enforcement staff considered pursuing a fraud case against Stanford under Section 206, the perceived obstacles to filing an action could have been eliminated.

### B.     The Enforcement Staff Did Not Consider Filing a Section 206 Case or Conducting a Section 206 Investigation

#### 1.     The 2005 Referral Did Not Mention Section 206

The 2005 Enforcement Referral did not discuss any potential violations of the Investment Advisers Act, including Section 206.  *See* Exhibit 101.  In fact, it did not even mention that SGC was a registered investment adviser.  *Id*.  It did not contain any reference to the previous examinations, including the 1998 and 2002 investment adviser examinations, which would have necessarily included the information that SGC was a registered investment adviser.  *Id*.

Prescott explained that she did not reference the prior examinations because she thought the 2004 Examination gave Enforcement enough information to act upon. Prescott Testimony Tr. at 14.[89]  Although the 2005 Enforcement Referral did not specifically discuss Section 206 of the Investment Advisers Act, it did state:

---

[88]   A former FWDO Examination branch chief who asked not to be identified testified that, generally:

> Once the attorneys figured out that Section 206 of the Advisers Act, antifraud provision,
> does not contain the word "security," man, you can make a lot of hay out of 206 (1) and
> (2).  We'd make them look good bringing in a case and just charging 206(1) and (2).
> You don't even have to have a security involved.

Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 58.

[89]   Prescott testified that, while drafting her 2005 referral memorandum, she became aware that there had been previous examinations, but she did not review them because she felt there was enough information in the 2004 examination report to support a referral.  Prescott Testimony Tr. at 13-14.  However, she testified that until 2009, she was unaware of the 1998 Stanford MUI, which was referenced in both the 1998 and 2002 investment adviser examination reports.  *Id*. at 12; Exhibit 70 at 2; Exhibit 55 at 1.  Wright testified that Prescott's position in the Examination group was Senior Special Counsel to the B-D examiners, and, thus, she would not have interacted with the investment adviser examiners.  Wright Testimony Tr. at 41, 59-60.  As discussed below, the failure to include information from the 1998 and 2002 investment adviser examinations in the 2005 Enforcement Referral made by the B-D Examination staff may have had significant consequences for the conduct of the Enforcement investigation.

As further evidence of the self-imposed wall between the two examination groups, Staff Acct  the examiner on the 1997 B-D Examination of SGC, testified that no one from the Investment Advisor examination group contacted him in connection with the 1998 or 2002 exams. Staff Acct 1 Testimony Tr. at 28, 38-39. Staff Acct 1 testified that the Investment Advisor and B-D Examination groups "just kind of never talked to each
(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> SGC claims that it keeps no records regarding the portfolios into which SIB places investor funds and that it can not get this information from SIB.  Indeed, SGC has related to the Staff that SIB claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and SIB's own internal "Chinese Wall" policies with SGC.

Exhibit 101 at 2 (footnotes omitted).

### 2.  Neither Cohen's nor Preuitt's November 2005 Memorandum Discussed a Section 206 Violation

Similar to the 2005 Enforcement Referral, the Preuitt and Cohen Memoranda did not discuss a potential Section 206 claim, nor did they reference the fact that SGC was a registered investment adviser.  Cohen's memorandum did state:



Exhibit 144 at 6.  Cohen then discussed SGC's and concluded that the SEC would . *Id*. at 7.  According to the Cohen Memorandum:



---

*Id*. at 39. testified that, in connection with the 1998 SGC examination that he conducted, he gained some familiarity with the 1997 B-D Examination, "but not a great deal." Testimony Tr. at 15-16.

148

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



*Id.* at 6-7 (emphasis in original).

Cohen concluded that it was [DPP, WP] [AC, DPP, WP] regarding the SIB CDs:

[DPP, LE, WP]

*Id.* at 8-9.[90]

### 3. When the FWDO Staff Met With Addleman, She Was Unaware That SGC Was an Investment Adviser

Addleman testified that she was "unaware" that the Investment Adviser Examination staff had done an examination of SGC in Houston in 1998 and 2002. Addleman Testimony Tr. at 40. In fact, Addleman testified that she was not aware that SGC was a registered investment adviser when the staff briefed her on the matter in November 2005. *Id.* at 34-35. Addleman only learned that SGC had been a registered investment adviser during her OIG testimony. *Id.* at 40-41. Her reaction to that information was striking, as evidenced by the following exchange:

> Q: [T]he fact is … that Stanford was a dual registrant, a broker-dealer and an investment adviser. You didn't know that, correct?
>
> A: As I sit here, it's a surprise.

---

[90] [IA Examiner 2] testified that, in his experience, the Enforcement attorneys in FWDO were not "very familiar with the Investment Advisors Act." [IA Examiner 2] Testimony Tr. at 77.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> …
>
> Q: I take it … that you were unaware that the Investment
>   Adviser exam staff had done an exam of Stanford
>   Group Company in Houston in 1998 and 2002. ….
>
> A: I was not aware of that.
>
> …
>
> Q: … And I assume that you were unaware that the 2002
>   exam had resulted in a referral to enforcement to bring,
>   among other things, a [Section] 206 case. …
>
> A: I didn't know that, no.

*Id.*

Because the Enforcement staff was not familiar with any of the findings of the
investment adviser examinations, bringing a Section 206 case against SGC for its
admitted failure to conduct any due diligence regarding Stanford's investment portfolio
was never considered.  As discussed below, that option would have been "a potentially
straightforward way to have attempted to approach [the Ponzi scheme]."  *Id.* at 45-46.

   **C.    The Enforcement Staff Could Have Filed a Section 206 Case With the
          Potential For Shutting Down SGC's Sales of the SIB CDs and/or
          Discovering Evidence of the Ponzi Scheme**

As discussed above, the 2002 Examination Report discussed SGC's failure to
conduct any due diligence regarding the SIB CDs.  █IA Examiner 2█ testified about that failure as
follows:

> [F]or all of [SGC's] investment advisory clients they were
> [a] fiduciary and whenever they refer that client to some
> other investment product, whether it's a security or not,
> they were supposed to do some due diligence into doing
> that.  So we asked them:  Give us the due diligence file for
> this offshore bank.  We want to see [] everything you
> looked at before you made this recommendation to refer
> these clients over.  The only thing we got if I remember
> right was just the file with the financial statements and
> maybe a couple other things in there.  So █IA Examiner 1█
> and I took the position that that wasn't enough.

█IA Examiner 2█ Testimony Tr. at 48-49.

█IA Examiner 1█ explained SGC's failure to conduct the required due diligence as follows:

**150**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Q: [SGC] needed to know what SIB's portfolio was that supported the CD rates, right?

A: Right.  I mean, they did that with all of their managers in the Schedule A in the wrap program.  They were constantly reviewing to make sure these managers were complying with their investment mandates, staying within their universe and all those things.  They didn't do any of that with Stanford International.

IA Examiner 1 Testimony Tr. at 113.

Had the SEC successfully prosecuted an injunctive action against SGC for violations of Section 206, an anti-fraud provision, it could have completely stopped the sales of the SIB CDs through the SGC investment adviser.  Moreover, as a practical matter it could have significantly impacted the sales of the CDs through the SGC broker-dealer.  As Prescott described in the 2005 Enforcement Referral:

Certainly, the ability to sell through a U.S. based broker-dealer gives SIB an *imprimatur* of legitimacy to foreign investors.  It is quite possible that action by the Commission against SGC for its role in the CD offering could cause the entire scheme to collapse.

Exhibit 101 at 6 (emphasis in original). ENF BC 3 acknowledged that a case against SGC that would have stopped its sales of the SIB CDs would have been worth bringing in 2005. ENF BC 3 Testimony Tr. at 71-72.[91]

As noted above, Addleman was not aware that SGC was a registered investment adviser until her OIG testimony.  During that testimony, Addleman testified regarding the missed opportunity to have filed a Section 206 action against SGC, in the following exchange:

Q: … [The examiners' Section] 206 argument was focused on the fact that the Investment Adviser in

---

[91]     Basagoitia had stated in her November 18, 2004 e-mail to Exam Sr Cnsl

Most Clients open accounts because they believe the B-D's clearing agreement with Bear Stearns provides them with account protection. They also believe in the soundness of US laws. Should the Bank not have US representation, clients would not invest as they do at the Bank.

Exhibit 106.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> Houston would not provide them any information about
> … what [SIB] was investing the proceeds in to generate
> these returns.  And, in fact, affirmatively represented
> that they had no such information, alternatively saying
> that there was a prohibition in Antiguan bank secrecy
> laws that prevented SGC from getting that information
> and then secondly … claiming there was a Chinese wall
> between the entities.  And so the theory that they
> proposed in essence was that … the investment adviser
> did not have enough due diligence to satisfy its
> fiduciary duty to its clients under either [Sections]
> 206(1) [or] 206(2). …  [D]o you have an opinion on
> the viability of that case?
>
> A:  As I sit here, I have a bit of a pit in my stomach,
> because I wish I had known that.  …  Adviser cases are
> always easier than broker-dealer cases because of the
> heightened fiduciary duty standard.  And it always does
> give an alternative way to look at facts.  If I knew that
> and I overlooked it, I apologize.  If I didn't know it, I'm
> a little frustrated but.
>
> Q:  But if you had known that at that time, would that have
> been a very good avenue to bring a case against
> Stanford under Section 206 of the Advisers Act?
>
> A:  Well, I don't want to overstate it, but it would have
> been an alternative theory that has some potential, yeah.

Addleman Testimony Tr. at 40-43.

The OIG then asked Addleman to review the 2002 Examination Report.  *See Id*. at
43-44.  After reviewing that report, Addleman testified in the following exchange:

> Q:  … [D]o you have a sense of the viability or the
> potential for bringing a Section 206 case in order to get
> into court and if nothing else shut down the sale of the
> CDs by the Investment Adviser entity until they had
> adequate due diligence and perhaps through the civil
> discovery process … obtain the evidence of a Ponzi
> scheme.  Do you have an opinion about that?
>
> A:  I do.  I think that the issue when you're dealing with an
> adviser versus a broker-dealer here gives the ability to
> sort of add on that due diligence component …. [W]hen
> you put it in the fiduciary realm and you have, for

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> example, the chart in here that shows the difference between what the U.S. CDs were paying and this purportedly Antiguan CD, there's reason to raise a red flag that would require additional fiduciary duties upon an adviser that wouldn't or might not be there with respect to a broker. *So, yes, I see that as a potentially straightforward way to have attempted to approach it.*[92]

*Id.* at 45-46 (emphasis added).

## XI.   HAD THE SEC FILED AN ACTION EARLIER, SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY HAVE BEEN AVOIDED

The 1998 Examination Report estimated that "SGC brokerage and advisory clients may have invested as much as $250 million in the CDs."  Exhibit 55 at 1.  The 2002 Examination Report stated, "SIB's financial statements for the year ended December 31, 2001, discussed in more detail below, indicated total 'certificates of deposit' of $1.1 billion."  Exhibit 70 at 10.  The 2002 Examination Report estimated that $640 million of those outstanding CDs were attributable to SGC.  *Id.* at 2.  The 2004 Examination Report indicated that SIB had $1.5 billion of outstanding CDs, of which $227 million were held by U.S. citizens.  Exhibit 98 at 4.

The growth in sales of the fraudulent CDs continued to increase at an alarming rate after the 2004 Examination.  The SEC's brief filed in support of its February 16, 2009 action against Stanford described that growth as follows:

> SIB sold more than $1 billion in CDs per year between 2005 and 2007, including sales to U.S. investors.  The bank's deposits increased from $3.8 billion in 2005, to $5 billion in 2006, and $6.7 billion in 2007.  SIB markets CDs to investors in the United States exclusively through SGC advisers pursuant to a Regulation D private placement.  In connection with the private placement, SIB filed a Form D with the Commission.

---

[92]   In contrast to Addleman, Cohen testified that a Section 206 claim would have been just as difficult to bring as a Section 10b-5 claim.  Cohen Testimony Tr. at 80-86.  However, it should be noted:  (1) a Section 206 claim would not have posed the jurisdictional question of whether the SIB CDs were securities; (2) SGC's lack of due diligence regarding its sales of the SIB CDs would have more easily supported a Section 206 fiduciary-based claim than a claim that those sales violated the NASD suitability rule; and (3) Section 206(2) has a lower scienter standard in which only a showing of negligence is necessary for a successful action.  *See* Exhibit 149 at 26-27.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Memorandum of Law in Support of Motion for Ex Parte Temporary Restraining Order, Preliminary Injunction and Other Emergency Relief ("SEC Brief"), filed on February 17, 2009, attached as Exhibit 149 at 7.  In its Complaint filed on February 16, 2009, the SEC alleged that "SIB, acting through a network of SGC financial advisors, has sold approximately $8 billion of self-styled 'certificates of deposits' …"  Exhibit 1 at ¶ 2.

A Stanford Victims Coalition survey indicated that losses could have potentially been minimized for a significant percentage of investors had the investors been aware of an investigation or examination of Stanford in 1997, when SEC examiners first raised concerns about the fund.[93]  Nearly a third of the Stanford investors who responded to the survey indicated that they invested with Stanford prior to 2005.  *See* Exhibit 154 at 1.  Approximately 95% of the 211 responding Stanford investors stated that knowledge of an SEC inquiry would have affected their decision to invest.  *See id.* at 4.  One Stanford victim, who invested the money that she "saved through several years of business, nights working late and skipping vacations [she] could have taken with [her] family," said that had she "known that Stanford Group was ever under investigation by the SEC, [she] would not have bought at all."  *See* February 2010 Inspector General Survey Response Excerpts, attached as Exhibit 155 at 1; February 2010 Stanford Victims Coalition Survey Response Excerpts, attached as Exhibit 156 at 1.[94]  Two other investors said that an SEC investigation "would have been a very large red flag" and they "would have transferred out of that bank immediately."  Exhibit 156 at 2.

Indeed, over 99 percent of the surveyed investors had no knowledge of the SEC's inquiry at the time they first invested. Exhibit 154 at 3.  One Stanford investor stated, "[I] [h]ad no knowledge of any prior SEC complaints or inquiries.  I researched on [the] internet and could find no registered complaints against Stanford.  Obviously, [I] would not have invested with Stanford if there was any sign of trouble."  Exhibit 155 at 2.

The action taken by SEC Enforcement as part of its investigation in June 2005 in sending a questionnaire out to Stanford investors in an attempt to identify clear misrepresentations by Stanford, as discussed in Section VII.A of this report, raised significant concerns among the investors.  Rawl and Tidwell Interview Tr. at 8.  Mark Tidwell, a vice president and financial adviser at Stanford from 2004 through 2007 who later contacted the SEC with concerns about Stanford, said that his phone "lit up like a Christmas tree the morning [the questionnaire] went out."  *Id.*  This flurry of phone calls from his clients led Tidwell to believe that had the SEC sent clients questionnaires prior to 2005, it would have "absolutely" raised red flags with clients, and made them more

---

[93]    In February 2010, at the request of the OIG, the Stanford Victims Coalition, an organization of Stanford investors, sent a survey to investors in the SIB CDs.  The Stanford Victims Coalition received 211 responses to its survey.  *See* February 2010 Inspector General Survey Summary, attached as Exhibit 154. Respondents to the survey certified that all answers provided were correct to the best of their knowledge.

[94]    The Stanford Victims Coalition conducted its own survey of Stanford investors in February 2010.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

hesitant to invest in Stanford at earlier dates.  *See id*. at 7, 8.  Rawl also testified that the 2005 SEC investor questionnaire led to "significant concerns" by investors in the CDs.  *See id*. at 7.

However, even after investors received the questionnaire about Stanford in June 2005, many continued to invest because financial advisers told them that the fund had been given "a clean bill of health" by the SEC.  Exhibit 155 at 3.  Advisers told their investors that the inquiry was "routine," a result of a "disgruntled employee," and that "the investigation was complete and fined SGC a very small amount for some 'sloppy accounting'…."  *Id*. at 29, 37.  In fact, financial advisers used the fact that the SEC had previously examined Stanford to reassure investors about the fund's safety.  One investor said that her broker told her that "regulators came constantly" and everything at Stanford was "perfect."  Stanford Victim Interview Memorandum, attached as Exhibit 157.  Investors were told that the SEC  regulated Stanford and Stanford had "always passed with flying colors."  Exhibit 155 at 4.  Ironically, this gave investors "comfort knowing that [Stanford was] being watched."  *Id*. at 5.  Tidwell noted that he was told "there was never an issue with any regulatory body," that there may have been some regulatory "grumbling here or there, but all those matters were closed" and that anything that a governmental agency had looked into was "fine," and there was "nothing ongoing."  Rawl and Tidwell Interview Tr. at 10-12.

Tidwell stated that it gave him comfort when he was told by Stanford management that nothing was found by any regulatory inquiries, and that his understanding that regulatory entities looked into Stanford and found nothing was an "endorsement."  *Id*. at 12-13.  Stanford officials were able to persuasively represent that Stanford had been given a "clean bill of health" by the SEC because, in fact, Stanford had been examined on multiple occasions and only been issued routine deficiency letters; deficiencies that they purportedly remedied.  The 1997, 1998, 2002 and 2004 SEC examinations of SGC all resulted in deficiency letters sent from the FWDO examiners to SGC.  SGC responded to each of these deficiency letters in a manner that would allow them to claim that they had responded to and addressed the SEC's concerns.  *See, e.g.,* October 17, 1997 Letter from Lena Stinson to ▆Staff Acct 1▆ ("[T]he deficiencies have been noted and your recommendations implemented."), attached as Exhibit 158.

Some even increased their investments due to confidence in the SEC's audits.  One investor stated, "[I]n late 2008 I increased my CD investment by 150% due to the confidence in the SEC audit … and the approval of the SEC."  Exhibit 155 at 2.[95]

---

[95]   Ironically, Enforcement branch chief ▆ENF BC 3▆ testified that he was concerned that if the SEC brought a technical violation against SGC, that could do more harm than good in the sense that SGC would publicize that the SEC has been investigating them and all that was wrong was a minor issue.  ▆ENF BC 3▆ Testimony Tr. at 70.

*Recipients of this report should not disseminate or copy it without the Inspector General's approval.*

One investor reported that her husband contacted the SEC to inquire about Stanford's stability.  *See* Stanford Victim Interview Memorandum.  This investor said that SEC representative stated the fund was "very solid," "the most solid group in Texas." *Id*.  She said that the SEC confirmed that Stanford was a "prestigious" fund that had been "functioning well for 18 years."  *Id*.

In addition, investors reported that they relied on favorable remarks concerning Stanford by Federal government leaders, including a 2008 commendation from President George W. Bush, in making their decision to invest in Stanford.  *See* February 20, 2008 letter from George W. Bush, attached as Exhibit 159.  For example, one investor stated: "[T]here was nothing but praise by our congressmen, senators, and our own President Bush [as to] how wonderful [t]his company and man was and the safest sound company." Exhibit 155 at 6.  Another investor stated that "SGC had an impec[c]able record and had received many awards and commendations[,] one even from President Bush commending Allen Stanford for his exemplary conduct in the business community."  *Id*. at 7.

## XII.   THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING AN ACTION AGAINST STANFORD EARLIER WAS DUE, IN PART, TO THE STAFF'S PERCEPTION THAT THE CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF CASE FAVORED BY THE COMMISSION

### A.   Senior Enforcement Management Emphasized the Need For "Stats"

Degenhardt told the OIG that he "absolutely felt that it was important to convey to the Commission the number of cases that his office brought."  Degenhardt Interview Memorandum at 2.  He said the regional offices were "heavily judged" by the number of cases they brought when he first came to the SEC.  *Id*.  Degenhardt stated that after 1997, the FWDO brought more cases than any other regional office on a per-capita basis.  *Id*. He said the FWDO, the third-smallest regional office, was always in the "top three" for overall number of cases brought from 1997 through 2005, and in 2001, the FWDO brought the highest number of cases of any regional or district office.  *Id*.  He emphasized that this was a "source of great pride" for himself, Spencer Barasch as the head of Enforcement in the FWDO, and the FWDO as a whole.  *Id*.

Degenhardt described himself as having been "very outspoken" while he was at the SEC, but felt he was "bullet proof" because of the high number of cases that the FWDO brought and, as a result, the Commission "could not get rid of him."  *Id*. at 4. Degenhardt said he would often "fight with the bureaucrats in DC" and would tell the staff, "You are my shield, because of the high numbers of cases you are bringing, so if you like me working here, keep bringing a lot of cases."  *Id*.

According to Degenhardt, Barasch was even more concerned about "stats" than Degenhardt was, stating that "it was very important to Barasch that the FWDO bring a high number of cases."  *Id*. at 4.  Degenhardt stated that the FWDO's high number of cases "was a feather in Barasch's cap."  *Id*.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Barasch told the OIG:

> [E]very regional and district office was very motivated to
> bring as many cases as possible, because that's --you were
> judged by the number of cases you brought and then the
> quality of the cases you brought.  And it was both.  And the
> number of cases was extremely important. …

Barasch Interview Tr. at 28.  Like Degenhardt, Barasch told the OIG that there was one
year in which the FWDO brought more cases than any other regional or district SEC
office.  Barasch Interview Tr. at 28-29.

Cohen also acknowledged the primacy of "stats" as follows:

> Everybody was mindful of stats. …  Stats were recorded
> internally by the SEC in Washington. …  I think when I
> was assistant director, there was a lot of pressure to bring a
> lot of cases.  I think that was one of the metrics that was
> very important to the home office and to the regions.

Cohen Testimony Tr. at 105.  Cohen testified that the pressure to bring a lot of cases
came from Barasch and Degenhardt, and that Barasch and Degenhardt would compare
the FWDO's stats with those of other offices.  *Id.* at 108-109.  Cohen testified that the
FWDO was "very proud" of its productivity.  *Id.* at 109 ENF BC 3 also testified that he
understood that there was pressure on regional offices to show that they had brought "X"
number of cases per year in order to show that they were productive. ENF BC 3 Testimony
Tr. at 75-76 ENF BC 3 also testified that the FWDO was well-known for bringing a lot of
cases and that its reputation for doing so was a source of pride within the office.  *Id.* at
78.

Wright observed that after he left FWDO's Enforcement group, "Barasch [put] a
lot more pressure on people to produce numbers."  Wright Testimony Tr. at 18.  Wright
testified that the pressure to produce numbers also came from Degenhardt, stating:

> [Degenhardt] came from a big law firm, and he quickly
> decided the way to impress people was to come up with
> lots of numbers.  And Spence, of course, was part of that.

*Id.* at 18-19.  Wright testified that Barasch "was pretty upfront" with the Enforcement
staff about the pressure to produce numbers and communicated to the Enforcement staff,
"I want numbers.  I want these things done quick."  *Id.* at 21-22.

Wright also observed a change in emphasis when Addleman replaced Barasch as
Associate District Director for Enforcement.  Wright Testimony Tr. at 49-50.  Wright
testified that Addleman was not so enamored with the numbers like Barasch and

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Degenhardt were and that Addleman "was much more concerned about the kind of cases you're bringing and why you're bringing cases." *Id*.

Addleman acknowledged that before she became the Associate District Director for Enforcement, "there was some internal pressure within the Fort Worth office to generate numbers … of cases." Addleman Testimony Tr. at 27. By contrast, she agreed that while obviously it's important to have numbers, it's also important to have substantial cases, and even cases that are complicated or difficult or that may involve some work to get through the Commission. *Id*. Addleman described this "culture shift" as follows:

> My emphasis was less on numbers than the [Degenhardt and Barasch] administration … where people were of the belief that the numbers were the only thing that mattered … And there needed to be some, in my opinion, reality brought back to what the enforcement program is supposed to be. … So, yes, I think there's definitely a culture shift and Jeff [Cohen] had a little trouble with some of that I will admit. … He had some tougher cases. I won't say that he only had easy things, but in a way that he could sort of charge ahead on the things that he knew were going to be fruitful and give rise to a number as opposed to a case that didn't have that degree of certainty, if you will, would be a factor in his analysis.

*Id*. at 28-29.

Walter Ricciardi, former Deputy Director of Enforcement from 2005 through 2008, was quoted in the April 16, 2009 Bloomberg article, *Stanford Coaxed $5 Billion as SEC Weighed Powers*, as follows:

> SEC enforcement offices were evaluated on the number of cases, or "stats," they brought in, rather than on the seriousness or difficulty of action, said Walter Ricciardi, the agency's deputy chief of enforcement from 2005 through 2008, in a speech April 1 in New York. "So if you brought an Enron, that's one," Ricciardi said. "If you brought a WorldCom, that's two." Delisting 135 defunct companies in a week for failing to file annual reports gave an enforcer 135 cases to count, he said. "Maybe certain investigations would have gotten put in the right place and in the right posture" with a different evaluation system, he said.

**158**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Alison Fitzgerald and Michael Forsythe, *Stanford Coaxed $5 Billion as SEC Weighed Powers*, Bloomberg, April 16, 2009, attached as Exhibit 160 at 4. *See also* Judith Burns, *SEC's Near-Record Enforcement Results Raise Questions*, Dow Jones, October 9, 2008, attached as Exhibit 161.

### B.    The Pressure For "Stats" May Have Discouraged the Staff From Pursuing Difficult Cases

Wright testified that the pressure for numbers incentivized the Enforcement staff to focus on easier cases, the "quick hits."  Wright Testimony Tr. at 18.  According to Wright, as a result of the "pressure on people to produce numbers[,] … anything that didn't appear … likely … to produce a number in a very short period of time got pretty short shrift."  *Id*. at 18.[96]  A former FWDO Examination branch chief, who asked not to be identified, agreed that the FWDO Enforcement staff "were concerned about the number of cases that they were making and that perhaps if it wasn't a slam-dunk case, they might not want to take it because they wanted to make sure they had enough numbers because that's what they felt the Commission wanted them to do."  Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 86-87.

[BD Examiner 1] testified that "examiners will refer great cases to Enforcement, and they just sit there … for a variety of reasons." [BD Examiner] Testimony Tr. at 54 [BD Examiner] testified that one reason that great cases "sit" in Enforcement is that the Enforcement staff takes the approach that, "Yes, there may be some fraud here, but it is not a slam dunk, [and] we are not going to try to go to court if it is not a slam dunk."  *Id*.  Similarly [IA Examiner 2] testified that he "got the sense that [the Enforcement staff] did not want to lose any cases.  So if there was a high risk of losing a case, there was a reluctance for them to take it." [IA Examiner 2] Testimony Tr. at 77.

Addleman acknowledged that when she became the Associate District Director for Enforcement in the FWDO, there was a feeling that the Commission was possibly more receptive to clear-cut cases, in which you have clear victims already losing money,

---

[96]  Wright recalled one case that he had assigned to Prescott when Barasch was her branch chief that he later learned Barasch had instructed her not to work on because it was not going to be a quick hit.  Wright Testimony Tr. at 22-24.  Ironically, that case bore many similarities to the Stanford matter.  *Id*.  Wright testified that the matter "involved insurance, and while presumably they were selling insurance, it was really a Ponzi scheme."  *Id*. at 23.  Wright believes that Barasch told Prescott not to work on it [DPP, WP]

But, as Wright explained, "the case got transferred [to another SEC office]. … [T]hey did a little research and came up with the idea that what they were selling was not an insurance contract but really a security. … [A]nd it became one of these [cases] where you rush to the courthouse to get a temporary injunction and restraining order and all the rest."  *Id*. at 23.  Wright reflected on the parallels between that case and Stanford, stating, "Again, you get back to the number aspect, you know.  If you got a problem with determining whether or not something is a security, just like in Stanford, then it's going to be harder to do.  It's not going to be a quick hit.  You're not going to get a number quicker."  *Id*. at 24.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

and that if they were going to bring a case, they should bring a case that is more clear-cut and has potential victims, so it's easier to get through the Commission and generate their numbers.  Addleman Testimony Tr. at 27.  Similarly, Preuitt testified:

> [Stanford] was also a very difficult case.  It was going to use a lot of resources, and that was unappealing.
>
> And very much during the Cox administration, there was concern that the Commission wasn't going to take anything unless it was just nailed down and perfect and beautiful and that you might receive a lot of negative feedback unless you had a case like that.  And people wanted to avoid that sort of negative response. …

December 14, 2009 Preuitt Testimony Tr. at 55-56.

As discussed below, at some point, FWDO management was instructed to focus less on Ponzi scheme cases.  However, as Preuitt explained, the FWDO was willing to bring Ponzi scheme cases if they were *easy* cases:

> [T]o be fair, the Fort Worth office has been one of the most aggressive offices in terms of Ponzi schemes.
>
> … But most of those are really quite easy to prove, and you can get into court quickly.  And we were just very aggressive on doing those.
>
> So during Hal and Spence's tenure, we did many Ponzi schemes; but they were small in comparison.  They were much -- you know, very easily proven.  Once they start to break and you can get some bank records, I mean, in comparison, the difficulty of those cases is, you know – it doesn't compare.

*Id*. at 56-57.

Wright testified that Stanford "was not going to be a quick hit.  It was going to be a dogfight."  Wright Testimony Tr. at 18.  Accordingly, Wright explained that Stanford was not considered as high priority of a case as easier cases.  *Id*. at 18-19.  Similarly, Preuitt told the OIG that Cohen did not want to pursue the investigation "[b]ecause it was going to be hard to prove…."  Preuitt Interview Tr. at 18-19.  Preuitt testified that Cohen only wanted to bring cases that were slam dunk, easy cases.  January 26, 2010 Preuitt Testimony Tr. at 42.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Preuitt testified that no one in Enforcement ever disagreed with her conclusion that Stanford was probably a fraud.  December 14, 2009 Preuitt Testimony Tr. at 45. According to Preuitt, Enforcement's unwillingness to investigate Stanford "was always about … barriers. … [Stanford] was seen [by Enforcement] as a fantastically difficult case, and I couldn't convince them to do it."  *Id*. at 45-46.[97]

The Enforcement staff perceived the Stanford case was difficult, in part, because there was no evidence that the Ponzi scheme was collapsing.  The Cohen Memorandum included the following observation:



Exhibit 144 at 3-4 (emphasis in original).[98]

On October 25, 2004, while the 2004 examination was ongoing, Wright forwarded to Preuitt an e-mail chain from early-June 2003 that discussed Enforcement staff's view at that time that a Stanford investigation was too difficult to undertake. October 25, 2004 E-mail from Hugh Wright to Julie Preuitt, attached as Exhibit 162.

---

[97]   Degenhardt and Barasch vigorously denied that the FWDO was averse to difficult investigations during their tenure.  Degenhardt told the OIG that, in addition to doing "kick in the door and grab" cases, the FWDO had worked on complex cases.  Degenhardt Interview Memorandum at 2.  He added that he felt the FWDO "worked very hard in his tenure on all types of cases (including big cases)…."  *Id*. at 6. Barasch told the OIG that he had brought several cases against broker-dealers and investment advisers. Barasch Interview Tr. at 30-35.  Barasch also stated that he was instructed to "focus[] on working what would be deemed to be good core cases for the Commission."  *Id*. at 13.

[98]  ENF Staff Atty 5 testified that she believed it was difficult to bring a Ponzi scheme case before the scheme began to unravel because "you don't have anybody complaining about anything going wrong, everybody is happy, so they are not particularly cooperative ENF Staff Atty Testimony Tr. at 18-19.  The belief that the SEC could not act against a suspected Ponzi scheme was shared by the staff in the SEC's failed Bernard Madoff investigation.  Doria Bachenheimer, the Assistant Director responsible for a 2005-2006 investigation of Madoff that was closed without any action, testified in the OIG's investigation of that matter that she viewed circumstantial evidence that Madoff was running a Ponzi scheme as only "theories," stating, "[the red flags of a Ponzi scheme that were presented to the Enforcement staff] weren't evidence.  You know, it wasn't something we could take and bring a lawsuit with."  *See* the OIG's September 30, 2009 Report of Investigation, Case No. 509, entitled "Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme," at 247.  Bachenheimer further explained her view that "[i]t's very challenging to develop evidence [about a Ponzi scheme] until the thing actually falls apart."  *Id.*

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Preuitt responded:

> I love this stuff.  We all are confident that there is illegal
> activity but no easy way to prove.[⁹⁹]  Before I retire the
> Commission will be trying to explain why it did nothing.
> Until it falls apart all we can do is flag it every few years.

October 25, 2004 E-mail from Julie Preuitt to Hugh Wright, attached as Exhibit 162.

But Preuitt and [IA Examiner 1] testified that after the revelation that the SEC failed to uncover the Bernard Madoff Ponzi scheme, the staff's view about recommending an Enforcement action without clear evidence that it was a Ponzi scheme changed.  [IA Examiner 1] explained the change as follows:

> I have a general recollection that our office, after the
> Madoff situation, said, hey, is there anything that we have
> any concern about that we haven't done something about,
> and I believe Stanford was one of them. …
>
> And, so, we decided we need to pick this up and run with it
> and see if we can do something because, you know, *the
> game has changed.  The risk of losing is a whole lot less
> now.  We -- we're going to be punished more for not doing
> something than for doing something and ending up being
> unsuccessful or whatever.*  That was my general feeling,
> that we couldn't let that sleep anymore.

[IA Examiner 1] Testimony Tr. at 136 (emphasis added).  Similarly, Preuitt testified:

> Well, clearly when Madoff broke, that changed everything.
> People felt like now … maybe … the Commission will not
> turn us down if we bring to them, you know, an imperfect
> case where we don't have all of the documents.

December 14, 2009 Preuitt Testimony Tr. at 87-88.  The OIG found in its earlier report regarding the Stanford investigation as follows, "Immediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation became more urgent for the FW[D]O and, after ascertaining that the DOJ investigation was in its preliminary phase, the FW[D]O staff asked DOJ if it could move forward with the Stanford investigation."  Report of Investigation, Case No. OIG-516, entitled

---

[99]  [IA Examiner 1] testified that Stanford was "a subject of common discussion in the office."  [IA Examiner 1] Testimony Tr. at 122.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

"Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation" at 10.

###### C.    Ponzi Scheme Cases Were Disfavored by Senior Enforcement Officials

Degenhardt told the OIG that Enforcement Director Richard Walker was critical that the FWDO was bringing too many Temporary Restraining Order (TRO), Ponzi, and prime bank cases, which Walker referred to as "kick in the door and grab" cases or "mainstream" cases.   Degenhardt Interview Memorandum at 2.   According to Degenhardt, Walker told him that the FWDO needed to bring more Wall Street types of cases, like accounting fraud cases.   *Id.*   Degenhardt recalled a meeting with Walker in which Walker said, "[G]ive the Ponzi scheme-type cases to the states."   *Id.* at 4. Degenhardt said that he replied, "[T]he states are not capable of doing these cases," to which Walker reiterated, "[G]ive them to the states."   *Id.*

Barasch told the OIG that when he was hired to be the director of Enforcement for the FWDO, senior management in the Enforcement Division in Washington, DC, as well as in the Denver Regional Office (which supervised the FWDO at that time), told him to clean up the FWDO's inventory and repeatedly told him that the FWDO's emphasis should be on accounting fraud cases.   Barasch Interview Tr. at 12-14.   Barasch told the OIG that the pressure to focus on accounting fraud cases exponentially increased after Enron filed for bankruptcy on December 2, 2001, and revelations of massive accounting fraud followed.   Barasch Interview Tr. at 24.

Barasch further told the OIG that he was told that the FWDO was spending way too much of its resources on Ponzi-scheme kinds of cases, and that those resources would be better deployed on accounting fraud cases.   Barasch Interview Tr. at 34.[100]   Barasch specifically recalled that in November 2000, after the FWDO brought several Ponzi scheme cases, he was told by a senior official in the Enforcement Division (whom Barasch declined to name): "Spence, you know you got to spend your resources and time on financial fraud.   What are you bringing these cases for[?]"   Barasch Interview Tr. at 31-33.

Preuitt also testified that the FWDO "actually received a great deal of pushback from all of the Ponzi schemes that we were doing."   December 14, 2009 Preuitt Testimony Tr. at 57.   Preuitt explained her view that "the Commission is very interested in a fraud of the day.   And [Stanford] wasn't ever the fraud of the day."   *Id.* at 55.

---

[100]   In the context of another Ponzi scheme matter investigated by the FWDO, NYRO Counsel , a PII Counsel in the SEC's New York office, e-mailed a FWDO attorney on January 14, 2004, "[O]f course [the SEC] should get out of the business of burning resources to chase Ponzi schemes …."   E-mail dated January 14, 2004 from NYRO Counsel at Exhibit 163.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

According to Preuitt, Ponzi scheme cases "became the fraud of the day after Madoff." *Id.* at 56.

### D.   The SEC Bureaucracy May Have Discouraged the Staff From Pursuing Novel Legal Cases

Degenhardt told the OIG that the arduous process of getting the SEC staff's approval in Washington, DC to recommend an Enforcement action to the Commission was a factor in deciding which investigations to pursue.  Degenhardt Interview Memorandum at 5.  Degenhardt recalled one matter in late-2000 in which the FWDO staff invested a lot of time in an investigation involving ███████ and felt strongly that the matter warranted an Enforcement action.  *Id.* at 5-6; February 11, 2001 E-mail from Harold Degenhardt to Annette Nazareth and Robert Colby, attached as Exhibit 164.  However, staff in the Division of Market Regulation took the position that ███████ and consequently prevented the FWDO staff from bringing the matter to the Commission's attention.  *Id.*

Barasch also recalled the FWDO's unsuccessful efforts to convince the staff in Washington, DC, to recommend an Enforcement action ███████.  Barasch Interview Tr. at 37-39.  Barasch said his experience in that matter was a factor in his view that the Stanford matter was not worth investigating.  *Id.* at 39.  According to a former FWDO Examination branch chief, the Enforcement staff in Washington, DC – specifically the staff in the Branch of Regional Office Assistance ("BROA")[101] – would not have let an Enforcement recommendation on Stanford go to the Commission because of its novel characteristics.  Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 79-80.  He described the process of trying to get Enforcement recommendations to the Commission through BROA as "very frustrating."  *Id.* at 80.

Wright testified that "[o]ver a period of time when I was here, [the bureaucracy] got a lot worse. … [Y]ou've got so many layers between what you do in Fort Worth before it ever gets to the Commission.  It's got to go through what was called BROA at that time.  I don't know what it's called now.  And you have a lot of people second-guessing everything, and so, you know, what we thought were good reasons weren't necessarily accepted by anybody else."  Wright Testimony Tr. at 13-14.

Addleman testified that the process of obtaining a formal order in the Stanford matter, in particular, involved a "ridiculous" amount of review by various staff in DC, stating:

> As I recall, it took a longer period than was appropriate, in my opinion, to get the formal order done, both in terms of getting the written product out the door and then getting it

---

[101]   BROA has been renamed the Office of Chief Counsel.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> through the Commission.  I mean, it was something
> ridiculous like two months of review in DC before it got on
> a Commission calendar, those kinds of things.  So there
> were a lot of time delays that are, I suppose, different
> points in my career more frustrating than others and this
> might have been one of those points where I was frustrated.

Addleman Testimony Tr. at 33. [ENF Staff Atty 5] also recalled that the process of getting the staff's
request for a formal order before the Commission took a particularly long time because of
jurisdictional issues and comments and pushback from other offices within the SEC.
[ENF Staff Atty 5] Testimony Tr. at 47-48.

Preuitt testified that she believed that the desire of the Enforcement staff to avoid
difficult cases was partly due to the realities of dealing with the Commission's
bureaucracy.  Preuitt described the challenges posed by that bureaucracy in the following
exchange:

> A:  [T]he gauntlet, even before you get to the part of the
>     Commission, is nightmarish, to get through market reg,
>     to get through IM, to get through general counsel. …
>     And it's just like hitting your head against the wall
>     repeatedly over and over and over. …
>
> Q:  So is it your impression that in general … the harder
>     cases, more challenging cases are going to be difficult
>     to get through the bureaucratic process in
>     Washington?
>
> A:  A nightmare.  Difficult is an understatement.  It is a
>     horrific miserable process. …
>
> …
>
> A:  [N]ot only do [the Enforcement staff] have to worry
>     about criticism if [a case] finally gets to the
>     Commission ….  First [the Enforcement staff] have to
>     deal with a year or two of nightmarish difficulties, so it
>     really was no small thing for [the Examination staff] to
>     ask them to try to bring this on a more novel case.  Did
>     I think it was worth it?
>     Did I think that the senior people then should have
>     supported and helped that process and protected their
>     staff in some way from the misery to make it happen, I
>     did.  But I don't want to give the impression I thought
>     this was easy to do and they could just go do it and they

**165**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> were stubborn.  Nobody wanted to face the people in
> Washington.  They didn't and for good reason.

January 26, 2010 Preuitt Testimony Tr. at 72-74.

As discussed above, for seven years the SEC Enforcement staff did not open an investigation into Stanford although every member of the staff that had examined Stanford believed the CDs were a Ponzi scheme.  That failure was due in part to repeated decisions by Barasch to quash the matter.  Immediately after he left the SEC, an investigation of Stanford was opened.  While that investigation proceeded haltingly, beset by feuding among the staff that at times consumed more of the staff's time and energy than the actual investigation, as discussed below, Barasch repeatedly attempted to represent Stanford in connection with the investigation he had blocked for seven years.

## XIII. AFTER LEAVING THE SEC, BARASCH SOUGHT TO REPRESENT STANFORD IN CONNECTION WITH THE SEC INVESTIGATION ON THREE SEPARATE OCCASIONS AND DID REPRESENT STANFORD FOR A LIMITED PERIOD OF TIME

### A. In June 2005, Two Months After Leaving the SEC, Barasch Sought to Represent Stanford and Was Advised He Could Not Do So

Barasch left the SEC on April 14, 2005, and joined the law firm of Andrews Kurth, LLP later that month.  *See* March 9, 2005 Andrews Kurth press release, attached as Exhibit 165.  On June 1, 2005, Jane Bates, SGC's Chief Compliance Officer, asked an Investment Adviser consultant who was working with SGC for an attorney recommendation as follows:

> Would you give me names of some very good attorneys
> you would recommend that we might want to hire if
> necessary for this SEC inquiry[?]  SEC Enforcement is
> involved and I want to be prepared.  This is informal now,
> but that could change.

June 1, 2005 E-mail from Jane Bates to [Stanford Empl 6] attached as Exhibit 166.  On June 2, 2005, the consultant responded and recommended Barasch specifically because of his FWDO experience, saying,

> . . . [R]ight off the bat my instinct would say to call
> [Barasch] because of his specific experience in dealing with
> the FWDO enforcement staff.

June 2, 2005 E-mail from [Stanford Empl 6] to Jane Bates, attached as Exhibit 166.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On June 6, 2005, Bates e-mailed Yolanda Suarez, Stanford Financial Group ("SFG") Chief of Staff, and Mauricio Alvarado, SFG General Counsel, as follows:

> … I talked to our [investment adviser] consultant who used to be a Branch Chief at OCIE in DC and asked him if he knew any individuals who knew the SEC Enforcement staff in Fort Worth.  He gave me the name of the following individual [Barasch] who recently left the SEC and is at Andrews Kurth in Dallas.

June 6, 2005 E-mail from Jane Bates to Yolanda Suarez, attached as Exhibit 167 at 2.  Suarez immediately e-mailed Alvarado, "Lets [sic] talk to him."  June 6, 2005 E-mail from Yolanda Suarez to Mauricio Alvarado, attached as Exhibit 167.

On or about June 11, 2005, [Stanford Empl 1], a SFG compliance employee, forwarded the recommendation of Barasch to Robert Allen Stanford.  *See* E-mail from [Stanford Empl 1] to Robert Allen Stanford, attached as Exhibit 168.  Stanford replied, "This guy looks good and probably knows everyone at the Fort Worth office. Good job." [Stanford Empl 1] June 11, 2005 E-mail from Robert Allen Stanford to [Stanford Empl 1] attached as Exhibit 168.

By June 17, 2005, Alvarado had contacted Barasch, presumably about representing Stanford.  *See* June 17, 2005 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 169  On June 20, 2005, Barasch e-mailed Richard Connor, Assistant Ethics Counsel in the SEC's Office of General Counsel, as follows:

> Hope all is well in this time of incredible change at the SEC.  I never believed that my departure would trigger so many others to abandon ship…
>
> I have been approached about representing an investment complex called Stanford Financial Group, of Houston, Texas, in connection with (what appears to be) a preliminary inquiry by the Fort Worth office.  The assigned attorneys are (I think) [ENF Staff Atty 5] and [ENF BC 3].
>
> *I am not aware of any conflicts* and I do not remember any matters pending on Stanford while I was at the [C]ommission. Would you please confirm this with the Fort Worth staff?[102]

---

[102]   Connor testified that he did not recall Barasch at any point telling him that in 1998, Barasch had participated in a decision to close an inquiry regarding Stanford; in 2002, Barasch had participated in a decision to refer a complaint about Stanford to the Texas State Securities Board; and in 2003, Barasch had participated in a decision not to investigate Stanford after reviewing a complaint that Stanford was engaged in a massive Ponzi scheme.  Connor Testimony Tr. at 14-15.  Barasch stated that he did not mention the

(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

June 20, 2005 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 170 (emphasis added).

Although Barasch claimed not to remember any matters pending on Stanford while he was at the SEC, the OIG investigation found, as discussed more fully above, that Barasch had played a significant role in the FWDO's inquiries and examinations of the possibility of Stanford engaging in a Ponzi scheme or similar fraud, including:  (1) in 1998, deciding to close an inquiry regarding Stanford, *see* Section II.C; (2) in 2002, deciding to forward the ░Complainant 1░ letter to the TSSB and not respond to the letter or investigate the issues it raised, *see* Section IV.E; (3) in 2002, deciding not to act on the Examination staff's referral of Stanford for investigation, *see* Sections IV.H and I; (4) in 2003, participating in a decision not to investigate Stanford after receiving the ░Confidential Source░ letter comparing Stanford's operations to the ░PII░ fraud, *see* Section V; and (5) in 2003, participating in a decision not to investigate Stanford after receiving the letter from an anonymous insider alleging that Stanford was engaged in a "massive Ponzi scheme," *see* Section V.B.

Federal conflict-of-interest laws impose on former government employees a lifetime ban on making a communication to or appearance before an employee of a federal agency or court in connection with a particular matter (A) in which the United States is a party or has a direct and substantial interest, (B) in which the former employee was personally and substantially involved as a government employee, and (C) which involved a specific party or parties at the time of the participation.  *See* 18 U.S.C § 207(a)(1); *see also* 17 C.F.R. § 200.735-8(a)(1).  Under federal ethics regulations, "[t]he same particular matter may continue in another form or in part," and "[i]n determining whether two particular matters involving specific parties are the same, all relevant factors should be considered, including the extent to which the matters involve the same basic facts, the same or related parties, related issues, the same confidential information, and the amount of time elapsed."  5 C.F.R. § 2641.201(h)(5).  Moreover, "[a] particular matter may involve specific parties prior to any formal action or filings by the agency or other parties."  5 C.F.R. § 2641.201(h)(4).[103]

---

1998 inquiry or the 2002 matter to Connor when they spoke in 2006 because he "just didn't remember anything" about these events.  Barasch Interview Tr. at 60.  Connor agreed that this conduct would be pretty substantial involvement in a variety of Stanford-related matters over time, and that when an individual is seeking ethics advice to represent a particular company before the Commission, that individual should inform the Ethics Office of the roles he played previously while at the Commission.  Connor Testimony Tr. at 15.

[103]   One of the examples provided in 5 C.F.R. 2641.201 makes clear that a government employee can be found to have participated in a particular matter even if the employee left the agency before charges were filed.  Example 1 to paragraph (h)(4) of the regulation provides as follows:  "A Government employee participated in internal agency deliberations concerning the merits of taking enforcement action against a company for certain trade practices.  He has participated in a particular matter involving specific parties and may not represent another person in connection with the ensuing administrative or judicial proceedings against the company."

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Given that all of the instances listed above involved essentially the same parties and the same underlying issue, *i.e.*, whether Stanford was engaging in a Ponzi scheme or a similar fraud, in our view, Barasch had personal and substantial involvement over a period of time in the Stanford Ponzi scheme matter that, under the applicable criminal statute, precluded him from communicating to or appearing before the SEC regarding Stanford.  In fact, Connor agreed that Barasch's earlier involvement in the 1998 inquiry, the 2002 complaint referral and the 2003 Ponzi-scheme complaint, would have barred Barasch from representing Stanford in the 2005 SEC investigation.  Connor Testimony Tr. at 13-14.

In response to Barasch's request to confirm that he had no conflicts, Connor contacted ██████ on June 20, 2005.  *See* June 20, 2005 E-mail from Richard Connor to Spencer Barasch, attached as Exhibit 170.  After Connor contacted ██████ ██████ e-mailed several members of the FWDO regarding "Stanford Group Company" and asked:

> Spence is looking to become engaged on the above referenced matter.  The matter was referred to Enforcement by [the Examination staff] via a memo dated March 14, 2005.  The memo was from Victoria, to Spence.  Does anyone know if Spence received the memo before his departure?  Did he read it?  Did anyone have any discussions with him about the matter?  I'll let the Ethics Office know.

June 20, 2005 E-mail from ██████ to Harold Degenhardt, *et al.*, attached as Exhibit 171.

On June 20, 2005, Prescott responded to ██████ e-mail:

> I had no discussions with Spence individually, but he was present (along with Hal, Julie,██████ and Cohen) at a regulatory summit meeting in Austin earlier this spring at which the general facts of the case were presented.  I did not give Spence a copy of the memo.  Although it was prepared for him, Julie and ██████ had been discussing the case, and it is my understanding that Julie forwarded the memo directly to ██████ I do not know whether ██████ discussed it with Spence or not, or whether Julie sent the memo to anyone but ██████

June 20, 2005 E-mail from Victoria Prescott to ██████, attached as Exhibit 171.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On June 20, 2005, Degenhardt responded to ███████ e-mail:

> This is really no different from the prior matter.[104]

> A memorandum was sent to Spence while here.  Whether he says that he received it, or not, is irrelevant.  He cannot represent them.  Please pass this to Ethics folks, though I would be amazed, if they had not reached this conclusion independently.

June 20, 2005 E-mail from Harold Degenhardt to ███████, attached as Exhibit 172.

On June 20, 2005, Cohen responded to Degenhardt's e-mail:

> I didn't discuss Stanford with Spence.  Anyway, I agree with your assessment Hal; even if Spence doesn't recall reading it, as preoccupied as he was at the time, it may have simply slipped his memory.  And optically, it would look very bad.

June 20, 2005 E-mail from Jeffrey Cohen to Harold Degenhardt, attached as Exhibit 172.

Connor then determined, based on the information he received from the Fort Worth staff, including Prescott, that Barasch could not represent Stanford on the basis of his attendance at a meeting with regulators in the district at which complaints about a Ponzi scheme at Stanford were discussed.  Connor Testimony Tr. at 16-18.  Connor stated, ". . . [U]pon learning more information from the staff in Fort Worth, we made the determination that Spence Barasch had participated in the Stanford matter and that he could not participate in these post-employment activities."  *Id*. at 16.[105]

On June 20, 2005, at 7:14 p.m., Alvarado e-mailed Robert Allen Stanford and Suarez about the news that Barasch could not represent Stanford:

> As you know, per your instructions, I was in the process of retaining the legal services of Spencer Barasch, the former

---

[104]   When interviewed by the OIG, Degenhardt did not recall this e-mail, but noted that Barasch would have been prevented from working on any Stanford matter that his group had worked on.  Degenhardt Interview Memorandum at 6.

[105]   Connor explained that Barasch's actions in attending a meeting at which it was discussed whether Stanford was a Ponzi scheme "would constitute participation, and that matter, whether it had been assigned a particular number or not, would be considered a continuation of . . . whatever the Fort Worth number that was assigned to it that ultimately became the Enforcement investigation.  So it would be the issues, the parties are all the same, and so that initial participation would continue right on up until a formal investigation was opened and a Fort Worth number was assigned to it."  Connor Testimony Tr. at 20.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> head of enforcement of the Dallas SEC office, currently
> with Andrews and Kurth.  However, he called me today to
> inform me that he was unable to assist us in the referenced
> matter as he was conflicted out.  It appears that he did not
> receive the okay from the office of the General Counsel of
> the SEC, as the matter started before he left the SEC.  He
> left the SEC six weeks ago.  Thus, we are not able to retain
> his services.  Thanks.

June 20, 2005 E-mail from Mauricio Alvarado to Robert Allen Stanford, attached as Exhibit 173.  On July 2, 2005, Robert Allen Stanford reacted strongly to the news, stating, "This is bs and I want to know why the SEC would /could conflict him out."  July 2, 2005 E-mail from Robert Allen Stanford to Mauricio Alvarado, attached as Exhibit 173.

We note that apart from Barasch's involvement in Stanford matters while he was at the FWDO, at the time Barasch sought to represent Stanford in June 2005, he was prohibited by the federal conflict-of interest statutes from communicating to or appearing before the SEC on *any* matter until April 13, 2006, one year after his departure.[106] During his OIG interview, Barasch stated that he did not recall having contacted the SEC in 2005 about representing Stanford, but did acknowledge he was subject to the one-year ban.  Barasch Interview Tr. at 53-54.  In fact, when the OIG first asked Barasch about his effort to represent Stanford in 2005, his immediate response was as follows:

> 2005 I had my one-year ban.  Okay.  I had a one-year
> ethical ban, because I was an SES or [Senior Officer], or
> whatever they're called.  So I couldn't practice before the
> Commission for a year.

*Id.* at 53.

---

[106]   18 U.S.C. § 207(c)(1) prohibits certain senior government officials from "knowingly mak[ing], with the intent to influence, any communication to or appearance before any officer or employee of the department or agency in which such person served within 1 year before" termination from senior service, if that communication or appearance is made "on behalf of any other person (except the United States), in connection with any matter on which such person seeks official action by any officer of employee of such department or agency . . . ."  *See also* 5 C.F.R. § 2641.204; 17 C.F.R. § 200.735-8(a)(4).  This one-year ban is not in any way limited to matters in which the former employee participated as a government employee; rather, it is "a one year across the board" prohibition on appearing before the individual's former agency.  Connor Testimony Tr. at 36-37.  Connor confirmed that Barasch was subject to the one-year ban.  *Id.* at 37.

Recipients of this report should not disseminate or copy it without the Inspector General's approval.

### B. In September 2006, Stanford Retained Barasch to Represent it in Connection With the SEC's Investigation of Stanford, and Barasch Performed Legal Work on Behalf of Stanford

Approximately one year after the SEC's Ethics Office determined that Barasch's conflicts, not the one-year ban, prevented him from representing Stanford in connection with the SEC investigation, Stanford retained Barasch to do just that.  On September 29, 2006, Robert Allen Stanford e-mailed Alvarado and James Davis, SIB's Chief Financial Officer, the following:

> The former sec [D]allas lawyer we spoke about in [S]t
> [C]roix.  Get him on board asap.

September 29, 2006 E-mail from Robert Allen Stanford to Mauricio Alvarado, attached as Exhibit 174.  Alvarado responded to Robert Allen Stanford approximately one hour later:

> I have already spoken to Spencer Barasch.  I have
> scheduled a meeting for next Tuesday in Miami in the
> afternoon.  For your information, Spencer is a partner at
> Andrews Kurth and was previously the Associate Director
> in the SEC's Fort Worth office where he headed up the
> agency's enforcement program in the Southwest.

September 29, 2006 E-mail from Mauricio Alvardo to Robert Allen Stanford, attached as Exhibit 174.

Also on September 29, 2006, Barasch e-mailed Alvarado:

> Thanks for the call this morning – I look forward to the
> opportunity to be of service to Stanford going forward.
>
> I will await instructions about where and when to meet in
> Miami on [T]uesday. . . .

September 29, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 175.  On Monday, October 2, 2006, Alvarado notified Robert Allen Stanford and Davis, "Fyi.  I will be meeting with Spencer Barasch, former SEChead [sic] of enforcement tomorrow at 3:00 PM at our offices in Miami (21st floor conference room)."  October 2, 2006 E-mail from Mauricio Alvarado to James Davis and Robert Allen Stanford, attached as Exhibit 175.

On October 3, 2006, Barasch met with Alvarado in Stanford's Miami office.  *See* Andrews Kurth billing records, attached as Exhibit 176; Barasch Interview Tr. at 52-53, 55-57.  Barasch told the OIG that, after sitting in the lobby of the Miami office for "over

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

an hour," he met with Alvarado "for 15 minutes, and all [Alvarado] did was hand[] [him] a stack of Stanford promotional documents . . . ." Barasch Interview Tr. at 56.  Barasch billed 4.5 hours for the meeting and preparation for the meeting which, according to his billing records, did not include time related to travel or review of publicly available company information to prepare on the day before for the meeting.  *See* Exhibit 176.

On October 4, 2006, the day after the meeting in Miami, Barasch followed up with Alvarado by e-mail as follows:

> I enjoyed finally meeting you yesterday.  Some follow-up thoughts/questions?
>
> (1)  Any more news from the SEC or from Antigua?  Did you actually make the trip to Antigua this morning?
>
> (2)  How is the progress on the response to the NASD?  . . .

October 4, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 177.

Alvarado responded to Barasch's e-mail, stating:

> Likewise, I am very glad that we finally met.  Responding to your questions, we have not heard anything else from the SEC today.  We are nonetheless, working on the draft response to the NASD. . . .
>
> As soon as I get back to Houston [from Antigua], I will give you a call to discuss further, and plan a strategy to follow.
>
> I am glad that you are now part of our team. I look forward to our working together.

October 5, 2006 E-mail from Mauricio Alvarado to Spencer Barasch, attached as Exhibit 177.  Barasch billed 6.5 hours to Stanford on October 4, 2006, for return travel from Miami and "review [of] documentation received from company about SEC and NASD inquiries." Exhibit 176.

On October 12, 2006, Barasch billed Stanford 0.7 hours for, *inter alia*, a "[t]elephone conference with Mauricio Alvarado regarding status of SEC and NASD matters."  *Id.*  On October 12, 2006, Alvarado e-mailed Barasch and Thomas Sjoblom, a

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

partner at Proskauer Rose LLP who represented Stanford on the SEC's investigation, the following regarding the "NASD CD Inquiry," as follows:

> Spence/Tom,
>
> Per our conversation, I am attaching for your review our proposed response to the latest NASD letter dated September 27, 2006.  Please review it and send me your comments, if any, by the end of the day tomorrow.  . . .

October 12, 2006 E-mail from Mauricio Alvarado to Spencer Barasch and Thomas Sjoblom, attached as Exhibit 178.

Barasch responded to Alvarado's request for comments the next day, October 13, 2006, stating:

> As much as I would like to offer you some brilliant suggestions, and show off my wisdom, I have nothing of substance to add.  I think the content of the response, and its tone, are excellent.
>
> I suspect that the NASD will just go through the motions to satisfy the SEC.

October 13, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 179.  Alvarado forwarded Barasch's comments to Robert Allen Stanford on October 13, 2006, with the introduction, "FYI.  This is the feedback from the former SEC person in Fort Worth in relation to our proposed draft letter to the NASD."  October 13, 2006 E-mail from Mauricio Alvarado to Robert Allen Stanford, attached as Exhibit 180.

In his SEC interview, Barasch told the OIG that Alvarado had asked him to review a draft letter to the NASD, but that he had only "looked at it for two minutes." Barasch Interview Tr. at 59.  Barasch stated that he wrote him back and said "something like . . . , 'Hey, as much as I'd like to tell you I have pearls of wisdom, I have nothing to add.'"  *Id.*  Barasch said that his two-minute review of the draft letter "was the extent of [his] involvement with Stanford."  *Id.* at 59-60.[107]

On October 16, 2006, Barasch e-mailed Bernerd Young, SGC's Chief Compliance Officer, stating, "Get back to me on dates for Antigua – if not too far out,

---

[107]    In fact, as demonstrated in this section of the report, the OIG found evidence that, in addition to reviewing the draft letter to the NASD, Barasch had met with Stanford General Counsel Alvarado, reviewed documentation received from the company, and participated in conference calls with Alvarado, and in connection with this work billed a total of approximately 12 hours to Stanford.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

week of November 13th would be great." October 16, 2006 E-mail from Spencer Barasch to Bernerd Young, attached as Exhibit 181. In response, Young e-mailed a Stanford employee the same day as follows:

> I was speaking to Mauricio [Alvarado] at the Jean Gilstrap awards Friday night and he would like me to bring our outside counsel, Spencer Barasch to visit the Bank. Mauricio would like this done in the next few months if possible. Please send me your availability through the end of the year, I will coordinate with Mr. Barasch and then coordinate with your staff.

October 16, 2006 E-mail from Bernerd Young to Juan Rodriguez-Tolentino, attached as Exhibit 182. Four days later, on October 20, 2006, Young e-mailed another Stanford employee to arrange for Barasch's visit as follows:

> As you can see below, I have been requested by Mauricio Alvarado to bring our securities outside counsel to view your fine facilities. On Tuesday, Mauricio again requested (in Mr. Stanford's presence no less) that this meeting be accomplished ASAP.
>
> If you or Juan can provide me with a couple of available dates, I will run it by Mr. Barasch and let you know.
>
> If you are not the right person, I apologize, and please point me in the right direction.

October 20, 2006 E-mail from Bernerd Young to ▮▮▮Stanford Empl 7▮▮▮, attached as Exhibit 183.

On October 26, 2006, the Commission issued a formal order of investigation in the Stanford matter. Exhibit 148. On November 20, 2006, the SEC staff had a conference call with Sjoblom. *See* November 21, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 184. The next day, November 21, 2006, at 11:07 a.m., Stanford counsel Sjoblom sent Alvarado an e-mail with the subject "Spencer Barasch." November 21, 2006 E-mail from Thomas Sjoblom to Mauricio Alvarado, attached as Exhibit 185. Sjoblom's e-mail stated:

> . . . [D]o you have Spencer's phone number and name of his law firm. I am sending the letter to the SEC requesting formal order. So that I get the formal order, I need to also tell them that I will accept service, but will not be back until late next week. So, don't send subpoenas until then.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

*Id.*  Approximately one hour later, at 12:20 p.m., Alvarado sent Sjoblom the requested contact information for Barasch.  November 21, 2006 E-mail from Mauricio Alvarado to Thomas Sjoblom, attached as Exhibit 185.

An e-mail sent later that day, at 2:57 p.m., from Barasch to Alvarado suggests that Barasch and Sjoblom may have discussed the SEC investigation after Sjoblom received Barasch's contact information.  In that e-mail, Barasch stated:

> Would you ask Tom [Sjoblom] if he recalls who the other
> SEC person was that called him yesterday?  *[M]ay be*
> *somebody I know well and can call for info.*

Exhibit 184 (emphasis added).  Alvarado responded a few minutes later, "He told me that the call was from ENF Staff Atty 5 and the new Chief."  November 21, 2006 E-mail from Mauricio Alvarado to Spencer Barasch, attached as Exhibit 184.  Barasch replied, "'New chief' could mean a number of people -- if he has the name, it would help. [I]f not, no big deal."  Exhibit 184.  Alvarado then asked Sjoblom, "What are the names of the SEC folks who called you yesterday?"  November 21, 2006 E-mail from Mauricio Alvarado to Thomas Sjoblom, attached as Exhibit 186.  Alvarado e-mailed Barasch, "He did not get the name."  November 21, 2006 E-mail from Mauricio Alvarado to Spencer Barasch, attached as Exhibit 184.[108]

On or about November 27, 2006, Barasch spoke with Cohen about Stanford.  *See* November 27, 2006 E-mail from Spencer Barasch to Jeffrey Cohen, attached as Exhibit 187.  Barasch told the OIG that he had called and talked to ENF Staff Atty 5 or left a voice-mail for ENF Staff Atty 5 and Cohen called him back.  Barasch Interview Tr. at 64.  Barasch said he knew he "talked to [Cohen.]"  *Id.*  Barasch stated that Cohen asked him during the conversation, "Spence, can you work on this?"  *Id.*  According to Barasch, Cohen told him, ". . . I'm not sure you're able to work on this[,]" and Barasch replied, "I'm already talking to Rick Connor about it."  *Id.*  Cohen testified that Barasch may have called him, but that he did not remember any "specifics" of the conversation, although he said he thought that he remembered talking to Barasch "about the prospects of his getting involved in the case . . . ."  Cohen Testimony Tr. at 111-112.[109]

---

[108]  Barasch's Stanford billing records do not have an entry for November 21, 2006.  *See* Exhibit 176.  The last date in November 2006 that Barasch billed time to the Stanford account was November 13, 2006.  *Id.*  On November 13, 2006, Barasch billed Stanford 0.3 hours for a "[t]elephone conference with Mauricio Alvarado regarding status of SEC and NASD inquiries."  *Id.*

[109]  If Barasch did, in fact, discuss the substance of the SEC's investigation of Stanford in the telephone call with Cohen, Barasch could have made a communication to his former agency with intent to influence in violation of 18 U.S.C. § 207(a)(1).  Under 5 C.F.R. 2641.201(d), "[a] former employee makes a communication when he imparts or transmits information of any kind, including facts, opinions, ideas, questions or direction, to an employee of the United States, whether orally, in written correspondence, by electronic media, or by any other means."  A communication "is made with the intent to influence when made for the purpose of… (ii) Affecting government action in connection with an issue or aspect of a
(Footnote continued on next page.)

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

C.    **In Late November 2006, After He Had Already Performed Legal Work on Stanford's Behalf, Barasch For the Second Time Sought SEC Approval to Represent Stanford and Was Again Told He Could Not Do So**

On November 27, 2006, Barasch belatedly sought permission from the SEC's Ethics Office to represent Stanford.  *See* November 27, 2006 E-mail from Spencer Barasch to Jeffrey Cohen, copying Richard Connor, attached as Exhibit 187.  On November 27, 2006, Barasch e-mailed Cohen the following:

> Jeff –
>
> FYI, I just talked to Rick Connor in the GCs office and shared with him our conversation about Stanford -- I am sure he will be following up with you soon.

*Id.*[110]  Also on November 27, 2006, Preuitt e-mailed [ENF Staff Atty 5]:

> March 22[nd] 2005 -- the last summit meeting that Spence attended.  It was in Austin and Victoria made a presentation regarding Stanford.  I cannot find my notes, but I would swear in court that he was in attendance at that meeting and that Victoria discussed Stanford.  He was familiar enough with the issue that he was negative on the case and the idea that we would ever be able to do anything about Stanford during the meeting.  Victoria will be back tomorrow and she may have notes regarding the specifics of what she discussed regarding Stanford.  Spence was very aware of the firm and its activities, but some of that may have been from our earlier attempt to get enforcement to take action against the firm in either 1997 or 1998.  I will look to see if Spence was e-mailed the Stanford report and referral memo.  I'm not certain he ever saw that because it was given to [ENF Asst Dir 1] to discuss with us.[111]

---

matter which involves an appreciable element of actual or potential dispute or controversy."  5 C.F.R. § 2641.201(e).  However, we found no specific evidence that such a violation occurred.

[110]  As discussed above, Barasch had already been denied permission from the SEC's Ethics Office to represent Stanford in the SEC investigation in June 2005.

[111]  Five minutes after sending this e-mail, Preuitt forwarded to [ENF Staff Atty 5] her April 5, 2005 e-mail to [ENF Asst Dir 1] with the referral memorandum and stated:

> The e-mail below suggests strongly that Spence had not looked at the memo.  I really don't think that he did.

(Footnote continued on next page.)

**177**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

November 27, 2006 E-mail from Julie Preuitt to ▮▮▮▮▮▮▮, attached as Exhibit 189.[112]

On December 13, 2006, Prescott e-mailed Connor and copied Preuitt the following:

> I have been out of the office, and this morning received your voice mail inquiry about the location of the meeting in which Stanford was discussed as a possible enforcement matter.  My recollection is that this was at one of the meetings among regulators in our district that occurs quarterly, and that this particular meeting was in Austin, Texas.

December 13, 2006 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit 190.  Preuitt responded to Prescott, stating:

> I gave him the same information yesterday.  Spence had told them that he didn't recall the meeting and wanted to know where it was held.

December 13, 2006 E-mail from Julie Preuitt to Victoria Prescott, attached as Exhibit 191.

Sometime after Connor was reminded by Preuitt and Prescott about Barasch's prior involvement in the Stanford matter, Connor called Barasch and told him that he could not represent Stanford on the SEC investigation and made reference to Barasch's attendance at Prescott's presentation during the March 2005 meeting of regulators.  Barasch Interview Tr. at 58; *see also* Connor Testimony Tr. at 16.  Barasch told the OIG that he asked Connor to reconsider as follows:

> . . . [S]o I said, "Rick, if that's the sole basis for me to hav[e] a conflict on this, I have to tell you, one I don't remember it.  Two, the discussions at these meetings, these roundtables, are so superficial, and at such a high level, you

---

I don't know that discussions at a meeting about a situation he was already familiar with would preclude him or not.

November 27, 2006 E-mail from Julie Preuitt to ▮▮▮▮▮▮▮ attached as Exhibit 188.

[112]  Preuitt testified that the SEC Ethics Office requested information about how much involvement Barasch had with SEC investigations of Stanford while he was with the SEC, and she "specifically referred them to . . . a summit meeting with the other regulators in the district," at which they discussed Stanford at length.  Preuitt December 14, 2009 Testimony Tr. at 77-78.

**178**

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> know, I can't imagine that anything of any significance
> there would have been [discussed]." I said, "Would you
> please reconsider[?]" I needed the work. But I wanted it to
> be ethical work.

Barasch Interview Tr. at 58-59. Barasch stated that Connor called him back again and told him that he could not represent Stanford on the SEC investigation, and that Barasch then called Alvarado and relayed that decision. *Id.* at 59-60.

Barasch further told the OIG that when Connor informed him that he was prohibited from working on the Stanford investigation, Barasch "had done absolutely nothing to that point," and that Alvarado had not yet asked him to do anything. *Id.* at 59. Barasch told the OIG that, as discussed above, what he described as a two-minute review of a draft letter to the NASD "was the extent of [his] involvement with Stanford." *Id.* at 59-60.[113] As shown above, by the time he contacted Connor on November 27, 2006, Barasch had already met with Stanford's General Counsel, participated in telephone conferences with him and reviewed pertinent documentation, resulting in billings to Stanford of approximately 12 hours. *See* Exhibit 176.

It appears to the OIG that Barasch's representation of Stanford may have violated the District of Columbia and Texas Bar rules of professional conduct.[114] As discussed above, the DC Bar's Rules of Professional Conduct state that "[a] lawyer shall not accept other employment in connection with a matter which is the same as, *or substantially related to*, a matter in which the lawyer participated personally and substantially as a public officer or employee." District of Columbia Rule of Professional Conduct 1.11 (emphasis added). *See* Exhibit 48.[115] The Texas Disciplinary Rules of Professional Conduct state that "a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or

---

[113] Barasch told the OIG that Alvarado had set up a phone call with Sjoblom and him "to talk about the case, "but he was in Dubai on a case and couldn't make the call." Barasch Interview Tr. at 59. So, according to Barasch, they "never had the call." *Id.* Sjoblom sent an e-mail to Barasch and Alvarado on December 6, 2006, containing dialing instructions for a conference call. December 6, 2006 E-mail from Thomas Sjoblom to Spencer Barasch and Mauricio Alvarado, attached as Exhibit 192. Barasch replied, "What day? I am in [D]ubai through [F]riday," and Alvarez responded, "Please call me when you come back." *Id.*

[114] Barasch is admitted to practice law in both the District of Columbia and the State of Texas. *See* Barasch biography, attached as Exhibit 193.

[115] The inquiry under Rule 1.11 "is a practical one asking whether the two matters substantially overlap." *In re Sofaer*, 728 A.2d 625, 628 (D.C. 1999)(footnote omitted). The D.C. Court of Appeals noted as follows regarding the language of Rule 1.11: "By announcing an approach that deems transactions substantially related if the former government attorney may have had access to any information that could be useful – not just legally relevant – in the later transaction . . . we have broadened the scope of the substantially related test for revolving door purposes." *Brown v. District of Columbia Board of Zoning Adjustment*, 486 A.2d 37 (D.C. 1984)(quotations and parenthetical omitted).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

employee, unless the appropriate government agency consents after consultation." *See* Exhibit 47.[116]   Accordingly, the OIG is referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Office of Bar Counsel for the District of Columbia and the Chief Disciplinary Counsel for the State Bar of Texas.

### D.   Immediately After the SEC Sued Stanford on February 17, 2009, Barasch Again Sought to Represent Stanford, This Time in the Litigation

Despite having had significant responsibility for delaying the initiation of an SEC investigation into Stanford's Ponzi scheme for seven years and having been advised by the SEC's Ethics Office on two separate occasions that he could not represent Stanford in connection with the SEC's investigation, on the very day that the SEC filed its action against Stanford, Barasch contacted the SEC's Ethics Office a third time in an effort to represent Stanford.

On February 17, 2009, Barasch sent an e-mail to Connor, stating:

> I hope this e-mail finds you well and that you are surviving all the turmoil on Wall Street.
>
> I have a conflict related question [f]or you, where time is of the essence.  It involves the Stanford matter filed by the Fort Worth office today that has been all over the news.
>
> Would you please call me the first chance you get:  if I am not in my office you can try my cell anytime, . . . .

February 17, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 194.

Connor stated that he could not recall another occasion on which a former SEC employee contacted his office on three separate occasions trying to represent a client in the same matter.  Connor Testimony Tr. at 27.

---

[116]   In contrast to the Texas and District of Columbia rules of professional conduct, with the exception of the one-year ban, federal conflicts-of-interest statutes do not *per se* prohibit a former SEC employee from representing a party in connection with a matter in which he or she participated while employed at the SEC. Instead, the federal statutes impose a narrower ban on former government employees against knowingly make a communication or appearance before an officer or employee of a federal agency or court on behalf of another person in connection with a particular matter (A) in which the United States is a party or has a direct and substantial interest, (B) in which the person participated personally and substantially as an officer or employee, and (C) which involved a specific party or parties at the time of the participation.  18 U.S.C. § 207(a)(1).  "Behind-the-scenes assistance" is not prohibited, "provided that the assistance does not involve a communication to or an appearance before an employee of the United States."  5 C.F.R. § 2641.201(d)(3).

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Connor testified:

> [I]t struck me as unusual that [Barasch] would be coming
> back for a matter that obviously he would have known that
> he had been told he couldn't participate in the matter . . .
> on two [previous] occasions.

*Id*. at 44-45.

Barasch described the circumstances of his third request to represent Stanford as follows:

> 2009 the whole thing[] blows up.  Every lawyer in Texas
> and beyond is going to get rich over this case.  Okay?  And
> I hated being on the sidelines.  And I was contacted right
> and left by people [to] represent them.

Barasch Interview Tr. at 61.[117]

On February 19, 2009, Prescott e-mailed Connor, "I tried to return your call last evening, but missed you.  Since then, I found an old e-mail that I think pertains to the question being raised. I will forward it to you."  *See* February 19, 2009 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit 195.  Prescott then forwarded to Connor the e-mail she had sent him on December 13, 2006, in connection with the last time Barasch had sought clearance to represent Stanford.  February 19, 2009 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit 196.  Connor replied to Prescott, "Thanks for your help. This is all we need for now."  February 19, 2009 E-mail from Richard Connor to Victoria Prescott, attached as Exhibit 196

Connor testified that ". . . Barasch was upset with [the Ethics Office's] decision [that he could not represent Stanford]. . . .  He . . . strongly argued that the matter currently in 2009 was new and was different and unrelated to the matter that had occurred before he left."  Connor Testimony Tr. at 27.  In a February 23, 2009 e-mail to Connor, Barasch disagreed with the SEC's position that he could not represent Stanford in the SEC litigation because of his past involvement in the SEC matter.  *See* February 23, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 197.  Barasch cited statements in the press by Stephen Korotash, Associate Regional Director of the FWDO Enforcement group, that "[t]he current S.E.C. charges stem from an inquiry opened in

---

[117]   Barasch explained that "this [was] four years after he left the Commission" and he did not think "this would be a matter that would still be lingering…"  Barasch Interview Tr. at 61.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

October 2006 after a routine examination of Stanford Group"[118] in support of his argument as follows:

> Please review the information noted below, and then I would like to talk with you as soon as reasonably possible. With all due respect to the persons with whom you are dealing in the FWDO, I don't think they have their facts and information correct. I left the Commission on April 15, 2005, more than one year before the SEC's Associate Director in charge of "this matter" has publicly acknowledged that "this matter" arose. (although irrelevant here, I reiterate that to the extent that there was a "prior matter," I had no involvement in it, either).
>
> Rick, the Commission seems to be taking a different position on the date of "this matter" with me than it appears to be taking publicly. Maybe I am missing something, but it seems pretty self-evident to me that there is no conflict in this matter. I have copied my firm's General Counsel, who is in agreement with me.

*Id.*

In his OIG interview, Barasch described the basis for his belief at the time that the SEC action must have been unrelated to any matters that he had been involved with while at the SEC, as follows:

> . . . I said, "Hey, Rick. This is a new matter. I'd like to work on it. I don't know how or what, yet, but I'm getting lots and lots of calls." . . . And then somewhere right about that time, right then the staff is getting slammed in Fort Worth for, you know, why did it take so long. And the question was when did this thing start. When did this matter start, and Steven Korotash . . . [was] quoted in the "Journal" and the "Times." "This matter didn't start until 2006." There's a quote. . . . So I send [the articles] to Rick, and I go, "Hey, here's my proof, and this is a new matter. It's right there." Steve [Korotash] says, "This

---

[118] *See* Clifford Krauss, Phillip L. Zweig and Julie Creswell, *Texas Firm Accused of $8 Billion Fraud*, The New York Times, February 17, 2009, attached as Exhibit 198. Barasch also cited a Wall Street Journal article in support of his argument that he did not have a conflict representing Stanford in the SEC litigation. *See* Glenn R. Simpson, Dionne Searcey and Kara Scannell, *Madoff Case Led SEC to Intensify Stanford Probe*, Wall Street Journal, February 19, 2009, attached as Exhibit 199.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> matter started in '06." That was a year after I left. So the
> way I see it, I could work on it.

Barasch Interview Tr. at 61-62. Barasch told the OIG that Connor called him and
responded:

> . . . I don't remember the words he used, but it was
> something along the lines that Steven misspoke. . . . And
> that the matter really did go back before that . . . . So what
> was left out there in the press was '06, but he was telling
> me it was something earlier, and I wasn't going to argue
> with him. I didn't want to embarrass his staff or Steve, or
> anything, so I just absolutely dropped it.

*Id.* at 62-63.[119]

> Subsequently, on March 9, 2009, Barasch e-mailed Connor as follows:

> Based on our last conversation on this issue, it is my
> understanding that the Commission's position is that I have
> a conflict and should not participate in "the SEC matter" in
> which I allegedly participated back in 2005. To the extent
> that my firm participates in "that SEC matter," I will be
> walled off …. I am writing to let you know that I am
> intending to participate, on behalf of one or more former
> Stanford employees (who, by the way, joined Stanford after
> 2005), in different matters, specifically private litigation
> and/or regulatory inquiries by a State securities regulator.
> Please advise asap if you believe that this presents any
> issues.

March 9, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 200.

---

[119]   Connor disagreed with Barasch's position that the matter began in 2006, testifying as to his perspective
as follows:

> [T]he matter did not start in 2006, and I don't know exactly what the basis was for
> [Korotash] to say that it did. But from our perspective, from the ethics perspective, the
> matter had clearly started long before that. It had started back when Mr. Barasch was
> here, and it was a continuation of the same matter. It was a matter involving, among
> other things, a Ponzi scheme by Stanford, and that . . . matter had started much earlier
> and had continued as the same matter right up to the time we were talking.

Connor Testimony Tr. at 26.

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Connor responded:

> Your participation in the other Stanford matters does not
> violate the post-employment laws.  Your prohibition
> applies only to appearing before or communicating with the
> federal government in connection with the same matter that
> you participated in while at the SEC.

March 10, 2009 E-mail from Richard Connor to Spencer Barasch, attached as Exhibit 200.

## CONCLUSION

The OIG investigation found that the SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to that conclusion a mere two years after SGC, Stanford's investment adviser, registered with the SEC in 1995.  We found that over the next eight years, the SEC's Fort Worth Examination group conducted four examinations of Stanford's operations, finding in each examination that its sale of CDs through SIB could not have been "legitimate," and that it was "highly unlikely" that the returns Stanford claimed to generate could have been achieved with its purported conservative investment approach.  While the Fort Worth Examination group made multiple efforts after each examination to convince Enforcement to open and conduct an investigation of Stanford, no meaningful effort was made by Enforcement to investigate the potential fraud, or to bring an action to attempt to stop it, until late 2005.

Moreover, the OIG investigation found that even at that time, Enforcement missed an opportunity to bring an action against SGC for its admitted failure to conduct any due diligence regarding Stanford's investment portfolio, which could have potentially completely stopped the sales of the SIB CDs through the SGC investment adviser, and provided investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  The OIG investigation found that this particular type of action was not considered, partially because the new head of Enforcement in Fort Worth was not apprised of the findings in the investment advisers' examinations in 1998 and 2002, or even that SGC had registered as an investment adviser, a fact she learned for the first time in the course of this OIG investigation in January 2010.

The OIG did not find that the reluctance on the part of the SEC's Fort Worth Enforcement group to investigate or recommend an action against Stanford was related to any improper professional, social or financial relationship on the part of any former or current SEC employee.  We found evidence, however, that SEC-wide institutional influence within Enforcement did factor into the repeated decisions not to undertake a full and thorough investigation of Stanford, notwithstanding staff awareness that the potential fraud was growing.  We found that senior Fort Worth officials perceived that

**Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

they were being judged on the numbers of cases they brought, so-called "stats," and communicated to the Enforcement staff that novel or complex cases were disfavored.  As a result, cases like Stanford, which were not considered "quick-hit" or "slam-dunk" cases, were not encouraged.

The OIG's findings during this investigation raise significant concerns about how decisions were made within the SEC's Division of Enforcement with regard to the Stanford matter.  We are providing this Report of Investigation ("ROI") to the Chairman of the SEC with the recommendation that the Chairman carefully review its findings and share with Enforcement management the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, if applicable) is taken, on an employee-by-employee basis, to ensure that future decisions about when to open an investigation and when to recommend that the Commission take action are made in a more appropriate manner.

The OIG is also recommending that the Chairman and the Director of Enforcement give consideration to promulgating and/or clarifying procedures with regard to:

(1)     the consideration of the potential harm to investors if no action is taken as a factor when deciding whether to bring an enforcement action, including consideration of whether this factor, in certain situations, outweighs other factors such as litigation risk;

(2)     the significance of bringing cases that are difficult, but important to the protection of investors, in evaluating the performance of an Enforcement staff member or a regional office;

(3)     the significance of the presence or absence of United States investors in determining whether to open an investigation or bring an enforcement action that otherwise meets jurisdictional requirements;

(4)     coordination between the Enforcement and OCIE on investigations, particularly those investigations initiated by a referral to the Enforcement by OCIE;

(5)     the factors determining when referral of a matter to state securities regulators, in lieu of an SEC investigation, is appropriate;

(6)     training of Enforcement staff to strengthen their understanding of the laws governing broker-dealers and investment advisers; and

(7)     emphasizing the need to coordinate with the Office of International Affairs and the Division of Risk, Strategy, and Financial Innovation, as appropriate, early

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

in the course of investigations in which relevant documents, individuals, or entities are located abroad.

The OIG investigation also found that the former head of Enforcement in Fort Worth, Spencer Barasch, who played a significant role in multiple decisions over the years that quashed the investigations of Stanford, sought to represent Stanford on three separate occasions after he left the Commission, and in fact represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so. Because the OIG found that Barasch's representation of Stanford appeared to violate state bar rules that prohibit a former government employee from working on matters in which that individual participated as a government employee, we are referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Bar Counsel offices in the two states in which he is admitted to practice law.

**Submitted:** OIG Staff 1      **Date:** PII

**Concur:** OIG Staff 2      **Date:** PII

**Approved:** H. David Kotz      **Date:** 3·31·10

151

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS | § | |
| COURT-APPOINTED RECEIVER FOR THE | § | |
| STANFORD INTERNATIONAL BANK, LTD., | § | |
| ET AL. | § | |
| | § | Case No. 03:09-CV-0724-N |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES R. ALGUIRE, ET AL. | § | |
| | § | |
| Defendants. | § | |

---

**DECLARATION OF**
**KEVIN M. SADLER**

---

I, Kevin M. Sadler of 98 San Jacinto Blvd. Suite 1500, Austin, Texas, 78701 state on oath as follows:

1.      I am lead counsel for Receiver Ralph S. Janvey.  The statements made in this declaration are true and correct based on the knowledge I have gained during my representation of the Receiver.

2.      This declaration is filed in support of the Receiver's application for temporary restraining order, preliminary injunction, and writ of attachment.

3.      This writ of attachment is not sought for the purpose of injuring or harassing the Accountholders subject to this application, but only to ensure the Receiver does not lose the debt owed to him by those Accountholders.

4.     As set forth in detail in the attached Van Tassel Declaration, the Accountholders subject to this application are justly indebted to the Receiver for $139,987,649.

5.     The Receiver will probably lose his debt unless this writ of attachment is issued.

6.     More than 2/3 of the Accountholders reside outside of Texas (80 of the 117).

7.     The Receiver has been unable to serve 19 of the Accountholders, despite a diligent effort.

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746. Executed this 26 day of March 2010.

Kevin M. Sadler

# EXHIBIT 7



**STANFORD FINANCIAL GROUP**

*Feb - 26 - 05*
*Bonus levels*
*30 → 33*
*40 → 44*
*50 → 55*

**R. ALLEN STANFORD**
Chairman & CEO

April 19, 2004

Mr. David Nanes
President
Stanford Group Mexico, S.A. de C.V.

Dear David,

Per our meeting of yesterday regarding your base salary and bonus compensation, I have outlined below the figures we agreed upon.

1.  I have authorized the adjustment to your base salary effective April 15, 2004. Gil Lopez will contact you today to confirm this.

2.  The bonus program that you were previously on will now be amended to reward you upon your team achieving the following net production amounts during a calendar quarter:

    30M (Net Production) will equal a bonus amount of 350k

    40M (Net Production) will equal an additional 350k or 700k total

    50M and above (Net Production) will equal an additional 350k or 1.05M total which is the maximum amount to be paid during any quarter.

3.  If you personally finish within the top five of our quarterly TPC Competition you will receive a payment of 100k.

4.  I feel this is a very fair and equitable financial reward based upon the responsibilities and production expectations that I have given you. I will review this compensation structure with you in our quarterly TPC meeting one year from now in April 2005.

David, I have given a tremendous amount of responsibility to you and have placed a tremendous amount of confidence and trust in you in leading our operations in Mexico. I will expect nothing less than a 100% effort every single day from you in leading your team to reach levels of growth never before imagined. I also expect you to be a role model for all the TPC teams as you not only lead your team but also continue to produce individually. I cannot over emphasize the importance you play in our collective efforts to reach our goal of 6.5Bn in Total Assets at SIB by December 31, 2006.

I will work closely with you and Gonzalo in face-to-face meetings at least once a month in Antigua. Our first scheduled meeting being at 10:00 AM Tuesday May 18, 2004 at SIB.

Please acknowledge receipt and agreement with this by signing below.

Growth!...Growth!...Growth!...

R. Allen Stanford                                          _____

R. Allen Stanford                                          David Nanes

STANFORD FINANCIAL GROUP COMPANY • 5050 Westheimer • Houston, Texas 77056 USA
(713) 964-5100 • (713) 964-5101 Voice Mail • (713) 964-5110 Fax

# EXHIBIT 8

From: Davis, James
Sent: Wednesday, March 19, 2008 8:31 PM
To: Pendergest, Laura
Subject: RE: Upcoming Call with FA's


915a here

-----Original Message-----
From: Pendergest, Laura
Sent: Wednesday, March 19, 2008 3:19 PM
To: Davis, James
Subject: RE: Upcoming Call with FA's

When?  I am at your disposal...

-----Original Message-----
From: Davis, James
Sent: Wednesday, March 19, 2008 3:13 PM
To: Pendergest, Laura
Subject: RE: Upcoming Call with FA's

Before the call, we need to have a short overview of these===and other===questions.


-----Original Message-----
From: Pendergest, Laura
Sent: Wednesday, March 19, 2008 2:40 PM
To: Green, Jason; Bogar, Danny; Weiser, Charles; Davis, James
Cc: Batarseh, Jonathan T
Subject: RE: Upcoming Call with FA's

I am fine with either approach, but I don't see any reason to not wait and answer all questions
tomorrow.  I am sure if he has these questions others will as well.  Therefore, it may make more
sense to answer them all at one time vs. a piecemeal approach.  I am open to suggestions, though, so
please let me know.

Thanks,
Laura

-----Original Message-----
From: Green, Jason
Sent: Wednesday, March 19, 2008 2:31 PM
To: Pendergest, Laura; Bogar, Danny; Weiser, Charles
Cc: Batarseh, Jonathan T
Subject: Fw: Upcoming Call with FA's

Laura, Chuck, and Danny,

This is a heads up. See Roberto's email to Scott, Eddie and me below. I don't know how many of these
questions will actually be asked tomorrow.  Do we want to preemptively address some of these today?
Please let me know your thoughts.

Thanks,
Jason

----- Original Message -----
From: Ulloa, Roberto
To: Chaisson, Scott S.
Cc: Carreno, Eddie M.; Green, Jason
Sent: Wed Mar 19 14:25:46 2008
Subject: Upcoming  Call with FA's

The following would be my questions:


Liquidity funding, how SGC does it?

**190**

Which banks provide liquidity funding to SGC?

SIB's funding sources other than CDs?

SIB's Equity Investments, what percentage is private?

Have we reduced/increased our exposure to financials?

How leveraged is Stanford, is it 30 to 1 like most investment banks?

Roberto

_____

Roberto Ulloa

Senior Vice President

Financial Advisor

STANFORD GROUP COMPANY

MEMBER FINRA/SIPC

   201 South Biscayne Blvd.,

   21st Floor

   Miami, Florida 33131

   Tel: 305-347-2430

   Fax: 305-579-0155

rulloa@stanfordeagle.com <mailto:rulloa@stanfordeagle.com>

# EXHIBIT 9



*Innovative Strategies for Environmental Liability Management*

*Two Midtown Plaza, 1349 West Peachtree Street, Suite 2000, Atlanta, GA 30309*
*Tel: (404)347-9050   Fax: (404)347-9080*

## FACSIMILE TRANSMITTAL

DATE: _2-22-07_

TO: _Mark Burke_

FAX NUMBER: _404-231-6205_

FROM: _Billy Hall_

PROJECT: _____

SUBJECT: _____

**NUMBER OF PAGES INCLUDING COVER SHEET:** _3_

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

MESSAGE:

**CONFIDENTIALITY NOTICE**

The Material contained in this facsimile is intended for the name recipient only. It may contain privileged and confidential information. If you are not the intended recipient(s), you must not copy, distribute, take any action in reliance upon, or disclose any details contained in this facsimile to any person. If you have received this facsimile in error, please destroy it immediately and contact us at (404)347-9050.

*P/S. fax to
Mark Beuke
Stanford Group*

*Mark Beuke
404-231-6205*

# Analysis of Investing in a Certificate of Deposit with the Stanford International Bank

<u>Summary:</u>

As an offshore bank focused on growth, Stanford International Bank offers interest rates on certificates of deposit that are very competitive and typically higher than its U.S. bank counterparts. Though these rates can be attractive, a closer look at the bank's history, the bank's financials, and the general risks of investing offshore should give investors considerable pause before investing.

<u>Recent History:</u>

Stanford International Bank was established in 1985 and is domiciled in Antigua. Its aggressive focus on asset growth has enabled the firm to grow from $2.2B in assets in 2003 to $4.1B in assets in 2005. This growth has been filled primarily by international clients seeking privacy in the Caribbean banking industry. **With the promise of privacy and minimal government interference, Caribbean banks, including Stanford Bank, have become a haven for international drug cartels.** On April 6, 1998, a U.S. federal magistrate judge issued an order to Stanford Bank freezing the accounts of Zepeda and Bastida, Mexican based international drug cartels.

**The bank's chairman, R. Allen Stanford, has been the target of criticism by U.S. State Department and Treasury officials for using his financial and political clout in Antigua to gain control of the government office that regulated his and other banks.** A recent article in the Philadelphia Inquirer writes:

> *"One State Department cable from the American Embassy in Barbados said Stanford employees wrested control of bank files from a government office with the aim of purging information that might be damaging to Stanford's banking business....When Stanford allies seized government banking records from an Antiguan agency they were seeking to replace, it was the last straw for U.S. officials saying it was unacceptable for Stanford, owner of one of the country's largest offshore banks, to have so much influence over the Antiguan agency that regulated his interests."[1]*

<u>Bank Financials:</u>

A close look at Stanford's financials reveals a strikingly different business model to that of their U.S. banking counterparts. This can be summed up in their own strategy statement, found on the company's website:

> *"Most banks generate their profits on the margin between interest and fees earned on loans and other credit facilities and interest paid on deposits...SIB's business model is different. Although the Bank earns income from credit facilities and fees, the majority of the Bank's assets are invested in globally diversified portfolios."[2]*

Most U.S. banks take the investor's deposit, loan the money to a borrower, and then pay CD interest to the investor from the interest made on the loan. However, Stanford Bank invests the deposit into a portfolio of securities. **The bank relies on the appreciation of their investments in the global stock markets to provide a large enough return on investment to pay the guaranteed interest on the CDs.** This portfolio consists of 55% Equities, 23% Fixed Income, and 22% Other (metals and alternatives)[3]. This is similar in many ways to a mutual fund, but with one distinct difference – a mutual fund does not guarantee returns. The primary reason that a mutual fund would not typically guarantee this type of return is because a portfolio represented by over 55% Equities is exposed to substantial volatility and risk. Though a bull-market can be rewarding, a sustained bear-market can be a potential disaster for investors holding CDs backed by this strategy.

**In addition to the market risk found in the underlying portfolio, it appears that the bank may be susceptible to a dependence on new deposits and renewed certificates in order to continue paying investors the guaranteed CD interest and the principal of maturing CDs.** This is because the liabilities, primarily consisting of CD obligations, are close to equaling the bank assets. According to the annual report, the Total Assets were $4.06 billion at the end of 2005[4]. However, the outstanding Liabilities total $3.77 billion[4]. In the event that the assets, consisting primarily of equities, dropped only 7%, then the bank's liabilities would most likely exceed the total assets and the bank would face the real possibility of missing interest and/or principal payments. One does not have to look very far back to be reminded of a

193

time when global equities experienced a significant decline. During 2001-2003 the global equities markets dropped 43%[5].



## Offshore Risks:

Though not without its shortfalls, the U.S. financial markets provide more corporate accountability and investor transparency than any other country. This is largely due to the oversight of government and quasi-government agencies. Investing overseas – particularly in small countries such as Antigua – can be very risky. The governments in these countries are usually not equipped to regulate their financial markets and protect investors. The government of Antigua, for example, regulates their banking industry through their Financial Services Regulatory Commission. The commission is responsible for the regulation and supervision of all licensed banking institutions in Antigua. **These institutions are subject to annual on-site examinations to ascertain their compliance with the relevant laws, regulations and international standards. But with a staff of only 3 bank examiners[6], it may be difficult to conduct thorough examination of a bank with over $4 billion in assets.**

In addition to the superior regulatory oversight in the US banking industry, the FDIC insurance program provides up to $100,000 of government-backed insurance on each account held within qualified banks. This is an added layer of comfort for an investor purchasing CDs. **Investments offered by offshore banks are typically backed only by the full faith and credit of that bank.**

## Competitive Alternatives

Considering the level of portfolio risk, business risk, and offshore investment risk of a CD offered by Stanford Bank, it may be prudent to consider competitive alternatives. A few alternatives are listed below:

- US Bank CDs
    o Rates for 12 month CDs are currently yielding 5.5 – 5.7%[7]
    o FDIC insured up to $100,000 per bank CD
    o Low risk of loss of principal

- Georgia Municipal Bonds
    o Laddered portfolio of bonds can reduce interest rate risk and geographic risk
    o Most bonds are insured and have AAA rating
    o **Yields up to 5%, Federal and State taxable equivalent yield up to 8.47%[8]**
    o Low risk of loss of principal if bonds held to maturity

- Municipal Bond Mutual Fund
    o Managed portfolio of municipal bonds
    o Security of investing in US municipal market
    o Purchase and eventual sale is simplified
    o **Yields up to 5%, Federal taxable equivalent yield up to 7.7%**
    o Risk of loss of principal can be minimized (shorter maturity)

1. *Philadelphia Inquirer*
2. *www.StanfordInternationalBank.com*
3. *2005 Annual Report: Note 12*
4. *2005 Annual Report: Balance Sheet*
5. *MSCI EAFE Index 2001-2003*
6. *Financial Services Regulatory Commission – Organizational Chart*
7. *Yields quoted on Bankrate.com – 03/08/06*
8. *Assuming top federal and state income tax bracket*

# EXHIBIT 10

William C. Hall
NewFields
1349 W. Peachtree St NW
Atlanta, GA 30309

Dear Billy:

Below and in the enclosed attachments please find my response to the fax that you recently forwarded to me, "Analysis of Investing in a Certificate of Deposit with the Stanford International Bank."  I hope that you find it helpful.

If there are any additional questions please forward them to me and I will address those as well. However, I strongly recommend that we schedule a meeting between you and Stanford leadership that can speak in significant depth to any questions that you may have.  The author is welcome also.  I also recommend that we schedule a trip to visit Stanford International Bank in Antigua which should, in my opinion, answer any lingering questions or doubts.

With all respect to the author, much of the content of the "Analysis" appears to be either dated, taken out of context, incompletely cited or supported, or just plain wrong.  This suggests at best a lack of objectivity on the part of the author.

I know that one cannot convince every skeptic, but I hope that the following will help in the education process and encourage you to share this with the author.

## I.  Basic Information on Stanford International Bank and Antigua Banking

• Stanford International Bank is an international bank, not an off-shore bank, with a prudent investment approach that it has followed for 20 years. The Bank's investment portfolio is a globally diversified allocation that is invested across countries, asset classes, sectors, and currencies. This allows the Bank to manage assets and liabilities with more predictability and create larger spreads on portfolio returns over yield paid to the client.

• The Bank believes that the portfolio is well diversified and utilizes an absolute return philosophy which is more conservative than basing returns on a loan portfolio.

• It is a $5-billion bank offering only banking products. The Bank issues certificates of deposit which like all other CD's have a stated rate and maturity so the client is not tied to market risk, but rather the solvency of the bank. In 20 years of serving high- net worth clients, the Bank has never defaulted on the payment of interest or principal with any depositor.

• The Bank is also able to increase clients' yields because it is in a zero tax jurisdiction. Because the Bank is domiciled in Antigua/Barbuda, it is exempt from exchange controls and has a 50-year guarantee of tax-free status. As a result of the tax-free status, the Bank is able to use these savings to increase the rates paid to depositors on CD products.

**195**

• The Bank uses more than 20 third party independent money managers located throughout the world.

• The Bank is privately held with a single shareholder, and declares no dividends. Every single dollar earned is reinvested back into the Bank's retained earnings, which continuously strengthens its capital base for continued growth. Currently, more than 90% of the Bank's own equity position supplements invested assets, improving its income-producing capabilities, allowing the Bank to pay higher rates.

• The Bank makes a small percent of loans (less than 5%), backed by 100% cash collateral, which eliminates default risk - there are no loan loss reserves that reduce potential yields.

• The Bank has over 30,000 clients in 90 countries.

• It is a regulated entity, is compliant with the international BASEL II standards and, as a result, maintains some of the strictest depository guidelines in the industry. The nation of Antigua and Barbuda proactively meets the requirements of international regulatory bodies and is committed to having the best regulatory platform in the international financial sector.

     o Basel II is an effort by international banking supervisors to update the original international bank capital accord (Basel I), which has been in effect since 1988. The Basel Committee on Banking Supervision, on which the United States serves as a participating member, developed the current proposals. They aim to improve the consistency of capital regulations internationally, make regulatory capital more risk sensitive, and promote enhanced risk-management practices among large, internationally active banking organizations.

• Antigua's rating with the International Monetary Fund (IMF) is in line with the UK and ahead of Switzerland in the area of banking and regulatory oversight. The Financial Services Regulatory Commission (FSRC) conducts quarterly examinations at the bank.

• Stringent know-your-customer/anti-money-laundering laws, terrorist financing tracking and requirements for in-country company management reduce the possibility of money laundering and the financing of terrorist activities.

• The Patriot Act had little impact on the bank as most of the policies and procedures were already in place at Stanford International Bank.

• There are insurance policies in place to indemnify in case of fraud and/or embezzlement. The Bank also maintains excess FDIC insurance with its correspondent banking relationships.  Depository insolvency policy insuring Stanford International Bank's funds held in correspondent banks, including excess FDIC coverage in the case of US Banks. This policy is issued by Brit Insurance Ltd. and is rated by A.M. BEST Rating "A' (Excellent) and Fitch Rating of Al- (Strong).

     o All correspondent banks that are depositors of Stanford International Bank funds are reputable institutions and have been pre-approved by the insurance companies underwriting the policy.

          • A Bankers Blanket Bond with Lloyds of London rated by A.M. BEST Rating "A" (Excellent).

     • Directors and Officers Insurance with Lloyds of London rated by A.M. BEST Rating "A" (Excellent).

• Because the Bank offers just one product, a CD, this results in lower administrative, overhead and distribution expenses.

• The Bank, as well as all of Stanford, does not accept any cash transactions or money orders.

• The Bank has strong cash flow, return of equity, and no debt.

• Stanford International Bank opened a representative office in Montreal, Canada in December 2004. This is the first license for a representative office that Canada has granted to an independently owned bank in nearly a decade, and follows a thorough review of Stanford International Bank operations and Antigua's financial sector by the Office of the Superintendent of Financial Institutions (OSFI) Canada.


## II. Chairman Allen Stanford's Political Involvement in Antigua

Mr. Stanford moved to Antigua and Barbuda in 1992 and became a citizen in 1999 after falling in love with the small Caribbean nation, which is a member of the British Commonwealth of Nations.  He believes strongly in the country's role as an important international banking center and is a driving force behind long-term investment in the islands.

It is well known that Mr. Stanford was asked to serve in an advisory capacity to the Government of Antigua and Barbuda on the drafting of anti-money laundering and regulatory matters in respect to the financial services sector.

He assembled a top-notch team of former U.S. legal and regulatory professionals (former FBI, DEA, Customs, U.S. Attorney, Federal Banking oversight, regulatory and exam personnel) who delivered a detailed report on what Antigua and Barbuda should do in order to put in place a first rate regulatory, supervisory and anti-money laundering program through various measures including new legislation.

Today, Antigua and Barbuda is regarded as a "model jurisdiction" by the United Nations and has received highly favorable ratings from the international regulatory bodies.  Mr. Stanford's role was purely as an advisor to the Government with no authority or powers.  He served in this capacity for approximately 14 months.

The enclosed article from Money Laundering Alert (MLA) fully discusses Mr. Stanford's involvement in the Antiguan banking industry. Additionally, I have also attached an article from the MLA dated October 1, 2001 entitled "Antigua Gets U.S. Reprieve Two Years After Controversial Advisory". This more recent MLA discusses the significant reforms that the Antiguan government implemented since 1999. These and other MLA's can be found online at www.moneylaundering.com.

As with any high-profile and heavily involved entrepreneur or company, Mr. Stanford does have his detractors.  Nonetheless, Mr. Stanford, now Sir Allen Stanford, was recently honored with knighthood when he was appointed Knight Commander of the Most Distinguished Order of the Nation (Antigua and

Barbuda). His Royal Highness Prince Edward Duke of Wessex joined Queen Elizabeth's representative Governor-General of Antigua and Barbuda, Sir James B. Carlisle, to award the knighthood during the Silver Jubilee Independence Day Celebration in 2006.

Billy, I hope this begins to address the concerns raised by the "Analysis."  Please let me know if you need additional information and when we can get together to discuss this in detail.  Additionally, let me know when we can schedule a trip to visit Stanford International Bank.  The bank does have availability the week of April 9 and the week of April 16.

Warmest regards,


Timothy A. Vanderver III, J.D.

# EXHIBIT 11



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
FORT WORTH DISTRICT OFFICE
BURNETT PLAZA, SUITE 1900
801 CHERRY STREET, UNIT #18
FORT WORTH, TEXAS 76102-6882
PHONE: (817) 978-3821      FAX: (817) 978-2809



September 12, 2005

Mr. Jay Comeaux, President
Stanford Group Company
5050 Westheimer
Houston, TX  77056

Re:  Stanford Group Company
     SEC No. 48611, CRD No. 39285

Dear Mr. Comeaux;

Our examination of Stanford Group Company ("SGC") conducted in October 2004, disclosed the following violations and deficiencies in the firm's operations. As the Staff believes the Stanford International Bank ("SIB") CDs sold by the firm to be securities, all federal securities laws, rules, and regulations apply to SGC, SGC's sales of the products, and the products themselves. Set forth below are areas in which corrective action should be taken, to the extent that it has not been taken, since the time of the examination.

A. <u>Misrepresentations and Omissions – Rule 10b-5</u>

The Staff's review found that SGC made material misstatements to investors concerning the Stanford International Bank ("SIB") CDs, as well as failing to disclose material facts in connection with the sales.

The type of disclosures provided to investors purchasing SIB CDs is dependant upon whether the investor is a U.S. citizen or a foreign national. Regarding U.S. investors, the Staff found the "Disclosure Statement U.S. Accredited Investor Certificate of Deposit Program" ("Disclosure Statement") to contain conflicting information regarding the safety and security of the SIB CDs. While some information contained in the Disclosure Statement indicates the risk of loss in investing in the SIB CDs, other statements imply little or no risk to the investor. The Staff found the statements implying little or no risk to the investor, such as "At maturity of the CD Deposit, we will provide you the principal amount in the CD Deposit plus any accrued and unpaid interest," as well as the section of the document entitled "Guaranteed Rate of Return" to be materially misleading as they inaccurately imply a safety of principal and the guarantee of receipt of interest on the principal.

**199**

Regarding foreign investors, the disclosure documents contain material omissions in that they do not definitively state that the CDs are subject to risk of loss. Furthermore, SGC does not send to its foreign customers the Disclosure Statement provided to U.S. citizens, but only a marketing brochure which repeatedly compares the SIB CDs to conventional U.S. certificates of deposit thereby erroneously implying safety and security in the SIB CDs. One illustration compares the growth of a $1,000,000 investment in a SIB CD for ten years to the growth of a U.S. Bank CD. Another compares interest rates on SIB CDs versus U.S. Bank CDs over a ten-year period along with the notation that "Over the past decade, Stanford International Bank CDs have outperformed U.S. bank CDs by an average of 4.6%." Specific statements regarding the lack of risk are contained throughout the document. While the marketing brochure does note that customer funds are invested into "a portfolio of highly marketable securities", even this indirect allusion to risk is downplayed by statements which claim that such a strategy is in the best interest of SIB investors. Overall, the Staff found that due to the lack of risk disclosure and to the inappropriate nature of the comparisons between the SIB CDs and U.S. bank CDs, the firm had made both material omissions and material misrepresentations in the marketing brochure provided to foreign customers.

B. <u>Unsuitable Recommendations – NASD Rule 2310</u>

The NASD requires that in recommending to a customer the purchase of any security, that the member firm shall have reasonable grounds for believing that the recommendation is suitable as to the customer's financial situation and needs. Since SGC and its representatives do not have the information available to determine the actual investments made with the customers' funds (i.e. the actual and specific investments in the SIB portfolios) and the risk level of the SIB CDs, it cannot know if the product is suitable as to its customer's needs.

C. <u>Failure to Prepare or Obtain Confirmations for SIB CD Transactions - NASD Rule 2230, SEC Rule 10b-10; SEC Rule 17a-3(a)(8), and SEC Rule 17a-4(b)(1)</u>

The firm failed to prepare, obtain or maintain confirmations of SIB CD transactions effected through the firm as required by the Rules. Furthermore, the firm does not independently prepare confirmations of the transactions, but rather relies on SIB to send confirmations to investors. Regarding SEC Rule 10b-10, without copies of confirmations it is unclear if investors receive any notice regarding the commissions paid to SGC for sales of the CDs. While the Disclosure Statement given to U.S. investors includes limited information regarding the commissions received by SGC for the sales of the SIB CDs, the statements are not definitive to the amount of commissions paid on each transaction, only noting that the fees "are currently up to three percent, negotiated annually." It is also not clear that the three per cent referral fee is paid as long as the funds are on deposit. As for sales to foreign investors, the Staff found no evidence the remuneration received by SGC on the SIB CD transactions were being disclosed to the foreign investors, as there is no discussion of SGC's compensation in the sales literature provided to foreign investors and no confirmations were provided for our review. Finally, SGC also failed to disclose to any of its customers any information regarding the compensation that registered representatives may earn in sales contests sponsored by SIB.

2

D. <u>Excessive Commissions – NASD Rule 2440, NASD Rule 2810, and NASD Rule 2830</u>

SGC failed to abide by limitations imposed by the NASD regarding the amount of commissions that can be charged on any one transaction. As noted earlier, SGC receives three per cent annually on all investments made with SIB. In the case of SIB CDs with a 60-month maturity, the commission rate is therefore equivalent to 15% of the amount invested. Since 15% is in excess of an allowable commission for any kind of securities, the commission on the 60-month transactions clearly violate NASD Rule 2440 regarding Fair Prices and Commissions.

E. <u>Failure to Establish, Maintain, and Enforce Written Supervisory Procedures - NASD Rule 3010(b)(1)</u>

The firm did not have any written supervisory procedures ("WSP") designed to ensure that customer accounts purchasing SIB CDs were reviewed on a periodic basis and to ensure that transactions in the accounts of foreign investors were suitable.

F. <u>Failure to Conduct Periodic Reviews of Customer Account Activity in SIB CDs - NASD Rule 3010(c)</u>

The firm failed to conduct a periodic review of customer activity in SIB CDs, as the firm maintains that it has no supervisory responsibilities regarding the products. The Staff disagrees with the firm's position as the Rules place a responsibility for the supervision of all activities on the firm. In addition, given the lack of complete records regarding SIB CD transactions currently maintained by the firm, the firm would be unable to conduct such reviews should it decide to do so.

G. <u>Failure to Develop and Implement an Adequate AML Program - NASD Rule 3011</u>

<u>Inadequate AML procedures</u>

- Although the firm maintains procedures regarding AML reviews, the procedures for branch office reviews do not provide enough detail regarding how reviews will be conducted, the records to be utilized during the review process, and how reviews will be documented. The procedures for the firm's compliance department reviews are also not specific enough as to how reviews will be conducted, the records to be utilized during the review process, and how reviews will be documented. In addition, the firm has not specifically identified the individual responsible for conducting compliance department reviews.

- The firm's procedures failed to contain examples of money laundering "red flags" to be used by firm employees to detect possible money laundering. Such "red flag" information should be incorporated into the firm's procedures.

3

- The firm had no procedure discussing continued monitoring of customer accounts that it determines are engaged in "suspicious" activity.

- The firm had no procedure to ensure compliance with the Treasury Department's "Travel rule" when facilitating customer requests to wire funds from their customer accounts at Bear Stearns to their accounts or accounts of unrelated third parties. The Staff noted that the while the firm had no such procedures, it was providing the required information to Bear Stearns.

- The firm had no written procedures regarding obtaining information concerning the source of its customers' net worth, and income and how a customer's account would be utilized (i.e. anticipated types of trading and trading patterns so that the firm would be able to detect future deviations from expected patterns). The Staff noted that in practice, the firm obtains information regarding the source of its customers' net worth and income, but does not obtain and record information regarding the proposed use of the customers' accounts. None of the account information forms for 25 accounts reviewed by the Staff contained any information regarding the intended use of the accounts.

- The firm's procedures do not require firm personnel to obtain secondary documentary information to verify the identity of U.S. customers (either business entities or individuals). The Staff is unaware of any difference between documentation that should be obtained from non-U.S. customers versus U.S. customers.

- The firm failed to promptly update its AML procedures to designate its current AML officer, although that officer had been functioning in that capacity for approximately two months at the time of the Staff's examination. The firm's AML procedures designated Lea Stinson as its AML officer, when the officer was actually Rep Poppell.

- The firm had no procedure in place designed to ensure that there was no collusion between firm employees and customers with respect to money laundering.

- The firm's policies and procedures generally prohibit the receipt of currency, traveler's checks, and money orders for stock purchases or to be credited to customer accounts; however, the policies and procedures do not designate an individual to be responsible for determining whether cashiering department employees either intentionally or inadvertently receive such instruments. The procedures also do not discuss any reviews to detect the receipt of such instruments or how such reviews would be documented.

- The firm has no written procedure requiring the reporting of any financial interest in an account in a foreign financial institution. The firm's procedures do not address the use of Treasury Form 90-22.1 to report such financial interests and do not designate an individual as responsible for making the filings. The procedures also do not

4

discuss how the firm will ensure that filings are made by the required filing date or what evidence the firm will maintain of the filings.

### Failure to Adequately Implement AML Procedures

- The firm failed to implement written procedures that required it to categorize customer accounts based on degree of risk of money laundering. The firm's procedures required that all accounts be classified as Tier I, II, or III (I representing the lowest risk and III representing the highest risk), and that the frequency of account monitoring be commensurate with the account's risk level. The firm failed to categorize accounts as required by its procedures, and maintained no readily producible list of accounts by risk level. One of the account information forms utilized by the firm contained a section in which firm personnel could indicate the account's risk level, but there was no evidence the section was being completed.

- While the firm's procedures require that firm personnel obtain primary documentary information from all customers opening accounts, the firm failed to implement its procedure in that it failed to obtain documents containing a photograph or similar safeguard for all of its U.S. customers. In addition, the firm did not obtain primary identification for any of its institutional accounts. Specifically, in two instances, the firm failed to obtain documentary information from individual U.S. customers. Such documentation is readily available in the form of driver's licenses. In nine other instances, the firm failed to obtain primary documentary information for business entities, such as articles of incorporation, partnership agreements, or business licenses. One of the nine accounts was a charitable organization which the firm's procedures identified as a level II in terms of risk. One of the nine accounts had produced articles of incorporation, but the document was in Spanish and had not been translated into English.

- The firm's procedures required that it obtain secondary documentary information from non-U.S. individuals opening accounts; however, the firm failed to implement its procedures in this regard. Specifically, in three instances, the firm failed to obtain secondary documentation from non-U.S. customers. In another 13 instances, the firm failed to obtain secondary documentary information from U.S. customers, or non-U.S. business entities opening accounts. The Staff believes that based on the composition of the firm's clientele, it should obtain two forms of documentary identification from all customers.

### H.  Failure to File Treasury Form 90-22.1 - Bank Secrecy Act Section 103.24

SGC failed to provide documentation that it had reported financial accounts held at SIB during the 2003 calendar year within the time frames set forth in the Treasury's rules. Specifically, the firm was required to file Treasury Form 90-22.1 reflecting its financial interest in a SIB bank account and FlexCD by June 30, 2004. While the firm provided the Staff with a copy of the form and stated that the form had been filed as required by the rule, the firm did not

5

maintain any documentation reflecting the date the form was filed and the form itself was undated. In addition, the firm was under the mistaken impression that it was not required to file the form for its 2004 holdings in 2005. The form is required to be filed by June 30th of the year following any year in which the firm has any interest in foreign financial accounts.

I. Failure to Deliver the Firm's Privacy Policy to All Customers - Regulation S-P

The firm failed to produce evidence that it had delivered its privacy policy to all new customers upon opening accounts or effecting a securities transaction through the firm. Specifically, there was no evidence that six of 25 customer accounts reviewed by the Staff had received a copy of the firm's privacy policy upon opening their accounts. All of the customers were located in the firm's Miami branch office. The firm was only able to provide a document containing a list of new accounts opened at the Miami office along with the initials of Miami branch office principals. The Staff noted that the document did not contain any specific evidence that the privacy policy had been delivered and that the principal's initials next to customer account numbers did not document delivery. Finally, the documentation provided by the firm as evidence that the privacy policy was delivered was not consistent with the evidence of delivery required to be maintained as discussed in the firm's WSP. The WSP require that a registered principal specifically note that the privacy policy was mailed by writing "PP" (for privacy policy), writing the date the policy was mailed, and initialing the line on the account information form entitled "Have you sent forms to customer?"

J. Failure to Enforce WSP with Regard to Delivery of the Firm's Privacy Policy to Customers - NASD Rule 3010(b)(1)

The firm failed to enforce its WSP with respect to documenting the delivery of its privacy policy to new customers. The firm's WSP contained a requirement that a registered principal initial a line on the new account form indicating that the firm's privacy policy was mailed to the customer and include the date of the mailing. There was no evidence that principals in the firm's Miami office were following the procedure.

K. Failure to Maintain Accurate Financial Ledgers - SEC Rule 17a-3(a)(2)

The firm failed to record all liabilities to its general ledger. The firm maintains several Demand Deposit Accounts ("DDA") at Morgan Chase National bank. As of August 31, 2004, the firm was overdrawn on four accounts. The balances from these accounts were combined with other bank accounts at Morgan Chase instead of being properly recorded as liabilities. The amount of checks drawn in excess of bank balances per the records of a broker-dealer must be included in aggregate indebtedness, unless the broker-dealer carries two or more accounts at the same bank that are separated for the purposes immaterial to SEC Rule 15c3-3 and has an agreement with the bank stipulating that: except for bookkeeping and statement purposes, all such accounts are considered as one; the bank is authorized and agrees to treat these accounts as a single account and to apply balances in any one or more accounts to any debits in any other accounts without further advice or instruction by the firm; in the opinion of the bank's

6

independent outside counsel, the agreement allows the bank to take the above action and is legally binding under banking, bankruptcy and other applicable federal and state laws.

L.  Failure to Meet Continuing Education Requirements - NASD Conduct Rule 1120

The Staff reviewed SGC's continuing education plan for 2003 and found that 18 covered registered persons failed to complete the firm's continuing education training program for that year[1]. All covered registered persons included in a member's plan must take all appropriate and reasonable steps to participate in continuing education programs as required by the firm.

Closing Comments

We are bringing the concerns described above to your attention for immediate corrective action, without regard to any other action(s) that may result from the examination. You should not assume that the Registrant's activities not discussed in this letter are in full compliance with the federal securities laws or other applicable rules and regulation.

In connection with our regulatory responsibilities, we request that you inform this office what steps have been taken to correct the above concerns. Before you respond to communications from this office, please refer to the Privacy Act Notice which was delivered to you at the beginning of our examination.

Please acknowledge receipt of this letter by signing and returning to this office the enclosed copy and advise, in writing, within three weeks, what precautions will be taken to assure that future violations of the above provisions will not occur. Additionally, please forward a copy of your response to:

Katrina Carroll
Office of Compliance and Inspection Examinations
U.S. Securities and Exchange Commission
Building 901, Room 2019
450 5th Street, NW
Washington, D.C. 20549

and

Ms. Virginia Jans, District Director
NASD  District No. 6
12801 N. Central Expressway, Suite 1050
Dallas, TX 75243

and

---

[1] The term "covered registered person" shall apply to any registered person with a broker/dealer who has direct contact with customers in the conduct of the broker/dealer's securities sales, trading and investment banking activities, research analyst and immediate supervisors of such persons.

Benette Zivley, Director Inspections and Compliance Division
Texas State Securities Board
P. O. Box 13167
Austin, Texas 78711-3167

We urge you to give this matter your prompt attention.  If you have any questions, please contact the undersigned at (817) 900-2601

Sincerely,

JULIE A. PREUITT
ASSISTANT DISTRICT ADMINISTATOR

By:  Gregory Harris
     Securities Compliance Examiner

Stanford Group Company

By:_____

8

# EXHIBIT 12

**From:** Hamm, Suzanne
**Sent:** Monday, December 22, 2008 8:43 PM
**To:** Green, Jason
**Cc:** Batarseh, Jonathan T
**Subject:** FW: Stanford Intl. Bank

Passing this along to you...

Thx
Suzanne

---

**From:** Dahlquist, Steven N.
**Sent:** Monday, December 22, 2008 12:16 PM
**To:** Hamm, Suzanne
**Cc:** Vollmer, Chuck
**Subject:** Stanford Intl. Bank

Suzanne;
At the request of Chuck Vollmer I am forwarding an email from a local CPA who is advising one of my prospective clients. Ken is a principal in a well known Sarasota firm and has been one of my key centers of influence.
His primary concern centers on the lack of an established U.S. accounting firm doing the audit. This concern has been expressed before and, in light of Madoff, will be expressed again.
More disclosure on the current firm as well as the regulatory bodies that certify our financial soundness would be helpful.
Thanks and have a Merry Christmas

Steve Dahlquist

---

**From:** Ken Honick [mailto:ken@ehpcpa.com]
**Sent:** Thursday, December 18, 2008 9:38 AM
**To:** Dahlquist, Steven N.
**Subject:** Open Questions

Steve --

Nicci has indicated that she intends to open an account with Stanford when she accumulates the funds in 2009.

Have you found answers yet with respect to the "CD" program at Stanford International Bank? How is the income reported to the taxpayer? What tax disclosures are required? I would appreciate it, Steve.

I have to admit, Steve, that I'm not totally comfortable with Stanford International Bank. Oh, I've Googled it and found nothing upsetting. The Venezuela branch was raided by that government on allegations of Stanford spying for the U.S. Big deal. And Stanford sponsors cricket all over the Caribbean. That's nice. The audited financials are lovely and I'm sure the headquarters are lovely too. The audit firm in Antigua, C.A.S. Hewlett & Co, Ltd, however, is unknown to me. Stanford International Bank shows consistent growth in assets and remarkably steady financial performance. How do I know that it is real? I know that seems like a rude question. After all, scads of European and even Swiss banks invest in it. But as we have seen with Bernard Madoff, having audited financials, surviving scrutiny by regulatory agencies, having impressive clientele, a golden reputation, and a record of outstanding performance doesn't mean all that much. Madoff's firm was audited by a tiny firm of questionable quality, to be kind. SIF's "international CD" product translates to me as a subordinated debenture and I am unable to weigh the risk and the return of this product.

It is probably just my training as a CPA, as a professional skeptic, but SIF just seems too good to be true. Ii was asking these questions prior to the Madoff news, but his collapse brings it into focus. I don't know what you can add, Steve, that would give me comfort, but I'm open to hearing more.

Thanks.

Ken

IRS CIRCULAR 230 DISCLOSURE: Please note that the views expressed herein or in any attachments are not intended or written to be used,

and may not be used or relied upon, for the purpose of (i) avoiding tax-related penalties that may be imposed by the Internal Revenue Service, or (ii) promoting, marketing, or recommending to another party any tax-related matters addressed herein.

Ken Honick
Eaton Honick Pellegrino & McFarland, P.A.
1800 Second Street, Suite 880
Sarasota, FL 34236
Tel.: (941) 365-1172
Fax: (941) 957-0423

# EXHIBIT 13

From: McDaniel, Douglas M.
Sent: Tuesday, September 04, 2007 8:43 PM
To: Rodriguez-Tolentino, Juan
Subject: FW: quick question...

Attachments: SIB questions.doc

Juan,

Per Mr. Davis's suggestion, would you have 15-20 minutes to spend with me on the
phone this week?  See my original e-mail to Mr. Davis below.  I have attached the
list of questions I have as I seek to become even more comfortable with the bank.

I am pretty open this week...could do Wednesday pm at 3:00 CST, Thursday same time,
or Friday morning at 9:30 am, just to name a few times.

Look forward to hearing from you.

Doug

-----Original Message-----
From: Davis, James
Sent: Tuesday, September 04, 2007 6:37 AM
To: McDaniel, Douglas M.; Pendergest, Laura
Cc: Register ,Chris J.
Subject: RE: quick question...

Hi,
Doug, at the end of the day, Juan Rodriguez, as long time President of the bank is
undeniably the best source of information.  Both LP and I are knowledgeable about
their financial position and Asset/Liability management model, but are not involved
in their day-to-day operations.

Jim

-----Original Message-----
From: McDaniel, Douglas M.
Sent: Thursday, August 30, 2007 4:17 PM
To: Pendergest, Laura
Cc: Register ,Chris J.; Davis, James
Subject: FW: quick question...

Hey Laura,

I hope all is well.

Please see me e-mail to Mr. Davis below.

Could you be so kind as to give me 15-20 minutes on the phone to talk about the
bank?  When in the next week would work for you?

I have attached my questions...some of them may sound like an investigative reporter
but I'd like to get as comfortable as I can with the bank.  I feel like I can do a
lot more business with it.

Look forward to hearing from you.

Doug

-----Original Message-----

From: Davis, James
Sent: Wednesday, August 29, 2007 2:33 PM
To: McDaniel, Douglas M.
Cc: Register ,Chris J.; Pendergest, Laura
Subject: RE: quick question...

Hi,

Laura and her team.  Give Laura a call.

Great to here from you, looking forward to the Tupelo open h.

Best,

Jim

Sent from my GoodLink synchronized handheld (www.good.com)

 -----Original Message-----
From:       McDaniel, Douglas M.
Sent: Wednesday, August 29, 2007 02:14 PM Central Standard Time
To:   Davis, James
Cc:   Register ,Chris J.
Subject:    quick question...

Jim,


I have only done $3,000,000 of my clients' money (and my own) in the CD product.


I have the potential to do much more, but to do that, I would need to become even
more comfortable with the product.


I really need a 15-30 minute forum with someone who can answer questions...I can't
help it…it's the 'CPA' coming out in me.


My questions revolve around the bank's investment portfolio and the historical
returns.


Who would be the most informed person for me to talk to?


I am WELL aware that much of that information is confidential, but I just need as
much information as they can give.


I have a list of prominent Mississippi folks I want to approach and need to be well
armed in order to be successful.

Thanks for all you do,


Doug




_____

Douglas M.McDaniel, CPA/PFS, CFP™
Managing Director

Stanford Group Company
1400 Meadowbrook Road, Suite 100
Jackson, MS  39211


Voice:  601.364.7300

Fax:     601.364.7307

www.stanfordfinancial.com

SIB questions:

1. I have heard that the bank's portfolio, since inception, has had returns ranging from 11% to 15%. Is this true?

2. I understand there is an insurance policy for funds held by custodian banks not insured by the FDIC. Does Quanta Capital Holding issue this policy? If so, why use such a poorly rated insurance company?

3. What financial instruments and strategies are in place to guard against significant losses in the portfolio, particularly on the equity side? Does each of the managers hedge their own portfolios against loss or do you employ a separate manager to hedge the total bank portfolio.

4. What level of discretion do your equity managers have?

5. There are many people involved on the investment committee of the Bank. How does this committee ensure that appropriate hedging is in place? This would seem to require some sophisticated calculations outside the expertise of most investment committees.

6. My understanding is that from 2000-2002, the Bank's portfolio returns were in the range referred to in question 1. With S&P and EAFE negative for all of those years, and yet a tolerance of up to 50% equity for the bank, how was the bank's portfolio invested.

7. I understand Michael Zarich is no longer at the bank. Has this position been filled? My impression is that this position is more a liaison than an actual CIO, which appeals to me. I prefer to have the bank portfolio overseen by a sophisticated investment committee rather than by one person, regardless of their competence.

8. What would really give us comfort is to have Chris Register, my FA partner here, come to Memphis one day and see how the analysts there oversee the managers and all the due diligence that goes on. Would that be possible?

9. Is there anything you can think of that I have not asked that seems to give prospective depositors great comfort about the bank?

# EXHIBIT 14

## AFFIDAVIT OF NON-SERVICE

# UNITED STATES DISTRICT COURT
## Northern District of Texas

Case Number: 3:09-CV-724-N

Plaintiff:
**RALPH S. JANVEY**

vs.

Defendant:
**JAMES R. ALGUIRE, et al.**

For:
David T. Arlington
BAKER BOTTS L.L.P
1500 San Jacinto Cneter
98 San Jacinto Blvd.
Austin, TX 78701

Received by CONTINENTAL COURT REPORTERS, INC on the 17th day of November, 2009 at 9:00 am to be served on **DAVID NANES, 901 Brickell Key Blvd., Apt. #1803, Miami, FL 33131**.

I, Jesus Guerra, being duly sworn, depose and say that on the **18th day of March, 2010 at 3:00 pm, I:**

**NON-SERVED:** After due search, careful inquiry and diligent attempts I was unable to serve the **Summons In A Civil Action and 20 Day/First Amended Complaint and Appendix** for the reason that I failed to find **DAVID NANES** or any information to allow further search. Read the comments below for further details.

**Additional Information pertaining to this Service:**
1111 BRICKELL AVENUE, #1, MIAMI IS A VIRTUAL OFFICE WHERE MR. NANES ONLY RECEIVES MAIL & FAXES. HE COMES IN OCCATIONALLY TO PICK THEM UP BUT HE DOES NOT HAVE A PHYSICAL OFFICE AT THIS LOCATION.
848 BRICKELL KEY DRIVE, UNIT #801 IS OWNED BY ELIZABETH AND DAVID NANES. SECURITY TOLD ME THAT THEY ONLY KNOW ELIZABETH AND THEY HAVE NOT SEEN HER SINCE NOVEMBER 2009. THERE HAS BEEN NO ONE GOING IN OR OUT OF THE UNIT.
11/8/2009 7:00 pm Attempted Service at 848 Brickell Key Drive. No response, left a piece of paper on the door.
11/19/2009 1:00 pm Attempted Service at 848 Brickell Key Drive. Paper and a notice are still on the door. No response.
11/21/2009 10:50 am Attempted Service at 848 Brickell Key Drive. Paper and notices are still on the door. No response. Spoke with guard who knows Elizabeth (defendant's wife) stated he has not seen her in over a month.
12/27/2009 5:00 pm Attempted Service at 848 Brickell Key Drive. Paper and notices are still on the door. No response. Guard still has not seen Elizabeth (defendan't wife).
1/12/2010 7:00 pm Attempted Service at 848 Brickell Key Drive. There is only a FedEx notice on the door. I left a note on the door.
1/21/2010 11:00 am Attempted Service at 848 Brickell Key Drive. Note and FedEx notice are no longer there. No response. Left another note on the door.
1/25/2010 7:40 pm Attempted Service at 848 Brickell Key Drive. Note is still on the door. No response.
1/26/2010 6:15 pm Attempted Service at 848 Brickell Key Drive. Note is still on the door. No response.
3/10/2010 2:00 pm Attempted Service at 848 Brickell Key Drive. No notes on the door. No response. Left anther note on the door.
3/11/2010 10:00 am Attempted Service at 848 Brickell Key Drive. Paper is still on the door. No response. Spoke with Guard who stated that he has no seen Elizabeth in some time.
DEFENDANT DOES NOT RESIDE AT 901 BRICKELL KEY BLVD., APT. #1803, MIAMI. PER MANAGEMENT GUSTAVO HERRERA IS THE OWNER AND OCCUPANT OF THIS UNIT. THERE IS NO LISTING FOR DAVID NANES ANYWHERE IN THE BUILDING.

213

## AFFIDAVIT OF NON-SERVICE for 3:09-CV-724-N

I certify that I am over the age of 18, have no interest in the above action, and am authorized, in good standing, in the judicial circuit in which the process was served.

Under penalties of perjury, I declare that I have read the forgoing document and that the facts stated in it are true.

Subscribed and Sworn to before me on the 18th day
of March, 2010 by the affiant who is personally known
to me

_____
NOTARY PUBLIC

Jesus Guerra
C.P.S #935

**CONTINENTAL COURT REPORTERS, INC.**
**2777 Allen Parkway**
**6th Floor**
**Houston, TX 77019**
**(800) 779-6981**
Our Job Serial Number: 2009005823

Copyright © 1992-2009 Database Services, Inc. - Process Server's Toolbox V6 3u

**214**

# EXHIBIT 15

From: Shaw, Douglas
Sent: Friday, January 09, 2009 10:03 PM
To: Comeaux, Jay
Subject: RE: WSJ NEWS ALERT: Citigroup Is in Talks to Unload Smith
Barney

Lost more $ from SIB due to the Tidwell article.

Have you had any issues with it?

Doug

-----Original Message-----
From: Comeaux, Jay
Sent: Friday, January 09, 2009 3:52 PM
To: Shaw, Douglas
Subject: RE: WSJ NEWS ALERT: Citigroup Is in Talks to Unload Smith Barney

WOW, thanks

-----Original Message-----
From: Shaw, Douglas
Sent: Friday, January 09, 2009 3:02 PM
To: Comeaux, Jay
Subject: Fw: WSJ NEWS ALERT: Citigroup Is in Talks to Unload Smith Barney

In case you didn't see this.  Doug

----- Original Message -----
From: WSJ.com Editors <access@interactive.wsj.com>
To: Shaw, Douglas
Sent: Fri Jan 09 14:42:22 2009
Subject: WSJ NEWS ALERT: Citigroup Is in Talks to Unload Smith Barney

_____
NEWS ALERT
from The Wall Street Journal


Jan. 9, 2009

Citigroup is in talks to sell its Smith Barney brokerage and asset-management unit,
according to people familiar with the situation. One possibility being seriously
considered is a joint venture with Morgan Stanley, these people said. No deal has
been reached yet.


FOR MORE INFORMATION, please see:
http://online.wsj.com/article/SB123152743795268785.html?mod=djemalertNEWS


The article link above is also mobile friendly. Mobile users, click the link to see
this story now.

_____
ADVERTISEMENT

Work directly with today's business thought leaders in Wharton's Senior Management
Programs. Wharton faculty will help you develop effective solutions for your
business challenges and gain innovative frameworks for finding new market

**215**

opportunities.

http://ad.doubleclick.net/clk;210528284;6853491;l?
http://ad.doubleclick.net/clk;210570531;28842185;b

_____
SUBSCRIPTION INFORMATION

TO UNSUBSCRIBE DIRECTLY from this list, go to:
http://setup.wsj.com/EmailSubMgr/do/delete?addr=dshaw%40STANFORDEAGLE.COM&id=0
Your request will take effect within 48 hours.

TO VIEW OR CHANGE any of your e-mail settings, go to the E-Mail Setup Center:
http://online.wsj.com/email
You are currently subscribed as dshaw@STANFORDEAGLE.COM

FOR FURTHER ASSISTANCE, please contact Customer Service at 1-800-369-2834 or 1-609-
514-0870 between the hours of 7 am - 10 pm Monday - Friday and 8 am - 3 pm Saturday
or e-mail onlinejournal@wsj.com.

_____
Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved.

# EXHIBIT 16

**From:** Comeaux, Jay [JComeaux@StanfordEagle.com]
**Sent:** Friday, August 01, 2008 8:11 PM
**To:** Rigby, Glen
**Subject:** FW: Tidwell Client

**Attachments:** image001.jpg
**BCC List:** grigby@stanfordeagle.com

FYI below.

Jay

_____

From: Barrett, Robert A.
Sent: Friday, August 01, 2008 2:06 PM
To: Comeaux, Jay
Subject: Tidwell Client

Mr. Comeaux,

You asked to be notified if I had any CD withdrawals…

I had a former Tidwell client break an $8.125% CD.  This came as a total surprise to me!

I was never notified of the withdrawal request, so I could not ask the client why he was leaving. Now that the funds have left, the client will not return calls.

As it takes two weeks to process an IRA CD withdrawal, this was most likely the result of the Bloomberg article.

We are trying to get a copy of the withdrawal request.

  Robert A. Barrett

  Financial Advisor

  Stanford Group Company

  5050 Westheimer Road - Second Floor

  Houston, Texas 77056  U.S.A

  Phone: 713-599-6572

  Mobile: 832-865-5643

  Fax: 713-964-8340

  Toll-Free: 800-958-0009

  _____

**217**

From: Kittle, Kaye
Sent: Friday, August 01, 2008 1:27 PM
To: Buzzell, John; Carlile, Bonita
Cc: Barrett, Robert A.
Subject: Charles W Thibedeau IRA- withdrawal

Hello,

I see that client Charles W Thibedeau withdrew the full balance on his CD# 121489 on 07/30/08.  The broker on this account was #202 (Robert Barrett).  However, Robert and I were not notified that this account was being withdrawn.  Would you please let me know how the withdrawal instructions were received by STC?  Could you please send a copy of the withdrawal request for the file?

Here is a screenshot of the activity:


Thanks,

Kaye Kittle

Registered Client Service Assistant

Stanford Group Company

5050 Westheimer

Houston, TX 77056

(713) 964-5202 - Direct

(713) 964-8340 - Fax

HYPERLINK "mailto:kkittle@stanfordeagle.com"kkittle@stanfordeagle.com

# EXHIBIT 17

*[handwritten: completed on 7-18... and put in mail   Frank's copy]*
*[handwritten: 5]*

## STANFORD INVESTOR QUESTIONNAIRE

### I.   INFORMATION ABOUT YOU

Your name:   REDACTED

Your address:   REDACTED

Your telephone number:   REDACTED

Your age: 62    Your employment (If retired, when did you retire and from what occupation): Retired 6/02, President & CEO, OSCA Inc. (NASDAQ) Currently Partner in two closely held businesses & Active Investor

Your education level: BS BA - UL · Lafayette

Is your net worth or joint net worth with your spouse greater than $1,000,000?
YES ✓ NO___

Have you had an individual income in excess of $200,000 in each of the two most recent years or joint income with your spouse in excess of $300,000 in each of those two years, and do you have a reasonable expectation of reaching that same income level in the current year? YES ✓ NO___   *[handwritten: 2002  Adjusted Gross Income $4,910,317   2003   120,129   2004   485,859]*

Before you invested in the Stanford program, did anyone request any information about your financial status or your previous investment experience? YES ✓ NO___

Prior to your Stanford investment, what types of investments had you made? Public Equities, Municipal Bonds (TAX FREE), CDs, Real Estate, Annuities and Private Closely held businesses

### II.   INFORMATION ABOUT YOUR INVESTMENTS

Did you invest in Stanford's Certificate of Deposit Program ("CD Program")? YES ✓ NO___  If yes, why did you invest in the CD program? Higher Rate of Return on certificate of deposit

How did you first find out about the investment opportunity in Stanford's CD program? ___ REDACTED - Business Partner Novo Sep told me about Stanford after one of meetings

When and how were you contacted about Stanford, and by whom? _____
August 04 met with Hank Mills and Tiffany Augelle at a
meeting set up by [REDACTED] _____

Who did you deal with at Stanford? Tiffany Augelle and Hank Mills

What was the date of your initial investment in Stanford's CD Program? _____
September 17, 2004

How much money did you initially invest in Stanford's CD Program? _____
$ 100,000.00

Please describe how you paid for your initial investment in Stanford's CD Program (e.g.,
by check, wire transfer, etc. and indicate the bank name). If you paid by check, please
provide a copy of the cancelled check to the staff. Morgan Keegan - MOR
Check No. 1041 (Attached)

Did you subsequently increase your investment in Stanford's CD Program? YES ✓
NO ___ If yes, how much have you invested to date? 300,000 personaly and an
additional $ 100.00 thru Hollian Pinacle Group LLC, a partnership
of which I own 1/3 interest
Prior to investing, who told you about Stanford's CD Program, and what were you told? __
[REDACTED] + Business partner told me about excellent
CD Rate.

What documents, offering materials, or contracts did you receive? Please provide copies of
the documents to the staff? Stanford International Bank LTD information package
including index linked CD, Flex CD Fixed CD, Subscription Agreement,
Disclosure Statement & 2003 Annual Report (Attached)

Did you receive a document entitled "Disclosure Statement, U.S. Accredited Investor
Certificate of Deposit Program"? YES ✓ NO ___ If yes, when and from whom? _____
August 2004, from Tiffany Augelle

Describe any communications you had with anyone regarding the above referenced
Disclosure Statement, if any. Please include who the communication was with, when,
where, and the circumstances of the communication. Discussed Disclosure Statement
with Tiffany Augelle and Hank Mills in August 04. They urged
me to do my own due deligence and offered to set up meeting
with Stanford Financial Group to help me better understand Stanford's
Investment strategy.

STANFORD INVESTOR QUESTIONNAIRE

Have you ever received a copy of Stanford's annual report? If so, when did you receive such report(s), who sent it to you and for what year(s), and what were the circumstances of your receiving such report? Yes in August 2004 during 1st meeting with Tiffany Angelle and Hank Mills which was set up by Mike Robicheaux. I was given a copy of Stanford's 2003 Annual Report. This was the same report that [REDACTED] had shown me at his office

What did you understand you were investing in? Uninsured certificate of deposit in an International Bank

Please describe in full what were you told, if anything, about the risk of this investment. Include who told you, how they told you, when, the circumstances of the communication, etc. I was told that although the CD's were uninsured that Stanford had never defaulted in the past due to the success of their investment strategy which is capital preservation.

Did anyone guarantee the return of your principal investment? YES___ NO✓ If yes, fully describe the circumstances of the communication (e.g., who made the guarantee, when was it made, where, how it was made, and what was said about it). _____

_____

_____

_____

_____

Did anyone guarantee a specific return on your investment? YES___ NO✓ If yes, please describe fully what return you promised, who made the guarantee and when, what you were told, how it was communicated to you, and any other details you can recall. _____
I was quoted a specific rate of return on an uninsured CD which I clearly understood was not a guarantee.

_____

_____

_____

Did anyone tell you where Stanford was going to invest your funds in order to generate returns for CD Program Investors? YES✓ NO___ If yes, please describe fully what you were told about where investor funds where going to be invested, when and how it was communicated to you, and any other details you can recall. At a teleconference with Laura Pendergast, Managing Director Stanford Financial on December 30 2004. Attended by myself, two of my partners, Tiffany Angelle, Hank Mills and Jason Green of Stanford from their Houston office. Ms Pendergast managed 20+ (outside) money managers with certain mandates for capital preservation which obviously contributed to consistent returns in the 12-13% range even in 2001 & 2002 when many investors

Did anyone tell you that funds invested in the CD Program were insured against loss? YES___ NO _✓_ If yes, please describe fully what you were told, who made the statements and when, how it was communicated to you, and any other details you can recall (*e.g.*, who was insuring the investment). _____

_____

_____

_____

_____

_____

If you received investment returns on your CD Program investment, please specify the amount of returns you received and the period of time involved? Hollan Pinnacle Group LLC Received a Return of $102,514.40 for a 6 month Investment of $100,000.

How do you receive your investment returns (*e.g.*, by check, direct deposit, account credits, etc.)? Direct Deposit

Have you ever attempted to liquidate, withdraw, cancel or redeem your investment in the CD Program? YES _✓_ NO___ If yes, please describe any difficulties or problems you experienced in attempting to liquidate, withdraw, cancel or redeem your investment. ___ No difficulty - The Hollan Pinnacle Group LLC funds plus interests were rendered promptly and without difficulty upon maturity (April 9, 2005)

What is the current status of your investment? Still have $300,000 personally invested in Stanford's Certificates of Deposits

When was the last time you discussed your investment with a representative of Stanford? _ Monday Tuesday May 31, 2005

Who did you speak to and what did he or she tell you about your investment? Tiffany Angelle. She called to notify me that Stanford International Bank was increasing CD rate by 50 basis points effective June 1, 2005 on deposits greater than $250,000.

Did you make any recordings of conversations you had with representatives of Stanford concerning your investment? YES___ NO _✓_ If yes, please produce a copy of them to the staff.

Did you take notes of your conversations with representatives of Stanford concerning your investment? YES___ NO _✓_ If yes, please produce a copy of them to the staff.

Please provide copies of your account statements for the Stanford CD Program for the time period January 1, 2005 to the present. ( attached )

**222**

STANFORD INVESTOR QUESTIONNAIRE                                    Page 4

# EXHIBIT 18



Stanford International Bank

# The Stanford Financial Group Family of Companies

## The Stanford Financial Group of Companies



# Qualifying investors are allowed to utilize SIB's management-expertise, capital, infrastructure and other resources to transfer substantially all of their investment risks <u>to</u> Stanford International Bank, with the exception of credit risk.



# In exchange for accepting these risks, SIB has the potential to earn greater returns on investor's funds and profit from the difference.



# SIB has successfully managed these risks to the benefit of its depositors and itself for over twenty years.

# SIB Returns



For Internal Use Only

# EXHIBIT 19

| Trade Date | Account # | FA Name/# | CUSIP | Security Name | Trade Ref # | Buy/ Sell | Number Of Shares | Execution Price | Commi ssion Amount | Sale Credit Amount | Principal Amount | Misc Fee Amount | Total Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/02/2008 | NJM011072 | Norman Blake / Brown Baine | 58740XQB9 | MERCANTILE BK MICH GRAND RAPIDS CTF DEP ACT/365 3.000% 12/05/08 B/E DTD 06/05/08 SOLICITED ORDER | T09S9W | BUY | 50,000.0000 | 100.0000 | | 62.50 | 50,000.00 | .00 | 50,004.50 |
| 06/02/2008 | NJM012500 | Jason Fair | 45660R7E0 | INDYMAC BK FSB PASADENA CALIF CTF DEP ACT/365 3.050% 12/11/08 B/E DTD 06/11/08 SOLICITED ORDER YLD 3.041 TO MAT | T09SK8 | BUY | 100,000.0000 | 100.0000 | | 125.00 | 100,000.00 | .00 | 100,004.50 |
| 06/03/2008 | NMY120824 | Chris Thomas | 32117JAA9 | FIRST NATL BK & TR CO COLUMBIA MO CTF DEP ACT/365 2.850% 09/08/08 REG DTD 06/06/08 SOLICITED ORDER YLD 2.850 TO MAT | T09W14 | BUY | 20,000.0000 | 100.0000 | | 20.00 | 20,000.00 | .00 | 20,000.00 |
| 06/03/2008 | NMW001760 | Henry Mills/Tiffany Angelle | 32117JAA9 | FIRST NATL BK & TR CO COLUMBIA MO CTF DEP ACT/365 2.850% 09/08/08 REG DTD 06/06/08 SOLICITED ORDER YLD 2.818 TO MAT | T09W1U | BUY | 55,000.0000 | 100.0000 | | 55.00 | 55,000.00 | .00 | 55,004.50 |
| 06/03/2008 | NJM013375 | Charles Hughes | 98154KEK5 | WORLD SVGS BK FSB HOUSTON TEX CTF DEP ACT/365 5.350% 07/11/08 B/E DTD 07/13/08 SOLICITED ORDER YLD 2.958 TO MAT | T09V4E | BUY | 50,000.0000 | 100.2000 | | 100.00 | 50,100.00 | .00 | 52,515.66 |
| 06/03/2008 | NJM013375 | Charles Hughes | 939379JV6 | WASHINGTON MUT BK HENDERSON NEV CTF DEP ACT/365 5.350% 07/18/08 B/E DTD 07/18/07 SOLICITED ORDER YLD 2.899 TO MAT | T09V33 | BUY | 50,000.0000 | 100.2500 | | 125.00 | 50,125.00 | .00 | 52,504.02 |
| 06/10/2008 | NMW031924 | Keith Cox/Tiger Blackwell | 319600AC6 | FIRST CITY BK COLUMBUS OHIO CTF DEP ACT/365 3.400% 06/15/09 B/E DTD 06/13/08 SOLICITED ORDER YLD 3.393 TO MAT | T1AICU | BUY | 70,000.0000 | 100.0000 | | 140.00 | 70,000.00 | .00 | 70,004.50 |

**229**

# EXHIBIT 20

MEMORANDUM

TO:              SGC Financial Advisors

FROM:         Rep Poppell

DATED:       May 27, 2005

RE:              SEC questionnaire to SGC clients


To SGC advisors:

As some of you may be aware, the SEC has opened an informal, non-public inquiry regarding our participation in SIB's U.S. Accredited Investor Program. The purpose of this inquiry is to make certain that SGC is complying with all the applicable rules of the Federal Security Laws relating to the U.S. Accredited CD Program offered by SIB. The SEC has selected clients at random who will receive a questionnaire with specific questions regarding their purchase of the CD product. This is a voluntary response requested by the SEC. Please encourage your clients to complete this questionnaire and return to the SEC, as instructed by the cover letter.

Please let us know of any clients who may receive this questionnaire.

Rep Poppell

# EXHIBIT 21



September 27, 2006

Stanford Group Company
5050 Westheimer, 3rd Floor
Houston, Texas 77056
Attn.: Mr. Ralph E. Poppell, Sr., Vice President and Director of Compliance

RECEIVED
OCT - 2 2006
SGC COMPLIANCE

Re:  Stanford Group Company
       OT-2005022037

Ladies and Gentlemen:

This office is continuing its inquiry with respect to the firm's offering of Certificates of Deposit issued
by Stanford International Bank.

To facilitate our inquiry, it is requested that you provide a response to each of the apparent deficiencies
noted below the:

1.  The staff notes that the Disclosure Statement, the International Private Banking brochure, the
    Flex CD brochure, the Index-Linked CD brochure, and the Fixed CD brochure should have
    disclosed the fact that the affiliation between Stanford International Bank and Stanford Group
    Company could create a conflict of interest in the NASD member's offer of the CD investments.
    Failure to make such a disclosure regarding the affiliation as a conflict of interest is a violation of
    NASD Conduct Rule 2210(d)(1)(A). Please comment.

2.  The Stanford International Bank Ltd. brochure claims to have "No Credit Risk" (page 5) and "No
    Loan Losses" (page 7). The brochure claims that customers are not exposed to the risks
    associated with commercial loans, because the bank only lends on a cash-secured basis to
    existing customers. However, none of the brochures reveal any of the risks associated with the
    portfolio holdings of the bank, such at market risk and currency risk. The breakdown of portfolio
    holdings as to category of investment product and the amount of the portfolio in each type of
    currency is addressed in the Disclosure Statement – however, no specific investments are
    identified. And, the foreign investors who received the Stanford International Bank Ltd. brochure
    are not provided with the Disclosure Statement anyway, because it is only delivered to U.S.
    accredited investors. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(B), in that
    it misleads customer and may obscure the risks associated with the CD products. Please
    comment.

3.  The Stanford International Bank Ltd. brochure, on page 6, reads "*Prudent Investments. Global
    investments, not loans, are the primary source of Bank earnings. Interest rates paid to depositors
    are based on prudent investment return expectations and are reviewed quarterly by the Board of*

Dallas District Office
12801 N. Central Expressway
Suite 1050
Dallas, TX
75243-1778

tel 972 701 8554
fax 972 231 7646
www.nasd.com

Investor protection. Market integrity.

Stanford Group Company
Attn.: Mr. Ralph E. Poppell, Sr., Vice President and Director of Compliance
September 27, 2006
Page 2

*Directors.*" Stanford Group Company has represented that it does not know what is in SIB's portfolio – "No account representative or financial advisor will know the individual securities positions underlying the CD's of Citicorp, Chase Manhattan Bank, Bank of New York, Bank of America, or Wachovia Bank. The most that will be known is precisely what the financial consultants of SGC know –i.e., the allocations of the portfolio among equities, bonds, currencies and metals." (from Chadbourne & Parke, LLP's response of October 3, 2005, in response to the SEC's assertion that the CD's were unsuitable because the financial advisors did not know what was in the underlying portfolios). The breakdown of types of investments and allocations among different currencies is available to registered persons in the "Disclosure Statement", but there is no information on any specific investments.) The assertion that the investments are "prudent" appears to be unwarranted and misleading, in view of the fact that no one at SGC knows what the investments are. This is in apparent violation of NASD Conduct Rule 2210(d)(1)(B). Please comment.

4.  Page 8 of the Stanford International Bank Ltd. brochure contains performance graphs comparing SIBL CD's with U.S. Bank CD averages. Such a comparison should have contained detailed and specific disclosure about the differences between the subjects of comparison, i.e., that U.S. Bank CD's are insured by the FDIC, whereas SIBL CD's are not. In addition, there should have been further disclosure of the differences in regulation of U.S. Banks and SIBL; for example, that U.S. banks are subject to regulation by an agency of the U.S. Government, whereas SIB is not subject to such oversight. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(A). Please comment.

5.  The Index-Linked CD brochure contains a misleading discussion which implies the investor will be purchasing a portfolio of stocks, bonds, mutual funds, and cash. Specifically, the concern lies with these statements: *"Clients may select from the Nasdaq 100, S&P 500, and DJ EURO STOXX 50 indexes upon initial investment. These indexes offer growth potential and the opportunity to diversify an existing portfolio mix of stocks, bonds, mutual funds, and cash."* This is an apparent violation of NASD Conduct Rule 2210(d)(1)(B). Please comment.

6.  The Index-Linked CD accrues interest and makes payment to holders of principal and interest upon maturity. However, the brochure fails to indicate that an investor may have an annual tax liability on an investment that pays no interest until maturity. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(A). Please comment.

This request is made pursuant to NASD Procedural Rule 8210 which requires a member firm and persons associated (or formerly associated) with a member firm to provide information with respect to any matter involved in an investigation, complaint, or proceeding. Your response must be received in this office no later than **October 11, 2006.**

Stanford Group Company
Attn.: Mr. Ralph E. Poppell, Sr., Vice President and Director of Compliance
September 27, 2006
Page 3

If you have any questions, please contact the undersigned at (972) 701-8554.

Sincerely,

Stacy L. Hagar
Special Investigator

/jw

# EXHIBIT 22

**From:**          Vollmer, Chuck
**Sent:**          Wednesday, February 11, 2009 2:52 AM
**To:**            Drews, Matthew; LeBaron, Jim
**Subject:**       Fw: Press Heads-up - Business Week Article

More good news and my response I have also talked to suzanne about our need to head
this stuff off by hiring an auditor of substance.

----- Original Message -----
From: Vollmer, Chuck
To: Rodriguez, Lula
Sent: Tue Feb 10 20:50:00 2009
Subject: Re: Press Heads-up - Business Week Article

It is imperative that we become proactive against this attack. Hiring a big name audit
firm would go a long way to answer these allegations. It would also handle the question
of our custodians and the fact that assets really do exist. I have been a proponent of
this for 4 years hoping this day would never come. Unfortunately it has. That said  we
can defeat those attacking us if we act immediately.

----- Original Message -----
From: Rodriguez, Lula
To: Hamm, Suzanne; Milner, Brent B.; Posner, Jeffrey; Notowich, Scott; Thornton,
Joanne; Vingerhoedt, Frans; Weissenstein, Eric; Weiser, Charles; Vollen, Gary D.;
Vollmer, Chuck; Meinhold, Keith; Maldonado, Patricia; Fortin, Barbara; Garcia, Luis;
Hubener, Doug; Lopez, Gil
Cc: Bertsch, Brian; Fernandez, Robert; Roldan, Elizabeth
Sent: Tue Feb 10 20:23:18 2009
Subject: FW: Press Heads-up - Business Week Article

I am sorry, I should have copied you on the initial email. I just push the button
before I was finished with the names, thank you, Lula

-----Original Message-----
From: Rodriguez, Lula
Sent: Tuesday, February 10, 2009 9:14 PM
To: 'Nanes, David'; Rodriguez-Tolentino, Juan; Staley, Jack; Bogar, Danny; Davis,
James; Alvarado, Mauricio; Stinson, Lena; Stack, Joan; Walker, Kye; McCarthy, Chase;
Meacham, Deborah; Hamm, Suzanne; Stoelker, Andrea; Green, Sharon; Green, Jason; Parker,
Rich; Spivak, Gary; Garlich, Edward; Conzelman, James; Johnson, Lionel C.; Mathias,
Anne; Valliere, Gregory; Stein, Ronald; Fusselmann, William; Fontana, Lawrence; Rigby,
Glen; Poppell, Rep; Holt, Laura
Cc: Baldwin, Jennifer; Roldan, Elizabeth; Bertsch, Brian; Fernandez, Robert; Moreno,
Hycha; Rodriguez, Lula
Subject: Press Heads-up - Business Week Article
Importance: High


Colleagues, as early as tomorrow morning, we are expecting a Business Week article that
will rehash some of the old allegations made by former disgruntled employees and that
were the basis for a Bloomberg story that ran last July. We are expecting the story to
also mention the recent visits by regulators to some of our North American offices.  We
will circulate the article to you once it appears online.

Given the current market environment we anticipate that this article will generate

**234**

additional media inquiries and coverage.  Accordingly, once we are able to assess the
tone of the article, we will circulate recommended talking points for you to use in
addressing any concerns from colleagues or clients. Please share this information with
your individual teams as you deem appropriate.

Any press inquiries are to be directed to Brian Bertsch at (212) 372-4499 or to our
Miami Office (305) 329-1681 for proper handling.  Thank you

Lula

# EXHIBIT 23

**From:** Barrios, Chad
**Sent:** Monday, June 06, 2005 9:02 PM
**To:** Mills, Hank
**Subject:** SEC Inquiry
**Hank we were just trying to find out how many of your clients received a letter from the SEC and if there are any negative repercussions.**

**Regards,**
**Chad**

*Chad Barrios*
**Financial Advisor**
**Stanford Group Company**
**445 North Boulevard**
**Baton Rouge, LA 70802**
**cbarrios@stanfordeagle.com**
**(225) 381-0529**

# EXHIBIT 24

**From:** Thomas, Pam
**Sent:** Monday, June 13, 2005 9:13 PM
**To:** Receptionist Houston; Arnold, George; Bennett, Teral; Berger, Andrea; Brownlee, Nancy; Cisneros, Susana; Comeaux, Jay; Cooper, Don; Crimmins, Ken; Cunningham, Amanda J.; DAmato, Jason A.; Ethridge, Elsie; Fry, John M.; Hare, Seth E.; Hoffman, Steven; Klingen, Joe; LeBlanc, Jason; Ling, Trevor Derek; Makransky, Anthony; Malvaez, Manuel; Mejia, Emilio; Miller, Donald R; Murchison, Spencer; Newton, Russ; Northam, Lupe; Perez, Tony; Perry, Louis M.; Rai, Sumeet; Rawl, Charles; Roys, Rocky; Shaw, Douglas; Simmons, Brent; Thomas, Christopher B.; Tidwell, Mark; Trullenque, Alvaro; Whittemore, David S.; Zarich, Michael
**Cc:** Alonso, Molly; Bennett, Ann; Correa, Mauricio; Dellosso, Joanne; Hernandez, Veronica; Hoelting, Marcia; Laverde, Helena; Lushute, Vicki; Martell, Yaneth; Olivier, Priscilla; Perez, Melissa K; Sigue, Paula; Thomas, Pam; Vandermeer, Alba; Waterland, Lisa B.; Zayas, Telsie
**Subject:** Sales meeting - Thursday, June 16th @ 3:15 PM in the Lodis Room
Please mark your calendars for this meeting.  Location of meeting to be determined.


*Pam Thomas*

Registered Client Service Assistant
Stanford Group Company
5050 Westheimer
Houston, TX 77056
(713) 964-5202 - Direct
(713) 964-8340 - Fax
*pthomas@stanfordeagle.com*

---

**From:** Tidwell, Mark
**Sent:** Wednesday, June 08, 2005 7:36 AM
**To:** Thomas, Pam
**Subject:** FW: Sales Meeting June 9, Thursday at 3:15

**Please mark your calendars – Thursday, June 16th @ 3:15 PM in the Lodis Room. This is the Sales Meeting that was rescheduled from last week.**

---

| | |
|---|---|
| **From:** | Tidwell, Mark |
| **Sent:** | Friday, June 03, 2005 12:18 PM |
| **To:** | Thomas, Pam |
| **Cc:** | Comeaux, Jay |
| **Subject:** | Sales Meeting June 9, Thursday at 3:15 |

Jay Comeaux and myself request everyone to attend this meeting. Agenda items include:

Introduce recent hires
Discuss SEC questionnaire
IAG updates on portfolio changes and performance.

Please let Molly Alonso know if you are **unable** to attend.
Mark


D. Mark Tidwell, CFP®
*Senior Vice President*
*Financial Consultant*
Stanford Group Company
5050 Westheimer
Houston, TX 77056

(713) 964-8344 Direct
(800) 958-0009
(713) 964-8340 Fax
*mtidwell@stanfordeagle.com*

*Pam Thomas*

Registered Client Service Assistant
Stanford Group Company
5050 Westheimer
Houston, TX 77056
(713) 964-5202 - Direct
(713) 964-8340 - Fax
*pthomas@stanfordeagle.com*

**238**

# EXHIBIT 25

**DRAFT**

[BERNIE YOUNG'S LETTERHEAD]

October _____, 2006

**VIA FEDERAL EXPRESS**

Ms. Stacy L. Hagar
Special Investigator
NASD
12801 N. Central Expressway, Suite 1050
Dallas, Texas 75243-1778

        Re:    OT-20050022037/Stanford Group Company

Dear Ms. Hagar:

This letter is the response of Stanford Group Company ("SGC") to the NASD's letter dated
September 27, 2006 regarding the offering of Certificates of Deposit issued by Stanford
International Bank Ltd. ("SIBL").  SGC will respond to each of the requests in the order set forth
in the NASD's letter.


**Request Number 1:**

**The staff notes that the Disclosure Statement, the International Private Banking brochure,
the Flex CD brochure, the Index-Linked CD brochure, and the Fixed CD brochure should
have disclosed the fact that the affiliation between Stanford International Bank and
Stanford Group Company could create a conflict of interest in the NASD member's offer of
the CD investments.  Failure to make such a disclosure regarding the affiliation as a
conflict of interest is a violation of NASD Conduct Rule 2210(d)(1)(A).  Please comment.**

        Response to Request Number 1:

We have, in the Disclosure Packet, fully disclosed the affiliation of SGC and SIBL, the
compensation arrangements and other areas that could create a conflict of interest, real or
perceived.

The Disclosure Statement, the International Private Banking brochure, the Flex CD brochure, the
Index-Linked CD brochure, and the Fixed CD brochure are all included in the Disclosure Packet
given to U.S. Accredited Investors. The purpose of the brochures is to provide supplemental
information concerning the U.S. Accredited Investor CD in conjunction with the other
documents in the Disclosure Packet. The Disclosure Packet, in its entirety, therefore, provides
U.S. Accredited Investors with all of the necessary and important information needed to engage

**239**

in a meaningful evaluation of the risks and rewards of the U.S. Accredited Investor Certificate of Deposit Program.

The Disclosure Statement prominently discloses SIBL's transactions with its affiliates on pages 5, 9 and 17, stating that it pays referral fees and "additional incentive bonuses" to representatives that introduce potential depositors to SIBL, and that potential depositors "may obtain information regarding any of these fees from SIBL upon written request."

Specifically, the Disclosure Statement, in a section entitled "Risk and Other Factors Affecting Stanford International Bank and the U.S. Accredited Investor CD Program, Referral Fees" on page 5, states:

> "Referral Fees are paid to persons who introduce Depositors to us. See "Description of the U.S. Accredited Investor CD Program, Referral Fees" on page 9 for a more detailed discussion of these fees. We currently pay a referral fee of 3% to our affiliate Stanford Group Company. Such fees are paid on an annual basis and are subject to change on an annual basis. Referral fees paid to others will not reduce the principal amount of your CD Deposit or the interest earned thereon."

The referenced section of the Disclosure Statement entitled, "Description of the U.S. Accredited Investor CD Program, Referral Fees" on page 9, states:

> "We may engage certain persons to introduce potential Depositors to the U.S. Accredited Investor CD and pay them a referral fee. We may also pay additional incentive bonuses to our representatives. You may obtain information regarding any of these fees from us upon written request. Among the firms with which SIBL has entered into referral agreements is Stanford Group Company, a United States registered broker/dealer and an affiliate of SIBL. See section entitled "Affiliate Transactions" for a discussion of this arrangement. Referral fees paid to others will not reduce the principal amount of your CD Deposit or the interest earned thereon."

The referenced section of the Disclosure Statement entitled "Affiliate Transactions" on page 17, states:

> "Among the persons or entities that may offer the U.S. Accredited Investor CD to Depositors on our behalf is Stanford Group Company ("SGC"), a Texas corporation which is a registered broker/dealer in the United States and is affiliated with us through common ownership. In such instances, SGC will be acting as an independent contractor, for which we will pay a referral fee for SGC's services.  (See "Referral Fee" sections on pages 5 and 9).

*       *       *

> SIBL and an affiliated company, Stanford Financial Group Company ("SFG"), have had a marketing and service contract in force since 1995, which provides us with marketing and management services for a negotiated fee. This contract is automatically renewed on a yearly basis unless terminated by one of its parties. We are also party to a referral fee agreement with SGC. The fees paid pursuant to the referral fee arrangement with SGC are calculated as a percentage of SGC's managed client portfolio of SIBL deposits, and

2

**240**

are currently 3%, negotiated annually. Referral fees paid do not reduce the principal amount of any CD Deposits or any interest earned thereon."

It is also important to note that SGC sends a referral fee notification letter to all referred accounts (both U.S. and non-U.S.), to inform investors of the 3% referral fee paid by SIBL to SGC and to offer the investor the opportunity to object. If the client objects, neither SGC nor the financial advisor receives any referral fee.

**Request Number 2:**

**The Stanford International Bank Ltd. brochure claims to have "No Credit Risk" (page 5) and "No Loan Losses" (page 7). The brochure claims that customers are not exposed to the risks associated with commercial loans, because the bank only lends on a cash-secured basis to existing customers. However, <u>none</u> of the brochures reveal any of the risks associated with the portfolio holdings of the bank, such at market risk and currency risk. The breakdown of portfolio holdings a[s] to category of investment product and the amount of the portfolio in each type of currency is addressed in the Disclosure Statement – however, no specific investments are identified. And, the foreign investors who received the Stanford International Bank Ltd. brochure are not provided with the Disclosure Statement anyway, because it is only delivered to U.S. accredited investors. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(B), in that it misleads customer and may obscure the risks associated with the CD products. Please comment.**

<u>Response to Request Number 2:</u>

We strongly believe that we have adequately disclosed the risks in the Disclosure Packet. Statements such as, the CD "involves substantial risk" and investors "may lose your entire investment," as stated below, are specifically included in the Disclosure Statement to eliminate any possible misconceptions or confusion about the safety and security of deposits.

The first section of the Disclosure Statement, on pages 3-5, entitled "Risk and Other Factors Affecting Stanford International Bank and the U.S. Accredited Investor CD Program," describes the operating history, global investment portfolio, regulatory issues, jurisdictional issues, absence of any U.S. or other governmental guarantee or insurance protection, notice that Depositors should conduct their own due diligence, lack of registration of the CDs as "securities," restrictions of transfer or resale of the CD Deposits, investment risk and strategy, and referral fees.

In that section, on page 3, under the subsection entitled "Global Investment Portfolio," it is stated in bold faced type:

"The viability of the U.S. Accredited Investor CD and the ability of SIBL to pay principal and interest on the CD Deposits are dependent on our ability and the ability of our portfolio managers to consistently make profitable global investment decisions. There can be no assurance that these decisions will continue to yield profitable results for SIBL or cause the investments made in the U.S. Accredited Investor CD or any other products

3

**241**

we offer to produce returns sufficient to fund the payment obligations of the CD Deposits. Past performance is not indicative of future results. (See description of "Investment Philosophy and Portfolio Diversification" on page 16.)"

It is further stated in the same section on page 3:

"Investing in securities issued by international governments and corporations involves considerations and risks not typically associated with investing in obligations issued by the U.S. Government and U.S. corporations. The values of international investments can be affected by changes in currency rates or exchange control regulations, application of international tax laws changes in governmental administration or economic or monetary policy, or changed circumstances in dealings between nations. Forces of supply and demand on foreign exchange markets determine international currency exchange rates. These forces are themselves affected by the international balance of payments and other economic and financial conditions, government intervention, speculation and other factors. Moreover, foreign currency exchange rates may be affected by the regulatory control of the exchanges in which the currencies trade. Investments in foreign markets can be affected by factors such as expropriation, confiscation, taxation, lack of uniform accounting and auditing standards, and potential difficulties in enforcing contractual obligations and investment policies, and may be affected by extended settlement periods."

The Disclosure Statement also contains a cautionary statement on the page immediately following the cover page that the CD Program offered by SIBL "INVOLVES SUBSTANTIAL RISK TO POTENTIAL DEPOSITORS."  Similarly, on page 5, in the section entitled "Risk and Other Factors Affecting Stanford International Bank and the U.S. Accredited Investor CD Program, Investment Risk and Strategy," the following statement appears in bold faced type:

"YOU MAY LOSE YOUR ENTIRE INVESTMENT UNDER CIRCUMSTANCES WHERE WE MAY BE FINANCIALLY UNABLE TO REPAY THOSE AMOUNTS. PAYMENTS OF PRINCIPAL AND INTEREST ARE SUBJECT TO RISK."

Further, as a matter of good business practice and to apprise investors of the nature of the risk associated with SIBL's CDs, the marketing brochure provided to U.S. Accredited Investors contains the following two-fold disclaimer, which is affixed inside the front or back cover of the brochure:

"Stanford International Bank Limited is an Antiguan Bank whose deposits are not covered by deposit insurance protection provided by U.S. Federal Deposit Insurance Corporation.

Stanford International Bank's products are ordinary bank deposit obligations, are not securities under U.S. federal or any state law, and therefore they are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder."

We reiterate that it is important to note that the Disclosure Packet consists of multiple documents and in its entirety provides a U.S. Accredited Investor with relevant and essential information needed to make a fully informed investment decision concerning the U.S. Accredited Investor Certificate of Deposit Program.  The purpose of the brochures is to provide supplemental information concerning the U.S. Accredited Investor CD in conjunction with the other documents in the Disclosure Packet.

The Disclosure Packet is given to U.S. Accredited Investors despite the fact that the U.S. securities laws do not require that Accredited Investors be given any disclosure information. Moreover, the marketing brochure is not an offer for sale. As stated on page 12 of the brochure, in the first note, "This information should not be considered an offer."  On pages 10 and 12, the brochure also instructs interested persons to contact SIBL for more details.

As for the fact that foreign investors are not given the Disclosure Statement, we stated in our letter to the SEC dated October 3, 2005, that we believe that both the process of selling CDs to foreign investors, as well as the content of the marketing materials used with foreign investors may well be beyond the reach of the U.S. regulators.

The solicitation and sales of SIBL's CDs to foreign investors occurs primarily abroad. For nearly all of these investors, the point of sale -- including initiation of the sale, pre-qualification of the investor, and consummation of the sale -- occurs abroad.  Further, the final point of sale -- the place where the business is ultimately transacted -- is Antigua.  That is, the final decision of whether or not to accept an investor into the CD program is made by SIBL in Antigua. It is not until after the sale is consummated abroad that the paperwork is sent to SGC's company headquarters office in Houston.

Also stated in our letter to the SEC dated October 3, 2005,  "Section 30(b) of the Exchange Act, 15 U.S.C. § 78dd(b) plainly states that the Exchange Act and the rules thereunder do not apply to any normal business in securities transacted outside the U.S....Section 30(b) thus expressly limits the SEC's jurisdiction over securities business transacted outside the U.S., unless it is done so 'in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion' of the Exchange Act."

It is important to note that foreign clients are merely purchasing CDs at an international bank in Antigua subject to Antiguan regulations. Foreign clients open a bank account in Antigua with the appropriate documents such as signature cards and bank account application. They are not purchasing the U.S. Accredited Investor CD, and thus are not required to be given or to complete the same paperwork as U.S. Accredited Investors.

We also wish to reiterate, as stated in response to Request No. 1 above, that SGC sends a referral fee notification letter to all referred accounts (both U.S. and non-U.S.), to inform investors of the 3% referral fee paid by SIBL to SGC and to offer the investor the opportunity to object. If the client objects, neither SGC nor the financial advisor receives any referral fee. SGC also discloses in the Disclosure Statement, on pages 5, 9 and 17, that it pays referral fees and "additional incentive bonuses" to representatives that introduce potential depositors to SIBL, and that

potential depositors "may obtain information regarding any of these fees from SIBL upon written request."

**Request Number 3:**

**The Stanford International Bank Ltd. brochure, on page 6, reads** *"Prudent Investments. Global investments, not loans, are the primary source of Bank earnings. Interest rates paid to depositors are based on prudent investment return expectations and are reviewed quarterly by the Board of Directors."* **Stanford Group Company has represented that it does not know what is in SIB's portfolio – "No account representative or financial advisor will know the individual securities positions underlying the CD's of Citicorp, Chase Manhattan Bank, Bank of New York, Bank of America, or Wachovia Bank. The most that will be known precisely what the financial consultants of SGC know – i.e., the allocations of the portfolio among equities, bonds, currencies and metals." (from Chadbourne & Parke, LLP's response of October 3, 2005, in response to the SEC's assertion that the CD's were unsuitable because the financial advisors did not know what was in the underlying portfolios). The breakdown of types of investments and allocations among different currencies is available to registered persons in the "Disclosure Statement", but there is no information on any specific investments.) The assertion that the investments are "prudent" appears to be unwarranted and misleading, in view of the fact that no one at SGC knows what the investments are. This is in apparent violation of NASD Conduct Rule 2210(d)(1)(A). Please comment.**

Response to Request Number 3:

We respectfully disagree that "the assertion that the investments are 'prudent' appears to be unwarranted and misleading."

"Prudent" as defined in Webster's dictionary is "using good judgment or common sense in handling practical matters." Black's Law Dictionary defines the "prudent-investor rule", also known as the "prudent-man [person] rule," as "the principle that a fiduciary must invest in only those securities or portfolios of securities that a reasonable person would buy." Black's defines a "reasonable person", also known as "prudent person" or "reasonably prudent person" as a "hypothetical person used as a legal standard to determine whether someone acted with negligence, who exercises the degree of attention, knowledge, intelligence, and judgment that society requires of its members for the protection of their own and of others' interests." For the reasons listed below, SGC firmly believes it has acted reasonably and exercised prudence in evaluating the offering of the SIBL CD to accredited investors in the U.S.

1.   SGC's Compliance Department conducts ongoing due diligence on SIBL which includes at least two on-sight visits annually. Interviews are held with the bank's senior management including the President, Chief Compliance Officer, and Senior Investment Officer. Other matters such as anti-money laundering, client due diligence procedures, changes in policies and procedures, investment policy and allocations, and regulatory audits are routinely discussed. In addition to on-site visits, SGC

reviews the SIBL quarterly updates and annual reports, as well as other information gathered, such as the International Monetary Fund Report on Antigua and Barbuda.

2.     SIBL has a longstanding, secure banking history, and has paid principal and interest payments to CD depositors for over 20 years as contracted. For the past 20 years (long before SGC even existed) SIBL has been issuing interest bearing CDs payable over relatively short maturities (i.e., 3 months, 6 months, or 1 year) largely due to the global diversification of investments in the banks portfolio, though longer maturities are available. Over 50% of the bank's CDs mature within one year. During its 20 year history, SIBL has never once defaulted upon payment to a customer of CD principal and/or interest when due.  Nor has SIBL ever been the subject of a regulatory enforcement action in connection with its bank operations and practices.

3.     During the eight years since the inception of the U.S. Accredited Investor CD Program, SGC has received no customer complaints regarding the SIBL CD.

4.     SIBL's investment strategy is set annually by its Board of Directors and reviewed by them at least quarterly. The investment philosophy includes capital preservation and a steady annual flow of revenues which is based on an investment methodology that pursues minimization of risk, liquidity, portfolio efficiency, operational flexibility, and absolute returns versus relative returns.  The bank's portfolio is diversified by asset classes, economic sectors, issuers, currencies, and geographic areas.  SGC reviews these allocations quarterly.

5.     As discussed in our letter to the SEC dated October 3, 2005, SIBL is a highly regulated financial institution subject to comprehensive regulation. Primary Regulation comes from three sources: the International Business Corporation Act ("IBC Act"), Statutory Instruments ("SI"), and the operational procedures of the Financial Services Regulatory Commission ("FSRC"). The FSRC has exclusive supervisory power over international banks in Antigua, including the authority to issue and revoke bank licenses at any time. More information regarding the strength and integrity of the FSRC can be found on its website at www.fsrc.gov.ag/fsrcregulation.asp.

Antiguan banking regulations include licensing criteria, capital adequacy requirements, internal audit and compliance requirements, examination and inspection requirements, and strict anti-money laundering regulations, among others. In December, 2004, the International Monetary Fund ("IMF") issued a positive report regarding Antiguan banking regulations and legal framework.

As stated in SI 22 (2004), SIBL is subject to stringent reporting and inspection requirements of the IBC Act. Section 242 of the IBC Act requires international banks to submit: (a) quarterly returns, expressed in U.S. dollars, containing an analysis of customer liabilities to the bank and a statement of the bank's assets and liabilities; (b) an annual audited return, expressed in U.S. dollars, providing an analysis of customer liabilities in respect of loans, advances, and other assets, as well as a profit and loss statement, balance sheet, and statement of assets and liabilities; (c) annual

7

**245**

certification of ownership; and (d) any other report requested by an appropriate official.  Accounts must be "audited in accordance with the International Standards for Auditing issued by the International Federation of Accounts, New York."

As further stated in our letter to the SEC dated October 3, 2005, "Deposits with SIBL are protected by strict capital, reporting and inspection requirements. Antigua banks must have a minimum $5 million capital requirement (required in order to obtain a license). (IBC Act § 238; SI 42-4 (1998).)  The IMF noted in its review of Antigua's banking regulations that the 'capital requirement of US$5.0 million appear[ed] to be at the top end when compared to the practice in other offshore banking centers.' (IMF Rep., 12.)  Banks also must have a minimum equity-to-asset ratio of 5% (not counting off-balance sheet assets). (SI 41-13 (1998).) The regulations further limit a corporation's exposure to a single entity or group of closely related parties to 25% of the corporation's capital. (SI 21 (2004).) A corporation must obtain prior approval before exceeding the 25% threshold. (SI 21 (2004).)"

In addition, as previously reported, rather than paying dividends to its shareholder, SIBL's earnings are reinvested as retained earnings ($133 million for 2004, up from $96 million for 2003) to provide SIBL with an enhanced earnings and "capital" cushion. This figure for retained earnings is only part of SIBL's larger equity cushion in the amount of $246 million (up from $135 million in 2003). SIBL's assets ($3.086 billion) exceed its liabilities ($2.839 billion) by $ 247 million (8.7%).  This is in excess of  U.S. legal requirements, further reflecting SIBL's "safe and sound" banking practices compared to US banks. Further, SIBL's investment assets ($2.848 billion) exceed deposits ($2.827 billion), including the CDs, of which the index-linked CDs ($17.8 million) constitutes only .63% (less than 1 percent of total deposits).

6.     The law of Antigua provides holders of time deposits with preferential debt status in the event of liquidation. Section 289 of the IBC Act requires that all time deposit holders be paid back at least $20,000 before any other depositors or creditors.

7.     Although not required to do so, on its own initiative SIBL has obtained extensive insurance coverage to insulate itself from potential insolvency of any U.S. correspondent bank through which funds may flow, as well as additional Fidelity coverage. The Disclosure Statement, on page 12, in a section entitled "Stanford International Bank Ltd., In General," states:

> "The insurance coverage held by SIBL includes Property and Casualty, Exporter's Package, Vehicle, Worker's Compensation and Travel. Fidelity coverages include Bankers' Blanket Bond, Directors' and Officers' Liability, and Errors and Omissions Liability coverages. We also maintain Depository Insolvency insurance. We maintain excess FDIC and Depository Insolvency insurance, currently in the amount of US$20 million, for each of our major U.S. and foreign correspondent banks. The latter insurance protects us against the possible insolvency of specified financial institutions where we may place our own funds. This insurance does not insure customer deposits and is not the equivalent of the FDIC insurance offered on deposits at many institutions in the United States."

8

8.      Some of the banks that serve as money managers are among the most highly respected and regulated international commercial and investments banks in the world, including Credit Suisse First Boston, Lehman Brothers, Societe Generale, and Couttes (owned by the Royal Bank of Scotland).

**Request Number 4:**

**Page 8 of the Stanford International Bank Ltd. brochure contains performance graphs comparing SIBL CD's with U.S. Bank CD averages.  Such a comparison should have contained detailed and specific disclosure about the differences between the subjects of comparison, i.e., that U.S. Bank CD's are insured by the FDIC, whereas SIBL CD's are not.  In addition, there should have been further disclosure of the differences in regulation of U.S. Banks and SIBL; for example, that U.S. banks are subject to regulation by an agency of the U.S. Government, whereas SIB is not subject to such oversight. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(A).  Please comment.**

<u>Response to Request Number 4:</u>

We agree that the graphs in the brochure do not state that U.S. bank CD's are insured by the FDIC, whereas SIBL CD's are not**.** However, we believe we have, in the Disclosure Packet, adequately addressed this subject. We reiterate that the Disclosure Packet, when reviewed in its entirety, adequately provides U.S. Accredited Investors with a total mix of information for the U.S. Accredited Investor Certificate of Deposit Program.  Moreover, as financially sophisticated investors, U.S. Accredited Investors should take into consideration the total mix of information made available to them, *i.e.*, the entire Disclosure Packet, and not just a select few of the many documents provided in the Disclosure Packet. We believe, therefore, that the Disclosure Packet, as a whole, presents a fair and balanced treatment of the risks and potential benefits of the U.S. Accredited Investor CD, including that the SIBL CD's are not FDIC insured and are not subject to U.S. securities and banking regulations.

As a matter of good business practice and to apprise investors of the nature of the risk associated with SIBL's CDs, the marketing brochure containing the performance graphs provided to U.S. Accredited Investors contains the following two-fold disclaimer, which is affixed inside the front or back cover of the brochure:

> "Stanford International Bank Limited is an Antiguan Bank whose deposits are not covered by deposit insurance protection provided by U.S. Federal Deposit Insurance Corporation.
>
> Stanford International Bank's products are ordinary bank deposit obligations, are not securities under U.S. federal or any state law, and therefore they are not subject to the reporting requirements of any jurisdiction, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder."

In addition, the Disclosure Statement, on pages 3-5, devotes an entire section titled RISK AND OTHER FACTORS AFFECTING STANFORD INTERNATIONAL BANK AND THE U.S.

ACCREDITED INVESTOR CD PROGRAM to disclosure of the risks associated with the U.S. Accredited Investor CDs.  This particular section advises U.S. Accredited Investors to carefully consider an extensive list of important risk factors that could affect the U.S. Accredited Investor Certificate of Deposit Program. Included within the list are risks associated with the fact that the U.S. Accredited Investors CDs are not FDIC insured and are not subject to U.S. securities and banking regulations. Similar disclosures regarding lack of FDIC insurance are on the inside cover page, and page 12 of the Disclosure Statement (see item 7 in response to Request No. 3 above).

The Disclosure Statement, on page 4, specifically states:

> "SIBL'S PRODUCTS ARE NOT SUBJECT TO THE REPORTING REQUIREMENTS OF ANY JURISDICTION, NOR ARE THEY COVERED BY THE INVESTOR PROTECTION OR SECURITIES INSURANCE LAWS OF ANY JURISDICTION SUCH AS THE U.S. SECURITIES INVESTOR PROTECTION INSURANCE CORPORATION OR THE BONDING REQUIREMENTS THEREUNDER. THE CD DEPOSITS AND THE CD CERTIFICATES ARE NOT INSURED BY THE FDIC OR ANY OTHER AGENCY OF THE UNITED STATES GOVERNMENT OR ANY STATE JURISDICTION, OR BY ANY INSURANCE PROGRAM OF THE GOVERNMENT OF ANTIGUA AND BARBUDA."

Therefore, we respectfully disagree with your assertion that there are no disclosures of the differences in regulations of U.S. Banks and SIBL.

**Request Number 5:**

**The Index-Linked CD brochure contains a misleading discussion which implies the investor will be purchasing a portfolio of stocks, bonds, mutual funds, and cash. Specifically, the concern lies with these statements:** *"Clients may select from the Nasdaq 100, S&P 500, and DJ EURO STOXX 50 indexes upon initial investment.  These indexes offer growth potential and the opportunity to diversify an existing portfolio mix of stocks, bonds, mutual funds, and cash."* **This is an apparent violation of NASD Conduct Rule 2210(d)(1)(B).  Please comment.**

Response to Request Number 5:

We respectfully disagree that the statement you quoted from the reverse side of the Index-Linked CD flyer/brochure implies that anyone is purchasing a portfolio of stocks, bonds, mutual funds, and cash. In fact, page 1 of the same Index-Linked CD flyer, states:

> "The Index-Linked CD (ILCD) provides a secure way for the investor to participate in the growth potential of certain equity markets by linking the returns to the performance of a specified index. Upon maturity, the Index-Linked CD will pay the initial amount invested, plus either a minimum guaranteed return based on the 30-day rate for Stanford International Bank's FixedCD, or a return equal to the average percent increase in value (APIV) of the index of choice multiplied by an established participation rate – whichever is greater."

10

After the above explanation, the actual mathematical formula to compute the "payout upon maturity" is spelled out. The complete description provided on both sides of the flyer makes it clear that the return does not depend on the various securities being tracked by the index, and that having a link to an index just provides the investor an upside over the minimum interest rate for the particular CD term purchased.


**Request Number 6:**

**The Index-Linked CD accrues interest and makes payment to holders of principal and interest upon maturity.  However, the brochure fails to indicate that an investor may have an annual tax liability on an investment that pays no interest until maturity. This is an apparent violation of NASD Conduct Rule 2210(d)(1)(A).  Please comment.**

      <u>Response to Request Number 6:</u>

We agree that there is no mention of potential tax liability in the brochure; however, we believe we have, in the Disclosure Packet, adequately addressed this subject.

We reiterate that the Disclosure Packet consists of multiple documents that in its entirety provides a U.S. Accredited Investor with relevant and essential information needed to make a fully informed investment decision concerning the U.S. Accredited Investor Certificate of Deposit Program. The purpose of the Index-Linked CD brochure is to provide supplemental information concerning that particular type of CD in conjunction with the other documents in the Disclosure Packet.

The Disclosure Statement, on page 9, in a section entitled "Description of the U.S. Accredited Investor CD Program, Taxes and Reporting", states:

> "Interest on the CD Deposits will not be subject to any tax, withholding or other charge in Antigua and Barbuda under current law. Citizens and residents of the United States may be subject to U.S. federal and state income tax on interest earned on CD Deposits. In addition, an investment in the CD Deposits may trigger certain U.S. government reporting requirements. We do not provide tax reporting or legal advice to Depositors. Therefore, you should consult with your tax advisor or legal counsel as to the tax and reporting consequences of an investment in the CD Deposits."

We appreciate your ongoing courtesy in addressing these matters, and wish to stress that SGC has and continues to pursue the goal of not only meeting, but exceeding the requirements of the regulatory agencies, and applicable U.S. laws, rules and regulations. Should you require further information regarding this response, please do not hesitate to contact me at (713) 964-5274.

Sincerely,

Bernerd E. Young
cc:     Mauricio Alvarado, General Counsel, Stanford Financial Group

# EXHIBIT 26

**From:** Poppell, Rep
**Sent:** Friday, May 27, 2005 4:01 PM
**To:** Alvarado, Mauricio; Bogar, Danny; Bates, Jane
**Subject:** FW: RE: SEC letter

All:

I have spoken with SEC, Jennifer Brandt, SEC Department of Enforcement

SEC has opened a non-public inquiry into the CD program of SIB (being sold through SGC).

This has been opened within the last couple of months.  It is non-public.  SEC cannot give us details.  It is normal business practice for the SEC to NOT notify SGC of this inquiry.

I have asked for a copy of the SEC request being made to our clients.  They will consider sending me a copy.

Meanwhile, I have received a copy of this letter from one of our clients.

I suggest we discuss this promptly.

Rep

---

**From:** Poppell, Rep
**Sent:** Friday, May 27, 2005 9:41 AM
**To:** Bates, Jane; Alvarado, Mauricio
**Subject:** RE: SEC letter

Jay Comeaux phoned......his broker Doug Shaw has received a phone call from one of his clients.  It seems the client has received a letter and subsequest request from the SEC regarding his respective purchase of an SIB CD from SGC.  The letter is signed by Jennifer Brandt, SEC department of enforcement.

I am not aware of such letter and am attempting to contact SEC to inquire.

Jay is attempting to get a copy of this letter from the client.

I will keep you abreast.

Rep

**250**

# EXHIBIT 27

**From:** Whitaker, Bill
**Sent:** Thursday, May 22, 2008 6:18 PM
**To:** Green, Jason
**Cc:** Bradham, J C.; Taylor, Susie
**Subject:** SIB Auditors

**Attachments:** image001.jpg

Jason,

I met with a very wealthy prospect yesterday who was the former Southeast Managing Director of Arthur Anderson.

I presented the SIB CD and his first question concerned the auditors, C.A.S. Hewlett & Co. Ltd. in Antigua. He said he was familiar with auditors in the Caribbean, and did not recognize their name. He also said that he was surprised that a $7 Billion bank did not retain a Big 4 or an International Auditor.

Please let me know who could I talk to give me a better understanding of the SIB auditors, their history with Stanford, and any other information you feel would be helpful.

Thanks, Bill.

Bill Whitaker

Senior Vice President, Investments

Stanford Group Company

Monarch Tower, Suite 700

3424 Peachtree Road, NE

Atlanta, GA  30326

404-231-6229

404-231-6205 Fax

877-230-6200 Toll Free

HYPERLINK "mailto:bwhitaker@stanfordeagle.com"bwhitaker@stanfordeagle.com

# EXHIBIT 28

**From:** Kuhrt, Mark
**Sent:** Tuesday, September 25, 2007 9:55 PM
**To:** Groesbeck, Mark
**Subject:** RE: auditor
They do not have a website and only have a representative office in London.  The principle is CAS Hewlett and he resides in Antigua.

*Mark Kuhrt*
*Stanford Financial Group*

---

**From:** Groesbeck, Mark
**Sent:** Tuesday, September 25, 2007 2:40 PM
**To:** Kuhrt, Mark
**Subject:** auditor

Mark
I thought you might know the answer to this question. The SIB annual report is audited by C.A.S. Hewitt & Co in Antigua – is this the only location of this firm? Are they part of a larger firm based in say London? If they have a company website that might be good for me to review.
Thanks
Mark

Mark A. Groesbeck CFP[R], ChFC[R], CLU[R]
Stanford Group Company
SVP/Director of Financial Planning
5050 Westheimer Road
Houston, TX 77056
(O) 713-964-8356
(toll free) 800-958-0009
(fax) 713-964-8364

# EXHIBIT 29

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| | § | Case No. 03:09-CV-0724-N |
| Plaintiff, | § § | |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § | |

---

## DECLARATION OF
## KARYL VAN TASSEL

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.     A copy of my resume is attached to Doc. 18 as exhibit **KVT-1**.  It summarizes my education and relevant work experience.  As it states, I am a Certified Public Accountant in the State of Texas, USA, and a Senior Managing Director of FTI Consulting, Inc.  I have 24 years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services.  I have performed detailed financial analyses for a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations.  In the litigation context, I have acted as an expert on a variety of economic damage claims and forensic accounting issues.  In several cases alleging fraud and other wrongdoing, I have traced funds for potential recovery.  I have

**253**

also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

2.     Based on FTI's analysis of the accounting and payroll records of the Stanford entities, as well as bank records from Stanford-controlled bank accounts and the accounts of Wealth Management Services, Ltd. ("WMS"), WMS received over $9.8 million in transfers from Stanford entities.  These funds were transferred to WMS's Wachovia account in Florida, at a rate of approximately $225,000 per month, from 2006 through the beginning of the Receivership.  Today, only a few thousand dollars are left in the Wachovia account, according to the bank records available to the Receiver.  The vast bulk of deposits (over 80%) into this account came from the $9.8 million transferred from Stanford.  In total, nearly $5.3 million in this account was transferred away from the United States via international wire transfer, including at least $750,000 in international transfers just in the last quarter of 2008 and January 2009.

I declare under penalty of perjury that the foregoing is true and correct.  *See* 28 U.S.C. § 1746.  Executed this 19 day of April 2010.

Karyl Van Tassel

# EXHIBIT 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. §§§§§ | |
| Plaintiff, §§ | Case No. 03:09-CV-0724-N |
| v. § | |
| JAMES R. ALGUIRE, ET AL. §§ | |
| Defendants. §§ | |

---

**DECLARATION OF
JAMES R. SCARAZZO**

---

I, James R. Scarazzo of 1001 K Street, Suite B-100, Washington, DC state on oath as follows:

### EXPERIENCE, EXPERTISE, WORK IN THIS CASE

1.      This declaration is made in support of the Receiver's Application for TRO, Preliminary Injunction, and in the alternative, Writ of Attachment (the "Application").

2.      I am employed by FTI Consulting, Inc.   The statements made in this declaration are true and correct based on the knowledge I have gained from the work I have performed in the course of FTI's investigation on behalf of the Receiver, including my participation in the collection of documents and electronic evidence.

3.      The documents attached to the Receiver's Application as Exhibits 3, 4, 8, 9, 10, 12, 13, 15, 16, 18, 20, 22, 23, 24, 25, 26, 27, and 28 are true and correct copies of emails

**255**

or email attachments that FTI collected from Stanford's email servers or computer hard drives in the course of its investigation on behalf of the Receiver.

 

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746.  Executed this 19th day of April 2010.

James R. Scarazzo