IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY,                     §
                                     §
          Plaintiff,                 §
                                     §
v.                                   §          Civil Action No. 3:09-CV-724-N
                                     §
JAMES R. ALGUIRE, *et al.*,          §
                                     §
          Defendants.                §

## PRELIMINARY INJUNCTION

This Order addresses the Receiver's application for preliminary injunction [392].

Because the Court finds that the Receiver satisfies all the requirements to obtain a

preliminary injunction under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), the

Court grants his application.   The Court enjoins certain former Stanford employees

("Employee Defendants")[1] from removing funds currently frozen in accounts located at

Pershing LLC and JP Morgan Clearing Corp., unless funds in the accounts exceed the total

of: (1) commissions earned from the sale of SIB CDs; (2) SIB quarterly bonuses; and (3)

branch managing-director quarterly compensation.[2]

---

[1]*See* Appendix A (list of Employee Defendants).

[2]For a totals for each category of funds for each defendant, see the declaration of
forensic account Karyl Van Tassel.  App. to Receiver's Mot. for Prelim. Inj. at 3–12 [393].

PRELIMINARY INJUNCTION – PAGE 1

# I. BACKGROUND

## A. The Stanford Ponzi Scheme

In February 2009, the Securities Exchange Commission ("SEC") sued various players in what it called a "massive Ponzi scheme" controlled by R. Allen Stanford. Stanford, through his Stanford International Bank ("SIB"), issued some $7.2 billion in sham certificates of deposit ("CDs") to investors.[3] Stanford perpetuated his fraud through a web of more than 100 entities. Defendants in this case are former employees of the Stanford entities. Most worked for Stanford Group Company ("SGC"), a registered broker-dealer; SGC's principal source of revenue was the sale of SIB-issued CDs.

The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors. CD proceeds largely went to speculative and illiquid investments; payments to the first round of investors; large "loans" that Stanford and his associates used funded a lavish lifestyle; and commissions, bonuses, and loans to SGC employees. Indeed, by the time the SEC filed suit, most of the $7.2 billion revenue from CD sales was gone, and the value of the Stanford entities' combined assets was less than $1 billion.

## B. Procedural History

After the SEC brought suit against Stanford, this Court appointed a Receiver to "marshal, conserve, protect, and hold funds and assets" obtained in connection with this scheme. The Court appointed Ralph S. Janvey as the receiver of these assets, and vested him

---

[3]The facts in this section represent the Court's findings based on the evidence before it in this proceeding.

"with full power of an equity receiver under the common law as well as such powers as are enumerated herein in this order."  The Court also froze all accounts that originated through SGC, and the Receiver took control of those accounts.

Several months after the Court froze these accounts, the Court advised the Receiver that he must either assert claims against account holders or release their accounts.  Thus, the Receiver sued hundreds of investors ("Investor Defendants") and former Stanford employees ("Employee Defendants"), bringing claims against them in the SEC proceeding as "relief defendants."  The Court then severed the "relief defendant" complaint from the SEC action, creating this separate lawsuit, *Janvey v. Alguire*.  Shortly after this case commenced, the Receiver asked the Court to continue the account freeze as to the Investor Defendants.  The Court held a hearing on the issue on July 31, 2009, at which it ruled that the asset freeze could continue only with respect to interest earned from the CDs, but not with respect to return of principal.  The Fifth Circuit affirmed the Court's Order in part and reversed it in part, holding that the Receiver must release *all* of the Investor funds because the Investor Defendants were not proper "relief defendants."  *Janvey v. Adams*, 588 F.3d 831, 834–35 (5th Cir. 2009).

The Fifth Circuit in *Adams* did not specifically address whether the Employee Defendants were proper relief defendants.  *See generally id.*  However, in light of the Fifth Circuit's reasoning, the Receiver amended his complaint against the Employee Defendants.  *See* Second Am. Compl. at 4–5 [156].[4]  His only remaining claims against the Employee

---

[4]The new complaint states:
The Receiver now respectfully files this Second Amended Complaint Against

Defendants are fraudulent transfer and, in the alternative, unjust-enrichment.

Further, post-*Adams*, the Receiver reached a partial compromise with the Employee Defendants regarding a partial release of their frozen accounts. *See* Order of Jan. 7, 2010 [174]. Several months later, the parties reached another compromise resulting in an another agreed order, which this Court entered. *See* Order of Apr. 6, 2010 [379]. That order provided for the immediate release of all funds in the Employee Defendants' accounts, with the exception of several limited categories of funds. The funds that were to remain frozen were: (1) commissions earned from the sale of SIB CDs; (2) SIB quarterly bonuses; and (3) branch managing-director quarterly compensation. *Id.* at 1.

The April 6 account freeze was set to expire on June 1, 2010. The Receiver asked Court to continue the account freeze in the form of a temporary restraining order, a preliminary injunction, or a writ of attachment. *See* Mot. for Prelim. Inj. at 33 [392]. The Court granted the request for temporary restraining order pending resolution of the preliminary injunction application. *See* Order of May 28, 2010 [448].

The Receiver asks the Court to enjoin "removal or dissipation of the assets in the Accounts" pending a trial on the merits in this case. *Id.* The Employee Defendants argue that the Court must deny the Receiver's preliminary injunction application because (1) the Court cannot issue a preliminary injunction because their claims are subject to arbitration,

---

Former Stanford Employees and an Appendix in support, amending herein his claims against the Former Stanford Employees to dismiss the relief-defendant claims against them in light of the recent decision of the U.S. Court of Appeals for the Fifth Circuit in *Janvey v. Adams*, Nos. 09-10761 & 09-10765, 2009 WL 3791623 (5th Cir. Nov. 13, 2009).

*Id.* at 5.

(2) the Receiver's requested relief is really an impermissible motion for writ of attachment;

(3) the Receiver cannot meet the requirements for a preliminary injunction; and (4) the

Receiver's calculation of CD proceeds are flawed. The Court addresses each of these

arguments in turn.

## II. THE COURT CAN GRANT PRELIMINARY RELIEF
## BEFORE DECIDING WHETHER TO COMPEL ARBITRATION

Defendants argue that the Court is without power to grant preliminary injunctive relief

because the Receiver's claims against them are subject to arbitration.  The Fifth Circuit has

not weighed in on the question of "'[w]hether the [Federal] Arbitration Act bars the issuance

of a preliminary injunction pending arbitration.'"  *RGI, Inc. v. Tucker & Assocs., Inc.*, 858

F.2d 227 (5th Cir. 1988) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCollum*,

469 U.S. 1127 (1985) (White, J., dissenting from denial of cert.)).  The Fifth Circuit *has* held

that, at a minimum, a district court may issue a preliminary injunction pending arbitration

where such relief was contemplated by the parties' agreement.  *RGI*, 858 F.2d at 231.

The situation in this case is different from the cases cited above because Defendants'

motions to compel arbitration, many of which very recently became ripe, are still pending.

*See Positive Software Solutions Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 561, 563

(N.D. Tex. 2003) (distinguishing between granting injunctive relief while a motion to compel

arbitration is pending and granting injunctive relief after a determination that the dispute is

subject to arbitration).  Due to the time-sensitive nature of the Receiver's requested relief,

the Court finds itself in the position of having to decide whether to issue a preliminary

injunction before it can resolve the myriad motions to compel arbitration now pending in this

case.

The Court holds that it has the power to preserve the status quo pending a decision on the motions to compel arbitration.  "[T]he weight of federal appellate authority recognizes some equitable power on the part of the district court to issue preliminary injunctive relief in disputes that are ultimately to be resolved by an arbitration panel." *Merrill Lynch, Pierce, Fenner & Smith v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993) (citations omitted)**;** *accord Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1380 (6th Cir. 1995) ("[W]e adopt the reasoning of the First, Second, Third, Fourth, Seventh, and arguably the Ninth, Circuits and hold that in a dispute subject to mandatory arbitration under the Federal Arbitration Act, a district court has subject matter jurisdiction under § 3 of the Act to grant preliminary injunctive relief . . . .").  These cases, which address whether a court may issue injunctive relief pending the resolution of an arbitration itself, do not specifically address whether a court may preserve the status quo pending its resolution of a *motion to compel* arbitration.  However, the logical inference is that the greater includes the lesser: if a district court has the power to order interim relief pending the conclusion of an arbitration itself, surely it also has the power to do so pending a decision on a motion to compel.[5]

The Court has not decided whether: (1) the Receiver's claims are subject to arbitration, or (2) the parties' arbitration agreement contemplates preliminary injunctive

---

[5]To hold otherwise would create a harsh procedural rule: in order to avoid irreparable injury, motions to compel arbitration where a request for injunctive relief is involved must be resolved before any temporary restraining order expires.  Such a rule would be both burdensome for district courts and impracticable, given the time it takes motions to compel arbitration to become ripe for ruling, even if no discovery is required.

relief.  Accordingly, if the Court rules in favor of Defendants on their motions to compel arbitration, Defendants may ask the Court to reconsider its preliminary injunction in light of Fifth Circuit law and the terms of the arbitration agreement.

### III. A TUFTA INJUNCTION IS A DISTINCT REMEDY FROM A WRIT OF ATTACHMENT

The Employee Defendants also argue that, regardless of the form of the Receiver's request, the relief he really seeks is a writ of attachment and the Court must analyze it as such.  *See* Defs.' Resp. at 7 [413].  The Court rejects this argument because "attachment" and "injunction" are distinct and alternative remedies under TUFTA.  Texas courts analyze preliminary TUFTA injunctions under Section 24.008(3), which provides for "an injunction against further disposition the asset transferred or of other property."  TEX. BUS. & COM. CODE ANN. § 24.008(3); *see, e.g.*, *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 610 (Tex. App. — Houston [1 Dist.] 2002, no pet.) (distinguishing remedy of a TUFTA injunction from attachment in non-TUFTA cases).  TUFTA's remedies provision also provides for an attachment as a provisional remedy.  TEX. BUS. & COM. CODE ANN. § 24.008(2).  Thus, the statute's plain terms make clear that "attachment" and "injunction" are distinct remedies.  Accordingly, because the Court exercises its discretion to grant a preliminary injunction under TUFTA, it need not consider the Receiver's alternative request for a writ of attachment.

### IV. THE COURTS GRANTS THE RECEIVER'S MOTION<br>FOR PRELIMINARY INJUNCTION UNDER TUFTA

TUFTA provides various remedies for fraudulent transfer claimants, one being an injunction against "further disposition by . . . the transferee . . . of the asset transferred or of

other property." Tex. Bus. & Com. Ann. § 24.008(3)(A).  A court may grant a TUFTA

injunction "subject to applicable principles of equity and in accordance with applicable rules

of civil procedure." *Id.*  The "applicable principles of equity" that determine when a district

court may issue preliminary injunctive relief "are long-established in this circuit."

*Libertarian Party of Tex. v. Fainter*, 741 F.2d 728, 729 (5th Cir. 1984).  A party seeking

preliminary injunctive relief must demonstrate:

> (1) a substantial likelihood that plaintiff will prevail on the merits,
> (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,
> (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and
> (4) that granting the preliminary injunction will not disserve the public interest.

*Id.* (citing *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

The party seeking the preliminary injunction must clearly carry the burden of persuasion on

all four requirements.  *Bluefield Water Assoc., Inc. v. City of Starkville*, 577 F.3d 250, 253

(5th Cir. 2009).  The decision whether to grant preliminary injunctive relief lies within the

sound discretion of the trial court.  *Miss. Power & Light Co. v. United Gas Pipe Line Co.*,

760 F.2d 618, 621 (5th Cir. 1985).

### A. Likelihood of Success on the Merits

"To determine the likelihood of success on the merits," a court must "look to the standards provided by the substantive law." *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (citing *Miss. Power & Light*, 760 F.2d at 622).[6] "Substantial likelihood" does not mean "more than negligible." *Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 954 (5th Cir. 1978). Something more than that is required. However, "[a] plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (citing *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596 n.34 (5th Cir. 2003)); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2948.3 (2d ed. 1995) [hereinafter WRIGHT & MILLER] (noting that "[a]ll courts agree" that a "plaintiff must present a prima facie case but need not show that he is certain to win" (citing cases)).

---

[6]In considering the likelihood of success on the merits, the Court looks to the evidence the parties have presented in this preliminary injunction proceeding. Defendants object to the Receiver's evidence as inadmissible on various grounds. *See* Defs.' Resp. at 2–3 [413]; Defs.' Resp. at 5–14 [417]. The Court overrules these objections. A preliminary injunction proceeding is not constrained by the same formal procedures as a trial. *See Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987). Indeed, "'inasmuch as the grant of preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be held . . . .'" *Id.* (quoting 11C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2949).

*1. The Receiver's Prima Facie Case.* — The Receiver creates a prima facie case for liability under TUFTA.[7] Under TUFTA, certain transfers are deemed invalid as to present and future creditors. Specifically, "[a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE ANN. § 24.005(a)(1).

Under the Uniform Fraudulent Transfer Act, "transfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007) (citing *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)). Thus, the Receiver may establish fraudulent intent by establishing that the Stanford enterprise operated as a Ponzi scheme. *See Warfield*, 436 F.3d at 558. A so-called "Ponzi scheme" is "'[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors.'" *Schonsky*, 247 F. App'x at 586 (citing BLACK'S LAW DICTIONARY 1180 (8th ed. 2004)). The transferee's knowledge is not relevant to determining whether transfers were made with an intent to defraud. *Id.*[8]

---

[7]Defendants argue that the Court must deny the Receiver's preliminary injunction application because the Receiver failed to plead his fraudulent transfer claim with requisite particularity under Rule 9(b). *See* Defs.' Resp. at 18 [417]. The Court will address the sufficiency of the Receiver's complaint at a later date, when it rules on Defendants' pending motions to dismiss. The question before the Court today is whether the Receiver has shown a likelihood of success in the context of these preliminary injunction proceedings.

[8]Because no Texas Supreme Court cases address the requisite mental state for a transferee-defendant under TUFTA, the Fifth Circuit in *Schonsky* made its best "*Erie* guess" as to the proper construction of the statute. *See id.* This accords with the plain language of TUFTA, which posits that transfers are fraudulent "if the *debtor* made the transfer or incurred

The Court finds that the Receiver has properly demonstrated that: (1) the funds he seeks to freeze represent transfers of Stanford CD proceeds, and (2) that the Stanford enterprise operated as a Ponzi scheme (and thus that actual intent to defraud was present). As to the transfers, it is undisputed that the currently frozen funds represent amounts transferred from the Stanford entities to the Employee Defendants in the course of their employment.[9]   The frozen funds represent: (1) loans made by SGC to the Employee Defendants; (2) commissions earned from the sale of SIB CDs; and (3) quarterly bonuses to financial advisors and managing directors.  In other words, the frozen funds directly represent proceeds and profits that the Employee Defendants earned selling Stanford CDs.[10]

Second, the Receiver presents ample evidence that the Stanford scheme, within which the transfers occurred, was a Ponzi scheme.  This creates a presumption of actual fraud on the part of the debtor-transferor (here, the Stanford entities).  He relies on the plea agreement

---

the obligation with actual intent . . . ."  TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (emphasis added).

[9]Defendants also argue that the Receiver has not shown a likelihood of success on the merits of his claims because he has improperly "lumped" the Employee Defendants in his complaint and in this preliminary injunction proceeding.  This is incorrect.  The Receiver presents competent evidence that each individual Defendant received transfers of money representing CD sale proceeds from the Stanford Ponzi scheme.  *See* App. to Receiver's Mot. for Prelim. Inj. at 8–12.  He presents evidence of actual fraudulent intent on the part of the debtor-transferor, Stanford.  Defendants do not dispute that Defendants received the transfers in question as proceeds from the Stanford scheme.  Nor do they point the Court to authority indicating that some other, more individualized showing is required.

[10]As the Receiver notes, it is not important whether the currently frozen funds, which were commingled in the Employee Defendants' CD accounts with other amounts that have since been released, are the exact funds received in connection with the Stanford scheme.  This is because TUFTA allows an injunction against further disposition of "the asset transferred or of other property."  TEX. BUS. & COM. CODE ANN. § 24.008(a)(3)(A).

PRELIMINARY INJUNCTION – PAGE 11

of James Davis, the chief financial officer of SGC.  *See* App. to Notice of Filing [771], *SEC v. Stanford Int'l Bank*, Civil Action No. 09-CV-0298 (N.D. Tex. 2009) [hereinafter "Davis Declaration"].  Davis admitted that the Stanford enterprise took in billions of dollars in CD sales, most of which it diverted into illiquid and overinflated investments.  *Id.* at 41–45.  Davis himself admitted that the Stanford CD-selling enterprise was a "massive Ponzi scheme," in which investors could not be paid without money collected from later investors.  *Id.* at 44–45.   The Receiver presents an extensive report from a forensic accountant confirming Davis's admissions.  *See* App. to Receiver's Reply [444-2 to 444-4].  He also provides a report from the inspector general of the SEC, which also confirms that the Stanford enterprise operated as a Ponzi scheme.  App. to Receiver's Mot. for Prelim. Inj. at 28–184.

Defendants argue that the Receiver fails to demonstrate that the Stanford enterprise operated as a Ponzi scheme.  *See* Defs.' Resp. at 12 [392].  They argue that, to the extent the Stanford enterprise had any legitimate revenue-generating activity, it was not a Ponzi scheme.  This is incorrect.  It is true that a Ponzi scheme "usually" lacks "any operation or revenue-producing activity other than the continual raising of new funds."  BLACK'S LAW DICTIONARY, *supra*, at 1180.  However, the term "usually" is an important qualifier in Defendants' definition.  Just because the typical Ponzi scheme lacks any legitimate revenue-producing activity does not mean the Stanford scheme was not a Ponzi scheme.  Even if Stanford maintained some legitimate investments in order to lure in more investors, the evidence indicates that they comprised a small fraction of his portfolio.  *See* Davis Declaration at 43.

PRELIMINARY INJUNCTION – PAGE 12

The Court finds that the Stanford enterprise operated as a Ponzi scheme, and that the frozen accounts hold proceeds of the fraudulent scheme transferred to Defendants by Stanford with an intent to hinder, delay, and defraud Stanford creditors.

**2. *Affirmative Defenses.* —** Because the Receiver showed he is likely to succeed on his prima facie case, Defendants can refute that he is likely to succeed on the merits only by showing that they are likely to succeed on an affirmative defense. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) ("[O]nce the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed.").

TUFTA includes a statutory affirmative defense, which provides that "[a] transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." TEX. BUS. & COM. CODE ANN. § 24.009(a). A defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration. *See, e.g.*, *Hahn v. Love*, 2009 WL 793637, at *6 (Tex. App. — Houston [1 Dist.] 2009, pet. denied).

Defendants fail to show that they are likely to succeed on an objective-good-faith defense. First, they present no evidence to indicate that they acted in objective good faith. As to the second prong of their good-faith defense, Defendants present no evidence that they provided equivalent value for the fraudulent transfers they received. Further, the Fifth

Circuit has held that, as a matter of law, services provided in the context of a Ponzi scheme do not constitute "reasonably equivalent value." *See Warfield*, 436 F.3d 558–60. Accordingly, the Court finds that Defendants fail to establish the elements of this affirmative defense, and that it does not preclude the Court's determination that the Receiver is likely to succeed on the merits.

### B. Threat of Irreparable Harm

A party seeking a preliminary injunction must show that "the threatened harm would impair the court's ability to grant an effective remedy." 11A WRIGHT & MILLER § 2948.1. The party must also show that there is an actual likelihood that the suggested harm will occur. *See id.*

The Receiver successfully shows that the threatened harm — dissipation of the assets that are the subject of this suit — would impair the Court's ability to grant an effective remedy. Much of the relief the Receiver seeks under TUFTA is equitable in nature and involves the specific assets that are now frozen. *See* TEX. BUS. & COM. CODE ANN. § 24.008(a) (listing various equitable remedies available under TUFTA, including avoidance of the fraudulent transfer, injunction, and appointment of an equitable receiver). If Defendants were to dissipate or transfer these assets out of the reach of the Court, the Court would be unable to grant the equitable remedies the Receiver seeks.

Other Courts have reached a similar conclusion in both fraudulent transfer and analogous cases. In numerous fraudulent transfer cases,[11] courts have held that dissipation

---

[11]As the statute itself makes clear, the Texas Legislature adopted TUFTA with the specific purpose that it be applied uniformly with other states' versions of the Act. TEX. BUS.

of assets would be an irreparable harm to a plaintiff. *See, e.g.*, *S. New Eng. Tel. Co. v. Global Naps, Inc.*, 595 F. Supp. 2d 155, 159 (D. Mass. 2009) ("This Court is persuaded that, absent an injunction, there is a substantial risk that Convergent or Gangi will dissipate, conceal or otherwise secrete assets thus causing irreparable harm to SNET."); *Seib v. Am. Sav. & Loan Ass'n of Brazoria County*, 1991 WL 218642, at *4 (Tex. App. — Dallas 1991, no writ) ("The property has been the subject of a scheme of fraudulent conveyances. If further transfers of such property are not enjoined, appellees will be forced to file lawsuits against subsequent transferees in an attempt to recover the property."). Courts have reached a similar conclusion in analogous contexts as well. *See, e.g.*, *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) ("[A]bsent the continuation of the asset freeze, the Enjoined Defendants will conceal, dissipate, or otherwise divert their assets, thereby defeating the possibility of the Court granting effective final relief in the form of equitable monetary relief for consumers."); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002) (holding that plaintiffs could obtain preliminary injunction if, inter alia, they could show that the defendants were "likely to dissipate the assets that may satisfy the equitable remedies" sought by plaintiffs).

Defendants argue that the Court cannot find irreparable harm because the Receiver has an adequate remedy in the form of money damages. It is true that courts generally do not find irreparable harm where money damages would be an adequate remedy. *See* 11A WRIGHT & MILLER § 2948.1 (citing cases). However, this rule does not inhere when "any

---

& COM. CODE ANN. § 24.012 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."). Thus, the Court finds persuasive UFTA cases from other jurisdictions.

judgment ultimately obtained . . . would be unenforceable." *Productos Carnic, S.A. v. Central Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). For example, "when the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the status quo pending judgment where the legal remedy might prove inadequate . . . ." *United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496–97 (4th Cir. 1999) (discussing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)). This is precisely the kind of case where preliminary injunctive relief is appropriate despite the fact that the suit is to recover money: the essence of a TUFTA claim is that the money now held by the transferee-defendant actually belongs to the creditor-plaintiff.

In addition to showing that the threatened harm would be irreparable, a party seeking a preliminary injunction must also show more than mere fear or speculation that the harm will occur. 11A WRIGHT & MILLER § 2948.1 (citing cases). Defendants argue that, in this case, that means that the Receiver must show a likelihood that each individual defendant would dissipate the frozen assets absent a preliminary injunction. They rely on a case from the Southern District of Texas, in which the court came to a similar conclusion. *See Newby*, 188 F. Supp. 2d at 707. There, the court noted that, although dissipation of asset could constitute irreparable harm to any "future equitable award entered by this court," the plaintiffs were required to show that "each defendant is likely to dissipate the assets that may satisfy the equitable remedies." *Id.*

However, the case on which Defendants rely is not a fraudulent transfer case. Various courts, including Texas courts, have found that a history of fraudulent transfer of an asset

creates a presumption of its further dissipation.  *See, e.g.*, *In re Focus Media*, 387 F.3d 1077, 1087 (9th Cir. 2004) (history of fraudulent transfer "raises the specter of irreparable harm to the bankruptcy estate if these funds are not frozen"); *Affordable Media*, 179 F.3d at 1236–37 (district court's finding of a risk of dissipation of assets, in light of defendants' "history of spiriting their commissions," was "far from clearly erroneous"); *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (district court had discretion to freeze assets of individual defendants in light of history of shifting assets from fraudulent entity to individual defendants)*; Seib*, 1991 WL 218642, at *4 ("In cases such as this where there is a prior history of fraudulent conveyances, it is necessary to preserve the status quo of the subject matter of the suit pending a final trial of the case on its merits.").

Like the other courts that have inferred a likelihood of dissipation from a history of fraudulent conveyance, this Court is satisfied that the risk of harm to the Receiver absent the injunction is more than mere speculation.  The assets in question have been the subject of prior fraudulent conveyances to the detriment of Stanford investors.  Thus, the Court finds it is likely that, absent an injunction, the assets would again be dissipated or transferred out of reach of Stanford creditors and thus that the Receiver has adequately shown a threat of irreparable harm.

### C. Balance of Interests and Service of Public Interest

Further, the potential harm to the Receiver absent a preliminary injunction outweighs the potential harm to Defendants.  Defendants argue that "the mere pennies that an investor may receive in a theoretical distribution from a successful recovery by the Receiver does not outweigh the [financial advisors'] interest in their own assets."  The Court disagrees.  The

Court must weigh, on one hand, the harm to Defendants of not being able to spend or use the frozen assets pending resolution of the merits of this case, and, on the other hand, the harm to investors as a whole if no injunction issues. For them, the harm is the possible dissipation of one of the few remaining assets that may eventually be available to Stanford's victims. On balance, the Court finds that this potential harm to the investors outweighs the harm of Defendants not being able to access their assets during the pendency of this case.

Finally, the preliminary injunction will not disserve the public interest. In fact, the opposite is true. The Receiver seeks to enjoin removal of frozen funds because he believes they are fraudulently transferred assets that properly belong to innocent Stanford creditors. If the funds are dissipated, they may be transferred out of the reach of the Receiver — and thus the investors — forever. To risk dissipation of one of the few assets potentially available to Stanford's fraud victims before this case can be decided on its merits would substantially disserve the public interest.

## V. THE RECEIVER'S CALCULATIONS

Defendants advance various arguments that this injunction should not issue because the *amount* of the Receiver's requested freeze is flawed. First, Defendants argue that their IRA accounts are exempt under Texas law from attachment, execution, and seizure for the satisfaction of debts. *See* Defs.' Resp. at 18–19 [417]. However, not every IRA is automatically exempt from creditors' claims. "A party claiming an exemption under section 42.0021 bears the burden of proving that he or she is entitled to it." *Jones v. Am. Airlines, Inc.*, 131 S.W.3d 261, 270 (Tex. App. — Fort Worth 2004, no pet.) (citations omitted). Specifically, the party claiming an exemption must show that she has a legal right to the

funds in the account.  *See id.*  Defendants fail to carry this burden, especially in light of tremendous evidence and the Court's finding that the funds in the IRA accounts represent fraudulently transferred Ponzi scheme proceeds.

Second, Defendants argue that the freeze should not extend to pre-tax amounts because Defendants already paid taxes on their earnings.  In response, the Receiver points the Court to one case in which a federal court declined an offset for taxes paid.  *See Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008).  There, the Ninth Circuit held that

> if we permit offsets for taxes, logic suggests we should also permit offsets for bank transfer fees and other fund management fees. . . . There is simply no principle by which to limit such offsets . . . . If each net winner could shield his gains in their entirety in this manner, the purpose of UFTA would be defeated, and the multitude of victims who lost their entire investment would receive no recovery.

*Id.*  The Court is compelled enough by this reasoning to decline the request for offset with respect to the preliminary injunction.

Third, Defendants argue that they are entitled to offset of: (1) amounts they lost on their own personal Stanford investments, and (2) amounts of unpaid compensation owed to Defendants.  Defendants provide no legal authority indicating that they would be entitled to such an offset.  These amounts are essentially unsecured claims Defendants have against the Stanford entities.  Like all other Stanford creditors, Defendants may seek these amounts through the Receiver's claims process.

Fourth, Defendants argue that some of the frozen funds predate TUFTA's four-year statute of limitations period and that those amounts must be excluded from the freeze.  However, Defendants make no effort to establish which frozen funds are subject to the statute

of limitations.  Further, as the Receiver correctly notes, even if some of the specific funds now frozen were transferred prior to the limitations period, the total amount of his claims far exceeds the frozen amounts.  Because TUFTA allows an injunction on the asset transferred or "other property," the Court overrules Defendants' statute-of-limitations objection.

Fifth, Defendants allege several problems with the Receiver's calculations of employee loans and severance payments.  The Court overrules this objection because loan and severance payments are not part of the current account freeze that the Receiver seeks to continue.  *See* Order of Apr. 6, 2010 at 1; Receiver's Reply at 7 n.13 [444]; *see also* App. to Receiver's Mot. for Prelim. Inj. at 3–12 (declaration of forensic accountant Karyl Van Tassel, listing loan and severance payments separately from the three categories of funds the Receiver seeks to enjoin).

## VI. BOND

Although Rule 65's security requirement is generally thought to be mandatory, a district court has discretion to determine the appropriate amount of bond.  11A WRIGHT & MILLER § 2954 (noting that "[t]he mandatory nature of the security requirement is ameliorated by" the qualification that the security will be "'in such sum as the court deems proper.'").  Thus, the Fifth Circuit, along with other federal courts of appeals, has held that a court may dispense with the security requirement if the grant of an injunction carries no risk of monetary loss to the defendant.  *See, e.g*, *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971) ("We think, though, that so long as the petitioner continues to pay her rent, it is very unlikely that the defendant will suffer any harm during the pendency of Mrs. Steward's efforts to protect herself and her children from eviction."); *see also* 11A WRIGHT & MILLER

§ 2954 ("Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." (citing cases)). Here, the Receiver has shown that the frozen accounts are safely in the custody of the financial institutions where they are held. Employee Defendants will be entitled to any interest that accrues on their accounts in the event they eventually prevail on the merits at trial. Further, Defendants fail to show that they would suffer any other monetary harm from lack of access to the frozen accounts if the preliminary injunction issues, let alone the possible value of such harm so as to allow the Court to calculate an appropriate security. In light of Defendants' failure to demonstrate a specific monetary harm that will befall them if the injunction issues, the Court finds that no bond is necessary at this time.

## CONCLUSION

Because the Court finds that the Receiver satisfies all the requirements to obtain a preliminary injunction under TUFTA, the Court grants his application for preliminary injunction. The Court enjoins the Employee Defendants from removing funds currently frozen in accounts located at Pershing LLC and JP Morgan Clearing Corp., unless funds in the accounts exceed the total of: (1) commissions earned from the sale of SIB CDs; (2) SIB quarterly bonuses; and (3) branch managing-director quarterly compensation. *Id.* at 1.[12]

It is further ordered that this Order is binding upon the parties to this action, their officers, agents, servants, employees and attorneys and upon persons in active concert or

---

[12]For a totals for each category of funds for each defendant, see the declaration of forensic account Karyl Van Tassel. App. to Receiver's Mot. for Prelim. Inj. at 3–12 [393].

participation with them who receiver actual notice of this Order by personal service or otherwise.

Signed June 10, 2010.

David C. Godbey
United States District Judge

PRELIMINARY INJUNCTION – PAGE 22

**APPENDIX A: LIST OF STANFORD EMPLOYEE DEFENDANTS**

1. Jeffrey E. Adams
2. Paul Adkins
3. Jeannette Aguilar
4. James R. Alguire
5. Peggy Allen
6. Orlando Amaya
7. Victoria Anctil
8. Tiffany Angelle
9. Susana Anguiano
10. James F. Anthony
11. Sylvia Aquino
12. Juan Araujo
13. Monica Ardesi
14. George Arnold
15. John Michael Arthur
16. Patricio Atkinson
17. Mauricio Aviles
18. Donald Bahrenburg
19. Brown Baine
20. Timothy Bambauer
21. Isaac Bar
22. Elias Barbar
23. Stephen R. Barber
24. Jonathan Barrack
25. Robert Barrett
26. Jane E. Bates
27. Timothy W. Baughman
28. Marie Bautista
29. Oswaldo Bencomo
30. Teral Bennett
31. Lori Bensing
32. Andrea Berger
33. Marc H. Bettinger
34. Norman Blake
35. Stephen G. Blumenreich
36. Michael Bober
37. Nigel Bowman
38. Brad Bradham
39. Fabio Bramanti
40. Fernando Braojos
41. Alexandre Braune
42. Charles Brickey
43. Alan Brookshire

44. Nancy Brownlee
45. Richard Bucher
46. George Cairnes
47. Fausto Callava
48. Robert Bryan Cannon
49. Frank Carpin
50. Rafael Carriles
51. Scott Chaisson
52. James C. Chandley
53. Naveen Chaudhary
54. Jane Chernovetzky
55. Susana Cisneros
56. Ron Clayton
57. Neal Clement
58. Christopher Collier
59. Jay Comeaux
60. Michael Conrad
61. Michael Contorno
62. Bernard Cools-Lartigue
63. Don Cooper
64. Jose Cordero
65. Oscar Correa
66. James Cox
67. John Cravens
68. Ken Crimmins
69. Shawn M. Cross
70. James Cross
71. Patrick Cruickshank
72. Greg R Day
73. William S. Decker
74. Michael DeGolier
75. Andres Delgado
76. Pedro Delgado
77. Ray Deragon
78. Arturo R. Diaz
79. Ana Dongilio
80. Matthew Drews
81. Carter W. Driscoll
82. Abraham Dubrovsky
83. Torben Garde Due
84. Sean Duffy
85. Christopher Shannon Elliotte
86. Neil Emery
87. Thomas Espy
88. Jordan Estra

PRELIMINARY INJUNCTION – PAGE 24

89. Jason Fair
90. Nolan Farhy
91. Evan Farrell
92. Marina Feldman
93. Ignacio Felice
94. Bianca Fernandez
95. Freddy Fiorillo
96. Lori J. Fischer
97. Rosalia Fontanals
98. James Fontenot
99. Juliana Franco
100. John Fry
101. Roger Fuller
102. Attlee Gaal
103. Miguel A. Garces
104. Gustavo A. Garcia
105. David Braxton Gay
106. Gregg Gelber
107. Mark Gensch
108. Gregory C. Gibson
109. Michael D. Gifford
110. Eric Gildhorn
111. Luis Giusti
112. Steven Glasgow
113. John Glennon
114. Susan Glynn
115. Larry Goldsmith
116. Ramiro Gomez-Rincon
117. Joaquin Gonzalez
118. Juan Carlos Gonzalez
119. Russell Warden Good
120. John Grear
121. Jason Green
122. Stephen Greenhaw
123. Mark Groesbeck
124. Billy Ray Gross
125. Vivian Guarch
126. Donna Guerrero
127. John Gutfranski
128. Rodney Hadfield
129. Gary Haindel
130. Jon Hanna
131. Dirk Harris
132. Virgil Harris
133. Kelley L. Hawkins

134. Charles Hazlett
135. Roberto T. Helguera
136. Luis Hermosa
137. Daniel Hernandez
138. Martine Hernandez
139. Patrica Herr
140. Alfredo Herraez
141. Helena M. Herrero
142. Steven Hoffman
143. Robert Hogue
144. John Holliday
145. Nancy J. Huggins
146. Charles Hughes
147. Wiley Hutchins, Jr.
148. David Innes
149. Marcos Iturriza
150. Charles Jantzi
151. Allen Johnson
152. Susan K. Jurica
153. Marty Karvelis
154. Faran Kassam
155. Joseph L. Klingen
156. Robert A. Kramer
157. David Wayne Krumrey
158. Bruce Lang
159. Grady Layfield
160. James LeBaron
161. Jason LeBlanc
162. William Leighton
163. Mayra C. Leon De Carrero
164. Robert Lenoir
165. Humberto Lepage
166. Francois Lessard
167. James C. Li
168. Gary Lieberman
169. Jason Likens
170. Trevor Ling
171. Christopher Long
172. Robert Long, Jr.
173. Humberto Lopez
174. Luis Felipe Lozano
175. David Lundquist
176. Michael MacDonald
177. Anthony Makransky
178. Megan R. Malanga

179. Manuel Malvaez
180. Maria Manerba
181. Michael Mansur
182. Iris Marcovich
183. Janie Martinez
184. Claudia Martinez
185. Aymeric Martinoia
186. Bert Deems May, Jr.
187. Carol McCann
188. Francesca McCann
189. Douglas McDaniel
190. Matthew McDaniel
191. Pam McGowan
192. Gerardo Meave-Flores
193. Lawrence Messina
194. Nolan N. Metzger
195. William J. Metzinger
196. Donald Miller
197. Trenton Miller
198. Hank Mills
199. Brent B. Milner
200. Peter Montalbano
201. Alberto Montero
202. Rolando H. Mora
203. David Morgan
204. Shawn Morgan
205. Jonathan Mote
206. Carroll Mullis
207. Spencer Murchison
208. David Nanes
209. Jon Nee
210. Aaron Nelson
211. Gail Nelson
212. Russell C. Newton, Jr.
213. Norbert Nieuw
214. Lupe Northam
215. Scott Notowich
216. Monica Novitsky
217. Kale Olson
218. John D. Orcutt
219. Walter Orejuela
220. Alfonso Ortega
221. Zack Parrish
222. Tim Parsons
223. William Peerman

PRELIMINARY INJUNCTION – PAGE 27

224. Beatriz Pena
225. Ernesto Pena
226. Roberto Pena
227. Roberto A. Pena
228. Dulce Perezmora
229. Saraminta Perez
230. Tony Perez
231. James D. Perry
232. Lou Perry
233. Brandon R. Phillips
234. Randall Pickett
235. Eduardo Picon
236. Edward Prieto
237. Christopher Prindle
238. A. Steven Pritsios
239. Arturo Prum
240. Maria Putz
241. Judith Quinones
242. Sumeet Rai
243. Michael Ralby
244. Leonor Ramirez
245. Nelson Ramirez
246. David Rappaport
247. Charles Rawl
248. Syed H. Razvi
249. Kathleen M. Reed
250. Steven Restifo
251. Walter Ricardo
252. Giampiero Riccio
253. Jeffrey Ricks
254. Juan C. Riera
255. Alan Riffle
256. Randolph E. Robertson
257. Steve Robinson
258. Timothy D. Rogers
259. Eddie Rollins
260. Peter R. Ross
261. Rocky Roys
262. Thomas G. Rudkin
263. Julio Ruelas
264. Nicholas P. Salas
265. Tatiana Saldivia
266. John Santi
267. Christopher K. Schaefer
268. Louis Schaufele

PRELIMINARY INJUNCTION – PAGE 28

269. John Schwab
270. Harvey Schwartz
271. William Scott
272. Haygood Seawell
273. Leonard Seawell
274. Morris Serrero
275. Doug Shaw
276. Nick Sherrod
277. Jon C. Shipman
278. Jordan Sibler 50,000
279. Rochelle Sidney
280. Brent Simmons
281. Edward Simmons
282. Peter Siragna
283. Steve Slewitzke
284. Nancy Soto
285. Paul Stanley
286. Sanford Steinberg
287. Heath Stephens
288. William O. Stone Jr.
289. David M. Stubbs
290. Mark V. Stys
291. Timothy W. Summers
292. Paula S. Sutton
293. William Brent Sutton
294. Ana Tanur
295. Juan Carlos Terrazas
296. Scot Thigpen
297. Christopher Thomas
298. Mark Tidwell
299. Yliana Torrealba
300. Jose Torres
301. Al Trullenque
302. Audrey Truman
303. Roberto Ulloa
304. Eric Urena
305. Miguel Valdez
306. Nicolas Valera
307. Tim Vanderver
308. Jaime Vargas
309. Pete Vargas
310. Ettore Ventrice
311. Mario Vieira
312. Evely Villalon
313. Maria Villanueva

PRELIMINARY INJUNCTION – PAGE 29

314. Chris Villemarette
315. Frans Vingerhoedt
316. Daniel Vitrian
317. Charles Vollmer
318. James Weller
319. Bill Whitaker
320. Donald Whitley
321. David Whittemore
322. Charles Widener
323. John Whitfield Wilks
324. Thomas Woolsey
325. Michael Word
326. Ryan Wrobleske
327. Ihab Yassine
328. Bernerd E. Young
329. Leon Zaidner