IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.* | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-0724-N |
| | § | |
| ALGUIRE, *et al.*, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.* | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0366-N |
| | § | |
| MIGUEL VENGER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, *et al.* | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0415-N |
| | § | |
| JUAN JOSE RODRIGUEZ POSADA, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

ORDER – PAGE 1

RALPH S. JANVEY, *et al.*                        §
                                                 §
        Plaintiff,                               §
                                                 §
v.                                               §        Civil Action No. 3:10-CV-0478-N
                                                 §
GILBE CORP., *et al.*,                           §
                                                 §
        Defendants.                              §

RALPH S. JANVEY, *et al.*                        §
                                                 §
        Plaintiff,                               §
                                                 §
v.                                               §        Civil Action No. 3:10-CV-0528-N
                                                 §
BUCK'S BITS SERVICE, INC., *et al.*,             §
                                                 §
        Defendants.                              §

RALPH S. JANVEY, *et al.*                        §
                                                 §
        Plaintiff,                               §
                                                 §
v.                                               §        Civil Action No. 3:10-CV-0617-N
                                                 §
NANCY R. JOHNSON, *et al.*,                      §
                                                 §
        Defendants.                              §

RALPH S. JANVEY, *et al.*                        §
                                                 §
        Plaintiff,                               §
                                                 §
v.                                               §        Civil Action No. 3:10-CV-0725-N
                                                 §
JAMES C. BARR, *et al.*,                         §
                                                 §
        Defendants.                              §


RALPH S. JANVEY, *et al.*                        §

§
§
Plaintiff,                                    §
§
v.                                            §                    Civil Action No. 3:10-CV-0844-N
§
INDIGO TRUST, *et al.*,                       §
§
§
Defendants.                       §


RALPH S. JANVEY, *et al.*                     §
§
Plaintiff,                            §
§
v.                                            §                    Civil Action No. 3:10-CV-0931-N
§
TONYA DOKKEN, *et al.*,                       §
§
§
Defendants.                       §


RALPH S. JANVEY, *et al.*                     §
§
Plaintiff,                            §
§
v.                                            §                    Civil Action No. 3:10-CV-1002-N
§
JOSE MANUEL FERNANDEZ, *et al.*,              §
§
§
Defendants.                       §

ORDER – PAGE 3

# ORDER

The Order addresses the Receiver's motion for partial summary judgment against some of the Stanford investors who received payment in excess of their original investment (the "Net Winners").[1]  For the reasons that follow, the Court grants the motion in part, and denies the motion in part.[2]

## I. THE RECEIVER'S ASSET RECOVERY ACTION

This case relates to the Securities and Exchange Commission's (the "SEC") ongoing securities fraud action against R. Allen Stanford, his associates, and various entities under Stanford's control (the "Stanford Defendants").  As part of that litigation, this Court assumed exclusive jurisdiction and took possession of the "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate").  *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *in SEC v. Stanford Int'l Bank*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009).  The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated"

---

[1]This Order addresses the Receiver's substantially identical motions in the following cases: *Janvey v. Alguire*, No. 09-CV-724 [615]; *Janvey v. Venger*, No. 10-CV-366 [145]; *Janvey v. Rodriguez-Posada*, No. 10-CV-415 [46]; *Janvey v. Gilbe Corp.*, No. 10-CV-478 [46]; *Janvey v. Buck's Bits*, No. 10-CV-528 [30]; *Janvey v. Johnson*, No. 10-CV-617 [26]; *Janvey v. Barr*, No. 10-CV-725 [24]; *Janvey v. Indigo Trust*, No. 10-CV-844 [31]; *Janvey v. Dokken*, No. 10-CV-931 [43]; and *Janvey v. Fernandez*, No. 10-CV-1002 [89].

[2]The Court also denies, as untimely, the Magness Defendant's motion for leave to file a supplemental response to the Receiver's motion for partial summary judgment [*Janvey v. Alguire*, No. 09-CV-724, Doc. 830].

in the Receivership Order. *Id.* at 3. Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5.

The Receiver has brought numerous actions against the Net Winners, seeking to avoid payments made to those investors who received payments in excess of their principal investment. The Receiver now moves for partial summary judgment.

## II. CHOICE-OF-LAW ANALYSIS

The parties disagree about the correct law to apply to this fraudulent transfer action. The Receiver seeks to apply the Texas Uniform Fraudulent Transfer Act ("TUFTA") against every Net Winner, while different Net Winners argue that either their own states' laws, or the law of Antigua, supply the relevant standards. The Court finds that there is no conflict of laws between UFTA-enacting states and that the conflict between UFTA and Antiguan law is a false conflict.

### A. Basic Choice-of-Law Principles

Under any choice-of-law analysis, the Court must first determine whether apparently conflicting laws actually conflict.  If no conflict exists, the Court need not conduct a choice-of-law analysis.  *See Covington v. Alban Offshore Ltd.*, 650 F.3d 556, 558-59 (5th Cir. 2011) ("[W]e need not decide in this case whether those principles should be drawn from Texas law or federal law, because both bodies of law lead us to the same conclusion."); *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir.2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary.").

If, however, the laws conflict, the Court must decide whether federal or state choice-of-law rules apply.  *In re Cyrus II P'ship*, 413 B.R. 609, 613 (Bankr. S.D. Tex. 2008).  In the federal receivership context, state choice-of-law rules apply.[3]  *See Terry v. June*, 420 F. Supp. 2d 493, 499-502 (W.D. Vir. 2006) (applying state choice-of-law rules in federal receivership action because there was no compelling federal interest); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that courts must apply forum choice-of-law rules in diversity cases); *Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir. 1977) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Mintz v. Allen*, 254 F. Supp. 1012 (S.D.N.Y. 1966)) (noting that *Klaxon* applies to pendent jurisdiction state-law claims).  Thus, the Court applies Texas choice-of-law rules.

---

[3]And, in any event, the Fifth Circuit indicates that the federal "independent judgment" choice-of-law test is the same as Texas's "most-significant relationship" test.  *In re Mirant Corp.*, 675 F.3d 530, 536 (5th Cir. 2012).

Under Texas choice-of-law rules, the Court next looks to whether an apparent conflict is an "actual conflict" or a "false conflict." A false conflict exists if the state with a potentially conflicting law does not have an actual interest in the dispute. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984) (finding "false conflict" because only Texas had interest in applying its law)*; see also Sandefer*, 846 F.2d at 322 (citing B. Currie, Selected Essays on Conflict of Laws 189 (1963); R. Leflar, L. McDougal & R. Felix, Cases and Materials on American Conflicts Law 320-21 (1982)) (applying Louisiana conflicts rule). A state has an actual interest, for conflicts purposes, if the state's relationship to the dispute is within the scope of the policies of the law sought to be applied. *Sandefer*, 846 F.2d at 322. If the conflict is false, the Court should not apply the law of the uninterested state. If a true conflict exists, Texas applies the "most significant relationship as enunciated in Sections 6 and 145 of the Restatement (Second) of Conflicts." *Guiterrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).[4]

---

[4]Texas courts are not explicit about whether the mechanics of false conflicts analysis are separate from the Restatement choice-of-law analysis. In *Duncan*, in fact, the Court appears to treat its false conflicts analysis as an application of Section 6 of the Restatement. 665 S.W.2d at 421. Yet the Court's opinion focused solely on governmental interests. *See Duncan*, 665 S.W.2d at 422 ("New Mexico has no governmental interest in the resolution of this issue."); J. George, *False Conflicts and Faulty Analyses: Judicial Misuse of Governmental Interests in the Second Restatement of Conflict of Laws*, 23 Rev. Litig. 489, 541 (2004) (arguing that *Duncan* adopted the Restatement, but applied a governmental-interest analysis). In a subsequent case, *after* concluding that three states had an interest in the dispute, the Court applied the Restatement more explicitly. *See Torrington v. Stutzman*, 46 S.W.3d 829, 848-50 (Tex. 2000). Based on the Court's readings of *Duncan* and *Torrington*, the Court guesses that the choice-of-law analysis in the false conflicts situation, under Texas law, is a distinct analysis based solely on governmental interests. Accordingly, the Court will first apply a governmental-interest analysis to determine whether any potential conflict is a false one. *See Duncan*, 665 S.W.2d at 421 ("The beginning point for evaluating

### B.  Choice-of-Law Contacts

To determine what states have an interest in this dispute, the Court must analyze the various states' contacts with the litigation.  *See De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1414 (5th Cir. 1995) (engaging in false conflicts analysis by first examining state contacts); *Duncan*, 665 S.W.2d at 421 (same).  Accordingly, for purposes of its present choice-of-law analysis, the Court makes the following findings:

**1.  *The Stanford Entities Operated as One Entity in Houston, Texas.*** – To the extent that the Receiver stands in the shoes of the Stanford Entities, the Court finds that the Receiver's relevant contact is Texas.  Although the Stanford Entities are located all over the world, with affiliates in at least 13 countries, this Court has previously held that the entire network operated as a single entity.  Order of July 30, 2012 [176], *in In re Stanford Int'l Bank, LTD.*, Civil Action No. 3:09-CV-0721-N (N.D. Tex. filed April 20, 2009) ("COMI Order") at 36.  Finding that the United States was the Stanford Entities' "center of main interest," the Court determined that "Stanford operated the entire network of Stanford Entities as an integrated unit in order to perpetrate a massive worldwide fraud."  *Id.*  Further, it held that "[e]ach Stanford Entity either participated in the scheme, derived benefit from the scheme, or lent the appearance of legitimacy to the entirety of Stanford's fraudulent

---

these contacts is the identification of the policies or 'governmental interests,' if any, of each state in the application of its rule.").  After eliminating false conflicts, if any actual conflict exists, the Court will then undertake a full Restatement analysis. *Cf. Sandefer*, 846 F.2d at 322 (applying Louisiana's similar two-step choice-of-law analysis).

enterprise." *Id.* The Court finds the same rationale applicable here and treats the Stanford Entities as a single entity.[5]

The Court now finds that the aggregated Stanford Entities were headquartered in Houston, Texas. In his own advertisements, Allen Stanford stated that the Stanford Entities were connected by a "powerful cohesive network" known as the Stanford Financial Group ("SFG"). SFG, by Stanford's own admission, was headquartered in Houston, Texas. Further, although Stanford's marketing literature indicated that the members of SFG were independent, in fact Stanford was the sole owner, directly or indirectly, of more than 130 separate Stanford entities. The evidence shows that Stanford entrusted two other individuals as his chief advisors, Tim Davis and Laura Pendergest-Holt. Although Stanford, Davis, and Holt did not work exclusively in Houston, Houston was the only city where all three had offices. Additionally, the majority of all the Stanford Entities' proceeds came through the sales of CDs through Stanford International Bank ("SIB"), and SIB maintained its principal operating account in Houston. SFG, through its Houston offices, even paid the salaries of other Stanford Entity employees. Thus, although Stanford Entities were located nationally and internationally, the Court finds that, when aggregated, those entities were headquartered in Houston, Texas. Accordingly, for its choice-of-law analysis, the Court will treat the Stanford Entities as a Texas entity.

---

[5]The Court notes that veil-piercing and substantive consolidation doctrines differ based on jurisdiction. Nevertheless, the Court previously found that veil-piercing or substantive consolidation would apply "[r]egardless of the standard employ[ed]." COMI Order at 26. Accordingly, the Court need not apply a choice-of-law analysis to aggregate the Stanford Entities.

**2. The Court Finds No Central Location for the Stanford Creditors.** – The Stanford Creditors, on the other hand, are not predominantly located in any particular location. The Receiver, although located in Texas, also represents the Stanford Creditors all over the world. *See Janvey v. Democratic Sen. Campaign Comm., Inc.*, No. 11-10704, 2012 WL 5207460, at *2 (5th Cir. 2012) (holding that Receiver represents Stanford creditors in TUFTA claims). To the extent that the Receiver represents these creditors, his contacts do not favor any particular state or country.

**3. The Court Treats Each Transferee Individually.** – For its choice-of-law analysis, the Court treats each transferee individually. Each transferee is entitled to a separate choice-of-law analysis, with a recognition of the transferees' particular contacts with respect to each individual fraudulent transfer action. *See Henrey Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 698 (Tex. 2002) (holding plaintiffs failed to show predominance where they did not conduct choice-of-law analyses for each plaintiff); *Treierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir. 1996) (noting choice-of-law must be decided for each defendant); *Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993) (same).

### B. The Conflict Between Antigua and UFTA is False

In light of these contacts, the Court finds that the any conflict between Antigua law and UFTA is false. A false conflict occurs where, although the laws of two possibly interested states might substantively conflict, only one state has an actual interest in the dispute. *See Duncan*, 665 S.W.2d at 422; *see also Sandefer*, 846 F.2d at 322. A state has

an actual interest if its relationship to the dispute is within the scope of the policies of the law sought to be applied.  *Sandefer*, 846 F.2d at 322.

Antigua has no actual interest in this dispute.[6]  The Court recognizes that the Stanford investors, both creditors and Net Winners, purchased CDs from SIB, located in Antigua.  But the Court has already found that the Stanford Entities operated as a single entity, headquartered in Houston, Texas.  *See* Part II(B)(1).  Although the Net Winners purchased CDs from an Antiguan corporation, that corporation was a sham, existing solely to perpetuate a worldwide fraud.  Antigua has no interest in applying its own law in such a scenario. Further, although Antigua may have some interest in protecting its citizens from the rescission of transfers that are later found fraudulent, no Net Winner asserts his or her right to Antiguan law as an Antiguan citizen.  In fact, it seems that few Stanford investors, if any, were located in Antigua at all; Antiguan law apparently prohibited SIB from serving Antiguans.  *See* Van Tassel Decl. *in* App. Supp. Receiver's Reply Mot. Summ. J. 51-51, ¶ 47.

Accordingly, the Court finds that, although Antiguan law may conflict with UFTA provisions, Antigua has no interest in the application of its law.  Therefore, to the extent that there may be a conflict between the law of any individual state with an actual interest in the litigation and Antiguan law, it is a false one.

---

[6]The fact that an individual Net Winner might prefer application of Antiguan law is irrelevant to this analysis.

### C.  As Between UFTA-Enacting States, There Is No Conflict

The Uniform Fraudulent Transfer Act ("UFTA") has been adopted by 43 states.  *In re Mirant Corp.*, 675 F.3d 530, 537 n.3 (5th Cir. 2012).  These 43 states have identical language in their fraudulent transfer provisions, and that language is "virtually identical" to the corresponding language in the Bankruptcy Code.  *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006); 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . or obligation . . . if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation.").  The Court is not aware of any Net Winner claiming that a non-UFTA state law applies to his or her fraudulent transfer action.  And because the UFTA-enacting states have identical "reasonably equivalent value" language, the Court finds that, as between UFTA-enacting states, there is no conflict.

The Net Winners argue that different states apply the UFTA "reasonably equivalent value" provision differently, and thus, the Court must engage in a conflicts analysis.  First, the Court is not convinced that the differences in outcomes actually conflict.[7]  And, even if

---

[7]For example, some Florida-based defendants argue that the Eleventh Circuit is split from the Fifth Circuit on its interpretation of "reasonably equivalent value."  In *In re Financial Federated Title & Trust*, 309 F.3d 1325 (11th Cir. 2002), the Eleventh Circuit reversed the district court and held that a Ponzi scheme employee could provide reasonably equivalent value by providing administrative services for the company perpetuating the scheme.  *Id.* at 1331-33.  This is allegedly inconsistent with the Fifth Circuit's holding in *Warfield v. Byron,* 436 F.3d 551 (5th Cir. 2006).  There, the Court held that a broker could not provide reasonably equivalent value to a Ponzi scheme by recruiting new investors.  *Id.* at 560.  But the holding that a Ponzi scheme employee might provide reasonably equivalent value to a Ponzi scheme by providing certain administrative support is not necessarily inconsistent with a holding that a broker does not provide reasonably equivalent value by recruiting new investors; the broker's assistance directly extends the fraudulent scheme while

the outcomes do conflict, a different interpretation of the same language is not a conflict. Rather, reasonably equivalent value, in the Ponzi scheme context, is merely an unsettled issue. An unsettled issue is not an actual conflict of laws. *Covington*, 650 F.3d at 558-59 (finding no conflict between Texas and federal law even in light of potentially conflicting federal precedent).

Further, although courts wrestling with reasonably equivalent value determinations may reach different conclusions, those courts tend to rely on the same body of law. *See, e.g.*, *Warfield*, 436 F.3d at 560 (relying on federal law to interpret Washington's UFTA provisons); *In re Carrozzella*, 268 B.R. at 487-491 (relying on UFTA and cases under Bankruptcy Code). Thus, since the Court would look to the same body of cases applying the law of any UFTA-enacting state, the Court would reach the same conclusion regardless of which UFTA jurisdictions law that it applied. Thus, no conflict exists. *See Covington*, 650 F.3d at 558-59.

---

administrative support extends the fraud only tangentially. Further, even if these cases were inconsistent, both deal with whether particular *services* rendered gave reasonably equivalent value, not whether the time value of money offered reasonably equivalent value. Thus, neither case is directly applicable to the issues here and accordingly, the holdings do not directly conflict in the context of this case. Although the Net Winners do cite some cases that deal with the time value issue, like *In re Carrozzella & Richardson*, 286 B.R. 480, 490-91 (D. Conn. 2002) and *In re Unified Commercial Capital*, No. 01-MBK-6004L, 01-MBK6005L, 2002 WL 32500567, at *4 (W.D.N.Y. June 21, 2002), these cases do not necessarily show an actual conflict either. The *Unified Commercial Capital* court applied federal law. *Id.* And no Net Winner specifically argues that Connecticut law should apply to it because it is a resident of Connecticut or that the *Carrozella* holding is somehow particular to Connecticut's UFTA provisions. Rather, the Net Winners cite *Carrozzella* as support for a universal interpretation of "reasonably equivalent value" to apply to all Net Winner defendants.

Some Net Winners argue that Texas law conflicts with other UFTA states' laws because Texas law empowers a court to award attorneys' fees "as are equitable and just." TEX. BUS. & COM. CODE § 24.013.  The Court need not presently decide this issue.  While the Receiver does claim that he is entitled to attorneys' fees under Texas law, he has not raised the merits of that claim in the instant motions for partial summary judgment.  Thus, for purposes of this Order, the Court need not yet decide either whether an award of attorneys' fees to the Receiver would be equitable and just and, if so, whether Texas law should apply (or vice versa).  Those questions can wait for another day.

Accordingly, because there is no conflict of laws between UFTA-enacting states as relating to the instant motions, the Court need not undertake a choice-of-law analysis as between those states.  As between Texas and any other UFTA-enacting state, as far as this Order is concerned, the Court applies Texas law.  *See Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532 (5th Cir. 2002) (holding that law of the forum state applies when substantive state law does not conflict).

### III.  SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).  Courts, however, need not sift through the record in search of triable

issues.  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its

belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Once the movant has made this showing, the burden shifts to the nonmovant to

establish that there is a genuine issue of material fact so that a reasonable jury might return

a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-

87 (1986).  Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions"

will not suffice to satisfy the nonmovant's burden.  *Douglass v. United Servs. Auto. Ass'n*,

79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).  Indeed, courts resolve factual controversies

in favor of the nonmoving party "'only when an actual controversy exists, that is, when both

parties have submitted evidence of contradictory facts.'"  *Olabisiomotosho v. City of Hous.*,

185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Wash. Capital Dus,

Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### IV.  THE NET WINNERS ARE LIABLE TO THE RECEIVER FOR THEIR NET WINNINGS

UFTA provides that a creditor may avoid a transfer if that transfer was fraudulent.

A transfer is considered fraudulent if it was made "with actual intent to hinder, delay, or

defraud any creditor of the debtor."  *E.g.*, TEX. BUS. & COM. CODE § 24.005(a).  In the

context of a Ponzi scheme, if the Receiver proves that such a scheme exists, the Receiver

need not prove actual intent to defraud; rather, actual intent is presumed.  *Janvey v. Alguire*,

628 F.3d 164, 178 (5th Cir. 2010) (holding that Receiver carried his burden by providing

sufficient evidence of a Ponzi scheme, "thereby obviating the need to prove fraudulent intent

of the *transferees*." (emphasis in original)).

However, even if a transfer was made with actual intent to hinder, delay, or defraud,

the Receiver is not entitled to avoid any transfer to any Net Winner transferee if the

transferee received the transfer "in good faith *and* for a reasonably equivalent value." TEX.

BUS. & COM. CODE § 24.009(a) (emphasis added).  Further, even if the Receiver may avoid

a  transfer, if the transferee received in good faith, the transferee is entitled to offset any

liability "to the extent of the value given the debtor for the transfer or obligation." *Id.*

§ 24.009(d).  Under UFTA, a transferee gives value for a transfer if "in exchange for the

transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."

*Id.* § 24.004(a).  The primary consideration in analyzing the exchange of value for any

transfer is the degree to which the transferor's net worth is preserved.  *Warfield v. Byron*, 436

F.3d 551, 560 (5th Cir. 2006) (citing *Butler Aviation Int'l v. Whyte*, 6 F.3d 1119, 1127 (5th

Cir. 1993)).

### A.   The Receiver Has Shown That Stanford Operated a Ponzi Scheme

This Court has repeatedly held that Stanford operated a Ponzi scheme.  *See* Order,

Mar. 31, 2011 [1310] in SEC Action (citing Order Granting Prelim. Inj., June 10, 2010 [456],

*in Janvey v. Alguire*, No. 3:09-CV-0724 (N.D. Tex. filed Apr. 20, 2009), *aff'd* 628 F.3d 164

(5th Cir. 2010)); Order, July 30, 2012 [176], *in In Re Stanford International Bank, Ltd.*, No.

3:09-CV-0721-N (N.D. Tex. filed Apr. 20, 2009) (clarifying Court's finding that Stanford operated a Ponzi scheme).  Here, the Court again holds that, as a matter of law, Stanford operated a Ponzi Scheme.

  *1. The Van Tassel Declaration Is Competent Summary Judgment Evidence*. – This Court, and others, have repeatedly relied on the declarations of Karyl Van Tassel in connection with Stanford matters.  *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F. Supp. 2d 825, 856 n.54 (N.D. Tex. 2011) ("As this and other courts have observed, Van Tassel's declarations provide clear numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme and reflect an extraordinarily detailed analysis." (internal quotations and citations omitted)).  Although the Net Winners continue to object to Van Tassel's declaration, the Court again overrules those objections.

  First, many Net Winners argue that Van Tassel's declarations are not based on "personal knowledge" because she relies partially on work product from members of her team.  But "[u]nlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge of observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted); *see also Salinas v. State Farm Fire and Cas. Co.*, Civil Action No. B-10-194, 2012 WL 5187996, at *6 (S. D. Tex. Feb. 23, 2012) (relying on expert testimony over objection that expert relied on work of others).  This objection is overruled.

Many Net Winners next argue that Van Tassel impermissibly relied on hearsay and unauthenticated documents. But an expert may rely on such evidence if that evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions of inferences upon the subject." FED. R. EVID. 703. The Court has already rejected similar arguments. *Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d at 834 n.9. Here, too, the Court overrules this objection.

Finally, the Net Winners also argue that Van Tassel's declarations lack an adequate foundation for her conclusion. The Court overrules this objection as well. The Court has previously noted that Van Tassel's declarations draw conclusions from "objectively verifiable Stanford entity, customer, and third party records, worksheets, and databases using reliable practices and methodologies that are standard in the fields of accounting and finance." *Id.* (quotation omitted); *accord Pendergrest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 880-81 (S.D. Tex. 2010) ("The Court receives in evidence and credits Van Tassel's conclusions based on the detailed analysis of documentary evidence, augmented by interviews of persons with firsthand knowledge, concerning the source and use of [SIB] funds, [SIB's] financial condition at various points in time, the timing and cost of assets acquired by various Stanford Entities (e.g., real estate and private equity investments), and the compensation of financial advisors who sold [SIB] CDs.").

The Court overrules all objections to the Van Tassel declarations and relies on those declarations in its determination of the Receiver's Net Winner summary judgment motions.

    *2. Van Tassel's Declaration Establishes that Stanford Operated a Ponzi Scheme.* –
A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later
investors generates artificially high dividends or returns for the original investors, whose
example attracts even larger investments." *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir.
2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)).  Van Tassel specifically
declares that "[b]ased on FTI's analysis to date, I have concluded that the overwhelming
majority of the funds use to make purported SIB CD interest and redemption payments was
proceeds from the sale of new SIB investors."  *See* Supplemental Van Tassel Decl. *in* App.
Supp. Receiver's Mot. Summ. J. 139, ¶ 15.  Van Tassel also concludes that "SIB offered CD
rates that were significantly greater than those offered in the United States."  *See* Van Tassel
Decl. *in* App. Supp. Receiver's Mot. Summ. J. 150, ¶ 12.  And, moreover, Van Tassel points
out that SIB touted its above-market rates in marketing materials.  *Id.*  The Court finds this
evidence sufficient to establish that the Stanford Entities operated as a Ponzi scheme.

    *3. The Expert Opinion of Alton R. Davis Is Unreliable.* – The Net Winners rely on
an expert declaration by Alton R. Davis to attempt to establish a fact issue that the Stanford
Entities operated as a Ponzi scheme.  Although Davis's opinion — that the Stanford Entities
were solvent — might raise a fact issue, the method used to arrive at this opinion is
unreliable.  Thus, the declaration is incompetent summary judgment evidence.  *See Daubert*,
509 U.S. at 589 (scientific expert testimony must be reliable); *Kumho Tire Co., Ltd. v.
Carmichael*, 526 U.S. 137, 141 (1999) (applying *Daubert* to non-scientific testimony).

Davis, an experienced valuation analyst, concludes that Van Tassel improperly valued three SIB assets: (1) loans made from SIB to Stanford; (2) SIB's holdings in Antiguan real estate; and (3) SIB's private equity investments. Davis omitted Van Tassel's valuation adjustments and then, using SIB's own books and records, concluded that SIB was solvent. But a valuation which relies only on the books of the company being valued is simply not reliable in this context. *See Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186 (7th Cir. 1993) (rejecting expert testimony where expert did not value assets at "market values"); *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 883 (Bankr. N.D. Cal. 2008) (noting that evaluation based solely on internal documents is not credible). A Houston jury convicted Stanford of thirteen counts of fraud. *See* Jury Verdict, March 6, 2012 [808], *in United States v. Stanford*, No. 4:09-CR-00342-1 (S.D. Tex. filed June 18, 2009). Jim Davis and Laura Pendergest-Holt both pled guilty to assisting Stanford in his fraudulent empire. *See* Plea Agreement as to Laura Pendergest-Holt, June 21, 2012 [890] in *United States v. Stanford*; Plea Agreement of Jim Davis, Pl.'s Mot. Summ. J., Ex. 1. In light of these developments, an expert opinion that simply takes the Stanford Entities at their word is not competent summary judgment evidence. *See, e.g.*, *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 870, 890 (E.D. Wis. 2010) (holding expert testimony unreliable where expert ignored certain facts); *In re Iridium Operating LLC*, 373 B.R. 283, 350 (Bankr. S.D.N.Y. 2007) (noting that expert opinion is unreliable "when the expert made no attempt to reconcile his view with a number of real world events and fails to acknowledge and account for these events" (internal

quotation marks and alterations omitted)).  Because unreliable expert evidence is no evidence at all for summary judgment purposes, *see Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 382-83 (5th Cir. 1996), the Court declines to consider Davis's declaration.  And because Davis's declaration is the only evidence that the Net Winners offer regarding the solvency of SIB and the Stanford Entities, the Court finds that the Net Winners failed to raise an issue of material fact about Stanford's operation as a Ponzi scheme.  Accordingly, the Receiver has met his summary judgment burden on this issue.

### B.  The Net Winners Did Not Provide Value for Their Interest Payments

Courts almost universally hold that the transfer of "false profits" from a Ponzi scheme is not made in exchange for value. *See, e.g.*, *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995); *In re Bernard L. Madoff Inv. Secs., LLC*, Adv. Pro. No. 09-1503, 2011 WL 4434632, at *11 (Bankr. S.D.N.Y. Sept. 22, 2011); *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 164-65 (1998) ("Almost all courts have held that a debtor does not receive reasonably equivalent value or fair consideration for any payments made to its investors.").  However, courts are decidedly less uniform where an investor enters into a contract with the Ponzi scheme for interest payments.

On one end of the split, many courts hold that investors that recover more than their principal from a Ponzi scheme investment do not provide reasonably equivalent value because the contract is void as against public policy. *See, e.g.*, *Warfield v. Carnie*, No. 3:04-CV-633-R, 2007 WL 1112591, at *12 (N.D. Tex. Apr. 13, 2007) (citing *In re United Energy*

*Corp.*, 944 F.2d 589, 595 (9th Cir. 1991)); *In re Hedged-Inv. Assocs., Inc.*, 84 F.3d 1286,

1290 (10th Cir. 1996); *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993); *In re*

*Indep. Clearing House*, 77 B.R. 843, 858 (D. Utah 1987).  Other courts, however, look to the

specific transaction between the Ponzi scheme and the transferee, holding that, where a

contract provides a reasonable rate of interest, the contract is enforceable, and that the

investor provided reasonably equivalent value for the transfer.  *See, e.g.*, *In re Carrozzella*

*& Richardson*, 286 B.R. 480, 483-84 (D. Conn. 2002); *First Commercial Mgmt. Grp.*, 279

B.R. 230, 236 (Bankr. N.D. Ill. 2002); *In re Unified Commercial Capital*, 260 B.R. 343, 346-

48 (Bankr. W.D.N.Y. 2001).[8]

    Although the Fifth Circuit has not yet spoken on the exact issue, the Court's leanings

seem clear.  In *Warfield v. Bryon*, 436 F.3d 551 (5th Cir. 2006), the Court held that an

---

[8]The Net Winners also rely on *In re IFS Financial Corp.*, 417 B.R. 419 (S.D. Tex. 2009) and the Fifth Circuit's decision in *Janvey v. Adams*, 588 F.3d 831, 835 (5th Cir. 2009). But the Receiver is correct that, in *IFS Financial*, the court noted only that "IFS did receive reasonably equivalent value from the disputed transfers in that its liability for fraud was reduced in the amount of the transfers." *IFS Fin. Corp.*, 417 B.R. at 442.  Nowhere in the opinion does the court mention any investor recovering more than his principal investment. Holding that a Ponzi scheme investor may recover payments made up to his principal investment is consistent with the vast majority of courts addressing the issue. *See, e.g.*, *Donnel v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008); *In re AFI Holding, Inc.*, 525 F.3d 700, 708-09 (9th Cir. 2008); *Lehmann*, 56 F.3d at 755; *Hedged-Inv. Assocs., Inc.*, 84 F.3d at 1289-90.  And *Janvey v. Adams* also fails to establish that the Net Winners provided reasonably equivalent value for their interest payments.  There, the Court held the Receiver could not proceed in joining CD holders only as nominal relief defendants.  The Court reasoned that the SIB CDs "constitute[d] a sufficient legitimate ownership interest to preclude treating the Investor Defendants as relief defendants." *Adams*, 588 F.3d at 835.  That holding has no effect on this Court's fraudulent transfer analysis.  There was no fraudulent transfer issue theory in that case, and thus, questions of value and reasonably equivalent value were simply never raised.  Thus, neither of these cases support the Net Winners' position.

investment broker failed to provide reasonably equivalent value by providing brokerage services for the Ponzi scheme.  Specifically, the Court stated that "it takes cheek to contend that in exchange for the payments [the broker] received, the . . . Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments." *Id.* at 560.  In its opinion, the Court cited favorably Ponzi scheme cases holding that brokers do not provide value even if they have a brokerage contract with the scheme.  *Id.* (citing *In re Ramirez*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *Randy v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995); *Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 16 (Bankr. D.D.C. 1993)).  Although the scenario here is different — brokerage services provide a different value than the time value of money — the thrust seems the same: a contract with a Ponzi scheme, and literal value provided to the Ponzi scheme, is not dispositive of the fraudulent transfer value inquiry.  Rather, literal value provided to a scheme that only extends the fraud, is not value, as defined by UFTA, as a matter of law.  In light of these decisions, especially *Warfield*, the Court sides with those courts that choose not to enforce investment contracts with a Ponzi scheme.  Accordingly, the Net Winners failed to provide value in exchange for the interest they received.

The courts that choose to enforce similar investment contracts rely heavily on the premise that the use of money provides literal value.  *See, e.g.*, *Unified Comm. Capital*, 260 B.R. at 353.  But, for UFTA purposes, value is defined in reference to the transfer of property or in reference to debt.  *E.g.*, TEX. BUS. & COM. CODE § 24.004 ("Value is given for a

transfer or an obligation if . . . property is transferred or an antecedent debt is secured or satisfied."). Here, the Net Winners claim that their interest payments secured an antecedent debt. But the statute defines debt as "liability on a claim." *Id.* § 24.002(5). Holding that an investor may not keep his interest payments is thus not a holding that the investor provided no literal *value*. Instead, the holding results from the fact that the investor had no *claim* and thus, the interest payments made from the scheme failed to pay down any debt, as defined by UFTA.

Starting from the premise that contracts with Ponzi schemes are void and unenforceable, the general rule that investors may keep principal payments but must return interest payments necessarily follows. The investor has a claim for fraud or restitution for the principal he or she was fraudulently induced to lend. *See supra*, note 11. But investors do not have a claim, absent the contractual one, for their interest payments. *See In Re Bayou Group, LLC*, 362 B.R. 624, 635 (Bankr. S.D.N.Y. 2007) (collecting cases); *see also* 47 C.J.S. INTEREST & USURY § 136 ("[W]here interest is recoverable other than under a contract, and payment of the principal as such is made and accepted, no interest can be recovered, the payment of the debt extinguishing the right to recover interest thereon. Interest, in such a case, is merely incidental to the debt or principal and cannot exist without it. Thus interest cannot be recovered in a separate action." (footnotes omitted)). Because the investors have a claim for their principal, those payments paid down an antecedent debt and, as such, were given for value. Because the investors had no claim for interest, such payments were not

given in exchange for value.  Accordingly, the Receiver may avoid the interest payments given in excess of the Net Winners' principal investments.[9]

The Court recognizes that forcing Net Winners to pay back interest payments will cause some pain.  But for victims of a Ponzi scheme, everyone is a loser.  *See Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) ("Ponzi schemes leave no true winners once the scheme collapses — even the winners were defrauded, because their returns were illusory."). And the Net Winners will be in far better shape, having recovered at least their principal, than most Stanford victims, who lost everything.[10]  Allowing Net Winners to keep their fraudulent above-market returns in addition to their principal would simply further victimize the true Stanford victims, whose money paid the fraudulent interest.  Although other courts have sometimes disagreed, the Court finds that avoiding the interest payments is the most equitable and just solution to a difficult problem.  *See id.* at 780 (holding that avoidance of net winnings is most equitable solution).

---

[9]Further, the Court notes that the alternative rule would require a CD-by-CD investigation to determine whether any given interest rate was reasonable. *See, e.g.*, *Unified Comm. Capital*, 260 B.R. at 350 (holding that "reasonable contractual interest" qualified as reasonably equivalent value).  Whether or not an interest rate is reasonable, of course, depends on a wide variety of different factors.  Application of such a rule, accordingly, would be time and resource intensive.  Although the relative ease in application of the majority Ponzi scheme rule is not necessarily cause to apply that rule, the impracticalities of the alternate rule warrant consideration.

[10]The Court acknowledges that in at least some circumstances, the Receiver would like to recoup the Net Winners' principal as well.  That is an argument for another day not raised by the instant motions.

### C.  The Receiver's Claims Are Not Barred by Limitations

This Court has already held that UFTA's discovery rule applies to the Receiver's fraudulent transfer claims because the fraudulent transfers were inherently undiscoverable. *See Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 835 (N.D. Tex. 2011).  And, given the size and scope of the Stanford scheme, discovering the fraudulent nature of the Net Winning transfers certainly takes time.  *See Janvey v. Democratic Senatorial Campaign Comm.*, 69 F.3d 848, 854 (5th Cir. 2012).  Further, the burden is on the Net Winners to "(1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pleaded or otherwise raised, by proving as a matter of law there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury." *Id.* at 854 (quoting *Cadle Co. v. Wilson*, 136 S.W.3d 345, 352 (Tex. App. – Austin 2004, no pet.)).  No Net Winners offer any evidence that the Receiver actually knew of the fraudulent nature of any of these interest transactions but failed to file suit within a year.  Accordingly, the Receiver's claims are not barred by limitations.

### D.  The Receiver May Recover from IRA Accounts

Some Net Winners argue that the Receiver may not recover his or her Net Winnings because those winnings are held in an Individual Retirement Account ("IRA") because an IRA is exempt from attachment, execution, or seizure.  *See* TEX. PROP. CODE § 42.0021(a).

The Net Winners also argue that the Receiver improperly sued beneficiaries of the IRAs rather than the custodians of those IRAs.  Both arguments fail.

First, the IRA exemption only applies if the investor "has a legal right to the funds in the IRA," *Janvey v. Alguire*, 647 F.3d 585, 601-602 (5th Cir. 2011), and the party claiming the exemption must establish that legal right.  "The mere fact that an account is an IRA account does not automatically entitle the [investor] to the exemption." *Id.*  But investors have no legal right to fraudulently transferred funds.  *See United States v. Chapman*, 756 F.2d 1237, 1240 (5th Cir. 1985) ("[A] conveyance which is found to be fraudulent as to creditors is wholly null and void as to such creditors and the legal as well as the equitable title remains in the debtor for the purpose of satisfying debts."); *Rutherford v. Carr*, 87 S.W. 815, 816 (Tex. 1905) (holding that legal title to property subject to a fraudulent transfer remains with debtor).  Thus, the IRA exemption does not apply.

Nor did the Receiver sue the improper parties.  UFTA specifically provides that the Receiver, in order to avoid a fraudulent transfer, may recover a money judgment against "the first transferee of the asset or the person for whose benefit the transfer was made." *E.g.*, TEX. BUS. & COM. CODE § 24.009(b)(1).  Although the Court recognizes that IRAs are distinct legal entities, UFTA specifically provides for recovery against the beneficiary in this instance.  Thus, the Receiver may recover from Net Winners, even if those Net Winners held their interest payments in IRA accounts.

### E.  The Receiver's Summary Judgment Motion Is Not Premature

Many Net Winners also argue that the Receiver's motion is premature.  Specifically, many Net Winners have pending motions to dismiss and have yet to answer the Receiver's complaint.  But Federal Rule of Civil Procedure 56 provides that "a party may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Here, the Court ordered limited discovery on the matters raised in the Receiver's motion.  Order of May 24, 2011, *in Janvey v. Alguire*, Civil Action No. 3:09-CV-0724-N (N.D. Tex. filed Apr. 20, 2009).  That limited discovery is complete.  Thus, ruling on the Receiver's motion is not premature.  *See, e.g.*, *Stein v. Oshinsky*, 348 F.2d 999, 1000-01 (2d Cir. 1965) (pre-answer motion for summary judgment was not premature); *Owner-Operator Ind. Drivers Assoc. v. C.R. England, Inc.*, 325 F. Supp. 2d 1252, 1261 (D. Utah 2004) (holding that motion for summary judgment was not premature where defendants had "full opportunity to submit any contrary evidence and ample time to reply to Plaintiffs' legal arguments"); *Coregis Ins. Co. v. McCollum*, 961 F. Supp. 1572, 1577 (M.D. Fla. 1997) (motion for summary judgment not premature where defendants "had ample time to conduct discovery in order to gather evidence to rebut Plaintiff's motion").[11]

---

[11]The Court does not decide the issues in the motions to dismiss.  Those motions remain pending, and the Court will decide those motions in due course.  The partial summary judgment granted here remains interlocutory pending disposition of those motions and the remaining claims in these actions.

### F. The Receiver Produced Evidence of the
### Amount of Investors' Net Winnings

Many Net Winners object to Van Tassel's declarations of the amount of interest the Net Winners received.  Many of these objections are the same as the objections raised by the Net Winners to Van Tassel's Ponzi scheme evidence.  The Court again overrules those objections.  Van Tassel is entitled to rely on the works of others.  *See supra*, Part IV(B)(2).  And "[t]he contents of voluminous writing, recordings, or photographs which cannot conveniently be exmained in court may be presented in the form of a chart, summary, or calculation."  FED. R. EVID. 1006.  In other words, "a district court does not abuse its discretion by admitting summary testimony where the evidence presented is voluminous and complex."  *United States v. Whitfield*, 590 F.3d 325, 364 (5th Cir. 2009).

Van Tassel declares that the damage calculations "were developed by the FTI team through a detailed review and analysis of the SIB records of CD interest and redemption payments from SIB customer accounts."  Van Tassel Decl., *in* App. Supp. Receiver's Mot. Summ. J. 80. Van Tassel describes her methodology:

> If a payment was made from an SIB customer account, the customer(s) who held that account were identified as recipient(s) of the purported CD interest or redemptions.  Once the customer(s) were identified, the SIB customer records were searched electronically for certain common identifiers, such as name, address, *etc.*, to identify all other SIB accounts associated with the customer(s).  If the name on each of the customer accounts appeared to be the same, the purported interest and redemption payments were added together into one line item entry on the schedule.  If the names on the accounts did not appear to be the same, they are listed as separate entries on the schedules.  If we determined through review of available records that someone other than the

> SIB account holder received purported CD interest or redemption payments,
> they are included on the appropriate schedule.

*Id.* Further, the Receiver made Van Tassel available for cross-examination and made the

underlying evidence available for inspection. *Harris v. United States*, 356 F.2d 582, 585 (5th

Cir. 1966) (permitting "the use of short-form summarizations by experts where, as here,

thorough cross-examination is afforded and relevant records are available for inspection").

Many Net Winners also argue that Van Tassel's damage calculations are inaccurate

because they fail to reflect an offset for the income tax that the investors paid after receiving

their interest payments.  But, as noted by the Fifth Circuit, there is no basis for this offset in

UFTA.  *See Janvey v. Alguire*, 647 F.3d 585, 602 (5th Cir. 2011); *see also Wing v.*

*Dockstader*, 482 F. App'x. 361, 365 (10th Cir. 2012) (holding that net winner investors are

not entitled to offset for taxes paid) (unpub.); *Donnell v. Kowell*, 553 F.3d 762, 779 (9th Cir.

2008) (same).  Accordingly, Van Tassel's chart showing a summary of her conclusions

regarding the amount of Net Winnings each investor received is also competent summary

judgment evidence.

### G.  Some Net Winners Raise a Fact Issue Regarding the Amount of Their Winnings

Although many Net Winners object to Van Tassel's declarations, most fail to offer

any contrary evidence.  Because the Court credits Van Tassel's declarations, without any

evidence tending to show another possible damage number, the investors without contrary

evidence fail to raise a material fact issue.  However, a small number of investors offer

evidence tending to rebut Van Tassel's declarations and thus raise an issue of material fact as to the Receiver's damage calculations.  Specifically, the Receiver is not entitled to summary judgment against John D. and Janis C. Westmoreland because Van Tassel's damage calculation fails to differentiate between those defendants and their now deceased mother, Ivy Pearl Westmoreland.  The Receiver is not entitled to summary judgment against Marilyn F. Howell and the Marilyn Howell Manley Trust because the Howell Defendants raise a fact issue as to whether they paid a penalty not reflected in the damage calculation. Accordingly, summary judgment is inappropriate as to those investors.

## CONCLUSION

For the reasons stated above, the Court grants the Receiver's motions in part and denies them in part.  The Receiver is entitled to judgment against each Net Winner investor, except the Westmorelands, Marilyn Howell, and the Marilyn Howell Family Trust, according to Van Tassel's calculations as listed in the KVT-4 attachment to Exhibit 5 of the Receiver's Motion for Summary judgment.[12]  The Court does not grant the Receiver attorneys' fees.  The Court also finds that this Order "involves a controlling question as to which there is substantial ground for difference of opinion and that an immediate appeal from

---

[12]Prior to entry of this Order, the Receiver and Defendant Judy L. Timberlake jointly moved to dismiss the Receiver's claims against Timberlake.  *See Janvey v. Venger*, No. 10-CV-366 [309].  The Court grants the motion and dismisses the Receiver's claims against Timberlake with prejudice.  Accordingly, the Receiver is also not entitled to judgment against Timberlake.

the order may materially advance the ultimate termination of the litigation," and thus, pursuant to 28 U.S.C. § 1292(b), certifies the Order for interlocutory appeal.

Signed January 22, 2013.

David C. Godbey
United States District Judge