IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RALPH S. JANVEY,                        §
                                        §
        Plaintiff,                      §
                                        §
v.                                      §        Civil Action No. 3:09-CV-0724-N
                                        §
JAMES R. ALGUIRE, *et al.*,             §
                                        §
        Defendants.                     §

## ORDER

This Order addresses various Stanford employees' (the "Employee Defendants") motions to compel arbitration [docs. 1015, 1016, 1017, 1018, 1019, 1020, 1021, 1022, 1025, 1049]. These motions are before the Court on remand from the Fifth Circuit in *Janvey v. Alguire* (*Alguire III*), 539 F. App'x 478, 479 (5th Cir. 2013). The Court determines that, under the circumstances of this particular receivership and the facts of the present case, (1) the Receiver has not adopted the arbitration agreements, and (2) arbitration of the Receiver's claims would frustrate a central purpose of federal equity receiverships. Thus, the Court denies the Employee Defendants' motions to compel arbitration.

### I. BACKGROUND

#### A. Origins of the Receiver's Asset Recovery Action

This case arises out of the Securities and Exchange Commission's ("SEC") imposition of a receivership for R. Allen Stanford's massive Ponzi scheme. The SEC filed suit in this Court, requesting the Court appoint a receiver over Stanford individually and several related

entities (the "Stanford Entities"). As part of that litigation, this Court assumed exclusive jurisdiction and took possession of the "Receivership Assets" and "Receivership Records" (collectively, the "Receivership Estate"). *See* Second Am. Order Appointing Receiver, July 19, 2010 [1130] (the "Receivership Order"), *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009). The Court appointed Ralph S. Janvey to serve as Receiver of the Receivership Estate and vested him with "the full power of an equity receiver under common law as well as such powers as are enumerated" in the Receivership Order. *Id.* at 3.

Among these enumerated powers, the Court "authorized [the Receiver] to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate." *Id.* at 4. Additionally, the Court "specifically directed and authorized [the Receiver] to . . . [c]ollect, marshal, and take custody, control, and possession of all the funds, accounts, mail, and other assets of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated," *id.*, and to file in this Court "such actions or proceedings to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate." *Id.* at 5.

Pursuant to those powers, the Receiver filed suit against former employees (the "Employee Defendants") of the Stanford Entities, claiming that the Employee Defendants received fraudulent transfers in violation of the Texas Uniform Fraudulent Transfer Act

("TUFTA") or, in the alternative, were unjustly enriched at the expense of the creditors of the Receivership Estate.

### B. History of the Motions to Compel Arbitration

The Employee Defendants first filed their motions to compel arbitration in January 2010. Since then, these motions have been on two separate trips to the Fifth Circuit, resulting in three Fifth Circuit opinions.[1] The most recent Fifth Circuit decision addressing these motions provides a concise overview of this history:

> Before it addressed the motions to compel arbitration, the district court granted a preliminary injunction freezing certain assets of the Employee Defendants. On appeal of that order, a panel of this court initially held that the Receiver's claims were not subject to arbitration. However, the panel subsequently withdrew that opinion, substituted a new opinion which concluded that this court lacked jurisdiction to address the motions to compel, and remanded so that the district court could rule on the motions in the first instance. On remand, the district court denied the motions to compel arbitration, holding that the Receiver had standing to bring claims on behalf of creditors and therefore was not bound by the arbitration agreements. This appeal followed.

*Alguire III*, 539 F. App'x at 479 (citations omitted).

The *Alguire III* Court reversed this Court's previous denial of the motions to compel arbitration. *Id.* at 480. The Fifth Circuit concluded that this Court's holding – that the Receiver was "not a party to or bound by the Employee Defendants' arbitration agreements"[2]

---

[1]*Janvey v. Alguire* (*Alguire III*), 539 F. App'x 478 (5th Cir. 2013) (per curiam) (unpublished opinion), *cert. denied*, 2014 WL 348236 (June 30, 2014); *Janvey v. Alguire* (*Alguire II*), 647 F.3d 585 (5th Cir. 2011); *Janvey v. Alguire* (*Alguire I*), 628 F.3d 164 (5th Cir. 2010), *withdrawn by Alguire II*, 647 F.3d 585.

[2]*Janvey v. Alguire*, 2011 WL 10893950, at *2–4 (N.D. Tex. 2011), *rev'd*, 539 F. App'x 478 (5th Cir. 2013).

– relied upon the erroneous legal conclusion that the Receiver has standing to bring suit on behalf of the third-party investor creditors. *Id.* The Fifth Circuit's conclusion in *Alguire III* relies upon legal principles articulated by another recent Fifth Circuit decision in a related Stanford case. As stated in *Alguire III*, the argument that the Receiver:

> has standing to bring suit on behalf of creditors and, therefore, that he is a stranger to the arbitration agreements between Stanford and the Employee Defendants[,] . . . is foreclosed by this court's recent decision in *Janvey v. Democratic Senatorial Campaign Committee, Inc.* (*DSCC II*), in which we held that "a federal equity receiver has standing to assert only the claims of the entities in receivership."

*Id.* (quoting *Democratic Senatorial Campaign Comm.* (*DSCC II*), 712 F.3d 185, 190 (5th Cir. 2013)).

The Fifth Circuit in *Alguire III* remanded the case and these motions back to this Court. Thus, this Court is to decide once again whether to deny or grant the motions to compel arbitration, but this time based on the question of "whether the Receiver is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities." *Id.*

## II. RELEVANT LEGAL STANDARDS

### A. General Legal Standard for Addressing Arbitration Clauses

"Section 2 of the Federal Arbitration Act (FAA) makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1744 (2011) (quoting 9 U.S.C. § 2). "The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *Id.* at 1745 (citing *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008)). "The FAA establishes 'a liberal federal policy

favoring arbitration agreements.'" *D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 360 (5th Cir. 2013) (quoting *Concepcion*, 131 S. Ct. at 1749).

"Because the FAA is 'at bottom a policy guaranteeing the enforcement of private contractual arrangements,' we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625 (1985)). "The Federal Arbitration Act 'does not require parties to arbitrate when they have not agreed to do so . . . .'" *Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 562 (5th Cir. 2011) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 217 (5th Cir. 2003) (quoting *Waffle House*, 534 U.S. at 293)). "The federal policy favoring arbitration does not extend to a determination of who is bound because, as stated by the Supreme Court, the purpose of the Federal Arbitration Act is 'to make arbitration agreements as enforceable as other contracts, but not more so.'" *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1074 (5th Cir. 2002) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)).

Additionally, "the Arbitration Act's mandate may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). "If such a command exists, it 'will be discoverable in the text,' the statute's 'legislative history,' or 'an "inherent conflict" between arbitration and the [statute's] underlying purposes.'" *D.R. Horton*, 737 F.3d at 360 (alteration in original) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). "When considering whether a

contrary congressional command is present, courts must remember 'that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.'" *Id.* (quoting *Gilmer*, 500 U.S. at 26). "The party opposing arbitration bears the burden of showing whether a congressional command exists," and "[a]ny doubts are resolved in favor of arbitration." *Id.* (citations omitted).

### B. The Limited Caselaw Regarding the FAA and Federal Equity Receiverships

Few courts have considered the interplay between federal equity receivers and the FAA, probably because federal bankruptcy procedures have, in great part, supplanted federal equity receiverships.[3] Equity receiverships in the United States can be traced back to the Chancery courts of England,[4] and the relationship between bankruptcy and common law receiverships in the United States dates back to the 1800s.[5] Procedures for state receiverships

---

[3]*See* 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2981 (2d ed. 1987) [hereinafter WRIGHT & MILLER] ("[T]he scope of federal equity receivership in this country has diminished sharply as the scope of bankruptcy practice and other statutory receiverships have enlarged." (citation omitted)). *But see infra* note 11.

[4]Jesse G. Reyes, *The Swinging Pendulum of Equity: How History and Custom Shaped the Development of the Receivership Statute in Illinois*, 44 LOY. U. CHI. L.J. 1019, 1044 (2013); *see also* 12 WRIGHT & MILLER § 2981 ("Receivership practice apparently grew out of the need of the English Court of Chancery for an additional means of protecting real property for the benefit of remaindermen when the court doubted that the party in possession would obey the court's injunction to stay waste and preserve the property, rents, and profits for those ultimately entitled to receive them." (citation omitted)).

[5]*See* Reyes, *supra* note 4, at 1044–47.

ORDER – PAGE 6

existed in the 1800s to assist in foreclosure suits, among other functions, with many states

codifying the pre-existing rules in equity surrounding their appointment and powers.[6]

Federal equity receiverships, on the other hand, became prominently known for one

main function in the late 1800s and early 1900s: railroad reorganization.[7]  As stated by one

legal commentator, "In a very real sense, the history of corporate reorganization is the history

of nineteenth-century railroad failure.  The periodic collapse of the railroads led to the first

true reorganizations – which were called equity receiverships."[8]  Another legal commentator

offers the following comparison: "Receiverships, like chapter 11 today, were expected to

offer something more – a stronger tool for resolving a railroad's financial problems."[9]  While

this particular form of federal equity receivership was largely replaced in 1933 and 1934 by

the addition of certain provisions to the Bankruptcy Act of 1898,[10] the SEC and federal courts

_____

[6]*Id.* at 1046–49.  The Court notes that when it uses the term "equity receivers" it is not referring to state receivers in this type of context.  *See generally Duparquet Huot & Moneuse Co. v. Evans*, 297 U.S. 216, 221 (1936) ("A receivership in a foreclosure suit is limited and special.  The rents and profits are impounded for the benefit of a particular mortgagee, to be applied upon the debt in the event of a deficiency. . . . There is neither winding up of the business nor attempt to reorganize it and set it going anew.  This is not the equity receivership of which the lawmakers were thinking if context and analogy have capacity to deliver up a lesson." (citations omitted)).

[7]Kevin Moore, *The SEC's Role in American Corporate Reorganization: A Historical Analysis*, 2011 ANN. SURV. OF BANKR. LAW 6, Part I.A.1–2 (2011).

[8]*Id.* (quoting DAVID A. SKEEL, JR., DEBT'S DOMINION 750–52 (2001)).

[9]Stephen J. Lubben, *Railroad Receiverships and Modern Bankruptcy Theory*, 89 CORNELL L. REV. 1420, 1425 (2004).

[10]*See* 12 WRIGHT & MILLER § 2981 ("With the enactment, in 1933 and 1934, of Bankruptcy Act provisions dealing with the reorganization of interstate railroads and other corporations, which now appear in Chapter 11 of the 1978 Bankruptcy Reform Act, the most

have a history of relying upon federal equity receiverships in SEC enforcement actions, especially in the last few years.[11] In the late 1800s and the early to mid-1900s bankruptcy law repeatedly borrowed principles from receivership law and vice versa.[12] Thus, in some ways the two bodies of law evolved together, and in some ways the two bodies of law evolved apart.[13]

_____

frequently used form of federal equity receivership, known as the consent receivership, has all but disappeared." (citation omitted)).

[11]See G. Ray Warner & Keith Sharfman, *The SEC in Bankruptcy*, 18 AM. BANKR. INST. L. REV. 569, 569 (2010) ("After a period of relative inactivity following the passage of the Bankruptcy Code (which has a less expansive view of the SEC's role than that of the former Chandler Act whose regime the Code replaced), the SEC's involvement in bankruptcy has intensified in recent years with the ascendancy of equity committees and with the increased use of receiverships and corporate monitors in Ponzi scheme and other cases both inside and outside of chapter 11.").

[12]See, e.g., *Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (discussing the development of the *Barton* Rule in receivership law and bankruptcy law); Douglas G. Baird & Thomas H. Jackson, *Bargaining After the Fall and the Contours of the Absolute Priority Rule*, 55 U. CHI. L. REV. 738, 744 n.20 (1988) (tracing the development of the absolute priority rule through receivership and bankruptcy law); Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 941 (2000) ("In its receivership cases, the Supreme Court was prone to analogize to general federal bankruptcy jurisdiction." (citing *Riehle v. Margolies*, 279 U.S. 218, 223 (1929))).

[13]See *United States v. Key*, 397 U.S. 322, 329–30 (1970) ("In 1933, Congress enacted § 77 of the Bankruptcy Act, providing a statutory procedure for the reorganization of railroads. Section 77, as well as later corporate reorganization statutes discussed below, was designed to follow the general format of the equity receivership. As one of the early commentators on the federal statutes has noted, '(t)he principles of the equity receivership underlie nearly every substantive provision of the (reorganization acts).' These statutes were not, of course, mere codifications of the law governing equity receiverships. They were designed in part to correct abuses and inefficiencies that had existed under the prior regime." (citations omitted)); Moore, *supra* note 7, Part III.A.2 ("The 1978 Bankruptcy Code incorporated many aspects of the equity receivership and authorized the appointment of a trustee with powers similar to that of a receiver. However, there are critical differences

The circumstances just described produce an odd state of affairs for caselaw on federal equity receivers: the majority of this caselaw is quite old, though some more recent caselaw exists on SEC equity receiverships (and this area of the law may start to develop more rapidly in the future). Bankruptcy caselaw, on the other hand, has further developed at a much more consistent rate on many of the common law rules and principles that pertained to both equity receivership law and bankruptcy law. Accordingly, this Court will make use of the much larger body of law present in bankruptcy, while trying to note any relevant differences between the two bodies of law that could produce different outcomes.

### III. While the Receiver Can Be Bound as a Nonsignatory to the Arbitration Agreements, the Receiver Has Not Adopted the Arbitration Agreements

Before a general requirement to arbitrate exists, a party must first be bound to an arbitration agreement – either as a signatory or through a principle of law or equity. Discussions of possible exceptions to this general requirement to arbitrate, like *McMahon*'s contrary congressional command,[14] are only necessary after such an initial determination.[15]

The Court begins this analysis by rejecting the Receiver's argument that the Receiver may pick and choose on which receivership entity's behalf it brings its various claims

_____

between SEC equity receiverships and bankruptcy cases.").

[14]*See infra* Part IV.

[15]The Court notes that the parties do not dispute (1) whether the Receiver's claims are encompassed by the arbitration agreements involved, or (2) whether the arbitration agreements should be considered invalid under state law.

throughout the various Stanford cases.[16]  This Court has previously treated the Stanford Entities, when operating under Allen Stanford, as a single enterprise.[17]  In the present case, allowing the Receiver to pick and choose, as a litigation strategy, among separate Stanford corporations in deciding upon which Stanford entity the Receiver brings his various claims would be inconsistent with the Court's previous rulings and inconsistent with equity.

Such an approach would also produce additional complications.  For instance, the Receiver wants to sue the Employee Defendants on behalf of Stanford International Bank ("SIB"), and wishes for SIB and the other Stanford corporation to be treated as legally distinct entities.   In this type of situation, the Receiver appears to allege two separate transfers – a fraudulent transfer from SIB to the particular Stanford corporations that employed the various Employee Defendants, and a transfer from this Stanford employer corporation to its employees.  It is certainly true that TUFTA claims can be asserted against subsequent transferees.  *See GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, 2011 WL 124237, at *4 (N.D. Tex. 2011) ("The TUFTA not only creates liability against 'the

---

[16]*See* Receiver's Resp. 6 [1029] ("The FA Defendants, along with other Stanford employees, received more than $215 million in CD Proceeds that were diverted from SIB. As a creditor, SIB has fraudulent transfer claims for the funds the FA Defendants received from the scheme.").

[17]*See Janvey v. Alguire* (the "*Net-Winners Order*"), 2013 WL 2451738, at *2 (N.D. Tex. 2013) ("Although the Stanford Entities are located all over the world, with affiliates in at least 13 countries, this Court has previously held that the entire network operated as a single entity." (citation omitted)); Order, June 5, 2014, at 4 [194], *Rotstain v. Trustmark National Bank*, No. 3:09-CV-02384-N (N.D. Tex. filed Dec. 15, 2009) ("This Court has also held that, notwithstanding the appearance of multiple legal entities, Stanford's financial empire was a single business enterprise centered in Houston, Texas." (citation omitted)).

person for whose benefit the transfer was made,' such as the debtor, but also against the 'first transferee of the asset,' or any 'subsequent transferee.'" (citing TEX. BUS. & COM. CODE § 24.009(b))). But such a claim is still dependent on the initial transfer being a fraudulent transfer. *See* TEX. BUS. & COM. CODE § 24.009(b) (stating that the creditor may recover judgment for the value of the asset transferred "to the extent a transfer is voidable in an action by a creditor"). Thus, in this particular situation, the Receiver would be on both sides of this alleged initial fraudulent transfer, as the appointed receiver for both SIB and the other various Stanford corporations involved in the claims against the Employee Defendants.

The Court declines the Receiver's approach and, instead, follows the Court's previously applied approach of treating the Stanford Entities, at least when Allen Stanford was operating his Ponzi scheme, as a single entity.

### A. Both State Law and Federal Law Apply

The Fifth Circuit has now made clear that, in general, questions regarding whether an arbitration agreement can be enforced by or against nonparties/nonsignatories are to be decided by state law, not federal law. *See Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 255 (5th Cir. 2014) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009)). Successor rights and powers of federal entities – like federal equity receivers – however, are determined by federal law. *Cf. In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010) ("[T]rustee's successor rights arise under federal law . . . ."). Application of state law may still be necessary, however, because "the extent of those rights depends entirely on applicable state law." *Id.* In the present case, questions regarding the successor rights of the

Receiver involve a federal entity asserting a state claim. Thus, the Court looks to both federal law and state law in deciding whether the Receiver, as a nonsignatory, is bound by these arbitration agreements.

The Court applies Texas law in considering the questions involving state law. *See Net-Winners Order*, 2013 WL 2451738, at *1–5. Regarding the federal law to be applied, current caselaw on an equity receiver's successor rights is limited. Thus, because equity receivership law and bankruptcy law share similar roots regarding their successor rights,[18] the Court will supplement the sparse equity receivership law by also examining relevant bankruptcy law.

### B. The Receiver, as a Nonsignatory, Can Be Bound Under the Arbitration Agreements by Applicable State and Federal Law

Under Texas law, "[s]everal rules of law and equity may bind nonsignatories to a contract." *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009). The Texas Supreme Court has found that nonsignatories generally should be bound to arbitrate claims

---

[18]In the late 1800s and early 1900s, courts applied the same rule to federal equity receivers and bankruptcy trustees regarding contracts and the transfer of property to the receivership/bankruptcy estate. *See* Vern Countryman, *Executory Contracts in Bankruptcy*, 57 MINN. L. REV. 439, 444–45 (1973) [hereinafter *Executory Contracts, Part I*]. This rule, sometimes referred to as the "assume or reject" election, derived from an 1818 English bankruptcy case, *Copeland v. Stephens*, 106 Eng. Rep. 218 (K.B. 1818), and was imported to the United States, first in the bankruptcy context and then in the receivership context. *Id.* This assume-or-reject rule was remarkably resilient in the bankruptcy context regardless of the bankruptcy provisions involved, even if seemingly contradictory. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. COLO. L. REV. 845, 932 n.64 (1988) ("[I]n the U.S., *Copeland* was applied regardless of the type of statute in force at the time, an issue which at least one early U.S. court specifically remarked upon." (citing *Streeter v. Sumner*, 31 N.H. 542, 558 (N.H. 1855))).

derived from the signatory covered by an arbitration agreement. *See id.* at 644–47. In *Labatt Food Services*, the Texas Supreme Court determined, after analyzing the state's Wrongful Death Act, the beneficiaries of the deceased brought an entirely derivative claim. *Id.* at 646–47. The Court concluded that the beneficiaries were bound by the deceased's arbitration agreement. As stated by the Court, "regardless of the fact that [the nonsignatories] are seeking compensation for their own personal loss, they still stand in [the signatory's] legal shoes and are bound by his agreement." *Id.* at 647.

Accordingly, the Receiver can be bound by the arbitration agreements as a nonsignatory if the successor rights of the Receiver, as determined under equity receivership law alongside the applicable Texas law, show that (1) the Receiver's claims in this case are derived solely from the Stanford Entities; (2) no exception exists under Texas law as to the general rule regarding arbitration of derivative claims; and (3) there is no difference, of relevance in this present case, between the Receiver's rights or obligations and the rights or obligations the Stanford Entities would have.

The first two issues can be addressed succinctly: the Fifth Circuit has recently ruled in a related Stanford case that, because of standing requirements, the Receiver's TUFTA claims cannot be brought on behalf of third-party investor creditors and must be asserted on behalf of the Stanford Entities. *See DSCC II*, 712 F.3d at 190 ("[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors . . . ."). Thus, the Receiver's claims in this case are derived solely from the Stanford Entities. Furthermore, the Court has not found any exception in Texas

caselaw where courts have stated that equity receivers are an exception to Texas's general rule regarding arbitration of derivative claims.

The remaining issue directly implicates the successor rights of equity receivers. To determine what rights and obligations exist for federal equity receivers the Court looks at both receivership and bankruptcy law.

The Third Circuit provides a helpful analysis on a trustee's successor rights in a case involving the FAA and a bankruptcy trustee who was a nonsignatory to the at-issue arbitration agreement:

> We start our analysis with the principle that a trustee is generally bound by the debtor's non-executory contracts. In fact, were the trustee considered a wholly different entity from the pre-petition debtor and generally free to disavow the debtor's pre-petition contracts, 11 U.S.C. § 365, which allows the trustee to reject executory contracts, would be wholly redundant. We see no reason to make an exception for arbitration agreements to the general rule binding trustees to pre-petition non-executory contracts, especially in face of the strong federal policy favoring arbitration, and the Arbitration Act, which puts arbitration agreements on the same footing as other contracts.

> We also find support for our conclusion that arbitration agreements should be treated like other contractual commitments in those cases which have held that a debtor-in-possession in a reorganization case is bound by a pre-petition agreement to arbitrate. We see no reason why the trustee should be treated any differently. Thus, we conclude that in actions brought by the trustee as successor to the debtor's interest under section 541, the "trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor. [Conversely,] [t]he trustee is, of course, subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." COLLIER ON BANKRUPTCY, ¶ 323.02[4]. One such defense is a contractual arbitration provision. Accordingly, we hold that the trustee is bound to arbitrate all of its claims that are derived from the rights of the debtor under section 541.

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153–54 (3d Cir. 1989) (alterations in original) (citations and footnotes omitted); *see also Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 318 (S.D. Tex. 1999) (Rosenthal, J.) ("'The trustee-plaintiff stands in the shoes of the debtor for the purposes of the arbitration clause and the trustee-plaintiff is bound by the clause to the same extent as would the debtor.'" (quoting *Hays*, 885 F.2d at 1153)).

The Sixth Circuit, in a relatively recent equity receivership case, provides an analysis of a federal equity receiver's successor rights in relation to an arbitration agreement. *See Javitch v. First Union Sec., Inc.*, 315 F.3d 619 (6th Cir. 2003). The *Javitch* court relied upon the *Hays* decision, as well as an older federal district court case involving a state receiver,[19] in its analysis:

> The general rule is that a receiver acquires no greater rights in property than the debtor had and that, except as to liens in existence at the time of the appointment, the receiver holds the property for the benefit of general creditors under the direction of the court. *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962, 963 (6th Cir. 1929). . . .

> Applying this general rule, the court in *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1153–54 (3d Cir.1989), concluded that arbitration agreements, like other prepetition contractual commitments, were binding on the bankruptcy trustee to the same extent that they would bind the debtor.

---

[19]The Court notes that the *Javitch* court cites *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962 (N.D. Ohio 1929), as *In re K-T Sandwich Shoppe of Akron*, 34 F.2d 962 (6th Cir. 1929). The Court is uncertain why the *Javitch* court appears to be treating this case as a Sixth Circuit decision.

*Id.* at 625. The *Javitch* court went on to conclude that "we find that [the Receiver], who is bringing claims on behalf of [receivership entities], is bound to the arbitration agreements to the same extent that the receivership entities would have been absent the appointment of the receiver." *Id.* at 627.[20]

This Court finds the *Hays* court reasoning regarding trustees and nonexecutory contracts persuasive and applicable to federal equity receivers. Accordingly, the Court determines that equity receivers, as nonsignatories, can be bound to contracts to the same extent receivership entities would be bound. The Court, however, does not find *Hays* helpful in determining a significant resultant question – whether the Employee Defendants' arbitration agreements are contracts that the Receiver can reject, an ability that has deep historical roots for both federal equity receivers and bankruptcy trustees and that continues to be an important tool for both.

### C. The Receiver Has Rejected the Arbitration Agreements

A bankruptcy trustee's ability to "assume or reject" / "adopt or repudiate" certain contracts and leases predates both the 1978 Bankruptcy Code as well as the Bankruptcy Act of 1898. *See Am. File Co. v. Garrett*, 110 U.S. 288, 295 (1884) ("It has long been a recognized principle of the bankrupt laws that the assignees were not bound to accept property of an onerous or unprofitable character." (collecting cases)).[21] Professors Vern

---

[20]*See also Capitol Life Ins. Co. v. Gallagher*, 47 F.3d 1178 (10th Cir. 1995) (unpublished opinion) ("The arbitration clause at issue governs disputes only between Capitol and GSL and, by extension, the [state] receiver for GSL.").

[21]*See also supra* note 18.

Countryman and Michael Andrew each provide influential historical accounts of this ability. *See generally* Andrew, *supra* note 18; Countryman, *Executory Contracts: Part I*, *supra* note 18. These historical accounts vary in certain significant respects,[22] but both accounts agree that this long-standing ability applied to both bankruptcy trustees *and* federal equity receivers:

> By 1893, seventy-five years after *Copeland*, the U.S. Supreme Court was able to describe that principle as a general rule applicable to both bankruptcies and receiverships:
>
> > The general rule applicable to this class of cases is undisputed that an assignee or receiver is not bound to adopt the contracts, accept the leases, or otherwise step into the shoes of his assignor, if in his opinion it would be unprofitable or undesirable to do so; and he is entitled to a reasonable time to elect whether to adopt or repudiate such contracts.

Andrew, *supra* note 18, at 860 (quoting *U.S. Trust Co. v. Wabash W. Ry. Co.*, 150 U.S. 287, 299–300 (1893)); *accord* Countryman, *Executory Contracts: Part I*, *supra* note 18, at 444–45 (outlining the historical development of this rule and its extension to equity receivers).[23]

---

[22]*Compare* Vern Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 MINN. L. REV. 479, 479 (1974) ("The bankruptcy trustee's option to assume or reject an executory contract evolved from the judicial doctrine that permitted abandonment of worthless or onerous property the title to which had passed from the bankrupt to the trustee." (footnote omitted)), *with* Andrew, *supra* note 18, at 863 n.80 (rejecting the conventional view that "executory contracts doctrine evolved from the more general doctrine permitting abandonment of worthless assets," and arguing that the "doctrine of 'abandonment' of assets other than contracts and leases, which became statutory only in the Bankruptcy Code, evolved in the U.S. from contract and lease cases, not vice versa").

[23]*See also* Ellsworth E. Clark et al., *Adoption and Rejection of Contracts and Leases by Receivers*, 46 HARV. L. REV. 1111, 1111 (1933) ("Courts and text-writers commonly state that a receiver may elect to adopt or to reject contracts and leases, and that he has a reasonable time within which to make such election." (collecting cases)).

Under current bankruptcy law, "Section 365(a) provides that a trustee may 'assume or reject any executory contract or unexpired lease of the debtor.'" *Stewart Title Guar. Co. v. Old Republic Nat. Title Ins. Co.*, 83 F.3d 735, 738 (5th Cir. 1996) (quoting 11 U.S.C. § 365(a)). Courts rely on various approaches and tests when it comes to executory contracts and section 365.[24] Courts in the Fifth Circuit have relied at times upon Countryman's material breach test and have relied at other times upon more functional approaches. *Compare In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994) ("Courts applying § 365(a) have indicated that an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."), *with*

---

[24]As described by the First Circuit in *In re La Electronica, Inc.*:

> Although the Bankruptcy Code does not define the term "executory contract," most courts adopt the position advanced by Professor Vern Countryman, defining an "executory contract" as one "under which the obligation [of] both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Vern A. Countryman, *Executory Contracts in Bankruptcy, Pt. I*, 57 MINN. L. REV. 439, 460 (1973). A few courts, treating Professor Countryman's definition as "helpful but not controlling," hold that the determination whether a contract is "executory" requires a more "functional" approach, "with an eye towards furthering the policies of the Bankruptcy Code." *See In re Richmond Metal Finishers, Inc.*, 34 B.R. 521 (Bkrtcy. E.D. Va. 1983), *rev'd.*, 38 B.R. 341 (E.D. Va. 1984), *rev'd.*, 756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986); *see also In re Magness*, 972 F.2d 689, 694 (6th Cir. 1992); *In re Jolly*, 574 F.2d 349 (6th Cir.), *cert. denied*, 439 U.S. 929 (1978); *In re Booth*, 19 B.R. 53 (Bankr. D. Utah 1982). *See generally* David G. Epstein, et al., 1 BANKRUPTCY § 5-4(b) (1992) (surveying case law on both sides of issue).

995 F.2d 320, 322 n.3 (1st Cir. 1993).

*In re El Paso Refinery, L.P.*, 220 B.R. 37, 42 n.15 (Bankr. W.D. Tex. 1998) ("Examining the instant case in this manner also allows us – requires us, in fact – to exercise a functional approach to the executory Contract.  As has been noted elsewhere, the focus of the functional approach is not whether the contract is 'executory,' but instead whether its assumption or rejection could in any way benefit the estate.").

Under Countryman's material breach test[25] this Court concludes that arbitration agreements must be analyzed as separate executory contracts, based on the nature of the agreement as well as arbitration caselaw regarding severability.[26]  As stated by a leading bankruptcy scholar, "Viewed as an independent contractual obligation of the parties, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought."  Westbrook, *supra* note 26, at 623 (footnote omitted).  Furthermore, the appropriate remedy in this circumstance cannot be for the Court to require specific performance by the trustee – *i.e.*, to compel arbitration – because "injured part[ies] cannot insist on specific performance by the trustee."

---

[25]The Court notes its analysis and conclusions would not significantly change if employing a more functional test.

[26]For a discussion regarding severability, see Jay Lawrence Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 MINN. L. REV. 595, 623 & n.112 ("It is now firmly established in the United States, as well as in many other countries, that an arbitration clause is considered a separable contract between the parties which survives as an obligation of the promisor even if the underlying contract is voidable." (citing *Prima Paint*, 388 U.S. at 403) (collecting foreign cases)).

ORDER – PAGE 19

*See id.* at 619 (collecting cases).[27] Lastly, the trustee's ability to assume or reject is generally

contingent on approval by the court. *See id.* at 626 (citing 11 U.S.C. § 365(a)).[28]

---

[27]*See also Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012) ("After rejecting a contract, a debtor is not subject to an order of specific performance." (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *Midway Motor Lodge of Elk Grove v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 407 (7th Cir. 1995))); *Lubrizol Enterps., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1048 (4th Cir. 1985) ("Even though § 365(g) treats rejection as a breach, the legislative history of § 365(g) makes clear that the purpose of the provision is to provide only a damages remedy for the non-bankrupt party." (citing H.R. REP. NO. 95-595, at 349 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6305)).

[28]For additional support for this overall argument among legal practitioners and commentators, see Jason S. Brookner & Monica S. Blacker, *The Rejectability of Arbitration Clauses*, 26-APR. AM. BANKR. INST. J. 1, 77 (2007) ("Allowing arbitration clauses to be rejected appears to be in line with the policies behind the Code and the Arbitration Act: The Act requires that arbitration contracts be given the same deference as other contracts, and the Code permits [debtors-in-possession] to retain contracts that are valuable to the estate and reject those that are not. To the extent an arbitration clause is not of value or benefit to the estate, it should be treated the same as other executory contracts and should be subject to rejection by the [debtors-in-possession] or the trustee." (footnote omitted)); Mette H. Kurth, Note, *An Unstoppable Mandate and an Immovable Policy: The Arbitration Act and the Bankruptcy Code Collide*, 43 UCLA L. REV. 999, 1031 (1996) ("[T]he Bankruptcy Code denies all other contracting parties the benefit of specific performance for breach of an executory contract. This is true despite the fact that damages, though calculated in full, are likely to be only partially satisfied in bankruptcy and despite the fact that the debtor's estate can demand full payment for any breach by the other contracting party. There is no apparent reason for an arbitration agreement, which is ancillary in nature, to receive more favorable treatment than other executory contracts." (footnote omitted)); Note, *Jurisdiction in Bankruptcy Proceedings: A Test Case for Implied Repeal of the Federal Arbitration Act*, 117 HARV. L. REV. 2296, 2313 (2004) (arguing that "arbitration clauses are executory contracts and that, consequently, the [trustee] should have the discretion to assume or reject arbitration contracts in order to maximize the value of the estate"); Polina Kushelev, Note, *An International Approach to Breaking the Core of the Bankruptcy Code and FAA Conflict*, 28 EMORY BANKR. DEV. J. 355, 371, 372–73 (2012) ("Analyzing arbitration agreements show that they readily fit [Countryman's] definition of executory contracts. . . . Because arbitration clauses are just like any other privately agreed-upon contractual term, 'the power of bankruptcy courts to interfere with the contractual relations between the parties and to change, modify[,] or impair contractual obligations of their contracts apply equally to

The Court finds this reasoning persuasive and applicable in the equity receivership context.  Furthermore, based on this reasoning, the Court concludes that the Receiver has rejected the arbitration agreements and that these rejections were proper, based on the particular circumstances of this receivership.

First, while more recent receivership caselaw is sparse on the topic, based on the recent caselaw that does exist and the habit of courts in more dated opinions to cite bankruptcy and receivership cases almost interchangeably, the Court deems it reasonable to conclude that the current state of equity receivership law on the "assume or reject" doctrine remains similar to bankruptcy law.  *See Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1453 (8th Cir. 1992) ("It has been recognized for at least a century that receivers may repudiate contracts and leases." (collecting cases)); *see also Pa. Steel Co. v. N.Y.C. Ry. Co.*, 198 F. 721, 744 (2d Cir. 1912), *cited with approval by Cent. Trust Co. v. Chi. Auditorium Ass'n*, 240 U.S. 581, 589 (1916).

---

arbitration clauses.'  Section 365 therefore properly allows trustees to modify and impair creditors' contractual obligations by rejecting arbitration agreements." (citation omitted)).

Surprisingly, while many courts have held that arbitration clauses are severable agreements that survive rejection of the underlying executory contract, *see, e.g.*, *Societe Nationale Algerienne*, 80 B.R. 606, 609 (D. Mass. 1987), not many courts have engaged in an in-depth analysis of whether the arbitration agreements themselves, as severable agreements, should be considered executory – though some courts, like *Hays*, have simply asserted, with little to no analysis, that arbitration agreements are nonexecutory.  One circuit court raised the question of whether arbitration agreements are properly viewed as executory contracts, but did not decide this question.  *See Allegaert v. Perot*, 548 F.2d 432, 435 n.7 (2d Cir. 1977) ("[I]f the parties have terminated or have fully performed under a contract, but have not arbitrated their dispute as the contract's arbitration clause provides, is the arbitration agreement an executory contract within the meaning of section 70b of the Bankruptcy Act and, therefore, rejectable by the trustee?").

Second, the Court determines that the Receiver in the present case has rejected the arbitration agreements. Receivership caselaw is clear that federal equity receivers are under no obligation to affirmatively reject an executory contract. *See Samuels v. E.F. Drew & Co.*, 292 F. 734, 739 (2d Cir. 1923) ("The receiver is under no obligation to renounce an executory contract. The contract is terminated, even though the receiver never renounces." (collecting cases)). Instead, "[t]here is a presumption that the receiver will not adopt a contract. If he does, it is a voluntary act of his own, to be performed with promptness . . . ." *Id.*; *see also Menke v. Willcox*, 275 F. 57, 58–59 (S.D.N.Y. 1921) (Learned Hand, J.) ("[T]he mere inaction of receivers, where they do not enjoy any benefits from assets *cum onere*, is never of itself an adoption, though it may endanger their right to adopt. In order to be bound, they must positively indicate their intention to take it over."). This is fairly consistent with Chapter 7 liquidations under current bankruptcy law. *See* 11 U.S.C. § 365(d)(1) ("In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected."). The Court deems the Receiver's actions in filing this lawsuit in federal court against the Employee Defendants as rejection of the arbitration agreements. Furthermore, the Court notes that the significant amount of time that has passed without any sort of affirmative action by the Receiver in attempting to adopt either the Employee Defendants' arbitration agreements (or even the underlying contracts) also indicates rejection.

Lastly, the Court views the Receiver's rejections as permissible in the present case. If the Court required the Receiver to adopt these arbitration agreements, it would greatly burden and deplete the receivership estate. Such a result, weighed in the balance, would be unjust and inequitable. *Cf. Fauci v. Mulready*, 337 Mass. 532, 536–37 (Mass. 1958) ("An equity receiver upon appointment is not bound to perform or adopt executory contracts and leases, unless directed to do so by the court which appointed him. In the absence of such orders, a receiver should reject any executory contract or lease, the performance of which will be burdensome and deplete the receivership estate."); *see also infra* Part IV.E (discussing burden arbitration would impose on Receiver).

The Court makes this decision while acknowledging there are strong federal policy considerations behind the FAA that should be taken into account. *See Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983) (describing the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements"). The Court further acknowledges that allowing the Receiver to reject these arbitration agreements in some ways invokes specters of the past – where courts treated arbitration agreements with hostility, a problem that Congress intended to resolve with the FAA.[29]  But the law is clear: The purpose of the FAA "was to place an arbitration agreement 'upon the same footing as other contracts, where it belongs.'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219

---

[29]*See* Kurth, *supra* note 28, at 1031 ("One difficulty with denying arbitration agreement's preferential treatment is that, in one sense, this recreates the problems that the Arbitration Act intended to resolve. Without specific performance, parties have no adequate measure of damages for nonperformance of an arbitration agreement.").

(1985) (citing H.R. REP. NO. 68-96, at 1 (1924)); *see also Concepcion*, 131 S. Ct. at 1745 ("[C]ourts must place arbitration agreements on an equal footing with other contracts . . . ." (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006))). Permitting the Receiver to reject the arbitration agreements is very much consistent with this – forcing the Receiver to adopt the arbitration agreements would actually put arbitration agreements above other contracts.

The Court's decision does not change even if the Court applies a strict standard for this determination, like the one announced by the Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984). As stated in *Bildisco*, "The Bankruptcy Court must make a reasoned finding on the record why it has determined that rejection should be permitted. . . . balancing the interests of the affected parties – the debtor, creditors, and employees." *Id.* at 527. While much of this analysis will be more fully articulated below in Part IV in a slightly different context, the Court determines that all these separate arbitrations would greatly burden the receivership estate, in terms of both financial costs and overall administration. The increased financial costs from dozens, if not hundreds, of separate arbitrations would greatly deplete the receivership estate and likely force the Receiver to abandon pursuing some of his claims to recover Receivership Assets. All these separate arbitrations are also likely to be much less efficient, to produce inconsistent results, and to add significant delay to this receivership process.

Furthermore, the overall costs of all these arbitrations would ultimately be felt by the victims of the Stanford Ponzi scheme – the creditors of this receivership. The Employee

Defendants may lose some benefits from either a unilateral arbitration or arbitration of a small group of defendants – these arbitrations may take place in a more convenient location and may possibly be less expensive. The Court does give weight to these interests. The biggest advantage to the Employee Defendants, however, appears to be forcing the Receiver into a position where it would be cost-prohibitive for him to pursue all his claims against each Employee Defendant. As a court acting in equity, the Court does not give much weight to this interest. Overall, the Court determines the balance of the equities favors rejection.

Thus, the Court concludes that the Receiver has permissibly rejected the Employee Defendants' arbitration agreements.[30] While the foregoing is dispositive on the question of compelling arbitration, the Court further analyzes this topic by examining the interplay, under *McMahon*, between the FAA and the federal equity receivership statutory scheme.[31]

---

[30]The Court notes that, like in bankruptcy, any damages that result from the Receiver's rejection of an executory contract must be administered through the claims process. *See, e.g.*, *Bildisco*, 465 U.S. at 530 ("[C]laims arising after filing, such as result from the rejection of an executory contract, must also be presented through the normal administration process by which claims are estimated and classified." (citations omitted)).

[31]The Court does so because the vast majority of bankruptcy caselaw, both in the Fifth Circuit and elsewhere, decide issues regarding arbitration and bankruptcy under *McMahon*. *See* Michael D. Fielding, *Elevating Business Above the Constitution: Arbitration and Bankruptcy Proofs of Claim*, 16 AM. BANKR. INST. L. REV. 563, 597 (2008) ("The current view of the intersection of bankruptcy and arbitration is dominated by the Supreme Court's decision in *Shearson/American Express, Inc. v. McMahon*."). Thus, while the Court believes that antecedent issues regarding topics that include nonsignatories and executory contracts may fully resolve receivership and bankruptcy cases involving arbitration agreements, the Court will also follow the path of analysis favored by most bankruptcy courts.

## IV. ARBITRATION OF THE RECEIVER'S CLAIMS CONFLICTS WITH THE CENTRAL PURPOSES AND OBJECTIVES OF THE FEDERAL EQUITY RECEIVERSHIP STATUTORY SCHEME

In the alternative, the Court considers "whether federal statute or policy renders the claims nonarbitrable." *Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.*, 588 F.3d 884, 886 (5th Cir. 2009). In the present case, this analysis focuses on the applicability of the *McMahon* exception, which allows the FAA to be "overridden by a contrary congressional command." *McMahon*, 482 U.S. at 226. No Fifth Circuit decision exists regarding *McMahon*'s application in equity receiverships. Indeed, equity receivership caselaw across all circuits provides little guidance on the matter. Thus, this Court once again begins its analysis by turning to bankruptcy law for guidance. The Court then considers the federal statutes endorsing, incorporating, supplementing, and extending the rights and powers of federal equity receivers. The Court must also consider the central purposes and objectives of federal equity receiverships. Only then will the Court consider whether arbitration of the Receiver's claims in the present case would conflict with a central purpose or objective of federal equity receiverships.

### A. McMahon's Application in the Bankruptcy Context

The first federal appellate court to address the potential conflict between the Bankruptcy Code, enacted in 1978, and the FAA was *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55, 57 (3d Cir. 1983). The *Zimmerman* court held that between the competing policies of the FAA and the Bankruptcy Code, the latter is more favored:

> Bankruptcy proceedings . . . have long held a special place in the federal judicial system. . . . While the sanctity of arbitration is a fundamental federal concern, it cannot be said to occupy a position of similar importance. Therefore, because of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the Arbitration Act. Thus, while a bankruptcy court would have the power to stay proceedings pending arbitration, the use of this power is left to the sound discretion of the bankruptcy court.

*Id.* at 59–60. *Zimmerman*'s impact and influence was immediate: legal commentators "overwhelmingly supported *Zimmerman*, and most circuits initially followed the *Zimmerman* court's reasoning." Kurth, *supra* note 28, at 1016 (citations omitted).[32]

*Zimmerman*'s life span in the Third Circuit was short-lived, however – just six years after deciding *Zimmerman*, the Third Circuit labeled the case as no longer good law in *Hays*.[33] The *Hays* court provided two main reasons for doing so: "*Zimmerman*'s reasoning is founded on the statutory scheme of the Bankruptcy Reform Act of 1978 before the 1984 Amendments, and it was decided before *McMahon* and other recent Supreme Court arbitration cases." *Hays*, 885 F.2d at 1159.

This first reason focused on how Congress expanded the jurisdiction of bankruptcy courts under the Bankruptcy Reform Act of 1978. *See id.* ("Congress involved a new

---

[32]*See also* Fred Neufeld, *Enforcement of Contractual Arbitration Agreements Under the Bankruptcy Code*, 65 AM. BANKR. L.J. 525, 531–32 (1991) (stating that *Zimmerman* "was followed by nearly all of the bankruptcy courts and district courts that confronted the conflict between bankruptcy and arbitration").

[33]*Zimmerman*'s influence can be seen by its continued acceptance for many years following *Hays* by courts outside the Third Circuit. *See* Kurth, *supra* note 28, at 1016.

allocation of jurisdiction that permitted all matters and proceedings that arose in connection with bankruptcy cases [to be] tried in one action before the bankruptcy court." (alteration in original) (quoting *Zimmerman*, 712 F.2d at 58)). But the jurisdiction of bankruptcy courts was sharply curtailed just a few years later by the 1984 Amendments, which represented Congress's reaction to the Supreme Court identifying portions of the Bankruptcy Reform Act of 1978's jurisdictional provision as unconstitutional. *See id.* (citing *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)).

As for the second reason, *Zimmerman* predated a series of Supreme Court opinions on the FAA that viewed the FAA in a more favorable light in comparison to previous caselaw. *See id.* (citing *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989); *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985))). *Hays* concluded that these Supreme Court opinions rejected the idea of "a hierarchy of congressional concerns that places the bankruptcy law in a position of superiority over that Act," which undercut portions of *Zimmerman*'s analysis. *Id.* at 1161.

The *Hays* court, by comparison, relied heavily on one of the post-*Zimmerman* Supreme Court cases, *McMahon*, in its analysis. In analyzing the noncore, debtor-derived claims at issue,[34] the court inquired "whether the Bankruptcy Code invested the district court

---

[34]Earlier in its opinion, the *Hays* court concluded that a trustee is not bound to arbitrate its claims that are not derived from the debtor on pre-petition agreements to arbitrate because "it is the *parties* to an arbitration agreement who are bound by it and whose intentions must be carried out." *Hays*, 885 F.2d at 1159 (citing *Mitsubishi*, 473 U.S. at 625).

with discretion to refuse to enforce that clause." *Id.* at 1155. What determined this outcome was whether the party opposing enforcement of an otherwise binding arbitration agreement could meet "its burden of showing that the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause in a case of this kind." *Id.* at 1156. The court ultimately concluded: "Where, as here, a trustee seeks to enforce a claim inherited from the debtor in an adversary proceeding in a district court, we perceive no adverse effect on the underlying purposes of the Code from enforcing arbitration – certainly no adverse effect of sufficient magnitude to relieve a district court of its mandatory duty under the Arbitration Act . . . ." *Id.* at 1161.

The Fifth Circuit followed the *Hays* approach in analyzing whether successors to a Chapter 11 debtor were bound to arbitrate Code-derived, core claims. *See In re Nat'l Gypsum Co.*, 118 F.3d 1056 (5th Cir. 1997). The *National Gypsum* Court's analysis focused on the importance of the types of claims at issue in relation to the Bankruptcy Code's purposes and objectives, and determined "[t]here can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith." *Id.* at 1068. As stated by the Court:

> We think that, at least where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.

*Id.* at 1069.  Based on this rationale, the Court held that arbitration of these claims was not required.

The Fifth Circuit affirmed this approach in *In re Gandy*, 299 F.3d 489, 495 (5th Cir. 2002).  In *Gandy*, the Court analyzed whether a debtor-in-possession bringing, *inter alia*, state fraudulent transfer claims (under TUFTA) on behalf of unsecured creditors under 11 U.S.C. § 544(b) was bound to arbitrate these claims.  The *Gandy* Court determined that the TUFTA claims under section 544(b) should be viewed like the claims in *National Gypsum* – claims that "are in essence created by the Bankruptcy Code for the benefit of creditors of the estate."  *Id.* at 495–96.  The Court further determined that resolution of these TUFTA claims "implicates matters central to the purposes and policies of the Bankruptcy Code," and that "this dispute intimately implicates a central purpose of the Bankruptcy Code: the expeditious and equitable distribution of the assets of Debtor's estate."  *Id.* at 498.  Based on this reasoning, the Court once again held that arbitration was not required:

> Some of the purposes of the Code we mentioned in *National Gypsum* as potentially conflicting with the Arbitration Act include the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders.  In this Debtor's case, each of these concerns is tangible and justifies the federal bankruptcy forum provided by the Code.

*Id.* at 500 (citing *Nat'l Gypsum*, 118 F.3d at 1069).

*Hays* and *National Gypsum* have become the seminal opinions for applying *McMahon* in the bankruptcy context, and this approach has since been explicitly adopted by a majority of the circuits, with no other circuit court showing clear opposition.  *See generally In re*

*Thorpe Insulation Co.*, 671 F.3d 1011, 1020 (9th Cir. 2012) (collecting cases), *cert. denied*, 133 S. Ct. 119 (2012).

### B. The Statutory Framework of Federal Equity Receiverships

Federal equity receiverships, despite the name, have a federal statutory framework. The beginnings of this codification started as early as 1911. *See Link v. Powell*, 57 F.2d 591, 592 (W.D.S.C. 1932) ("The statute under which the receivers were appointed was enacted on March 3, 1911, 36 Stat. 1102, Judicial Code, § 56, 28 U.S.C. § 117.").[35] The codification continued when law and equity were officially merged in 1938 in the Rules of Civil Procedure. *See, e.g.*, FED. R. CIV. P. 17(b); FED. R. CIV. P. 66; FED. R. CIV. P. 83. This process continued outside the Rules of Civil Procedure as well. *See, e.g.*, 18 U.S.C. § 1910; 28 U.S.C. § 957; 28 U.S.C. § 958; 28 U.S.C. § 959; 28 U.S.C. § 1292(a)(2); 28 U.S.C. § 1692.

This framework, however, is by no means a detailed statutory scheme that provides specific instructions on how an equity receivership is operated – but such a loose scheme was on purpose: "it is clear from the text of [Rule 66] itself that, in formulating it, the Committee did not wish to undertake a revision of federal receivership practice." 12 WRIGHT & MILLER § 2981 (footnote omitted); *see also* FED. R. CIV. P. 66 (1938) ("The practice in the administration of estates by receivers or by other similar officers appointed by the court shall

---

[35]*See also S.E.C. v. Bilzerian*, 378 F.3d 1100, 1103 (D.C. Cir. 2004) (noting that "prior to 1948, the provisions of both [§§ 754 and 1692] were contained in a single predecessor statute, 28 U.S.C. § 117" (citation omitted)).

be in accordance with the practice heretofore followed in the courts of the United States or as provided in rules promulgated by the district courts . . . .").

Thus, it is clear that Congress intended for federal equity receiverships to function as they had at common law, unless otherwise noted. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here . . . common-law principle[s] [are] well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." (citations and internal quotation marks omitted)).

One significant shortcoming of the equity receivership, as functioning at common law, was that "[i]n order to sue in a federal court other than the appointing court . . . , absent special authorization by statute or local court rule, it was necessary for the receiver to obtain an ancillary appointment or for an ancillary receiver to be appointed by the other court." 12 WRIGHT & MILLER § 2981 (citations omitted).[36] This problem was partially addressed by

───────────────────

[36]*See also Great W. Min. & Mfg. Co. v. Harris*, 198 U.S. 561, 574–75 (1905) (explaining that because "a receiver is an officer of the court which appoints him," and "'has no extraterritorial power of official action'" the appointing court cannot confer the receiver with the authority to go into a foreign jurisdiction to take possession of the debtor's property, and concluding that a receiver, "in the absence of some conveyance or statute vesting the property of the debtor in him, . . . cannot sue in courts of a foreign jurisdiction upon the order of the court which appointed him, to recover the property of the debtor" (quoting *Booth v. Clark*, 58 U.S. 322, 338 (1854))).

28 U.S.C. § 117 (1911), which provided equity receivers with statutory authorization for exclusive jurisdiction over certain fixed property spanning multiple judicial districts, like railroad tracks.  This approach, however, still received criticism,[37] and Congress eventually responded to requests to fix this problem by providing much broader statutory authorization in 1948.  *See* 28 U.S.C. §§ 754, 1692.

Congress purposefully designed section 754 to help aid receivers trying to recover receivership assets across the country, and this was done by vesting the receiver – and thus the district court – with "complete jurisdiction and control of all such property with the right to take possession thereof."  28 U.S.C. § 754; *see also Bilzerian*, 378 F.3d at 1104 ("'[T]he territorial jurisdiction of the appointing court is extended to any district of the United States where property believed to be that of the receivership estate is found, provided that the proper documents have been filed in each such district as required by § 754.'" (quoting *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 823 (6th Cir. 1981))).  Thus, by enhancing the jurisdictional reach of equity receiverships in section 754,[38] Congress clearly emphasized the

---

[37]*See, e.g.*, Note, *Federal Practice Respecting Foreign Receiverships*, 43 HARV. L. REV. 805, 808–09 (1930) ("Consequently it has been suggested that Congress might well confer power on a district court to set up an ordinary equity receivership effective with respect to the entire estate, thus approximating what seems long to have been the practice in England, and in the states with respect to appointees of county courts.  Indeed, such legislation would be but an extension of existing statutes under which a receivership over a unitary property of a fixed nature, extending over several districts within a state, or even a circuit, may be set up by a district court." (citing *Report of Committee on Equity Receiverships*, ASS'N OF THE BAR OF THE CITY OF N. Y., YEAR BOOK 1927, 299, 312–15) (other citations omitted)).

[38]For a more in-depth discussion of how section 754 extended the jurisdictional reach of the previous equity receivership statute, see *Haile*, 657 F.2d at 823 (quoting 7-Pt. 2

importance of consolidating in one court all matters involving the receivership estate and assets. In this regard, section 1692 is important as well, with courts interpreting the combination of sections 754 and 1692 as providing a national service statute for receivers,[39] further indicating that Congress wished to expand the reach and power of federal equity receivers, especially in the context of consolidation. *See Terry v. June*, 2003 WL 22125300, at *5 (W.D. Va. 2003) ("[S]ubstantial weight must be given to the congressional policy behind the authorization of nationwide service of process provided by section 1692. Provision for national service is made to facilitate judicial efficiency by permitting courts to manage claims concerning Receivership Property in a single forum." (citing *In re AES Corp. Sec. Litig.*, 240 F. Supp. 2d 557, 561 (E.D. Va. 2003))); *see also Quilling v. Stark*, 2006 WL 1683442, at *3 (N.D. Tex. 2006) ("Together, these statutes give a receivership court both *in rem* and *in personam* jurisdiction in all districts where property of the receivership estate may be located. This promotes judicial efficiency by permitting courts to manage claims regarding receivership property in a single forum." (citations and internal quotation marks omitted)).

---

MOORE'S FEDERAL PRACTICE, P 66.08(1) at 1949–50 (2d ed. 1980)).

[39]*Haile*, 657 F.2d at 826 ("The process authorized by § 1692 is not 'extra-territorial' but rather nationwide. The appointment court's process extends to any judicial district where receivership property is found."); *Bilzerian*, 378 F.3d at 1103 ("§ 754 is 'a stepping stone on [the court's] way to exercising in personam jurisdiction over' one who holds receivership assets in a remote district." (alteration in original) (quoting *S.E.C. v. Vision Commc'ns, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996))).

ORDER – PAGE 34

Additionally, courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, like the present receivership. *See S.E.C. v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) ("Our court, like many others, has recognized that as part of courts' equitable powers under the Securities Acts of 1933 and 1934, it may impose receiverships in securities fraud actions to prevent further dissipation of defrauded investors' assets." (collecting cases)); *see also S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972) ("It is now well established that Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a) (1970), and Section 27 of the 1934 Act, 15 U.S.C. § 78aa (1970), confer general equity powers upon the district courts."); 15 U.S.C. § 80a-41(d) ("[T]he court as a court of equity may, to the extent it deems necessary or appropriate, take exclusive jurisdiction and possession of the investment company or companies involved and the books, records, and assets thereof, wherever located . . . .").[40]

---

[40]The Court acknowledges that well-established law exists regarding the lack of an inherent conflict between arbitrating various claims in the securities law context and the purpose of the 1933 and 1934 securities law acts. *See McMahon*, 482 U.S. at 238 ("[W]e hold the McMahons' agreements to arbitrate Exchange Act claims 'enforce[able] . . . in accord with the explicit provisions of the Arbitration Act.'" (second alteration in original) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518 (1974))); *id.* at 242 ("The McMahons may effectively vindicate their RICO claim in an arbitral forum, and therefore there is no inherent conflict between arbitration and the purposes underlying § 1964(c)."); *Rodriguez de Quijas*, 490 U.S. at 481 ("[T]he right to select the judicial forum and the wider choice of courts are not such essential features of the Securities Act that § 14 is properly construed to bar any waiver of these provisions."). The rationale and holdings of these cases are not applicable to the present case – the federal equity receivership statutes exist apart from the 1933 and 1934 Acts, the history and reasoning behind the legislation regarding federal equity receiverships and the securities laws are very different, and the purposes and objectives driving each statutory scheme differ significantly.

The federal equity receivership statutory framework also can – and, in the situation of the current Stanford receivership, does – interact with another federal statutory scheme: federal multidistrict litigation ("MDL").  *See* 28 U.S.C. § 1407.  As explained by Wright and Miller:

> [I]n 1968, Congress passed the multidistrict litigation (MDL) statute, 28 U.S.C. § 1407.  It authorizes the temporary transfer of related cases pending in multiple districts to a single district judge for coordinated pretrial proceedings.  It also establishes the Judicial Panel on Multidistrict Litigation (JPML or Panel), which determines whether this transfer is appropriate on the facts and, if so, decides what district and which judge should be denominated the transferee forum and transferee judge.  The courts from which the cases are transferred are called the transferor courts.  The legislative history explains:
>
> > The objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the 'just and efficient conduct' of such actions.  The committee believes that the possibility for conflict and duplication in discovery and other pretrial procedures in related cases can be avoided or minimized by such centralized management.
>
> If the litigation is not terminated in the transferee court through pretrial proceedings or by settlement, the Panel orders remand of the cases to their transferor courts for trial.

15 WRIGHT & MILLER § 3861 (4th ed. 2013) (footnotes and citations omitted).  Thus, in the Stanford receivership, cases brought, not involving the Receiver, in other federal courts across the country are also being transferred to this Court through the MDL statute, highlighting once again the congressional goal of consolidation.

ORDER – PAGE 36

### C. The Objectives and Purposes of This Receivership Are Equivalent to the Objectives and Purposes of the Bankruptcy Code in a Chapter 7 Proceeding

The shared roots of receivership law and bankruptcy law has produced shared historical purposes and objectives in each body of law. There remains significant overlap between the central purposes and objectives of the federal equity receivership statutory framework and the central purposes and objectives of the Bankruptcy Code.

In general, the purpose of bankruptcy under the Bankruptcy Code is to marshal assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate. *See In re MortgageAmerica Corp.*, 714 F.2d 1266, 1273 (5th Cir. 1983) ("The basic idea behind a corporate chapter 7 bankruptcy case is the marshalling of assets and their pro-rata distribution to creditors."); *id.* at 1274 ("[O]ne of 'the prime bankruptcy polic[ies]' that pervades virtually every provision of the Code is that of 'equality of distribution among creditors,' and, conversely, one of the principal bankruptcy *bêtes noires* is the '"race of diligence" of creditors to dismember the debtor' before its assets are exhausted." (second alteration in original) (quoting H.R. REP. NO. 95-595, at 178 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138)).

The purpose of federal equity receiverships is essentially the same – to marshal assets, preserve value, equitably distribute to creditors, and, either reorganize, if possible, or orderly liquidate. This makes sense, seeing as federal equity receiverships were the predecessor to Chapter 7 liquidations and Chapter 11 reorganizations. *See Duparquet Huot*, 297 U.S. at 220 ("The remedy [to be replaced by Section 77B of the Bankruptcy Act, enacted in 1934,] was

the one generally known as an 'equity receivership,' whereby the assets of a corporation were committed to the custody of a court until the time should arrive when they could be returned to the rehabilitated debtor, or if that should be impossible, divided among creditors. . . . The end was reorganization or liquidation or something akin thereto." (citations omitted)).

In this particular case, the purpose and objectives of the receivership, as delineated in the Receivership Order, closely reflect the general purpose shared by the Bankruptcy Code and federal equity receiverships.  *See* Receivership Order, *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N.  Among other things, the Court specifically directed and authorized the Receiver to do the following:

> • "Collect, marshal, and take custody, control, and possession of all [Receivership Assets] of, or in the possession or under the control of, the Receivership Estate, or assets traceable to assets owned or controlled by the Receivership Estate, wherever situated." *Id.* at 3.
> • "Make such ordinary and necessary payments, distributions, and disbursements as the Receiver deems advisable or proper for the marshaling, maintenance, or preservation of the Receivership Estate." *Id.* at 6.
> • Perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage, and injury to the Estate." *Id.*
> • "Institute, prosecute, compromise, adjust, intervene in, or become party to such actions or proceedings in state, federal, or foreign courts that the Receiver deems necessary and advisable to preserve the value of the Receivership Estate." *Id.*
> • "Preserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants." *Id.* at 7.

Ultimately, this particular receivership is the essential equivalent of a Chapter 7 bankruptcy.[41]  The Stanford Entities are no longer run by Allen Stanford; instead, the Receiver manages these corporations, with the end goal of liquidation.  This liquidation process operates pursuant to the federal statutory framework for equity receiverships and the common law rules and principles that have been incorporated by Congress into this loose statutory scheme.  The Receiver in this receivership has been pursuing the Receivership Assets scattered across the globe,[42] liquidating Receivership Assets currently in the Receiver's possession,[43] and distributing payments to creditors pursuant to the court-approved claims procedure.[44]  While a different federal statutory scheme – one that is looser

---

[41]This particular receivership does also contain some elements of a Chapter 11 bankruptcy, like a creditors' committee.  *See, e.g.*, Order, Aug. 10, 2010 [1149], *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N (creating the Official Stanford Investors Committee and imbuing the committee with "rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States").

[42]"The Stanford empire . . . consisted of [approximately] 130 separate Stanford entities employing over 3,000 employees located across the U.S., Europe, the Caribbean, Canada, and Latin America."  Order, Nov. 14, 2011, at 5 [1471] (citations and internal quotation marks omitted), *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N.  As pertaining to Receivership Assets that have been located in foreign countries, the Receiver estimates that "Receivership entities and individuals held more than $300 million in cash, investments, and other assets in foreign accounts as of the date the Receivership began, including assets held in accounts in Canada, the United Kingdom, and Switzerland." Notice of Receiver's 8th Interim Report Regarding Status of Receivership, Asset Collection, and Ongoing Activities 4 [2019], *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N.

[43]*See generally* Notice of Receiver's 8th Interim Report, *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N.

[44]As would occur under the Bankruptcy Code, the Stanford receivership has a formal claims procedure.  *See* Order, May 4, 2012 [1584], *SEC v. Stanford Int'l Bank*, No. 3:09-CV-0298-N.

and more flexible than the Bankruptcy Code – is at work, the overall purposes and objectives of the Stanford receivership track the overall purposes and objectives present in the Bankruptcy Code and a Chapter 7 proceeding. *See, e.g.*, *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("The goal in both securities-fraud receiverships and liquidation bankruptcy is identical – the fair distribution of the liquidated assets." (citation omitted)). Thus, this Court finds bankruptcy caselaw analyzing potential conflicts between arbitration of claims and the purposes of the Bankruptcy Code applicable to the equity receivership in the present case.

### D. This Court Has Discretion to Deny Arbitration

The Fifth Circuit's application of *McMahon* in the bankruptcy context is hinged on the following logic: "nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, *i.e.*, whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether arbitration of the proceeding would conflict with the purposes of the Code." *Nat'l Gypsum*, 118 F.3d at 1067. For a bankruptcy court to be afforded discretion in refusing to enforce an arbitration clause, there must be a specific conflict with a central purpose of the Bankruptcy Code in arbitrating the particular claims at issue. *See id.* ("'[U]nder the Supreme Court precedents there is discretion but in the bankruptcy context there must be a demonstrated specific conflict between enforcing an arbitration clause and the textual provisions and/or purposes of the Bankruptcy Code to justify the exercise of discretion by a bankruptcy court in refusing to

enforce an arbitration clause.'" (quoting *In re Chorus Data Sys.*, 122 B.R. 845, 851 (Bankr. N.H. 1990))).

In following this approach, this Court determines that in the present case a specific conflict arises between arbitrating the Receiver's fraudulent transfer claims[45] under the Employee Defendants' arbitration agreements and certain central purposes of the federal equity receivership statutory framework, especially in the added context of the Stanford receivership being a multidistrict litigation SEC receivership over a Ponzi scheme.

The Court begins this analysis by determining that a case involving a federal equity receiver asserting fraudulent transfer claims to recover receivership estate assets is the equivalent of a trustee or debtor-in-possession asserting Code-created fraudulent transfer claims to recover bankruptcy estate assets.[46]

_____

[45]In the context of *McMahon*'s applicability, the Court views the analysis regarding the Receiver's alternative unjust enrichment claims as equivalent to the fraudulent transfer claims.

[46]Certain Employee Defendants argue that because these fraudulent transfer claims are derived from receivership entities, this Court's reliance on the bankruptcy caselaw should require a conclusion that arbitrating such derivative claims can rarely (or even never) produce a conflict with a central purpose of the federal equity receivership statutory framework. But this argument latches on to bankruptcy legal doctrine while ignoring the real question at work: What are the central objectives and purposes of the federal statutory framework at issue? In the bankruptcy context, however, this first question is followed by an important second question: What are the limitations of this federal statutory framework?

Federal bankruptcy courts operate under certain constitutional and jurisdictional limitations that do not apply to federal district courts presiding over federal equity receiverships. For example, because of constitutional complications involving Article I judges, bankruptcy courts have limited authority over legal claims that do not involve Code-created rights and claims. *See, e.g.*, *Hays*, 885 F.2d at 1158 n.14 ("A bankruptcy court cannot issue final orders or judgments over non-core proceedings unless the parties assent.");

First, fraudulent transfer claims play an important role in the fulfillment of the primary purposes and objectives of both the Bankruptcy Code and federal equity receiverships. *See In re S.W. Bach & Co.*, 425 B.R. 78, 103 (Bankr. S.D.N.Y. 2010) ("[T]he purpose of the trustee's avoidance powers is to protect creditors, and arguably to encourage an equitable distribution of the debtor's property to creditors, and, in turn, prevent a debtor from favoring one creditor or third party over other creditors, all of which go to the 'heart of federal bankruptcy proceedings' of restructuring debtor-creditor relations." (collecting cases)); *Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) ("The purpose of UFTA is to permit the receiver to collect those assets that can actually be located and recovered in the wake of a

---

*see also Stern v. Marshall*, 131 S. Ct. 2594, 2610 (2011). Thus, the discussed purpose and objectives of the Bankruptcy Code necessarily apply primarily to Code-created rights and claims. *See Hays*, 885 F.2d at 1157 ("[I]t is clear that in 1984 Congress did not envision all bankruptcy related matters being adjudicated in a single bankruptcy court."); *see also supra* Part IV.A (describing how Congress, through the 1984 Amendments, limited the jurisdiction of bankruptcy courts in light of constitutional limitations on the powers of Article I judges).

Federal equity receiverships, by comparison, do not encounter these types of constitutional limitations because these proceedings operate in federal district courts, under Article III judges. And instead of the Bankruptcy Code's hedged statutory authority regarding jurisdiction, federal equity receiverships enjoy broad statutory authority regarding their jurisdictional authority and power: "The receiver and the court of appointment have exclusive jurisdiction and control over receivership property in whatever district it may be located," if a receiver follows the filing requirements of section 754. KATHY BAZOIAN PHELPS & HON. STEVEN RHODES, THE PONZI BOOK: A LEGAL RESOURCE FOR UNRAVELING PONZI SCHEMES § 1.02, 1-4 (2012). In other words, the equity receivership court and the equity receiver have exclusive jurisdiction and control of the receivership estate and receivership assets, regardless of where or whom the receiver's claims are derived from and whether the claims asserted are based on state or federal law. Thus, the Court finds this bankruptcy-based argument by Employee Defendants to be unconvincing.

Ponzi scheme, and to ratably distribute those assets among all participants, including the many investors who lost everything.").[47]

Second, because the Receiver's fraudulent transfer claims against the Employee Defendants in this case are seeking to recover Receivership Assets, these claims can and do rely on sections 754 and 1692, providing this Court with *in rem* and *in personam* jurisdiction. *See* Order, Sept. 6, 2011, at 6 [696] ("Section 754 and 28 U.S.C. § 1692 provide the appropriate statutory authority for the Court's exercise of personal jurisdiction in this case. By allowing a receiver and district court to exercise jurisdiction over purported receivership estate property, section 754 serves 'as a stepping stone on [a court's] way to exercising *in personam* jurisdiction' over those persons having custody or control over the property at issue." (alteration in original) (quoting *Vision Commc'ns*, 74 F.3d at 290)). The Receiver therefore brings these claims pursuant to federal statutes that give special jurisdictional authorization to federal equity receivers pursuing receivership assets.

Furthermore, but for the existence of federal equity receiverships and these receivership statutes, the Stanford Entities are unlikely to have viable fraudulent transfer claims against any of the Employee Defendants. This is because without the legal fiction as explained in *Scholes v. Lehmann*, 56 F.3d 750, 753–55 (7th Cir. 1995), these claims would

---

[47]*See also* Note, *Suits by Representatives to Set Aside Fraudulent Conveyances*, 45 YALE L.J. 504, 509 (1936) ("[T]he object of an equity receivership is to collect all assets of the debtor and distribute them among such creditors as have valid claims . . . [T]o deny the receiver the right to recover property fraudulently conveyed opens the door for a race among the defrauded creditors to satisfy their claims out of the fraudulently conveyed property, thereby resulting in unnecessary litigation and administrative difficulty due to the unsettling of claims . . . .").

likely fall victim to the defense of *in pari delicto*. *See DSCC II*, 712 F.3d at 191 ("'Now that the corporations created and initially controlled by Douglas are controlled by a receiver whose only object is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas.'" (quoting *Scholes*, 56 F.3d at 755)).

Based on the foregoing analysis, the Court finds the Fifth Circuit's decision in *Gandy* particular instructive. In *Gandy*, the Fifth Circuit determined that a state fraudulent transfer claim asserted by debtor-in-possession pursuant to the "strong arm" powers under 11 U.S.C. § 544(b) was a claim "in essence created by the Bankruptcy Code for the benefit of creditors of the estate" and this type of claim was "not – outside of bankruptcy – available to Debtor." *Gandy*, 299 F.3d at 495, 497. The *Gandy* Court therefore determined this fraudulent transfer claim as presenting the circumstance where "the importance of the federal bankruptcy forum provided by the Code is at its zenith." *Id.* (quoting *Nat'l Gypsum*, 118 F.3d at 1068). Following this reasoning, this Court determines that the Receiver's fraudulent transfer claims are "core" receivership claims where the importance of the federal equity receivership statutory scheme is at its zenith.[48]

---

[48]Certain Employee Defendants argue that all fraudulent transfer claims, "whether in bankruptcy or receivership[,] . . . now must be arbitrated" in light of the recent Supreme Court decision in *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165 (2014). They claim this is because *Executive Benefits* "specifically held that fraudulent conveyance claims are 'not core.'" Defs.' Letter to the Court [1067] (citing *Exec. Benefits*, 134 S. Ct. at 2174).

Similarly to the bankruptcy context – where *National Gypsum* and *Gandy* listed some of the central Code purposes that potentially conflict with the Arbitration Act as including "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders," *id.* at 500 (quoting *Nat'l Gypsum*, 118 F.3d at 1068) – the central goals and underlying purposes of federal equity receiverships produce the same potential conflicts with the FAA. *Cf. MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) ("Disputes that involve both the Bankruptcy Code and the Arbitration Act

This argument fails for multiple reasons. First, defendants' claim regarding *Executive Benefits* badly mischaracterizes the opinion: The Supreme Court is clear that this decision "*assume[s] without deciding*, that the fraudulent conveyance claims in this case are *Stern* claims." *Exec. Benefits*, 134 S. Ct. at 2174 (emphasis added); *see also id.* at 2172, 2173 (defining *Stern* claims as "proceedings that are defined as 'core' under § 157(b) but may not, as a constitutional matter, be adjudicated as such[,] at least in the absence of consent," and holding that "[w]hen a court identifies a claim as a *Stern* claim, it has necessarily 'held invalid' the 'application' of § 157(b) – *i.e.*, the 'core' label and its attendant procedures – to the litigant's claim"). Thus, *Executive Benefits* does not "specifically [hold] that fraudulent conveyance claims are 'not core.'"

Second, Fifth Circuit precedent is clear that the core/noncore distinction is not outcome determinative when analyzing whether a "contrary congressional command" exists under *McMahon*. *See Nat'l Gypsum*, 118 F.3d at 1067 ("The core/non-core distinction conflates the inquiry set forth in *McMahon* and *Rodriguez* with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding."); *see also In re Mintze*, 434 F.3d 222, 229 (3d Cir. 2006) ("The core/non-core distinction does not, however, affect whether a bankruptcy court has the discretion to deny enforcement of an arbitration agreement. It merely determines whether the bankruptcy court has the jurisdiction to make a full adjudication." (citing *Nat'l Gypsum*, 118 F.3d at 1068)).

The final reason for this Court rejecting the defendants' argument closely relates to the previous reason: federal equity receiverships under Article III judges are not subject to the constitutional limitations on jurisdiction present in bankruptcy proceedings under Article I judges. *See supra* note 46.

often present conflicts of 'near polar extremes: bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach toward dispute resolution.'" (quoting *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999))). Centralization and consolidation in one court are actually even more important to fulfilling the central purposes and objectives of an equity receivership – section 754 clearly shows this need for centralization and consolidation in one federal court.  Furthermore, like the *Gandy* Court's determination that arbitration of the debtor-in-possession's fraudulent transfer claims "intimately implicates a central purpose of the Bankruptcy Code: the expeditious and equitable distribution of the assets of Debtor's estate," *Gandy*, 299 F.3d at 498, the expeditious and equitable distribution of the Receivership Assets is at the heart of federal equity receiverships presiding over collapsed Ponzi schemes, like the present case.

Arbitration decentralizes, deconsolidates, strips the court and the receiver of exclusive jurisdiction over the receivership assets, interferes with the broad powers of both the court and the receiver to adjudicate all issues affecting receivership assets, and opens the door to the possibility of a distribution process that becomes, in part, "first-come, first-served."  The Court thus concludes that arbitration of a receiver's fraudulent transfer claims conflicts with the central purposes and objectives of the federal equity receivership statutory scheme, as well as the objectives and purposes of the MDL statute.  Following the guidance of *National Gypsum* and *Gandy*, this Court concludes that it "retains 'significant discretion' to refuse to stay the adversary proceeding and compel arbitration."  *Id.* at 495 (quoting *Nat'l Gypsum*, 118 F.3d at 1069).

ORDER – PAGE 46

### E. The Court Exercises its Discretion in Denying Arbitration

The consequences of enforcing the Employee Defendants' arbitration agreements are many. First, FINRA's rules explicitly disfavor and arguably completely prevent any sort of efficient class/collective arbitration.[49] This would produce a multitude of arbitrations, which

---

[49]FINRA rules do allow for the possibility of some consolidation. *See, e.g.*, FINRA Rules 13312–14. But it seems unlikely that significant consolidation would occur, based on FINRA's preference to avoid (and FINRA's lack of rules and procedures to address) arbitrations involving a significant number of parties. *See, e.g.*, FINRA Rule 13204(a)(1) ("Class action claims may not be arbitrated under the Code."); FINRA Rule 13204(a)(2) ("Any claim that is based upon the same facts and law, and involves the same defendants as in a court-certified class action or a putative class action, or that is ordered by a court for class-wide arbitration at a forum not sponsored by a self-regulatory organization shall not be arbitrated under the Code . . . ."); FINRA Rule 13204(b)(1) ("Collective action claims under the Fair Labor Standards Act, the Age Discrimination in Employment Act, or the Equal Pay Act of 1963 may not be arbitrated under the Code."); FINRA Rule 13204(b)(2) ("Any claim that involves plaintiffs who are similarly-situated against the same defendants as in a court-certified collective action or a putative collection action, or that is ordered by a court for collective action at a forum not sponsored by a self-regulatory organization, shall not be arbitrated under the Code, if the party bringing the claim has opted-in to the collection action."); *see also* FINRA Interpretive Letter to Cliff Palefsky, Esq., Sept. 21, 2009 ("In its 1992 Approval Order . . . the SEC noted that the judicial system has already developed the procedures to manage class action claims, and that entertaining such claims through arbitration at the NASD would be 'difficult, duplicative and wasteful.' The Approval Order stated, 'The Commission agrees with the NASD's position that, in all cases, class actions are better handled by the courts and that investors should have access to the courts to resolve class actions efficiently.'"), *available at* https://www.finra.org/Industry/Regulation/Guidance/InterpretiveLetters/P002521.

A recent Southern District of New York opinion further supports the proposition that FINRA does not accommodate arbitrations involving a significant number of parties:

[F]ollowing an instance in which a court did not treat a FLSA collective action as a class action under Rule 13204, *see Gomez v. Brill Sec.*, 2010 WL 4455827 (S.D.N.Y. 2010), the SEC amended the FINRA rules to add § 13204(b) to explicitly extend the treatment set out in Rule 13204(a) to FLSA collective actions. In its Notice prior to amending the rule, the SEC again affirmed the view that "FINRA believes that collective actions, like class actions, should

---

would result in significant fees per arbitration. These arbitrations could also occur in multiple venues, which once again increases expenses. Furthermore, multiple arbitrations in multiple venues greatly increases the likelihood of inconsistent results. Thus, instead of this receivership proceeding along with all of the Employee Defendants present in a small number of cases before the same court where one court can make consistent rulings, arbitration of the Receiver's claims against the Employee Defendants would produce dozens if not hundreds of separate arbitrations spread across the country.

Another significant consequence is that it is likely that the Receiver will not be able to afford to proceed against all the Employee Defendants. This would either result in these defendants being able to get away with Receivership Assets scot-free, or it would produce a "first-come, first-served" scenario if the Court decided to lift the stay as to these particular Receivership Assets. The Court views both outcomes disfavorably, especially when considering that the Employee Defendants possess one of the largest remaining portions of the existing Receivership Assets.

This disruption of the current receivership would go directly against central purposes of the federal equity statutory scheme, along with the goals of the MDL statute and securities laws. Large numbers of separate arbitrations would be disastrous to the Stanford

---

be handled by the judiciary system, which has extensive procedures to manage such claims." *Proposed Rule Change To Amend the Code of Arbitration Procedure for Industry Disputes To Preclude Collective Action Claims From Being Arbitrated*, 77 FED. REG. 1773–01, 1774 (proposed Jan. 11, 2012).

*Zeltser v. Merrill Lynch & Co.*, 2013 WL 4857687, at *2 (S.D.N.Y. 2013), *appeal withdrawn* (Feb. 28, 2014).

ORDER – PAGE 48

receivership, and would ultimately further hurt the victims of the Stanford Ponzi scheme.

The Court therefore uses its discretion to deny these motions to compel arbitration

### CONCLUSION

Because the Court determines that the Receiver has not adopted the Employee Defendants' arbitration agreements and that arbitration of the Receiver's claims in the present case would conflict with a central purpose or objective of federal equity receiverships, the Court denies the Employee Defendants' motions to compel arbitration.[50]

Signed July 30, 2014.

David C. Godbey
United States District Judge

---

[50]The Court notes that Defendants Charles Rawl and Mark Tidwell assert that certain facts distinguish them from the other Employee Defendants. For example, Rawl and Tidwell argue that collateral estoppel requires that the Receiver's claims against them be arbitrated because Stanford Group Company had previously initiated arbitration proceedings against these two defendants regarding Rawl and Tidwell's wrongful termination claims against the company. *See* Defs. Rawl and Tidwell's Mot. to Compel Arbitration 6–7 [1019] ("Stanford asserted, and prevailed on its arguments, that Rawl and Tidwell must be compelled to arbitrate. Under general principles of collateral estoppel and equity, the Receiver, in its capacity as the Stanford entity, cannot now be permitted to refuse the very position Stanford advanced and adjudicated in its favor." (citing *In re Stanford Group Co.*, 273 S.W.3d 807, 810 (Tex. App. – Houston [14th Dist.] 2008, no pet.))). Because the events referenced by Rawl and Tidwell occurred pre-receivership – before the appointment of the Receiver – and their motion to compel arbitration of the Receiver's claims involve different claims and significantly different issues than the ones at issue in the state court action, the Court determines that these two defendants and their motion to compel arbitration do not require different treatment, as compared to the other Employee Defendants' motions to compel arbitration at issue in this Order.