**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Case No. 3:09-CV-0724-N-BG |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL., | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Case No. 3:10-CV-0366-N-BG |
| v. | § § | |
| MIGUEL VENGER, ET AL., | § § | |
| Defendants. | § § | |

**BRIEF IN SUPPORT OF RECEIVER'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT REGARDING CERTAIN
DEFENDANTS' GOOD FAITH AFFIRMATIVE DEFENSE**

**BAKER BOTTS L.L.P.**

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Scott D. Powers
Texas Bar No. 24027746
scott.powers@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701-4039
512.322.2500
512.322.2501 (Facsimile)

**ATTORNEYS FOR**
**RECEIVER RALPH S. JANVEY**

### TABLE OF CONTENTS

Table of Authorities ......................................................................................................... v

Summary ........................................................................................................................... 1

Background ....................................................................................................................... 3

    I.      Allen Stanford and others perpetrated a massive Ponzi scheme............................ 3

    II.     The Defendants received millions of dollars in CD redemptions from the Stanford Ponzi scheme after being warned by their financial advisors. ................. 5

          A.     Michael Word warned his clients to redeem their SIB CDs immediately after learning about the Bernard Madoff Ponzi scheme..................................................................................................... 5

          B.     The O'Briens redeemed their SIB CDs after attorney Michael O'Brien was warned by his financial advisor that Stanford had violated federal laws and filed a lawsuit on behalf of that financial advisor based on such claims................................................................... 8

Argument & Authorities ................................................................................................... 9

    I.      TUFTA's affirmative defense requires Defendants to establish that they took the transfers in good faith. ........................................................................ 9

    II.     The Defendants are not entitled to TUFTA's "good faith" defense if they were on inquiry notice of Stanford's fraud or insolvency and failed to conduct a diligent investigation that would have allayed the suspicions of a reasonable person. ........................................................................................ 10

          A.     The Good Faith Standard: An Overview .................................................. 10

          B.     Step One: Were the Defendants on Inquiry Notice?................................. 11

          C.     Step Two: Did the Defendants fulfill their duty to investigate? .............. 12

    III.    The Defendants were on inquiry notice of Stanford's fraud and insolvency and did not conduct a diligent investigation that would have allayed the suspicions of a reasonable person. ........................................................ 13

          A.     Michael Word's warning to redeem their SIB CDs before maturity put the Word Defendants on inquiry notice of Stanford's fraud and insolvency. .............................................................................................. 13

          B.     Information from Charles Rawl put the O'Briens on inquiry notice of Stanford's fraud and insolvency. ....................................................... 18

1.      Rawl told O'Brien that Stanford was engaging in illegal
        and fraudulent conduct.................................................................. 18

2.      Rawl told O'Brien about another Stanford employee who
        had alleged that Stanford was violating federal securities
        laws and regulations.................................................................... 19

C.      The fact that the Defendants elected to pay substantial penalties to
        redeem their SIB CDs before maturity establishes that they had
        inquiry notice of Stanford's fraud and insolvency.................................... 23

Conclusion ...................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*GE Capital Commercial, Inc. v. Worthington Nat'l Bank*,
   754 F.3d 297 (5th Cir. 2014) ........................................................................12, 24

*Hahn v. Love*,
   321 S.W.3d 517 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)........................10, 11, 23

*In re Agric. Research & Tech. Grp., Inc.*,
   916 F.2d 528 (9th Cir. 1990) ........................................................................11, 23

*In re Am. Hous. Found.*,
   785 F.3d 143 (5th Cir. 2015) ........................................................................11, 12

*In re Cohen*,
   199 B.R. 709 (B.A.P. 9th Cir. 1996)........................................................................11, 12

*In re Hannover Corp.*,
   310 F.3d 796 (5th Cir. 2002) ........................................................................25

*In re M & L Bus. Mach. Co.*,
   84 F.3d 1330 (10th Cir. 1996) ........................................................................13, 24

*In re Manhattan Inv. Fund Ltd.*,
   397 B.R. 1 (S.D.N.Y. 2007)........................................................................12, 14, 22, 23

*Janvey v. Adams*,
   588 F.3d 831 (5th Cir. 2009) ........................................................................3, 4

*Janvey v. Alguire*,
   628 F.3d 164 (5th Cir. 2010) ........................................................................9

*Janvey v. Dem. Sen. Camp. Comm.*,
   793 F. Supp. 2d 825 (N.D. Tex. 2011) ........................................................................3, 4, 11

*Janvey v. Dem. Sen. Camp. Comm., Inc.*,
   712 F.3d 185 (5th Cir. 2013) ........................................................................11

*SEC v. Cook*,
   No. 3:00-CV-272-R, 2001 WL 256172 (N.D. Tex. Mar. 8, 2001)........................................................................12

*SEC v. Helms*,
   No. A-13-cv-1036-ML, 2015 WL 1040443 (W.D. Tex. Mar. 10, 2015) ........................................................................12, 24

*Swanson v. Hearst Corp. Long Term Disability Plan*,
    586 F.3d 1016 (5th Cir. 2009) .................................................................................18, 23, 25

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ..........................................................................................11, 13

STATUTES

Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (West 2015)...........................................................9

Tex. Bus. & Com. Code Ann. § 24.009(a) (West 2015)..............................................................10

Tex. Bus. & Com. Code Ann. § 24.012 (West 2015)...................................................................11

Tex. Civ. Prac. & Rem. Code Ann. § 10.001 (West 2002)..........................................................19

OTHER AUTHORITIES

4 COLLIER ON BANKRUPTCY ¶ 548.07 (Lawrence P. King ed., 15th ed. 1996) .....................13, 24

PETER SPERO, FRAUDULENT TRANSFERS, PREBANKRUPTCY PLANNING AND
    EXEMPTIONS § 4:14 (2015 ed.) .........................................................................................11

## SUMMARY

When the Stanford Ponzi scheme collapsed, thousands of Stanford investors were left holding worthless SIB CDs. The Defendants who are subject to the Receiver's Cross-Motion for Partial Summary Judgment, however, redeemed their CDs shortly before the collapse and only after (1) being warned to do so by their Stanford financial advisor immediately after Bernard Madoff was arrested for running a Ponzi scheme, or (2) learning from their financial advisor that Stanford was engaging in unlawful and fraudulent conduct. As a result of being forewarned, the Defendants were able to redeem over $22 million in SIB CDs, and the money used to fund those redemptions simply came from other purchasers of SIB CDs.

Because the SIB CD redemptions were payments from the Stanford Ponzi scheme, they were fraudulent transfers as a matter of law. Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), the Defendants cannot retain those transfers unless they prove that they received the payments in good faith. Good faith means the Defendants did not know (i.e., actual knowledge) or have any reason to know (i.e., constructive knowledge) of Stanford's fraud or insolvency. If the Defendants had constructive knowledge, meaning knowledge of facts that would have excited the suspicions of a person of ordinary prudence, they had a duty to conduct a diligent investigation that would have allayed the suspicions of a reasonable person. Thus, if the Defendants were on constructive notice of Stanford's fraud or insolvency, they cannot establish good faith under TUFTA if they failed to investigate at all or if they did investigate and the investigation only confirmed their suspicions or raised more concerns.

The summary judgment record establishes conclusively that the Word Defendants had knowledge of facts that triggered a duty to investigate, but they failed to do anything to fulfill that duty. Michael Word, the Stanford financial advisor for all summary judgment defendants except the O'Briens, testified that he began calling his clients on the same day that

Bernard Madoff was arrested for running a Ponzi scheme and that he advised his clients to pay early-withdrawal penalties to redeem their CDs immediately.  Word told his clients that the Madoff Ponzi scheme was one of the reasons for his warning to cash out of the SIB CDs.

The O'Briens similarly had knowledge of facts that triggered their duty to investigate, but in their case, Michael O'Brien either failed to investigate or investigated and determined that Stanford was engaging in illegal and fraudulent conduct.  Michael O'Brien, who invested in the SIB CDs along with his wife Mary O'Brien, was an attorney who learned through Charles Rawl, the O'Briens' financial advisor, that Stanford was purging files and destroying documents during an ongoing SEC inquiry related to the SIB CDs and that Stanford had knowingly used incorrect historical performance data to market one of its investment products to clients.  O'Brien represented Rawl and another financial advisor in a lawsuit against Stanford making those very allegations.

In light of what the Defendants already knew about SIB and the SIB CDs—e.g., SIB was an offshore bank that advertised, even in uncertain economic times, above-market and consistent rates of return on CDs that were backed by safe and liquid investments—the warnings the Defendants received from their financial advisors immediately before they redeemed their CDs triggered a duty to conduct a diligent investigation that would have allayed the suspicions of a reasonable person.  It is undisputed that the Defendants failed to fulfill this duty.  Instead, the Defendants chose to pay substantial early withdrawal penalties so they could redeem their SIB CDs to the detriment of thousands of other investors who were not the beneficiaries of warnings from their Stanford financial advisors.

Under these circumstances, the Defendants cannot establish that they received the fraudulent transfers from Stanford in good faith, and the Court should grant the Receiver's Cross-Motion for Partial Summary Judgment.

### BACKGROUND

## I.  Allen Stanford and others perpetrated a massive Ponzi scheme.

This action arises out of the multi-billion-dollar Ponzi scheme perpetrated by Allen Stanford and others through a network of more than 130 entities (the "Stanford Entities"). *See Janvey v. Adams*, 588 F.3d 831, 833 (5th Cir. 2009); *Janvey v. Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d 825, 856–57 (N.D. Tex. 2011); (Ex. A, August 4, 2015 Decl. of Karyl Van Tassel at ¶¶ 6–7, App. 8).  As the Court and the Fifth Circuit have previously recognized, Stanford's core objective was to sell fraudulent certificates of deposit ("CDs") issued by Stanford International Bank, Ltd. ("SIB" or "SIBL") and marketed by the Stanford Entities, including Stanford Group Company ("SGC").  *See Adams*, 588 F.3d at 833; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 856–57.

SIB maintained a high volume of CD sales by promising above-market returns and representing to investors that the CDs were backed by safe, liquid investments.  *See Adams*, 588 F.3d at 833.  In SIB's marketing brochures, which were typically provided to investors, Stanford claimed that "[SIB] pays higher interest rates to depositors" because "[SIB] has been consistently profitable since inception."  (*See* Ex. A, August 4, 2015 Decl. of Karyl Van Tassel at KVT-NWD-16, SIB Brochure at 6, App. 8185.)  These brochures further claimed that SIB's investment philosophy was "anchored in time-proven conservative criteria" and emphasized that SIB's "prudent approach and methodology translate into deposit security for our customers." (*See id.*, SIB Brochure at 3, App. 8182.)  Stanford also touted to investors that SIB focused "on maintaining the highest degree of liquidity as a protective factor for our depositors . . . [by

investing] in a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks." (*See id.*)  In fact, SIB was insolvent, and Stanford used funds from the sale of new CDs to make purported principal and interest payments to existing CD investors.  *See Adams*, 588 F.3d at 833.

On February 16, 2009, the SEC filed a lawsuit against Allen Stanford, SIB, and other corporate entities owned, either directly or indirectly, by Allen Stanford.  *See id.*; *Dem. Sen. Camp. Comm.*, 793 F. Supp. 2d at 828.  The Court appointed Ralph S. Janvey as Receiver for the Stanford Entities.  *See id.*  The Receiver subsequently filed a series of ten lawsuits (the "Net Winner Lawsuits") against Stanford investors who received transfers from SIB in amounts exceeding their investment in SIB CDs (the "Stanford Net Winners").[1]  The Defendants who are subject to the Receiver's Cross-Motion for Partial Summary Judgment (the "Defendants") are among the Stanford Net Winners named in the Net Winner Lawsuits.

The instant motion relates to all of the transfers the Defendants received after they were warned about Stanford by their financial advisors.[2]  Those redemptions total more than

---

[1]    The ten Net Winner Lawsuits are: *Janvey v. Alguire, et al.*, Case No. 3:09-cv-0724-N-BG;  *Janvey v. Venger, et al.*, Case No. 3:10-cv-0366-N-BG; *Janvey v. Posada, et al.*, Case No. 3:10-cv-0415-N-BG; *Janvey v. Gilbe Corp., el al.*, Case No. 3:10-cv-0478-N-BG; *Janvey v. Buck's Bits, et al.*, Case No. 3:10-cv-0528-N-BG; *Janvey v. Johnson, et al.*, Case No. 3:10-cv-0617-N-BG; *Janvey v. Barr, et al.*, Case No. 3:10-cv-0725-N-BG; *Janvey v. Indigo Trust, et al.*, Case No. 3:10-cv-0844-N-BG; *Janvey v. Dokken, et al.*, Case No. 3:10-cv-0931-N-BG; and *Janvey v. Fernandez, et al.*, Case No. 3:10-cv-1002-N-BG.

[2]    In January 2013, the Receiver obtained partial summary judgment against the Defendants, as well as other Stanford Net Winners, for all amounts that they received in excess of their respective investments in SIB (i.e., their net winnings), on the grounds that they did not exchange reasonably equivalent value for those amounts as a matter of law.  (*See* Order Regarding Receiver's Motion for Partial Summary Judgment Against Net Winners (the "Net Winner Order"), Case No. 3:09-cv-0724-N-BG, Doc. 909; Case No. 3:10-cv-0366-N-BG, Doc. 310; Case No. 3:10-cv-0415-N-BG, Doc. 88; Case No. 3:10-cv-0478-N-BG, Doc. 89; Case No. 3:10-cv-0528-N-BG, Doc. 68; Case No. 3:10-cv-0617-N-BG, Doc. 64; Case No. 3:10-cv-0725-N-BG, Doc. 59; Case No. 3:10-cv-0844-N-BG, Doc. 59; Case No. 3:10-cv-0931-N-BG, Doc. 110; Case No. 3:10-cv-1002-N-BG, Doc. 165.)  Partial summary judgment against Defendants James F. Seymour Family Trust, James Seymour, and Loretta Seymour was granted on the same grounds in September 2015. (*See* Amended Order, Case No. 3:10-cv-0366-N-BG, Doc. 553.)  Some of the Defendants received portions of their net winnings after they were warned about Stanford by their financial advisors.  Thus, in addition to being unable to establish the exchange of reasonably equivalent value, the Defendants cannot retain those amounts because they did not receive the transfers in good faith.  To the extent the Court's Net Winner Order and the Court's order concerning this Cross-Motion for Partial Summary Judgment address the same transfers, the ultimate amount of liability for each Defendant will be addressed at the final judgment stage.

$22 million. (*See* Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-18, KVT-NWD-19, App. 8207, 8248.)   Because the Defendants cannot establish that they received those transfers in good faith, as required by TUFTA's affirmative defense, the Court should enter summary judgment in favor of the Receiver.

## II.   The Defendants received millions of dollars in CD redemptions from the Stanford Ponzi scheme after being warned by their financial advisors.

### A.   Michael Word warned his clients to redeem their SIB CDs immediately after learning about the Bernard Madoff Ponzi scheme.

Except for the O'Briens, all of the Defendants who are subject to the Receiver's Cross-Motion for Partial Summary Judgment were clients of SGC financial advisor Michael Word (the "Word Defendants").[3]   On December 11, 2008, numerous media outlets reported that Bernard Madoff had been arrested for running a Ponzi scheme.   (*See* Stipulated Facts ¶ 30.)[4] Michael Word testified that he noticed similarities between the Madoff Ponzi scheme and Stanford, including claims of consistent, double-digit investment returns and a lack of transparency related to the individual positions in Madoff's and SIB's investment portfolios. (*See* Ex. C, Word Dep. 105:9–16, 106:1–16, 114:16–24, July 17, 2015, App. 8308–10.)   After learning of Madoff's arrest, Word immediately began calling his clients and told them to get out

---

[3]      The Word Defendants are: Arthur R. Waxley Jr.; Charles E. Smith; Charles R. Sanchez and Mamie C. Sanchez; Charlie L. Massey; Clarence H. Forshag and the Estate of Betty Jo Forshag; Clyde Anderson; Daniel Joseph Daigle and Jilda A. Daigle; Darrell D. Courville; Dennis Childress; Dennis L. Kirby; Dot G. Melder and Matt Melder, in His Capacity as Representative of the Estate of Jack W. Melder; Emolyn L. Watts; Estate of James D. Simmons; Gary Wood; Gene Causey; Gwendolyn E. Fabre; James E. Brown Sr.; James F. Seymour Family Trust, James Seymour, and Loretta Seymour; James R. Hastings; James T. Weiner; James W. Boring Jr.; Jodie F. Crawford and the Estate of Robert B. Crawford Jr.; John E. Taylor; John R. Holguin; Kenneth W. Dougherty; Larry N. Smith; Larry W. Perkins; Laura Jeanette N. Lee; Michael A. Speeg; Monty M. Perkins; Murphy Buell; Richard S. Feucht and Joan A. Feucht; Robert L. Bush; Ronald B. McMorris and Virginia H. McMorris; Ronald W. Parker; Terry N. Tullis; Thomas W. Slaughter; Troy L. Lillie Jr.; and William E. Ensminger.

[4]      The parties' Stipulated Facts were filed in each of the ten Net Winner Lawsuits on October 30, 2015. (*See* Case No. 3:09-cv-0724-N-BG, Docs. 1383-1384; Case No. 3:10-cv-0366-N-BG, Docs. 567-568; Case No. 3:10-cv-0415-N-BG, Docs. 157–158; Case No. 3:10-cv-0478-N-BG, Docs. 154–155; Case No. 3:10-cv-0528-N-BG, Docs. 126-127; Case No. 3:10-cv-0617-N-BG, Docs. 103-104; Case No. 3:10-cv-0725-N-BG, Docs. 121-122; Case No. 3:10-cv-0844-N-BG, Docs. 121-122; Case No. 3:10-cv-0931-N-BG, Docs. 175-176; Case No. 3:10-cv-1002-N-BG, Docs. 282–283.)

of the SIB CDs, even though that meant paying substantial early-withdrawal penalties. (*See* Ex. C, Word Dep. 103:23–104:17, App. 8306–07.)   Word told his clients that the Madoff scheme was one of the reasons he wanted them to redeem their CDs immediately.  (*See* Ex. C, Word Dep. 115:10–116:6; 117:4–118:16, App. 8311–14.)

Despite his best efforts and his concern that Stanford would collapse before his clients' SIB CDs matured, Word was unable to get all of his clients out of the CDs before Stanford suspended early withdrawals from SIB.[5]  (*See* February 10, 2009 E-Mail from Word to Grady Layfield, App. 8289 ("I had scheduled today and tomorrow (2/09 and 2/10) to take my remaining clients out of the SIB CD's, but you informed me that early withdrawals have been suspended for an indefinite period of time. . . .  My concerns are the same, what if SIB fails before the CD matures?"); February 11, 2009 E-Mail from Word to Jason Green, App. 8291 (same).)  The Word Defendants are the clients that Word was able to get out of SIB before Stanford's early-withdrawal suspension went into effect.  (*See* Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-18, App. 8207–46 (identifying withdrawals the Word Defendants made on or after December 11, 2008).)

Several Word Defendants have admitted that these conversations with Word and news of the Madoff scheme raised serious concerns about SIB and the SIB CDs.  (*See* Ex. C, Word Dep. 116:10–19, App. 8312 ("Madoff, like I have said, one of many things that caused me to be concerned."); Ex. D, May 12, 2009 Letter from James Brown, App. 8321 (claiming that he "chose to back out of the CD account after the Madoff scandal"); Ex. E, Brown Dep. 49:1–7,

---

[5]     In order to curb the pace of early withdrawals by Word's clients, Word's supervisors told him to slow down his calls.  (*See* February 10, 2009 E-Mail from Word to Grady Layfield, App. 8289 ("I have been taking a proactive approach to talking to my clients about getting out of SIB before maturity and reinvesting into more traditional investments, such as bonds, CD's stocks, and mutual funds.  I have been questioned and asked by Stanford to slow down my phone calls to my clients about them taking their money out of SIB before the deposit matures."); February 11, 2009 E-Mail from Word to Jason Green, App. 8291 (same).)

50:18–21, 51:12–19, Sept. 22, 2015, App. 8334–36 (testifying that Madoff scheme "put the nail in the coffin" and was "one of the red lights" that made him concerned about Stanford and the same thing happening to him); Ex. F, Weiner Dep. 16:24–17:16, App. 8353–54 ("the fact [that] a lot of people lost a lot of money" in the Madoff Ponzi scheme made him concerned about Stanford and losing his entire life savings "crossed [his] mind"); Ex. G, Dougherty Dep. 42:24–44:5, 45:23–46:14, Sept. 21, 2015, App. 8373–77 (the Madoff Ponzi scheme was "one of the things that [he and his wife] were worried about" because it "could happen to [them]," and he was concerned that he could lose his entire investment if he did not redeem his SIB CDs); Ex. H, Defendants' Discovery Responses, Daigle's First Amended Responses to Receiver's First Interrogatories and Requests for Production at 10, App. 8567 ("The news of the Madoff Ponzi scheme also pushed Defendant [Daniel Daigle] to call his financial advisor to request his SIB CDs be redeemed.").)

        In the wake of Madoff's arrest and Word's warning to his clients, every Word Defendant elected to pay early-withdrawal penalties to get out of SIB before their CDs matured. (*See* Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-18, App. 8207.) Collectively, the Word Defendants paid more than $375,000 in penalties to redeem their CDs early, and received more than $21 million from Stanford shortly before the Ponzi scheme collapsed.  (*See id.*)  None of the Word Defendants conducted any investigation related to Stanford after Madoff's arrest and Word's calls.  (*See* Ex. H, Defendants' Discovery Responses, Responses to Interrogatory No. 5, App. 8382–96.)[6]

---

[6]        The first fifteen pages of Exhibit H comprise a compilation of the Defendants' responses to the Receiver's Interrogatory No. 5: "Describe any investigation, research, background check, due diligence, or similar inquiry regarding the nature and operations of the Stanford Entities that you conducted at any time, including the date of the investigation, the reason for the investigation, the results of the investigation, the names of the persons involved in the investigation, and any documents related to the investigation."  (Ex. H, Defendants' Discovery Responses, Responses to Interrogatory No. 5, App. 8382–96.)  The Defendants' interrogatory responses are also included in Exhibit H.

**B.**     **The O'Briens redeemed their SIB CDs after attorney Michael O'Brien was warned by his financial advisor that Stanford had violated federal laws and filed a lawsuit on behalf of that financial advisor based on such claims.**

Defendants Michael O'Brien and Mary O'Brien (the "O'Briens") were clients of SGC financial advisor Charles Rawl. The O'Briens invested $1,000,000 in SIB CDs through Rawl in December 2006. (Ex. I, O'Brien Dep. 9:25–10:4, July 30, 2015, App. 9447–48.) In December 2007, Rawl and Mark Tidwell (another financial advisor) resigned from SGC. (*See* Ex. I, O'Brien Dep. 18:12–18, App. 9449.) After SGC demanded that Rawl and Tidwell repay certain amounts they had received from Stanford as forgivable loans, they hired Michael O'Brien as their attorney. (*See* December 21, 2007 Letter from O'Brien to Rebecca Hamric, App. 8251; Ex. I, O'Brien Dep. 22:5–22:22, App. 9450.)

In January 2008, Michael O'Brien drafted a lawsuit against SGC on behalf of Rawl and Tidwell, contending that Rawl and Tidwell were constructively discharged and wrongfully terminated. (*See* Ex. J, Rawl and Tidwell Petition ¶ 10, App. 9466.) The lawsuit alleged that "[d]uring the course of their employment, [Rawl and Tidwell] became aware of certain illegal practices at Stanford involving the sale of SIBL certificates of deposit and other securities offerings." (*Id.* ¶ 5, App. 9465.) The lawsuit also alleged that "Stanford gave [Rawl and Tidwell] a 'Hobson's Choice' of either participating in illegal conduct, or to resign to avoid potential criminal prosecution and/or penalties as a willing participant with Stanford." (*Id.* ¶ 10, App. 9466.) The petition included the following "violations of federal laws and/or regulations" by Stanford as the basis for Rawl and Tidwell's alleged constructive discharge:

- "Stanford's purging of files and destruction of documents with knowledge of an ongoing SEC Inquiry into the SIBL CD and the CD sales practices;" and

- "Stanford's use of historical performance data in connection with the sale of securities to clients that was known to be incorrect."

(*Id.* ¶¶ 8(b)-(c), 9, App. 9466.)

Michael O'Brien received firsthand information from his clients, the former Stanford financial advisors, that Stanford was engaging in illegal and fraudulent conduct, and he included allegations of such conduct in court papers he filed on behalf of Rawl and Tidwell. (*See id.*)   A few weeks later, rather than remain invested in SIB CDs, the O'Briens paid a $20,000 early-withdrawal penalty to get out of the SIB CDs twenty-one months before they were scheduled to mature.   (*See* Ex. I, O'Brien Dep. 62:8–20, 63:2–6, App. 9459–60.)   The O'Briens have admitted that they did not conduct any investigation related to Stanford before redeeming their CDs.   (*See* Ex. H, Defendants' Discovery Responses, Responses to Interrogatory No. 5, App. 8396 (both answering "None").)   The O'Briens received $1,087,505.10 in transfers from the Stanford Ponzi scheme.   (*See* Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-19, App. 8248.)

## ARGUMENT & AUTHORITIES

### I.   TUFTA's affirmative defense requires Defendants to establish that they took the transfers in good faith.

TUFTA provides that a creditor may avoid a transfer if that transfer was fraudulent.   A transfer is fraudulent if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor."   Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (West 2015).   "In the context of a Ponzi scheme, if the Receiver proves that such a scheme exists, the Receiver need not prove actual intent to defraud; rather, actual intent is presumed."   (Net Winner Order at 15–16 (citing *Janvey v. Alguire*, 628 F.3d 164, 178 (5th Cir. 2010)).)   This Court has previously held that Stanford was a Ponzi scheme.   (*See* Net Winner Order at 17 ("Here, the Court again holds that, as a matter of law, Stanford operated a Ponzi Scheme.").)   Therefore, all of the transfers the Defendants received from the Stanford Ponzi scheme were fraudulent under TUFTA as a matter of law.

The Defendants can keep the fraudulent transfers they received only if they can prove both (1) that they took the transfers in good faith, and (2) that they received the transfers in exchange for reasonably equivalent value.[7]  *See* Tex. Bus. & Com. Code Ann. § 24.009(a) (West 2015); Net Winner Order at 16.   The Defendants have the burden of proving both prongs of TUFTA's affirmative defense.  *See Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

## II.   The Defendants are not entitled to TUFTA's "good faith" defense if they were on inquiry notice of Stanford's fraud or insolvency and failed to conduct a diligent investigation that would have allayed the suspicions of a reasonable person.

### A.   The Good Faith Standard: An Overview

The outcome of the Parties' Cross-Motions for Partial Summary Judgment turns on the question of whether the Defendants took the relevant transfers in good faith.  The Parties disagree about the standard for evaluating good faith.  The Receiver's position, shared by, among others, the Fifth Circuit in its most recent opinion on this issue, is that Defendants cannot establish that they took the transfers from Stanford in good faith if they had constructive knowledge—i.e., they were on "inquiry notice"—of Stanford's fraud or insolvency and failed to conduct a diligent investigation that would have allayed the suspicions of a reasonable person.[8]

---

[7]      As noted above, the Receiver has already obtained summary judgment related to the amounts that the Defendants received in excess of their investments in SIB (i.e., Net Winnings) on the basis that the Defendants did not exchange reasonably equivalent value for those amounts as a matter of law.  *See* supra note 2.  The Receiver's current Cross-Motion for Partial Summary Judgment relates to the legal standard applicable to the good faith prong of the TUFTA affirmative defense and whether the Defendants can prove good faith under the proper standard. (*See* Agreed Order Regarding Briefing Schedule for Cross-Motions for Summary Judgment, Case No. 3:09-cv-0724-N-BG, Doc. 1377; Case No. 3:10-cv-0366-N-BG, Doc. 555; Case No. 3:10-cv-0415-N-BG, Doc. 155; Case No. 3:10-cv-0478-N-BG, Doc. 152; Case No. 3:10-cv-0528-N-BG, Doc. 124; Case No. 3:10-cv-0617-N-BG, Doc. 101; Case No. 3:10-cv-0725-N-BG, Doc. 116; Case No. 3:10-cv-0844-N-BG, Doc. 91; Case No. 3:10-cv-0931-N-BG, Doc. 173; Case No. 3:10-cv-1002-N-BG, Doc. 276.)

[8]      Defendants also cannot establish that they obtained the transfers in good faith if they had *actual* knowledge of Stanford's fraud or insolvency.  The Receiver has not asserted that the Defendants had actual knowledge of Stanford's fraud or insolvency.  This Motion therefore addresses only whether the Defendants had constructive knowledge, and if so, whether they conducted a diligent investigation that would have allayed the suspicions of a reasonable person.

*See In re Am. Hous. Found.*, 785 F.3d 143, 164 (5th Cir. 2015)[9] (the good faith test asks (1) "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose" and (2) whether, having been put on inquiry notice, the transferee "satisf[ied] a 'diligent investigation' requirement") (internal quotation marks omitted); *see also* infra pp. 11–13.

## B.   Step One: Were the Defendants on Inquiry Notice?

In analyzing whether Defendants received the transfers in good faith, the first question is "whether [Defendants] had information that put [them] on inquiry notice that [Stanford] was insolvent or that the transfer might be made with a fraudulent purpose."   *In re Am. Hous.*, 785 F.3d at 164.   Whether Defendants were on inquiry notice is an objective determination; if Defendants had knowledge of facts or circumstances that would excite the suspicions of a person of ordinary prudence and lead that person to inquire further into Stanford's possible fraud or insolvency, Defendants were on inquiry notice of Stanford's fraud or insolvency.   *Id.*; *see also Hahn*, 321 S.W.3d at 527 ("A transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in good

---

[9]     *In re American Housing* examined the good faith defense under Section 548(c) of the Bankruptcy Code. *See* 785 F.3d 143 at 164.   Because TUFTA is to be interpreted consistently with UFTA, *see* Tex. Bus. & Com. Code Ann. § 24.012 (West 2015), and the good faith analysis under UFTA is equivalent to the good faith analysis under Section 548(c), cases analyzing good faith under Section 548(c) are instructive in assessing good faith under TUFTA.   *See In re Cohen*, 199 B.R. 709, 720 (B.A.P. 9th Cir. 1996) ("[A]nalysis of inquiry notice under UFTA § 8(a) applies with equal force to Bankruptcy Code § 548(c)."); *In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 534 (9th Cir. 1990) ("Although the Uniform Act and the common law thus provide the substantive law in this case, cases construing the Bankruptcy Code counterparts are persuasive authority due to the similarity of the laws in this area."); PETER SPERO, FRAUDULENT TRANSFERS, PREBANKRUPTCY PLANNING AND EXEMPTIONS § 4:14 (2015 ed.) ("Good faith under the UFTA is said to be the equivalent of good faith under 11 U.S.C.A. § 548(c)."). This Court and the Fifth Circuit have held that cases interpreting Section 548 are instructive in analyzing fraudulent transfers under TUFTA.   *See  Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (finding that Washington's UFTA is "virtually identical" to Section 548 and concluding that cases interpreting Section 548 are consistent with Washington law); *see also Dem. Sen. Camp. Comm., Inc.*, 793 F. Supp. 2d at 856 n.52 ("There are no material differences between the Washington and Texas UFTA statutes."); *Janvey v. Dem. Sen. Camp. Comm., Inc.*, 712 F.3d 185, 194 (5th Cir. 2013) ("UFTA is modeled on § 548(a)(1) of the Bankruptcy Code, and, therefore cases interpreting § 548(a)(1) may be used to interpret UFTA or its Texas equivalent.").

faith."); *see also GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 312 (5th Cir. 2014) (endorsing *Hahn*'s analysis of TUFTA's good faith defense); *SEC v. Helms*, No. A-13-cv-1036-ML, 2015 WL 1040443, at *9 (W.D. Tex. Mar. 10, 2015) (TUFTA's good faith standard asks "what [Ponzi scheme investors] should have known, and whether that information should have put them on inquiry notice that [the Ponzi scheme entity] was insolvent or otherwise engaged in a fraudulent scheme"); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 23 (S.D.N.Y. 2007) (rejecting transferee's argument "that its lack of actual knowledge of [the transferor's] fraud indicates that it was not on inquiry notice" because "reliance on actual knowledge misconstrues the inquiry notice standard" and noting that "[d]etermining what [the transferee] knew is not the same as asking whether [the transferee] should have attempted to learn more"); *SEC v. Cook*, No. 3:00-CV-272-R, 2001 WL 256172, at *4 (N.D. Tex. Mar. 8, 2001) ("One lacks the good faith that is essential to the [TUFTA] defense to avoidability if possessed of enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction." (quoting *In re Cohen*, 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996) (discussing UFTA Section 8(a), which is identical to TUFTA Section 24.009))).

### C.     Step Two: Did the Defendants fulfill their duty to investigate?

Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the second question is whether the transferee satisfied a "diligent investigation" requirement. *In re Am. Hous.*, 785 F. 3d at 164. If the Defendants had knowledge of facts that triggered a duty to investigate further, they did not receive the transfers in good faith unless they first conducted a diligent investigation that would have allayed the suspicions of a reasonable person. *Id.*; *see also In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 22–23 (noting that "good faith question can be broken down into two parts: (1) whether [the transferee] was on inquiry notice of the [transferor's] fraud and (2) whether [the

transferee] was diligent in its investigation of the [transferor]"); *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (failure of transferee to inquire more closely about company operated as a Ponzi scheme, in light of "abundant suspicious information he possessed about the people, the scheme, and the previous schemes," raised serious questions about good faith defense); *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1335–36 (10th Cir. 1996) ("The presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment." (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.07 at 548–73 (Lawrence P. King ed., 15th ed. 1996))).

**III.    The Defendants were on inquiry notice of Stanford's fraud and insolvency and did not conduct a diligent investigation that would have allayed the suspicions of a reasonable person.**

**A.    Michael Word's warning to redeem their SIB CDs before maturity put the Word Defendants on inquiry notice of Stanford's fraud and insolvency.**

After watching reports of Madoff's arrest on the news,[10] Word immediately called his clients and told them to redeem their SIB CDs.  (*See* Ex. C, Word Dep. 103:23–104:17, App. 8306–07 (testifying that what led to his decision to get his clients out of the SIB CDs included the news of Madoff's arrest and that he started calling his clients that same day); *see also* Ex. K, Lillie Dep. 80:24–81:14, Sept. 21, 2015, App. 9490–91 (testifying that Word told him, "I'm going to recommend my people that are in CDs in Antigua to go ahead and redeem.").

Based on what the Word Defendants already knew about SIB and the SIB CDs— *e.g.*, SIB was an offshore bank that advertised, even in uncertain economic times, above-market

---

[10]    By the time Word learned that Madoff had been arrested in connection with the SEC's investigation into the Madoff Ponzi scheme, Word had been on notice of the SEC's investigation into Stanford and the SIB CDs for more than four months. (*See* July 31, 2008 E-mail from John Buzzell to Michael Word, App. 8281 (sending Word a link to a Bloomberg article titled "SEC Investigating Stanford Group Offshore-Bank CDs" and informing Word that he "just received a call from a concerned client [(Defendant Charles Massey)] regarding the below listed article on Bloomberg.com regarding SIBL").)

and consistent rates of return on CDs that were backed by safe and liquid investments—Word's sudden insistence that they pay substantial early-withdrawal penalties to get out of the CDs triggered a duty to investigate further.  *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 23 (noting that objective standard applies to good faith defense and considering "whether what [transferee] knew or should have known triggered a duty to investigate further"); *see also, e.g.*, Ex. G, Dougherty Dep. 35:17–36:5, App. 8371–72 ("So one day Michael [Word] called me out of the blue and said, look, we need to go ahead and redeem the CDs."); Ex. L, Massey Dep. 59:19–60:9, Sept. 21, 2015, App. 9509–10 ("Mr. Word explained to [me] that he had some gut feelings that everything might not be just right, that he was not sleeping well at night, that he seemed uncomfortable with the foreign investment [(i.e., the SIB CDs)], that it may be best to move it back [to the United States]."); Ex. K, Lillie Dep. 77:3–79:15, 81:18–82:23, App. 9487–89, 9491–92 (watching CNBC special in which Lillie said that he got "scared" when Word called because "[i]f [Word's] concerned now that maybe something is wrong with the bank, I said, we need to get that money out of there" and testifying that he was scared of "just exactly what's happened" and "los[ing] every penny immediately and hav[ing] no time to react to it")).

By telling his clients that the Madoff scheme was one of the reasons he wanted to get them out of the SIB CDs, (*see* Ex. C, Word Dep. 115:10–116:6, 117:4–118:16, App. 8311–14), Word conveyed his concerns that Stanford was like Madoff.  Indeed, Word and several of the Word Defendants have admitted that the Madoff scheme made them concerned about SIB and the SIB CDs.  (*See* Ex. C, Word Dep. 116:10–19, App. 8312 ("Madoff, like I have said, one of many things that caused me to be concerned."); Ex. D, May 12, 2009 Letter from James Brown, App. 8321 (claiming that he "chose to back out of the CD account after the Madoff scandal"); Ex. E, Brown Dep. 49:1–7, 50:18–21, 51:12–19, App. 8334–36 (testifying that

Madoff scheme "put the nail in the coffin" and was "one of the red lights" that made him concerned about Stanford and the same thing happening to him); Ex. F, Weiner Dep. 16:24–17:16, Sept. 22, 2015, App. 8353–54 ("the fact [that] a lot of people lost a lot of money" in the Madoff Ponzi scheme made him concerned about Stanford and losing his entire life savings "crossed [his] mind"); Ex. G, Dougherty Dep. 42:24–44:5, 45:23–46:14, App. 8373–77 (the Madoff Ponzi scheme was "one of the things that [he and his wife] were worried about" because it "could happen to [them]," and he was concerned that he could lose his entire investment if he did not redeem his SIB CDs); Ex. H, Defendants' Discovery Responses, Daigle's First Amended Responses to Receiver's First Interrogatories and Requests for Production at 10, App. 8567 ("The news of the Madoff Ponzi scheme also pushed Defendant [Daniel Daigle] to call his financial advisor to request his SIB CDs be redeemed.").)

The apparent similarities between the Madoff Ponzi scheme and Stanford were cause for concern. Both the Madoff and Stanford schemes claimed that they earned consistent, double-digit returns on their respective portfolios.[11]  (*See* Ex. C, Word Dep. 105:9–16, 114:16–24, App. 8308, 8310 (listing "consistent double-digit returns" as characteristic used by the news to describe Madoff, in response to a question regarding similarities he recognized between Stanford and what he was hearing about Madoff at the time of his arrest).  Both schemes promised investors above-market returns. [12]  (*See* Ex. E, Brown Dep. 51:24–52:9, App. 8336–37

---

[11]     As of July 2008, Word was actively questioning SIB's claims of consistent, double-digit returns on its investment portfolio.  (*See* July 25, 2008 E-Mail from Word Regarding Proposed Question for SIB Conference Call, App. 8283 ("If you look back over time at some of the best money managers and hedge fund managers, you are hard-pressed to find someone that produces consistent returns as we claim to have made.  How are we able to pull off consistent, double-digit return every year?").)

[12]     Based on the representations in SIB's brochures, the Word Defendants knew that Stanford offered above-market rates on the SIB CDs.  (*See* Ex. A, August 15, 2010 Decl. of Karyl Van Tassel at KVT-NWD-16, SIB Brochure at 8, App. 8187 (chart reflecting a direct comparison between the average SIB CD rate and the average U.S. bank CD rate for each year between 1997 and 2006 ); *see also, e.g.*, Ex. E, Brown Dep. 40:11–23, App. 8333 (testifying that he knew from the time he invested in the SIB CDs that they paid higher rates than U.S. bank CDs); Ex. F, Weiner Dep. 58:18–22, App. 8356 (he knew that SIB CDs paid "a couple points better" than U.S. bank CDs);

(testifying that he knew both Madoff and Stanford had promised above-market returns and that the similarity "threw up a red light").)  And both schemes failed to provide information related to the individual positions in their investment portfolios.  (See Ex. C, Word Dep. 114:16–24, App. 8310 (testifying that one of the similarities he recognized between SIB and the Madoff Ponzi scheme was that he "couldn't see the positions of the [SIB] portfolio" and that he was "concerned of the lack of transparency").)  Recognizing these similarities in his discussions with clients, Word told them that he wanted to manage their funds in a manner that would allow him to see the individual positions.  (See Ex. C, Word Dep. 105:9–16, 106:1–16, 115:10–116:6, App. 8308–09, 8311–12 ("Madoff was mentioned [in conversations with clients] in relation as everything else that was mentioned of the reason why I wanted to bring the money and manage it myself and see the positions.").)

None of the Word Defendants redeemed their SIB CDs prior to the call from their financial advisor.  But in the weeks following Word's calls to his clients, and in the midst of constant media coverage claiming that the investors in the Madoff Ponzi scheme were at risk of losing their entire investments, all of the Word Defendants heeded their financial advisor's warning and redeemed their CDs.[13]  (See Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-18, App. 8207; see also Ex. E, Brown Dep. 51:8–15, App. 8336 (testifying that he knew Madoff was "doing something illegally" and that he heard on television that the

---

Ex. K, Lillie Dep. 54:3–56:11, App. 9484–86 (agreeing that rate comparison information was available to him); Ex. L, Massey Dep. 42:9–42:25, App. 9508  ("[n]o doubt" he could have asked for SIB brochure with chart comparing SIB and U.S. bank CD rates); Ex. G, Dougherty Dep. 29:17–25, App. 8370 (financial advisor would have provided SIB brochure if he had asked for it).)

[13]      In the seven-week period between Madoff's arrest on December 11, 2008 and the end of January 2009 (approximately two weeks before the SEC filed its enforcement action against Stanford), Word's clients withdrew more than $49 million from SIB.  (See Ex. C, Word Dep. 118:24–121:1, App. 8314–17; see also January 5, 2009 E-Mail from Word to SGC's Commissions Administrator, App. 8285 (confirming that his clients' withdrew $12,247,484 from SIB during the final week of December 2008); February 3, 2009 E-Mail from SGC's Commissions Administrator to Word, App. 8287 (asking Word to confirm that his clients withdrew $37,104,625 from SIB in January 2009).)

investors in the Madoff scheme were at risk of losing their investments); Ex. M, Causey Dep. 52:7–18, Sept. 22, 2015, App. 9525 (when news of the Madoff scheme first came out, he understood that Madoff had broken the law and that the people who invested in Madoff had lost their investments); Ex. F, Weiner Dep. 13:13–22, App. 8352 (claiming that he first heard the term "Ponzi scheme" in connection with the Madoff fraud).)

In light of what the Word Defendants already knew about SIB and the SIB CDs from SIB's marketing brochures, Word's warning to get out of the SIB CDs before maturity was sufficient to excite the suspicions of a person of ordinary prudence and trigger a duty to investigate.  But the Word Defendants did not conduct any investigation, much less a reasonably diligent investigation.  (*See* Ex. H, Defendants' Discovery Responses, Responses to Interrogatory No. 5, App. 8382–96; *see also, e.g.*, Ex. E, Brown Dep. 52:10–13, App. 8337 (testifying that he did not investigate whether Stanford was a Ponzi scheme after learning about Madoff); Ex. F, Weiner Dep. 17:21–18:2, App. 8354–55 (same); Ex. M, Causey Dep. 51:25–52:3, App. 9524–25 (same).)   That the Word Defendants redeemed their CDs only after receiving a warning from their financial advisor and without conducting any investigation defeats any argument that the Word Defendants lacked constructive knowledge of Stanford's fraud and insolvency when they received the fraudulent transfers.

The evidence establishes that none of the Word Defendants had redeemed their CDs prior to Madoff's arrest on December 11, 2008, that numerous media outlets reported on Madoff's arrest for running a Ponzi scheme, that Word recognized similarities between the Madoff scheme and Stanford, that Word immediately warned his clients to redeem their CDs and cited Madoff as one of the reasons, and that all of the Word Defendants elected to pay substantial penalties to redeem their CDs before maturity and without conducting any investigation.  Based

on this evidence alone, no reasonable juror could find that the Word Defendants took the transfers from the Stanford Ponzi scheme in good faith. *See Swanson v. Hearst Corp. Long Term Disability Plan*, 586 F.3d 1016, 1018 (5th Cir. 2009) ("No genuine issue of material fact exists if the evidence is such that no reasonable juror could find for the nonmovant.").

### B.   Information from Charles Rawl put the O'Briens on inquiry notice of Stanford's fraud and insolvency.

#### 1.   Rawl told O'Brien that Stanford was engaging in illegal and fraudulent conduct.

A few weeks before the O'Briens redeemed their SIB CDs, Michael O'Brien drafted a lawsuit alleging that "[d]uring the course of their employment, [Rawl and Tidwell] became aware of certain illegal practices at Stanford involving the sale of SIBL certificates of deposit and other securities offerings." (Ex. J, Rawl and Tidwell Petition ¶ 5, App. 9465.) O'Brien also alleged in the lawsuit that Stanford was purging files and destroying documents "with knowledge of an ongoing SEC Inquiry into the SIBL CD and the CD sales practices" and using "historical performance data in connection with the sale of securities to clients that was known to be incorrect." (*Id.* ¶¶ 8(b)–(c), App. 9466.) The lawsuit further asserted that "[t]he business practices of Stanford . . . , which caused [Rawl and Tidwell] to resign, constitute violations of federal securities, and/or NASD regulations, as well as certain Treasury and/or Internal Revenue federal laws and/or regulations." (*Id.* ¶ 11, App. 9467.)

Because allegations that Stanford was engaging in illegal and fraudulent conduct—i.e., destroying documents during an SEC inquiry and intentionally misrepresenting performance data related to one of its investment products—would have excited the suspicions of a person of ordinary prudence, O'Brien had a duty to conduct a diligent investigation under TUFTA as soon as Rawl told him about it. (*See* Ex. I, O'Brien Dep. 46:23–47:1, App. 9457–60 (answering "[i]n my mind, it certainly is," when asked whether it is unusual for an entity to

purge files and destroy documents during an SEC inquiry).)   The O'Briens admit in their discovery responses, however, that they did not perform a diligent investigation before redeeming their SIB CDs.   (*See* Ex. H, Defendants' Discovery Responses, Responses to Interrogatory No. 5, App. 8396 (both answering "None").)   Accordingly, based on their own admissions, the O'Briens cannot show that they conducted a diligent investigation that would have allayed the suspicions of a reasonable person and therefore cannot establish good faith.

Nonetheless, by signing and filing the lawsuit on behalf of Rawl and Tidwell in Texas court, O'Brien certified that to the best of his knowledge, information, and belief, formed after reasonable inquiry, there was a good faith basis for alleging that Stanford was engaging in illegal and fraudulent conduct.   *Cf.* Tex. Civ. Prac. & Rem. Code Ann. § 10.001 (West 2002) (providing that "[t]he signing of a pleading . . . constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, *formed after reasonable inquiry*: . . . (3) each allegation or other factual contention in the pleading or motion *has evidentiary support*") (emphasis added).   If in fact he conducted an investigation before filing the lawsuit, as he certified to the court that he did, O'Brien must have concluded that the allegations against Stanford of illegal and fraudulent conduct had a reasonable basis in fact, and were likely true. Of course, that conclusion would not allay the suspicions of a reasonable person.   Thus, whether you consider the O'Briens' discovery responses or Michael O'Brien's certification to the Texas court when he filed a lawsuit accusing Stanford of fraud, the O'Briens cannot establish good faith under TUFTA.

### 2. Rawl told O'Brien about another Stanford employee who had alleged that Stanford was violating federal securities laws and regulations.

As part of the dispute between O'Brien's clients and Stanford,  Rawl told O'Brien about another former Stanford employee, Charles Satterfield, who had filed a similar claim

against Stanford a few months earlier.  (*See* December 31, 2007 E-Mail from O'Brien to Hamric, App. 8255 ("Lastly, I am anticipating that Stanford will soon file a U-5 with the NASD, and I would like to avoid further problems, *similar to the Satterfield case*, if a false, misleading, or derogatory filing is made by Stanford." (emphasis added)); *see also* Ex. I, O'Brien Dep. 34:9–14, App. 9455 (Rawl told O'Brien about Satterfield before O'Brien sent his December 31, 2007 e-mail to Hamric).)[14]  Yet, even though O'Brien knew of this similar claim and even referenced Satterfield in his communications with Stanford on behalf of Rawl, O'Brien did nothing to investigate Satterfield's claim.  If he had, it would not have allayed the concerns of a reasonable person.

Satterfield's claim alleged that his employment with Stanford was terminated in May 2007 after he questioned whether Stanford had violated federal securities laws and NASD regulations.   (*See* October 2007 Satterfield Statement of Claim ¶¶ 28–30, App. 8263.) Satterfield's Statement of Claim—which named SGC and several SGC employees, including SGC's President and Chief Compliance Officer, as defendants—alleged that SGC was insolvent without the CD referral fees from SIB and that SGC's management demonstrated a willingness to flaunt federal securities laws and NASD regulations:

> • "On its own, SGC is not a financially viable entity in that since its inception, it has failed to generate enough revenue from the sales and trading of securities other than products offered by SIBL to remain financially solvent.  As such, SGC is essentially a sales conduit for SIBL and not a traditional broker/ dealer firm. This arrangement has been effected to attempt to circumvent federal laws and regulations that would otherwise require SIBL to register as a foreign bank operating with the United States."[15]  (*Id.* ¶ 9, App. 8259.)

---

[14]     A Form U-5 is the document that U.S. broker-dealers file with NASD/FINRA describing the status of a particular broker.  (*See* Ex. I, O'Brien Dep. 29:16–18, App. 9451.)

[15]     O'Brien claims that he may have reviewed a copy of Satterfield's Statement of Claim "[a]t some point possibly," but he does not have a specific recollection as to when he reviewed it.  (*See* Ex. I, O'Brien Dep. 31:21–32:3, 32:22–33:2, App. 9452–54.)

- "The Stanford group of companies generates substantially all of its profits from its unregulated and offshore business activities." (*Id.* ¶ 42, App. 8266.)

- "Soon after April 1, 2007, Claimant also discovered the extent to which SGC principals, including Respondent Young, Respondent Bogar and the aforementioned Wood held the SEC and NASD in utter contempt and the willingness of the aforementioned SGC principals, through overt action and benign neglect, to permit activities that appeared to constitute violations of federal securities laws and/ or NASD regulations." (*Id.* ¶ 22, App. 8262.)

- "In general, U.S. regulators, including the NASD, are held in contempt and despised by senior managers of SGC.  Significantly, while employed by SGC, Claimant received more training in what not to discuss in archived company e-mails (thus circumventing the intent of records retention requirements) than he was given in how to comply with Anti-Money Laundering statutes." (*Id.* ¶ 42, App. 8266.)

- "The material management weaknesses within Stanford were so problematic and pervasive that [on] or about April 12, 2007, the NASD censured and fined the firm for multiple violations of federal securities laws and/ or NASD regulations." (*Id.* ¶ 38, App. 8265.)

- "The record will show that senior management of Stanford, in reaction to the NASD's censure and fine, in a concerted effort to misrepresent the truth to the investing public did instruct company employees, including Registered Representatives discussing the matter with existing and prospective clients that the violations were the result of an accidental error on behalf of the SGC Accounting Department in one overnight occurrence that lead to an isolated incident where the firm was in technical violation of NASD minimum capital requirements." (*Id.* ¶ 39, App. 8265.)

- "Such material representations of fact in dealing with the investing public are a pervasive pattern of behavior on the part of SGC management and show the willingness of SGC management to flaunt federal securities laws and/ or NASD regulations if and when such behavior suited their purposes." (*Id.* ¶ 40, App. 8266.)

- "While the censure and fine levied against SGC by the NASD on or about April 12, 2007 indicated the NASD was aware of substantive and material violations of federal securities laws and/ or NASD regulations during the period relative to the matter now before the Board, there is reason to believe additional possible substantive and material violations of federal securities laws and/ or NASD regulations were occurring within SGC that the NASD was not aware of." (*Id.* ¶ 41, App. 8266.)

- "In essence, Respondents named herein saw Claimant as a whistleblower that needed to be dealt with, and dealt with in a manner that would send a signal to

any other SGC employee who dared to not 'join the team' and thereby consider any possible violations of federal securities law and/ or NASD regulations and a subject to [be] neither considered nor discussed." (*Id.* ¶ 51, App. 8268.)

- "The reason Claimant was let go was that SGC wanted to intimidate and garner silence from any and all employees who knew of any wrongful activity within the organization." (*Id.* ¶ 53, App. 8268–69.)

O'Brien's admission that he did not investigate Satterfield's claims is further support for the conclusion that the O'Briens did not take the transfers from Stanford in good faith. (Ex. I, O'Brien Dep. 37:7–9, App. 9456.)  A reasonable person in O'Brien's position— i.e., a person who knew that his own clients resigned from Stanford amid allegations that Stanford was engaging in illegal and fraudulent conduct and who claimed that he "would like to avoid further problems, similar to the Satterfield case"—would have inquired into the basis of Satterfield's claims against Stanford.  *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 23 (noting that an objective standard applies to good faith defense and considering "whether what [transferee] knew or should have known triggered a duty to investigate further").

Had O'Brien made any effort to conduct a diligent inquiry related to Satterfield's claims, including by talking to Satterfield himself, before the O'Briens redeemed their CDs,[16] O'Brien would have learned that Satterfield was terminated by Stanford after he raised the same types of questions that Rawl and Tidwell had raised—questions regarding whether Stanford was violating federal laws and regulations.  (*See* October 2007 Satterfield Statement of Claim at ¶¶ 9, 22, 41, 53, App. 8259, 8262, 8266, 8268–69.)   O'Brien also would have learned about Satterfield's other allegations, including that SGC was insolvent without the revenue from the SIB CD referral fees, that Stanford was using SGC as a sales conduit for the SIB CDs to

---

[16]     Although O'Brien claimed in his deposition that he could not remember exactly when he reviewed Satterfield's Statement of Claim, including whether it was before or after the O'Briens redeemed their SIB CDs in March 2008, (*see* Ex. I, O'Brien Dep. 31:21–32:3, 32:22–33:13, App. 9452–54), the evidence establishes that he knew about the Satterfield case as of December 31, 2007, (*see* December 31, 2007 E-Mail from O'Brien to Hamric, App. 8255).)

circumvent U.S. laws and regulations, that all of the Stanford Entities were dependent on Stanford's "unregulated and offshore business activities" (i.e., SIB CD sales), and that SGC had been recently fined by the NASD for failing to maintain adequate capital reserves. (*See id.* ¶¶ 9, 38–39, 42, App. 8259, 8265–66.)

The information that Michael O'Brien obtained from Rawl immediately before the O'Briens redeemed their CDs, combined with what the O'Briens already knew about SIB and the SIB CDs, triggered a duty to investigate further. Because the O'Briens received the transfers from Stanford without conducting a diligent investigation that would have allayed the suspicions of a reasonable person, no reasonable juror could find that the O'Briens took the fraudulent transfers from Stanford in good faith. *Swanson*, 586 F.3d at 1018.

### C. The fact that the Defendants elected to pay substantial penalties to redeem their SIB CDs before maturity establishes that they had inquiry notice of Stanford's fraud and insolvency.

The Defendants' own actions establish that they were on inquiry notice of Stanford's fraud and insolvency when they received the fraudulent transfers. *See In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 23 (holding that transferee's own actions supported finding of inquiry notice because information caused transferee to investigate further). The Defendants did not passively receive fraudulent transfers from Stanford when each of their CDs matured. Rather, in contrast to the thousands of investors who were still invested in the SIB CDs when the Stanford Ponzi scheme collapsed, all of the Defendants elected to pay substantial penalties to redeem their CDs before maturity specifically *because* they obtained information from their financial advisors that put them on inquiry notice. *See Hahn*, 321 S.W.3d at 527.

The Defendants' early redemptions demonstrate that they were concerned about SIB's ability to pay on the CDs at maturity. *See In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 539–40 (9th Cir. 1990) (transferee's demand of timely payment despite

acknowledgment that transferee could not make payments provided support for bad faith conclusion); (*see also, e.g.*, Ex. G, Dougherty Dep. 35:11–13, App. 8371 (answering "No" when asked if he had any idea whether SIB could continue to pay the promised interest rate)).  When viewed together with Word's warning regarding the Madoff scheme and the information that O'Brien learned in his role as counsel for Rawl and Tidwell, the Defendants' early redemptions establish that there is no genuine issue of material fact regarding whether the Defendants had knowledge of facts or circumstances that put them on inquiry notice.

CONCLUSION

The Word Defendants were told that the Madoff Ponzi scheme was a reason to be concerned about Stanford and that they should redeem their CDs immediately.  Michael O'Brien learned from Rawl that Stanford was engaging in illegal and fraudulent conduct.  Yet, instead of reacting to the information they received from their financial advisors by investigating further, the Defendants immediately paid substantial early-withdrawal penalties to cash out of the SIB CDs before maturity.

The only conclusion that can be drawn from the evidence in the summary judgment record is that the Defendants received the transfers at issue with knowledge of facts that triggered a duty to investigate and without conducting a diligent investigation that would have allayed the suspicions of a reasonable person.  *See In re M & L Bus. Mach.*, 84 F.3d at 1335–36 (knowledge of facts that place the transferee on inquiry notice of the transferor's financial condition may deprive the transferee of good faith "unless investigation actually disclosed no reason to suspect financial embarrassment" (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.07 at 548–73)); *see also GE Capital*, 754 F.3d at 301, 312 (transferee failed to prove good faith under TUFTA where it failed to verify transferor's representations regarding extraordinary revenue growth); *Helms*, 2015 WL 1040443, at *6 (finding that investor in Ponzi scheme did not

perform adequate due diligence where investor "relied exclusively on either what he was told by [two of the Ponzi scheme entity's employees], or on financial documents and projections provided by [the entity]," and did not conduct "[a]n effective and independent examination of [the entity]," "did not effectively examine, test, or audit the operations of [the entity]," and "did not independently review or audit any of [the entity's] financial records"); *cf. In re Hannover Corp.*, 310 F.3d 796, 800 (5th Cir. 2002) (duty of inquiry satisfied where transferee undertook its own investigation, contacted the SEC and the federal district court, and received assurances from the district court that it could receive payments from debtor).

Therefore, as a matter of law, the Defendants cannot prove that they lacked constructive knowledge of Stanford's fraud and insolvency when they received the fraudulent transfers.  Because no reasonable juror could find that the Defendants took the fraudulent transfers from the Stanford Ponzi scheme in good faith, the Defendants' TUFTA affirmative defense fails as a matter of law.  *See Swanson*, 586 F.3d at 1018.

For the foregoing reasons, the Receiver respectfully requests that the Court grant the Receiver's Cross-Motion for Partial Summary Judgment and that the Court enter an order ruling that (1) the Word Defendants did not have good faith under TUFTA with respect to the fraudulent transfers they received on or after December 11, 2008, (*see* Ex. B, November 20, 2015 Suppl. Decl. of Karyl Van Tassel at KVT-NWD-18, App. 8207), and (2) the O'Briens did not have good faith under TUFTA with respect to the fraudulent transfers they received on or after March 27, 2008, (*see id.* at KVT-NWD-19, App. 8248).

Dated: November 20, 2015

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler
    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Scott D. Powers
    Texas Bar No. 24027746
    scott.powers@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    98 San Jacinto Blvd., Suite 1500
    Austin, Texas 78701-4039
    512.322.2500
    512.322.2501 (Facsimile)

**ATTORNEYS FOR**
**RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On November 20, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all counsel or pro se parties of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler