2.      The statements made in this declaration are true and correct based on the knowledge I have gained from the many documents I have reviewed and other work my team and I have performed in the course of FTI's investigation on behalf of the Receiver.

3.      I use the following acronyms or short-hand terms to refer to certain entities in this declaration:

- Stanford Entities — all legal entities owned, directly or indirectly, by the named Defendants in the SEC action as of the date the U.S. Receivership was instituted.

- SIB — Stanford International Bank, Limited.

- STCL — Stanford Trust Company Limited, an Antigua trust company.

- SFG — Stanford Financial Group, the name given to Allen Stanford's "global network of financial companies."

- SFGC — Stanford Financial Group Company, which provided shared services, including Treasury and Investment services, to SIB and other companies within SFG.

- SGC — Stanford Group Company, a U.S. broker-dealer entity incorporated in Texas.

### SEC ACTION AND FTI'S INVESTIGATION

4.      On February 16, 2009, the United States District Court for the Northern District of Texas appointed Ralph S. Janvey the Receiver for SIB and the rest of the Stanford Entities. On the same day, the Receiver retained FTI to perform a variety of services, including assisting in the capture and safeguarding of electronic accounting and other records of the Stanford Entities and forensic accounting analyses of those records, including cash tracing. I oversee, and am personally involved in, FTI's forensic accounting and cash tracing activities. The purposes of FTI's work have been, in part, to (a) determine the roles that the various Stanford Entities played in the fraud alleged by the SEC and specifically in the sale

**App. 562**

and redemption of SIB certificates of deposit ("CDs"); (b) identify the source(s) of income and cash flows of the various Stanford Entities; (c) trace funds to determine how they were allocated and disbursed throughout the Stanford Entities; and (d) review the circumstances relating to the sale of SIB CDs.

5.      As part of our work, we have interviewed numerous present and former Stanford Entity employees.  These include, but are not limited to, the persons whose names (as well as employer, title, and supervisor) are listed in **KVT-2**.  In addition, we have examined the available accounting and other records (including email files of certain former Stanford employees) relating to the Stanford Entities located in and/or gathered from Houston, Texas; Tupelo, Mississippi; Baldwyn, Mississippi; Memphis, Tennessee; Miami, Florida; St. Croix, United States Virgin Islands; Antigua; Barbuda; and other Stanford locations within and outside the U.S.  We have also reviewed extensive SIB customer records, including but not limited to paper and electronic records documenting SIB CD purchases, interest payments and redemptions.

6.      FTI has also obtained and analyzed paper and electronic files from third-party financial institutions where bank accounts of various Stanford Entities are or were located. These financial institutions include Toronto Dominion Bank in Canada, Trustmark National Bank and the Bank of Houston.  In addition, FTI has gathered and reviewed electronic and other data from Pershing, LLC and JP Morgan Clearing Corp., both of which have held or currently hold SGC customer accounts and former employee accounts, and SEI, which held or currently holds STC accounts.

7.      FTI's analyses of the records of SIB and other Stanford Entities were conducted using reliable practices and methodologies that are standard in the fields of

accounting and finance.  The findings and conclusions set forth herein are based on these analyses.

## SIB WAS A PONZI SCHEME

8.      The SEC alleges in its Second Amended Complaint in Case No. 03-CV-0298-N that the Stanford Entities constitute "a massive Ponzi scheme" involving "misappropriat[ion of] billions of dollars of investor funds."  Likewise, James Davis, Chief Financial Officer for both SIB (according to SIB's published financial statements) and SFGC and a long-time business associate and confidant of Allen Stanford, has pled guilty to charges that he conspired with Allen Stanford and others in running a Ponzi scheme in violation of federal securities laws.  In connection with his guilty plea, Davis admitted that SIB was a "massive Ponzi scheme whereby CD redemptions ultimately could only be accomplished with new infusions of investor funds."  James Davis admitted in his rearraignment that the Stanford enterprise was a Ponzi scheme from the beginning, and I have not seen anything in the records I have reviewed to indicate otherwise.  As explained in more detail below, my findings are consistent with the SEC's allegations and James Davis's admission that SIB was a Ponzi scheme.  SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) from at least 2004 and probably for much longer, yet it continued selling CDs to the end.  It induced investors to buy CDs by offering substantially above-market rates, issuing financial statements and other data that significantly overstated its earnings and assets, and misrepresenting its business model, investment strategy, financial strength, the safety and nature of its investments and other facts important to investors.  SIB incentivized Stanford-affiliated financial advisors to convince their clients to purchase SIB CDs over other kinds of investments by paying the financial advisors above-market commissions and other

**App. 564**

compensation tied to CD sales and to the retention of the CDs within SIB.  SIB's actual (as opposed to reported) earnings and assets, however, were insufficient to meet its CD payment obligations.  SIB could only keep the scheme going by selling yet more CDs and using the proceeds to pay redemptions, interest and operating expenses. Significant sums were also diverted to finance Allen Stanford's opulent life style of yachts, jet planes, travel, multiple homes, company credit cards, etc.  Davis, Holt and other insiders were paid handsomely for their complicity.  Davis, as part of his plea agreement, agreed to forfeit $1 billion in personal assets derived from the Ponzi scheme.

9.      Allen Stanford was sole owner, directly or indirectly, of more than 130 separate entities, including SIB and STC.  These entities comprised a single commonly-owned financial services network called the "Stanford Financial Group," which was headquartered in Houston.

10.      Stanford, along with a close band of confidants, controlled SFG (of which SIB was a part).  These confidants included Jim Davis, CFO of both SFGC and SIB, and Laura Pendergest Holt, Chief Investment Officer for SFGC.

11.      SIB was nothing like a typical commercial bank.  It did not offer checking accounts and did not make loans (other than to CD investors up to 80% of their CD balance).  It had one principal product line—certificates of deposit—and one principal source of funds—customer deposits from CD purchases.  The terms of some SIB CDs permitted partial redemptions before maturity upon customer demand.

12.      SIB offered CD rates that were significantly greater than those offered in the United States.  An SIB 2007 marketing brochure (attached as exhibit **KVT-3**) tracks SIB's historic CD yield against average US CD yields.  SIB's yield ranged from a high of 388% of

the US yield in 2002 to a low of 140% of the US yield in 2006.  According to the brochure, SIB was able to pay high CD rates by investing in "a well-diversified portfolio of highly marketable securities issued by stable governments, strong multinational companies and major international banks."  As a result, the brochure continues, "[SIB] has been consistently profitable since inception."  In other words, SIB purported to function like a hedge fund but, unlike a hedge fund, its customers were guaranteed (by SIB) a specified return regardless of the fund's performance.  SIB's reported returns were remarkably steady, fluctuating from only 11.7% to 14.9% between 1997 and 2007.  SIB showed a profit in good times and in bad.  The one exception was the second half of 2008, when financial sector businesses across the globe were struggling for survival and many feared we were on the brink of financial collapse.  Even then, SIB's accounting records reflected positive investment earnings, but a small overall loss—just 2% of total (purported) financial assets—after deductions for CD interest and other expenses.  What to some appeared to be too good to be true was indeed untrue.  As Stanford himself said at an October 2008 financial advisor conference: "We're about, as of early October, down about four percent, I guess. . . . I'm not happy with that [but] in this market I guess it's astounding."

13.     The most significant numbers on SIB's financial statements—revenue and asset value—were fictitious.  Davis states in his plea agreement that assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels.  My findings are consistent with those admissions.

14.     We found within SIB's accounting records worksheets used to derive fictitious SIB revenue back to 2004.  The Ponzi scheme conspirators would simply determine what level of fictitious revenue SIB needed to report in order to both look good to investors and

regulators and purport to cover its CD obligations and other expenses.  They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.

15.     The returns were fictitious, and they were based on fictitious asset totals.

(a)     SIB's records reflected that, as of December 31, 2008, it held $8.3 billion in "financial assets"—presumably actively traded securities and metals, as SIB represented to the public.  The reality was much different.  As of the end of 2008, SIB held less than $500 million in securities, or less than 7% of the total CD obligations.

(b)     FTI also discovered that $3.174 billion of SIB's claimed 2008 assets consisted of two real estate holding entities that had been purchased that same year for only $63.5 million and whose only assets were tracts of undeveloped Antiguan real estate.  The value of those assets was inflated 50 times the purchase price through a series of paper transactions involving other Stanford-owned entities.  These repetitive flips had no apparent economic substance and appear to have been engaged in solely to grossly overstate the value of the assets so as to prop up SIB's balance sheet.

(c)     FTI found that another $1.8 billion in SIB assets consisted of notes receivable from Allen Stanford.  Based on my team's investigation, however, Stanford had no significant assets apart from the various Stanford Entities, which collectively owed billions of dollars more than the fair value of their combined assets.

(d)     Other assets were similarly overstated.  Private equity investments, for example, were recorded on SIB's books at amounts that the Receiver's subsequent sales efforts have revealed to be many times greater than their realizable value.  These were valued at $1.2 billion as of June 30, 2008, but it is expected that the Receivership may realize as little as $35.4 million from the private equity assets held as of June 30, 2008.

(e)     Moreover, the fact that many of SIB's assets consisted of real estate, unsecured notes from Allen Stanford, and private equity investments was contrary to SIB's assurances to customers that its investments consisted of "highly marketable securities issued by stable governments, strong multinational companies and major international banks" so as to "maintain[] the highest degree of liquidity."  See KVT-3 at 3.

16.     Misinformation regarding SIB's financial strength, profitability, capitalization, investment strategy, investment allocation, the value of its investment portfolio, and other matters, was regularly disseminated from Stanford, Davis, Holt and others working under them to Stanford financial advisors, for use in inducing potential investors to purchase SIB CDs.

17.     SIB CDs were marketed through financial advisors employed by other Stanford-owned entities.  The financial advisors were heavily incentivized by above-market commissions and bonuses to steer their clients to SIB CDs rather than other investments.

18.     At the inception of the U.S. Receivership on February 16, 2009, SIB's total obligation to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008.  Based on my analysis, the market value of all

assets for all Stanford Entities (including SIB) combined total less than $1 billion.  At the time SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) by more than $6 billion.

19.     Through analysis of SIB's financial records, FTI has determined that SIB was insolvent by at least 2004 and very likely before then.   SIB's reported assets consisted overwhelmingly of "financial assets" and cash.  The published balance sheets represented that "financial assets" were reported at "fair value."  Of course, cash, by definition, is stated at fair value (assuming correct reporting).  We know, however, from our investigation and review of internal SIB records that the fair value of the SIB financial assets was much smaller than reported.   Each year, from 2004 forward, SIB's reported asset totals included, without disclosure to the public, notes receivable from Allen Stanford and certain assets with clearly inflated values.  When these amounts are deducted from the asset totals contained in SIB's published financial statements, it is apparent that, from at least 2004, SIB's liabilities exceeded the fair value of its assets.   Stanford's promissory notes were of no real value, because his apparent wealth was based on the SIB Ponzi scheme.  Moreover, private equity stakes initially held by other Stanford Entities (although likely purchased with SIB CD proceeds) were transferred to Allen Stanford, and then from Stanford to SIB, which recorded them on its books at much inflated values with no apparent economic gain having been achieved.  These transfers appear to have been booked for the purpose of giving SIB the false appearance of financial strength.   It is likely that other SIB assets were also fictitious or overvalued, as we saw in our analysis of 2008 data.  Certainly, persons engaged in conducting a Ponzi scheme would have had no incentive to understate asset values; and, as we have seen,

Stanford and his cohorts had a pattern of overstating asset values, ostensibly to induce more people to purchase "safe" SIB CDs.

20.     Through an analysis of cash flows for the period January 1, 2004 through February 17, 2009, we have verified that proceeds of CD sales were used to make purported interest and redemption payments on existing CDs.  That just confirmed what we knew had to be true anyway, as SIB's assets, reserves and investments were insufficient to fund its redemption and interest payments.  For example, SIB's CD transaction records indicate that approximately $2 billion was paid to investors for principal and interest from January 1, 2008 through February 17, 2009.  SIB's principal income-generating assets, which were managed in what was known as "Tier 2," never totaled more than $1 billion, even when the stock market was at a high and the economy was strong.  By the end of 2008, "Tier 2" had declined to less than $500 million, due to a combination of increasing redemptions and liquidations and falling market values.  Even if SIB had fully liquidated all investments in its portfolio, it would not have realized enough cash flow to cover just the redemptions in 2008 without the influx of new CD purchase money.  And in fact, when the market declined, we know that it took only 4 months for liquid assets to substantially deplete, even though $7.2 billion in CD obligations remained.  As a result of this decline, all actual gains earned since 2003 were lost.  Thus, although the SIB CD portfolio contained some legitimate investments, the earnings from those investments were negligible in comparison to and could not reasonably have been expected to cover SIB's total obligations to the CD holders.

21.     SIB necessarily used current CD proceeds to pay existing CD investors in previous years too.  Although SIB received some earnings on investments, those amounts were miniscule compared to its cash flow obligations.

22.     Based on FTI's analysis to date, I have concluded that from at least 2004 (and likely for much longer), SIB relied on proceeds from the sale of new CDs to make purported interest and principal payments to existing CD investors.  This is especially evident from the fact that, when CD sales faltered in 2008, SIB was immediately forced to sell off most of its assets that were readily available for liquidation just to maintain payments for a short time. By using the proceeds of new CD sales to pay interest and redemptions to existing CD holders, Stanford, Davis and their cohorts concealed their fraud and perpetuated the Ponzi scheme.

23.     CD sales proceeds not used to pay interest, redemptions, and current operating expenses (including commissions and other incentive payments to financial advisors) were either placed in speculative investments (many of them, such as real estate and private equity deals, illiquid), diverted to other Stanford Entities "on behalf of shareholder" (i.e., for the benefit of Allen Stanford) or used to finance Allen Stanford's lavish lifestyle (e.g., jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit card, etc.).

24.     A tipping point was reached in October 2008:  That month and every month thereafter, incoming funds from new investors were insufficient to offset outgoing payments to existing investors.  Continuing CD sales could no longer cover purported redemptions, interest payments and normal operating expenses.  This cash flow crisis caused a rapid depletion of liquid assets, which were inadequate to begin with to cover SIB's CD obligations.  By the time the U.S. Receivership was instituted, SIB had already suspended redemptions for certain investors and many Stanford Entities had stopped paying many obligations.  For example, SIB received negative publicity concerning its failure, in early

February 2009, to fund a $28 million commitment to a Florida communications company named Elandia International Inc.

25.     Notwithstanding SIB's insolvency and the rapid liquidation of its investments during 2008 and into 2009, CD sales continued until February 16, 2009, when the SEC and the U.S. Court intervened.  These CD purchases were too small, however, to continue to cover for the lack of assets owned by SIB.

26.     As noted above, SIB's earnings were grossly insufficient to cover the purported interest that it paid on CDs.  It relied overwhelmingly on the proceeds of new CD sales to pay purported interest on existing CDs.  Thus, the net winnings received by the Stanford Net Winners did not constitute a true return on invested capital.  The net winnings each of the Stanford Net Winners received are shown in the column entitled "Amount of Net Winnings" in exhibit **KVT-4**, attached hereto.  Such payments consisted overwhelmingly of funds that SIB had obtained by defrauding other CD investors.

Executed this 1st day of June 2011.


_____

Karyl Van Tassel

**App. 573**

# KVT-1



# Karyl M. Van Tassel, CPA

Senior Managing Director—Forensic and Litigation Consulting

Karyl.vantassel@fticonsulting.com

1001 Fannin
Suite 1400
First City Tower
Houston, TX 77002
Tel: (713) 353-5445
Fax: (713) 353-5459

**Certifications**
Certified Public Accountant

**Professional Affiliations**
American Institute of Certified Public Accountants

Texas Society of Certified Public Accountants

**Education**
B.S. in Business Administration, Emphasis in Accounting, University of Northern Colorado

Karyl Van Tassel is a senior managing director in the FTI Forensic and Litigation Consulting practice and is based in Houston. Ms. Van Tassel has twenty-five years of experience providing a variety of audit, accounting, tax, litigation, valuation and other financial advisory services. Ms. Van Tassel has been designated as an expert on valuations of closely held businesses, other economic damage claims and forensic accounting issues and has performed detailed financial analyses in a variety of litigation matters, including securities, intellectual property, breach of contract, antitrust, lender liability, fraud and wrongful terminations. She has also been retained by audit committees to assist in investigating allegations of accounting and financial improprieties.

Prior to joining FTI, Ms. Van Tassel was a partner in KPMG's Forensic Dispute Advisory Services practice. Prior to that she was a member of the litigation and bankruptcy consulting divisions of two national accounting firms as well as a regionally based firm, where she provided financial advisory services to the legal and insurance professions and private industry. She has also provided audit and tax services to auto dealerships, construction clients and governmental agencies. In addition, she has provided accounting services and investment analysis to a financial institution.

## Professional Experience

### Forensic Accounting

- Retained by court appointed receiver to investigate and track $85 million of funds embezzled by the CFO of a Texas energy company.  Searched the company records to determine the amount of the embezzled funds, and determine the various schemes used to remove the funds from the company.  After tracing the amount removed from the company, then traced assets through multiple shell companies and personal bank accounts, utilizing accounting information and electronic data obtained through email, hard drive and server sources.  Worked with receiver on monetizing assets recovered.

- Involved in various investigatory matters related to compliance with Foreign Corrupt Practices Act (FCPA), including assisting a monitor appointed under a deferred prosecution agreement of a company to analyze accounting and internal control procedures.  Prepared work plan for compliance testing and directed site visits, conducted interviews and assisted in preparing report of findings.  As a result of our work, have reported to head of enforcement at the Department of Justice.  With the three year term of the monitorship, have ongoing responsibilities for follow up with the company and oversight of responses to monitor's requests and reported findings, as well as follow up site visits for each year.

- Retained by audit committee of a drilling company to investigate issues related to potential FCPA violations.  One issue involved potential payments by the company to paramilitary groups in a Latin American country for protection of its rigs against attack.  Work involved determining whether payments were made by false invoices from an authorized vendor, the authenticity of the endorsements and bank accounts used for payments to these vendors,



and the background investigatory work to determine ultimate recipient of funds. Additionally, investigated payments made in a West African country to a freight handler and potential governmental authorities.  Analyzed invoices and payments, traced cash used to fund payments to the various entities to determine source of the funds, determined completeness through general ledger testing, and compiled findings for reporting to the Department of Justice.

- Retained by the audit committee on matters related to allegations of round trip trading in the energy industry. Assisted in providing multidisciplinary teams to extract data, analyze trades, document risk management practices and analyze appropriate accounting treatment, including potential restatement. Reports provided to audit committees to assist them in responding to SEC inquiries and investigations.

- Retained by company to perform analysis of costs incurred for provider of energy in submitting a claim in the refund of overpayments related to the California power settlements.  Reviewed regulatory filings to determine if costs and methodologies complied with FERC guidelines and state mandates.  Analyzed source documents as well as documenting the methodology utilized for compiling the information.

- Retained by counsel for a special committee of a publicly traded software company to investigate allegations of potential backdating of stock options.  Led a team of accounting and electronic evidence personnel to assist in acquiring and analyzing written and electronic information related to the stock option process and individuals involved.  Worked extensively with counsel analyzing accounting issues related to measurement dates and the appropriate accounting of stock grants for new hires, new account acquisition, employee ranking, compensation in lieu of cash, and sales incentive plans.  Analyzed appropriate accounting treatment and estimate of annual financial impact based upon alternative measurement dates.  Reported results to Board of Directors and auditors of the company.

- Retained by the audit committee of an electronics company to investigate allegations by the SEC related to revenue recognition issues, overstatement of inventory and property, plant and equipment and self-dealing by top level executives. Company eventually settled with the SEC and announced restated financial statements

- Retained by the audit committee of Fortune 500 company to analyze historical accounting issues related to accounting for long-term construction contracts. Issued report and had meetings with the SEC to discuss findings and accounting issues.

- Analyzed historical rates of return for a variety of mutual funds and equity investments to determine the impact of various investing options related to the assets of a trust. Compared actual returns to several indices to determine the difference and the potential damages allegedly incurred by the trust.

- In a securities matter related to the mining industry, analyzed the impact of the accounting and financial disclosures on the stock of a company. Analyzed various returns on equity investments for guideline companies in the industry as well as equity indices to measure impact of announcements and disclosures on the company stock.

- Retained by a hospital chain to analyze billings to Medicaid and insurance providers to determine if billings were appropriate based upon contractual provisions and consistent with the patients file and diagnosis. Worked with multidisciplinary team to consisting of computer



**App. 576**

specialists to retrieve data, database specialists to analyze information and medical personnel to review medical files.

- Retained to analyze various factors and transactions in matters asserting alter ego claims. Involved in a variety of matters where we provided detailed analyses of corporate governance, financial operational and control factors to determine the extent to which the information would indicate the existence of separate entities.

- Involved in analyzing various complex financial and accounting transactions regarding alleged improprieties in a variety of industries, either for internal investigations or litigation.

- Analyzed accounting treatment of revenues and related party disclosures for a defendant in a securities matter. Software company allegedly had overstated revenues by inappropriate application of accounting principles and improperly disclosed various related party transactions.

- Analyzed and traced assets between various related and affiliated companies, which involved complex accounting treatments. Traced cash and other assets to offshore companies. Testified in hearing for contempt of court regarding the disposition of certain cash receipts subsequent to the issuance of a temporary restraining order that limited the transfer of assets.

- Analyzed the alleged fraudulent activities of two major auto body repair shops for an insurance company. Determined the overall profitability of the auto body repair shops compared to the industry as a whole. From a large production of documents, also determined the availability of financial documents from the body shops, and their relationship to and substantiation of the results of inspections performed on vehicles after the repairs were completed. Assisted the economist in regards to the total business conducted over a 15-year period and extrapolated sample results to the entire population.

- Reconstructed the trust accounts of a real estate company after a fire suspected to be caused by arson. Determined amounts had been misappropriated for the personal use of various brokers. Analysis used in criminal investigation.

- Analyzed the accounts of a real estate developer accused by a family trust of misappropriation of funds. Analysis included complex transactions between 22 related partnerships. Included database extractions of various computers and synthesizing thousands of records to determine ultimate disposition of proceeds from investments.

- Retained by a lender to the defendant in a case involving an alleged ponzi scheme in the computer hardware industry. Analysis included determining the flow of transactions in the company between actual business operations and alleged fraudulent activities. Utilized large-scale database application to track transactions within the company, to the bank and to the potential investors. Analyzed the companies banking transactions to determine if the bank had allowed a "float" on the account, which the trustee alleged to be an additional loan to the company from the bank. Engagement resulted in settlement with company trustee.

- Analyzed the billings of a construction company related to the renovation and partial construction of a residence. Analyzed application of percentage of completion in monthly billings to determine overcharges throughout a three-year construction period.

- Analyzed the costs of producing a compact product for shipping hazardous materials.



Determined if improper allocations were made based upon cost accounting theories, resulting in overcharging to clients.

**Contract Disputes**

- Analyzed the payments made under a treaty whereby client ceded obligations under a reinsurance agreement in the variable annuity business. The allegations involved whether the contract was wrongfully terminated if underpayment of premium had not been made by insurance company to reinsurer. The issues involved included obtaining an understanding of the payment terms for the reinsurance coverage over an extended period on reinsurance of the guaranteed minimum death benefit of variable annuity life insurance policies. Led a multidisciplinary team working with large volumes of transactions data. Team included data analysis and electronic discovery specialists for the extraction of data over an extended time period with millions of transactions. Also, worked with actuaries to understand variables assumed in their analysis of the book of business and with underwriters to understand policies and procedures. Testified in arbitration that client had not underpaid over the period of time at issue in the matter.

- Analyzed the economic damages in a breach of contract and tort matter between client insurance company and a third party administrator. Analyzed the damages alleged by plaintiff's damage expert and provided rebuttal analysis of damages. Issues in the damage calculation related to valuation of a book of business for dread disease policies and calculation of amounts owed under a contract.

- Analyzed the economic damages sustained by an investor in a failed joint venture in a urea plant in Columbia. Opinion included a valuation of the business enterprise as of the date of the alleged breach, involving various analyses of the urea market, the prospective operation results and ability to attract lenders.

- Analyzed the lost profits sustained by a petrochemical company related to an alleged breach of a joint venture/operations agreement. Issues related to imbalance in the manufacturing facility due to inappropriate levels of various feedstock to the plant. Inability to maintain contracted levels of product forced inefficient plant operations, decreasing profitability.

- Analyzed the lost profits to a large engineering firm related to the inability to complete the construction of a polystyrene plant in the Middle East due to the Gulf War. Analysis involved analyzing the percentage of completion methods and determining profit at time of invasion, compared to projected profit had the event not occurred. Claim was submitted to the neutral arbitrators in Switzerland.

- In a breach of contract dispute, analyzed the economic losses sustained by the creator and distributor of personal care products. Analysis included working with a marketing expert to determine effects of demographic differences of consumers on buying habits and its impact on the subject company's profits and long-term viability.

- Analyzed the economic damage claim of a producer of accounting software. Provided testimony with regard to the out-of-pocket costs incurred for an internally developed product, which was used to replace the component, which the defendant did not deliver. Also analyzed the lost profit damages under a first to market theory.

- Analyzed the lost profits of a used car dealership related to a breach of contract. Analyzed



Karyl M. Van Tassel

industry margins compared with subject and other market conditions.

- Analyzed the economic damages of an exclusive distributor of sporting good products due to product defects. Calculated the economic impact to the distributor over an eight-year period, including lost profits, carrying costs of inventory and other incremental costs. Project necessitated analyzing the performance of over forty products and determining the cause factors impacting the diminution of profits.

- Provided rebuttal analysis of a $20 million claim for lost profits in a construction claim for an Arkansas highway project. Addressed the issues of causation as well as analyzing the underlying assumptions of the lost profit claim. The indirect claim for lost profits was dismissed on summary judgment, in part based upon our financial analysis of the causation issue.

- Determined the lost profits allegedly sustained by a provider of programming to the hotel industry, related to a breach of the right of first refusal for a satellite transponder. Coordinated industry experts in various areas including hotel/motel management, advertising, consumer demands, economic trends, cable programming and venture capital availability to analyze the feasibility of the programmer's claim.

- Calculated the economic damages, including lost profits and incremental expenses, in the largest asbestos case in Colorado for a major suburban shopping mall.

- In a contract dispute, determined the value of the restaurant operations included as part of a major Colorado ski resort. Analyzed market trends and restaurant industry comparables for use in the valuation. Also used industry information to benchmark against actual results, to determine management effectiveness.

- Analyzed the value of a franchise fast food establishment related to a breach of contract. Engagement included analyzing various offering circulars for franchises to determine relevant value drivers for similar franchises. Analyzed demographic data related to California communities included in franchise agreement.

- Analyzed a lost profit claim related to a chain of fast food restaurants in a breach of contract matter. Analyzed store-by-store financial metrics to determine average store results compared to subject stores. Analyzed economic and demographic trends in areas adjacent to subject stores.

**Insurance Claims**

- Analyzed the claim by a hospital related to the flooding of the facility. Engagement involved detailed analysis of the impacted departments and the financial impact of substituting less profitable services for higher margin services due to inability to provide full service medical operations. Also analyzed specific incremental staff costs incurred during the flood and cleanup period.

- Analyzed and assisted in preparing the claim of a large food manufacturer related to an explosion and fire in its primary manufacturing facility. Claim exceeded $100 million, which was settled expeditiously.

- Assisted risk management officer in analyzing a claim related to a fire at a resort



community. Claim involved business interruption for a variety of resort functions as well as property losses.

- Assisted in preparing the claim for a large training facility related to computer outages from lightening strikes. Analyzed business interruption claim and collateral losses. Claim eventually was settled in litigation.

- Assisted in claim related to a power outage for several business related to extended power outages related to a major train derailment.

**Intellectual Property**

- Analyzed the economic damages sustained by a construction product manufacturer due to an alleged patent infringement. Also analyzed the lost profits of the defendant company in a counterclaim for breach of contract. Analyzed market potential for the product, impact of noninfringing substitutes, marketing and distribution channels and other factors impacting sales volume and expenses.

- Analyzed the economic damages sustained in a patent infringement matter by an inventor in the sporting goods industry. Detailed analysis including addressing Georgia Pacific factors related to determining a reasonable royalty. Opinion included market royalty rates, royalty rates on other company products, incremental gross profit on patented property, and profit split method.

- On a consulting basis, analyzed the damages of a producer and global marketer of rubber-based products. Allegations included patent infringement trademark infringement, copyright violations, theft of trade secrets and fraud. Claim for damages exceeded $1 billion. Working for the defendant, analysis included impact of market and distribution channels on lost profits as well as reasonable royalty calculation.

- Analyzed the economic damages of one of the largest software companies in the world related to a patent infringement case. Analysis included determining product gross profitability for those alleged to have infringed the property. Also assisted in analyzing the appropriate royalty rate and allocating the revenue to the patented and nonpatented features of the product. Case settled for $100,000,000 less than claim.

- Analyzed the damages in a patent infringement matter related to modular cells for prison units. Engagement included a detailed analysis of a reasonable royalty, based in part upon the Georgia Pacific factors. Reasonable royalty was based upon market derived data, established rates by licensor and licensee, prior licensing history between the parties and analytical analysis of various profit measures.

- Analyzed value of patented technology for various biomedical devices held by a company for a potential acquisition. Analyzed the patented and nonpatented products to determine synergies and purchase drivers between the products since only a portion of the portfolio of products was to be purchased. Also considered impact of governmental approval process on value of patented properties that were still in clinical trials. Determined range of values based upon reasonable royalties obtained in the market place and from other analytical measures.

- Analyzed the value of patented technology in a laser devise used for noninvasive surgeries and dental work for a transfer to an off-shore entity for tax purposes. Engagement included



**App. 580**

analyzing the profit stream from the laser device as well as market derived rates.

- Analyzed the range of reasonable royalty for physicians developing a drug for cancer treatment. Patented property was related to improving efficacy of radiation treatments. Using analytical data and market derived rates, assisted in negotiating license with a biotechnology company.

- Analyzed the economic losses in a matter involving the alleged infringement of trademarks for a line of personal beauty products. Testified for the defendant in deposition regarding the economic damages sustained as well as presented counter claim testimony. Issues included analyzing relevant markets for personal care products, product survey information regarding product characteristics influencing buyers decisions, internet advertising, and product distribution channels for impact on damage analysis. Case resolved in settlement.

- Analyzed the lost profits sustained by the developer of a sporting good product resulting from an alleged trademark infringement. The economic damages were calculated both as the lost profits of the developer of the product based upon its own historical results as well as analyzing the profits of the alleged infringing entity. Also analyzed damages related to the cost of corrective advertising in conjunction with an advertising expert.

- Testified for the defendant in an injunction hearing regarding the nature of the advertising revenue as the primary source of income, the overlap in advertising between the "webzine" and magazine and the potential impact on economic damages. Case related to an alleged trademark infringement by a "webzine" of a magazine title.

- Analyzed damages of plaintiff related to disparagement of Ameritech Corporation's management of the alarm company post-acquisition. The case related to the alleged infringement of a trademark for a burglar alarm company purchased by the plaintiffs. Analyzed detail records of clients for overlap caused by clients subscribing to the defendant company due to disparaging information supplied to Ameritech clients in violation of a noncompete agreement as well as infringing use of trademarks.

- Performed royalty examinations for a multinational software company. Supervised multilingual and disciplinary teams to perform royal "audits" in several countries and domestically. Developed regular maintenance program for ongoing audits of contracts on a scheduled basis. Resulted in recovery in excess of $10,000,000, and assisted in favorable renegotiations with joint venture partners.

- Performed a royalty examination in a dispute between a software producer and distributor. Calculated the economic damages allegedly sustained by the software producer due to the alleged under reporting of software sales. Testified in arbitration regarding the results of our findings.

- Performed royalty examinations of five different licensees under contract "audit" rights for a developer of software. Worked with clients and licensees to resolve disputes, recovery of more than $1,500,000, and renegotiation of contracts.

**Post Acquisition Disputes**

- In a post-acquisition dispute, analyzed the results of certain long-term contracts obtained as part of a purchase of an international engineering firm. Analyzed the accounting treatment and financial results of the contracts, both pre- and post-acquisition, and the impact on the



**App. 581**

valuation of the business.

- Analyzed the lost profits due to alleged fraudulent misrepresentations in a purchase of a restaurant chain. Analysis included store-by-store data of prospective revenue and profitability, compared to those actually achieved. Analyzed market and economic trends in regions in which the restaurants operated to determine impact on profitability and sales from issues unrelated to the alleged misrepresentations.

- Served as an arbitrator in a dispute involving the closing balance sheet working capital provisions of a purchase agreement. In the medical insurance industry, analyzed the proposed adjustments to working capital including accounts receivable, reserves for losses and contingent liabilities.

- Prepared a claim of working capital adjustment related to the closing-balance sheet provisions of a purchase agreement in the computer storage industry. Analysis included inventory accounting, accounts receivable and deferred revenue.

- Analyzed the propriety of accounts receivables included in the representations and warranties in the purchase of an environmental services company. Allegations involved intentional overstatement of accounts receivable later determined to be uncollectible by the purchaser.

**Telecommunications**

- Analyzed the economic damages of a company that terminates traffic for other telecommunications companies who provide a variety of services to end-users. In a contract dispute with one of its clients, analyzed the lost profits as well as the diminution in the value of the business. Analysis included determining network capabilities in regions covered by the agreement during peak and off-peak time periods to determine availability of volume due to switching constraints.

- Analyzed the economic damages asserted in a class action matter against a RBOC. Analysis included detailed records for thousands of customers asserting held order claims over a six-year time period. Downloaded data records related to customer orders, service delivery, billing and customer data. Analyzed relevant tranches of class participants and related damages.

- Analyzed payments made by a major telecommunications company to a switching vendor over a five-year period of time. Based upon contract terms, worked with the company's engineers to determine how the provisioned switching products impacted the billing requirements under the contract. Analysis related to whether charges made by switching vendors were in excess of contract terms. Analysis resulted in multi-million dollar settlement with vendor.

- Analyzed payments made by a major telecommunications company to a single source construction vendor. Issues related to the propriety of charges incurred compared to services delivered over a period of several years. Analysis was used for negotiating a new contract with the contractor.

- In a contract dispute assisted in analyzing the viability of a "C-Block" license holders' business plan and the reasonableness of the company valuation. Researched "C-Block"



license auction values and results of operation of "C-Block" auction recipients.

- Oversaw an engagement in which 200 competitive local exchange carrier (CLEC) contracts were analyzed to extract compliance issues for billing and provisioning by a major telecommunications company. Results provided service representatives with information for communication with CLEC's.

### Miscellaneous

- Prepared analyses of lost wage claims, lost profit claims and incremental costs incurred in various personal injury matters. Based upon the opinions of rehabilitation specialists and career counselors, prepared damage analysis based upon the estimated reduction in worklife expectancy, decreased earnings potential or incremental costs incurred related to the alleged injuries.

- Analyzed value of businesses conveyed in pre-bankruptcy transactions related to claims of fraudulent conveyance.

- Assisted in economic analyses related to wrongful termination matters, including lost wage and benefit claims.

- Valued the stock of closely held businesses in a dissenting shareholder action, lender liability matter, condemnation proceeding and various marital dissolutions.

- Valued the stock of a closely held chain of restaurants for the purpose of spinning off certain restaurants to form a new company.

- Valued the stock of the largest oyster processing company in the world for a Northwest financial institution. The bank had acquired the company through foreclosure and required the valuation as part of its internal procedures required to sell the entity to an outside party.

- Valued a 50 percent ownership interest in an alarm monitoring company for a buyout of the partial owner's interest.

### Speaking Engagements

Addressed various state and local bar associations as well as other continuing legal education providers on the following matters:

- Valuation Intricacies

- Financial Statement Analysis and Presenting Financial Data at Trial

- Use of Economic Experts in Commercial Litigation and Case Management

- Valuation Issues in Fraudulent Conveyance Matters

- Valuation in a Cram Down Bankruptcy Proceeding

- Valuation of Businesses in Mergers and Acquisitions

- Valuation of Intellectual Property

- Valuation Issues for Biotechnology

### Publications

- Coauthor of "Calculation of Economic Damages in Commercial Litigation," Totaltape



Publishing Company, Tampa, Florida, 1990.

- "Valuing Intellectual Property: The Science and the Art," The Colorado Lawyer, August, 1997.

### Education

University of Northern Colorado—B.S. in Business Administration, emphasis in Accounting

### Summary of Testimony

| Case | Case Number | Type of Testimony | Law Firm Client | Year |
|------|-------------|-------------------|-----------------|------|
| *Edward Malo vs. Breckenridge Spa and William Benkelman* | U.S. District Court of Colorado 92-M-2537 | Deposition | Bradley Campbell Carney & Madsen | 1994 |
| *Asolo SpA, et al. vs. Giancarlo Tanzi* | U.S. District Court of Colorado 93-Z-1778 | Deposition, Trial | Hale & Dorr | 1995 |
| *LittleWing Co., Ltd. vs. Mesch & Associates d/b/a StarPlay Productions* | AAA Arbitration | Arbitration | Holme Roberts & Owen LLC | 1995 |
| *TLB, INC., an Ohio corporation, vs. Platinum Software, a California company* | U.S. District Court of Colorado 95-WY-621 | Deposition, Trial | Coghill & Goodspeed, P.C. | 1996 |
| *Primedia Intertec Corporation vs. Technology Marketing Corporation* | U.S. District Court of Kansas 98-2384-KHV | Trial | Locke Reynolds Boyd & Weisell Sonnenschein Nath & Rosenthal | 1998 |
| *Mountain Ocean, Ltd. d/b/a Everybody Ltd. vs. For Every Body, Inc.* | U.S. District Court Of Colorado | Deposition | Jones, Waldo, Holbrook & McDonough, P.C. | 1999 |
| *Prism Management Enterprises, Inc. vs. Crane Leake Casey Ehlers & Eggleston, P.C.* | District Court, La Plata County 97-CV-412 | Deposition, Arbitration | Jacobs Chase Frick Kleinkopf & Kelley, LLC | 1999 |

**App. 584**

Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| *Ameritech Corporation v. Jackson Burglar Alarm* | U.S. District Court of Colorado 98-N-2432 | Deposition | Holme Roberts & Owen | 1999 |
| *The Quizno's Corporation v. Robert W. Mitelhaus* | AAA Arbitration | Arbitration | Preeo, Silverman & Green | 1999 |
| *Gulf Communications, LLC v. Business Telecom, Inc., d/b/a BTI Telecommunications Services* | 398CV2444-6 U.S. District Court for Northern District of Texas, Dallas Division | Deposition | Kyle & Mathis | 1999 |
| *Southwest Recreation Industries, Inc. v. Fieldturf, Inc. and Fieldturf International, Inc.* | A-00CA063-SS U.S. District Court for the Western District of Texas, Austin Division | Deposition | Brown, Todd & Heyburn PLLC | 2000 |
| *Anthony G. Petrello and Cynthia Petrello v. Renaissance Builders, Inc. and Chandler Robinson* | 199-51358 The District Court of Harris County, Texas 270th Judicial District | Deposition | Fulbright & Jaworski LLP | 2001 |
| *Omagro De Columbia, L.D.C. vs. MCN Energy Enterprises, Inc., formerly named MCN Investment Corporation* | 67-180286-99 The District Court of Tarrant County, Texas 67th Judicial District | Deposition and Trial | Shannon, Gracey, Ratliff & Miller | 2001 |
| *Blitz Holdings Corp. v. Interamericas Financial Holdings Corp.* | Civil Action No. H-00-2247 United States District Court for the Southern District of Texas Houston Division | Contempt Hearing | Wilshire Scott & Dyer | 2001 |
| *Hartford Life Insurance Company And Hartford Life & Annuity Insurance Company v. Connecticut General Life Insurance Company* | Arbitration | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2002 |



www.fticonsulting.com

**App. 585**

Karyl M. Van Tassel

| | | | | |
|---|---|---|---|---|
| *National Health Insurance Company vs. National Plan Administrators, Inc. Hartford Life Insurance Company, and CRS Marketing Agency, Inc.* | GN – 101679, In the District Court, Travis County, Texas 53rd Judicial District | Deposition, Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2003 |
| *SOURCECORP, Incorporated, SOURCECORP DMS, Inc. and Information Management Services, Inc. v. Steve Shill, Rita Shill, Robin Meyer, and Mark Meyer* | No. 76Y1160016303ARN, American Arbitration Association | Testimony, Arbitration | Steptoe & Johnson, LLP | 2004 |
| *David Graben and Frank Strickler v. Western Reserve Life Assurance Company of Ohio; Intersecurities, Inc., and Timothy Hutton* | 03-08-648 The District Court of Wise County, Texas 271st Judicial District | Trial | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2005 |
| *Rodney Montello, et al v. Alcoa Inc., Reynolds Metals Company, Bon L. Campo and Tredegar Corporation* | The U.S. District Court of Southern District of Texas Victoria Division Civil Action No: V-02-84 | Deposition | Baker Botts LLP | 2006 |
| *Bencor, Inc. v. The Variable Annuity Life Insurance Company* | AAA Arbitration | Arbitration | Akin, Gump, Strauss, Hauer & Feld LLP | 2006 |
| *Highland Crusader Offshore Partners, L.P. et al v. Motient Corporation* | Cause No. 05-07996 In the District Court, Dallas County, Texas E-101st Judicial District | Deposition | Fulbright & Jaworksi LLP<br><br>Lackey Hershman L.L.P. | 2007 |
| *Gascoigne Melotte Holdings LLC (U.S.A.), Boumatic LLC (U.S.A.), Boumatic-Melotte SPRL (Belgium) v. Punch Technix N.V. (The Netherlands), et al* | In the International Chamber of Commerce Court of Arbitration | Arbitration | Baker Botts LLP | 2008 |



www.fticonsulting.com

**App. 586**

| | | | | |
|---|---|---|---|---|
| *Fair Isaac Corporation vs Texas Mutual Insurance Company* | Civil Action No. 4:05-CV-03007 in the United States District Court for the Southern District of Texas Houston Division | Deposition | Baker Botts LLP | 2008 |
| *RCA Holdings, Ltd, et al., v. Commonwealth Insurance Company, et al.* | Cause No. 2004-02048 in the 61st Judicial District Court of Harris County Texas | Deposition | Akin, Gump, Strauss, Hauer & Feld L.L.P. | 2010 |
| *Arthur R. Hausmann; Arthur R. Hausmann P.C. Defined Benefit Pension Plan; and Arthur R. Hausmann P.C. Defined Benefit Pension Plan Trust v. Union Bank of California, N.A. Investment Services LLC; The Hartford Life and Annuity Insurance Company; Christopher Montagna; William Fortner; Economic Concepts, Inc. ("ECI"); and DOES 1-100* | Case Number:  SA CV 07-1436 AHS (MLGx) in the United States District Court , Central District of California | Deposition | Morrison Foerster LLP | 2010 |
| *Memorial Herman Healthcare system and The Health Professionals Insurance Company, Ltd. V. State Street Bank and Trust Company; Cambridge Financial Services, Inc., and Ernest A. Liebre* | Case No. 07-4089 in the United States District Court for the Southern District of Texas Houston Division | Deposition | Locke Lord Bissell & Liddell LLP | 2010 |
| *Ralph S. Janvey, in His Capacity as Court-Appointed Receiver for the Stanford International Ban, Ltd., et al vs. James R. Alguire, et al* | Case No. 3:09-CV-0724-N in the United States District Court for the Northern District of Texas Dallas Division | Deposition | Baker Botts LLP | 2010 |



# KVT-2

| Employee Name | Department | Location | Job Title | Business Card Title | Supervisor Name |
|---|---|---|---|---|---|
| Amadio, Henry | SFGC Accounting | US TX Houston | Accounting Mgr | Accounting Manager | Lopez, Gilbert |
| Leal, Oscar | SFGC Accounting | US TX Houston | Supervisor Corporate Accounting | Supervisor Corporate Accounting | Amadio, Henry |
| Lopez, Gilbert | SFGC Accounting | US TX Houston | Chief Accounting Officer | Chief Accounting Officer | Davis, James M |
| Severtson, Anne M. | SFGC Accounting | US TX Houston | Business Systems Mgr | Business Systems Manager | Lopez, Gilbert |
| Ward, Pamela J. | SFGC Human Resources - North America | US TX Houston | Director | Director of Human Resources - North American Region | Bogar, Daniel T. |
| Varkey, Johnson (John) | SFGC IT | US TX Houston | Chief Information Officer | Chief Information Officer | Bogar, Daniel T. |
| Collinsworth, Mark P | SFGC Research and Trading | US TN Memphis | Managing Director | Managing Director-Global Asset Allocation | Holt, Laura L. |
| Holt, Laura L. | SFGC Research and Trading | US TN Memphis | Chief Investment Officer | Chief Investment Officer | Davis, James M |
| Palmliden, Frederic A. | SFGC Research and Trading | US TN Memphis | Research Analyst | Senior Investment Officer - Western Europe | Weeden, Kenneth |
| Weeden, Kenneth | SFGC Research and Trading | US MS Tupelo | Managing Director/Research and Inv | Managing Director- Global Regional Research and investments | Holt, Laura L. |
| Groves, Denise | SFGC Treasury | US TX Houston | Treasury Analyst | Treasury Analyst | Maldonado, Patricia C. |
| Maldonado, Patricia C. | SFGC Treasury | US TX Houston | Manager | Manager | Davis, James M |
| Patlan, Tarrie J. | SFGC Treasury | US TX Houston | Sr Treasury Analyst | Senior Treasury Analyst | Maldonado, Patricia C. |
| Davis, Rhonda L. | SGC Compliance | US TX Houston | Chief Compliance Officer | Chief Compliance Officer, SCM | Young, Bernerd E. |
| Jackson, Kerry | SGC Corporate Finance | US TX Houston | Sr VP | Senior Vice President / Controller | Weiser, Charles M. |
| Weiser, Charles M. | SGC Corporate Finance | US TX Houston | Executive VP | Chief Financial Officer | Bogar, Daniel T. |
| Pi, Osvaldo | SGC Merchant BK | US FL Miami | Managing Director | Managing Director | Bogar, Daniel T. |
| Alvarado, Pablo M (Mauricio) | SFGC Legal | US FL Miami | General Counsel | General Counsel | Stanford, R Allen |
| Amir, Irum | SFGC IT - Shared Services | US TX Houston | Web Developer | Web Developer | Barrueco, Robert C. |
| Autry, Mickey F. | SFGC IT | US TX Houston | Database Administrator | Senior SQL Database Administrator | Carlo, Ismael J. |
| Bhanushali, Arvindkumar R. | SFGC IT | US TX Houston | Sr Sybase DBA | Sr. Sybase Database Administrator | Carlo, Ismael J. |
| Bongartz, Pierre-Yves Willy J. (Pierre-Yves) | SFGC IT | US TX Houston | Odyssey Specialist | Odyssey Specialist | Carlo, Ismael J. |
| Brown, Marcus W. | SGC Compliance | US TX Houston | Compliance Analyst | Compliance Analyst | Davis, Rhonda L. |
| Buelna, Joseph N. | SFGC IT - Shared Services | US TX Houston | Web Team Lead | Team Lead, Web Team | Barrueco, Robert C. |
| Carlo, Ismael J. | SFGC IT | US TX Houston | Director | Director of IT Application Development | Varkey, Johnson (John) |
| Cross, Ted D. | SFGC IT | US TX Houston | Project Mgr | Project Manager | Kamman, William C. (Bill) |
| Davis, Rodrick A. | SFGC Security - North America | US TX Houston | Security Mgr | Security Manager | Raffanello, Thomas W. |
| Duskin, Helen G. | SGC Operations | US TX Houston | Director | Director of Operations Development | Fram, Frederick G. |
| Flores, Jose D | SGC PCG | US MS Jackson | Financial Planning Specialist | Financial Planning Specialist | Simmons, Edward T. |
| Fram, Frederick G. | SGC Operations | US TX Houston | Sr Director Operations | Senior Director of Operations | Bogar, Daniel T. |
| Fullerton, Scott B. | SFGC Accounting | US TX Houston | Sr Accountant | Sr. Accountant | Leal, Oscar |
| Hoelting, Marcia K. | SGC SIM | US TX Houston | Advisory Services Consultant | Advisory Services Consultant | Gifford, Michael D. |
| Johnson, Matthew E. | SFGC IT | US NY New York | IT Support Specialist | IT Support Specialist | Lacson, Emerson S. |
| Juarez, Felipe D. | SFGC Accounting | US TX Houston | Business Systems Analyst | Business Systems Analyst | Severtson, Anne M. |
| Kamman, William C. (Bill) | SFGC IT | US TX Houston | Manager | Program Manager | Carlo, Ismael J. |
| Shaw, Lawrence E. | SFGC IT - Shared Services | US TX Houston | Manager | Manager IT Security | Schwarberg, Larry R. Jr. |
| Lewis, Gareth I. (Ieuan) | SFGC IT | US TX Houston | Project Mgr | Project Manager | Varkey, Johnson (John) |
| Littlejohn, John C. (Chris) | SFGC IT | US TX Houston | Systems Engineer | Application/Desktop Infrastructure Manager | Merchant, Sohil A. |
| Merchant, Sohil A. | SFGC IT | US TX Houston | Director - IT Operations | Director, IT Operations | Varkey, Johnson (John) |
| Nagy, William K. | SGC Compliance | US NY New York | VP | Vice President, Institutional Compliance | Poppell, Ralph Edward |
| Pass, Trissy L | SGC Corporate Finance | US TX Houston | Manager | Manager, AP & Contract Administration | Liberato, Yolanda J. |
| Petty, Tiffany R | SFGC Accounting | US TX Houston | Payroll Supervisor | Payroll Supervisor | Lopez, Gilbert |
| Poppell, Ralph Edward | SGC Compliance | US NY New York | Sr VP/Director Compliance | Senior Vice President/Director of Compliance | Young, Bernerd E. |
| Ray, Matthew B. | SFGC IT | US TX Houston | Project Mgr | Project Manager | Kamman, William C. (Bill) |
| Sanchez, Orlando | SFGC Security - North America | US TX Houston | Security Supervisor | Security Supervisor | Davis, Rodrick A. |
| Sena, Nino Daniel (Anthony) | SGC Compliance | US NY New York | Associate VP | Associate Vice President, Compliance | Poppell, Ralph Edward |
| Simmons, Edward T. | SGC PCG | US MS Jackson | Vice President, Operations | Vice President, Operations | McDaniel, Douglas M. |
| Vallabhaneni, Ramagopal C. (Gopal) | SFGC IT - Shared Services | US TX Houston | Oracle Applications Developer | Oracle Applications Developer | Gu, Jian |
| Vidal-Pope, Shanna | SGC Merchant BK | US FL Miami | Executive Asst | Executive Assistant | Pi, Osvaldo |
| Whitcomb, George S (Steve) | SFGC IT - Shared Services | US TX Houston | Software Engineering Mgr | Software Engineering Manager | Carlo, Ismael J. |
| Young, Vanessa Y. | SFGC IT | US TX Houston | Software Engineering Mgr | Data Management Engineer | Whitcomb, George S (Steve) |
| Fortin, Barbara | SFGC Risk Management | US TX Houston | Manager | Corporate Risk Manager | Davis, James M |

# KVT-3



STANFORD

INTERNATIONAL PRIVATE BANKING

STANFORD INTERNATIONAL BANK LTD.

## STANFORD FINANCIAL GROUP

*Stanford Financial Group is a privately held, wholly owned global group of independent financial services companies founded in 1932 by Lodis B. Stanford, grandfather to the current sole shareholder Sir Allen Stanford. Stanford's core businesses are private wealth management and investment banking for institutions and emerging growth companies. Stanford provides private and institutional investors with global expertise in asset allocation strategies, investment advisory services, equity research, international private banking and trust administration, commercial banking, investment banking, merchant banking, institutional sales and trading, real estate investment and insurance. Stanford serves clients from over 100 countries on six continents.*

*Stanford International Bank is a member of Stanford Financial Group.*

*international*

STANFORD INTERNATIONAL BANK LTD.

*private*

*banking*

## S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



**Stanford International Bank Ltd.** conducts business with the world from its headquarters in Antigua. As a member of the Stanford Financial Group, the Bank adheres to business principles grounded in 75 years of proven financial success. Today, Stanford International Bank serves a worldwide community of affluent individuals and their families. Our unique private banking business model provides for the preservation of capital in an atmosphere of professionalism and trust.

---

Stanford International Bank offers the following advantages:

- Depositor security
- Higher interest rates on deposits
- Secure electronic account access
- Ancillary services
- Five-star personal service
- Innovative products

---

2