

# S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

**Zero-Tax Jurisdiction.** Our domicile does not tax earnings. This results in more available profit for reinvestment and the enhancement of depositor yields.

**No Loan Losses.**\* By making only cash-secured loans to its existing customers, the Bank eliminates credit risks and the negative impact on earnings due to loan losses.

**Greater Investable Assets.** More than 90% of the Bank's own equity position supplements investable assets, improving our income-producing capabilities.

\* Conservation of principal and interest rate on the CD deposits are dependent upon returns in our investment portfolio. Depending upon the climate in global investment markets, we utilize various investment strategies for the Bank's portfolios, which may include fixed income, equities and currencies. The returns on the Index-Linked CD will also be affected by the Market Index you choose. If the returns on the Bank's portfolios negatively affect our financial condition, then the same could negatively impact return of principal and interest on the CD.

7

App. 599

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



INTEREST RATES 1997 – 2006

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%)* | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%)** | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

Source: *Bloomberg L.P.*



Stanford International Bank CDs*
(not FDIC-Insured)

U.S. Bank CD Averages**
(FDIC-Insured)

*Over the past decade, Stanford International Bank CDs have outperformed U.S. bank CDs by an average of 3.9%*

PERFORMANCE 1997 – 2006



The above graphics are based on a $1,000,000 deposit invested for 12 months and renewed annually. The information herein has been obtained from sources we believe to be reliable, but we do not offer guarantees as to its accuracy or completeness. Past performance is not a guarantee of future results. All information is subject to change without notice.

* Stanford International Bank Limited CDs are not FDIC-Insured and are not subject to regulation or oversight of any agency of the U.S. government, nor are they subject to any restrictions on how portfolios are invested.

** U.S. Bank CDs are FDIC-Insured and are subject to regulation by an agency of the U.S. government.

8

**App. 600**

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

## Secure Electronic Account Access

Stanford International Bank offers customers access to their account information 24 hours a day, 365 days a year through our private, password-protected website. We continue to work toward making customer access easier, while maintaining the optimum level of privacy and security.

Our customer-only site will always utilize the most advanced firewall software and encryption technologies available in the financial services industry. This helps ensure the privacy upon which Stanford International Bank has built its reputation. We invite both existing and prospective customers to visit our public website **stanfordinternationalbank.com**.



## Ancillary Services

Our high-performance accounts and respect for customer privacy are supplemented by a range of ancillary services available to depositors. These include hold-mail and automatic bill paying, available upon request.

The Bank also issues some of the world's most respected payment instruments: American Express® Gold Card*, Visa® Gold Card and Gold MasterCard®

*"… access to account information 24 hours a day, 365 days a year …"*

\* Offered only to non-U.S. residents.

**App. 601**

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.



## Five-Star Personal Service

Our Bank was established with a personal service perspective from the very beginning. Individualized attention and a true commitment to depositor needs are standard operating procedure at Stanford International Bank.

Integrity defines our environment, and a firm adherence to an elevated code of values is built into our customer service initiatives. Our private wealth managers speak your language, understand your concerns and discreetly execute your instructions.

Your Stanford private wealth manager can help you diversify into a range of wealth management strategies through our affiliation with the Stanford Financial Group. Expert planning is available in brokerage and investment advisory services, trust administration and insurance.

We invite you to contact us by calling (268) 480-3700.

*"Your Stanford private wealth manager can help you diversify into a range of wealth management strategies…"*

10

**App. 602**

S T A N F O R D   I N T E R N A T I O N A L   B A N K   L T D.

# INNOVATIVE PRODUCTS

| ACCOUNT[1] | CURRENCY | WITHDRAWALS | ADDITIONAL DEPOSITS | KEY BENEFITS |
|---|---|---|---|---|
| **FIXEDCD**[SM][2][3]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | None allowed. Interest accumulates and is paid upon maturity[8]<br><br>Interest may be withdrawn[8] | None allowed | Attractive CD rates<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **FLEXCD**[SM][2][3]<br>*fixed-rate term deposit*<br><br>3 months<br>6 months<br>12 months<br>18 months<br>24 months<br>36 months<br>48 months<br>60 months | U.S. dollars<br>Euros<br>Other international currencies | Up to 25% of principal with 5 banking days' notice, with a maximum of 4 withdrawals per calendar year[4] | Allowed (minimum amount required) | Attractive CD rates with added level of flexibility<br><br>If base rate goes up, eligible balances[7] receive the higher rate<br><br>If base rate goes down, clients receive the original base rate until maturity<br><br>Interest compounded daily<br><br>Automatic rollover |
| **INDEX–LINKED CD**[SM][2][3]<br><br>3 years<br>4 years<br>5 years | U.S. dollars only | Not allowed for the first 12 months; thereafter, withdrawals allowed subject to penalties[5] | None allowed | Fixed attractive minimum return on investment[8]<br><br>High growth potential[9]<br><br>Preservation of capital |
| **PERFORMANCE**[SM]<br>*adjustable-rate open-term account* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Interest compounded daily |
| **PREMIUM**[SM]<br>*adjustable-rate open-term account* | U.S. dollars only | Any amount<br><br>Requires 15 calendar days' notice | Any amount, at any time | Adjustable rate of return with easy access to funds<br><br>Offers yields equivalent to the performance of selected U.S. Treasury bills and notes<br><br>Interest compounded daily |
| **EXPRESS**[SM]<br>*adjustable market-rate open-term account (offered as a supplementary account to Stanford International Bank clients)* | U.S. dollars<br>Euros<br>Other international currencies | Any amount<br><br>Within 24 hours of notification during regular banking days | Any amount, at any time | 24-hour access<br><br>Market-rate interest on qualifying balances[10]<br><br>Interest compounded daily |

*(1) This information should not be considered an offer. Please contact your Stanford International Bank representative for current account terms and conditions.*

*(2) For the U.S. Accredited Investor Program, a minimum opening balance of $50,000 is required.*

*(3) These CD deposits are subject to restrictions on transferability and resale and, in the U.S., may not be transferred or resold except as permitted under the Securities Act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.*

*(4) For the U.S. Accredited Investor Program, early withdrawal penalties can range from one to three month's interest, depending on the term of the CD. For the FlexCD, penalties will be assessed on withdrawals greater than 25%.*

*(5) For the U.S. Accredited Investor Program, the redemption price is the current market value of the investment index calculation less a penalty of 10%.*

*(6) Minimum balance required.*

*(7) For the U.S. Accredited Investor Program, eligibility is based on a minimum balance of $250,000.*

*(8) Interest is paid only at maturity, but may be subject to income taxes in the year it was earned but not received, depending on the tax laws in your jurisdiction.*

*(9) Returns will be affected by the Market Index you choose and its volatility.*

*(10) Or currency equivalent.*

11

*Stanford International Bank Limited ("SIB") is a private financial institution chartered under the laws of Antigua and Barbuda whose deposits are not covered by deposit insurance protection provided by the U.S. Federal Deposit Insurance Corporation.*

*SIB's products are ordinary bank deposit obligations and are not securities under U.S. federal or any state law. Therefore, they are not subject to the reporting requirements of any jurisdiction outside of Antigua and Barbuda, nor are they covered by the investor protection or securities insurance laws of any jurisdiction such as the U.S. Securities Investor Protection Insurance Corporation or the bonding requirements thereunder. There is no guarantee investors will receive interest distributions or the return of their principal.*

*Stanford Group Company may offer SIB CDs to its clients and receive a referral fee from SIB. Referral fees paid do not reduce the principal amount of any CD deposits or any interest earned thereon. Investors who are residents of the U.S. must be accredited investors and may receive this material only when preceded or accompanied by the Disclosure Statement for SIB's U.S. Accredited Investor Certificate of Deposit Program which fully discloses the potential benefits and risks of the investment.*



**Stanford International Bank Ltd.**
**A member of the Stanford Financial Group.**

**Stanford Group Company**
**Member FINRA and a member of the Stanford Financial Group.**



STANFORD

Stanford International Bank Ltd.
No. 11 Pavilion Drive • St. John's, Antigua, West Indies
Tel. 208.480.3700 • Fax 268.480.3737

Stanford Group Company
Member FINRA
5050 Westheimer • Houston, Texas 77056
713.964.8300

stanfordfinancialgroup.com

Members of the Stanford Financial Group.

# KVT-4

| Stanford Net Winners | Amount of Net Winnings | Case No. |
|---|---|---|
| MICHAEL E. STAID | $ 64,396.31 | 3:10-cv-0366-N |
| TIMOTHY A. JOHNSON | $ 149,572.57 | 3:09-cv-0724-N |
| GAINES D. ADAMS | $ 101,859.44 | 3:09-cv-0724-N |
| HENRY A. MENTZ III | $ 106,709.47 | 3:09-cv-0724-N |
| DAVID TOPP AND DORA TOPP | $ 98,648.14 | 3:09-cv-0724-N |
| SHANNON S. BUNDICK | $ 30,203.39 | 3:10-cv-0366-N |
| DENNIS L. KIRBY | $ 175,006.66 | 3:09-cv-0724-N |
| RISIA TOPP WINE | $ 23,911.16 | 3:09-cv-0724-N |
| TERRY N. TULLIS | $ 89,938.39 | 3:09-cv-0724-N |
| LYDA D. TYMIAK; LYDA D. TYMIAK FAMILY TRUST AND LYDA D. TYMIAK | $ 70,535.29 | 3:09-cv-0724-N |
| DIVO MILAN HADDAD; INFINITUM TRUST AND DIVO MILAN HADDAD; MARIA DE LOURDES MARTINEZ DE SIDNEY AND MARIE ROCHELLE SIDNEY MARTINEZ; MARIE ROCHELLE SIDNEY MARTINEZ; MARIE ROCHELLE SIDNEY MARTINEZ AND DIVO MILAN HADDAD | $ 474,585.99 | 3:09-cv-0724-N |
| FRANCIS NEZIANYA | $ 51,635.86 | 3:09-cv-0724-N |
| EMMA LEE LEFEBVRE | $ 117,977.06 | 3:09-cv-0724-N |
| LARRY N. SMITH | $ 73,370.47 | 3:09-cv-0724-N |
| MURPHY BUELL | $ 29,483.22 | 3:09-cv-0724-N |
| THE ANTHONY JOSEPH ANTINORI TRUST AND ANTHONY JOSEPH ANTINORI; AND STEVEN JAMES ANTINORI IN HIS CAPACITY AS TRUSTEE OF THE  ANTHONY JOSEPH ANTINORI TRUST; THE STEVEN JAMES ANTINORI TRUST AND STEVEN JAMES ANTINORI | $ 880,657.48 | 3:09-cv-0724-N |
| GENE CAUSEY | $ 123,288.92 | 3:09-cv-0724-N |
| KENNETH W. DOUGHERTY | $ 122,527.19 | 3:09-cv-0724-N |
| KEVIN A. MCKENZIE AND DENISE T. MCKENZIE | $ 56,727.82 | 3:09-cv-0724-N |
| ANTHONY G. PARKER | $ 183,692.20 | 3:09-cv-0724-N |
| JAMES E. BROWN SR. | $ 90,386.71 | 3:09-cv-0724-N |
| DENNIS CHILDRESS | $ 147,426.06 | 3:09-cv-0724-N |
| THOMAS W. SLAUGHTER | $ 211,481.93 | 3:09-cv-0724-N |
| CHARLES E. SMITH | $ 90,859.07 | 3:09-cv-0724-N |
| HARDEE M. BRIAN AND BETTY JO BRIAN; YOUNG FAMILY CEMETARY TRUST | $ 139,989.40 | 3:09-cv-0724-N |
| ARCHIE SMITH | $ 37,753.36 | 3:09-cv-0724-N |
| RICHARD S. FEUCHT; RICHARD S. FEUCHT AND JOAN A. FEUCHT | $ 133,701.68 | 3:09-cv-0724-N |
| ROBERT B. CRAWFORD JR. AND JODIE F. CRAWFORD | $ 72,197.81 | 3:09-cv-0724-N |
| DANIEL JOSEPH DAIGLE AND JILDA ANN DAIGLE; JILDA A. DAIGLE | $ 39,820.10 | 3:09-cv-0724-N |
| JOSEPH W. STRENGTH | $ 40,084.72 | 3:10-cv-0366-N |
| PHILLIP E. LANKFORD JR. | $ 227,091.90 | 3:09-cv-0724-N |
| CLAUDE M. NEEDHAM | $ 107,224.36 | 3:09-cv-0724-N |
| ROBERT SOULE | $ 91,266.03 | 3:09-cv-0724-N |
| SANDRA F. HARRELL | $ 154,587.85 | 3:09-cv-0724-N |
| JOSEPH A. CHUSTZ | $ 33,340.28 | 3:09-cv-0724-N |
| LARRY W. PERKINS | $ 27,640.62 | 3:09-cv-0724-N |
| LAURA JEANETTE N. LEE | $ 176,724.64 | 3:09-cv-0724-N |
| JUANITA QUINEALTY | $ 15,446.22 | 3:09-cv-0724-N |
| CHARLES R. SANCHEZ AND MAMIE C. SANCHEZ; CHARLES R. SANCHEZ SR.; MAMIE C. SANCHEZ | $ 82,204.45 | 3:09-cv-0724-N |
| CHERYL B. WATTS; THURSTON WATTS JR.; THURSTON WATTS JR. AND CHERYL B. WATTS | $ 197,839.65 | 3:10-cv-0366-N |
| TARRAL E. DAIGLE | $ 126,361.20 | 3:09-cv-0724-N |
| RICHARD A. DEVALL; RICHARD DEVALL AND SUE M. DEVALL; SUE M. DEVALL | $ 140,492.62 | 3:09-cv-0724-N |
| MONTY M. PERKINS | $ 29,491.95 | 3:09-cv-0724-N |
| CHARLIE L. MASSEY | $ 140,747.84 | 3:09-cv-0724-N |
| WILLIAM E. ENSMINGER | $ 39,845.96 | 3:09-cv-0724-N |
| MICHAEL J. DRAGO | $ 165,483.89 | 3:09-cv-0724-N |
| JIMMY QUEBEDEAUX | $ 26,693.16 | 3:09-cv-0724-N |
| AUDREY LETARD; JUDY A. VARNADO AND PATRICIA A. ALLISON AND AUDREY A. LETARD; PATRICIA A. ALLISON | $ 85,769.23 | 3:09-cv-0724-N |
| GWENDOLYN E. FABRE | $ 55,453.05 | 3:09-cv-0724-N |
| CLYDE ANDERSON | $ 174,856.85 | 3:09-cv-0724-N |
| JOHN O. LETARD | $ 254,452.09 | 3:09-cv-0724-N |
| HERMAN J. MILLIGAN JR. | $ 297,900.23 | 3:09-cv-0724-N |
| EMOLYN L. WATTS | $ 95,010.68 | 3:09-cv-0724-N |
| OLIVIA S. WARNOCK | $ 42,455.46 | 3:09-cv-0724-N |
| JOHN E. TAYLOR | $ 113,431.70 | 3:09-cv-0724-N |
| ARTHUR R. WAXLEY JR. | $ 115,268.15 | 3:09-cv-0724-N |
| ROBERT YOUNG JR. | $ 42,117.20 | 3:09-cv-0724-N |

**App. 608**

| Stanford Net Winners | Amount of Net Winnings | Case No. |
|---|---|---|
| DOROTHEA M. YOUNG | $ 15,562.29 | 3:09-cv-0724-N |
| DOT G. MELDER; JACK W. MELDER; JACK W. MELDER AND DOT G. MELDER | $ 51,689.19 | 3:09-cv-0724-N |
| JOHN D. COOPER | $ 119,750.43 | 3:09-cv-0724-N |
| DARRELL D. COURVILLE | $ 125,960.34 | 3:09-cv-0724-N |
| TROY L. LILLIE JR. | $ 203,451.44 | 3:09-cv-0724-N |
| ROBERT L. BUSH | $ 100,849.09 | 3:09-cv-0724-N |
| DOROTHY T. DUNCAN | $ 170,458.52 | 3:09-cv-0724-N |
| JOHN R. HOLGUIN | $ 118,725.76 | 3:09-cv-0724-N |
| BARBARA ANTHONY | $ 29,097.56 | 3:09-cv-0724-N |
| MICHAEL R. HOLCOMB | $ 28,364.18 | 3:09-cv-0724-N |
| EDGAR THERON OVERLAND | $ 90,361.49 | 3:09-cv-0724-N |
| JOHNNIE A. GRIFFITH | $ 38,521.26 | 3:09-cv-0724-N |
| GARY WOOD | $ 141,619.74 | 3:09-cv-0724-N |
| AZALEA REST CEMETARY INC. IRREV TRUST, AZALEA REST CEMETARY INC., AND GEORGE B. ANNISON, IN HIS CAPACITY AS TRUSTEE OF AZALEA REST CEMETARY INC. IRREV TRUST; GEORGE BUR ANNISON AND DIANE B. ANNISON | $ 310,437.59 | 3:09-cv-0724-N |
| BLUFF CREEK REDI-MIX, INC.; FLEN ROCK COMPANY, LLC.; FLENIKEN SAND & GRAVEL, INC.; LYMAN L. FLENIKEN JR. | $ 55,052.80 | 3:09-cv-0724-N |
| ROSS D. BRUCE AND MARSHA C. BRUCE | $ 64,991.83 | 3:09-cv-0724-N |
| PEGGY PAYNE MORAGNE | $ 141,229.66 | 3:09-cv-0724-N |
| MICHAEL A. SPEEG | $ 187,181.18 | 3:09-cv-0724-N |
| PLATEAU TELECOMMUNICATIONS | $ 438,074.19 | 3:09-cv-0724-N |
| ROBERT C. WILLIAMS | $ 48,727.92 | 3:09-cv-0724-N |
| MICHAEL J. TIMMONS | $ 40,081.62 | 3:09-cv-0724-N |
| JEFF P. PURPERA JR. | $ 97,693.42 | 3:09-cv-0724-N |
| BBRATSS PRODUCTIONS, INC.; TIMOTHY RUSSELL RICKETTS AND ROSE S. RICKETTS | $ 66,459.73 | 3:09-cv-0724-N |
| RONALD W. PARKER | $ 202,353.43 | 3:09-cv-0724-N |
| STEPHEN J. BURNHAM | $ 289,882.60 | 3:09-cv-0724-N |
| JAMES D. SIMMONS | $ 181,839.52 | 3:09-cv-0724-N |
| GOLD WING PARTNERS | $ 174,445.65 | 3:09-cv-0724-N |
| ERIC TUCKER; ERIC TUCKER AND JENNIFER TUCKER | $ 22,022.01 | 3:10-cv-0366-N |
| ROBERT S. GREER AND ALICE D. GREER | $ 102,523.66 | 3:09-cv-0724-N |
| THE DAVIS REVOCABLE TRUST | $ 100,260.79 | 3:09-cv-0724-N |
| JAMES W. BORING JR. | $ 167,087.27 | 3:09-cv-0724-N |
| MICHAEL WHEATLEY AND BETTY WHEATLEY | $ 199,508.38 | 3:09-cv-0724-N |
| MARY E. GERRY | $ 98,380.29 | 3:09-cv-0724-N |
| BILLIE RUTH MCMORRIS; RONALD B. MCMORRIS; RONALD MCMORRIS AND VIRGINIA MCMORRIS; VIRGINIA H. MCMORRIS | $ 246,164.09 | 3:09-cv-0724-N |
| EDITH IRMA WATTS | $ 79,224.44 | 3:09-cv-0724-N |
| MICHAEL S. ASMER | $ 42,664.50 | 3:09-cv-0724-N |
| WILLIAM BRUCE JOHNSON AND JENNIFER SAVOIC JOHNSON | $ 45,414.72 | 3:09-cv-0724-N |
| DIANE DUNN | $ 70,527.65 | 3:09-cv-0724-N |
| THOMAS H. TURNER | $ 181,615.32 | 3:09-cv-0724-N |
| WAYLAND B. ALEXANDER | $ 212,211.54 | 3:09-cv-0724-N |
| GMAG LLC | $ 3,144,779.91 | 3:09-cv-0724-N |
| GARY D. MAGNESS IRREVOCABLE TRUST | $ 4,491,442.93 | 3:09-cv-0724-N |
| MAGNESS SECURITIES L.L.C. | $ 879,734.30 | 3:09-cv-0724-N |
| EDUARDO A. NAJERA AND EDUARDO A. NAJERA AND JENNIFER M. NAJERA | $ 542,534.57 | 3:10-cv-0366-N |
| THOMAS J. MORAN | $ 987,675.25 | 3:09-cv-0724-N |
| DANIEL A. CAMPBELL AND HOLLY M CAMPBELL | $ 1,503,720.90 | 3:10-cv-0366-N |
| EQUUS VIII LLC | $ 92,927.04 | 3:10-cv-0366-N |
| APOGEE HOLDINGS, INC. | $ 82,436.76 | 3:10-cv-0366-N |
| ENRIQUE PAREDES AND MARIANNE PAREDES | $ 190,777.26 | 3:10-cv-0366-N |
| GENEVIEVE L. MILTON AND HERMON MILTON | $ 319,352.18 | 3:10-cv-0366-N |
| MICHAEL L. O`BRIEN AND MARY K. O`BRIEN AND MICHAEL W. O`BRIEN | $ 116,912.15 | 3:10-cv-0366-N |
| MARIA DE LOS ANGELES LLORENS | $ 72,429.73 | 3:10-cv-0366-N |
| DARIO RESTREPO AND SARMEN INVESTMENTS LIMITED | $ 73,088.06 | 3:10-cv-0366-N |
| WILLIAM L. LAFUZE | $ 228,723.95 | 3:10-cv-0366-N |
| MOORE, MOORE AND MOORE AND NAMDA INVESTMENT GROUP L.P. AND NATHAN ALLEN MOORE AND WANDA COLE MOORE AND SOCOCO LTDA | $ 195,602.14 | 3:10-cv-0366-N |
| PEDRO HURTADO DE MENDOZA AND SILVIA HURTADO DE MENDOZA | $ 331,360.36 | 3:10-cv-0366-N |
| JORGE A. HERNANDEZ AND LOURDES MENCI | $ 49,492.97 | 3:10-cv-0366-N |
| JAMES T. WEINER | $ 123,796.92 | 3:10-cv-0366-N |
| PATRICIA ANN COURTNEY | $ 221,233.42 | 3:10-cv-0366-N |
| JUDY L. TIMBERLAKE | $ 84,543.24 | 3:10-cv-0366-N |

**App. 609**

| Stanford Net Winners | Amount of Net Winnings | Case No. |
|---|---|---|
| CLARENCE H. FORSHAG AND BETTY JO FORSHAG | $ 112,299.18 | 3:10-cv-0366-N |
| OMAR RODRIGUEZ ROSALES AND ROSA MA. ROSALES DE RODRIGUEZ | $ 714,510.59 | 3:10-cv-0366-N |
| ARMILE ARDOIN AND ETHA V. ARDOIN | $ 140,907.59 | 3:10-cv-0366-N |
| DONALD J. SHERRILL AND SUSAN M. SHERRILL | $ 51,446.49 | 3:10-cv-0366-N |
| LISA C. SEYMOUR | $ 45,205.78 | 3:10-cv-0366-N |
| DALE W. WILSON AND JUDY ANN WILSON | $ 19,671.76 | 3:10-cv-0366-N |
| JAMES R. HASTINGS | $ 471,114.31 | 3:10-cv-0366-N |
| PHILLIP PEREZ AND SIRO PEREZ OLIVA AND DELIA PEREZ | $ 115,991.88 | 3:10-cv-0366-N |
| MANUEL ANTUNA AND ROSALIA ANTUNA | $ 23,964.87 | 3:10-cv-0366-N |
| JERRY WALLACE AND AUDREY WALLACE | $ 87,679.17 | 3:10-cv-0366-N |
| JUDY PALMISANO JONES | $ 19,710.08 | 3:10-cv-0366-N |
| JOHN SCHWOB AND ALINE C. SCHWOB AND SCHWOB CONSTRUCTION CORP. | $ 180,298.67 | 3:10-cv-0366-N |
| JAMES D. HOLDEN AND HENRIETTA M. HOLDEN | $ 61,737.96 | 3:10-cv-0366-N |
| ALLEN B. BYERLEY | $ 82,746.84 | 3:10-cv-0366-N |
| MICHAEL R. HICKS AND ADAM M. HICKS | $ 151,733.66 | 3:10-cv-0366-N |
| CHARLES W. THIBEDEAU | $ 88,190.31 | 3:10-cv-0415-N |
| R. EDWARD ROYBAL MDPA PROFIT SHARING PLAN AND T. AND R. EDWARD ROYBAL | $ 58,389.55 | 3:10-cv-0415-N |
| EMMA WALTHER AND REX DOMUS TRUST | $ 69,480.99 | 3:10-cv-0415-N |
| J. G. MCKOWEN AND MARILYN M. MCKOWEN | $ 67,342.84 | 3:10-cv-0415-N |
| RALPH YAFFE AND CAROL YAFFE | $ 63,393.58 | 3:10-cv-0415-N |
| CHRISTOPHER D. MUNYON AND MARIA ELENA MUNYON | $ 52,680.77 | 3:10-cv-0415-N |
| ANGELA ARROJO AND RAFAEL B. ARROJO AND LYDIA ARROJO QUINTANAL | $ 184,688.94 | 3:10-cv-0415-N |
| MALTON J. BULLOCK JR. | $ 132,016.07 | 3:10-cv-0478-N |
| JOHN COP JR. AND LAVERNE D. COP | $ 73,608.02 | 3:10-cv-0478-N |
| RAY GUIDRY | $ 47,894.37 | 3:10-cv-0478-N |
| MARK I. CAITHNESS | $ 31,271.08 | 3:10-cv-0478-N |
| JOSE MARIA CASTRO LOPEZ AND KEIKO FUJIMOTO | $ 47,421.40 | 3:10-cv-0478-N |
| JOSE AND WENDY ESTRELLA AND JOSE AND WENDY ESTRELLA TRUST AND JOSE ESTRELLA AND JOSE ESTRELLA TRUST | $ 229,248.26 | 3:10-cv-0478-N |
| WILLIAM T. EDWARDS MD PSP AGENCY | $ 93,244.69 | 3:10-cv-0478-N |
| IVY PEARL WESTMORELAND AND JOHN W. WESTMORELAND AND JANIS C. WESTMORELAND | $ 58,408.31 | 3:10-cv-0528-N |
| J. WILLIAM LOVELACE | $ 48,910.28 | 3:10-cv-0528-N |
| DONALD K. LAWRENZ AND JOANN LAWRENZ | $ 67,803.83 | 3:10-cv-0528-N |
| NANCY R. JOHNSON | $ 29,108.93 | 3:10-cv-0617-N |
| JOHN E. COXE AND MARGIE S. COXE | $ 27,937.53 | 3:10-cv-0617-N |
| BILLY J. BERGERON AND BERNADETTE C. BERGERON | $ 61,761.64 | 3:10-cv-0617-N |
| JAMES C. BARR AND PEGGY BARR | $ 130,146.99 | 3:10-cv-0725-N |
| JOE B. DAVIS JR. AND KAREN W. DAVIS | $ 27,697.86 | 3:10-cv-0725-N |
| HUGO CASCAVITA AND ICONEX RESOURCES TRUST | $ 148,270.05 | 3:10-cv-0844-N |
| INDIGO TRUST AND LAMALUNA TRUST AND MAURICIO DE MENDIOLA | $ 205,496.77 | 3:10-cv-0844-N |
| SARTIN LIVING TRUST OF 1994 | $ 56,145.62 | 3:10-cv-0931-N |
| HUELL HAM | $ 39,898.40 | 3:10-cv-0931-N |
| JOHN G. ADAMS AND REBECCA N. ADAMS | $ 80,555.27 | 3:10-cv-0931-N |
| WILLIAM J. WOHRER AND MICHALENE WOHRER | $ 46,923.90 | 3:10-cv-0931-N |
| GERALD W. TONNER AND MARY E. TONNER | $ 58,090.17 | 3:10-cv-0931-N |
| RAFAEL BERMUDEZ | $ 44,213.75 | 3:10-cv-0931-N |
| TONYA DOKKEN AND PEDER CHRISTIAN DOKKEN | $ 20,844.58 | 3:10-cv-0931-N |
| 2590 ASSOCIATES LLC AND MID-SOUTH CONTRACTORS, LLC | $ 199,538.27 | 3:10-cv-1002-N |
| D. MILLS AND M. MILLS TRUST | $ 33,937.53 | 3:10-cv-1002-N |
| HENRY WILSON AND JUNE S. WILSON | $ 34,329.25 | 3:10-cv-1002-N |
| KENNETH L TWISS | $ 24,842.70 | 3:10-cv-1002-N |
| MARK MILTON AND CHARLOTTE A. MILTON | $ 23,749.41 | 3:10-cv-1002-N |
| WALTER D. DURANT JR. | $ 38,471.97 | 3:10-cv-1002-N |
| STEPHEN BEARMAN | $ 22,903.23 | 3:10-cv-1002-N |
| JAY B BREAUX AND ROCHELLE D. BREAUX | $ 21,495.74 | 3:10-cv-1002-N |
| BO E NILSSON AND PIA M NILSSON | $ 22,353.87 | 3:10-cv-1002-N |
| DONALD PASSWATERS AND MARIA V. PASSWATERS | $ 15,203.00 | 3:10-cv-1002-N |
| CYNTHIA HAMPTON AND WILLIAM JERRY HAMPTON | $ 33,170.32 | 3:10-cv-1002-N |
| JAMES M. HUBBARD AND GENEVA M. HUBBARD | $ 34,695.39 | 3:10-cv-1002-N |
| AINSLIE REVOCABLE LIVING TRUST | $ 118,915.31 | 3:10-cv-1002-N |
| MARILYN F. HOWELL AND MARILYN HOWELL MANLEY TRUST | $ 167,747.99 | 3:10-cv-1002-N |
| DALE LAWRENZ AND MARILYN LAWRENZ | $ 30,050.42 | 3:10-cv-1002-N |
| TRENT FAMILY PARTNERSHIP LTD. | $ 57,298.17 | 3:10-cv-1002-N |
| LELAND STANFORD MANSION FOUNDATION[1] | $ 23,708.28 | 3:10-cv-1002-N |

**App. 610**

| Stanford Net Winners | Amount of Net Winnings | Case No. |
|---|---|---|
| EDWARD S. RUBIN ESTATE AND ROBERT RUBIN | $ 134,249.39 | 3:10-cv-1002-N |
| R.. GLENN SHERRILL JR. | $ 37,749.06 | 3:10-cv-1002-N |
| LARRY W MILTON | $ 60,159.11 | 3:10-cv-1002-N |
| JOSE MANUEL FERNANDEZ | $ 457,650.00 | 3:10-cv-1002-N |
| GEORGE MOE GOLDMAN | $ 50,475.83 | 3:10-cv-1002-N |
| DONNA M. VINES | $ 107,059.59 | 3:09-cv-0724-N |
| CAROLYN CRANSTON | $ 22,783.85 | 3:09-cv-0724-N |
| **TOTAL** | $ **32,363,297.52** | |

**Footnote 1**: The Receiver has sued Leland Stanford Mansion Foundation for $4,081,642.32 in Total CD
Proceeds.  The Total CD Proceeds received by Leland Stanford Mansion Foundation include
$2,500,000.00 that it received from the Stanford Defendants as a purported donation.  Although Leland
Stanford Mansion Foundation did receive the $2.5 million donation, that donation was not considered in
the calculation of the amount of its Net Winnings in the above chart.

# EXHIBIT KVT-NWD-8

*August 4, 2015 Declaration of Karyl Van Tassel*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § § | Case No. 03:09-CV-0724-N |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL. | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § § | Case No. 03:10-CV-0366-N |
| v. | § § | |
| MIGUEL VENGER, ET AL. | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| Plaintiff, | § § § | Case No. 03:10-CV-0415-N |
| v. | § § | |
| JUAN JOSE RODRIGUEZ POSADA, ET AL. | § § | |
| Defendants. | § § | |

**App. 613**

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                       §
                                             §        Case No. 03:10-CV-0478-N
            Plaintiff,                       §
                                             §
v.                                           §
                                             §
GILBE CORP., ET AL.                          §
                                             §
            Defendants.                      §

---

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                       §
                                             §        Case No. 03:10-CV-0528-N
            Plaintiff,                       §
                                             §
v.                                           §
                                             §
BUCK'S BITS SERVICE, INC., ET AL.            §
                                             §
            Defendants.                      §

---

RALPH S. JANVEY, IN HIS CAPACITY AS          §
COURT-APPOINTED RECEIVER FOR THE             §
STANFORD INTERNATIONAL BANK, LTD.,           §
ET AL.                                       §
                                             §        Case No. 03:10-CV-0617-N
            Plaintiff,                       §
                                             §
v.                                           §
                                             §
NANCY R. JOHNSON, ET AL.                     §
                                             §
            Defendants.                      §

---

**App. 614**

RALPH S. JANVEY, IN HIS CAPACITY AS    §
COURT-APPOINTED RECEIVER FOR THE    §
STANFORD INTERNATIONAL BANK, LTD.,    §
ET AL.    §
   §    Case No. 03:10-CV-0725-N
                Plaintiff,    §
   §
v.    §
   §
JAMES C. BARR, ET AL.    §
   §
                Defendants.    §

---

RALPH S. JANVEY, IN HIS CAPACITY AS    §
COURT-APPOINTED RECEIVER FOR THE    §
STANFORD INTERNATIONAL BANK, LTD.,    §
ET AL.    §
   §    Case No. 03:10-CV-0844-N
                Plaintiff,    §
   §
v.    §
   §
INDIGO TRUST, ET AL.    §
   §
                Defendants.    §

---

RALPH S. JANVEY, IN HIS CAPACITY AS    §
COURT-APPOINTED RECEIVER FOR THE    §
STANFORD INTERNATIONAL BANK, LTD.,    §
ET AL.    §
   §    Case No. 03:10-CV-0931-N
                Plaintiff,    §
   §
v.    §
   §
TONYA DOKKEN, ET AL.    §
   §
                Defendants.    §

---

**App. 615**

RALPH S. JANVEY, IN HIS CAPACITY AS      §
COURT-APPOINTED RECEIVER FOR THE         §
STANFORD INTERNATIONAL BANK, LTD.,       §
ET AL.                                   §
                                         §      Case No. 03:10-CV-1002-N
                    Plaintiff,           §
                                         §
v.                                       §
                                         §
JOSE MANUEL FERNANDEZ, ET AL.            §
                                         §
                    Defendants.          §

---

**SUPPLEMENTAL DECLARATION
OF KARYL VAN TASSEL**

---

I, Karyl Van Tassel of 1001 Fannin, Suite 1400, Houston, TX 77002 state under

penalty of perjury as follows:

1.      This declaration is intended to supplement my declaration in this matter dated

June 1, 2011 ("6/1/2011 Declaration").   All of the opinions and statements contained in my

6/1/2011 Declaration are incorporated herein.

2.      All definitions of terms contained in the 6/1/2011 Declaration apply here as well.

I also use the following short-hand terms in this declaration and define other such terms within

the text of the declaration:

- OIG Investigation - Investigation by the SEC's Office of Inspector General into
  SEC's response to concerns regarding Robert Allen Stanford's Alleged Ponzi
  Scheme, Case No. OIG-526.

- FWDO:  Fort Worth District Office of the SEC.

- 7/27/2009 Declaration:  Declaration of Karyl Van Tassel dated July 27, 2009 and
  filed as Doc. No. 18 in *Janvey v. Alguire, et al*, Case No. 3:09-CV-0724-N,
  pending in this Court.

**App. 616**

- 5/24/2010 Declaration:  Declaration of Karyl Van Tassel dated May 24, 2010 and filed in Docs. 444-2, 444-3, and 444-4 in *Janvey v. Alguire, et al*, Case No. 3:09-CV-0724-N, pending in this Court.

3.    Attached to this declaration are true and correct copies of the following exhibits:

- KVT-5[1]:  A data sheet created by Stanford's legal department describing SFGC, and a Services Agreement between SIB and SFGC.

- KVT-6:    Report of Investigation, United States Securities and Exchange Commission Office of Inspector General, Case No. OIG-526, dated March 31, 2010 ("OIG Report").

- KVT-7:  1997 SEC Examination Report Concerning Stanford Group Company, Examination No. 06-D-97-037, which was Exhibit 49 to the OIG Report ("1997 SEC Examination Report").

- KVT-8:    Excerpts of Testimony of Julie Preuitt, Assistant Director (former Branch Chief), FWDO Broker-Dealer Examination Group, taken during the OIG Investigation, which excerpts were included in Exhibits 5 and 6 to the OIG Report.

- KVT-9:  Excerpts of Testimony of Mary Lou Felsman, former Assistant District Administrator, FWDO Examination program, taken during the OIG Investigation, which excerpts were included in Exhibit 8 to the OIG Report.

- KVT-10:    Excerpts of Testimony from unidentified examiner[2] of the FWDO Investment Adviser Examination group of the SEC, taken during the OIG Investigation, which excerpts were included in Exhibit 12 to the OIG Report.

- KVT-11:  Letter from SEC to SGC dated July 16, 1998, which was Exhibit 69 to the OIG Report.

- KVT-12:  SIB internal presentation and returns chart.

- KVT-13:  Letter from SEC to SGC dated September 12, 2005.

- KVT-14:  Sales Credit Table.

- KVT-15:  Letter from NASD to SGC dated September 27, 2006.

---

[1]    Exhibits KVT-1 through KVT-4 are on file in this matter as attachments to my 6/1/2011 Declaration, all of which are incoporated herein.

[2]    The name of this examiner was redacted from the OIG Report.  *See, e.g.*, KVT-6, pp. 5, 44.

**App. 617**

- KVT-16:  Email exchange between Doug McDaniel, James Davis, Laura Pendergest-Holt, Juan Rodriguez-Tolentino, et al., between August 29, 2007 and September 4, 2007.

- KVT-17:  Email exchange between Robert Ulloa, Jason Green, James Davis, Laura Pendergest-Holt, et al., on March 19, 2008.

- KVT-18:  Email exchange between Neal Clement and Scot Thigpen on March 27, 2008.

- KVT-19:  Schedules of payments made to C.A.S. Hewlett in 2007-2008 from Trustmark account 3003104594.

- KVT-20:  Allocation spreadsheets and accompanying emails concerning payments to C.A.S. Hewlett.

- KVT-21:  Email from Jim Davis to SocGen dated May 19, 2005.

- KVT-22:  Letter from Jim Davis to SocGen dated February 26, 2003.

- KVT-23:  SocGen records filed by Department of Justice in *United States v. Robert Allen Stanford*, C.R. No. 4:09-342-01, pending in the United States District Court for the Southern District of Texas, Doc. No. 245.

- KVT-24:  James Davis Plea Agreement.

- KVT-25:  5/24/2010 Declaration of Karyl Van Tassel.

- KVT-26:  7/27/2009 Declaration of Karyl Van Tassel.

- KVT-27:  Purchase Agreement for Sea Eagle dated November 4, 2002.

- KVT-28:  Deed of Trust concerning Houston home purchased by Stanford Development Corporation for Mr. Stanford and his wife.

- KVT-30:  Excerpts of Testimony from unidentified examiner[3] of the FWDO Investment Adviser Examination group of the SEC, taken during the OIG Investigation, which excerpts were included in Exhibit 17 to the OIG Report.

- KVT-31:  2002 SEC Examination Report Concerning Stanford Group Company, Examination No. IA2003FWDO-012, which was Exhibit 70 to the OIG Report ("2002 SEC Examination Report").

---

[3]    The name of this examiner was redacted from the OIG Report. *See, e.g.*, KVT-6, pp. 5, 44.

**App. 618**

- KVT-32:  1998 SEC Examination Report Concerning Stanford Group Company, File No. 801-50374, which was Exhibit 55 to the OIG Report ("1998 SEC Examination Report").

- KVT-33:  Letter from SEC to SGC dated December 19, 2002, which was Exhibit 74 to the OIG Report.

- KVT-34:  Complaint letter to SEC regarding Stanford Bank dated October 28, 2002, which was Exhibit 76 to the OIG Report.

- KVT-35:  Citizen complaint letter regarding Stanford Group forwarded by Texas State Securities Board to SEC on August 4, 2003, which was contained in Exhibits 88 and 89 to the OIG Report.

- KVT-36:  Insider complaint letter dated September 1, 2003 and emails forwarding the complaint to the SEC, which were Exhibits 92-94 to the OIG Report.

- KVT-37:  2004 SEC Examination Report Concerning Stanford Group Company, Examination No. BD2005FWDO001, which was Exhibit 98 to the OIG Report ("2004 SEC Examination Report").

- KVT-38:  Appendix in Support of Receiver's Reply to Defendant R. Allen Stanford's Opposition to Receiver's Motion to Approve Procedures for the Sale of the Vessel "Sea Eagle" and Sale of the Vessel Pursuant to Those Procedures.

4.      FTI's continued analysis of the records of SIB, Allen Stanford, and other Stanford Entities was conducted using reliable practices and methodologies that are standard in the fields of accounting and finance.  Further, based on FTI's investigation relating to the Stanford Entities, it is my opinion that the SEC reports referenced herein as well as the evidence underlying those reports are both reliable and trustworthy.  Moreover, such reports and evidence are the types of information upon which professionals in the fields of accounting and finance typically rely, when such information is available, during investigations of this nature.

5.      Based on FTI's continued investigation of the operations of the Stanford Entities and on the data and documents cited or incorporated herein, it is my opinion that:

- The Stanford Entities were operating as a Ponzi scheme from at least 1999 forward;

**App. 619**

- SIB was insolvent (*i.e.* its liabilities exceeded the fair value of its assets) from at least 1999 forward;

- Robert Allen Stanford's ("Mr. Stanford" or "Allen Stanford") reported income from at least 1999 forward is comprised almost exclusively from the Stanford Entities, including proceeds from SIB CDs; and

- SFGC was insolvent (*i.e.* its liabilities exceeded the fair value of its assets) from at least 2000 forward and received SIB CD funds.

The following paragraphs discuss specific documents and other evidence and information supporting my opinions.

### THE SEC EXAMINERS FOUND
### THAT STANFORD WAS A PONZI SCHEME AS EARLY AS 1997

6.      Beginning in 1997 various departments within the Fort Worth District Office of the SEC found that the Stanford Entities were operating as a Ponzi scheme. *See generally* KVT-6. These findings were based on, *inter alia*, examinations in which the SEC found that: (1) SIB advertised consistent and significantly above-market rates of return to CD holders; (2) SIB paid SGC, and in turn SGC paid financial advisors, commissions that were significantly above market; (3) the returns on invested assets reported by SIB were consistent in volatile markets and were higher than those that would be likely from the type of "safe" investments described to the investors; and (4) SGC and its financial advisers neither maintained nor had access to sufficient information regarding the SIB CDs they were selling or the investment portfolio underlying those CDs. *Id.*

7.      In 1997, the FWDO Broker-Dealer Examination group of the SEC reviewed SGC's broker-dealer operations and found that the Stanford operations were a Ponzi scheme. KVT-6, pp. 29-33. This finding was based, in part, on the following findings which were included in the SEC report resulting from the examination:

> SIB promotes its products as being safe and secure.  A brochure regarding the products offered through SIB, including the FlexCD

**App. 620**

Account, states that "[F]unds from these accounts are invested in investment-grade bonds, securities and Eurodollar and foreign currency deposits." The brochure indicates a high level of safety for customer deposits. For example: "banking services which ensure safety of assets, privacy, liquidity and high yields", " . . . protects its clients' money with traditional safeguards", "placing deposits only with banks which have met Stanford's rigorous credit criteria", "depository insolvency bond", "bankers' blanket bond", and "portfolio managers follow a conservative approach". Based on the amount of interest rate and referral fees paid, SIB's statements indicating these products to be safe appear to be misrepresentations.

SIB pays out in interest and referral fees between 11% and 13.75% annually. To consistently pay these returns, SIB must be investing in products with higher risks than are indicated in its brochures and other written advertisements.

KVT-6, pp. 30-31; 1997 KVT-7, pp. 2-3. During the OIG Investigation, an SEC employee who was involved in the 1997 examination testified that she "concluded that the SIB CDs' purported above-market returns were 'absolutely ludicrous' and that the high referral fees SGC was paid for selling the CDs indicated that they were not 'legitimate CDs.'" KVT-6, p. 31; KVT-8, pp. 24-25. Another member of the examination group testified that when she retired at the end of 1997, she told a colleague to "keep your eye on these people because this looks like a ponzi scheme to me and some day it's going to blow up." KVT-6, p. 33; KVT-9, p. 26.

8.     In the 1997 Examination Report, the SEC further found that "Stanford Group failed to maintain books and records as they relate to the offer and sale of SIB products" and that "[i]t appears that the RR is recommending a particular product of SIB's and therefore should have a basis for making that recommendation . . ." KVT-7, p. 3. The same report noted, however, that Lena Stinson, the senior vice president and administrative officer of SGC, told the SEC that "once the application is sent, the RR is no longer involved (other than receiving a referral fee) and all paperwork is maintained by SIB." *Id.*

**App. 621**

9.       In 1998, the SEC's investor advisor group of the FWDO conducted another examination of SGC.  *See generally*, KVT-32.   The examiner who conducted that examination testified during the OIG Investigation that SGC's complete lack of information regarding the SIB CDs it was selling amounted to fraud:

> We asked for all due diligence information that the adviser or the Stanford Group Company possessed concerning the CDs, whatever they had as to how the money was being invested, performance returns of the portfolio, whatever they had, and as I recall, they produced very, very little.  They claimed, we don't have access to that information.
>
> …
>
> Well, the question is how would you sell it consistent -- in the case of an adviser, consistent with your fiduciary duty to your clients.…
>
> So my conclusion was, as I have asked you, give me everything you've got about that investment, and they gave me virtually nothing, certainly nothing in my mind that would be a reasonable basis for making a recommendation of an investment. So that's why -- I think if you see the letter I sent to Stanford as a result of this report, I put in there [Section] 206 language about it doesn't look like you've got enough information to fulfill your fiduciary duty in making this recommendation. … And that would have -- in my mind, have been one of the theories to bring a case against the adviser by enforcement that that was such a -- a glaring absence of basis for a recommendation that it amounted to deceit or fraud upon the client.

KVT-6, p. 44; KVT-10, pp. 41-44; KVT-11.

10.      Beginning in 1997, the SEC made numerous additional findings over the years relating to SIB CD rates of return, the excessive compensation paid to SGC and financial advisors who sold the CDs, the lack of information possessed by SGC and the financial advisors about the SIB CDs and the underlying investment portfolio, and discovered other facts that support the SEC's conclusion that a Ponzi scheme existed during those years.  For example:

**App. 622**

- In the 1997 Examination Report, the SEC found that "[d]uring 1996, [Allen] Stanford made a cash contribution of $19,000,000 to [SGC]. We are concerned that the cash contribution may have come from funds invested by customers at SIB. We noted that SIB had loaned Stanford $13,582,579. In addition, we noted that SFG had borrowed $5,447,204 from SIB for a total receivable at SIB of $19,029,783 directly and indirectly from [Mr.] Stanford. We contacted the general counsel for the Stanford companies regarding our concerns. The general counsel stated that the cash contribution came from personal funds and not from the above loans; however, it seems at least questionable whether Stanford has access to $19,000,000 in personal funds." KVT-6, p. 32; KVT-7, p. 3. One of the SEC examiners testified that this was a "red flag," and that they wanted more information about the origin of Mr. Stanford's cash contributions but were unable to obtain it. She further testified that the transactions made her assume that [Mr. Stanford] was possibly stealing from investors and that this was an attribute of fraud and potentially a Ponzi scheme. KVT-6, pp. 32-27; KVT-8, pp. 22-23, 26-27.

- The examiner who conducted the 1998 examination testified during the OIG Investigation that at the time of the examination, he was suspicious about "how Stanford was able to achieve these returns with such allegedly safe investments." He further stated that "extremely high interest rates, extremely generous compensation, [SGC] is extremely dependent upon that compensation to conduct its day to day operations. It just smells bad." KVT-6, p. 43; KVT-10, pp. 20-21.

- One of the examiners who conducted the 1997 examination and was familiar with the 1998 examination "testified that after the 1998 Examination, both the investment adviser and broker-dealer examiners 'knew that it was a fraud.'" KVT-6, p. 46; KVT-8, p. 60.

- In 2002, the SEC's investment adviser examination group conducted yet another examination of SGC. The examiner who conducted the 2002 examination discussed SGC with the examiner who conducted the 1998 examination and described that conversation in his testimony in the OIG Investigation as follows: "[H]e explained to me that he had been there in [1998], and that he had strongly suspected that the affiliated bank of the investment adviser had problems….I can't remember whether he actually came out and said ponzi scheme or fraud but he made it clear that the bank was taking in deposits and he suspected that, whenever there was a redemption, they were just taking that money out of -- new money from new investors. So, like I said, I can't remember if he used the word 'fraud' or 'Ponzi scheme,'' but he made it clear that that's what he suspected." KVT-6, p. 47; KVT-30, p. 12.

**App. 623**

- The examiner who conducted the 2002 examination testified that there were numerous red flags that caused him to conclude that Stanford had been operating a Ponzi scheme and that it was growing exponentially. *See., e.g.,* KVT-6, p. 48; KVT-30, pp. 68, 96.  One of those red flags was the consistent, above-market reported returns, about which the examiner stated, "[W]hen you take the CD rates, the commission, the overhead and added them together…it just seemed very unlikely that they could invest in anything legitimate to earn a return to cover all those expenses."  KVT-6, p. 48; KVT-30, pp. 29-30.  Other red flags noted by the examiner in his testimony were the high commissions paid to SGC financial advisers for selling the CDs and SGC's claimed lack of information about which of its clients had invested in the SIB CDs.  KVT-6, pp. 48-49; KVT-30, pp. 30, 66-68.

- The 2002 Examination Report found, in part, as follows:  (1) "There was no indication that anyone at SGC knew how its clients' money was being used by SIB or how SIB was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC;" (2) "[SGC] failed to document adequate due diligence with respect to its clients' investments in its affiliated offshore bank's certificates of deposit;" (3) SGC failed to adequately disclose to its customers the referral fees it received annually from the sales of SIB CDs; (4) SGC failed to adequately disclose its "overwhelming reliance on referral fees from sales of the SIB CDs for its financial success."  KVT-31, pp. 1, 10-13.  Similar deficiencies and violations were set forth in a deficiency letter from the SEC to SGC dated December 19, 2002.  KVT-33.

- In 2002 and 2003, the SEC received multiple complaints or tips, from both insiders and customers, that the Stanford operations were a Ponzi scheme, listing specific concerns ranging, *inter alia*, from high guaranteed rates of return, the secrecy surrounding the SIB CD portfolio, and SIB's use of a small unknown auditing firm on the island of Antigua. *See e.g.,* KVT-6, pp. 53-70; KVT-34; KVT-35; KVT-36.  The insider complaint concluded that the Stanford operation was a "Massive Ponzi Scheme."  KVT-6, p. 66 and KVT-36.

- In 2004, the SEC conducted yet another examination of Stanford Group Company, and in the resulting report concluded that:  (1)  "the offering of the SIB CDs may in fact be a very large ponzi scheme, designed and marketed by SIB's and SGC's [sic] to lull investors into a false sense of security by their claims that the SIB products are similar to traditional U.S. bank CDs;" (2) SGC was a high regulatory risk with regard to sales practice issues; (3) that "little, if any, of the funds invested into the SIB CDs may actually be invested as represented to investors;" (4) SGC failed or refused to produce documents concerning actual use of the monies

**App. 624**

invested; (5) SGC's regulatory violations included making misrepresentations and omissions to customers, charging excessive commissions and failing to disclose the amount of commissions charged;" and (6) that the following factors supported the conclusion that SIB CDs were a fraud - excessive commissions, aggressive sales contests, high "interest" rates, high returns every year for the last 10 years, SIB will not disclose its portfolio, and other factors leading the SEC to believe that Allen Stanford may have been engaging in money laundering and using investor funds without any oversight.  KVT-6, pp. 70-80; KVT-37.

### SIB's Investment Returns Were Too Good To Be True From At Least 1997 Forward

11.    The SEC's findings concerning the unusually consistent and high rates of returns from the SIB CDs are consistent with and support my conclusions contained in the 7/27/2009 Declaration, 5/24/2010 Declaration, the 6/1/2011 Declaration and my opinions stated herein. The high rates of return and consistent profitability of the SIB CD portfolio that were reported by SIB, at a time when the world economy was in crisis, are one factor that leads me to conclude that the rates of return were not the result of actual investment performance, and are more consistent with "reverse-engineered" rates of return that are one of the hallmarks of a fraudulent investment scheme.  In fact, there is evidence of this reverse-engineering of revenue both in the documents we have obtained and in the plea agreement of James Davis.  SIB offered CD rates that were significantly greater than those offered in the United States.  In its own marketing brochure, SIB included the following comparison in the yields of SIB CDs versus average U.S. Bank CD yields between 1997 and 2006:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 10.13 | 9.25 | 8.71 | 9.625 | 9.13 | 7.17 | 6.38 | 6.21 | 6.52 | 7.13 |
| U.S. Yield (%) | 5.8 | 5.3 | 4.9 | 5.85 | 3.55 | 1.85 | 1.78 | 2.7 | 4.46 | 5.08 |

**App. 625**

KVT-5.  At their worst, SIB CDs had a rate of return that was 140%, and at their best 388%, of the average rate for U.S. Bank CDs.  Even more incredible were the overall rates of return earned by the SIB CD investment portfolio between 1997 and 2007 -- *i.e.* the total amount earned by SIB on its purported investments, not just the amount paid to investors.  Specifically, according to internal company documents, the investment portfolio had a 14.9% overall rate of return in 1997, 14.8% in 1998, 14.2% in 1999, 14.1% in 2000, 14.3% in 2001, 14% in 2002, 11.7% in 2003, 11.9% in 2004, 12.1% in 2005, 12% in 2006 and 12.7% in 2007.  *See* KVT-12.

12.     A comparison of SIB's claimed overall rate of return on its CD investment portfolio to well known index rates of return during the same years further highlights the disparity in performance between the SIB CD portfolio and the world financial markets in general.  Over the years, the performance of the SIB CD portfolio often exceeded many of the well-known index rates of return.  Even when it did not, however, the returns for SIB were remarkably consistent and steady from year to year, a result that is extremely rare in normal market conditions and even more so during the time period in question.  The below chart shows the major index returns for the years 1997 through 2007 as well as the amounts allegedly earned by SIB during those years, all as reflected in SIB's own documents:

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SIB Yield (%) | 14.9 | 14.8 | 14.2 | 14.1 | 14.3 | 14 | 11.7 | 11.9 | 12.1 | 12 | 12.7 |
| Dow Jones Return | 22.64 | 16.10 | 25.22 | -6.18 | -7.10 | -16.76 | 25.32 | 3.15 | -0.61 | 16.29 | 6.43 |
| Dow Jones Stoxx 50 Return | 36.84 | 32.00 | 46.74 | -2.69 | -20.25 | -37.30 | 15.68 | 6.90 | 21.28 | 15.12 | 6.79 |
| Nasdaq 100 Return | 20.63 | 85.31 | 101.95 | -36.84 | -32.65 | -37.58 | 49.12 | 10.44 | 1.49 | 6.79 | 18.67 |
| S&P 500 Return | 31.01 | 26.67 | 19.53 | -10.14 | -13.04 | -23.37 | 26.38 | 8.99 | 3.00 | 13.62 | 3.53 |

**App. 626**

13.    As the chart above reflects, the SIB CD returns were in excess of and/or more consistent than virtually every other stock, CD, fund or other investment to which SIB compared its CDs in its marketing materials.

### SIB's Referral and Commission Rate Structure Was Economically Unsustainable From At Least 1997 Forward

14.    The SEC's findings concerning the above-market referral fees paid to SGC and above-market commissions paid to SGC financial advisors are consistent with and support my conclusions contained in the 7/27/2009 Declaration, 5/24/2010 Declaration, the 6/1/2011 Declaration and my opinions stated herein.  The fact that SGC financial advisors were paid far above normal market commission rates to sell the SIB CDs raises the question of how SIB could afford to pay those rates on top of extraordinary returns on the CDs.  SGC received a 3% commission (also called a "referral fee") on the initial sale of a SIB CD, and 3% annually for the life of the CD.  Financial advisors, in turn, received as much as an annual 1% commission on all amounts their customers had in CDs for that year and were eligible for commissions on the initial sale of CDs of 1% or more.  As the SEC pointed out in a September 2005 letter to the president of SGC as part of yet another SEC investigation, this commission structure would result in SGC receiving a referral fee of 15% of the amount invested on a SIB CD with a 60-month maturity, which the SEC said was more than any rate legally allowed.  *See* KVT-13.  That means the financial advisor for that customer would receive 5% of the amount invested over the life of the CD as the base commission.  Moreover, if the financial advisor sold over $2 million in SIB CDs in any given calendar quarter, he earned an additional 1% quarterly bonus on those sales.  By comparison, when an SGC broker sold a typical certificate of deposit issued by a U.S. bank (and insured by the FDIC), the commission to SGC was many times smaller than the normal commission SGC received on a SIB CD.  *See* KVT-14.

**App. 627**

15.     In addition to exceeding payments received for U.S. bank CD products, the SIB

CD commission structure for financial advisors was unusual in other ways.   The financial

advisors received a percentage each year of the amount their clients held in SIB CDs, regardless

of whether the financial advisor sold new CDs that year.   The "trailing commission," as it was

known, had the obvious impact of causing financial advisors to pressure customers into not

redeeming their CDs — *i.e.* into leaving their money with the bank.   In addition, the trailing

commission was structured to incentivize financial advisors to continue selling new CDs by

increasing — or decreasing — the percentage of their trailing commission depending on the

volume of new CDs they sold — or did not sell — in a given year.

16.     Commission and bonus structures like that used by SIB are not typical, largely

because they cannot be sustained economically — *i.e.* the investments do not generate enough

real returns to cover the stated CD rates of return, commissions and referral fees along with other

applicable expenses.

### INFORMATION AVAILABLE TO SGC AND THE FINANCIAL ADVISORS ABOUT CDS AND THE SIB INVESTMENT PORTFOLIO WAS INADEQUATE

17.     The SEC's findings concerning the lack of information known by or available to

SGC and its financial advisors regarding the SIB CDs and the underlying investment portfolio

are consistent with and support my conclusions contained in the 7/27/2009 Declaration,

5/24/2010 Declaration, the 6/1/2011 Declaration and my opinions stated herein.   The SEC

recognized these problems beginning in 1997.  FTI's investigation confirmed that these problems

continued until the collapse of the Ponzi scheme.

18.     The NASD concluded in 2006 that SGC violated NASD rules through

"unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"—at a

**App. 628**

time when SGC admitted that "no one at SGC knows what the investments are."  *See* KVT-15.

FTI's investigation confirms this conclusion.

19.     FTI's investigation uncovered that there was very little information available to

the Stanford financial advisors at any time about how SIB purportedly invested funds from the

sale of CDs.  It was commonly known throughout SGC that SIB was owned and controlled

ultimately by Allen Stanford, that James Davis and Laura Pendergest-Holt had principal

responsibility for the management of the SIB CD investment portfolio and that specific

information regarding the investment portfolio was not readily available.

20.     On the few occasions where we have discovered that financial advisors actually

inquired about SIB's investments, however, they received extremely limited and generic

information, making it impossible for them to evaluate the suitability of the CDs for their

customers.  They nonetheless continued to sell the SIB CDs to customers and were well paid to

do so, in spite of what should have been a "red flag" about this investment scheme.

21.     For example, in August 2007, financial advisor Doug McDaniel wrote to James

Davis, Laura Pendergest-Holt, and Juan Rodriguez-Tolentino: "I have only done $3,000,000 of

my clients' money (and my own) in the CD product.  I have the potential to do much more, but

to do that, I would need to become even more comfortable with the product."  *See* KVT-16.

McDaniel attached a list of questions, noting "some of them may sound like an investigative

reporter but I'd like to get as comfortable as I can with the bank."  At Davis's suggestion,

McDaniel forwarded the questions to Rodriguez-Tolentino, the president of SIB, along with a

request for a phone call on the topic.  The attached questions included: "My understanding is that

from 2000-2002, the Bank's portfolio returns were in the range [of 11% to 15%]. With S&P and

EAFE negative for all of those years, and yet a tolerance of up to 50% equity for the bank, how

was the bank's portfolio invested"; "What financial instruments and strategies are in place to
guard against significant losses in the portfolio, particularly on the equity side? Does each of the
managers hedge their own portfolios against loss or do you employ a separate manager to hedge
the total bank portfolio."; and "There are many people involved on the investment committee of
the Bank. How does this committee ensure that appropriate hedging is in place? This would seem
to require some sophisticated calculations outside the expertise of most investment committees."
FTI has located no evidence that Tolentino ever answered McDaniel's very basic questions.  By
late 2008, McDaniel nonetheless had increased his client SIB CD portfolio to over $13 million.
Between April 2006 and February 2009, he received $134,767 in SIB CD commissions, $84,359
in SIB quarterly bonuses, and $1,314,168 in loans.

22.      In March 2008, financial advisor Robert Ulloa wrote to Jason Green with a list of
similar concerns regarding SIB.  *See* KVT-17.  Ulloa inquired as to: "SIB's funding sources
other than CDs?"; "Which banks provide liquidity funding to SGC?"; "Liquidity funding, how
SGC does it?"; "SIB's Equity Investments, what percentage is private?"; "Have we
reduced/increased our exposure to financials?"; "How leveraged is Stanford, is it 30 to 1 like
most investment banks?"  Although Laura Pendergest-Holt suggested addressing Ulloa's
questions on an upcoming all-financial advisor call, noting "I am sure if he has these questions
others will as well," FTI has located no record of what, if any, answers were provided to the
group.  By late 2008, Ulloa had increased his client SIB CD portfolio to over $165 million.
Between 2005 and 2009 he received $3,585,168 in SIB CD commissions and $987,973 in SIB
quarterly bonuses.

23.      Also in March 2008, financial advisors Neal Clement, John Mark Holliday and
Scot Thigpen discussed SIB and how to "have a good story to tell prospective clients . . . in these

**App. 630**

difficult markets." *See* KVT-18.  Thigpen noted that it was "difficult . . . to show [SIB is] able to provide positive returns even in light of horrible market conditions."   Thigpen opined that "[a]ccredited investors are pretty savvy investors lots of times" and asked how one could show them the available SIB CD rates without showing them the underlying portfolio returns. Clement responded: "If I have a client that has to see the [SIB] portfolio, the SIB is not for them!!!!!"  By 2008, Clement's client SIB CD portfolio exceeded $20 million and Holliday's exceeded $3 million.  Between April 2006 and February 2009, Clement received $270,347 in SIB CD commissions, $163,882 in SIB quarterly bonuses, and $639,506 in forgivable loans; and Holliday received $33,358 in SIB CD commissions and $597,503 in forgivable loans.

24.    Thus, the SGC financial advisors had insufficient information upon which to make recommendations to clients regarding the suitability of SIB CDs.  The NASD reached the same conclusion as part of a 2006 inquiry into the SIB CD program and SGC's sales practices. Specifically, the NASD concluded that SGC had violated NASD rules through "unwarranted and misleading" assertions that SIB's portfolio investments were "prudent"—at a time when SGC admitted that "no one at SGC knows what the investments are."  *See* KVT-15.  This is fully consistent with, and indeed not surprising, given the SEC's similar findings going back to 1997.

## SIB's Use and Improper Compensation of a Small Antiguan Auditing Firm

25.    The complaints received by the SEC about SIB's use of a small Antiguan auditing firm, referenced above in ¶ 10, and the SEC's investigation of those issues, are consistent with and support my conclusions contained in the 7/27/2009 Declaration, 5/24/2010 Declaration, the 6/1/2011 Declaration and my opinions stated herein.

26.    When customers or financial advisors have concerns or questions about an investment product, one obvious way for them to investigate the product is to determine who the

**App. 631**

auditor is and contact them directly and to review audit reports.   Most multi-billion dollar investment funds go through rigorous audits by large and well-known audit firms and in fact switch auditors every few years to avoid even the appearance of impropriety.   This was not the case with SIB.   As reported in SIB's annual statements, and complained about by customers to the SEC as far back as 2002, SIB's auditing firm from the beginning was C.A.S. Hewlett & Co., Ltd., a very small local firm in Antigua.   The Hewlett firm lacked the apparent resources, credentials, reputation, and staff to audit a multi-billion dollar investment portfolio.   SIB used this firm even though at least 2 of the Big 4 audit firms and several other international firms had a presence on the island and all of the Big 4 had locations in the Caribbean.

27.     My team and I have been able to verify, through tracing, that SIB's external auditor, C.A.S. Hewlett, was paid, for professional services, $222,000 ($18,500 per month) in 2007 and $274,000 ($18,500 per month through April and $25,000 per month thereafter) in 2008, all from a Stanford Financial Group Limited account at Trustmark Bank in Houston, Texas.   FTI's schedules of payments made to C.A.S. Hewlett in 2007 and 2008 from the Trustmark account are attached as KVT-19.   The Stanford accounting department allocated these amounts, for internal accounting purposes, among nine different Stanford Entities, including SIB, as evidenced by the allocation spreadsheets attached hereto (with the emails to which they were attached) as KVT-20.

28.     We have also discovered that additional payments were made to C.A.S. Hewlett from a Stanford Financial Group, Ltd. ("SFGL") account at a Swiss bank named SG Private Banking (Suisse) S.A. ("SocGen Account").   In his plea agreement, James Davis described the SocGen Account as a "secret" account and stated that it was also used to pay bribes to Antiguan regulators.  KVT-24, p. 15.

**App. 632**

29.     On February 26, 2003, James Davis requested by letter that SocGen increase the monthly payment amount from the secret account to C.A.S. Hewlett from £10,000 sterling to £15,000 sterling effective March 1, 2003.  KVT 22.  On May 19, 2008, Davis requested by email that SocGen increase the monthly payments to C.A.S. Hewlett again from £15,000 (sterling) to £20,000 effective 15 June 2008.  KVT-21.  In addition to these monthly payments, however, the SocGen records filed by the DOJ show multiple additional payments from the secret SocGen Account to Hewlett, totaling hundreds of thousands of dollars:

- March 18, 2002 - £80,000 sterling
- September 7, 2005 - £6,000 sterling
- November 3, 2005 - $125,000
- December 5, 2005 - $125,000
- February 10, 2006 - $100,000
- May 2, 2007 - £16,000 sterling
- September 2, 2008  - £60,000 sterling
- September 8, 2008 - £60,000 sterling

These payments were over and above payments for C.A.S. Hewlett's audit services from SFGL's Trustmark account, and FTI has located no allocation records for these payments.

30.     The additional payments noted in paragraph 29 are important in considering the efficacy and legitimacy of the audits of SIB by C.A.S. Hewlett as both International Auditing Standards and FRSC regulations require that audits be "independent."  Based on our investigation, C.A.S. Hewlett appears not to have audited the vast majority of SIB's reported investments, even though they comprised 90% or more of SIB's assets.   Based on that fact, coupled with the large payments to C.A.S. Hewlett apparently unconnected with its audit fees, it appears that C.A.S. Hewlett's independence as an auditor of SIB was severely compromised.

## SIB'S FINANCIAL STATEMENTS WERE
## "REVERSE-ENGINEERED" FROM AT LEAST 1999 FORWARD

31.     Davis states in his plea agreement that as far back as at least 1999 assets were inflated to offset CD obligations and that revenue was "reverse-engineered" to arrive at desired levels.  KVT-24, pp. 12-15.  My findings are consistent with those admissions.

32.     We found within SIB's accounting records individual worksheets used to derive fictitious SIB revenue for each year from 2004 through 2008.  Within these same worksheets we also found the fictitious SIB revenue derived for the years 1999 through 2003.  The Ponzi scheme conspirators would simply determine what level of fictitious revenue and assets and resulting equity SIB needed to report financial performance and capital ratios that were both acceptable to regulators and attractive to investors and purported to cover its CD obligations and other expenses.  They would then back into that total amount by assigning equally fictitious revenue amounts to each category (equity, fixed income, precious metals, alternative, etc.) of a fictitious investment allocation.

33.     Based on our review and analysis of the worksheets used to derive the fictitious revenue amounts associated with those files, after comparing the figures in the spreadsheets to revenue figures reported on SIB's trial balance and financial statements, and after considering the statements made by James Davis, I have concluded that such worksheets were used to generate, or "reverse-engineer," false revenue figures back to at least 1999.

### SIB WAS INSOLVENT FROM AT LEAST 1999 FORWARD

34.     At the inception of the U.S. Receivership on February 16, 2009, SIB's total obligation to CD holders was approximately $7.2 billion (U.S.), versus reported investments valued at $8.3 billion as of December 31, 2008.  Based on my analysis, the market value of all assets for all Stanford Entities (including SIB) combined total less than $1 billion.  At the time

**App. 634**

SIB was placed into receivership, SIB was insolvent (*i.e.*, its liabilities exceeded the fair value of its assets) by more than $6 billion.

35.     Through further analysis of SIB's financial records, FTI has determined that SIB was insolvent by at least 1999 forward.  In particular, SIB did not have sufficient assets to cover its CD obligations; new investor money was required and was used to pay old investors from at least 1999 forward because there were insufficient assets to cover the CD redemption and interest liabilities.   SIB's reported assets consisted overwhelmingly of "financial assets" and cash.   The published balance sheets represented that "financial assets" were reported at "fair value."  Of course, cash, by definition, is stated at fair value (assuming correct reporting).   We know, however, from our investigation and review of internal SIB records that the fair value of the SIB financial assets was much smaller than reported.

36.     Each year, from 1999 forward, SIB's reported asset totals included, without disclosure to the public, outstanding "loans" or "notes receivable" from Allen Stanford.  SIB's financial records show that Allen Stanford's outstanding "loan" balances for the years 1999 through 2008 were at least as follows:

- December 31, 1999 - $52 million

- December 31, 2000 - $59.5 million

- December 31, 2001 - $112 million

- December 31, 2002 - $168 million

- December 31, 2003 - $335 million

- December 31, 2004 - $539 million

- December 31, 2005 - $630 million

- December 31, 2006 - $1.25 billion

- December 31, 2007 - $1.45 billion

**App. 635**

- December 31, 2008 - $1.79 billion

37.     The "loans" noted above have been deducted from the assets totals contained in
SIB's published financial statements to determine SIB's solvency because they are not valid
financial assets of SIB.  We have located and reviewed evidence that these purported loans were
merely bookkeeping entries used: (1) to cover up that SIB was sending funds to other Stanford
Entities and for the benefit of Allen Stanford; (2) to cover up improper accounting practices; and
(3) to obtain favorable tax results for Allen Stanford.  The evidence shows that the purported
loans were not created contemporaneously with actual transfers of funds, but were simply drafted
after the fact as a means to attain desired accounting effects on the Stanford Entities' books,
provide improper tax advantages to Mr. Stanford, and inappropriately increase SIB's equity
through an improper accounting entry.  For example, in at least one instance, both the
outstanding "loan" balance (recorded as an asset) and equity were increased by an equal amount
without any actual cash or other assets changing hands.  The increase in the so-called loan
balance over the years was composed of rollovers of fictitious accrued interest and additional
funds directed to various Stanford Entities and for the benefit of Mr. Stanford.  This pattern of
creating fake "loans" and falsifying assets and revenues goes back at least as far as November
1998, as the evidence establishes that the purported loan balance in that year was only $18.4
million and shows that the components of the increase in the so-called loan value for 1999, 2000,
and 2001 consisted primarily of interest rollovers, Mr. Stanford's purported assumption of debt
between Stanford entities and SIB, and SIB funds used to capitalize Stanford Entities.  These
"loans" were not actual, arms-length loans at all.  They were another tool used by the Stanford
Entities to cover up the real use of CD funds and inappropriately report the fake financial
condition of SIB and other Stanford Entities.

**App. 636**

38.     Even if the purported loans were considered to be true financial assets, we have concluded that Allan Stanford was either unable to pay the purported loans back or never intended to do so.  As of the date of the Receivership, Mr Stanford was unable to repay the $1.8 billion "loan," and he has stated numerous times that he lacked even sufficient assets to pay for his defense.  As noted below, the aggregate amount of non-Stanford income that Mr. Stanford claimed on his tax returns from 1999 through 2007 did not accumulate enough to allow him to buy a house, let alone pay back the SIB "loans" ranging from $52 million to $1.8 billion.  These purported notes were not disclosed to investors or even outside Allen Stanford's inner circle, and they were not separately noted in his tax returns as they should have been, which is discussed further below.  The so-called notes were always short term (due within one year), though never repaid, and they were unsecured by any other assets held by Mr. Stanford.  The manner in which these "loans" were recorded in the financial statements was not indicative of an appropriate arms-length transaction with a shareholder; instead, they were simply bookkeeping entries used to cover up SIB's transfer of CD funds to other Stanford Entities and for the benefit of Allen Stanford, to obtain favorable tax results for Allen Stanford, and to cover up improper accounting practices.  These purported loans to Mr. Stanford, which were classified by SIB as "financial assets at fair value," were inconsistent with the types of investments disclosed by SIB to investors.  Therefore, even if these so-called loans were considered to be appropriate financial assets (which they are not), they were uncollectible and have been deducted from the asset totals in SIB's financial statements in determining its solvency.

39.     When the above "loan" balances are deducted from the asset totals contained in SIB's published financial statements, I conclude that, from at least 1999 forward, SIB's reported liabilities exceeded the fair value of its assets and SIB was therefore insolvent.  The following

**App. 637**

table shows, for the years 1999 through 2008, the fair market value of SIB's assets (as reported

by SIB), excluding the "loans" to Allen Stanford, compared to the total reported liabilities of

SIB.

| Date | Adjusted Assets | Total Liabilities | Surplus/(Deficit) |
|------|------|------|------|
| 12/31/1999 | 623,893,966 | 628,067,020 | (4,173,054) |
| 12/31/2000 | 771,203,204 | 777,863,293 | (6,660,089) |
| 12/31/2001 | 1,085,830,292 | 1,122,829,384 | (36,999,092) |
| 12/31/2002 | 1,545,755,342 | 1,613,048,535 | (67,293,193) |
| 12/31/2003 | 1,890,506,026 | 2,090,477,407 | (199,971,381) |
| 12/31/2004 | 2,547,247,277 | 2,839,878,864 | (292,631,587) |
| 12/31/2005 | 3,428,961,957 | 3,776,659,957 | (347,698,000) |
| 12/31/2006 | 4,082,245,061 | 5,025,014,250 | (942,769,189) |
| 12/31/2007 | 5,603,317,128 | 6,702,960,952 | (1,099,643,824) |
| 12/31/2008 | 5,966,542,565 | 7,435,718,727 | (1,469,176,162) |

40.     When the above-referenced "loan" balances are deducted from SIB's asset totals

from 2000 forward, SIB's CD liabilities alone exceeded the fair market value of its assets.  The

following table shows, for the years 2000 through 2008, the fair market value of SIB's assets (as

reported by SIB), excluding the "loans" to Allen Stanford, compared to the CD liabilities of SIB.

| Date | Adjusted Assets | CD Deposits | Surplus/(Deficit) |
|------|------|------|------|
| 12/31/2000 | 771,203,204 | 772,261,025 | (1,057,821) |
| 12/31/2001 | 1,085,830,292 | 1,116,454,586 | (30,624,294) |
| 12/31/2002 | 1,545,755,342 | 1,606,062,398 | (60,307,056) |
| 12/31/2003 | 1,890,506,026 | 2,083,397,998 | (192,891,972) |

**App. 638**

| 12/31/2004 | 2,547,247,277 | 2,827,941,493 | (280,694,216) |
| 12/31/2005 | 3,428,961,957 | 3,763,011,041 | (334,049,084) |
| 12/31/2006 | 4,082,245,061 | 5,010,083,767 | (927,838,706) |
| 12/31/2007 | 5,603,317,128 | 6,689,964,304 | (1,086,647,176) |
| 12/31/2008 | 5,966,542,565 | 7,431,630,364 | (1,465,087,799) |

## FROM AT LEAST 1999 FORWARD, ALLEN STANFORD'S REPORTED INCOME WAS BASED ALMOST EXCLUSIVELY ON FUNDS FROM THE STANFORD ENTITIES

41.     Based on a review of records relating to the Stanford Entities and tax returns obtained from the IRS for Allen Stanford for the years 1999 through 2007, Allen Stanford received very little income from any source other than the Stanford Entities.  In three out of nine years covered by the tax returns, his non-Stanford income was less than $50,000.  For two additional years, it was under $100,000.  Even for years when he received over $100,000 in non-Stanford income, that income exceeded 2% of his total income only one time -- in 2005, when his non-Stanford income was 5.02% of his total income.[4]   The following table shows Allen Stanford's income for the years 1999 through 2007, broken down between income that came from the Stanford Entities and income that came from some other external source.

| Year | Reported Income | | | Percent of Reported Income | |
| | Stanford | Non-Stanford | Total | Stanford % | Non-Stanford % |
|---|---|---|---|---|---|
| 1999 | 5,364,783 | 69,926 | 5,434,709 | 98.71% | 1.29% |
| 2000 | 7,390,052 | 21,672 | 7,411,724 | 99.71% | 0.29% |
| 2001 | 15,828,358 | 136,774 | 15,965,132 | 99.14% | 0.86% |

[4]     The bulk of the non-Stanford income for 2005 was a capital gain in the amount of $2,600,620.  Although we have classified this amount as non-Stanford income, we actually do not have any information showing the source of that capital gain.  Thus, the capital gain may well be traceable to a source associated with the Stanford Entities.

**App. 639**

| | | | | | |
|---|---|---|---|---|---|
| **2002** | 27,691,286 | 27,257 | 27,718,543 | 99.90% | 0.10% |
| **2003** | 36,770,949 | 41,093 | 36,812,041 | 99.89% | 0.11% |
| **2004** | 298,180,436 | 85,052 | 298,265,488 | 99.97% | 0.03% |
| **2005** | 50,291,392 | 2,656,808 | 52,948,200 | 94.98% | 5.02% |
| **2006** | 43,302,997 | 457,342 | 43,760,339 | 98.95% | 1.05% |
| **2007** | 81,053,128 | 15,231 | 81,068,359 | 99.98% | 0.02% |
| **Grand Total** | **565,873,381** | **3,511,155** | **569,384,535** | 99.38% | 0.62% |

42.     The reported income from Stanford Entities and non-Stanford sources in the above paragraph do not show all of the Stanford funds provided to Allen Stanford.  In particular, Schedule F of IRS Form 5471, which was filed by Mr. Stanford for each year from 1999 through 2007, requires that the filer record information regarding loans to stockholders and other related persons.  Mr. Stanford, however, failed to record any of his purported SIB loans on this line item. In fact, from 1999 through 2007, Mr. Stanford never had enough reported income to repay the SIB "loans" that he had received.  For example, in 2003 the amount due on the so-called loan from SIB to Mr. Stanford was approximately $335 million, while the cumulative reported income from all years 1999 through 2003 was only approximately $93 million — a full $242 million less than the amount due on his SIB "loan."

43.     Moreover, Mr. Stanford diverted millions of dollars to his personal bank accounts from SFGL's SocGen Account, which account James Davis said, in his plea agreement, was both "secret" and funded by CD investor funds.  KVT-24, p. 15.  Based on the SocGen records filed by the DOJ, Mr. Stanford transferred over $78 million from the SocGen Account to his personal accounts between 2000 and 2006, specifically:

**App. 640**

- 2000 - $8.9 million

- 2001 - $500,000

- 2002 - $5 million

- 2003 - $39.5 million

- 2004 - $18 million

- 2006 - $6.5 million

44.     If you exclude any reported income known to be from the Stanford Entities, Mr. Stanford received only $3,511,155 from other sources between 1999 and 2007.  In fact, between 1999 and 2004, his non-Stanford income totaled only $381,774.  Although I do not have access to records concerning all personal expenses incurred by Allen Stanford during this time period, we learned that he purchased a yacht known as the Sea Eagle in November 2002 for $3.9 million, an amount that exceeds the total non-Stanford reported income Mr. Stanford received between 1999 and 2007.  *See* KVT-27.  Mr. Stanford's non-Stanford reported income does not even begin to cover the costs of the yacht.  In addition, over $18 million was spent to refurbish the Sea Eagle between June 2003 and February 2005.  *See* KVT-38.

45.     Although I do not have access to every record of Mr. Stanford's personal expenses incurred during this time period, our investigation has revealed that the vast majority of expenses that Mr. Stanford incurred, even for items or property used only for personal purposes, was actually paid by one or more of the Stanford Entities.  Just by way of example, Stanford Development Corporation purchased a home for Mr. Stanford and his wife in 1999 for a price of at least $2.15 million, which far exceeds his non-Stanford reported income not only for 1999 but for the entire period of 1999 through 2004.  *See* KVT-28.

**App. 641**

### "LOANS" FROM SIB AND TRANSFERS FROM THE SOCGEN ACCOUNT TO ALLEN STANFORD WERE FRAUDULENT

46.     As discussed in detail above, Allen Stanford received over $78 million from SFGL's SocGen Account and approximately $1.8 billion in purported loans from SIB.  I have reviewed section 24.005 of the Texas Uniform Fraudulent Transfer Act.  *See* TEX. BUS. & COMM. CODE ANN. § 24.005.  In particular, subsection (b) to section 24.005 provides a non-exhaustive list of eleven "badges of fraud" that may be used to determine whether a transfer was made with actual intent to hinder, delay, or defraud creditors.  I have determined that most of these badges of fraud are present in the transfers of "loans" and SocGen funds to Allen Stanford, as follows:

- The transfers of such funds were to an insider — namely Allen Stanford, owner of all Stanford Entities.

- Allen Stanford, who is a debtor himself, retained possession and control of the funds after the transfers and absconded with such funds.

- SIB, SFGL, and Allen Stanford removed the assets transferred to Allen Stanford, and they and other accomplices concealed the transfers of such assets.

- SIB and SFGL did not receive consideration that was reasonably equivalent to the value of the funds transferred to Allen Stanford; in particular, Allen Stanford's "promissory notes" were of no real value to SIB.

- SIB was insolvent when the transfers were made to Allen Stanford.

- SIB's transfer of funds to Allen Stanford occurred on or around the time that Allen Stanford incurred a substantial debt to repay SIB pursuant to the "loans" or "notes receivable."

### SFGC'S INCOME CAME ALMOST EXCLUSIVELY FROM THE STANFORD ENTITIES, WITHOUT WHICH IT WAS INSOLVENT

47.     Likewise, without funds from other Stanford Entities, SFGC was insolvent from at least 2000 forward.  SFGC was created for the purpose of providing services to SGC, SIB and other Stanford Entities.  During the course of our entire investigation since February 2009, we

have located no evidence which even suggests SFGC received any significant funds from sources other than the Stanford Entities.  In the periods we have analyzed, the percentage of revenue SFGC received from other Stanford Entities exceeded 94% of its total revenue in all but one year.   In 2004, the percentage was 82%; however, 17% of the remaining revenue was interest recorded on loans to the Government of Antigua.  These loans remain outstanding to date, and there is no indication that they were ever intended to be repaid.  I have stated in my prior declarations that the Stanford Entities were funded primarily by the proceeds from the sale of SIB CDs.  *See* KVT-26.  Accordingly, without the funds supplied by the Stanford Entities, SFGC was insolvent from at least 2000 through February 16, 2009.

**App. 643**

Executed this 2nd day of June, 2011.

_____

Karyl Van Tassel

**App. 644**

# KVT-5

# STANFORD FINANCIAL GROUP COMPANY

PRINCIPAL OPERATING OFFICE:
    5050 Westheimer
    Houston, TX 77056

INCORPORATION:
    Date:   9/16/93
    State:   Florida

CHARTER NO.: P93000065723
FEDERAL EMP. ID NO.: 74-2709825

LOCATION OF BRANCH OFFICES:

    201 S. Biscayne Boulevard
    12th Floor
    Miami, FL 33131

    6075 Poplar Avenue Suite 300
    Memphis, TN 38119

    508 E. Milam
    Mexia, TX 76667

ANNUAL STOCKHOLDERS MEETING:
    Date:         Annually, during the month of March
    Location:    Per stated notice of meeting

RESIDENT AGENT IN STATE OF INCORPORATION:
    Corporation Service Company
    1201 Hays St.
    Tallahassee, FL 32301

BUSINESS:      To provide Corporate, Administrative, Management and Financial Services to affiliated companies.

QUALIFIED TO DO BUSINESS IN:

| STATE: | DOING BUSINESS AS: |
|---|---|
| ALABAMA: | STANFORD FINANCIAL GROUP COMPANY OF FLORIDA, INC. |
| ARIZONA: | FLORIDA STANFORD FINANCIAL GROUP COMPANY (FN) |
| CALIFORNIA: | STANFORD FINANCIAL GROUP COMPANY WHICH WILL DO BUSINESS IN CALIFORNIA AS FLORIDA STANFORD FINANCIAL GROUP COMPANY |
| TEXAS: | STANFORD FINANCIAL GROUP COMPANY - FLORIDA |

CAPITAL STOCK:
Authorized:    1,000 shares at $ 0.01 per share
Total:         1,000
Issued:        1,000
Ownership:   100% - R. Allen Stanford

OFFICERS (As of 8/16/00):
President/Chairman of the Board/CEO: R. Allen Stanford
Chief Financial Officer/Treasurer:    James M. Davis
Secretary:                   Yolanda M. Suarez
Sr. VP/Director of Operations    Linda Wingfield

DIRECTORS (As of 11/01/99):
R. Allen Stanford
James M. Davis

BY LAWS / ARTICLES OF INCORPORATION / MINUTE BOOK KEPT AT:
    5050 Westheimer
    Houston, TX 77056

RESPONSIBLE:   Legal Department in Houston  PHONE: 713 964-5244

Revised: 05/25/06

**App. 646**

# SERVICES AGREEMENT
(this "Agreement")

This Agreement is entered into by and between Stanford International Bank Limited, a company existing pursuant to the laws of Antigua, hereafter known as "SIBL", and Stanford Financial Group Company, a company organized under the laws of the State of Florida, hereafter known as "SFGC" (collectively referred to as "the Parties").

WHEREAS, the Parties desire that SFGC continue providing administrative, human resources, legal and other services to SIBL.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is mutually covenanted and agreed by and between the Parties hereto as follows:

## DUTIES

1.    SFGC agrees that, during the term of this Agreement, it will provide the services described in this section to SIBL on a daily basis as the operations of SIBL may require; and,

2.    SFGC will provide administrative support including, without limitation, making its relevant employees available to SIBL as is necessary to provide management and administrative support to SIBL's day-to-day operations; and,

3.    SFGC will provide or engage others to provide accounting, legal, tax, operations, financial, treasury, and other related services, which may reasonably be requested by SIBL from time to time.

## SERVICE FEE

1.    In consideration for the aforementioned services, SIBL agrees to reimburse SFGC for all such costs incurred on behalf of SIBL.

2.    Management fees for SFGC will be as mutually agreed by the parties at the end of each month.

3.    The service fee shall be due and payable within 30 days of the invoice date from SFGC.

## TERM

1.    This Agreement shall be effective from December 29, 1994, and shall continue in full force and effect until either Party terminates the same by athirty (30) day written notice given to the other.

**App. 647**

## COVENANTS & GENERAL PROVISIONS

1. The Parties covenant and represent that they are each organized corporations in good standing under the laws of such jurisdictions under which they are organized and that the undersigned are officers of the same and authorized to execute this Agreement.

2. This Agreement may not be assigned in whole or in part without the prior written consent of the other Party.

3. This Agreement shall be deemed made in, and governed by, the laws of the state of Texas and in the event of a dispute, each Party hereby consents to the jurisdiction of the appropriate courts of the state of Texas to resolve such dispute.

4. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and assigns. Nothing in this Agreement, expressed or implied, is intended to confer on any person, other than the Parties or their respective successors and assigns, any rights, remedies or liabilities under this Agreement.

5. This Agreement constitutes the entire agreement between the Parties, contains all of the agreements between the Parties with respect to the subject matter hereof and supersedes any and all other agreements, either oral or written, between the Parties hereto with respect to the subject matter hereof.   No change or modification of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver of any provision of this Agreement shall be valid unless in writing and signed by the party against whom the waiver is sought to be enforced.

6. All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered or if received three business days after being mailed by certified or registered mail, postage prepaid, as follows:

| If to<br>Stanford Internal Bank Limited: | If to<br>Stanford Financial Group Company: |
|---|---|
| 4000 Airport Boulevard<br>St. Johns', Antigua WI<br>Attn: President/CEO | 5050 Westheimer<br>Houston, Texas 77056<br>Attn: General Counsel |

The parties may, by notice to the other party, change their respective addresses set forth above, said change of address to be effective upon receipt.

7. The section headings contained in this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

8. This Agreement may be executed in any number of counterparts, but all of such counterparts together shall constitute one and the same agreement.

**App. 648**

9.    No provision contained in this Agreement shall be deemed to have been abrogated or waived by reason of failure or delay to enforce the same, regardless of the number of breaches or violations, which may occur. This Agreement may be amended only by a writing executed by each party hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers, on <u>the 28th day of May, 20</u>02.

Stanford Financial Group Company               Stanford International Bank Limited.

By _____            By _____

Name  Yolanda M. Suarez                        Name   James M. Davis

Title  Secretary                               Title   Director, CFO

3

**App. 649**

# KVT-6

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



# REPORT OF INVESTIGATION

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION OFFICE OF INSPECTOR GENERAL

### Case No. OIG-526

### Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### March 31, 2010

## **REDACTION KEY**

AC = Attorney-Client Privilege

DPP = Deliberative Process Privilege

LE = Law Enforcement Privilege

PII = Personal Identifying Information

PP = Personal Privacy

WP = Attorney Work Product

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# Report of Investigation

## Investigation of the SEC's Response to Concerns Regarding Robert Allen Stanford's Alleged Ponzi Scheme

### Case No. OIG-526

# Table of Contents

INTRODUCTION AND BACKGROUND ........................................................................ 1

SCOPE OF THE OIG INVESTIGATION ......................................................................... 2

    I.    E-MAIL SEARCHES AND REVIEW OF E-MAILS ........................................... 2

    II.    DOCUMENT REQUESTS AND REVIEW OF RECORDS ............................. 3

    III.    TESTIMONY AND INTERVIEWS ..................................................... 4

RELEVANT STATUTES, RULES AND REGULATIONS ............................................ 10

EXECUTIVE SUMMARY ............................................................................................. 16

RESULTS OF THE INVESTIGATION ......................................................................... 29

    I.    IN 1997, THE FWDO EXAMINATION STAFF REVIEWED STANFORD'S BROKER-DEALER OPERATIONS AND MADE A REFERRAL TO ENFORCEMENT DUE TO A CONCERN THAT ITS SALES OF CDs CONSTITUTED A PONZI SCHEME ........................................................................... 29

        A.    Two Years After Stanford Group Company Began Operations, the SEC Identified It as a Risk and a Target For an Examination Based on Suspicions That Its CD Sales Were Fraudulent ........................................................................ 29

        B.    After Conducting a Short Examination, the Examination Staff Concluded That Stanford Was Probably Operating a Ponzi Scheme ........................................................................ 30

        C.    As a Result of Their Concerns That Stanford Was Operating a Ponzi Scheme, the Examination Staff Referred Their Stanford Findings to the Enforcement Staff .................................. 33

**App. 653**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

II.    EIGHT MONTHS AFTER THE EXAMINATION STAFF REFERRED STANFORD, THE ENFORCEMENT STAFF OPENED, AND QUICKLY CLOSED, A MATTER UNDER INQUIRY ................................................................................. 34

    A.    The 1998 Stanford MUI Was Likely Not Even Opened in Response to the Examination Staff's Referral, But in Response to a Concern From the U.S. Customs Department That Stanford Was Laundering Money ...................................................... 34

    B.    After Stanford Refused to Produce Documents, No Further Investigative Steps Were Taken .................................................. 36

    C.    The Enforcement Staff Closed the 1998 Stanford MUI Three Months After It Was Opened .......................................... 37

        1.    The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Was Not Warranted Because of the Lack of U.S. Investors .............................................. 38

        2.    The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Would Be Too Difficult Because of the Staff's Inability to Obtain Records From Antigua ..................................................................... 39

        3.    SGC's Outside Counsel, a Former Head Of The SEC's Fort Worth Office, May Have Assured Barasch That "There Was Nothing There" ...................................... 40

III.    IN 1998, THE FWDO EXAMINATION STAFF EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AND REACHED THE SAME CONCLUSION AS THE BROKER-DEALER EXAMINERS:  STANFORD'S CD SALES WERE PROBABLY FRAUDULENT .......................................................... 42

    A.    The 1998 Examination Concluded That SGC's Sales of SIB CDs Were Not Consistent With SGC's Fiduciary Obligation to Its Clients Under the Investment Advisers Act ................................................................................................... 44

    B.    The Enforcement Staff Failed to Consider the Investment Adviser Examiners' Concerns in Deciding Not to Investigate Stanford Further ..................................................... 46

**App. 654**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

IV.   IN 2002, THE SEC EXAMINERS EXAMINED SGC'S
      INVESTMENT ADVISER OPERATIONS AGAIN AND
      REFERRED STANFORD TO ENFORCEMENT ........................................... 47

      A.   In the 2002 Examination, the Examiners Found That
           Stanford's CD Sales Had Increased Significantly, Which
           Led to Concerns That the Potential Ponzi Scheme Was
           Growing .......................................................................................... 47

      B.   The 2002 Examination Found That SGC Was Violating the
           Investment Advisers Act By Failing to Conduct Any Due
           Diligence Related to the SIB CDs ............................................... 50

      C.   During the 2002 Examination, the FWDO Enforcement
           Staff Received a Letter From the Daughter of an Elderly
           Stanford Investor Concerned That the Stanford CDs Were
           Fraudulent ...................................................................................... 53

      D.   The FWDO Did Not Respond to the [Complainant 1] Letter and
           Did Not Take Any Action to Investigate Her Claims............................. 55

      E.   Although a Decision Was Made to Forward the [Complainant 1]
           Letter to the Texas State Securities Board, the Letter Was
           Never Forwarded ......................................................................... 56

      F.   In December 2002, the Examination Staff Referred Their
           Stanford Findings to the Enforcement Staff ............................................. 56

      G.   Based on the Earlier Decision to Forward the [Complainant 1]
           Letter to the TSSB, the "Matter" Was Considered Referred
           to the TSSB Even Before the 2002 Examination Report
           Was Sent to Enforcement............................................................. 57

      H.   The Enforcement Staff Did Not Open an Inquiry Into
           Stanford and Did Not Even Review the 2002 Examination
           Report........................................................................................... 58

      I.   The Enforcement Staff Did Not Refer the 2002
           Examination Report Findings to the TSSB................................. 59

      J.   In December 2002, the SEC Examination Staff Attempted
           to Interest the Federal Reserve in Investigating Stanford,
           But Concluded That the Federal Reserve Had [DPP]
           [DPP] of Stanford .................................................................. 60

**App. 655**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

V.  IN 2003, THE SEC ENFORCEMENT STAFF RECEIVED
TWO COMPLAINTS THAT STANFORD WAS A PONZI
SCHEME, BUT NOTHING WAS DONE TO PURSUE THOSE
COMPLAINTS ............................................................................................. 63

    A.  <span style="background:black;color:white">Confidential Source</span> in a Ponzi Scheme Case Filed By the SEC
Noted Several Similarities Between That Case and
Stanford's Operations ................................................................ 63

    B.  An Anonymous Insider Warned That Stanford Was
Operating "a Massive Ponzi Scheme" ....................................... 65

VI.  IN OCTOBER 2004, THE EXAMINATION STAFF
CONDUCTED A FOURTH EXAMINATION OF SGC IN
ORDER TO REFER STANFORD TO THE ENFORCEMENT
STAFF AGAIN ........................................................................................... 70

    A.  The Examination Staff Was Alarmed at the Increasing Size
of the Apparent Ponzi Scheme, and Accordingly, Made
Another Enforcement Referral of Stanford a "Very High
Priority" ..................................................................................... 70

    B.  The 2004 Examination Report Concluded That the SIB
CDs Were Securities and Were Part of a "Very Large Ponzi
Scheme" ..................................................................................... 72

    C.  The Examination Staff Conducted Significant Investigative
Work During the Six Months From October 2004 Through
March 2005 to Bolster Its Anticipated Enforcement
Referral ...................................................................................... 74

    D.  In March 2005, Barasch and Degenhardt Learned of the
Examination Staff's Work on Stanford and Told Them That
it Was Not a Matter That Enforcement Would Pursue ............... 79

VII.  IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT
THE SEC, THE EXAMINATION STAFF REFERRED
STANFORD TO ENFORCEMENT .............................................................. 80

    A.  The Enforcement Staff Initially Reacted Enthusiastically to
the Referral and Opened a MUI ................................................ 83

    B.  By June 2005, the Enforcement Staff Had Decided to Refer
the Matter to the NASD, Apparently as a Precursor to
Closing the Matter ...................................................................... 86

**App. 656**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

C.   In September 2005, the Enforcement Staff Decided to
Close the Stanford Investigation, But the Examination Staff
Fought to Keep the Matter Open ............................................................. 90

D.   In November 2005, the Head of the FWDO Enforcement
Group Overruled Her Staff's Objections to Continuing the
Stanford Investigation and Decided to Seek a Formal Order
in Furtherance of That Investigation ........................................................ 95

VIII.   THE ENFORCEMENT STAFF REJECTED THE
POSSIBILITY OF FILING AN "EMERGENCY ACTION"
AGAINST SIB BASED ON CIRCUMSTANTIAL EVIDENCE
THAT IT WAS OPERATING A PONZI SCHEME ......................................... 98

IX.   THE ENFORCEMENT STAFF REJECTED THE
POSSIBILITY OF FILING AN ACTION AGAINST SGC'S
BROKER-DEALER FOR VARIOUS VIOLATIONS OF THE
FEDERAL SECURITIES LAWS ................................................................... 103

X.   THE ENFORCEMENT STAFF DID NOT CONSIDER FILING
AN ACTION UNDER THE INVESTMENT ADVISERS ACT
THAT COULD HAVE POTENTIALLY SHUT DOWN SGC'S
SALES OF THE SIB CDs .............................................................................. 109

A.   The Issue of Whether the Stanford CDs Were Securities
Was Irrelevant to an Action Against SGC For Violations of
the Anti-Fraud Provisions of the Investment Advisers Act .................... 110

B.   The Enforcement Staff Did Not Consider Filing a Section
206 Case or Conducting a Section 206 Investigation ............................. 112

1.   The 2005 Referral Did Not Mention Section 206 .......................... 112

2.   Neither Cohen's nor Preuitt's November 2005
Memorandum Discussed a Section 206 Violation .......................... 113

3.   When the FWDO Staff Met With Addleman, She
Was Unaware That SGC Was an Investment Adviser ................... 114

C.   The Enforcement Staff Could Have Filed a Section 206 Case
With the Potential For Shutting Down SGC's Sales of the
SIB CDs and/or Discovering Evidence of the Ponzi Scheme ................. 115

XI.   HAD THE SEC FILED AN ACTION EARLIER,
SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY
HAVE BEEN AVOIDED ............................................................................... 118

**App. 657**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

XII.   THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING
AN ACTION AGAINST STANFORD EARLIER WAS DUE,
IN PART, TO THE STAFF'S PERCEPTION THAT THE
CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF
CASE FAVORED BY THE COMMISSION.................................................. 121

A.   Senior Enforcement Management Emphasized the Need
For "Stats"............................................................................... 121

B.   The Pressure For "Stats" May Have Discouraged the Staff
From Pursuing Difficult Cases ............................................... 124

C.   Ponzi Scheme Cases Were Disfavored by Senior
Enforcement Officials............................................................. 128

D.   The SEC Bureaucracy May Have Discouraged the Staff
From Pursuing Novel Legal Cases .......................................... 129

XIII. AFTER LEAVING THE SEC, BARASCH SOUGHT TO
REPRESENT STANFORD IN CONNECTION WITH THE
SEC INVESTIGATION ON THREE SEPARATE OCCASIONS
AND DID REPRESENT STANFORD FOR A LIMITED
PERIOD OF TIME ........................................................................ 131

A.   In June 2005, Two Months After Leaving the SEC, Barasch
Sought to Represent Stanford and Was Advised He Could
Not Do So ............................................................................... 131

B.   In September 2006, Stanford Retained Barasch to
Represent it in Connection With the SEC's Investigation of
Stanford, and Barasch Performed Legal Work on Behalf of
Stanford.................................................................................. 137

C.   In Late November 2006, After He Had Already Performed
Legal Work on Stanford's Behalf, Barasch For the Second
Time Sought SEC Approval to Represent Stanford and Was
Again Told He Could Not Do So............................................. 142

D.   Immediately After the SEC Sued Stanford on February 17,
2009, Barasch Again Sought to Represent Stanford, This
Time in the Litigation ............................................................ 145

CONCLUSION.......................................................................................... 149

**App. 658**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

## INTRODUCTION AND BACKGROUND

On February 17, 2009, the Securities and Exchange Commission ("SEC" or
"Commission") filed an action in the U.S. District Court for the Northern District of
Texas alleging that Robert Allen Stanford and his companies (collectively, hereinafter,
referred to as "Stanford") orchestrated an $8 billion fraud based on false promises of
guaranteed returns related to certificates of deposit ("CDs") issued by the Antiguan-based
Stanford International Bank ("SIB").  The SEC's Complaint alleged that SIB sold
approximately $8 billion of CDs to investors by promising returns that were "improbable,
if not impossible."  Complaint, *SEC v. Stanford International Bank, Ltd., et al.*, Case No.
3-09CV0298-L (N.D. Tex. filed February 17, 2009), attached as Exhibit 1, at ¶ 30.
Pursuant to the SEC's request for emergency relief, the Court immediately issued a
temporary restraining order, froze the defendants' assets, and appointed a receiver to
marshal those assets.[1]  After reviewing documents obtained from the court-appointed
receiver, the SEC filed an amended complaint on February 27, 2009, further alleging that
Stanford was conducting a Ponzi scheme.[2]

Shortly after the SEC filed its action against Stanford, the SEC's Office of
Inspector General ("OIG") received several complaints alleging that the SEC's Fort
Worth District Office ("FWDO")[3] had not diligently pursued its investigation of Stanford
until the Madoff Ponzi scheme collapsed in December 2008.  The complaints also
criticized the SEC for "standing down" from its investigation at some point in response to
a request from another federal law enforcement entity.

The OIG investigated those specific allegations and issued a report on June 19,
2009.  *See* Report of Investigation ("ROI"), Case No. OIG-516, entitled, "Investigation of
Fort Worth Regional Office's Conduct of the Stanford Investigation."[4]  The OIG

---

[1]   *See* Temporary Restraining Order, Order Freezing Assets, Order Requiring An Accounting, Order
Requiring Preservation of Documents, and Order Authorizing Expedited Discovery, *SEC v. Stanford
International Bank, Ltd., et al.*, Case No. 3-09CV0298-L (N.D. Tex. filed February 17, 2009), attached as
Exhibit 2; Order Appointing Receiver, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-
09CV0298-L (N.D. Tex. filed February 17, 2009), attached as Exhibit 3.

[2]   *See* First Amended Complaint, *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3-09CV0298-
L (N.D. Tex. filed February 27, 2009), attached as Exhibit 4.

[3]   The Fort Worth office of the SEC was elevated to a Regional Office on April 2, 2007.  Since then, the
Fort Worth office has reported directly to the SEC's Headquarters Office in Washington, DC.  Prior to
April 2007, the Fort Worth office was a District Office that reported to the SEC's Central Regional Office
in Denver.

[4]   The OIG investigation found that the FWDO staff had investigated Stanford before the December 2008
revelations about Madoff's Ponzi scheme, but that its efforts to pursue its suspicions of a Ponzi scheme had
been hampered by:  1) a lack of cooperation on the part of Stanford and his counsel; 2) certain jurisdictional
obstacles; and 3) according to a U.S. Department of Justice ("DOJ") indictment, criminal obstruction of the
FWDO's Stanford investigation by several individuals including the head of Antigua's Financial Services
Regulatory Commission.  *See* Report of Investigation, Case No. OIG-516, entitled "Investigation of Fort
        (Footnote continued on next page.)

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

received a letter, dated October 9, 2009, from the Honorable David Vitter, United States Senate, and the Honorable Richard Shelby, United States Senate, requesting "a more comprehensive and complete investigation of the handling of the investigation into Robert Allen Stanford and his various companies.…"  The letter specifically requested that the OIG review, *inter alia*, the "history of all of the SEC's investigations and examinations (conducted either by the Division of Enforcement or by the Office of Compliance Inspections and Examinations) regarding Stanford."  Accordingly, the OIG opened this investigation on October 13, 2009.  This investigation focused on any indications that the SEC had received prior to 2006 that Stanford was operating a Ponzi scheme or other similar fraud and what actions, if any, the SEC took in response.

## SCOPE OF THE OIG INVESTIGATION

### I.     E-MAIL SEARCHES AND REVIEW OF E-MAILS

Between October 13, 2009, and February 16, 2010, the OIG made numerous requests to the SEC's Office of Information Technology ("OIT") for the e-mails of current and former SEC employees for various periods of time pertinent to the investigation.  The e-mails were received, loaded onto computers with specialized search tools and searched on a continuous basis throughout the course of the investigation.

In all, the OIG received from OIT e-mails for a total of 42 current and former SEC employees for various time periods pertinent to the investigation, ranging from 1997 to 2009.  These included:  35 current or former FWDO employees, two current or former Headquarters Office of Compliance Inspections and Examinations ("OCIE") employees, two current or former Headquarters Division of Trading and Markets employees, one current Headquarters Division of Enforcement ("Enforcement") employee, one current Headquarters Ethics Office employee, and one former Office of Economic Analysis ("OEA") employee.  The OIG estimates that it obtained and searched over 2.7 million e-mails during the course of its investigation.

---

Worth Regional Office's Conduct of the Stanford Investigation." at http://www.sec.gov/foia/docs/oig-516-redacted.pdf.

The OIG investigation also found that in April 2008, the FWDO staff had referred its suspicion that Stanford was operating a Ponzi scheme to DOJ, and that subsequently, the FWDO staff, at DOJ's request, had effectively halted its Stanford investigation.  *Id.*  Immediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation had become more urgent for the FWDO staff and, after ascertaining that the DOJ investigation was in its preliminary phase, the FWDO staff had moved forward with its Stanford investigation.  *Id.*

**App. 660**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## II.      DOCUMENT REQUESTS AND REVIEW OF RECORDS

On October 27, 2009, the OIG sent comprehensive document requests to both Enforcement and OCIE, specifying the documents and records we required to be produced for the investigation.  The OIG had numerous e-mail and telephonic communications with Enforcement and OCIE regarding the scope and timing of the document requests and responses, as well as meetings to clarify and expand the document requests, as necessary.

We carefully reviewed and analyzed the information received as a result of our document production requests.  These documents included, but were not limited to, those relating to:  (1) a 1998 Stanford inquiry (MFW-00894); (2) a Stanford inquiry and investigation opened in 2005 (MFW-02973 and FW-02973); (3) a 1997 Broker-Dealer ("B-D") examination of Stanford (Examination No. 06-D-97-037); (4) a 1998 Investment Adviser ("IA") examination of Stanford (Examination No. 98-F-71); (5) a 2002 IA examination of Stanford (Examination No. IA 2003 FWDO 012); and (6) a 2004 B-D examination of Stanford (Examination No. BD 2005 FWDO 001).  In instances when documents were not available concerning a relevant matter, the OIG sought testimony and conducted interviews of current and former SEC personnel with possible knowledge of the matter.

The OIG also requested documents from the Financial Industry Regulatory Authority ("FINRA"), including documents concerning communications between FINRA or its predecessor, the National Association of Securities Dealers ("NASD") and the SEC concerning Stanford, and documents concerning the SEC's examinations and inquiries of Stanford.  The OIG also received and reviewed documents provided by the Stanford Victims Coalition, including the results of surveys of Stanford investors conducted by the Stanford Victims Coalition.

The OIG also reviewed numerous other publicly available documents, including: (1) Complaints filed by the SEC against Stanford and related parties in 2009; (2) the 2009 indictment of Robert Allen Stanford and others; (3) articles in various news media concerning Stanford; and (4) SEC Litigation Releases and an Administrative Proceeding Release concerning ███████

**App. 661**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## III.    TESTIMONY AND INTERVIEWS

The OIG conducted 51 testimonies and interviews of 48 individuals with
knowledge of facts or circumstances surrounding the SEC's examinations and/or
investigations of Stanford and his companies.

SEC Inspector General H. David Kotz personally led the questioning in the
testimony and interviews of nearly all the witnesses in the investigation.  Kotz also led
the investigative team for this ROI, which included ████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████[5].

The OIG conducted testimony on-the-record and under oath of the following 28
individuals:

1)      Julie Preuitt, Assistant Director (former Branch Chief), FWDO Broker-
        Dealer Examination group, Securities and Exchange Commission; taken
        on December 14, 2009 ("December 14, 2009 Preuitt Testimony Tr."), and
        January 26, 2010 ("January 26, 2010 Preuitt Testimony Tr.").  Excerpts of
        Testimony Transcripts attached as Exhibits 5 and 6, respectively.

2)      ████████████████, former Staff Attorney, FWDO Enforcement program,
        Securities and Exchange Commission; taken on December 14, 2009
        ("████████ Testimony Tr.").  Excerpts of Testimony Transcript attached
        as Exhibit 7.

3)      Mary Lou Felsman, former Assistant District Administrator, FWDO
        Examination program, Securities and Exchange Commission; taken on
        December 15, 2009 ("Felsman Testimony Tr.").  Excerpts of Testimony
        Transcript attached as Exhibit 8.

4)      ████████████ Staff Accountant, FWDO Broker-Dealer Examination
        group, Securities and Exchange Commission; taken on December 15,
        2009 ("████████ Testimony Tr.").  Excerpts of Testimony Transcript attached
        as Exhibit 9.

5)      Unidentified former Branch Chief, FWDO Enforcement program,
        Securities and Exchange Commission; December 15, 2009 ("Unidentified
        Former FWDO Enforcement Branch Chief Testimony Tr.").  Excerpts of
        Interview Transcript attached as Exhibit 10.

---

[5]    Significant assistance in this investigation was also provided by ██████████████████
████████████████████████████████████████████████████████████████████████████

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

6)   ▓IA Examiner 3▓ Examiner, FWDO Investment Adviser Examination group,
Securities and Exchange Commission; taken on January 11, 2010 ("▓IA Examiner 3▓
Testimony Tr.").  Excerpts of Interview Transcript attached as Exhibit 11.

7)   ▓IA Examiner 1▓ Examiner, FWDO Investment Adviser Examination
group, Securities and Exchange Commission; taken on January 11, 2010
("▓IA Examiner 1▓ Testimony Tr.").  Excerpts of Testimony Transcript attached as
Exhibit 12.

8)   ▓ENF BC 4▓, Branch Chief, FWDO Enforcement program, Securities
and Exchange Commission; taken on January 11, 2010 ("▓ENF BC 4▓
Testimony Tr.").  Excerpts of Testimony Transcript attached as Exhibit
13.

9)   ▓ENF Staff Atty 6▓, Staff Attorney, FWDO Enforcement program, Securities and
Exchange Commission; taken on January 11, 2010.

10)  ▓ENF Staff Atty 4▓ Staff Attorney, FWDO Enforcement program, Securities
and Exchange Commission, ▓PII▓
▓PII▓ taken on January 11,
2010 ▓ENF Staff Atty▓ Testimony Tr.").  Excerpts of Testimony Transcript attached
as Exhibit 14.

11)  ▓ENF BC 2▓, Branch Chief, FWDO Enforcement program,
Securities and Exchange Commission; taken on January 12, 2010
("▓ENF BC 2▓ Testimony Tr.").  Excerpts of Testimony Transcript attached
as Exhibit 15.

12)  Unidentified former Branch Chief, FWDO Examination group, Securities
and Exchange Commission; taken on January 12, 2010 ("Unidentified
Former FWDO Examination Branch Chief Testimony Tr.").  Excerpts of
Testimony Transcript attached as Exhibit 16.

13)  ▓IA Examiner 2▓ Examiner, FWDO Investment Adviser Examination group,
Securities and Exchange Commission; taken on January 13, 2010
("▓IA Examiner 2▓ Testimony Tr.").  Excerpts of Testimony Transcript attached as
Exhibit 17.

14)  ▓BD Exam BC 3▓ ▓PII▓ Branch
Chief, FWDO Broker-Dealer Examination group and former Examiner,
FWDO Investment Adviser Examination group, Securities and Exchange
Commission; taken on January 26, 2010.

15)  Victoria Prescott, Special Senior Counsel, FWDO Broker-Dealer
Examination group, Securities and Exchange Commission; taken on

**App. 663**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

January 27, 2010 ("Prescott Testimony Tr.").  Excerpts of Testimony
Transcript attached as Exhibit 18.

16)     ████ENF Asst Dir 1████, Assistant Director, FWDO Enforcement program, Securities
        and Exchange Commission; taken on January 27, 2010█ENF Asst Dir 1█estimony
        Tr.").  Excerpts of Testimony Transcript attached as Exhibit 19.

17)     Hugh Wright, former Assistant District Administrator, FWDO
        Examination group (former Assistant Director, FWDO Enforcement
        program), Securities and Exchange Commission; taken on January 27,
        2010 ("Wright Testimony Tr.").  Excerpts of Testimony Transcript
        attached as Exhibit 20.

18)     ████Exam Sr Cnsl████ Senior Counsel, FWDO Examination program,
        Securities and Exchange Commission; taken on January 27, 2010
        ("█Exam Sr Cnsl█ Testimony Tr.").  Excerpts of Testimony Transcript attached
        as Exhibit 21.

19)     Katherine Addleman, former Associate District Director, FWDO
        Enforcement group, Securities and Exchange Commission; taken on
        January 28, 2010 ("Addleman Testimony Tr.").  Excerpts of Testimony
        Transcript attached as Exhibit 22.

20)     ███BD Exam BC 2███ Branch Chief ██PII██████████, FWDO Broker-Dealer
        Examination group, Securities and Exchange Commission; taken on
        January 28, 2010██BD Exam BC 2█Testimony Tr.").  Excerpts of Testimony
        Transcript attached as Exhibit 23.

21)     ████BD Exam BC 1████Branch Chief, FWDO Broker-Dealer Examination
        group, Securities and Exchange Commission; taken on January 28, 2010
        ██BD Exam BC 1██ Testimony Tr.").  Excerpts of Testimony Transcript attached
        as Exhibit 24.

22)     Jeffrey Cohen, Assistant Director, FWDO Enforcement program,
        Securities and Exchange Commission; taken on February 16, 2010
        ("Cohen Testimony Tr.").  Excerpts of Testimony Transcript attached as
        Exhibit 25.

23)     ███ENF Staff Atty 5███ Trial Counsel, FWDO██PII████████████
        FWDO Enforcement program), Securities and Exchange Commission;
        taken on February 16, 2010 (█ENF Staff Atty█ Testimony Tr.").  Excerpts of
        Testimony Transcript attached as Exhibit 26.

**App. 664**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

24)  [ENF Staff Atty 2] Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; taken on February 16, 2010 [ENF Staff Atty] Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 27.

25)  Richard Connor, Assistant Ethics Counsel, Securities and Exchange Commission; taken on February 23, 2010 ("Connor Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 28.

26)  [BD Examiner 1] Examiner, FWDO Broker-Dealer Examination group, Securities and Exchange Commission; taken on February 26, 2010 [BD Examiner 1] Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 29.

27)  [ENF BC 3] Branch Chief, FWDO Enforcement program, Securities and Exchange Commission; taken on March 2, 2010 [ENF BC 3] Testimony Tr."). Excerpts of Testimony Transcript attached as Exhibit 30.

28)  [Sen Cnsl] Senior Counsel, [PII] Securities and Exchange Commission; taken on March 11, 2010.

The OIG also conducted interviews of the following 20 persons with relevant expertise and/or knowledge of information pertinent to the investigation:

1)  Julie Preuitt, Assistant Director (former Branch Chief), FWDO Broker-Dealer Examination group; conducted on October 2, 2009 ("Preuitt Interview Tr."), and November 2, 2009 ("Preuitt Interview Memorandum"), attached as Exhibits 31 and 32, respectively.

2)  Victoria Prescott, Special Senior Counsel, FWDO Broker-Dealer Examination program, Securities and Exchange Commission; conducted on October 29, 2009 ("Prescott Interview Tr."). Excerpts of Interview Transcript attached as Exhibit 33.

3)  [ENF Staff Atty 4] Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; conducted on November 3, 2009 ("[ENF Staff Atty 4] Interview Tr."). Excerpts of Interview Transcript attached as Exhibit 34.

4)  [ENF Staff Atty 3] former Staff Attorney, FWDO Enforcement program, Securities and Exchange Commission; conducted on November 9, 2009.

5)  [OEA 1] [PII] SEC Office of Economic Analysis, Securities and Exchange Commission; conducted on February 3 and 5, 2010 [OEA 1] Interview Memorandum"). Memorandum of Interview attached as Exhibit 35.

**App. 665**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

6) Harold Degenhardt, former District Administrator, FWDO, Securities and Exchange Commission; conducted on February 17, 2010 ("Degenhardt Interview Memorandum").  Memorandum of Interview attached as Exhibit 36.

7) Wayne Secore, Partner, Secore & Waller LLP; former District Administrator, FWDO; conducted February 17, 2010 ("Secore Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 37.

8) Jack Ballard, Partner, Ballard & Littlefield, L.L.P.; former Partner, Ogden Gibson White & Broocks, L.L.P.; conducted February 19, 2010 ("Ballard Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 38.

9) [TSSB Empl 1] [PII] Texas State Securities Board; conducted on February 24, 2010 [TSSB Empl 1] Interview Memorandum").  Memorandum of Interview attached as Exhibit 39.

10) Denise Crawford, Texas Securities Commissioner, Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum"). Memorandum of Interview attached as Exhibit 40.

11) [TSSB Empl 2] [PII] Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum"). Memorandum of Interview attached as Exhibit 40.

12) [TSSB Empl 3] [PII] Texas State Securities Board; conducted on March 1, 2010 ("TSSB Interview Memorandum").  Memorandum of Interview attached as Exhibit 40.

13) Spencer Barasch, Partner, Andrews Kurth LLP; former Assistant Director, FWDO Enforcement program, Securities and Exchange Commission; conducted on March 2, 2010 ("Barasch Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 41.

14) Leyla [Basagoitia] Wydler, former registered representative of Stanford Group Company; conducted on March 3, 2010 ("Wydler Interview Tr."). Excerpts of Interview Transcript attached as Exhibit 42.

15) Charles Rawl, President, Zenith Wealth Management, LLC; former Financial Advisor, Stanford Group Company; conducted on March 9, 2010 ("Rawl and Tidwell Interview Tr.").  Excerpts of Interview Transcript attached as Exhibit 43.

16) Mark Tidwell, CEO, Zenith Wealth Management, LLC; former Financial Advisor, Stanford Group Company; conducted on March 9, 2010 ("Rawl

**App. 666**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

and Tidwell Interview Tr."). Excerpts of Interview Transcript attached as
Exhibit 43.

17) ███████ Division of Risk, Strategy, and
Financial Innovation; conducted on March 22, 2010 ██████ Interview
Memorandum"). Memorandum of Interview attached as Exhibit 44.

18) ███████ Division of Risk, Strategy, and
Financial Innovation; conducted on March 23, 2010 ██████ and Berman
Interview Memorandum"). Memorandum of Interview attached as Exhibit
45.

19) Gregg Berman, Senior Policy Advisor, Division of Risk, Strategy, and
Financial Innovation; conducted on March 23, 2010 ██████ and Berman
Interview Memorandum"). Memorandum of Interview attached as Exhibit
45.

20) Stanford Victim; conducted on March 26, 2010 ("Stanford Victim
Interview Memorandum"). Memorandum of Interview attached as Exhibit
46.

**App. 667**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## RELEVANT STATUTES, RULES AND REGULATIONS

### The Commission's Conduct Regulation and Canons of Ethics

The Commission's Regulation Concerning Conduct of Members and Employees and Former Members and Employees of the Commission (hereinafter "Conduct Regulation"), at 17 C.F.R. §§ 200.735-1 *et seq*., sets forth the standards of ethical conduct required of Commission members and current and former employees of the SEC (hereinafter, referred to collectively as "employees").  The Conduct Regulation states in part:

> The Securities and Exchange Commission has been entrusted by Congress with the protection of the public interest in a highly significant area of our national economy.  In view of the effect which Commission action frequently has on the general public, it is important that . . . employees . . . maintain unusually high standards of honesty, integrity, impartiality and conduct. . . .

17 C.F.R. § 200.735-2.

Rule 8 of the Conduct Regulation prohibits a former Commission employee from appearing before the Commission in a representative capacity in a particular matter in which he or she participated personally and substantially while an employee of the Commission.  17 C.F.R. § 200.735-8 (a)(1).[6]  For purposes of Rule 8, a matter is defined as a "discrete and isolatable transaction or set of transactions between identifiable parties."  17 C.F.R. § 200.735-8(a)(1).

The Commission's staff has the obligation to continuously and diligently examine and investigate instances of securities fraud, as set forth in the Commission's Canons of Ethics.  17 C.F.R. §§ 200.50, *et seq*.  The Canons of Ethics state that "[i]t is characteristic of the administrative process that the Members of the Commission and their place in public opinion are affected by the advice and conduct of the staff, particularly the professional and executive employees."  17 C.F.R. § 200.51.  Hence, "[i]t [is] the policy of the Commission to require that employees bear in mind the principles in the Canons." *Id.*

---

[6]    Rule 8 also imposes a two-year restriction on a former employee from appearing before the Commission in a representative capacity in any matter that was under his or her official responsibility as an employee of the Commission "at any time within a period of [one] year prior to the termination of such responsibility."  17 C.F.R. § 200.735-8(a)(3).

**App. 668**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The Canons provide that "[i]n administering the law, members of this Commission should vigorously enforce compliance with the law by all persons affected thereby." 17 C.F.R. § 200.55.  The Canons acknowledge that Members of the Commission "are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people," and that "[i]t is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens." 17 C.F.R. § 200.53.  According to the Canons, "[t]heir success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions." *Id.*  The Canons also affirm, "A member should not be swayed by partisan demands, public clamor or considerations of personal popularity or notoriety; so also he should be above fear of unjust criticism by anyone." 17 C.F.R. § 200.58.  The Canons further state, "A member should not, by his conduct, permit the impression to prevail that any person can improperly influence him, or that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person." 17 C.F.R. § 200.61.

### Government-Wide Standards of Ethical Conduct

The Standards of Ethical Conduct for Employees of the Executive Branch include the following general principles that apply to every federal employee:

(1)     Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.

* * *

(5)     Employees shall put forth honest effort in the performance of their duties.

* * *

(14)    Employees shall endeavor to avoid any actions creating the appearance that they are violating the law of the ethical standards set forth in this part.  Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

5 C.F.R. § 2635.101(b).

11

**App. 669**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

## Federal Post-Employment Statutes and Rules

Federal conflict-of-interest laws impose on former government employees a lifetime ban on making a communication to or appearance before a federal agency or court as follows:

> Any person who is an officer or employee . . . of the executive branch of the United States (including any independent agency of the United States) . . . and who, after termination of his or her service or employment with the United States . . ., knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department agency [or] court . . . on behalf of any other person (except the United States . . . ) in connection with a particular matter –
>
> > (A)   in which the United Sates . . . is a party or has a direct and substantial interest,
> >
> > (B)   in which the person participated personally and substantially as such officer or employee, and
> >
> > (C)   which involved a specific party or specific parties at the time of such participation,
>
> shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a)(1).[7]

The statute defines "the term 'participated' [as] an action taken as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or other such action…."  18 U.S.C. § 207(i)(2).  *See also* 5 C.F.R. § 2641.201(i)(1).  Under the implementing ethics regulations, "[t]o participate 'personally' means to participate:  (i) Directly, either individually or in combination with other persons; or (ii) Through direct and active supervision of the participation of any person [the employee] supervises, including a subordinate."  5 C.F.R. § 2641.201(i)(2). "To participate 'substantially' means that the employee's involvement is of significance to the matter."  5 C.F.R. § 2641.201(i)(3).  Participation may be substantial even if "it is not determinative of the outcome of a particular matter."  *Id.*

---

[7]     In addition, like Rule 8(a)(3), 18 U.S.C. § 207(a)(2) contains a two-year restriction pertaining to particular matters which a former employee "knows or reasonably should know [were] actually pending under his or her official responsibility as [a government] officer or employee within a period of [one] year before the terminating of his or her service or employment with the United States . . . ."

12

**App. 670**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Further, the statute defines "the term 'particular matter' [as] any investigation,
application, request for a ruling or determination, rulemaking, contract, controversy,
claim, charge, accusation, arrest, or judicial or other proceeding."  18 U.S.C. § 207(i)(3).
The implementing regulations clarify the statutory prohibition as follows:

> The prohibition applies only to communications or
> appearances in connection with the same particular matter
> involving specific parties in which the former employee
> participated as a Government employee.  The same
> particular matter may continue in another form or in part.
> In determining whether two particular matters involving
> specific parties are the same, all relevant factors should be
> considered, including the extent to which the matters
> involve the same basic facts, the same or related parties,
> related issues, the same confidential information, and the
> amount of time elapsed.

5 C.F.R. § 2641.201(h)(5)(i).

The regulations also make clear that "[w]hen a particular matter involving
specific parties begins depends on the facts," and provide, in part, as follows:

> A particular matter may involve specific parties prior to
> any formal action or filings by the agency or other parties.
> Much of the work with respect to a particular matter is
> accomplished before the matter reaches its final stage, and
> preliminary or informal action is covered by the
> prohibition, provided that specific parties of the matter
> actually have been identified.

5 C.F.R. § 2641.201(h)(4).  One of the examples contained in the regulations provides as
follows:

> A Government employee participated in internal agency
> deliberations concerning the merits of taking enforcement
> action against a company for certain trade practices.  He
> left the Government before any charges were filed against
> the company for certain trade practices.  He has
> participated in a particular matter involving specific parties
> and may not represent another person in connection with
> the ensuing administrative or judicial proceedings against
> the company.

Comment 1 to 5 C.F.R. § 2641.201(h)(4).

13

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## Bar Rules of Professional Conduct

The District of Columbia Bar's Rules of Professional Conduct provide as follows:

> Rule 1.11—Successive Government and Private
> Employment
>
> (a)    A lawyer shall not accept other employment in
>        connection with a matter which is the same as, or
>        substantially related to, a matter in which the lawyer
>        participated personally and substantially as a public
>        officer or employee.  Such participation includes
>        acting on the merits of a matter in a judicial or other
>        adjudicative capacity.

District of Columbia Rules of Professional Conduct, Rule 1.11, attached as Exhibit 47.

Comment 4 to Rule 1.11 discusses the meaning of the term "substantially related"
as used in the rule, in part, as follows:

> The leading case defining "substantially related" matters in
> the context of former government employment is *Brown v.
> District of Columbia Board of Zoning Adjustment*, 486
> A.2d 37 (D.C. 1984)(en banc).  There the D.C. Court of
> Appeals, *en banc*, held that in the "revolving door" context,
> a showing that a reasonable person, could infer that,
> through participation in one matter as a public officer of
> employee, the former government lawyer "may have had
> access to information legally relevant to, or otherwise
> useful in" a subsequent representation, is *prima facie*
> evidence that the two matters are substantially related.  If
> this *prima facie* showing is made, the former government
> lawyer must disprove any ethical impropriety by showing
> that the lawyer "could not have gained access to
> information during the first representation that might be
> useful in the later representation."

*Id.*

The Texas Disciplinary Rules of Professional Conduct provide as follows:

> Rule 1.10 Successive Governments and Private
> Employment
>
> (a)    Except as law may otherwise expressly permit, a
>        lawyer shall not represent a private client in

14

**App. 672**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> connection with a matter in which the lawyer
> participated personally and substantially as a public
> officer or employee, unless the appropriate
> government agency consents after consultation.

*See* Texas Disciplinary Rules of Professional Conduct, Rule 1.10, attached as Exhibit 48.

For purposes of the above rule, the term "matter" includes:

(1)     Any adjudicatory proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge accusation, arrest or other similar, particular transaction involving a specific party or parties; and

(2)     any other action or transaction covered by the conflict of interest rules of the appropriate government agency.

*Id.* at Rule 1.10(f).

15

**App. 673**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# EXECUTIVE SUMMARY

The OIG investigation found that the SEC's Fort Worth office was aware since
1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to
that conclusion a mere two years after Stanford Group Company ("SGC"), Stanford's
investment adviser, registered with the SEC in 1995.  We found that over the next 8
years, the SEC's Fort Worth Examination group conducted four examinations of
Stanford's operations, finding in each examination that the CDs could not have been
"legitimate," and that it was "highly unlikely" that the returns Stanford claimed to
generate could have been achieved with the purported conservative investment approach.
Fort Worth examiners dutifully conducted examinations of Stanford in 1997, 1998, 2002
and 2004, concluding in each case that Stanford's CDs were likely a Ponzi scheme or a
similar fraudulent scheme.  The only significant difference in the Examination group's
findings over the years was that the potential fraud grew exponentially, from $250
million to $1.5 billion.

While the Fort Worth Examination group made multiple efforts after each
examination to convince the Fort Worth Enforcement program ("Enforcement") to open
and conduct an investigation of Stanford, no meaningful effort was made by Enforcement
to investigate the potential fraud or to bring an action to attempt to stop it until late 2005.
In 1998, Enforcement opened a brief inquiry, but then closed it after only 3 months, when
Stanford failed to produce documents evidencing the fraud in response to a voluntary
document request from the SEC.  In 2002, no investigation was opened even after the
examiners specifically identified multiple violations of securities laws by Stanford in an
examination report.  In 2003, after receiving three separate complaint letters about
Stanford's operations, Enforcement decided not to open an investigation or even an
inquiry, and did not follow up to obtain more information about the complaints.

In late 2005, after a change in leadership in Enforcement and in response to the
continuing pleas by the Fort Worth Examination group, who had been watching the
potential fraud grow in examination after examination, Enforcement finally agreed to
seek a formal order from the Commission to investigate Stanford.  However, even at that
time, Enforcement missed an opportunity to bring an action against SGC for its admitted
failure to conduct any due diligence regarding Stanford's investment portfolio, which
could have potentially completely stopped the sales of the Stanford International Bank
("SIB") CDs though the SGC investment adviser, and provided investors and prospective
investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  The
OIG investigation found that this particular action was not considered, partially because
the new head of Enforcement in Fort Worth was not apprised of the findings in the
investment advisers' examinations in 1998 and 2002, or even that SGC had registered as
an investment adviser, a fact she learned for the first time in the course of this OIG
investigation in January 2010.

**App. 674**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The OIG did not find that the reluctance on the part of the SEC's Fort Worth Enforcement group to investigate Stanford was related to any improper professional, social or financial relationship on the part of any former or current SEC employee.  We found evidence, however, that SEC-wide institutional influence within Enforcement did factor into its repeated decisions not to undertake a full and thorough investigation of Stanford, notwithstanding staff awareness that the potential fraud was growing.  We found that senior Fort Worth officials perceived that they were being judged on the numbers of cases they brought, so-called "stats," and communicated to the Enforcement staff that novel or complex cases were disfavored.  As a result, cases like Stanford, which were not considered "quick-hit" or "slam-dunk" cases, were not encouraged.

The OIG investigation also found that the former head of Enforcement in Fort Worth, who played a significant role in multiple decisions over the years to quash investigations of Stanford, sought to represent Stanford on three separate occasions after he left the Commission, and in fact represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

The first SEC examination of Stanford occurred in 1997, two years after SGC began operations and registered with the SEC, when the SEC Fort Worth Examination staff identified SGC as a risk and target for examination.  After reviewing SGC's annual audit in 1997, a former branch chief in the Fort Worth Broker-Dealer Examination group noted that, based simply on her review of SGC's financial statements, she "became very concerned" about the "extraordinary revenue" from the CDs and immediately suspected the CD sales were fraudulent.

In August 1997, after six days of field work in an examination of Stanford, the examiners concluded that SIB's statements promoting the CDs appeared to be misrepresentations.  The examiners noted that while the CD products were promoted as being safe and secure, with investments in "investment-grade bonds, securities and Eurodollar and foreign currency deposits" to "ensure safety of assets," the interest rate, combined with referral fees of between 11% and 13.75% annually, was simply too high to be achieved through the purported low-risk investments.

The branch chief concluded after the 1997 examination that the SIB CDs purported above-market returns were "absolutely ludicrous," and that the high referral fees SGC was paid for selling the CDs indicated they were not "legitimate CDs."  The Assistant District Administrator for the Fort Worth Examination program concurred, noting that there were "red flags" about Stanford's operations that caused her to believe it was a Ponzi scheme, specifically the fact that the "interest that they were purportedly paying on these CDs was significantly higher than what you could get on a CD in the United States."  She further concluded that it was "highly unlikely" that the returns Stanford claimed to generate could be achieved with the purported conservative investment approach.

**App. 675**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The examiners also were concerned about the recurring annual "trailer" or
"referral" fee that SGC received from SIB for referring CD investors to SIB, which they
viewed to be "oddly high" and suspicious.  This suspicion was heightened because the
examiners found that SGC did not maintain books and records for the CD sales, and
purported to have no actual information about SIB or the bases for the generous returns
that the CDs generated, notwithstanding the fact that they were recommending the CDs to
their clients and receiving these annual recurring fees for their referrals.

Further, the examiners made the surprising discoveries of a $19 million cash
contribution that Robert Allen Stanford made personally to SGC in 1996, and of
significant loans from SIB to Stanford personally, discoveries which the branch chief
testified were red flags that made her assume that Stanford "was possibly stealing from
investors."  In the SEC's internal tracking system, in which it recorded data about its
examinations, the Broker-Dealer Examination group characterized its conclusion from
the 1997 examination of SGC as "Possible misrepresentations.  Possible Ponzi scheme."

The OIG investigation found that in 1997, the examination staff determined that
as a result of their findings, an investigation of Stanford by the Enforcement group was
warranted, and referred a copy of their examination report to Enforcement for review and
disposition.  In fact, when the former Assistant District Administrator for the Fort Worth
Examination program retired in 1997, her parting words to the branch chiefwere, "keep
your eye on these people [referring to Stanford] because this looks like a Ponzi scheme to
me and some day it's going to blow up."

Despite the examiners' referral of their serious concern that SGC was part of a
Ponzi scheme, the Enforcement staff did not open a matter under inquiry ("MUI") into
the Stanford case until eight months later, in May 1998, and did so only after learning
that another federal agency suspected Stanford of money laundering.  The OIG
investigation further found the only evidence of any investigative action taken by
Enforcement in connection with this MUI was a voluntary request for documents that the
SEC sent SGC in May 1998.  We found that after Stanford refused to voluntarily produce
numerous documents relating to SGC's referrals of investors to SIB, no further
investigative steps were taken; after being opened for only three months, in August 1998,
the MUI was closed.

Reasons provided by Enforcement as to why the inquiry was closed related to the
lack of U.S. investors affected by the potential fraud and the difficulty of the
investigation because it would have to obtain records from Antigua.  However, we found
other, larger, SEC-wide reasons why the Stanford matter was not pursued, including the
preference for "quick hit" cases as a result of internal SEC pressure, and the perception
that Stanford was not a "quick hit" case.

The OIG investigation also found that in June 1998, while the Stanford MUI was
open, the Investment Adviser Examination group in Fort Worth began another
examination of SGC.  This investment adviser examination came to the same conclusions

18

**App. 676**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

as the broker-dealer examination, finding Stanford's "extremely high interest rates and
extremely generous compensation" in the form of annual recurring referral fees, and the
fact that SGC was so "extremely dependent upon that compensation to conduct its day-
to-day operations," very suspicious.

The investment adviser examiners also noted during the 1998 examination the
complete lack of information SGC had regarding the CDs and the SIB investment
portfolio that purportedly supported the CDs' unusually high and consistent returns.  The
examiners concluded that SGC had "virtually nothing" that "would be a reasonable basis"
for recommending the CDs to its customers.  In fact, the examiners found that no one at
SGC even maintained a record of all advisory clients who invested in the CDs.
Accordingly, the examiners identified possible violations of SGC's fiduciary duty as an
investment adviser to its clients, noting the affirmative obligation on the part of an
investment adviser to employ reasonable care to avoid misleading clients, and that any
departure from this fiduciary standard would constitute fraud under Section 206 of the
Investment Advisers Act of 1940 ("Investment Advisers Act").

The OIG investigation found, however, that the Enforcement staff completely
disregarded the investment adviser examiners' concerns in deciding to close the Stanford
MUI, and there was no evidence that the Enforcement staff even read the investment
advisers' 1998 examination report.  Notwithstanding this lack of Enforcement action, by
the summer of 1998, it was clear that both the investment adviser and broker-dealer
examiners "knew that [Stanford] was a fraud."

In November 2002, the SEC's investment adviser Examination group conducted
yet another examination of SGC.  In the 2002 examination, the investment adviser
examiners found that Stanford's operations had grown significantly in the four years
since the 1998 Examination, from $250 million in investments in the purported
fraudulent CDs in 1998, to $1.1 billion in 2002.  In 2002, these examiners identified the
same red flags that had been noted in the previous two examinations:  "the consistent,
above-market reported returns," which were "very unlikely" to be able to be achieved
with "legitimate" investments, and the high commissions paid to SGC financial advisers
for selling the SIB CDs without an understanding on the part of SGC as to what they
were referring.

The investment adviser examiners also found that the list of investors provided by
SGC was inaccurate, as the list they received from SGC of the CD holders did not match
up with the total CDs outstanding based upon the referral fees SGC received in 2001.
The examiners noted that although they did follow up with SGC about this discrepancy,
they never obtained "a satisfactory response, and a full list of investors."

The 2002 Examination concluded that SGC was violating Section 206 of the
Investment Advisers Act by failing to conduct any due diligence related to the SIB CDs.
The 2002 Examination report stated:

**App. 677**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> A review of SGC's "due diligence" files for the SIB [CDs] revealed that SGC had little more than the most recent SIB financial statements (year end 2001) and the private offering memoranda and subscription documents. There was no indication that anyone at SGC knew how its clients' money was being used by SIB or how SIB was generating sufficient income to support the above-market interest rates paid and the substantial annual three percent trailer commissions paid to SGC.

When the investment adviser examiners raised this issue with SGC, SGC markedly changed its representations to the SEC concerning its due diligence regarding SIB's CDs.  Previously, SGC represented that they essentially played no role in the investment decisions by SIB, but when challenged, SGC changed its story, and stated that they regularly visited the offshore bank, participated in quarterly calls with the Chief Financial Officer of the bank, and received quarterly information regarding the bank's portfolio allocations (by sector and percentage of bonds/equity), investment strategies, and top five equity and bond holdings.  SGC also told the examiners that information regarding the portfolio allocations was included in SGC's due diligence files.  Although the investment adviser examiners were surprised and suspicious about this discrepancy, and actually contemplated "drop[ping] by unannounced [at SGC] and ask[ing] to look at [the purported documents]," the OIG investigation found that the SEC did not follow up to obtain or review the newly-claimed due diligence information.

After the examiners began this third examination of Stanford, the SEC received multiple complaints from outside entities reinforcing and bolstering their suspicions about Stanford's operations.  However, the SEC failed to follow up on these complaints or take any action to investigate them.  On December 5, 2002, the SEC received a complaint letter from a citizen of Mexico who raised concerns similar to those the examination staff had raised.  The October 28, 2002 complaint from [Complainant 1] [Complainant 1] to the SEC Complaint Center raised several issues, including the considerably higher interest rate of the Stanford CDs when compared with that which other banks were offering, the fact that Stanford's returns were steady while other similar investments were significantly down, and noting that SIB's auditor was in Antigua without significant regulatory oversight.

While the examiners characterized [Complainant 1] concerns as "legitimate," the OIG investigation found that the SEC did not respond to the [Complainant 1] complaint and did not take any action to investigate her claims.  We found that while an SEC examiner drafted a letter to [Complainant 1] asking for additional information, he was told that Enforcement had decided to refer her letter to the Texas State Securities Board ("TSSB") and thus, never actually sent his draft letter to [Complainant 1].  However, the OIG investigation found that although there was an intention to forward the [Complainant 1] letter to the TSSB, there is no evidence that it was sent to the TSSB, either.

**App. 678**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

In addition, the OIG investigation found that although the examiners met with
Enforcement officials in late 2002 to attempt to convince Enforcement to open an
investigation or even an inquiry into the 2002 Examination Report's findings,
Enforcement staff declined to open a matter and likely never even read the 2002
Examination Report.  Moreover, even though the examiners were informed by
Enforcement that the findings in the 2002 Examination Report were referred to the TSSB
together with the ⬛Complainant 1⬛ letter, after interviewing officials from the Enforcement staff
and the TSSB, we found that no such referral was made.

Thus, by 2003, it had been approximately six years since the SEC Examination
staff had concluded that the SIB CDs were likely a Ponzi scheme.  During those six
years, the SEC had conducted three examinations which concluded the Stanford fraud
was ongoing and growing significantly, but no meaningful effort was made to obtain
evidence related to the Ponzi scheme.

In 2003, the SEC Enforcement staff received two new complaints that Stanford
was a Ponzi scheme, but the OIG investigation found that nothing was done to pursue
either of them.  On August 4, 2003, the TSSB forwarded to the SEC a letter from ⬛Confidential Source⬛
⬛Confidential Source⬛ in another Ponzi scheme action entitled ⬛PII⬛, which
discussed several similarities between the ⬛PII⬛ Ponzi scheme and what was
known at the time about Stanford's operations.  Before sending the letter to the SEC, the
TSSB Director of Enforcement called the SEC to discuss the matter and informed the
SEC that because ⬛PII⬛ was such a large fraud, he thought he needed to bring ⬛Confidential Source⬛
⬛Confidential Source⬛'s concerns regarding Stanford Group to the SEC's attention.  While the
⬛Confidential Source⬛'s complaint was forwarded to a branch chief in Enforcement, no action was
taken to follow up.

On October 10, 2003, the NASD forwarded a letter dated September 1, 2003,
from an anonymous Stanford insider to the SEC's Office of Investor Education and
Assistance ("OIEA") which stated, in pertinent part:

> STANFORD FINANCIAL IS THE SUBJECT OF A
> LINGERING CORPORATE FRAUD SCANDAL
> PERPETUATED AS A "MASSIVE PONZI SCHEME"
> THAT WILL DESTROY THE LIFE SAVINGS OF
> MANY; DAMAGE THE REPUTATION OF ALL
> ASSOCIATED PARTIES, RIDICULE SECURITIES
> AND BANKING AUTHORITIES, AND SHAME THE
> UNITED STATES OF AMERICA.

The OIG investigation found that while this letter was minimally reviewed by
various Enforcement staff, Enforcement decided not to open an investigation or even an

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

inquiry, but to refer it to the Examination group for yet another examination.  The
Enforcement branch chief explained his rationale as follows:

> [R]ather than spend a lot of resources on something that
> could end up being something that we could not bring, the
> decision was made to – to not go forward at that time, or at
> least to – to not spend the significant resources and – and
> wait and see if something else would come up.

It is not clear what the Enforcement staff hoped to gain by "wait[ing] [to] see if
something else would come up" after the SEC had conducted three examinations of SGC
finding that the SIB CDs were likely a Ponzi scheme and received three complaints about
Stanford.  It is also not clear what purpose the Enforcement staff thought would be served
by having the examiners conduct a fourth examination of SGC.

However, they ultimately did just that.  In October 2004, the Examination staff
conducted its fourth examination of SGC.  In fact, the broker-dealer Examination staff
initiated this fourth examination of Stanford solely for the purpose of making another
Enforcement referral.  By October 2004, approximately seven years since the SEC's first
examination of SGC, the SEC examiners found that SGC's revenues had increased four-
fold, and sales of the SIB CDs accounted for over 70 percent of those revenues.  As of
October 2004, SGC customers held approximately $1.5 billion of CDs with
approximately $227 million of these CDs being held by U.S. investors.  The 2004
examination concluded that the SIB CDs were securities and part of a "very large Ponzi
scheme."

The examiners analyzed the SIB CD returns using data about the past
performance of the equity markets and found that they were improbable.  The
examination staff concluded that SGC's sales of the SIB CDs violated numerous federal
securities laws and rules, including NASD's suitability rule, material misstatements and
failure to disclose material facts, in violation of Rule 10b-5 of the Securities Exchange
Act of 1934 ("Exchange Act"); failure to disclose to customers its compensation for
securities transactions, in violation of Rule 10b-10 of the Exchange Act; and possible
unregistered distribution of securities in violation of Section 5 of the Securities Act of
1933.

The 2004 Examination Report advocated that the SEC act against SGC for these
violations, in part, because of the difficulties in proving that SIB was operating a Ponzi
scheme.  One examiner stated that after the 2004 Examination, he believed it was
incumbent on the SEC to do whatever it could to stop the growing fraud, noting, as
follows, "although it may be difficult to prove that the offering itself is fraudulent, SGC
has nonetheless committed numerous securities law violations which can be proved
without determining the actual uses of the invested funds."

**App. 680**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The Examination staff also conducted significant investigative work during the seven months from October 2004 through April 2005 to bolster its anticipated Enforcement referral.  They reached out to the SEC's Office of Economic Analysis ("OEA") for assistance in taking the Examination staff's quantitative analysis of Stanford's historical returns "a step further."  However, OEA did not assist the examiners with any analysis of Stanford's returns.  The examiners also contacted an attorney in the SEC's Office of International Affairs ("OIA") for information regarding Antigua's regulation of Stanford.  In addition, they interviewed a former registered representative of SGC, who told them that the sale of SIB's CDs was a "Ponzi scheme."

However, in March 2005, senior Enforcement officials in Fort Worth learned of the Examination staff's work on Stanford and told them that it was not a matter that Enforcement would pursue.  A Special Senior Counsel in the Broker-Dealer Examination group made a presentation about her ongoing work on Stanford at a March 2005 quarterly summit meeting attended by the SEC, NASD, and state regulators from Texas and Oklahoma.  Immediately after her presentation, she recalled that she got "a lot of pushback" from both the head of the Fort Worth office and head of Enforcement who approached her and "summarily told [her] . . . [Stanford] was not something they were interested in."

As the examiners were preparing a formal referral memorandum to the Enforcement staff in an attempt to finally convince them to open an investigation, it was announced that the head of Fort Worth Enforcement was leaving the SEC.  Since he had made it "very clear … he wasn't going to accept [the Stanford referral]" at the March 2005 meeting, the examiners waited until he left the SEC to forward the referral to Enforcement.

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," noting that "from 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3% . . .[while] [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002."

The Enforcement staff initially reacted enthusiastically to the referral and opened a MUI.  They also contacted OIA to assist them in getting records from SIB in Antigua.  Further, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  However, by June 2005, the Enforcement staff had decided to refer the matter to the NASD, apparently as a precursor to closing the inquiry.  They had considered several options to obtain further evidence, including a request under the Mutual Legal Assistance in Criminal Matters Treaties, which were designed for the exchange of information in criminal matters and administered by the U.S. Department of Justice.  However, after the questionnaires revealed no valuable information, the only tangible action taken was the sending of a voluntary request for documents to Stanford.

**App. 681**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

On August 29, 2005, the Enforcement staff sent SIB its voluntary request for
documents.  However, requesting voluntary document production from Stanford was a
completely futile exercise.  Moreover, the Enforcement staff sent SIB the "standard
request" six days *after* SIB's attorney "made it clear that SIB would not be producing
documents on a voluntary basis."  The only reason for the staff's document request to
Stanford was apparent in a July 2005 e-mail from the branch chief, stating as follows:

> I feel strongly that we need to make voluntary request for
> docs from bank.  If we don't and close case, and later
> Stanford implodes, we will look like fools if we didn't even
> request the relevant documents.

The Enforcement staff sent the request even though it recognized that its efforts to obtain
the requested documents voluntarily were "moot[]."

After Stanford refused to voluntarily produce documents that would evidence it
was engaging in fraud, the SEC Enforcement staff was poised to close the Stanford
investigation.  However, the Examination staff fought to keep the Stanford investigation
open.  They appealed to the new head of Enforcement and considerable time was spent
over the next few months in an internal debate in the Fort Worth office concerning
whether to close the Stanford matter without investigation.  While the two sides debated
whether to conduct an investigation, all agreed that Stanford was probably operating a
Ponzi scheme.  One senior official noted, "[i]t was obvious for years that [Stanford] was
a Ponzi scheme."

Finally, in November 2005, the new head of Fort Worth Enforcement overruled
her staff's and her predecessor's objections to continuing the Stanford investigation and
decided to seek a formal order in furtherance of that investigation.  However, the
Enforcement staff rejected the possibility of filing an "emergency action" against SIB
based on what they deemed circumstantial evidence that it was a Ponzi scheme.  They
also decided that attacking Stanford's alleged Ponzi scheme indirectly by filing an action
against SGC for violations of the NASD's suitability rule, or failures to disclose or other
misrepresentations, would not be worthwhile.  Most significantly, the Enforcement staff
did not even consider bringing an action against Stanford under Section 206 of the
Investment Advisers Act, which establishes federal fiduciary standards to govern the
conduct of investment advisers.  Such an action against SGC could have been brought for
its *admitted* failure to conduct any due diligence regarding Stanford's investment
portfolio based upon the complete lack of information produced by SGC regarding the
SIB portfolio that supposedly generated the CDs returns.

Had the SEC successfully prosecuted an injunctive action against SGC for
violations of Section 206, an anti-fraud provision, it could have completely stopped the
sales of the SIB CDs though the SGC investment adviser.  Further, the filing of such an
action against SGC could have potentially given investors and prospective investors
notice that the SEC considered SGC's sales of the CDs to be fraudulent.  A Stanford

**App. 682**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Victims Coalition survey indicated that approximately 95% of 211 responding Stanford investors stated that knowledge of an SEC inquiry would have affected their decision to invest.  One Stanford victim, who invested the money that she "saved through several years of business, nights working late and skipping vacations [she] could have taken with [her] family," said that had she "known that Stanford Group was ever under investigation by the SEC, [she] would not have bought at all."  Indeed, the questionnaire that was sent out by Enforcement in June 2005 raised significant concerns among Stanford investors. A former vice president and financial adviser at Stanford from 2004 through 2007 who later contacted the SEC with concerns about Stanford, said that his phone "lit up like a Christmas tree the morning [the SEC questionnaire] went out."  However, after investors received the questionnaire about Stanford, many continued to invest because financial advisers told them that the fund had been given "a clean bill of health" by the SEC. Stanford officials were able to persuasively represent that Stanford had been given this "clean bill of health" because in fact, Stanford had been examined on multiple occasions and only been issued routine deficiency letters which they purportedly remedied. However, had a Section 206 action been commenced in 2005, it could have put many of Stanford's victims on notice that there were regulatory concerns about their investments.

The other significant benefit of bringing an action under Section 206 of the Investment Advisers Act (which the SEC eventually did when it filed its complaint in 2009) was that it did not require that the fraud involve a security.

The OIG investigation found that the decision not to even consider a Section 206 action was based at least partially on the fact that the new head of Enforcement was unaware that the investment adviser Examination staff had done examinations of SGC in 1998 and 2002, and was unaware that SGC was a registered investment adviser when the staff briefed her on the matter in November 2005.  In fact, she only learned that SGC had been a registered investment adviser during her OIG testimony in the course of this investigation in January 2010.  Because the Enforcement staff was not familiar with the findings of the 1998 and 2002 investment adviser examinations, they were not aware that this option had been documented by the examiners on more than one occasion.

The OIG investigation also found evidence of larger SEC-wide reasons that the Stanford matter was not pursued over the years.  We found that the Fort Worth Enforcement program's decisions not to undertake a full and thorough investigation of Stanford were due, at least in part, to Enforcement's perception that the Stanford case was difficult, novel and not the type favored by the Commission.  The former head of the Fort Worth office told the OIG that regional offices were "heavily judged" by the number of cases they brought and that it was very important for the Fort Worth office to bring a high number of cases.  This same person specifically noted that he personally had been "very outspoken" while at the SEC, but felt he was "bullet proof" because of the high number of cases that Fort Worth brought and, as a result, the Commission "could not get

25

**App. 683**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

rid of him."  The former head of Enforcement in Fort Worth also concurred that the

"number of cases [brought] were extremely important."  A Fort Worth Assistant Director
who worked on the Stanford matter stated:

> Everybody was mindful of stats. … Stats were recorded
> internally by the SEC in Washington. … I think when I
> was assistant director, there was a lot of pressure to bring a
> lot of cases.  I think that was one of the metrics that was
> very important to the home office and to the regions.

The former head of the Examination program in Fort Worth testified that
Enforcement leadership in Fort Worth "was pretty upfront" with the Enforcement staff
about the pressure to produce numbers and communicated to the Enforcement staff, "I
want numbers.  I want these things done quick."  He also testified that this pressure for
numbers incentivized the Enforcement staff to focus on "easier cases" – "quick hits."
Accordingly, as a result of the "pressure on people to produce numbers, … anything that
didn't appear … likely … to produce a number in a very short period of time got pretty
short shrift."  A former Fort Worth Examination branch chief also testified that the
Enforcement staff "were concerned about the number of cases that they were making and
that perhaps if it wasn't a slam-dunk case, they might not want to take it because they
wanted to make sure they had enough numbers because that's what they felt the
Commission wanted them to do."  The OIG investigation found that because Stanford
"was not going to be a quick hit," Stanford was not considered as high priority of a case
as easier cases.  The former branch chief in the Fort Worth broker-dealer Examination
group testified that the Enforcement Assistant Director working on the Stanford matter
"only wanted to bring cases that were slam dunk, easy cases."

In addition, according to the former head of the Fort Worth office, senior
management in Enforcement at headquarters expressed concern to Fort Worth that they
were bringing too many Temporary Restraining Order, Ponzi, and prime bank cases,
which they referred to as "kick in the door and grab" cases, or "mainstream" cases.  Fort
Worth was told to bring more Wall Street types of cases, like accounting fraud.  The
former head of Enforcement in Fort Worth told the OIG that when he was hired to his
position, Enforcement management in Washington, DC told him to clean up Fort Worth's
inventory and repeatedly told him that Fort Worth's emphasis should be on accounting
fraud cases.  He was cautioned that Fort Worth was spending way too much of its
resources on "mainstream" cases, and that those resources would be better deployed on
accounting fraud cases.  He specifically recalled that in November 2000, after Fort Worth
brought several Ponzi scheme cases, he was told by a senior official in the Enforcement
Division:  "[Y]ou know you got to spend your resources and time on financial fraud.
What are you bringing these cases for?"

**App. 684**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The OIG investigation also found that the SEC bureaucracy may have discouraged the staff from pursuing novel legal cases.  The former head of the Fort Worth office confirmed that the arduous process of getting the SEC staff's approval in Washington, DC to recommend an Enforcement action to the Commission was a factor in deciding which investigations to pursue.  A former branch chief in the examination program stated that she believed that the desire of the Enforcement staff to avoid difficult cases was partly due to the challenges in dealing with the Commission's bureaucracy.

Finally, the OIG investigation revealed that the former head of Enforcement in Fort Worth, who played a significant role in numerous decisions by the Fort Worth office to deny investigations of Stanford, sought to represent Stanford on three separate occasions after he left the SEC, and represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so.

This former head of Enforcement in Fort Worth was responsible for:  (1) in 1998, deciding to close a MUI opened regarding Stanford after the 1997 broker-dealer examination; (2) in 2002, deciding to forward the [Complainant 1] complaint letter to the TSSB and deciding not respond to the [Complainant 1] complaint or investigate the issues it raised; (3) in 2002, deciding not to act on the Examination staff's referral of Stanford for investigation after its investment adviser examination; (4) in 2003, participation in a decision not to investigate Stanford after receiving [Confidential Source]'s complaint letter comparing Stanford's operations to the [PII] fraud; (5) in 2003, participating in a decision not to investigate Stanford after receiving the complaint letter from an anonymous insider alleging that Stanford was engaged in a "massive Ponzi scheme;" and (6) in 2005, informing senior Examination staff after a presentation was made on Stanford at a quarterly summit meeting that Stanford was not a matter they planned to investigate.

Yet, in June 2005, a mere two months after leaving the SEC, this former head of the Enforcement in Fort Worth e-mailed the SEC Ethics Office that he had been "approached about representing [Stanford] . . . in connection with (what appears to be) a preliminary inquiry by the Fort Worth office."  He further stated, "I am not aware of any conflicts and I do not remember any matters pending on Stanford while I was at the commission."

After the SEC Ethics Office denied his request in June 2005, in September 2006, Stanford retained this former head of Enforcement in Fort Worth to assist with inquiries Stanford was receiving from regulatory authorities, including the SEC.  He met with Stanford Financial Group's General Counsel in Stanford's Miami office and billed Stanford for his time.  Following the meeting, he billed 6.5 hours to Stanford on October 4, 2006, for, *inter alia*, "review[ing] documentation received from company about SEC and NASD inquiries."  On October 12, 2006, he billed Stanford 0.7 hours for a "[t]elephone conference with [Stanford Financial Group's General Counsel] regarding status of SEC and NASD matters."  In late November 2006, he called his former subordinate, the Assistant Director who was working on the Stanford matter in Fort

**App. 685**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Worth, who asked him during the conversation, "[C]an you work on this?" and who in
fact told him, "I'm not sure you're able to work on this."  Near the time of this call, he
belatedly sought permission from the SEC's Ethics Office to represent Stanford.  The
SEC Ethics office replied that he could not represent Stanford for the same reasons given
a year earlier and he discontinued his representation.

In February 2009, immediately after the SEC sued Stanford, this same former
head of Enforcement in Fort Worth contacted the SEC Ethics Office a third time about
representing Stanford in connection with the SEC matter – this time to defend Stanford
against the lawsuit filed by the SEC.  An SEC Ethics official testified that he could not
recall another occasion in which a former SEC employee contacted his office on three
separate occasions trying to represent a client in the same matter.  After the SEC Ethics
Office informed him for a third time that he could not represent Stanford, the former head
of Enforcement in Fort Worth became upset with the decision, arguing that the matter
pending in 2009 "was new and was different and unrelated to the matter that had
occurred before he left."  When asked why he was so insistent on representing Stanford,
he replied, "Every lawyer in Texas and beyond is going to get rich over this case.  Okay?
And I hated being on the sidelines."

The OIG investigation found that the former head of Enforcement in Fort Worth's
representation of Stanford appeared to violate state bar rules that prohibit a former
government employee from working on matters in which that individual participated as a
government employee.  Accordingly, we are referring this Report of Investigation to the
Commission's Ethics Counsel for referral to the Office of Bar Counsel for the District of
Columbia and the Chief Disciplinary Counsel for the State Bar of Texas, the states in
which he is admitted to practice law.

We are also recommending that the Chairman carefully review this report's
findings and share with Enforcement management the portions of this ROI that relate to
the performance failures by those employees who still work at the SEC, so that
appropriate action (which may include performance-based action, if applicable) is taken,
on an employee-by-employee basis, to ensure that future decisions about when to open an
investigation and when to recommend that the Commission take action are made in a
more appropriate manner.  We are also recommending that the Chairman and Director of
Enforcement give consideration to promulgating and/or clarifying procedures with regard
to seven specific areas of concerns that we identify in the report.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

# RESULTS OF THE INVESTIGATION

I.   **IN 1997, THE FWDO EXAMINATION STAFF REVIEWED STANFORD'S BROKER-DEALER OPERATIONS AND MADE A REFERRAL TO ENFORCEMENT DUE TO A CONCERN THAT ITS SALES OF CDs CONSTITUTED A PONZI SCHEME**

A.   **Two Years After Stanford Group Company Began Operations, the SEC Identified It as a Risk and a Target For an Examination Based on Suspicions That Its CD Sales Were Fraudulent**

Stanford Group Company ("SGC") registered with the Commission as an investment adviser in September 1995, and as a broker-dealer in October 1995.  *See* Exhibit 49 at 1; Exhibit 55 at 2.  SGC was owned by Robert Allen Stanford, who also owned several affiliated companies, including Stanford International Bank ("SIB"), an offshore bank located in St. John's, Antigua, West Indies.  Exhibit 49 at 1.

SGC conducted a general securities business through a fully disclosed clearing arrangement with Bear Stearns Securities Corporation, and as of 1997, had five branch offices and 66 employees, 25 of which were registered representatives.  *Id.*  At that time, the firm had approximately 2,000 (1,200 foreign) customer accounts.  *Id.*

SGC was affiliated through common ownership with SIB, an offshore investment bank.  *Id.* at 2.  SGC had a written agreement with SIB wherein SGC referred its foreign customers to SIB, in return for which SIB paid a recurring annual 3.75% referral fee to SGC on all deposits referred to SIB.  *Id.*  SIB offered these customers several types of products, including the "FlexCD Account," which comprised 96% of all cash deposits at SIB.  *Id.*

The FlexCD Account required a minimum balance of $10,000, had maturities and annual interest rates ranging from one month at 7.25% to 36 months at 10% and withdrawals of up to 25% of the principal amount were allowed without penalties with a five day advance notice.  *Id.*  As of July 31, 1997, SGC was due referral fees of $958,424 which was based on customer deposits at SIB of $306,695,545 (75% of all deposits at SIB).  *Id.*

After SGC's fiscal year ended in June 1997, Julie Preuitt, then a branch chief in the FWDO Broker-Dealer Examination group, reviewed its annual audit as part of a process to identify "target[s] for examinations."[8]  December 14, 2009 Preuitt Testimony

---

[8]   Mary Lou Felsman, Assistant District Administrator for the FWDO Examination program from 1986 through the end of 1997 and Preuitt's supervisor, described Preuitt as an "excellent" branch chief.  Felsman Testimony Tr. at 32.

**App. 687**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Tr. at 13.  Preuitt testified that, based on her review of SGC's financial statements, she "became very concerned in terms [that SGC] had only been open for two years; and the firm had gone from very little revenue to an incredible amount of revenue in a very short time period, which [was] very unusual." *Id.*  Specifically, Preuitt explained that because SGC's revenues from CDs were "extraordinary," she scheduled an examination. *Id.* at 14.  Preuitt testified that based on the red flags she identified, she suspected the CD sales were fraudulent; "[i]t looked like … there was a problem…" *Id.* at 15.

Preuitt assigned the SGC examination to [Staff Acct 1] a FWDO staff accountant, because she had "the most confidence" in him, and believed he was "a very good examiner." *Id.* at 16.  At that point in time [Staff Acct 1] had seven years of experience conducting broker-dealer examinations at the National Association of Securities Dealers ("NASD") and five years of experience conducting broker-dealer examinations at the SEC [Staff Acct 1] Testimony Tr. at 8-9.  In addition to his experience, Preuitt testified that [Staff Acct 1] "had excellent judgment."  December 14, 2009 Preuitt Testimony Tr. at 17.

## B.    After Conducting a Short Examination, the Examination Staff Concluded That Stanford Was Probably Operating a Ponzi Scheme

The staff accountant assigned to the SGC examination [Staff Acct 1] spent six days at SGC's Houston office conducting field work for the examination.  STARS[9] Report, attached as Exhibit 50, at 1.  The examination field work was completed on August 29, 1997. *Id.*  The Examination Report, issued on September 25, 1997 (the "1997 Examination Report"), included the following findings:

Possible Misrepresentations -- Rule 10b-5

SIB promotes its products as being safe and secure.  A brochure regarding the products offered through SIB … states that "funds from these accounts are invested in investment-grade bonds, securities and Eurodollar and foreign currency deposits."  The brochure indicates a high level of safety for customer deposits.  For example: "banking services which ensure safety of assets, privacy, liquidity and high yields", [sic] "…protects its clients' money with traditional safeguards", "placing deposits only with banks which have met Stanford's rigorous credit criteria", "depository insolvency bond", "bankers' blanket bond", and "portfolio managers follow a conservative approach". [sic]  Based on the amount of interest rate and

---

[9]    STARS is an acronym for Super Tracking and Reporting System, the SEC examination groups' internal tracking system.  This system is described in more detail below.

**App. 688**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> referral fees paid, SIB's statements indicating these
> products to be safe appear to be misrepresentations.
>
> SIB pays out in interest and referral fees between 11% and
> 13.75% annually.  To consistently pay these returns, SIB
> must be investing in products with higher risks than are
> indicated in its brochures and other written advertisements.
>
> Because SIB is a foreign entity, we were unable to gain
> access to SIB's records.

Exhibit 49 at 2-3.

Preuitt testified that she reviewed the draft examination report and the supporting
documents carefully "because [the matter] was very serious, and [she] wanted to feel very
comfortable with what [the examiners] were alleging…."  December 14, 2009 Preuitt
Testimony Tr. at 18.  Preuitt concluded that the SIB CDs' purported above-market
returns were "absolutely ludicrous" and that the high referral fees SGC was paid for
selling the CDs indicated that they were not "legitimate CDs."  *Id.* at 24-25.
Consequently, Preuitt concluded that "[i]t was … impossible that this was a CD."  *Id.* at
25.

Similarly, Mary Lou Felsman, Assistant District Administrator for the FWDO
Examination program from 1986 through the end of 1997, testified that there were "red
flags" about Stanford's operations that caused her to believe it was a Ponzi scheme.
Felsman Testimony Tr. at 9, 16, 29.  Felsman recalled that the primary "red flag" was:

> [T]he interest that they were purportedly paying on these
> CDs was significantly higher than what you could get on a
> CD in the United States.  And as far as I know -- I mean, I
> wasn't an expert on foreign investments, but I was
> generally aware of the financial situation around the world
> at that time.  And whatever it was [Stanford] was offering
> was far above what anybody else offered, so that was, you
> know, kind of a red flag.

*Id.* at 14-15.

According to Felsman, her suspicions about the interest rates that Stanford's CDs
purportedly paid were heightened because those rates were supposedly generated with a
"safe, conservative" investment portfolio.  *Id.* at 15.  Felsman explained that it was
"highly unlikely" that the returns Stanford claimed to generate could be achieved with a
conservative investment approach.  *Id.*

**App. 689**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

[Staff Acct 1] was also concerned that the Stanford CDs were paying such high rates of
return, while at the same time SGC represented that the CDs were invested in safe, liquid
securities. [Staff Acct 1] Testimony Tr. at 15-16 [Staff Acct 1] did not believe that these returns were
possible for a safe, liquid investment.  *Id*. at 37, 43 [Staff Acct 1] testified: "I don't know where
you can find something that's safe and liquid that's going to pay 11 to almost 14 percent
… It just doesn't exist."  *Id*. at 16 [Staff Acct 1] testified that SGC was unable to articulate
exactly how these returns were being achieved.  *Id*. at 18 [Staff Acct 1] was concerned that SGC
was misrepresenting to investors that the deposits were being invested in liquid, safe
investments.  *Id*. at 20 [Staff Acct 1] further observed that the recurring annual "trailer" fee that
SGC received from SIB for referring CD investors to SIB was oddly high and did not
"smell right."  *Id*. at 34-35.

[Staff Acct 1] also noted SGC's failure to maintain books and records for the CD sales,
stating: "[I]f you're going to recommend a particular investment, you need to know that
that investment is suitable for that client. …  And in this instance … they didn't have
that, I guess, new account information that we would require:  name, address, financial
background."  *Id*. at 17-18.  Preuitt testified that the examiners felt like they could not get
any actual information regarding SIB during their examination of SGC.  December 14,
2009 Preuitt Testimony Tr. at 22.

The examiners also discovered what they identified as an "item of interest" in the
1997 Examination Report as follows:

> During 1996, Stanford made a cash contribution of
> $19,000,000 to Stanford Group.  We are concerned that the
> cash contribution may have come from funds invested by
> customers at SIB.  We noted that SIB had loaned Stanford
> $13,582,579.  In addition, we noted that [Stanford Financial
> Group] had borrowed $5,447,204 from SIB for a total
> receivable at SIB of $19,029,783 directly and indirectly
> from Stanford.  We contacted the general counsel for the
> Stanford companies regarding our concerns.  The general
> counsel stated that the cash contribution came from
> personal funds and not from the above loans; however, it
> seems at least questionable whether Stanford has access to
> $19,000,000 in personal funds.

Exhibit 49 at 3.

Preuitt [Staff Acct 1] and Felsman were suspicious about these loans that SIB had made
to Robert Allen Stanford and cash contributions that he, in turn, had made to SGC.
Preuitt testified that these transactions were a "red flag" that made her "assume[] he was
possibly stealing from investors."  December 14, 2009 Preuitt Testimony Tr. at 26. [Staff Acct 1]
testified, "It just baffled me that someone has 19 million dollars cash sitting on-hand to –
to loan out." [Staff Acct 1] Testimony Tr. at 16-17.  Felsman also described the loans from SIB

32

**App. 690**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

to Robert Allen Stanford and his $19 million cash contribution to SGC as another red flag.  Felsman Testimony Tr. at 29.

Staff Acct 1 testified that SGC's general counsel could not satisfactorily demonstrate that Stanford's cash contribution to SGC came from personal funds Staff Acct 1 Testimony Tr. at 16-17.  Preuitt testified that the examiners wanted more information regarding the origins of Stanford's cash contributions, but they were unable to obtain this information. December 14, 2009 Preuitt Testimony Tr. at 22-23.

The SEC's internal tracking system, STARS, records certain data about the SEC's examinations, including the disposition of the examinations.  December 14, 2009 Preuitt Testimony Tr., at 31-32 A Examiner 1 Testimony Tr. at 18.  The "Violations Description" entry of the STARS report for the SGC examination stated:  "Possible misrepresentations.  Possible Ponzi scheme."  *See* Exhibit 50 at 5.

C.     **As a Result of Their Concerns That Stanford Was Operating a Ponzi Scheme, the Examination Staff Referred Their Stanford Findings to the Enforcement Staff**

The 1997 Examination Report concluded that an investigation of Stanford for violations of Rule 10b-5 was warranted due to "[p]ossible misrepresentation and misapplication of customer funds."  Exhibit 49 at 1.  The conclusion of the September 25, 1997 Examination Report stated as follows:  "We will provide a copy of our report to the FWDO Division of Enforcement for their review and disposition."  Exhibit 49 at 4. Felsman recalled the examination staff referring the matter to Enforcement before she left at the end of 1997.  Felsman Testimony Tr. at 16.  The Examination staff referred the Stanford matter to Enforcement on September 25, 1997.  *See* Exhibit 50 at 5; *see also* December 14, 2009 Preuitt Testimony Tr. at 43.  At that time, the Examination staff provided Enforcement with a copy of its 1997 Examination Report Staff Acct 1 Testimony Tr. at 37-38.

Felsman testified that she believed Enforcement had not taken any action to pursue the referral when she retired at the end of 1997.  Felsman Testimony Tr. at 19. When she retired, Felsman's "parting words" to Preuitt were, "keep your eye on these people because this looks like a Ponzi scheme to me and some day it's going to blow up." Felsman Testimony Tr. at 26.  Felsman also testified:

> I've been gone 12 years.  And during that period of time I probably have seen or talked to Julie Preuitt perhaps six times.  And every time I talk[ed] to her I'd say, "Whatever happened to Stanford?"

*Id.*

**App. 691**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

## II.    EIGHT MONTHS AFTER THE EXAMINATION STAFF REFERRED STANFORD, THE ENFORCEMENT STAFF OPENED, AND QUICKLY CLOSED, A MATTER UNDER INQUIRY

Despite the examiners' referral of their serious concern that SGC was part of a Ponzi scheme, a Matter Under Inquiry ("MUI")[10] was not opened until May 18, 1998 (the "1998 Stanford MUI"), approximately eight months after the Examination referral. *See* 1998 MUI Form, attached as Exhibit 52 at 1.  Preuitt recalled that "it took a long time to get anybody [in Enforcement] to open something."  December 14, 2009 Preuitt Testimony Tr. at 42.

### A.    The 1998 Stanford MUI Was Likely Not Even Opened in Response to the Examination Staff's Referral, But in Response to a Concern From the U.S. Customs Department That Stanford Was Laundering Money

The OIG investigation found that Enforcement likely only opened the MUI after being contacted by the United States Customs Department regarding the possibility that Stanford was involved in money laundering.

The 1998 Stanford MUI was opened on May 18, 2008, at 5:17 p.m.  Exhibit 52 at 3.  Harold Degenhardt, District Administrator for the FWDO at that time, approved

---

[10]    According to the SEC's Enforcement Manual:

> Prior to opening a MUI, the assigned staff … should determine whether the known facts show that an Enforcement investigation would have the potential to address conduct that violates the federal securities laws. …  To determine whether to open a MUI, the staff attorney, in conjunction with the Assistant Director, should consider whether sufficiently credible sources or set of facts suggests that a MUI could lead to an enforcement action that would address a violation of the federal securities laws. Basic considerations used when making this determination may include, but are not limited to:
>
> ▪  The statutes or rules potentially violated
>
> ▪  The egregiousness of the potential violation
>
> ▪  The potential magnitude of the violation
>
> ▪  The potential losses involved or harm to an investor or investors
>
> ▪  Whether the potentially harmed group is particularly vulnerable or at risk
>
> ▪  Whether the conduct is ongoing
>
> ▪  Whether the conduct can be investigated efficiently and within the statute of limitations period
>
> ▪  Whether other authorities, including federal or state agencies or regulators, might be better suited to investigate the conduct

March 3, 2010 SEC Enforcement Manual, relevant excerpts attached as Exhibit 51 at 20.

**App. 692**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

opening the MUI.[11]  *Id.* at 2.  The matter was classified as, *inter alia*, "Fraud in Offer/Sales/Purchases," "Suitability" and "Possible Organized Crime."  *Id.*  At 11:22 a.m. earlier the same day, [BD Examiner 2] a broker-dealer examiner in FWDO, had e-mailed Hugh Wright, the Assistant District Administrator for the FWDO Enforcement group until June 1998,[12] the following:

> I received note from [Exam Sr Cnsl] an attorney in the FWDO Examination group] to contact [ENF Atty 1] [an SEC Enforcement attorney in Washington, DC] re a [broker-dealer] examination. [ENF Atty 1] … explained he had received a referral from US Customs Dept regarding possible money laundering and wanted information regarding our [broker-dealer] examination of Stanford Group. …
>
> Neither you nor Spence [Barasch] [the Assistant Director in charge of the FWDO Enforcement program] were in so I notified Hal [Degenhardt].  He was to followup with [ENF Atty 1].  I did not mail or fax any documents.  See me when you return and I'll give full details.

May 18, 1998 E-mail from [BD Examiner 2] to Hugh Wright, attached as Exhibit 53.  Preuitt testified that she believed the referral from the U.S. Department of Customs was what convinced Enforcement to finally open the 1998 Stanford MUI.  December 14, 2009 Preuitt Testimony Tr. at 48.

[ENF Staff Atty 1], the staff attorney assigned to the 1998 Stanford MUI , did not recall in her testimony whether or not she ever saw the 1997 Examination Report. [ENF Staff Atty 1] Testimony Tr. at 11-12. [ENF Staff Atty 1] did recall, however, knowing about allegations of money laundering and drug trafficking concerning SGC.  *Id.* at 13-20.  In addition, the only specific aspect of the investigation that [ENF Staff Atty 1] recalled was attending a meeting in Houston, Texas with several other law enforcement agencies, including the United States Attorney's Office, the Postal Inspector, and the Secret Service, in which the agencies discussed the information they had regarding SGC's possible involvement in money laundering and drug trafficking.  *Id.* at 20-22.[13]

---

[11]  Harold Degenhardt was District Administrator for the FWDO from 1996 to 2005.  Degenhardt Interview Memorandum at 1.

[12]  In June 1998, Wright became the Assistant District Administrator for the FWDO Examination group; after his transfer, Spencer Barasch replaced Wright as the head of the FWDO Enforcement program.

[13]  Preuitt testified that [ENF Staff Atty] was not "particularly enamored with the examination process" and that she "was not an attorney I would have steered it to because she was not one that was easily approachable or particularly enthralled."  December 14, 2009 Preuitt Testimony Tr. at 50.

**App. 693**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B.     After Stanford Refused to Produce Documents, No Further Investigative Steps Were Taken

The only evidence of any investigative action taken by Enforcement in connection with the 1998 Stanford MUI was a voluntary request for documents that the SEC sent to SGC on May 27, 1998.  *See* May 27, 1998 Letter from ▮ENF Staff Atty 1▮ to ▮Stanford Empl 2▮ ▮Stanford Empl 2▮ SGC Compliance Officer, attached as Exhibit 54.[14]  The SEC's May 27, 1998 voluntary request for documents sought, *inter alia*, information regarding individuals referred by SGC to SIB, marketing documents, and correspondence concerning SIB.  *See Id.*  The letter also requested that SGC Compliance Officer ▮Stanford Empl 2▮ meet with the staff on June 23, 1998 to answer questions concerning SGC.  *Id.* at 3.[15]

On June 10, 1998, Jack Ballard, a partner with Ogden, Gibson, White & Broocks, L.L.P., who represented SGC, responded by letter to the SEC's request for documents.  *See* June 10, 1998 Letter from Jack Ballard to ▮ENF Staff Atty 1▮ attached as Exhibit 56.  Ballard informed ▮ENF Staff Atty 1▮ that, instead of producing the name, address, and telephone number of each individual or entity referred by SGC to SIB, SGC would only produce two "representative referral files."[16]  *Id.* at 2.  SGC refused to produce documents reflecting the receipt, expenditure, transfer, use or allocation of funds from SIB by SGC, suggesting as an alternative that, "[m]uch of the same information is provided in a report entitled Detail of Referred Balances," which they offered to provide for January through April 1998.  *Id.* at 3-4.  SGC also refused to produce copies of SGC correspondence relating to referrals to SIB and its products.  *Id.* at 4.

On June 19, 1998, Ballard sent a follow-up letter to ▮ENF Staff Atty 1▮ and Degenhardt, expressing "serious concerns" that the SEC staff's inquiry might interfere with SGC's business.  *See* June 19, 1998 Letter from Jack Ballard to ▮ENF Staff Atty 1▮ copying Harold Degenhardt, attached as Exhibit 58 at 2-3.  In this letter, Ballard requested a meeting with Degenhardt to discuss those concerns about the staff's inquiry.  *Id.* at 3.

The OIG found no evidence that, after receiving Ballard's response, the SEC staff made further efforts to obtain documents from SGC, a registered entity that was obligated to produce documents to the SEC.  We also found that the staff did not seek a formal

---

[14]   Although the documents requested appear relevant to a securities fraud inquiry, ▮ENF Staff Atty▮ did not recall in testimony that the 1998 Stanford MUI concerned possible fraud or a Ponzi scheme. ▮ENF Staff Atty 1▮ Testimony Tr. at 14-15 ▮ENF Staff Atty 1▮ recalled that the matter related to allegations of money laundering and drug trafficking.  *Id.* at 14-18.  However, she acknowledged that she was not aware of any other matters in which the SEC investigated money laundering and that she did not know how or why the SEC would investigate drug trafficking.  *Id.*

[15]   According to the 1998 Examination Report on Stanford, ▮Stanford Empl▮ had not been employed by SGC since ▮Fill▮   *See* Exhibit 55 at 7.

[16]   A June 30, 1998, letter from SGC to ▮ENF Staff Atty▮ indicates that SGC sent "the referral files you requested" on this date.  *See* June 30, 1998 Letter from Lena Stinson to ▮ENF Staff Atty 1▮ attached as Exhibit 57.

**App. 694**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

order in connection with this inquiry, which would have enabled it to subpoena
documents and testimony.  [ENF Staff Atty 1] Testimony Tr. at 28.

The OIG investigation found that Enforcement, notwithstanding its limited
investigative efforts, shared the Examination group's concerns that Stanford was
operating a Ponzi scheme.  In fact, the Assistant District Administrator for the FWDO
Enforcement group Hugh Wright testified that in 1998, "As far as I was concerned at that
period of time, in [E]nforcement we all thought it was a Ponzi scheme to start with.
Always did."  Wright Testimony Tr. at 11.  But, as Wright testified:

> [W]e knew that the only way you're going to be able to do
> anything with regard to Stanford is if you get subpoena
> power, and at that point in time, I don't think we had
> enough facts to where we could have sent up a memo to the
> Commission to get the order that would have allowed us to
> issue subpoenas.

*Id.* at 13.

### C.      The Enforcement Staff Closed the 1998 Stanford MUI Three Months
         After It Was Opened

On August 6, 1998, approximately three months after the inquiry was opened, the
Enforcement staff closed the Stanford MUI.  *See* MUI Closing Form, attached as Exhibit
59 at 1.  The closing form indicates that the matter was "transferred to another Federal
agency."[17]  *Id.* [ENF Staff Atty 1] testified that the decision to close the MUI was made by
Spencer Barasch, the Assistant Director for the FWDO Enforcement program at that
time, possibly with Degenhardt's involvement. [ENF Staff Atty 1] Testimony Tr. at 31.

Barasch told the OIG that he had "a very specific recollection" that when he
replaced Wright in mid-1998 as the Assistant District Administrator for the FWDO
Enforcement group, he reviewed the entire case inventory in the office, and that Stanford
was one of the matters he reviewed.  Barasch Interview Tr. at 10.  Barasch recalled
meeting with [ENF Staff Atty 1] regarding which of her cases should be pursued and which cases
should be closed.  *Id.* at 12.  Barasch told the OIG that he recalled deciding to close the
Stanford MUI and to refer the Stanford matter to the NASD.[18]  *Id.*  Barasch also told the

---

[17]    The SEC staff granted access to its files concerning its 1998 Stanford inquiry to the Federal Bureau of
Investigation, United States Customs Service, Office of the United States Attorney for the Southern District
of Texas, and U.S. Internal Revenue Service.  *See* July 24, 1998 Letter from Harold Degenhardt to [FBI]
[FBI]   August 10, 1998 Letter from Harold Degenhardt to [IRS]  August 25, 1998 Letter from
Harold Degenhardt to [Customs]  and October 20, 1998 Letter from Harold Degenhardt to [DOJ]
[DOJ]  attached as Exhibits 60, 61, 62, and 63, respectively.

[18]    The OIG has not found any evidence that the Stanford matter was actually referred from the SEC to the
NASD in 1998.

**App. 695**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

OIG that Degenhardt may have been involved in the decision to close the Stanford MUI.
*Id.* at 16.

According to Preuitt, Barasch called her into his office to tell her he was closing
the MUI because he "didn't expect a very happy response" from her.  December 14, 2009
Preuitt Testimony Tr. at 51.  Preuitt testified that Barasch explained to her that although
Enforcement had not "determined there was no fraud," the matter was being closed due
to "some problems with the case." *Id.*[19]  Preuitt described her reaction to learning from
Barasch that the Stanford inquiry was being closed as "shock and disbelief and this
incredible feeling of failure and great disappointment." *Id.* ▮Staff Acct. 1▮ described
Enforcement's decision to not conduct a full-blown investigation of SGC as "kind of a
disappointment," and testified that both Preuitt and he were frustrated that the
investigation was not going forward. ▮Staff Acct. 1▮ Testimony Tr. at 28.

### 1.   The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Was Not Warranted Because of the Lack of U.S. Investors

Preuitt testified that Enforcement's "most significant" concern about pursuing the
matter was the lack of U.S. investors and that this issue caused "some folks in
Enforcement [to not want] to conduct an investigation."  December 14, 2009 Preuitt
Testimony Tr. at 44.  Preuitt explained that "[i]n discussions with Enforcement, they
seemed to believe that [the lack of US investors] was a concern and maybe limited our
interest[]."[20]  *Id.* at 35, 52.  Preuitt's view of the issue was "why would it matter[?]; we
have a U.S. broker-dealer engaged in fraud." *Id.* at 35.

Felsman also recalled that the staff believed that there were no U.S. citizens that
had purchased Stanford CDs.  Felsman Testimony Tr. at 28.  She testified that the lack of
U.S. investors created another issue for Enforcement because her understanding at the
time was that "the Commission itself was [not] interested in entertaining cases not
involving United States citizens." *Id.* at 20. ▮Staff Acct. 1▮ also recalled there being a concern
that there were no identified U.S. investors in the Stanford CDs, and he understood this to
probably be the reason why the Stanford investigation "didn't proceed as it should have."
▮Staff Acct. 1▮ Testimony Tr. at 25-26.

---

[19]   Barasch did not recall this conversation with Preuitt about closing the 1998 Stanford MUI, but said he
"may have very well" had that conversation.  Barasch Interview Tr. at 18.

[20] ▮IA Examiner 1▮ an FWDO examiner who, as discussed below, conducted a second examination of
SGC in 1998, testified that while generally, the lack of U.S. investors does not "matter in terms of the
SEC's ability to bring an action … it does factor into [Enforcement's] priorities." ▮Examiner 1▮ Testimony Tr. at
79.

**App. 696**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Degenhardt acknowledged that he believed the lack of U.S. investors was "a
factor" in determining whether to pursue a particular matter, and noted that Barasch
shared his view.  Degenhardt Interview Memorandum at 4.

### 2.     The Enforcement Staff Told the Examination Staff That an Investigation of Stanford Would Be Too Difficult Because of the Staff's Inability to Obtain Records From Antigua

Felsman recalled that Enforcement was concerned about a "major jurisdictional
issue" related to the matter before she left the Commission at the end of 1997.  Felsman
Testimony Tr. at 20. IA Examiner 1      an FWDO examiner who, as discussed below,
conducted a second examination of SGC contemporaneous with the 1998 Stanford MUI,
testified that he learned that the staff closed the MUI without seeking a formal order
because "they didn't have any clear evidence of a fraud simply because they didn't have
enough information about what was going on at the offshore bank [and] they had
questions about the jurisdiction and about their ability to successfully subpoena
information from that offshore bank." IA Examiner 1    Testimony Tr. at 24-25 Staff Acct 1 also
testified that it was his understanding that another reason that the investigation did not go
forward was the fact that SIB was an offshore entity, which was a jurisdictional issue.
Staff Acct 1 Testimony Tr. at 26, 44.

The Enforcement branch chief assigned to the 1998 Stanford MUI, who asked the
OIG not to be identified, testified that the SEC staff could not proceed with the matter
because they did not have access to foreign records concerning Stanford, and they had
insufficient information regarding how Stanford achieved the purported returns.
Unidentified Former FWDO Enforcement Branch Chief Testimony Tr. at 11.  Barasch
also told the OIG that the fact that the CDs were issued by a foreign bank was a
significant factor in his decision to close the 1998 Stanford MUI.  Barasch Interview Tr.
12-14.[21]

As discussed below in Section XII of this ROI, the OIG investigation found that
there were larger SEC-wide reasons why Stanford matter was not pursued, including the
message Barasch received from senior Enforcement officials to focus on accounting
fraud cases; the difficulties in obtaining approval from the SEC staff in Washington, DC
to pursue novel investigations; the pressure in the FWDO to bring a lot of cases; the
preference for "quick hit" cases as a result of that pressure; and the fact that Stanford was
not a "quick hit" case.

---

[21]     Barasch told the OIG that "at one point" he called the SEC's Office of International Affairs ("OIA")
and asked how hard it would be to get documents located in Antigua, and OIA responded that it would be
"almost impossible."  Barasch Interview Tr. at 35.  However, the OIG found no other evidence that any
Enforcement staff contacted OIA or sought assistance or information about obtaining documents from
Antigua before closing the 1998 Stanford MUI.  OIA staff has no record or recollection of any contact by
the FWDO regarding Stanford before December 2004.  See March 22, 2010 E-mail from OIA Atty 2
to OIG Staff 1     , attached as Exhibit 64.

**App. 697**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

3.      SGC's Outside Counsel, a Former Head Of The SEC's Fort
Worth Office, May Have Assured Barasch That "There Was
Nothing There"

SGC was represented by two outside counsel in connection with the SEC's 1998
Enforcement MUI:  (1) Ballard, and (2) Wayne Secore, a founding partner of Secore and
Waller.  *See* June 19, 1998 Letter from Jack Ballard to ENF Staff Atty 1 attached as
Exhibit 65; Secore Interview Tr. at 3-4.  Secore previously had been District
Administrator of the FWDO, from approximately 1981 through 1986.  Secore Interview
Tr. at 3.

The June 19, 1998 letter discussed above, from Jack Ballard to ENF Staff Atty 1
copying Degenhardt, stated the following:

As you know, Wayne Secore and I represent Stanford
Group Company ("SGC"), a registered broker-dealer and
investment advisor, in connection with the informal inquiry
being conducted by the Fort Worth District Office. We
have had several telephone discussions with you
concerning the scope of the inquiry which, as you have
informed us, primarily concerns the relationship of SGC
with Stanford International Bank ("SIB"), a private
international bank located in Antigua, West Indies.

Exhibit 65.

In his letter to ENF Staff Atty 1, Ballard expressed "serious concerns" about the SEC's
inquiry interfering with SGC's operations.  *Id.* at 2.  The letter concluded with the
following request for a meeting with Degenhardt:

Wayne [Secore] and I believe the seriousness of SGC's
concerns warrant a personal meeting with you and Harold
Degenhardt to discuss those concerns raised in this letter.
Wayne and I are available at any time on Tuesday, June 23
or Wednesday, June 24.  Please let me know at your
earliest convenience when a personal meeting with you and
Mr. Degenhardt can be scheduled.

*Id.* at 3.[22]

---

[22]   Although this letter and a June 10, 2008 letter to the SEC (*see* Exhibit 56) were from Ballard, Secore
appears to have been the lead attorney on the matter.  An SGC document apparently created in February
2002 summarized the legal fees paid by SGC and indicated that SGC paid Secore's firm, Secore & Waller,
$48,229.93 between June and October 1998 for services related to the 1998 SEC Enforcement matter.  *See*
(Footnote continued on next page.)

40

**App. 698**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Neither Ballard nor Secore recalled meeting with the SEC staff about Stanford. *See* Ballard Interview Tr. at 6; Secore Interview Tr. at 5, 8.  However, Secore did say that it was likely he met with senior SEC staff since the meeting was requested.  Secore Interview Tr. at 9-10.  Secore said that it was "very rare" that his request for a meeting with senior SEC staff was denied.  *Id.* at 10.

[ENF Staff Atty 1] did not recall whether Degenhardt or Barasch met with Secore, but she testified that it was very common for defense counsel in an investigation to contact Barasch or Degenhardt and discuss the investigation. [ENF Staff Atty 1] Tr. at 50-55.  [ENF Staff Atty 1] testified that she had been frustrated when this occurred.  *Id.* at 51.

During the course of this OIG investigation, Preuitt provided information alleging that in mid-2009, Barasch told her that in 1998, he had relied on a representation from Secore that the 1998 Stanford MUI should be closed.  According to Preuitt, at a restaurant in New Orleans, Louisiana, during a July 30 to August 1, 2009 social trip with her, Barasch, FWDO Enforcement staff attorney [ENF Staff Atty 4] and former FWDO Enforcement staff attorney [ENF Staff Atty 3] Preuitt asked Barasch why he had not pursued an investigation of Stanford in 1998.  December 14, 2009 Preuitt Testimony Tr. at 53-54.  Preuitt stated in her testimony that Barasch told her it was because "Wayne Secore had told him there was nothing there."  *Id.* at 53; *see also* Preuitt Interview Tr. at 4-5 (stating that Barasch told Preuitt "he asked Wayne Secore if there was a case there and Wayne Secore said that there wasn't.  So he was satisfied with that and decided not to pursue it further.")

Barasch told the OIG that he "vaguely" recalled Secore having represented Stanford.  Barasch Interview Tr. at 18-19.  However, he adamantly denied that Secore influenced his decision to close the Stanford MUI.  *Id.* at 21.  Barasch told the OIG that he recalled the trip to New Orleans in mid-2009 with Preuitt, [ENF Staff Atty 4] and [ENF Staff Atty 3]  *Id.* at 19.  Barasch told the OIG that he recalled discussing the Stanford case with Preuitt during this trip, and that Preuitt may have brought up the 1998 MUI in this conversation.  *Id.* at 19-21.  Barasch, however, denied telling Preuitt that he closed the MUI because of a representation by Wayne Secore about Stanford, stating that "I would never have said that. … I would never accept an attorney's representation about anything. … [T]hat's absurd."  *Id.* at 21.[23]

---

February 28, 2002 E-mail, attached as Exhibit 66.  By comparison, SGC paid Ballard's firm $15,622.05 for work related to the matter.  *Id.*

[23]   Preuitt testified that she and [ENF Staff Atty 4] discussed Barasch's statement to her about closing the 1998 MUI based on an assurance from Wayne Secore "several times," including during a subsequent business trip on October 21-22, 2009, while she and [ENF Staff Atty 2] were having dinner at the same New Orleans restaurant.  December 14, 2009 Preuitt Testimony Tr. at 88-89; December 15, 2009 E-mail from Julie Preuitt to David Kotz, attached as Exhibit 67.  On November 3, 2009 [ENF Staff Atty 2] told the OIG that he did not recall having a conversation with anyone about whether Wayne Secore had represented Stanford at some point. [ENF Staff Atty 4] Interview Tr. at 3.  He also told the OIG on November 3, 2009, that he didn't know that Secore had ever represented Stanford.

(Footnote continued on next page.)

41

**App. 699**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

## III. IN 1998, THE FWDO EXAMINATION STAFF EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AND REACHED THE SAME CONCLUSION AS THE BROKER-DEALER EXAMINERS: STANFORD'S CD SALES WERE PROBABLY FRAUDULENT

In June 1998, while the 1998 Stanford MUI was open, the FWDO's investment adviser Examination group began an examination of SGC. *See* Exhibit 55. ▇▇▇▇▇ ▇▇▇▇▇ and ▇▇▇▇▇ [24] were the examiners assigned to the matter. *Id.*

▇▇▇▇▇, the senior examiner on the matter, testified that he was aware of the B-D Examination group's concerns about "possible misrepresentations and a possible Ponzi scheme on the part of [Stanford]" when he started working on the 1998 Exam. ▇▇▇▇▇ Testimony Tr. at 18. ▇▇▇▇▇ also "understood the broker-dealer folks … were concerned that there wasn't a lot of information about what the offshore bank was doing with the money that was being raised through the sale of the CDs." *Id.* at 19.

The resulting examination report, issued on July 16, 1998 (the "1998 Examination Report") stated:

> The area of concern involves the registrant's "referral" of customers to an affiliated offshore bank for investment in "Certificates of Deposit" ("CDs") issued by that bank. The examiners sought to gather information about "referrals" of advisory clients. ….

> The examination revealed that at least seventeen SGC advisory client accounts have also invested an as-yet undetermined amount in the CDs. It was also represented to the examiners that these clients are non-U.S. citizens. Based upon the amount of referral fees earned by SGC in 1997, it appears that SGC brokerage and advisory clients may have invested as much as $250 million in the CDs. There is an outstanding request for the name, address and amount invested for each SGC advisory client who has also invested in the CDs.

> …

---

On January 11, 2010 ▇▇▇▇▇ provided the OIG with sworn, on-the-record testimony, and reiterated his claim that he had not heard that Secore ever represented Stanford. ▇▇▇▇▇ Testimony Tr. at 25. He also testified that he was not "aware of any role that Spence Barasch p▇▇▇▇▇ the Stanford investigation" and would not "have associated Spence Barasch with Stanford." *Id.* at 28. Finally, ▇▇▇▇▇ testified that he did not "recall ever having a discussion with [Preuitt] about Spence Barasch and Stanford." *Id.* at 27.

[24] The only substantive recollection ▇▇▇▇▇ had of the 1998 Examination was that it involved CDs that paid suspiciously high returns. ▇▇▇▇▇ Interview Tr. at 8-9, 13.

**App. 700**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> As of the date of this report, SGC has been unable to provide a complete list of the advisory clients invested in the CDs and the amount invested.
>
> …
>
> It was first represented to the examiners that no records were kept by SGC in relation to the client investments in the CDs.  However, SGC later represented that such records do exists [sic] and is compiling a list as requested.[25]

Exhibit 55 at 1, 4.[26]

IA Examiner 1 agreed that he shared the B-D examiners' "concerns about the fact that these CDs had relatively high interest rates and yet were being promoted as being very safe and secure. IA Examiner 1 Testimony Tr. at 20.  Like the B-D examiners, he was suspicious about "how Stanford was able to achieve these returns with such allegedly safe investments." *Id.* at 20 IA Examiner 1 summarized his concerns as follows:

> [E]xtremely high interest rates, extremely generous compensation, [SGC] is extremely dependent upon that compensation to conduct its day-to-day operations.  It just smells bad.

*Id.* at 21.

---

25 IA Examiner 1 explained, "[W]e asked the compliance personnel at Stanford have any advisory clients invested in these CDs, and their first answer was we don't know. … And, so during the course of the exam, maybe even after the completion of the fieldwork, they eventually got back to me and gave me a list, I believe, of names that included 17 names. IA Examiner 1 Testimony Tr. at 36 IA Examiner 1 found SGC's initial response that they did not know if any of SGC's clients had purchased the Stanford CDs "suspicious." *Id.* at 37.  He testified, "That was one in many red flags.  I found it incredible that they wouldn't know who they referred, at a minimum, to the bank." *Id.* at 44.

26   The 1998 Examination Report also discussed the fact that two SGC compliance officers had left within a two-month period and discrepancies in the reasons given for their departures.  Exhibit 55 at 7.  The report concluded that those facts "raise concerns about SGC's compliance system. … The examiners will bring this matter to the attention of FWDO Division of Enforcement." *Id.*

**App. 701**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

A. The 1998 Examination Concluded That SGC's Sales of SIB CDs Were
Not Consistent With SGC's Fiduciary Obligation to Its Clients Under
the Investment Advisers Act

[IA Examiner 1] testified that one of his concerns about SGC that arose during the 1998
Examination was the complete lack of information SGC had regarding the CDs and the
SIB investment portfolio that purportedly supported the CDs unusually high and
consistent returns.  [IA Examiner 1] explained:

> We asked for all due diligence information that the adviser
> or the Stanford Group Company possessed concerning the
> CDs, whatever they had as to how the money was being
> invested, performance returns of the portfolio, whatever
> they had, and as I recall, they produced very, very little.
> They claimed, we don't have access to that information.
> …
>
> Well, the question is how would you sell it consistent -- in
> the case of an adviser, consistent with your fiduciary duty
> to your clients.
> …
>
> So my conclusion was, as I have asked you, give me
> everything you've got about that investment, and they gave
> me virtually nothing, certainly nothing in my mind that
> would be a reasonable basis for making a recommendation
> of an investment.  So that's why -- I think if you see the
> letter I sent to Stanford as a result of this report, I put in
> there [Section] 206[27] language about it doesn't look like
> you've got enough information to fulfill your fiduciary duty
> in making this recommendation.  … And that would have --
> in my mind, have been one of the theories to bring a case
> against the adviser by enforcement that that was such a -- a
> glaring absence of basis for a recommendation that it
> amounted to deceit or fraud upon the client.

[IA Examiner 1] Testimony Tr. at 41-44.

---

[27]    Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-6, prohibits certain transactions
by investment advisers.

**App. 702**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties. No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On July 16, 1998, the SEC sent a letter to SGC that identified some of its
concerns resulting from the 1998 Examination. That letter described SGC's "[f]iduciary
[o]bligation" to its clients as follows:

> An adviser has a fiduciary relationship with clients and
> owes them undivided loyalty. … [An] investment adviser
> has an … affirmative obligation to employ reasonable care
> to avoid misleading clients.[28] Any departure from this
> fiduciary standard may constitute fraud upon clients under
> Section 206 of the Advisers Act.
>
> During the examination, it was learned that representatives
> of SGC recommend to broker-dealer and advisory clients
> investments in a "certificate of deposit" ("CDs") issued by
> an affiliated bank domiciled in St. John's, Antigua, West
> Indies, Stanford International Bank Limited ("SIB"). …
> [I]t was represented that no one at SGC maintained a record
> of all investors in the CDs or a record of all advisory clients
> who invested in the CDs. …
>
> SGC may be under a mistaken understanding that …
> somehow these investment recommendations, or
> "referrals," fall outside the purview of the Advisers Act and
> SGC's duties thereunder. Please be advised that the
> examiners do not take this position, but rather construe the
> adviser's duty of utmost good faith to apply to any and all
> dealings between SGC and its advisory clients to whom it
> owes a fiduciary duty. … Sections 206(1) and (2) forbid
> fraud and deceit by an adviser in dealing with its clients
> without regard to whether a security is involved.[29]

July 16, 1998 Letter from ████████ IA Examiner 3 ████ to Robert Glen, attached as
Exhibit 69 at 3-4.

---

[28]   In its Memorandum of Law in Support of Motion for Ex Parte Temporary Restraining Order,
Preliminary Injunction and Other Emergency Relief ("SEC Brief"), filed on February 17, 2009, attached as
Exhibit 68, the SEC cited *SEC v. Capital Gains Research Bureau, Inc. et al.*, 375 U.S. 180, 194 (1983) for
the proposition that an investment adviser has "an affirmative obligation to employ reasonable care to avoid
misleading [his or her] clients." *Id.* at 27.

[29] ██ IA Examiner 1 ██ testified that Stanford's response to the deficiency letter was inadequate and did nothing to
allay his concerns that Stanford's CD sales were fraudulent. ██ IA Examiner 1 ██ Testimony Tr. at 55-56.

**App. 703**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B.       The Enforcement Staff Failed to Consider the Investment Adviser Examiners' Concerns in Deciding Not to Investigate Stanford Further

▓IA Examiner 1▓ testified that the IA Examination staff brought their concerns to Enforcement's attention while the 1998 Stanford MUI was still open. ▓IA Examiner 1▓ Testimony Tr. at 47.  In fact ▓IA Examiner 1▓ testified that the only reason the examination staff did not make a second formal Enforcement referral of Stanford in connection with the 1998 Examination was the fact that Enforcement already had an open MUI.  *Id.* at 55-56. ▓IA Examiner 1▓ testified, however, that there were no "coordination efforts" between the examiners and the Enforcement staff in connection with the 1998 Stanford MUI.  *Id.* at 29. ▓IA Examiner 1▓ explained:

> My exam was done.  I did the exam report.  I understood
> enforcement was looking at it.  I just thought enforcement
> will go out and get whatever additional information they
> need.

*Id.*  Enforcement staff attorney ▓ENF Staff Atty 1▓ testified that she had no recollection of an examination of SGC in July 1998, and she did not recall the investment adviser examiners referring any information to her or her branch chief about SGC. ▓ENF Staff Atty 1▓ Testimony Tr. at 29-30.

According to a former FWDO Examination branch chief, the Enforcement staff's failure to coordinate with the examiners who were conducting an examination of Stanford contemporaneous with the 1998 MUI before deciding to close that MUI was, in his opinion, "crazy … nonsensical."  Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 37; *see also id.* at 43 (The Enforcement staff's failure to coordinate with ▓IA Examiner 1▓ "doesn't make any sense.")

▓IA Examiner 1▓ testified that he was "concerned" when Enforcement closed the 1998 Stanford MUI because "we still had the same concerns that this thing is going to continue to grow and we're not really comfortable that it's a legitimate operation." ▓IA Examiner 1▓ Testimony Tr. at 59.  Specifically ▓IA Examiner 1▓ concurred "that Stanford was operating some kind of fraud."  *Id.* at 60.  Preuitt testified that after the 1998 Examination, both the investment adviser and broker-dealer examiners "knew that it was a fraud."  December 14, 2009 Preuitt Testimony Tr. at 60.

46

**App. 704**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

## IV.    IN 2002, THE SEC EXAMINERS EXAMINED SGC'S INVESTMENT ADVISER OPERATIONS AGAIN AND REFERRED STANFORD TO ENFORCEMENT

In November 2002, the SEC's investment adviser examination group conducted yet another examination of SGC.  *See* Exhibit 70. █████████ and █████████ were the examiners assigned to the matter.  *Id.* at ii.  █████████ testified that he selected SGC as part of his plan to examine other registered investment advisers in Houston, Texas.  █████████ Testimony Tr. at 10-11.  █████████ testified that he asked █████████ if he wanted to assist with the Houston examinations, including Stanford.  *Id.* at 11-12.  In response, █████████ told █████████ that █████████ had examined SGC in 1998 and was concerned about its operations.  *Id.* at 12.  █████████ described █████████ reaction to █████████ request for assistance as follows:

> [W]hen I mentioned Stanford [to █████████ he kind of had an odd look on his face and I asked him, "What's wrong with Stanford?" And he explained to me that he had been there in [1998], and that he had strongly suspected that the affiliated bank of the investment advisor had problems.
> …
>
> I asked him what type of problems, you know, what was the deal, and -- I can't remember whether he actually came out and said Ponzi scheme or fraud but he made it clear that the bank was taking in deposits and he suspected that, whenever there was a redemption, they were just taking that money out of -- new money from new investors.  So like I said, I can't remember if he used the word "fraud" or "Ponzi scheme," but he made it clear that that's what he suspected.

*Id.* at 12.

### A.    In the 2002 Examination, the Examiners Found That Stanford's CD Sales Had Increased Significantly, Which Led to Concerns That the Potential Ponzi Scheme Was Growing

Stanford's operations had grown significantly in the four years since the 1998 Examination.  The 1998 Examination Report stated, "Based upon the amount of referral fees earned by SGC in 1997, it appeared that SGC brokerage and advisory clients may have invested as much as $250 million in the CDs."  Exhibit 55 at 1.  According to the Examination report issued on December 19, 2002 (the "2002 Examination Report"), "At the time of the current examination, the amount of referral fees received by SGC would be indicative of $640 million in CDs outstanding, primarily through SGC's efforts."

47

**App. 705**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

2002 Examination Report, attached as Exhibit 70 at 2.  The 2002 Examination Report
also noted:

> According to the last Form D filed with the Commission on
> January 29, 2002, SIB claimed to have sold $37.2 million
> (of $150 million offered) in CDs to an undisclosed number
> of U.S. resident accredited investors.  This amount reflects
> additional deposits of $22.3 million to U.S. investors since
> February 24, 2000, the date of the previous Form D, when
> SIB reported total sales of $14.9 million. … SIB's financial
> statements for the year ended December 31, 2001, …
> indicated total 'certificates of deposit' of $1.1 billion.

*Id.* at 10.

The 2002 Examination Report's conclusions included, "Based upon the results of
this examination, the FWDO has assigned a "risk rating" of "1," the highest risk rating
possible, primarily due to SGC's sales of the CDs."  Exhibit 70 at 15. IA Examiner 2 testified
that a "big factor" in the assignment of a "high" risk rating to Stanford was the
"suspicions [that] the international bank was a Ponzi scheme." IA Examiner 2 Testimony Tr. at
40.

According to the branch chief assigned to the 2002 Examination, who asked not
to be identified, he and the examiners had "major concerns" about Stanford's operations.
Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 46-47. IA Examiner 2
testified that there were numerous red flags regarding the SIB CDs that caused him to
conclude that Stanford had been operating a Ponzi scheme and it was growing
exponentially.  *See, e.g.,* IA Examiner 2 Testimony Tr. at 68, 96.  As IA Examiner 2 testified, one of
those red flags was the consistent, above-market reported returns, stating, "[W]hen you
take the CD rates, the commission, the overhead and added them together … it just
seemed very unlikely that they could invest in anything legitimate to earn a return to
cover all those expenses." IA Examiner 2 Testimony Tr. at 29-30.

IA Examiner 2 testified that the high commissions paid to SGC financial advisers for
selling the SIB CDs was another significant cause of the staff's suspicions. IA Examiner 2
made these observations in the following exchange:

> Q:  And did it make sense to you that Stanford Group
>     Company … [would] be able to persuade all these
>     people to invest [in the Stanford CDs] without having
>     any understanding as to what the product was … ?
>
> A:  It's been my experience that, when you offer a
>     commission that high to a rep, they'll find some way to
>     make it attractive to the customer.

**App. 706**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

…

> Q:  [W]ould you agree … that the high referral fee was
>      indicative of a possible fraud in two respects.  One is …
>      how you make a safe investment to support [the referral
>      fee] and the interest that you're paying?
>
> A:  Right.
>
> Q:  But two, it's indicative of a strong incentive that's
>      being put on the reps to sell that product.  Is that also
>      somewhat of a red flag … ?
>
> A:  Yes, that's correct.

[IA Examiner 2] Testimony Tr. at 66-68.

Another red flag that concerned the examiners was SGC's claimed lack of
information about which of its clients had invested in the SIB CDs [IA Examiner 2] testified that
during and after the examination [IA Examiner 1] and he asked SGC several times for a list of
SGC's investment advisory clients that had invested in SIB CDs.  *Id.* at 30, 55.  A March
20, 2003 e-mail from [IA Examiner 2] to [IA Examiner 1] stated:

> [SGC] sent us a list of CD investors.  The list seems
> awfully short.  They didn't include addresses - however,
> just looking at the names the majority appear to be US
> citizens.[30]

March 20, 2003 E-mail from [IA Examiner 2] to [IA Examiner 1] attached as Exhibit 71.
Approximately two months later, on May 22, 2003, [IA Examiner 1] e-mailed [IA Examiner 2]

> I was thinking about going back to confirm with [SGC's
> Compliance Officer] that we had a full list of CD holders
> that bought through SGC.  The totals from the list she gave
> us do not exactly match up with the total CDs outstanding
> that should be out there based upon the referral fees SGC
> received in 2001 ….

---

30 [IA Examiner 2] testified that he felt the issue of whether there were U.S. investors was irrelevant, but that he
understood that it was a factor for Enforcement. [IA Examiner 2] Testimony Tr. at 55-57.

**App. 707**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

May 22, 2003 E-mail from ▮▮▮ [IA Examiner 1] to ▮▮▮ [IA Examiner 2] attached as Exhibit 72. ▮▮▮ [IA Examiner 2]
testified that he did not believe the examiners ever got "a satisfactory response [to the
request], and a full list of investors."[31] ▮▮▮ [IA Examiner 2] Testimony Tr. at 109.

**B.      The 2002 Examination Found That SGC Was Violating the
         Investment Advisers Act By Failing to Conduct Any Due Diligence
         Related to the SIB CDs**

The 2002 Examination Report included the following comment regarding Section
206 of the Investment Advisers Act in its summary of violations, "[SGC] failed to
document adequate due diligence with respect to its clients' investments in its affiliated
offshore bank's certificates of deposit."  Exhibit 70 at 1.  The 2002 Examination Report
discussed SGC's lack of due diligence as follows:

> A review of SGC's "due diligence" files for the SIB
> certificates of deposit ("CDs") revealed that SGC had little
> more than the most recent SIB financial statements (year
> end 2001) and the private offering memoranda and
> subscription documents.  There was no indication that
> anyone at SGC knew how its clients' money was being
> used by SIB or how SIB was generating sufficient income
> to support the above-market interest rates paid and the
> substantial annual three percent trailer commissions paid to
> SGC.
> …
> The examiners obtained copies of the disclosure documents
> given to U.S. accredited investors ….  [T]he document
> provides no disclosure of specifically how the money will
> be used by the issuer.

Exhibit 70 at 10.

---

[31]   As discussed below, on December 16, 2002, ▮▮▮ [IA Examiner] and ▮▮▮ [IA Examiner 2] learned that Enforcement had
decided not to investigate Stanford before seeing the 2002 Examination Report and before that report was
even finished.  On December 19, 2002, ▮▮▮ [IA Examiner 1] e-mailed ▮▮▮ [IA Examiner 2] regarding their efforts to obtain
information from SGC regarding its clients who had invested in SIB CDs, stating, "On other hand, if we
aren't going to investigate the thing I don't see that it matters."  December 19, 2002 E-mail from ▮▮▮ [IA Examiner 1]
▮▮▮ [IA Examiner 1] to ▮▮▮ [IA Examiner 2], attached as Exhibit 73. ▮▮▮ [IA Examiner 2] testified that it would not have been a productive
exercise to push for more information from SGC if Enforcement had already decided to not investigate the
matter. ▮▮▮ [IA Examiner 2] Testimony Tr. at 90-91.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[IA Examiner 2] explained his rationale for concluding that SGC was violating Section
206 as follows:

> [F]or all of [SGC's] investment advisory clients they were
> [a] fiduciary and whenever they refer that client to some
> other investment product, whether it's a security or not,
> they were supposed to do some due diligence into doing
> that.  So we asked them:  Give us the due diligence file for
> this offshore bank.  We want to see [] everything you
> looked at before you made this recommendation to refer
> these clients over.  The only thing we got if I remember
> right was just the file with the financial statements and
> maybe a couple other things in there.  So [IA Examiner 1]
> and I took the position that that wasn't enough.

[IA Examiner 2] Testimony Tr. at 48-49 [IA Examiner 1] also testified that he considered SGC's due
diligence files to have been "extremely lacking." [IA Examiner 1] Testimony Tr. at 75.

On December 19, 2002, the Examination staff sent Stanford a deficiency letter to
SGC's Chief Compliance Officer, requesting that "SGC perform and document
substantial additional due diligence to determine whether the use of proceeds by the
issuer would indicate that the investment is suitable for its advisory clients."  *See*
December 19, 2002 Letter from [IA Examiner 1] to Jane Bates, attached as Exhibit 74 at
8.  That letter explained:

> An adviser has a fiduciary relationship with clients and
> owes them undivided loyalty. … Any departure from this
> fiduciary standard may constitute fraud upon clients under
> Section 206 of the Advisers Act and subject you to
> administrative, civil and/or criminal sanctions.
> …
>
> The Examination Staff's review of SGC's due diligence file
> with respect to its clients' investments in the [SIB CDs]
> indicated that *SGC did not have adequate information upon
> which to base a recommendation to a client.*
> …
>
> The rates offered by the CDs, as compared with current
> treasury rates, would indicate that the risk involved in the
> CDs may be great.

*Id*. at 7-8 (emphasis added).

**App. 709**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In March 2003, in addressing the deficiencies identified during the 2002
Examination, SGC markedly changed its previous representations to the SEC concerning
its due diligence regarding SIB's CDs.  *See* March 13, 2003 Letter from Jane Bates to
[Staff Acct 2] attached as Exhibit 75 at 4.  A March 19, 2003 e-mail from [IA Examiner 2] to
[IA Examiner 1] discussed SGC's latest response to the examination staff's deficiency letter as
follows:

> During the fieldwork of the examination, I got the definite
> impression that the Registrant's staff was trying to "wash
> their hands" of the offshore bank and downplay the
> activities of the bank in their office.  We were told that
> once a client was referred to the bank, the adviser's
> personnel no longer took an active role in managing that
> portion of the client's assets.  Now Jane [its Chief
> Compliance Officer] claims that Stanford's COO and Chief
> Compliance Officer regularly visit the offshore bank,
> participate in quarterly calls with the CFO of the bank, and
> receive quarterly information regarding the bank's portfolio
> allocations (by sector and percentage of bonds/equity, etc.),
> investment strategies, and top five equity and bond
> holdings.  Jane also says that such information will now be
> included in its due diligence files.  I believe this to be a
> mistake by Jane and others at Stanford - this response
> should come in handy when the bank collapses and
> everyone there plays dumb.[32]  Also, if this information is
> included in the due diligence file, we should have access to
> it now ….  Perhaps we should drop by unannounced and
> ask to look at it.

Exhibit 71.  [IA Examiner 1] responded:

> On the Stanford Bank issue, I am not sure what to do.  If
> they have the information they gathered on these visits to
> Antigua, why didn't they give it to us when we asked for
> it?  I guess we should ask for it again.

*Id.*

Regarding SGC's new claim to have information regarding SIB's portfolio,
[IA Examiner 2] testified that it was "a red flag that all of a sudden [SGC] claimed to have this
information when they didn't have it before." [IA Examiner 2] Testimony Tr. at 96.  In fact,

---
[32] [IA Examiner 2] testified that when he made this comment, he thought there was "about a 95 percent chance
that [SIB] was going to collapse" because it was a Ponzi scheme. [IA Examiner 2] Testimony Tr. at 99.

**App. 710**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

when [IA Examiner 2] received this letter, he "knew right then, that either [SGC's Chief
Compliance Officer] was a bit out of it or that she had lied."  *Id.* at 96-97.

However, the OIG investigation found that the SEC never received, nor requested,
the information referenced in SGC's March 13, 2003 letter.  *Id.*  Despite [IA Examiner 2]
suggestion in his March 19, 2003 e-mail that "[p]erhaps we should drop by unannounced
and ask to look at it," we found that the SEC did not follow-up to obtain the newly-
claimed due diligence information.  Exhibit 71 at 102-103.

**C.      During the 2002 Examination, the FWDO Enforcement Staff
Received a Letter From the Daughter of an Elderly Stanford Investor
Concerned That the Stanford CDs Were Fraudulent**

On December 5, 2002, Degenhardt received a letter dated October 28, 2002, from
a citizen of Mexico who raised concerns about Stanford similar to those raised by the
Examination staff.  *See* October 28, 2002 Letter from [Complainant 1]
to SEC Complaint Center, copying Harold Degenhardt (the "[Complainant 1] Letter"), attached
as Exhibit 76.  The [Complainant 1] Letter stated:

> My mother is an old woman with more than 75 years of age
> and she has all her money my father inherited to her for his
> life work in CDs of Stanford Bank.  This is the only money
> my mother has, and it is necessary for my mother, my
> sisters and me for living.  My mother put it in the United
> States because of the bad situation in Mexico and because
> the most important thing is to look for security.  …
>
> I am an accountant by profession and work for a large bank
> in Mexico.  I know some banking regulations of my
> country that are very different from practices in Stanford
> Bank and for that reason I am very nervous.  Please look at
> this bank and investigate if everything is honest and
> correct.  There are many investors from Mexico in this
> bank.
>
> My questions and doubts are listed here.
>
> 1.      Stanford says the CDs have insurance.  My mother
> receives two statements of accounts.  One from Stanford
> bank in Antigua with the CDs and another one from
> Stanford and Bear Stearns in New York.  I know Bear
> Stearns is a very good company, but the statement of Bear
> Stearns only has cash that my mother uses to take out
> checks.  This cash is the interest that the CD pays.  Is the

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

bank in Antigua truly covered by insurance of the United States Government?

2.      The CD has a higher than 9% interest and I know other big banks like Citibank pay interest of 4%.  Is this possible and secure?
…

4.      In December of 1999 the bank had a lot of investments in foreign currencies and in stocks.  In all the world many stocks and foreign currencies came down in 2000.  If a lot of money was in investments that came down, how did the bank make money to pay the interest and all of the very high expenses I imagine it has. …

5.      The accounting company that makes the audit (C.A.S. Hewlett & Co) is in Antigua and [no]body knows. I saw the case of ENRON with bad accounting and I am preoccupied with another case of fraud accounting.  Why is the auditor a company of Antigua that [no]body knows and not a good United States accounting company?

I know some investors that lost money in a United States company named InverWorld in San Antonio.  Please review very well Stanford to make sure that many investors do not get cheated.  These investors are simple people of Mexico and maybe many other places and have their faith in the United States financial system.

*Id.*[33]

---

[33]      Approximately eleven months before receipt of this letter, Barasch was forwarded another complaint from ▮Complainant 2▮ that stated:

I am currently providing ▮PII▮ services to an Antigua company and have become very concerned about the unusual activities of the Stanford Financial Group, a Texas based organisation, operating though subsidiaries on the Island.

…

The Company has recently written off a significant, overdue interest payment as "a gift to the people of Antigua" to enable the Government to pay its public employees and has announced that it will now make further substantial loans.

I draw this to your attention as these curious strategic decisions may not be reaching the shareholders of the Group and may ultimately be placing their investments at risk.

I would be pleased to forward further information upon request.

(Footnote continued on next page.)

**App. 712**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

[IA Examiner 2] testified regarding the [Complainant 1] Letter, that "It looked like she had the
same sort of concerns we had, about the higher rate of interest. … " [IA Examiner 2] Testimony
Tr. at 62. [IA Examiner 2] characterized those concerns as "legitimate." *Id.*

**D.    The FWDO Did Not Respond to the [Complainant 1] Letter and Did Not Take
Any Action to Investigate Her Claim**

[IA Examiner 1] testified that his reaction to the letter was, "[T]his is great, we've got
actually somebody complaining." [IA Examiner 1] Testimony Tr. at 93. [IA Examiner 1] also felt that "we
need[ed] to get in touch with this lady," because he was "almost certain there was
something to her complaint." *Id.* at 74. [IA Examiner 1] drafted a response to her letter. *Id.* at 73-
74.  That draft response stated, in part:

> If the person who sold the CD to your mother is a
> registered representative of SGC, a registered broker
> dealer and investment adviser in the United States, there may be
> some aid we can provide.  …  If you wish your letter to be
> considered a complaint with regard to this registered
> representative's actions, we will forward your letter to SGC
> and ask that they respond to you and this office to explain
> why such an investment was suitable for your 75-year old
> mother.  *That response might be enlightening to all of us.*
> …
>
> With respect to the interest rate being paid, we share your
> concerns about whether it is possible to pay such a high
> interest rate in the current economic environment.  As I am
> sure you are aware, the general principal [sic] is that the
> higher the interest rate offered, the more risk is being taken
> in the investment.  …

December 2002 Draft Letter to [Complainant 1] from [IA Examiner 1]
attached as Exhibit 78 (emphasis added).

        The OIG investigation found that [IA Examiner 1] response letter was never sent.
[IA Examiner 1] Testimony Tr. at 73-74.

---

February 5, 2002 E-mail from [OIE Atty] to Spencer Barasch, attached as Exhibit 77.  The OIG
found no evidence that anything was done in response to this complaint.

[34]    On December 11, 2002, [IA Examiner 1] e-mailed Wright the draft response and stated, [Staff Acct 2] and I have
come up with this draft response to the lady in Mexico.  It should at least get the ball rolling on responding.
Let us know what you want us to do."  *See* December 11, 2002 E-mail from [IA Examiner 1] to Hugh
Wright, attached as Exhibit 79.  The draft response was circulated to [ENF BC 4] a branch chief in
Enforcement, who responded, "I want to spend more time with this.  It may make sense after we look at
everything.  The letter should come from the enforcement attorney." *Id.*

**App. 713**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

**E.   Although a Decision Was Made to Forward the** ▮Complainant 1▮ **Letter to the
Texas State Securities Board, the Letter Was Never Forwarded**

▮IA Examiner 1▮ testified that after he had drafted a response to the ▮Complainant 1▮ Letter, he was
told that Barasch had decided to forward the ▮Complainant 1▮ Letter to the Texas State Securities
Board ("TSSB").  *Id.* at 91-92. ▮IA Examiner 1▮ was "puzzled" by Barasch's decision "because
[he] didn't see how the Texas State Securities Board could do even as much as we could
potentially do, much less more.  So it didn't make any sense..." *Id.* at 92.  According to a
tracking report and a notation that ▮IA Examiner 2▮ made on that document, the ▮Complainant 1▮ Letter
was to have been forwarded to the TSSB "per Barasch" on December 10, 2002.  *See* SEC
Tracking Report, attached as Exhibit 80.

However, the OIG investigation found that the ▮Complainant 1▮ Letter was not sent to the
TSSB.  Denise Crawford, Texas State Securities Commissioner, and ▮TSSB Empl 1▮ ▮PII▮
▮PII▮, told the OIG that the TSSB had searched its files and
found no record of receiving the letter.  TSSB Interview Memorandum at 4; ▮TSSB Empl 1▮
Interview Memorandum.  Crawford also stated that, as a matter of procedure, if the SEC
sends a letter to TSSB stating that the SEC is sending a complaint to the TSSB, the TSSB
regularly keeps records of such letters.  TSSB Interview Memorandum at 4.  Crawford
also stated that the fact that the TSSB does not have a record of such a letter in their files
would indicate that the TSSB never received such a letter from the SEC.  *Id.*[35]  Similarly,
the SEC has no record of Barasch having referred the matter to the TSSB.  *See* February
23, 2010 E-mail from Julie Preuitt to ▮OIG Staff 2▮ attached as Exhibit 81.

**F.   In December 2002, the Examination Staff Referred Their Stanford
Findings to the Enforcement Staff**

Before the 2002 Examination Report was completed, the Examination staff met
with the Enforcement staff several times to discuss their numerous concerns regarding
Stanford. ▮IA Examiner 2▮ testified that he and ▮IA Examiner 1▮ had "several meetings with
[E]nforcement" after returning from their Stanford examination, but that "there were no
high-level attorneys there." ▮IA Examiner 2▮ Testimony Tr. at 22.  Specifically, he did not believe
Degenhardt or Barasch attended any of those meetings.  *Id.*

The 2002 Examination Report found the following:

> The [Stanford] website … provides all the terms and
> conditions of the various types of CDs … offered by SIB
> … A person accessing the website can easily get
> information about how to contact SGC representatives,

---

[35]   Crawford, ▮TSSB Empl 2▮ ▮PII▮ of the Texas State Securities Board, and
▮TSSB Empl 3▮ ▮PII▮ of the Texas State Securities
Board, all stated that they had never seen the letter before.  TSSB Interview Memorandum at 4.

**App. 714**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> either by telephone or by email.  As a result, the website
> information appears to represent a general solicitation, or
> public offering, of the CDs to U.S. persons.

Exhibit 70 at 11-12.  The 2002 Examination Report described the related Enforcement
referral of this issue as follows:

> The issue concerning the possible unregistered public
> offering of the CDs has been referred to the FWDO's
> Enforcement Division, which has decided to refer the
> matter to the Texas State Securities Board.

*Id.* at 15 (footnote omitted).

The concerns that the examiners discussed with the Enforcement staff included
the fact that there was no indication that anyone at SGC knew how its clients' money was
being used by SIB or how SIB was generating sufficient income to support the above-
market interest rates paid and the substantial annual three percent trailer commissions
paid to SGC.  The examiners' concerns fueled "suspicions [that] the international bank
was a Ponzi scheme." [IA Examiner 2] Testimony Tr. at 40.

**G.     Based on the Earlier Decision to Forward the [Complainant 1] Letter to the
TSSB, the "Matter" Was Considered Referred to the TSSB Even
Before the 2002 Examination Report Was Sent to Enforcement.**

On December 16, 2002, [IA Examiner 1] copied two of the Enforcement attorneys with
whom he had been meeting regarding the Stanford matter on an e-mail exchange with
[IA Examiner 2] regarding Stanford.  December 16, 2002 E-mail from [IA Examiner 1] to [IA Examiner 2]
[IA Examiner 2], attached as Exhibit 82.  One of those attorneys, [ENF BC 4], a branch chief
in the Enforcement group, responded to [IA Examiner 1] and copied Barasch:

> You should be aware that, before you brought this matter to
> my attention, Spence [Barasch] had already referred it to
> the TSSB based on a complaint.  Neither you nor I knew
> about this referral.  I have since conferred with Spence
> about it.  We decided to let the state continue to pursue the
> case.  When you are finished with your report, however, I
> would like to read it.  At that time, I will reevaluate our
> interest in the matter.

*Id.*

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[IA Examiner 1] forwarded [ENF BC 4] e-mail to [Staff Acct 2], Wright and [IA Examiner 2] with the following introduction:

> Here's the latest on status with ENF.  Looks like TSSB will handle the matter.  I can't wait to see Texas execute a warrant in Antigua!![36]

Exhibit 82.

## H.    The Enforcement Staff Did Not Open an Inquiry Into Stanford and Did Not Even Review the 2002 Examination Report.

[IA Examiner 1] described his surprise at learning on December 16, 2002, that Enforcement had decided to not open a MUI based on the examiners' concerns but had instead "decided to let the state continue to pursue the case," as follows:

> This was a shot out of the blue because I had sent him the draft of my response letter to the Mexican lady and was waiting to get some comment, get it cleared to get it going.  And then I received this e-mail saying [IA Examiner 1] it's already been referred to the Texas State Securities Board.

[IA Examiner 1] Testimony Tr. at 103; *see also* Exhibit 82. [A Examiner 2] testified that he was "disappointed" and "frustrated" by Enforcement's decision to refer the Stanford matter to the TSSB. [IA Examiner 2] Testimony Tr. at 91.

On December 19, 2002, [A Examiner 2] e-mailed the 2002 Examination Report to [OCIE Exam Liaison], the FWDO Examination Liaison in the Office of Compliance Inspections and Examinations ("OCIE") in Washington, DC, and copied Barasch and

---

[36] [IA Examiner 2] testified that he "never did understand" Barasch's rationale for referring the matter to the TSSB in the following exchange:

> A:   … I'd hoped that they didn't just push this off on Texas without -- and just close the file and never look at it again.
>
> Q:   … [W]hat would be the value of Texas pursuing this versus the SEC?  What would they be able to do that you guys couldn't?
>
> A:   That I never did understand.  …  I think it's safe to say I was pretty confused, or -- just wasn't expecting a referral to the State of Texas.

[IA Examiner 2] Testimony Tr. at 84-85.

TSSB officials Crawford and [TSSB Empl 2] told the OIG that because the issuer – SIB – was overseas, it made much more sense for the SEC to pursue this matter rather than the TSSB.  TSSB Interview Memorandum at 4.

**App. 716**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

[ENF BC 4].  *See* December 19, 2002 E-mail from [IA Examiner 2] to [OCIE Exam Liaison],
attached as Exhibit 83 [IA Examiner 2] e-mail stated:

> The issue concerning the possible unregistered public
> offering of the CDs has been referred to the FWDO's
> Enforcement Division,[37] which has decided to refer the
> matter to the Texas State Securities Board.

*Id.*

After Barasch received [IA Examiner 2] e-mail with the 2002 Examination Report
attached, he asked [ENF BC 4] "at your convenience, i.e., no rush, let me know what you
think."  *See* Exhibit 83.  However, the OIG found no indication that [ENF BC 4] or Barasch
ever read the 2002 Examination Report. [ENF BC 4] testified that he had no recollection of
reading it [ENF BC 4] Testimony Tr. at 20.  Similarly, Barasch told the OIG that he did not
recall ever seeing the 2002 Examination Report.  Barasch Interview Tr. at 23, 35, 40.

Barasch stated that he did not recall why he decided not to open a MUI based on
the [Complainant 1] Letter or the 2002 Examination Report.[38]  Barasch Interview Tr. at 35-36.
Barasch further told the OIG that he did not recall having ever seen either of those two
documents.  Barasch Interview Tr. at 23-25, 35-36, 40, 43-44.

## I.     The Enforcement Staff Did Not Refer the 2002 Examination Report Findings to the TSSB

It appears that, contrary to what the Examination staff was told, the Stanford
matter was not referred to the TSSB; rather Barasch just decided not to pursue the matter.
Barasch told the OIG that he does not recall referring Stanford to the TSSB around this
time.  Barasch Interview Tr. at 23, 43-44.  As discussed above, the OIG found that the
[Complainant 1] Letter was not forwarded to the TSSB. [TSSB Empl 2] [PII]
[PII] at that time, told the OIG that he was never informed by Barasch or anyone
else at the SEC that the SEC's Examination staff had referred anything related to
Stanford for an Enforcement action in December 2002.  TSSB Interview Memorandum at

---

[37]   Although the 2002 Examination Report discussed the factual predicate for a Section 206 violation, the
cover page of the 2002 Examination Report, the "Conclusion" section of the 2002 Examination Report, and
[IA Examiner 2] e-mail to Barasch, *et al.*, only referred "[t]he issue concerning the possible unregistered public
f the CDs."  *See* Exhibit 70 at i and 15; Exhibit 83 [IA Examiner 2] testified, "[A]s far as I was
concerned, we referred the whole thing over to enforcement and to be honest with you, I didn't care which
one of these issues they wanted to take with and run, you know, we just wanted some action against the
firm to try to shut them down." [IA Examiner 2] Testimony Tr. at 70.

[38]   When he reviewed the cover memorandum for the 2002 Examination Report during his OIG interview,
Barasch noted that "just from a strict reading of this segment of this report, you know, again, there's no
reference to any fraud here.  And there's a reference simply to an unregistered offering of CDs."  Barasch
Interview Tr. at 23-24.

**App. 717**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

4-5.  According to [IA Examiner 2] even if the Stanford matter had been referred to the TSSB,
the 2002 Examination Report would not have been sent to the TSSB pursuant to the
SEC's policy of not sharing its examination reports with "any outside agency or anyone."
[IA Examiner 2] Testimony Tr. at 93.

> **J.**   **In December 2002, the SEC Examination Staff Attempted to Interest
> the Federal Reserve in Investigating Stanford, But Concluded That
> the Federal Reserve Had [DPP] of Stanford**

In December 2002, as the Examination staff was completing its report, the staff
contacted the Federal Reserve [DPP, WP]
[DPP, WP]
[DPP, WP]   *See* Exhibit 82 at 2.   On December 16, 2002, [IA Examiner 2] e-mailed [FR Empl 1]
[FR Empl 1] at the Federal Reserve Board as follows:

> Thanks for your help!  …  [W]e believe that approximately
> $640 million in CDs are currently outstanding from SGC's
> sales efforts (SGC receives a 3% annual commission from
> Stanford International Bank for referring clients).  …  The
> CDs pay a higher than market rate of interest, currently
> ranging from 3.65% … to 8.15% ….  The financial
> statements of the international bank indicate approximately
> $1,116,454,586 in outstanding customer deposits as of
> 12/31/2001.  The financial statements are vague as to the
> investment portfolio of the bank (approximately 59% is
> invested in "equities", while 41% is invested in "treasury
> bonds, notes, corporate bonds").  … . After you get a
> chance to review everything, please call me and tell me
> what you think.

February 12, 2003 E-mail from [IA Examiner 2] to [FR Empl 1] Exhibit 84 at 2-3.

On February 12, 2003, after not receiving a response to his December 16, 2002
e-mail, [IA Examiner 2] e-mailed [FR Empl 1] "Is anyone at your office interested in pursuing this
matter?  What is the current status?"  *See* attached as Exhibit 84 at 2.  After another three
months had lapsed, on May 21, 2003, [IA Examiner 1] e-mailed [IA Examiner 2]

> [Staff Acct 2] and I saw Hal [Degenhardt] in the hallway this
> morning shortly after our Stanford meeting.  Hal made the
> mistake of asking what I was up to and I made the mistake

---

[34][IA Examiner 1] testified, "[W]e had the issue of …CDs being sold that for all intents and purposes appear[ed]
to be banking activity.  We thought the banking regulators might have some say in this and might have a
regulatory hook to use against Stanford." [IA Examiner 1] Testimony Tr. at 100.

**App. 718**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

of telling the truth.  He now is concerned that we need to pursue the Stanford Bank CD issue through OCIE with the Federal Reserve.  He believes that there needs to be a high-level dialog on this between the SEC and Fed.

May 21, 2003 E-mail from ███████████ to ██████████ attached as Exhibit 85.

On May 21, 2003 ████████ contacted OCIE to address Degenhardt's concern and described the issue Degenhardt was concerned about as follows:

> Degenhardt[] has expressed an interest in our having a "high level" dialogue with the Federal Reserve regarding the "CDs" discussed in our examination report on the Stanford Group examination. … He is concerned about the ability of Stanford International Bank (SIB) to offer these CDs in the US without being a bank officially subject to US banking regulation.  … We have as yet received no reply from the Federal Reserve (██████████)[40]

May 21, 2003 E-mail from ███████████ to ████████████ attached as Exhibit 86 at 2.

On May 22, 2003 ████████ asked ████████, "Did Hal [Degenhardt] say what kind of role we [the Examination staff] were going to play in investigating this further?" Exhibit 84 at 1. ████████ explained that Degenhardt was not interested in the SEC investigating the matter; he was only interested in "mak[ing] sure we had done all we could do in alerting the banking authorities of our concerns …."  *Id.*

On June 3, 2003, ████████ updated Wright on the discussions with the Federal Reserve Board as follows:



DPP, WP, PII

---

[40] ████████ updated ████████ on May 22, 2003, "I have not heard a peep from ██████████."  Exhibit 84.

**App. 719**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



June 3, 2003 E-mail from [IA Examiner 1] to Hugh Wright, attached as Exhibit 87 at 2.

Wright forwarded [IA Examiner 1] update to Degenhardt and stated:



June 3, 2003 E-mail from Hugh Wright to Harold Degenhardt, attached as Exhibit 87 at
1-2.

Degenhardt responded to Wright's update on the unproductive discussions with
the Federal Reserve by querying, "This [is] all great, but what does it mean?  Is this
something that we ought to go after or not?"  *Id*. at 1.  Wright responded by describing
the history of the matter as follows:

> The decision not to go after it has been made in
> Enforcement some time back, who then referred [it] to
> Texas.  As mentioned below, the Fed referred the matter to
> the FBI [DPP] Nothing has
> changed since we referred it to Enforcement several months
> ago to suggest that it would be an easier case now than
> before.  After our exam a couple of years ago, Stanford

**App. 720**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> started filing Form Ds relying on Rule 506, although they
> did so under protest.  This would seem to make it difficult
> to work a case for selling unregistered securities.  If we
> can't go on that basis, then we would have to prove that
> they are operating a Ponzi scheme which would be very
> difficult, if not impossible, considering that, as far as I am
> aware, there have never been any complaints by investors,
> and all of the bank records and sales records are maintained
> offshore in Antigua.  In my opinion, there is nothing further
> for us to do at this point.

*Id.*

At this point in time, it had been approximately six years since the SEC
Examination staff had concluded that the SIB CDs were likely a Ponzi scheme.  During
that period, the SEC had conducted three examinations resulting in two Enforcement
referrals; an Enforcement inquiry had been opened and closed with no meaningful effort
to obtain evidence related to the Ponzi scheme; and the Examination staff had attempted
to interest the Federal Reserve in investigating Stanford, to no avail.  As discussed below,
it would take almost another six years, another Examination and Enforcement referral,
and the collapse of the Madoff Ponzi scheme before the SEC acted to shut down
Stanford's Ponzi scheme.

## V.   IN 2003, THE SEC ENFORCEMENT STAFF RECEIVED TWO COMPLAINTS THAT STANFORD WAS A PONZI SCHEME, BUT NOTHING WAS DONE TO PURSUE THOSE COMPLAINTS

### A.   [Confidential Source] in a Ponzi Scheme Case Filed By the SEC Noted Several Similarities Between That Case and Stanford's Operations

On August 4, 2003, the TSSB forwarded to Barasch a letter from [Confidential Source]
that discussed [Confidential Source] concern that Stanford was operating a Ponzi scheme.  *See
August 4, 2003 Letter from [TSSB Empl 2] to Spencer Barasch, attached as Exhibit 88; see
also July 31, 2003 Letter from [Confidential Source] to [TSSB Empl 4] (the [Confidential Source]
Letter"), attached as Exhibit 8* [PII] [Confidential Source PII] [42] *See* Exhibit 89. [PII] Letter discussed several

---

[41]   Barasch told the OIG that he did not recall seeing the [Confidential Source] Letter.  Barasch Interview Tr. at 45-
46.  Barasch said the TSSB sent virtually every complaint it received to the SEC, and the [Confidential Source] Letter
would have been one of many complaints that he received from the TSSB.  Barasch Interview Tr. at 46.

[42] [PII]



**App. 721**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

"striking similarities" between the ▬▬▬▬Ponzi scheme and what was known at the
time about Stanford's operations.  *Id.*  The ▬▬▬▬ Letter included the following
information:

> ▬▬▬▬▬▬was highly effective at avoiding regulatory
> oversight, through a Byzantine corporate structure where
> the funds from deposits were held in off shore entities, and
> the US entities only provided "administrative services" to
> the offshore entities.  Furthermore, the people that solicited
> the deposits were promoters employed by yet another
> corporate entity, and these promoters were provided little
> information about the financial wherewithal of the
> companies accepting deposits.  The ▬▬▬▬depositors
> who thought they were investing in money markets and CD
> instruments were told that their money was placed in
> conservative interest-bearing instruments, and
> unbeknownst to them, their deposits were used to fund
> speculative investments … Beyond these speculative
> investments, the funds were used to pay for the elaborate
> corporate headquarters in San Antonio and the expense of
> the promoters in the four offices in Mexico.
> …
>
> Unfortunately, organizations like ▬▬▬▬continue until
> they reach a point of illiquidity so severe that they can no
> longer honor client withdrawals.  At that time, the potential
> recovery to investors is greatly impaired.  In the case of
> ▬▬▬▬, barely $100 million of assets remained to
> cover obligations exceeding $425 million.  For the sake of
> the Mexican investors, I hope that Stanford is not
> constructed in the same manner as ▬▬▬▬

*Id.*  The letter also contained a detailed chart listing the aspects of the two companies that
were deemed to be similar.  *Id.* at1.

Before sending the ▬▬▬▬Letter to the SEC, ▬▬▬▬▬▬▬▬▬▬
▬▬▬▬called Barasch to discuss the matter.  TSSB Interview
Memorandum at 5.  ▬▬▬▬told the OIG that because▬▬▬▬ was such a significant
matter, he thought he needed to bring ▬▬▬▬concerns regarding Stanford to the
SEC's attention.  *Id.*▬▬▬▬stated that the SEC was a more appropriate body than the
TSSB to investigate Stanford, because of the international aspect and because of the

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**App. 722**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

significant amount of resources necessary to investigate the matter. *Id.* ▮TSSB Empl 2▮ told the
OIG that during his phone conversation with Barasch, Barasch did not mention the
▮Complainant 1▮ Letter that Barasch had supposedly sent to the TSSB in December 2002, nor did
he mention that the SEC Examination staff had completed an examination and referred
Stanford to the TSSB for enforcement action in December 2002. *Id.*

Barasch forwarded the ▮Confidential Source▮ Letter to ▮ENF BC 2▮ a branch chief in
the FWDO's Enforcement group. ▮ENF BC 2▮ Testimony Tr. at 9; *see* September 16, 2003
E-mail from ▮IA Examiner 1▮ to ▮ENF BC 2▮, Exhibit 91. ▮ENF BC 2▮ had worked on
the ▮PII▮ matter. ▮ENF BC 2▮ Testimony Tr. at 16.  In his OIG testimony, ▮ENF BC 2▮
acknowledged that the ▮PII▮ matter and the Stanford matter were similar. *Id.*  On
September 16, 2003, ▮IA Examiner 1▮ e-mailed ▮ENF BC 2▮ the 2002 Examination Report.  Exhibit
91.  But, as discussed below, it appears that ▮ENF BC 2▮ did not read that report. *See*
footnote 48.

**B.    An Anonymous Insider Warned That Stanford Was Operating "a
Massive Ponzi Scheme"**

On October 10, 2003, the NASD forwarded a letter dated September 1, 2003,
from an anonymous[43] Stanford insider to the SEC's Office of Investor Education and
Assistance ("OIEA") with the introduction, "We are referring [an] anonymous tip to your
attention, since the parties mentioned are outside of our jurisdiction."[44]  *See* October 10,
2003 E-mail from ▮OIEA Staff▮ to Spencer Barasch, attached as Exhibit 93.  On the
same day, OIEA forwarded the anonymous letter to Barasch[45] with the introduction:

Below please find a referral from NASD concerning
Stanford Financial Group[46].  I am sending it to your office

---

[43]    The letter was sent by Leyla Basagoitia (now Leyla Wydler), a SGC financial adviser from 2000 to
November 2002. *See* Wydler Interview Tr. at 4-8.  Basagoitia told the OIG that she was fired by SGC in
November 2002 because she refused to sell the SIB CDs to her clients. *Id.* at 7.  As discussed below,
Basagoitia contacted the SEC again in 2004 and was interviewed at least twice by the FWDO staff.

[44]    The NASD forwarded to the SEC the same anonymous letter a second time on October 20, 2003, with
the introduction:

Attached you will find a customer complaint submitted to NASD.  After review, it was
determined the products in question are not NASD-registered.  We are forwarding this
complaint to the SEC for review.

October 20, 2003 E-mail from NASD to SEC, attached as Exhibit 92.

[45]    Barasch told the OIG that he did not recall seeing the anonymous September 1, 2003 complaint.
Barasch Interview Tr. at 44-45.

[46]    SGC was a subsidiary of Stanford Financial Group ("SFG"). *See* Exhibit 70 at 3.

**App. 723**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

for its consideration.  There is nothing in NRSI for Stanford
Financial Group or Allen Stanford.

*Id*. at 1.  The letter stated:

> STANFORD FINANCIAL IS THE SUBJECT OF A
> LINGERING CORPORATE FRAUD SCANDAL
> PERPETUATED AS A "MASSIVE PONZI SCHEME"
> THAT WILL DESTROY THE LIFE SAVINGS OF
> MANY, DAMAGE THE REPUTATION OF ALL
> ASSOCIATED PARTIES, RIDICULE SECURITIES
> AND BANKING AUTHORITIES, AND SHAME THE
> UNITED STATES OF AMERICA.
>
> The Stanford Financial Group [SFG] of Houston, Texas has
> been selling to people of the United States and of Latin
> America, offshore certificates of deposit issued by Stanford
> International Bank, a wholly owned unregulated subsidiary.
> With the mask of a regulated US Corporation and by
> association with Wall Street giant Bear Stearns, investors
> are led to believe these CD's are absolutely safe
> investments.  Not withstanding this promise, investor
> proceeds are being directed into speculative investments
> like stocks, options, futures, currencies, real estate, and
> unsecured loans.
>
> For the past seventeen years or so, Stanford International
> Bank has reported to clients in perfect format and
> beautifully printed material of the highest quality,
> consistent high returns on the bank's portfolio, with never a
> down year, regardless of the volatile nature of the
> investments.  …
>
> The questionable activities of the bank have been covered
> up by an apparent clean operation of a US Broker-Dealer
> affiliate with offices in Houston, Miami, and other cities
> that clears through Bear Stearns Securities Corporation.
> Registered Representatives of the firm, as well as many
> unregistered representatives that office within the B-D, are
> unreasonably pressured into selling the CD's.  Solicitation
> of these high risk offshore securities occurs from the
> United States and investors are misled about the true nature
> of the securities.

**App. 724**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

The offshore bank has never been audited by a large reputable accounting firm, and Stanford has never shown verifiable portfolio appraisals.  The bank's portfolio is invested primarily in high risk securities, which is not congruent with the nature of safe CD investments promised to clients.

…

Unbelievable returns of the portfolio, non verifiable portfolio appraisals, non prudent investment strategies, information from insiders, and lavish expense management styles, suggest the portfolio is deeply underwater.  If true, returns and expenses are being paid out of clients' monies and by the size of the portfolio this would be one of the largest Ponzi Schemes ever discovered.

This letter is being written by an insider who does not wish to remain silent, but also fears for his own personal safety and that of his family.  The issue is being referred for investigation to the proper authorities, related parties, and persons whose mission is to inform the general public.  The key point to focus on is the real market value of Stanford International Bank's investment portfolio, which is believed to be significantly below the bank's obligations to clients.  Overlooking these issues and not thoroughly investigating them is becoming an accomplice to any wrongdoing.

September 1, 2003 Letter to the NASD Complaint Center, attached as Exhibit 94, (emphasis in original).

On October 10, 2003, Barasch forwarded the referral letter to ENF BC 2 and copied Jeffrey Cohen, an Assistant Director in the FWDO Enforcement group.  Exhibit 93.  Barasch asked ENF BC 2 "Let me know what you think of this situation. Recall, I previously sent you another rferral [sic] on this outfit."  Id. ENF BC 2 responded on October 12, 2003:

I have the previous referral from Confidential Source PII It didn't provide much solid information about securities violations.  I also spoke with IA Examiner 1 who did the most recent exam. IA Examiner 1 gave me a copy of his report.  I have not reviewed it thoroughly yet.  The main problem appears to be that the actual solicitations are made from representatives of an offshore bank (to purchase a CD from that bank), and NOT

67

**App. 725**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> from Stanford reps (though Stanford reps refer investors to
> the offshore bank - not sure if there's a referral fee).  I'll
> read the attached referral and let you know what I find.

*Id.*[47]

On October 30, 2003, [ENF BC 2] updated Barasch, "I have [Enforcement staff
attorney] [ENF Staff Atty 2] checking into it.  He and I will be speaking with [the Examination
staff] [IA Examiner 1] again about their exam."  Exhibit 92.  On November 4, 2003, [ENF BC 2] e-
mailed Cohen:

> I'm meeting with [ENF Staff Atty 2] and [IA Examiner 1] at
> 10:00 a.m. on a matter forwarded to us by Spence
> [Barasch], Stanford Financial (offshore CDs sold to
> Mexican investors, but with a Houston connection).  It may
> or may not become a MUI.

November 4, 2003 E-mail from [ENF BC 2] to Jeffrey Cohen, attached as Exhibit
95.

[ENF Staff Atty 2] testified that either Barasch, [ENF BC 2], or Cohen asked him to look at
the anonymous letter to see what public information was available concerning Stanford.
[ENF Staff Atty 2] Testimony Tr. at 11-12 [ENF Staff Atty 2] testified:  "It was, as Spence Barasch used to call it, a
tire kicker, something to look over" and was not a priority matter.  *Id.* [ENF Staff Atty 2] stated that he
spent approximately one day reading newspaper articles and other public documents
concerning Stanford.  *Id.* at 12.

[ENF Staff Atty 2] testified that when he reported to [ENF BC 2] what he had found in those
public documents, [ENF BC 2] told him "pretty much right off the bat, don't worry about it,
it's going to [the examinations group].  We're not going to work this [as an] enforcement
[case].'' [ENF Staff Atty 2] Testimony Tr. at 14-17 [ENF Staff Atty 2] testified that he believed that Barasch and/or
Cohen would have made the decision not to open an enforcement inquiry for Stanford at
this time. [ENF Staff Atty 2] Testimony Tr. at 15.

According to [ENF BC 2] handwritten notes, he met with [IA Examiner 1] [IA Examiner 2] and
[ENF Staff Atty 2] regarding SGC on November 5, 2003.  *See* [ENF BC 2] Notes, attached as Exhibit 96
at 1. [ENF BC 2] notes also indicate that SGC was discussed again on November 7, 2003,
during a meeting with Cohen and Barasch and a decision was made to "[l]et B/D exam go

---

[47] [ENF BC 2] testified that he had no recollection of ever reading the 2002 Examination Report. [ENF BC 2]
Testimony Tr. at 16.  In the October 12, 2003 e-mail referenced above, he stated that he had not "reviewed
[the report] thoroughly."  Exhibit 93.  He also stated that he was "not sure if there's a referral fee" for the
"Stanford reps refer[rals] [of] investors to the offshore bank."  *Id.*  However, the referral fees are
prominently discussed in the 2002 Examination Report.  Exhibit 70 at 1, 3, 6-7 and 11.  For example, the
"Summary of Violations" section discussed the referral fees on the first page of the report.  *Id.* at 1.

**App. 726**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

forward.  Then if nothing – Memo to file." *Id.* at 2. [ENF BC 2] testified that he recalled discussing Stanford with Cohen and Barasch, and "I think we recognized, obviously, what was being represented on these CDs that were being offered by Stanford looked suspicious, just because of the – I think the consistently high returns that were being put together with the claim that it was safe and secure." [ENF BC 2] Testimony Tr. at 17-18.

[ENF BC 2] testified that the discussions regarding Stanford primarily concerned whether the SIB CDs were securities, whether there were any U.S. investors, and whether documents could be obtained from SIB in Antigua.[48]  *Id.* at 17-19 [ENF Staff Atty 2] testified that Cohen had expressed his view that the SEC would not be able to prove a fraud case because the SEC could not compel documents from SIB. [ENF Staff Atty 2] Testimony Tr. at 17. [ENF Staff Atty 2] also recalled that Cohen had [DPP, WP] [DPP, WP] [49] *Id.*

[ENF BC 2] explained the Enforcement staff's rationale for not investigating Stanford at that time as follows:

> [R]ather than spend a lot of resources on something that could end up being something that we could not bring, the decision was made to – to not go forward at that time, or at least to – to not spend the significant resources and – and wait and see if something else would come up.

[ENF BC 2] Testimony Tr. at 19.

It is not clear what the Enforcement staff hoped to gain by "wait[ing] [to] see if something else would come up" after the SEC had conducted three examinations of SGC finding that the SIB CDs were probably a Ponzi scheme; received a letter from a relative of an investor concerned about the legitimacy of those CDs; received a letter from a [Confidential Source] in another Ponzi scheme case concerned about the similarities between his case and Stanford; and received an anonymous letter from a Stanford insider telling the SEC that Stanford was operating a "massive Ponzi scheme."

It is also not clear what purpose the Enforcement staff thought would be served by having the examiners conduct a fourth examination of SGC.  But, as discussed below, a fourth examination of SGC was conducted approximately one year later.  Preuitt testified

---

[48]  [ENF BC 2] did not recall whether anyone from the FWDO contacted the SEC's Office of International Affairs ("OIA") at this time regarding how to obtain SIB's records in Antigua.  *Id.* at 28-29.  Neither the OIG nor OIA could confirm that OIA was ever contacted by the Enforcement staff about Stanford before Prescott's contact, discussed below, in October 2004.  *See* Exhibits 64 and 97.

[49]  In addition, [ENF BC 2] testified that the anonymous nature of the September 1, 2003 complaint "made it a little more difficult to prove whether what they're saying is – is true." [ENF BC 2] Testimony Tr. at 19. Wright also noted that the anonymous nature of the complaint made it difficult to obtain further information.  Wright Testimony Tr. at 37.

**App. 727**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

that at the outset of that examination she "was very anxious about doing it because I didn't think that anything had changed so that we would necessarily be more effective than the past in terms of being able to get a case done."  January 26, 2010 Preuitt Testimony Tr. at 8.  However, that examination, combined with a change in senior management, did finally result in the opening of an Enforcement investigation.

## VI.   IN OCTOBER 2004, THE EXAMINATION STAFF CONDUCTED A FOURTH EXAMINATION OF SGC IN ORDER TO REFER STANFORD TO THE ENFORCEMENT STAFF AGAIN

### A.   The Examination Staff Was Alarmed at the Increasing Size of the Apparent Ponzi Scheme, and Accordingly, Made Another Enforcement Referral of Stanford a "Very High Priority"

By October 2004, approximately seven years since the SEC's first examination of SGC, its revenues had increased four-fold and sales of the SIB CDs accounted for over 70 percent of those revenues.  *See* Broker Dealer Examination Report for Stanford Group Company, dated December 2, 2004 (the "2004 Examination Report"), attached as Exhibit 98, at 2.  That growth, combined with the "prior examination findings," prompted the Examination staff to prepare a third Enforcement referral of Stanford.[50]  *Id.*  Wright acknowledged his frustration that his staff had examined SGC multiple times and found that the potential fraud was growing, but Enforcement would not pursue the matter.  Wright Testimony Tr. at 31.  However, according to Prescott, making another attempt to convince Enforcement to pursue Stanford was "a very high priority" for Wright in October 2004.[51]  Prescott Testimony Tr. at 84.  Moreover, Prescott testified, "Everyone [on the examination staff] wanted to see the case worked."  *Id.*

Consequently, in October 2004, the B-D Examination staff initiated another examination of Stanford solely for the purpose of making another Enforcement referral.  *See* Exhibit 98 at 2.  Preuitt assigned [BD Exam BC 2] and [BD Examiner 1] to the 2004 SGC

---

[50] [BD Exam BC 1], a branch chief assigned to the 2004 SGC exam, testified that the Examination staff was concerned about the growth in Stanford's revenues [BD Exam BC 1] Testimony Tr. at 12-13.

[51] On December 15, 2004, less than two weeks after the staff completed the 2004 Examination Report, Preuitt e-mailed the examiners who conducted the exam, "I just spoke with Hugh [Wright].  He is very concerned about Stanford and for good reason.  I need a memo prepared which provides a brief summary regarding what we believe the problems are there and what documents they have not produced."  *See* December 15, 2004 E-mail from Julie Preuitt to [BD Exam BC 2] attached as Exhibit 99.

**App. 728**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Examination. [52]  Preuitt described the genesis of this examination as follows:

> I was having a planning meeting with Mr. Hugh Wright regarding what the [exam] schedule would look like for the 2005 fiscal year and … he thought it was very important that we do Stanford Financial Group in the upcoming year. … I was very anxious about doing it because I didn't think that anything had changed so that we would necessarily be more effective than the past in terms of being able to get a case done, so we had a discussion to that effect and Mr. Wright was adamant that it was the right thing to do and we needed to go do it.  And not that I disagreed with him, but he was sort of asking me to go to battle [with Enforcement], … and it was going to take a lot of energy and resources and so we talked a lot about that and decided that … the affected investors needed to be served and so this was how we needed to do it.

January 26, 2010 Preuitt Testimony Tr. at 8.  Preuitt testified that the Examination staff's intention at the outset of the examination was to refer Stanford again to Enforcement.  *Id.* at 8-9.  In fact, the sole purpose of conducting the examination was to support an enforcement referral.  ▮▮ Testimony Tr. at 40.

In October 2004, essentially at the same time that the 2004 Examination began, Victoria Prescott joined the Examination group as Special Senior Counsel to the FWDO B-D Examination staff.[53]  Prescott immediately began working on creating a separate referral, tailored for Enforcement staff, while the examiners were preparing their report.  Prescott explained that the Examination staff's practice prior to her joining the group had been to simply provide a copy of its Examination report to the Enforcement staff when making a referral.  Prescott Testimony Tr. at 41-42.  She testified that her purpose in creating this separate, specifically-tailored Enforcement document for the Stanford

---

[52]   Preuitt testified that in assigning ▮▮ and ▮▮ to conduct the Stanford exam, she "chose the two people that I thought had the most experience and were likely the most capable examiners on staff …." January 26, 2010 Preuitt Testimony Tr. at 13.  During her OIG testimony, Preuitt descri      th as "extraordinarily capable staff."  *Id.*  In an April 8, 2005 e-mail to ▮▮ Preuitt described ▮▮ and ▮ as "awesome."  *See* April 8, 2005 E-mail from Julie Preuitt to ▮▮, attached as Exhibit 100 at 2. ▮▮ testified that she was "very impressed" with ▮▮ and that she thought that ▮▮ and ▮▮ were a very strong team.  ▮▮ Testimony Tr. at 9

[53]   Prescott had approximately thirteen years of experience as a branch chief and two years experience as a staff attorney in the FWDO Enforcement group.  Prescott Testimony Tr. at 7-9.  She was appointed to the newly-created Special Senior Counsel position to the FWDO B-D Examination staff in October 2004.  *Id.* Her primary function as Special Senior Counsel was to assist the broker-dealer Examination staff refer matters to Enforcement.  *Id.* at 11.  Stanford was the first matter that Prescott worked on in her new position.  *Id.* at 12, 18.

**App. 729**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

referral was to increase the likelihood that Enforcement would pursue the matter.  *Id*. at
42.

The Examination staff began its field examination work of Stanford on October 4,
2004, and concluded that work on October 8, 2004.  *See* Exhibit 98.  The staff completed
the 2004 Examination Report on December 2, 2004.  *Id.*

**B.      The 2004 Examination Report Concluded That the SIB CDs Were
          Securities and Were Part of a "Very Large Ponzi Scheme"**

In its 2004 Examination Report, the Examination staff concluded:

> Since the firm is engaged in the same activities [that were
> of concern in 1997] we believe SGC to be a high regulatory
> risk with regard to sales practice issues.
> …
>
> [T]he Staff is concerned that the offering of the SIB CDs
> may in fact be a very large ponzi scheme, designed and
> marketed by SIB's [sic] and SGC's [sic] to lull investors
> into a false sense of security by their claims that the SIB
> products are similar to traditional U.S. bank CDs.

*Id*. at 3, 16 BD Exam BC 2 testified that there were a lot of red flags associated with SGC's sales
of the SIB CDs, including the returns and the referral fees, that led him to believe they
were a Ponzi scheme. BD Exam BC 2 Testimony Tr. at 19-20.

The Examination staff also concluded that the SIB CDs were securities.  The 2004
Examination Report discussed the Examination staff's basis for that conclusion as
follows:

> The Staff believes that the SIB issued securities, which are
> marketed as certificates of deposit ("SIB CD" or "CD"), are
> CDs in name only and are claimed to be CDs as part of an
> overall scheme to evade federal regulation and to lull
> investors into believing that the safety of these securities is
> comparable to CDs issued by a United States bank.
>
> * * *
>
> Obviously, unlike a traditional certificate of deposit, SIB
> CDs are subject to risk. In fact, an SIB disclosure document
> makes the statements that "the ability of SIB to repay
> principal and interest on the CD Deposits is dependent on
> our ability to successfully operate by continuing to make

72

**App. 730**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> consistently profitable investment decisions" and "You may lose your entire investment (principal and interest)…."
>
> The Staff could discern no legitimate reason to refer to these investments as CDs. Instead, they appear to be referred to as CDs to lull investors into believing that the product offers the safety of a conventional certificate of deposit and to circumvent U.S. federal securities laws requiring registration.

Exhibit 98 at 3, 6 (second ellipsis in original).

The Examination staff further concluded that SGC's sales of the SIB CDs violated numerous federal securities laws.  For example, the 2004 Examination Report discussed the staff's conclusion that SGC was violating the NASD's suitability rule as follows:

> The NASD requires that in recommending to a customer the purchase of any security, the member firm shall have reasonable grounds for believing that the recommendation is suitable as to the customer's financial situation and needs.  Since SGC and its representatives do not have the information available to determine the actual investments made with the investors' funds and the risk level of the SIB CDs, it cannot know if the product is suitable as to its customer's needs.  Furthermore, not only is there no specific information available, the information that is available is highly suggestive of a fraudulent offering which would be inherently unsuitable for any investor.

*Id.* at 10-11 BD Exam BC 2 testified that he had also been "troubled" by the fact that SGC kept changing its excuses as to why it did not have information about SIB's portfolio. BD Exam BC 2 Testimony Tr. at 19-20.

In addition to possible violations of the NASD's suitability rule, the 2004 Examination Report identified several other apparent violations of the federal securities laws by SGC, including:  (1) material misstatements and failure to disclose material facts, in violation of Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"); (2) failure to disclose to customers its compensation for securities transactions, in violation of Rule 10b-10 of the Exchange Act; and (3) possible unregistered distribution of securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act"). *See* Exhibit 98 at 1.

The 2004 Examination Report advocated that the SEC act against SGC for these violations, in part, because of the difficulties in proving that SIB was operating a Ponzi scheme.  *Id.* at 3. BD Exam BC 2 testified that after the 2004 Examination he believed it was

**App. 731**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

incumbent on the SEC to do whatever it could to stop the growing fraud. BD Exam BC 2
Testimony Tr. at 28.  The Examination staff made its case for that course of action as
follows:

> The Staff also suspects that ultimately little, if any, of the
> funds invested into the SIB CDs may actually be invested
> as represented to investors. This suspicion is fueled by
> SGC's apparent inability and SIB's refusal to provide
> requested documents regarding the CDs, including the
> actual uses of the monies raised.  Since SIB is located in
> Antigua, and the securities in question are not registered,
> we have been unable to require SIB to provide or to
> otherwise gather the necessary documents to either verify
> or allay those suspicions.
>
> Although it may be difficult to prove that the offering itself
> is fraudulent, SGC has nonetheless committed numerous
> securities law violations which can be proved without
> determining the actual uses of the invested funds.
> Violations include making misrepresentations and
> omissions to customers, charging excessive commissions,
> and failing to disclose the amount of commissions charged.
> SGC also violated several other SEC and SRO Rules
> regarding books and records, supervision and anti-money
> laundering.

Exhibit 98 at 3.

At this juncture, the FWDO Examiners had tried without success for seven years
to persuade the Enforcement staff to investigate Stanford.  In October 2004, they
conducted a fourth examination with the sole purpose of making another Enforcement
referral.  As discussed below, this time the Examination staff took several investigative
steps beyond the examination itself hoping to make the matter more palatable for the
Enforcement staff to pursue.  Those steps, combined with a change in senior
management, did result in the opening of an Enforcement investigation in April 2005.
However, for the next six months, most of the staff's energy was spent debating about
whether to pursue the matter.

### C.   The Examination Staff Conducted Significant Investigative Work During the Six Months From October 2004 Through March 2005 to Bolster Its Anticipated Enforcement Referral

Prescott had begun working on the Enforcement referral of Stanford in October
2004, and spent several months doing additional investigative work beyond that
conducted as part of the examination process while preparing the referral.  Prescott

**App. 732**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

testified that her purpose in doing so was to maximize the chance that Enforcement would pursue the matter.  Prescott Testimony Tr. at 41-42.

At Prescott's request ████ analyzed the improbability of the CDs' returns using data about the past performance of the equity markets.  Prescott Testimony Tr. at 62-63; *see also* March 14, 2005 Draft Memorandum from Victoria Prescott to Spencer Barasch (the "2005 Enforcement Referral"), attached as Exhibit 101 at 8.  Prescott also reached out to the SEC's Office of Economic Analysis ("OEA") for assistance in taking the Examination staff's quantitative analysis of Stanford's historical returns "a step further."  Prescott Testimony Tr. at 63-64.  Prescott explained:

> I was interested in … trying to get a way of converting our intuitive concerns about the rates of return in light of what the markets were doing to something that could be used as evidence.  I was hoping that the Office of Economic Analysis could do some number crunching to help us with that.

*Id.* at 57.

Prescott testified that it would have been "helpful" if OEA had done analysis, such as a macroanalysis, and confirmed that the returns seemed highly improbable or suspicious.  *Id.* at 62.  However, OEA did not assist the Enforcement staff with any analysis of Stanford's returns.  *Id.* at 64-65.

Prescott contacted ████ ████ in April 2005 concerning Stanford.  Prescott Testimony Tr. at 65.  According to Prescott's notes of an April 26, 2005, telephone call with ████ she provided ████ some details concerning SIB's reported earnings on investments in comparison with global equity market indices.  April 26, 2005 Prescott notes, attached as Exhibit 102; Prescott Testimony at 57, 65.  According to Prescott's notes ████ told her that he was very busy and could not say when he would get to the Stanford matter.  *See* Exhibit 102.  Prescott testified that she was unaware of any analysis ever provided by OEA on the Stanford matter.  Prescott Testimony Tr. at 64-65.

According to an April 19, 2005 e-mail from Prescott to ████, a branch chief in Enforcement who, as discussed below, was assigned to the matter, ████ may have also had contact with ████ about the Stanford matter.  *See* April 19, 2005 E-mail from Victoria Prescott to ████, attached as Exhibit 103.  ████ testified that he did not remember OEA providing any analysis, but that it would have been helpful to have had someone in OEA give an expert opinion as to the improbability of the Stanford returns.  ████ Testimony Tr. at 27-28.  ████ told the OIG that he had no recollection of ever discussing the Stanford matter with FWDO Enforcement staff.  *See* ████ Interview Memorandum.

**App. 733**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

It is possible that the Enforcement investigation may have been advanced had
OEA responded to the request for some expert analysis of Stanford's claims.  After
reviewing Prescott's analysis of those claims in the 2005 Enforcement referral, ████
████ ███ in the Division of Risk, Strategy, and Financial
Innovation ("RSFI"),    stated unequivocally that ████
████ ████Interview Memorandum. ████
stated, ████ ████ Id. ████stated that
it should have been "very easy" to perform a quantitative evaluation of the plausibility of
SIB's reported returns by running various computer models.  Id.



On October 18, 2004, Prescott contacted ████, an attorney in OIA, for
information regarding Antigua's regulation of Stanford.[56]  See October 18, 2004 E-mail
from Victoria Prescott to ████, attached as Exhibit 97 at 2-3.  Prescott sought
that information because it was relevant to the jurisdictional issue of whether the Stanford
CDs were securities.  Id.  Prescott also contacted OIA in January 2005 for information
about SIB's London auditor.  See January 6, 2005 E-mail from Victoria Prescott to ████

---

[54]   RSFI was created as a Division in 2009 and includes the group that was formerly OEA.

[55]   The paragraph Berman referred to stated:

> Further, SIB's annual audit casts doubt upon its claims of consistent profitability over the
> last 20 years. For example, from 2000 through 2002, SIB reported earnings on
> investments of between approximately 12.4% and 13.3%. This return seems remarkable
> when you consider that during this same time frame SIB supposedly invested at least
> 40% of its customers' assets into the global equity market. Ten of 12 global equity
> market indices were down *substantially* during the same time frame. The indices we
> reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in
> 2002. It is equally unlikely that the portion of the portfolio invested into debt instruments
> (approximately 60%) could make up the expected losses in the equity portion of the
> portfolio. For example, in 2002, when the global indices were down 25%, the debt
> portion of the portfolio would have to generate an approximately 40% return for SIB to
> generate the 12.4% overall return it claimed in 2002.

Exhibit 101 at 5 (footnote omitted) (emphasis in original).

[56]   Prior to Prescott's contact, the OIG investigation found no evidence that any of the Fort Worth
examination or enforcement staff had ever asked OIA for assistance in connection with the previous
examinations and enforcement referrals.

**App. 734**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

`OIA Atty 3`, attached as Exhibit 104.  Prescott was "suspicious" about the legitimacy of the
auditor and the integrity of its audit of SIB.  *Id.*

> Preuitt testified with reference to Prescott's contact with OIA:

> > [W]e made a decision that we were going to go ahead and
> > start with like the preliminary steps of an investigation and
> > not end it where an examination typically did.  And
> > Victoria [Prescott] had a lot of experience in this and she
> > thought it was one of the places to go and basically start the
> > investigation.

January 26, 2010 Preuitt Testimony Tr. at 38.

> On December 20, 2004, Prescott interviewed Leyla Basagoitia, a former
registered representative of SGC.[57]  *See* Notes of December 20, 2004 Interview, attached

---

[57]    Basagoitia first contacted the SEC on or around October 27, 2004.  On that date, `Exam Sr Cnsl`,
senior counsel in the FWDO's Examination group, whose duties at that time included handling complaints
from the public, spoke with Basagoitia. `Exam Sr Cnsl` Testimony Tr. at 8-9; October 27, 2004 E-mail from
`Exam Sr Cnsl` to `BD Exam BC 1` attached as Exhibit 105.  According to an October 27, 2004 e-mail
from `Exam Sr Cnsl` to `BD Exam BC 1` Basagoitia told him that she was terminated by SGC because she would not
sell the SIB CDs and because she told SGC that the CDs were not suitable investments.  *See* Exhibit 105.
Basagoitia told `Exam Sr Cnsl` that she could identify other SGC representatives who were terminated for the
same reason.  *Id.*  Basagoitia also told `Exam Sr Cnsl` that she believed that the CDs were a Ponzi scheme.  *Id.*

Basagoitia told the OIG that during her conversation with `Exam Sr Cnsl`, he responded:

> … something along the way like, oh, we don't want any blood on the street.  What he
> meant by that I don't know, to tell you the truth.  What it seemed to me or my
> understanding was like maybe we're going to investigate; or maybe, you know, you
> can't, unless a client or a customer loses money and calls the SEC then, you know, the
> SEC does something about it.

Wydler Interview Tr. at 10-11.

`Exam Sr Cnsl` testified that he thought that Basagoitia was credible when he spoke to her. `Exam Sr Cnsl`
Testimony Tr. at 14. `Exam Sr Cnsl` October 27, 2004 e-mail to `BD Exam BC 1` stated, "Based on our meeting last
week and my conversation with this woman, `DPP, WP` In
addition, it's reasonable to conclude at this point that the Stanford Group is at least a co-issuer on these
CD's."  *See* Exhibit 105.

On November 18, 2004, Basagoitia sent `Exam Sr Cnsl` an e-mail that stated, in part:

> Here are more observations regarding Stanford Group:
>
> …
>
> 3.    Clients never talk to people at the Bank. They only deal with their Reps and
> operations people in Houston. Clients are led to believe the bank is a subsidiary of a
> regulated US corporation.
>
> 4.    Management promotes contests among Reps and offices in the US to raise assets for
> the Bank. Winners are handsomely paid. I was offered a trip to Antigua.

(Footnote continued on next page.)

**App. 735**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

as Exhibit 107.  Prescott's notes of that interview evidence that Basagoitia told her that the sale of SIB's CDs was a "Ponzi scheme."  *Id.* at 1.  Basagoitia also told Prescott that she believed that SIB "should disclose what [its] portfolio is at any time to investors."  *Id.* Basagoitia complained that SIB:

> Never want to show the portfolio—invest in currency,
> stocks bonds, options
> She asked to see the portfolio—told it was proprietary info
> and do not show it
> …
>
> Investors think the investment is very safe; in reality,
> investing in very risky investments; stocks, bonds currentcy
> [sic]—she saw reports

*Id.*  Prescott described the information she obtained from Basagoitia as follows:

> The most useful information that she gave was giving me
> [Stanford Empl 4] name, and I think there was another fellow
> named [Stanford Empl] I followed up and called all the people
> whose names she gave me, and I found them more helpful.
> They were -- they had a broader understanding, and Leyla
> had made up her mind that this was -- that Stanford was a
> problem, but she couldn't really relate evidence.  I don't
> think she had any.  She had her conclusion, and her
> approach to it was sort of *ipso facto* that it must be, and I
> could never get details from her that I would consider really
> useful from an evidentiary standpoint.

Prescott Testimony Tr. at 33-34.

Prescott interviewed [Stanford Empl 4] one of the two former SGC registered representatives who Basagoitia identified, on December 28, 2004, and January 6, 2005.

---

…

7.   Some of the highest producers for the bank are unlicensed people that solicit from the B-D offices in Houston, such as [Stanford Empl 5] who offices in Houston and has no securities license.

8.   Most Clients open accounts because they believe the B-D's clearing agreement with Bear Stearns provides them with account protection. They also believe in the soundness of US laws. Should the Bank not have US representation, clients would not invest as they do at the Bank.

November 18, 2004 E-mail from Leyla Basagoitia to [Exam Sr Cnsl], attached as Exhibit 106. [Exam Sr Cnsl] forwarded Basagoitia's e-mail to Prescott on December 22, 2004.  *Id.*

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

*See* December 28, 2004 Notes, attached as Exhibit 108; January 6, 2005 Notes, attached as Exhibit 109.  According to Prescott's notes, [Stanford Empl 4] told her that he had been "forced to offer it under extreme pressure from Stanford."  Exhibit 108 at 1. [Stanford Empl 4] also told Prescott that "[t]he firm would not reveal to registered reps how the money was invested" (s*ee* Exhibit 109 at 2) and that "a lot of smoke and mirrors" surrounded the SIB CDs (*see* Exhibit 108 at 1).[58] [Stanford Empl 4] told Prescott that SGC was "very touchy about [the SIB CDs] not being called a security," but that he had heard the firm had received "an opinion from a noted former NASD[] or SEC att[orne]y that it was a security."  *Id.* [Stanford Empl 4] believed that the SIB CD offering was a fund.  *Id.*

Prescott testified that [Stanford Empl 4] and [Stanford Empl 3] also did not have any concrete "evidence," but they provided "a better idea [than Basagoitia] of … how things were handled from the perspective of someone inside the firm."  Prescott Testimony Tr. at 36.  Prescott described this information as "a starting point."  *Id.*

### D.    In March 2005, Barasch and Degenhardt Learned of the Examination Staff's Work on Stanford and Told Them That it Was Not a Matter That Enforcement Would Pursue

Prescott told the OIG that Preuitt asked her to make a presentation about her ongoing work on Stanford at a March 2005 quarterly summit meeting attended by the SEC, NASD, and state regulators from Texas and Oklahoma.[59]  Prescott Interview Tr. at 9-11.  According to Preuitt, who also attended the meeting, Barasch "looked … annoyed" during Prescott's presentation.  Preuitt Interview Tr. at 7.

Immediately after her presentation, Prescott recalled that she got "a lot of pushback" from Barasch and Degenhardt.  Prescott Interview Tr. at 8.  Prescott stated

---

[58]    Prescott also interviewed [Stanford Empl 3], another former SGC registered representative who Basagoitia identified, on January 11, 2005.  *See* January 11, 2005 Notes, attached as Exhibit 110. [Stanford Empl 3] told Prescott that "[t]he operations of [SIB] are not transparent."  *Id.* at 1.

[59]    Denise Crawford, Texas State Securities Commissioner, told the OIG that she believed that the TSSB and SEC staff may have discussed their mutual concern about Stanford as early as the late 1990s at these quarterly meetings designed to foster cooperation and "share information" between the SEC and state regulators.  TSSB Interview Memorandum at 1-3.  Crawford explained that the TSSB had examined SGC in May 1997 in part because of the similarities between SGC and [PII].  *Id.* at 1.

During a Texas state budget hearing on February 20, 2009, Crawford stated that the TSSB had referred Stanford to the SEC ten years ago.  *See* Roma Khanna, *Past probes sought to tie Stanford to drugs*, February 20, 2009, attached as Exhibit 111 at 2.  We found however that, there was no referral from the TSSB to the SEC.  Crawford and [TSSB Empl 1], [PII], confirmed that the TSSB staff has no record or recollection of a referral by the TSSB to the SEC having been made before, as discussed above, the TSSB forwarded the [Confidential Source] letter to the SEC in August 2003.  TSSB Interview Memorandum at 3-4 [TSSB Empl 1] Interview Memorandum.  Crawford told the OIG that the mutual, information-sharing discussions which may have occurred at the quarterly meetings in the late-1990s were the communications between the TSSB and the SEC concerning Stanford in the 1990s, to which she was referring.  *Id.* at 3-4.

**App. 737**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

that while she was "still standing in the room where the presentation had been made,"
Barasch and Degenhardt approached her and "summarily told [her] … it was not
something they were interested in."  *Id.* at 9-10; *see also* Prescott Testimony Tr. at 39-40.
Prescott felt "blindsided" when Barasch and Degenhardt told her that Stanford "was not
something that they wanted to pursue, that they had looked at [it] before."  Prescott
Interview Tr. at 10.  She was "really taken by surprise that [Barasch and Degenhardt]
would have already formed an opinion and that their minds appeared to be closed to it."
*Id.*  Prescott explained further:

> It was a very perfunctory conversation, and it was very -- it
> was not a matter for -- it was not up for discussion.  I was
> being told. … And, you know, I just -- I felt a little bit – I
> don't know, I felt like I'd been put in an awkward position.
> … I had no idea what all had gone on, apparently, and here
> I though I'd turned in a good piece of work and was talking
> about it to significant players in the regulatory community,
> and I no sooner sit down, shut up and the meeting ended,
> but then I got pulled aside and was told this has already
> been looked at and we're not going to do it.

*Id.* at 12.  *See also* Prescott Testimony Tr. at 44-45, 56-58.  Preuitt described
Degenhardt's and Barasch's "dismissive" reaction to Prescott's presentation as "very
disheartening."  January 26, 2010 Preuitt Testimony Tr. at 33.[60]

## VII.   IN APRIL 2005, IMMEDIATELY AFTER BARASCH LEFT THE SEC, THE EXAMINATION STAFF REFERRED STANFORD TO ENFORCEMENT

Preuitt testified that because Barasch had made it "very clear … he wasn't going
to accept [the Stanford referral]" at the March 2005 meeting, the Examination staff
"waited till after he left the Commission … to go ahead and refer it over."  Preuitt
Interview Tr. at 7-8; *see also, id.* at 13 ("[W]e waited until after [Barasch] left to actually
send over the enforcement memo" in order "to avoid a repeat of before.").

On April 5, 2005, Preuitt e-mailed ███████████, an Assistant Director in
Enforcement, the most recent draft of Prescott's referral memorandum – a March 14,
2005 Draft Memorandum from Victoria Prescott to Spencer Barasch[61] (the "2005

---

[60]   Barasch told the OIG that he had attended the March 2005 meeting with other regulators, but that he
had "no recollection" of Prescott's presentation or a conversation with her about that presentation.  Barasch
Interview Tr. at 49-50.

[61]   The March 14, 2005 draft referral memorandum that Preuitt sent ████ was addressed to Barasch.  *See*
Exhibit 101.  On March 9, 2005, the SEC announced Barasch's departure.  *See* SEC Press Release No.
2005-34 (March 9, 2005), attached as Exhibit 112.  Barasch's last day at the SEC was April 14, 2005.  *See*
SEC personnel record, attached as Exhibit 113.

(Footnote continued on next page.)

**App. 738**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Enforcement Referral"), attached as Exhibit 101; *see* April 5, 2005 E-mail from Julie
Preuitt to ███████ ENF Asst Dir 1, attached as Exhibit 114 at 3.  Preuitt's e-mail to ███████ ENF Asst Dir 1 stated:

> Victoria [Prescott] put this together.  I think it does a great
> job of summarizing our concerns.  It has been looked at by
> Hugh [Wright], but not by anybody in enforcement.
>
> I don't think we can get the Bank (be clear when you read),
> but I do think that we can get the [broker-dealer] which will
> ultimately get the Bank.  A LOT of money involved.

*Id.*

> The 2005 Enforcement Referral began with the following:

> An October 2004 examination of Commission-registered
> broker-dealer SGC, headquartered in Houston, Texas, has
> uncovered evidence suggesting that SGC and its affiliated
> company Stanford International Bank ("SIB") may be
> violating the securities laws.  Specifically, we are
> concerned that:

> - SGC is selling unregistered securities, possibly
>   without a valid exemption;
>
> - SGC and SIB are making misrepresentations and/or
>   inadequate disclosures regarding the unregistered
>   offering(s), most notably to foreign investors;
>
> - SIB may be engaging in a fraudulent scheme
>   (possibly either a money laundering and/or a Ponzi
>   scheme) through the sales of the unregistered
>   securities, and refuses to provide the staff with
>   sufficient information to dispel this concern.

Exhibit 101 at 1.  It also stated, "As of October 2004, SGC customers held approximately
$1.5 billion of CDs.  Approximately $227 million of these CDs were held by U.S.
investors." *Id.*

---

Prescott testified that when she began drafting the referral memorandum, she had intended to send it to
Barasch.  Prescott Testimony Tr. at 48-49.  However, the announcement of his departure changed that
intention.  *Id.* at 47-50, 54-55.  Barasch told the OIG that he did not recall receiving the 2005 Enforcement
Referral, and that he was certain that he never read it.  Barasch Interview Tr. at 47-48.  Barasch explained,
because he had already announced that he was leaving the SEC for private practice by the date of the 2005
Enforcement Referral, March 14, 2005, he had recused himself from all new matters by that time, and he
had been out of the office on leave a lot around that time.  *Id.* at 47-49.

**App. 739**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

The 2005 Enforcement Referral also stated:

> SGC claims that it keeps no records regarding the portfolios into which SIB places investor funds and that it cannot get this information from SIB.  Indeed, SGC has related to the Staff that SIB claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and SIB's own internal "Chinese Wall" policies with SGC.

*Id.* at 2 (footnotes omitted).

The 2005 Enforcement Referral characterized the SIB CD returns as "too good to be true," explaining:

> SIB's high interest rates are inconsistent with its claimed portfolio.  …  Moreover, the Staff is equally suspicious of SIB's *recurring annual 3%* trailer.  We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product.
> …
>
> [F]rom 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%.  This return seems remarkable when you consider that during this same time frame … [t]he indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002.  It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002.

*Id.* at 5 (emphasis in original) (footnotes omitted).

**App. 740**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

A.      **The Enforcement Staff Initially Reacted Enthusiastically to the Referral and Opened a MUI**

The immediate reaction from the Enforcement staff to the Stanford referral was very positive.  On April 8, 2005, ▓▓▓▓ e-mailed Preuitt and Prescott:

> [T]his memo is terrific.  Very nicely done.
>
> Moreover, I agree with the preliminary legal conclusions in the memo, including the deduction that this almost certainly has to be fraudulent.
>
> I would like to get together with both of you and talk in greater depth about possible courses of action.  From a tactical standpoint, the international dimension concerns me because it limits our investigative powers.  The [broker-dealer] is domestic, of course, but I'm concerned that taking action only against the domestic [broker-dealer] will have a limited long-term effect on the whole apparently-criminal organization, most of which is overseas.  Moreover, the immediate impact on U.S. investors of an action against the domestic [broker-dealer] might not be favorable.

Exhibit 114.

Preuitt immediately responded to ▓▓▓▓ observations about the "international dimension" as follows:

> The problem is very interesting. We agree with many of your concerns.  Its a difficult choice.  It seems too difficult to go after the foreign entity so nothing happens or it seems too limiting to go after the US [broker-dealer] when we know the whole thing must be a fraud.  *As a result, we've just sat around for ten years fussing about what is going on at this firm/bank.*

*Id.* (emphasis added).

Although ▓▓▓▓ was very interested in the case, he did not have a staff attorney available, so on April 12, 2005, ▓▓▓▓ forwarded the referral to Jeffrey Cohen and ▓▓▓▓

**App. 741**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[ENF Asst Dir 2] the other two Assistant Directors in FWDO Enforcement, with the following explanation:

> I've reviewed this and spoken to Victoria and Julie, and I believe this case is worth pursuing.  Victoria's memo … does a good job of laying out the apparent violations.  If, after reviewing it, you find yourself wondering why I thought the case was worth pursuing, let me know.  I don't think that will be your reaction, but I'm happy to share my impression of this if it would be helpful. … One of the obvious logistical and jurisdictional problems with this case is the location of the issuer in Antigua.[62]

April 12, 2005 E-mail from [ENF Asst Dir 1] to Jeffrey Cohen, attached as Exhibit 115.  One day later, Cohen forwarded [ENF Asst Dir 1] e-mail to [ENF BC 3] a branch chief in Cohen's group, and asked, "[W]hat's [ENF Staff Atty 5] ] handling?  Does she have time for this one?"  *Id.*

On April 14, 2005, [ENF BC 3] e-mailed Prescott:

> Your memo was fantastic.  Will be very helpful going forward. [ENF Staff Atty 5] and I are opening MUI with hope of bringing case quickly (possibly [Temporary Restraining Order]).  May need some help from you and [other members of the Examination staff] to make it happen.[64]

April 14, 2005 E-mail from [ENF BC 3] to Victoria Prescott, attached as Exhibit 116.  On April 15, 2005, Cohen responded to [ENF Asst Dir 1] April 12, 2005 e-mail, "We've opened a MUI in [ENF Staff Atty 5] name."  April 15, 2005 E-mail from Jeffrey Cohen to [ENF Asst Dir 1] attached as Exhibit 117 at 2.  Later the same day, Cohen e-mailed [ENF Asst Dir 1] that the Stanford matter "look[ed] promising."  *Id.* at 1.

---

[62] [ENF Asst Dir 1] testified that it was "almost impossible … if you're telling people you've got a CD and it's safe like a bank CD … I don't know how anybody can generate returns in double digits while still offering that kind of security.  I mean, all of this is implausible." [ENF Asst Dir] Testimony Tr. at 29.

[63]  At that time, [ENF Staff Atty 5] was a FWDO Enforcement staff attorney.

[64] [ENF BC 3] explained his initial reaction to the memorandum as follows:

> [T]here was the thought that this could have been a Ponzi scheme and that if, essentially, we could get kind of bank records that would reflect, you know, the money basically going in and then not being used for legitimate investment purposes but being used to kind of pay back prior investors, that, you know, we'd be able to bring a case quickly.

[ENF BC 3] Testimony Tr. at 20 [ENF BC 3] testified that he had hoped to bring a case quickly because it seemed as though the matter was an ongoing fraud and he wanted to stop it as quickly as possible.  *Id.* at 20-21.

**App. 742**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Early in the investigation, the Enforcement staff contacted OIA to assist them in getting records from SIB in Antigua. ▉ENF BC 3▉ Testimony Tr. at 24.  In May 2005, the Enforcement staff sent questionnaires to U.S. and foreign investors in an attempt to identify clear misrepresentations by Stanford to investors.  June 3, 2005 E-mail from ▉ENF BC 3▉ to Jeffrey Cohen, attached as Exhibit 118; *see also* ▉ENF BC 3▉ Testimony Tr. at

Charles Rawl, a financial advisor at SGC from 2005 through 2007 who raised concerns about Stanford with the SEC in 2008, told the OIG in an interview that the investor questionnaires led to "significant concerns" by investors in the CDs.  Rawl and Tidwell Interview Tr. at 6-10.  Mark Tidwell, another financial advisor at SGC from 2004 through 2007, who later raised concerns about Stanford with the SEC, told the OIG that his phone "lit up like a Christmas tree" with client concerns after the questionnaires were sent out.  *Id.* at 8.

▉DPP, WP, PII▉

▉ENF BC 3▉ Testimony at 36.  Of course, as ▉ENF BC 3▉ and ▉ENF Staff Atty 5▉ acknowledged, until a Ponzi scheme begins to collapse, its victims are unsuspecting and not in a position to provide the SEC staff with evidence of the ongoing Ponzi scheme ▉ENF BC 3▉ testified, "[U]nlike a lot of Ponzi schemes that have collapsed when you've got investors calling you and … they can't get their money out or there's clear misrepresentations … here … we just didn't have that."  *Id.* at 34. ▉ENF BC 3▉ further explained that while a Ponzi scheme is ongoing, it is difficult to get investors to complain about it because they are still getting paid.  *Id.* at 35. ▉ENF Staff Atty 5▉ testified that it was generally hard to bring a Ponzi scheme case before the Ponzi started to unravel because:

> [Y]ou don't have any witnesses, you don't have anybody complaining about anything going wrong, everybody is happy, so they are not particularly cooperative.  In fact, they are usually against us when we go in and talk to them, as was the case with a lot of the investors in Stanford. They were against us even meddling.

▉ENF Staff Atty 5▉ Testimony Tr. at 18-19.

As demonstrated below, after the Stanford investors failed to deliver any evidence that the Enforcement staff believed would have allowed them to bring a case against Stanford, the staff attempted to close the matter and refer it to the NASD.

**App. 743**

Case 3:09-cv-00724-N-BG   Document 1399-10   Filed 11/20/15   Page 146 of 210   PageID
21293

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

### B.    By June 2005, the Enforcement Staff Had Decided to Refer the Matter to the NASD, Apparently as a Precursor to Closing the Matter.

██████████ testified that at a meeting with Cohen and others shortly after the referral, Cohen was "not real excited" about the Stanford matter, and that Cohen expressed ████████ ████████[65] Testimony Tr. at 24-25.  By June 2005, two months after opening the MUI, Enforcement's interest in the matter had waned.[66]  On June 14, 2005 ██████████, an attorney ████who was assisting the Enforcement staff with the Stanford matter, asked █ for a "pithy email … explaining to [the Antiguan regulator] why our case is compelling."  *See* June 14, 2005 E-mail from ████████ to ████████, attached as Exhibit 124, at 2.  ████████ forwarded ████████ e-mail to ██████ with the sarcastic comment, "Uhhh--yeah….we'll send a persuasive e-mail setting out why our case is so compelling…"  *Id.* at 1 (ellipses in original).  ██████ responded jokingly, "Apparently he hasn't seen your closing memo."  *Id.*

At June 21, 2005 quarterly regulators meeting, Cohen expressed pessimism about the viability of the SEC's investigation.  *See* Minutes of June 21, 2005 Regulatory Coordination Meeting, attached as Exhibit 125.  Attendees at the meeting included Degenhardt, Cohen, Prescott, Preuitt and a representative from NASD.  *Id.* at 5.  The minutes of that meeting memorialized Cohen's remarks as follows:

> Stanford – Jeff [Cohen] not optimistic about viable enforcement referral disclosure very cleverly crafted - impeccable for most part investors well off, enjoying returns -no concrete evidence of Ponzi

---

[65] There is some indication that Cohen might have spoken to Barasch about Stanford a few days after Barasch left the SEC and approximately one week after Cohen opened the MUI.  As discussed above in footnote 63, Barasch's last day at the Commission was April 14, 2005.  On Friday, April 22, 2005, a social function was held in Barasch's honor.  *See* April 24, 2005 E-mail from Jeffrey Cohen to Harold Degenhardt, *et al.*, attached as Exhibit 119.  At 6:35 p.m. on Sunday, April 24, 2005, Cohen e-mailed several SEC employees the remarks he had written for Barasch's party.  *Id.*  Four hours later, at 10:34 p.m. on Sunday April 24, 2005, Cohen e-mailed ████ "Must discuss this case with both of you ASAP—critical."  April 24, 2005 E-mail from Jeffrey Cohen to ██████, attached as Exhibit 120.

[66] On April 19, 2005, the SEC received from the Department of Labor's Occupational Safety & Health Administration (OSHA) a copy of a Sarbanes-Oxley whistleblower complaint from an individual alleging that he was terminated in reprisal for reporting illegal financial activities.  *See* SEC Complaint/Tip/Referral database printout, Control Number 13639, attached as Exhibit 121.  On June 21, 2005 ████e-mailed Degenhardt about the FWDO's receipt of this whistleblower complaint, stating, "In rare cases, the referrals contain information that does justify follow-up, and this one appears to be an example of that.  Stanford Group is a very problematic broker-dealer that has been the subject of enforcement investigations."  June 21, 2005 E-mail from ██████to Harold Degenhardt, attached as Exhibit 122. ████then sent an e-mail to ████about the whistleblower complaint, stating, "This whistle blower [sic] may provide some valuable inside info on the firm that otherwise would be hard to get."  June 21, 2005 E-mail from ██████to ██████, attached as Exhibit 123. ████testified that he did not recall talking to this complainant. ████Testimony Tr. at 45-46.

App. 744

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

>Trying to reach out to some foreign investors for more
>information.
>
>Calls it a CD when it's more like a hedge fund. Telling
>foreign investors there is no risk but American investors are
>being told there is complete risk. Moneys are being held in
>Stanford's Antigua Bank. The fee is not disclosed to
>foreigners and to US they are not told fees are reoccurring.
>…

*Id.* at 1-2.

A July 8, 2005 e-mail from ▮▮▮ to ▮▮▮ discussed "[o]ptions to obtain
[Stanford] bank documents."  July 8, 2005 E-mail from ▮▮▮ to ▮▮▮,
attached as Exhibit 126. ▮▮▮ summarized these options as follows:

>1. MLAT[67] (Requires criminal interest, even soft interest,
>to make this request);[68]
>
>2. Ask [the IRS attaché to Antigua] to lean on Leroy
>King;[69] and
>
>3. Ask for the documents voluntarily from Stanford.

*Id.* at 2.

---

67   The SEC's intranet describes Mutual Legal Assistance in Criminal Matters Treaties ("MLATs") as
follows:

>… MLATs are designed for the exchange of information in criminal matters and are
>administered by the US Department of Justice …  Despite the fact that MLATs are
>primarily arrangements to facilitate cross-border criminal investigations and
>prosecutions, the SEC may be able to use this mechanism in certain cases. …  US
>criminal interest in the matter may be required….  Notwithstanding the slowness of the
>process …, MLATs may be an effective mechanism to obtain assistance …"

*See* "Obtaining Documents And Testimony From Abroad," attached as Exhibit 127, at 3.

68   ▮▮▮ testified that the staff drafted a MLAT request but it required "criminal interest, and … [t]he
criminal authorities [the U.S. Department of Justice] wouldn't step up." ▮▮▮ Testimony Tr. at 44-45.
Consequently, ▮▮▮ testified that a MLAT request was not sent while she worked on the Stanford matter
[in 2005 and 2006].  *Id.*

69   Leroy King was the Administrator and Chief Executive Officer of the Antigua Financial Services
Regulatory Commission.  As discussed below, King has been indicted for criminal obstruction of the SEC's
Stanford investigation.

**App. 745**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

██████ e-mail prompted ██████ to e-mail Prescott:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.  As for MLAT, we probably should discuss further.  Talked to FBI agent in Houston who was aware of Standford [sic].[70] ██████ ██████ As for having [the IRS attaché to Antigua] lean on Leroy King, can't hurt.

*Id*. at 1.

In June 2005,[71] Degenhardt directed Prescott to refer the matter to the NASD. *See* Prescott Interview Tr. at 31-32.  The decision to refer the matter to the NASD apparently was made within days of a meeting attended by, Degenhardt, Cohen and a NASD representative, during which Cohen expressed that he was "not optimistic about [a] viable enforcement referral."[72]

According to Prescott, Degenhardt did not give her "much in the way of explanation" for why he wanted the matter referred to the NASD.  *Id*.; *see also* Prescott

---

[70] ██████ testified that he could not recall any discussions with the FBI regarding Stanford in 2005. ██████ Testimony Tr. at 52.

[71] A June 29, 2005 draft of the NASD referral letter is attached as Exhibit 128.  The final referral letter that was sent to the NASD on July 21, 2005, is attached as Exhibit 129.  The letter included essentially the same information contained in the 2005 Enforcement Referral.  The letter noted, "SGC's admitted inability to get information from SIB about the investments underlying the CDs suggests that SGC may be violating NASD Rule 2310 (Suitability)."  Exhibit 129 at 2.

According to a September 2009 FINRA report released on October 2, 2009, the NASD conducted a routine examination of Stanford sometime in 2005.  *See* Report of the 2009 Special Review Committee on FINRA's Examination Program in Light of the Stanford and Madoff Schemes ("FINRA Report"), attached as Exhibit 130, at 18.  The lead examiner on FINRA's 2005 Stanford examination gave "special attention to the CD issue [because of] … substantial concerns in the Dallas office regarding the Stanford firm and the CD program in particular.  *Id*. at 20.  The lead examiner and his manager "decided that it made sense to take a broad look and 'see what we reel in.'"  *Id*.

██████ the former SEC Enforcement staff attorney who had worked on the SEC's 1998 MUI concerning Stanford, worked at FINRA ██████ and "joined the discussion on the CD issue" while the FINRA examiners prepared for their Stanford exam.  *Id*.; ██████ Tr. at 33.  "From the moment she became involved in discussions regarding the CD aspect of the 2005 Stanford cycle exam, ██████ reportedly expressed the view that the Stanford CDs were *not* 'securities' regulated under the federal securities laws, and were therefore outside of FINRA's jurisdiction."  Exhibit 120 at 20 (emphasis in original).

[72] *See* Exhibit 125.  The meeting where Cohen made his pessimistic comments about the Stanford investigation occurred on June 21, 2005.  *Id*.  By June 29, 2005, Prescott had drafted the referral letter.  *See* Exhibit 128.

**App. 746**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Testimony Tr. at 68 ("[T]he case was being referred to the NASD because we were
instructed to do so, and my recollection is that came from Hal Degenhardt….").

Prescott testified that she had been "unhappy" about the decision to refer the
Stanford matter to the NASD.  Prescott Testimony Tr. at 68.  Prescott "felt like that it was
unlikely that the NASD would be able to be able to create the same kind of result that we
could here at the Commission."  *Id.*  She "wanted to see [the SEC] work the case."  *Id.* at
68-69.

Prescott's "impression and understanding was that we were referring it to the
NASD because we would not be working it."  *Id.* at 69.  Prescott explained that
Degenhardt's "intent was probably to [shut down the investigation].  But in the meantime
we kept arguing and lobbying for it here, Julie [Preuitt] taking the lead, and I was
assisting her with that.  Julie [Preuitt] is pretty relentless when she decides something
needs to happen.  And so she was continuing to lobby and talk to people."  Prescott
Interview Tr. at 33.

Preuitt also told the OIG that the NASD referral had been made because
Enforcement was "trying to get rid of it."  Preuitt Interview Tr. at 9.  As discussed in
Section XII, the OIG investigation found that Enforcement was reluctant to take these
types of cases for a variety of reasons, including:  the difficulties in obtaining approval
from the SEC staff in Washington, DC to pursue novel investigations; the pressure in the
FWDO to bring a lot of cases; the preference for "quick hit" cases as a result of that
pressure; and the fact that Stanford was not a "quick hit" case.  Preuitt testified that
referring the matter to the NASD was "ludicrous," and "after the referral was made I just
pretended like it had never happened."  January 26, 2010 Preuitt Testimony Tr. at 44.

By mid-August 2005, the Enforcement staff had apparently conveyed to [Sen Cnsl]
their intention to close the matter because Stanford was refusing to voluntarily produce
documents.  In an August 17, 2005 e-mail from [Sen Cnsl] to [ENF Staff Atty 5] discussing OIA's
comments regarding a draft request for documents, [Sen Cnsl]

As this letter may mark the end of your investigation, I
think it makes sense that we think long and hard about the
type of letter we wish to send.

August 17, 2005 E-mail from [Sen Cnsl] to [ENF Staff Atty 5], attached as Exhibit 131.

In late August 2005, the Enforcement staff sent SIB a voluntary request for
documents.  *See* September 1, 2005 E-mail from [ENF BC 3] to Jeffrey Cohen, attached
as Exhibit 132.  However, requesting voluntary document production from Stanford was
a completely futile exercise.  [Sen Cnsl] noted in his August 17, 2005 e-mail, the
ineffectiveness of sending Stanford "a letter that relies on the good will of the recipient."
Exhibit 131.

**App. 747**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Moreover, the Enforcement staff sent SIB this "standard" request six days *after* SIB's attorney "made it clear that SIB would not be producing documents on a voluntary basis."  *See* August 23, 2005 E-mail from ▉▉ENF Staff Atty 5▉▉ to ▉▉Sen Cnsl▉▉, attached as Exhibit 133.  The Enforcement staff sent the request even though it recognized that its efforts to obtain the requested documents voluntarily were "moot[]."  *Id.*

The reason behind the staff's document request to Stanford was apparent in a July 10, 2005 e-mail from ▉▉ENF BC 3▉▉ to Victoria Prescott as follows:

> I feel strongly that we need to make voluntary request for docs from bank.  If we don't and close case, and later Stanford implodes, we will look like fools if we didn't even request the relevant documents.

Exhibit 126.

It is not clear why the Enforcement staff would have expected Stanford to produce documents evidencing that it was operating a Ponzi scheme.  In this instance, the staff knew that the request was futile, but decided to send it anyway so as not to later appear foolish.  As discussed below, their decision to close the matter was overruled by new senior management in the FWDO.

### C.   In September 2005, the Enforcement Staff Decided to Close the Stanford Investigation, But the Examination Staff Fought to Keep the Matter Open

In the fall of 2005, the FWDO Enforcement staff considered closing its Stanford investigation after it had reached an impasse due to Stanford's lack of cooperation and the staff's lack of access to SIB's records in Antigua.  ▉▉ENF BC 3▉▉ described this impasse in a September 1, 2005 e-mail to Cohen and ▉▉ENF Staff Atty 5▉▉:

> Antigua will not compel bank to produce docs.  After much time talking with OIA, we finally received green light to issue volun[t]ary doc request to bank, care of the bank's attorney.  Letter issued last week. ▉▉ENF Staff Atty 5▉▉ spoke with attorney for bank, who stated bank would not be producing docs. …



**App. 748**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

September 1, 2005 E-mail from to ██████ENF BC 3██████to Jeffrey Cohen, attached as Exhibit
132.  Cohen responded, "Close the case."  *Id.*

However, the examination staff, Preuitt in particular, fought to keep the
Enforcement investigation open.  On September 21, 2005, at 9:46 a.m., ███ENF Staff Atty 5███ e-mailed
Cohen the following:

> On Stanford, this morning I heard that people from [the
> Examination staff] met with [James] Clarkson [the newly
> appointed Acting Director of the FWDO[74]] yesterday about
> it.  A little annoying, eh?  Do you know anything about
> that?  I'll tell you what I know when I see you.[75]

September 21, 2005 E-mail from ███ENF Staff Atty 5███ to Jeffrey Cohen, attached as Exhibit
136.  At virtually the same time that ███ENF Staff Atty 5███ sent her e-mail to Cohen, Preuitt e-mailed the
examination staff's "report on Stanford" to Clarkson ███ENF BC 3███ and ███ENF Staff Atty 5███ *et al.  See*
September 21, 2005 E-mail from Julie Preuitt to James Clarkson, attached as Exhibit 137.
Approximately one hour later, at 10:41 a.m., Cohen e-mailed ███ENF BC 3███ regarding Preuitt's e-
mail to Clarkson, "Please call me about this."  *Id.*  At 11:35 a.m., Cohen responded to
███ENF Staff Atty 5███ e-mail telling him "that people from [the Examination staff] met with Clarkson
yesterday about [Stanford]" as follows:

> Who from [the Examination staff]?  How did you hear it?
> Where's ███ENF BC 3███?

Exhibit 136.  Four minutes later, after receiving no response from ███ENF Staff Atty 5███ to his questions,
Cohen e-mailed ███ENF Staff Atty 5███:

> Please respond (I'm not reaching ███ENF BC 3███).  Who from
> [the Examination staff]…and are you talking about our
> office or DC?

*Id.* (ellipse in original).

---

[73]   Cohen testified that he decided to close the Stanford matter "out of deference to ███ENF BC 3███
recommendation."  Cohen Testimony Tr. at 52-53 ██ENF BC 3██ disputed this assertion, stating his belief that
Cohen decided to close the case because he felt that it was appropriate to do so, not because Cohen was
deferring to ██ENF BC 3██ recommendation. ██ENF BC 3██ Testimony Tr. at 79-80.

[74]   Degenhardt's departure from the SEC was announced on August 15, 2005.  *See* SEC Press Release
2005-116 (Aug. 15, 2005), attached as Exhibit 134.  On August 31, 2005, James Clarkson was named as
the Acting Director of the FWDO.  *See* SEC Press Release 2005-123 (Aug. 31, 2005), attached as Exhibit
135.

[75]   The e-mail exchange indicates that Cohen was out of the office which is supported by the fact that he
responded from his blackberry.  *See* Exhibit 136.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

[ENF Staff Atty 5] replied:

> …Julie [Preuitt] said they talked to Clarkson and expressed
> their frustration with the fact that enforcement didn't want
> to bring a case ….

*Id.*

However, Preuitt's efforts did not change Cohen's decision to close the case.  On
October 24, 2005, [ENF Staff Atty 5] e-mailed Prescott and Preuitt:

> FYI, we have decided to recommend closing the Stanford
> investigation.  We're preparing the closing memo.  I'll keep
> you posted.

October 24, 2005 E-mail from [ENF Staff Atty 5] to Victoria Prescott, attached as Exhibit
138 at 2.[76]  Twenty minutes after receiving this message, Preuitt forwarded it to
Katherine Addleman, FWDO Associate District Director for Enforcement,[77] copying
Cohen and [ENF Staff Atty] and asked, "Can we discuss before closing?"  *Id.*  Preuitt testified that
she also "went to Kit [Addleman] telling her how much we needed not to close this and
that angered [Cohen]."  January 26, 2010 Preuitt Testimony Tr. at 56.

Cohen responded to Preuitt's e-mail, copying Addleman and [ENF Staff Atty 5]

> Since our last meeting in [ENF Staff Atty 5] office last
> week [ENF Staff Atty 5] and I met to discuss with the legal intern …
> the fruits of her research. [DPP, WP, LE]
> [DPP, WP, LE]

Exhibit 138.

According to an October 26, 2005 e-mail exchange between [ENF BC] and [ENF Staff Atty 5] the
Examination staff advocated for continuing the investigation and the     rcement staff
continued advocating that the matter be closed. [ENF Staff Atty 5] described the status of the matter
as follows:

> Well, Stanford is kind of a goat screw.  Long story short,
> Jeff [Cohen] told me to kill it, Julie [Preuitt] was upset,
> started an e-mail battle, long talks with Julie, fight b/w Julie
> and Jeff (Julie won), now I'm researching and doing all
> kinds of stuff on it, but still am finding [DPP, WP]

---

[76]  Prescott testified that she was "unhappy" when she received [ENF Staff Atty 5] e-mail that said Enforcement was
closing the Stanford investigation.  Prescott Testimony Tr. at 74.

[77]  Addleman replaced Barasch as the FWDO Associate District Director for Enforcement on August 23,
2005.  *See* SEC Press Release 2005-120 (Aug. 23, 2005), attached as Exhibit 123.  Addleman was FWDO
Associate District Director for Enforcement until 2007.  Addleman Testimony Tr. at 9.

**App. 750**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[DPP, WP], but having to run down every possible scenario. It's not so much fun. That's about all.[78]

October 26, 2005 E-mail from [ENF Staff Atty 5] to [ENF BC 3] attached as Exhibit 141. [ENF BC 3] responded, "On Stanford, agree with Jeff [Cohen]. If no offering fraud, not worth pursuing." *Id.* [ENF Staff Atty 5] replied, "I totally do agree with Jeff. Julie is just really passionate about this and is fighting hard, going to Kit [Addleman], etc. and so we have to do all this stuff. It's frustrating!" *Id.*

On October 27, 2005, Clarkson e-mailed Preuitt:

> I advised Jeff [Cohen] that I understood that the exam staff and the folks in enforcement were wrestling with how to deal with the Sandford [sic] matter. I requested that he prepare for me a brief memo setting out the reasons why enforcement feels that the case can't be made. I would like you to do the same from an exam staff perspective. … When I return to the FWDO on November

---

78   It appears that until November 2005, the Enforcement staff spent more time and energy trying to close the Stanford matter than they spent investigating it. On October 27, 2005, Wright e-mailed Clarkson regarding his concerns about Cohen's interactions with the examination staff in connection with Stanford. *See* October 27, 2005 E-mail from Hugh Wright to James Clarkson, attached as Exhibit 140. Specifically, Wright tried to "clarify the situation as it relates to Julie [Preuitt], Victoria [Prescott], and maybe [ENF Staff Atty 5]" *Id.* at 1. Wright explained:

> Basically, Julie is scared of Jeff's reactions to anything that crosses him. … According to Julie, Victoria is also very concerned [PP]
>
> [PP] … Whether resolving the issues about the Stanford case will alleviate the situation is questionable. … If the decision is made to close Stanford, that is certainly up to Kit and the enforcement staff. … The point that I am trying to make clear is that at least one member of the staff, and maybe more, are personally concerned [PP]

*Id.* at 2.

The staff tension may have been exacerbated by the fact that Cohen had been Degenhardt's choice to replace Barasch, but on August 23, 2005, Addleman was named as Barasch's successor instead. *See* Exhibit 139; Addleman Testimony Tr. at 55-56. Addleman had worked in the FWDO office as a branch chief at one point. *See* Exhibit 139. She was serving as an Assistant Regional Director for Enforcement in the SEC's Denver Regional Office when she was promoted to Associate District Director for Enforcement in FWDO. *Id.* Addleman testified that Cohen had been "unhappy with my appointment to that position over him." Addleman Testimony Tr. at 19-20.

**App. 751**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> 7th, Kit [Addleman] and I will plan to sit down with you
> and Jeff and resolve this matter one way or the other.

October 27, 2005 E-mail from James Clarkson to Julie Preuitt, attached as Exhibit 142 at 1-2.

In response to Clarkson's request, Preuitt prepared a November 7, 2005 memorandum for Clarkson and Addleman that summarized the Examination staff's concerns about Stanford.  *See* November 7, 2005 Memorandum from Hugh Wright to James Clarkson (the "Preuitt Memorandum"), attached as Exhibit 143.  In addition to discussing the significant circumstantial evidence that the SIB CDs were a Ponzi scheme, the Preuitt Memorandum noted:

> Stanford is expanding rapidly.  From what records we can
> obtain it has increased its assets by approximately 50%
> over the last 18 to 24 months.  Per our discussions with
> current and former Stanford Group personnel, Stanford
> Bank has been in a consistent state of growth over the past
> ten years and the pressure to increase the amount of sales
> has increased over the last two or three years.  Accordingly,
> Stanford Bank has not had to undergo any period when
> withdrawals have exceeded deposits.  Such pressure to
> increase sales is frequently associated with fraudulent
> schemes.

*Id.* at 2.  The Preuitt Memorandum closed with a recommendation that the Enforcement staff obtain a formal order of investigation as follows:

> In light of the earmarks of fraud noted above, it is troubling
> to imagine the Commission failing to resolve its concerns
> regarding the legitimacy of the product offered because the
> relevant parties either refuse to or cannot provide the
> requested, necessary information to confirm or dispel those
> concerns.  Just as troubling, is to imagine the Commission
> to continue allowing a U.S. registered broker-dealer to offer
> a product about which it does not have the necessary
> information to make a reasonable basis for a
> recommendation.

*Id.* at 2.

The Preuitt Memorandum convinced senior management to overrule Cohen and continue the investigation.  This decision ultimately ended the feuding between the examiners and the Enforcement staff that had consumed most of the time spent on the matter to that point.

**App. 752**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> **D.**     **In November 2005, the Head of the FWDO Enforcement Group
> Overruled Her Staff's Objections to Continuing the Stanford
> Investigation and Decided to Seek a Formal Order in Furtherance of
> That Investigation**

In response to Clarkson's request for a memorandum setting forth Enforcement's
perspective regarding the Stanford investigation, Cohen prepared an eleven-page
memorandum (the "Cohen Memorandum") that discussed the status of the investigation,
the difficulties confronting the staff, and Cohen's view of the options going forward.  *See*
November 14, 2005 Memorandum from Jeffrey Cohen to James Clarkson, attached as
Exhibit 144.  Cohen addressed the Examination staff's recommendation for a formal
order as follows:



*Id.* at 1-2.

Cohen recommended that, if the Stanford investigation continued, it should focus
on [DPP, WP] causes of action.  *Id.* at 11.  After discussing the
[DPP, WP]
[DPP, WP] Cohen made the following recommendation:



95

**App. 753**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

[REDACTED: DPP, WP]

*Id*.[80]

Addleman testified that she recalled that at this time there was a "disagreement" between the Examination staff and the Enforcement staff about the Stanford investigation.  Addleman Testimony Tr. at 12.  She recalled that the Enforcement staff "was having a difficult time getting their arms around whether it was a fraud."  *Id*.  She testified that the issue was framed as, "[D]oes it make sense to do a case that[] … appeared at that time to be all that the SEC could prove would be a registration violation, does it make sense for us to use scarce resources for that case versus something else[?]"  *Id*. at 14.

Addleman met with the staff to discuss the disagreement.  January 26, 2010 Preuitt Testimony Tr. at 62.  Before she met with the staff, Addleman was aware that there had been other examinations of Stanford prior to the 2004 Examination.  Addleman Testimony Tr. at 14.  However, she was not aware that the examination staff had concluded as far back as 1997 that Stanford was a potential Ponzi scheme.  *Id*.)

Addleman recalled that during the meeting, the staff discussed the possibility of filing an action against Stanford alleging violations of the federal securities laws unrelated to a Ponzi scheme as a way to overcome Stanford's refusal to provide documents necessary to prove the SIB CDs were a Ponzi scheme.  *Id*. at 14-15.  Specifically, Addleman recalled a discussion about "whether it made sense to bring a Section 5 [unregistered securities] case and try and address in a court setting as opposed to a Commission investigation getting behind those documents."  *Id*. at 15-16.  Addleman testified that Cohen had "the strongest view" on the issue.  *Id*. at 16.  Despite Cohen presenting a [REDACTED: DPP, WP] charge as an option in the Cohen Memorandum, Addleman characterized Cohen's view on bringing a [REDACTED: DPP, WP]
[REDACTED: DPP, WP]

---

[79]     Addleman explained that the reason for the [REDACTED: DPP, WP] in the Cohen Memorandum which [REDACTED: DPP, WP] … [REDACTED: DPP, WP] [REDACTED: DPP, WP] was that Addleman had been "pretty direct … that we were going to continue to do what we could to obtain information" about Stanford.  Addleman Testimony Tr. at 26.  *See also*, Prescott Testimony Tr. at 78 ("The memorandum itself seems [REDACTED: DPP, WP] but the context in which this memorandum was created came out of the decision to close it.  So I viewed this as, okay, if we're not going to close it, here is my best judgment as to how we might be able to proceed.")

[80]     Preuitt testified that working with Cohen was "extraordinarily difficult," in part because "he only wanted to bring cases that were slam dunk, easy cases."  January 26, 2010 Preuitt Testimony Tr. at 42.  Preuitt elaborated, "He wanted to have all of his cases so they were narrowed down to something so small and so bulletproof that you could be exempt from any sort of possible criticism that it would tend to gut your case."  *Id*.

**App. 754**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

▮▮▮ DPP, WP ▮▮▮                                              Exhibit 144; Addleman Testimony

At the meeting, Addleman decided to "keep the case open and to seek a formal
order."  Prescott Interview Tr. at 34.  Although Cohen proposed limiting the investigation
to ▮ DPP, WP ▮ Addleman decided to continue the investigation of
whether Stanford was operating a Ponzi scheme.  *See* Addleman Testimony Tr. at 24-26.
Addleman made this decision because of "the possibility of a Ponzi scheme and a pretty
significantly-sized one."  *Id.* at 26.  She added, "although there are some hurdles, we
needed to move the investigation forward and if possible get into court."  *Id.*  Addleman
testified that after the meeting, the Enforcement staff "did move [the investigation]
forward and … did look for avenues to try and determine the best way to get evidence [of
a Ponzi scheme]."  *Id.* at 25-26.

The staff obtained a formal order of investigation on October 26, 2006 – two
years after the Examination staff began their examination of SGC in order to refer the
matter to Enforcement.[81]  As discussed above, the staff's conduct of the Stanford
investigation from this point forward was the subject of a previously-issued OIG Report.
That OIG Report did not substantiate the allegation that the SEC had made no effort to
investigate Stanford after obtaining the formal order until Madoff's Ponzi scheme
collapsed in mid-December 2008.  The OIG also found that after April 2008, when the
FWDO staff referred Stanford to DOJ, the FWDO effectively halted its Stanford
investigation at the request of DOJ so it could pursue its criminal case.  However, the
OIG investigation also found that "[i]mmediately after the revelations of the Madoff
Ponzi scheme became public in December 2008, the Stanford investigation became more

---

[81]    After Addleman decided to seek a formal order, it took the FWDO staff approximately seven months
to prepare a formal order action memorandum because, according to Addle▮▮▮ohen "worked very, very
hard to get it perfect."  Addleman Testimony Tr. at 51.  On April 25, 2006, ▮ENF Staff Atty 5▮ received comments to a
draft of the formal order action memorandum from Cohen and ▮ENF BC 1▮, a branch chief who had
replaced ▮ENF BC▮ on the Stanford investigation.  *See* April 25, 2006 E-mail from ▮ENF BC 1▮ to ▮ENF Staff Atty 5▮
▮ENF Staff Atty 5▮, attached as Exhibit 145.  One comment to the draft action memorandum was:

> We need right here a thorough discussion of what FWDO [Enforcement and Examination
> staff] have been doing with this matter since the referral – we'll stick with the 3/05 referral
> date rather than what I understand to be the exam date in 10/04.  List everything, including
> document gathering, meetings, research, whatever.  We're going to get nailed for the passage
> of time unless we have a good explanation here.  Be creative.

*Id.* at 4, note 1.

A draft of the formal order action memorandum was circulated by the FWDO for review and comment
to various SEC offices and divisions in Washington, DC, on June 13, 2006.  *See* June 13, 2006 E-mail from
Jeffrey Cohen to "Enforcement Action Memos," attached as Exhibit 146.  FWDO responded to comments
received from OCIE, the Office of General Counsel and the Divisions of Investment Management, Market
Regulation, and Corporation Finance.  *See* August 21, 2006 E-mail from ▮ENF Staff Atty 5▮ to ▮ENF Atty 2▮
and ▮ENF Asst Ch Cnsl▮ attached as Exhibit 147.  Four months after the draft was circulated, the request for
the formal order was presented to the Commission and approved.  *See* October 11, 2006 Action
Memorandum Seeking Formal Order Authority, attached as Exhibit 148.

**App. 755**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

urgent for the FWRO," and the SEC moved forward with its Stanford investigation.
Report of Investigation, Case No. OIG-516, entitled "Investigation of Fort Worth
Regional Office's Conduct of the Stanford Investigation" at 10.

## VIII. THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN "EMERGENCY ACTION" AGAINST SIB BASED ON CIRCUMSTANTIAL EVIDENCE THAT IT WAS OPERATING A PONZI SCHEME

In November 2005, the Enforcement staff considered recommending that the
Commission file an "emergency action" against SIB expressly alleging that the CDs were
a Ponzi scheme based solely on the circumstantial evidence available to the staff.  *See*
Exhibit 144.  The Cohen Memorandum presented this option as follows:



**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



*Id.* at 2-3 (footnotes omitted).

The Cohen Memorandum stated that bringing such an action 

*Id.* at 4.  *See also* Cohen Testimony Tr. at 50

The Cohen Memorandum acknowledged that there were two primary categories
of circumstantial evidence that would have supported an allegation by the Commission
that the SIB CDs were a Ponzi scheme –



*Id.* at 3-4 (footnotes omitted) (emphasis in original).

**App. 757**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Cohen believed that the ▇▇▇▇▇▇▇▇▇▇▇▇▇ that the CDs were a Ponzi scheme and the ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ meant that an action by the Commission would have been a ▇▇▇▇▇▇▇▇▇



*Id.* at 4 (footnotes omitted) (emphasis in original).  Cohen also noted that if the Commission filed an action, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ *Id.*

Cohen testified that he met with Addleman, Clarkson and Stephen Korotash, then a FWRO trial attorney, and that those three individuals decided against filing an emergency action ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇. Cohen Testimony Tr. 65-68.  Cohen testified that he was not "entirely comfortable with that decision" and that he "thought it was a mistake at the time we met." *Id.* at 68, 78.[82]

In April 2006, the Enforcement staff apparently considered presenting to the Commission the issue of whether it should file an emergency action.  *See* Exhibit 145.  A draft of the formal order action memorandum that was circulated in April 2006 discussed three "special issues" as follows:

> This matter raises three special issues:  (1) ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇ (2) whether further investigation is warranted to determine whether the CD program is a Ponzi scheme; and (3)

---

[82]   However, as discussed above, approximately six weeks before the meeting, Cohen had instructed ▇▇▇▇ to "[c]lose the case" and Addleman overruled Cohen after an appeal by Preuitt.  *See* Exhibit 132.

**App. 758**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.

*Id.* at 7.

        After including verbatim an excerpt from the draft action memorandum concluded.
*Id.* at 9.  As the draft action memorandum noted, during the five months since the November 2005 meeting,                              *Id.* at 8, note 10.

        However, the draft formal order action memorandum that the FWDO submitted to Washington, DC, for review and comment on June 13, 2006 ("June Draft Action Memorandum"), omitted the discussion of filing an "emergency action" as a "special issue."  *See* Exhibit 146.  The June Draft Action Memorandum described the special issues as follows:



*Id.* at 5.  The June Draft Action Memorandum did state,

                                    *Id.* at 6.

        Ultimately, the SEC did rely, in part, on circumstantial evidence in filing an action against Stanford on February 16, 2009.[84]  The following chart compares some of the circumstantial evidence included in the SEC's 2009 Complaint with similar statements from the prior examinations and referrals.

_____

[83]    The discussion of the "special issues" and the statement                              in the June Draft Action Memorandum, were                              *See* Exhibit 148.

[84]    The Complaint filed by the SEC in 2009 also relied on "additional evidence in 2008 that was not available earlier."  *See* Prescott Testimony Tr. at 60.  *See also* Report of Investigation, Case No. OIG-516, entitled "Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation."

**App. 759**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

| SEC ALLEGATIONS IN 2009 | EVIDENCE FROM PRIOR EXAMS |
|---|---|
| **SIB claims that its "diversified portfolio of investments" lost only 1.3% in 2008, a time during which the S&P 500 lost 39% and the Dow Jones STOXX Europe 500 Fund lost 41%**. Exhibit 1 at ¶ 3 (emphasis added).  *See also*, *id*. at ¶ 29<br><br>For almost fifteen years, SIB represented that it has experienced consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993) … Since 1994, SIB claims that it has never failed to hit targeted investment returns in excess of 10%. … SIB's historical returns are improbable, if not impossible. After reviewing SIB's returns on investment over ten years, a performance reporting consultant hired by Stanford characterized SIB's performance as "not possible - almost statistically impossible."  Further, in 1995 and 1996, SIB reported identical returns of 15.71%, a remarkable achievement considering the bank's "diversified investment portfolio." Exhibit 149 at 7-8. | [F]rom 2000 through 2002, SIB reported earnings on investments of between approximately 12.4% and 13.3%.  This return seems remarkable when you consider that during this same time frame SIB supposedly invested at least 40% of its customers' assets into the global equity market.  Ten of 12 global equity market indices were down substantially during the same time frame.  The indices we reviewed were down by an average of 11.05% in 2000, 15.22% in 2001 and 25.87% in 2002. It is equally unlikely that the portion of the portfolio invested into debt instruments (approximately 60%) could make up the expected losses in the equity portion of the portfolio.  **For example, in 2002, when the global indices were down 25%, the debt portion of the portfolio would have to generate an approximately 40% return for SIB to generate the 12.4% overall return it claimed in 2002**. Exhibit 101 at 5 (emphasis added). |
| SIB's extraordinary returns have also enabled the bank to pay disproportionately large commissions to SGC for the sale of SIB CDs.  SGC receives a 3% fee from SIB on sales of CDs by SGC advisers. … SGC promoted this generous commission structure in its effort to recruit established financial advisers to the firm. **The commission structure also provided a powerful incentive for SGC financial advisers to aggressively sell CDs to United States investors**, and aggressively expanded its number of financial advisers in the United States. Exhibit 149 at 9 (emphasis added). | **Moreover, the Staff is equally suspicious of SIB's *recurring annual 3% trailer. We are unaware of any legitimate, short-term, low or no-risk investments that will pay a 3% concession every year an investor keeps his funds invested in any product**. Exhibit 101 at 5 (emphasis added). |

102

**App. 760**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

In addition to the foregoing, Enforcement's decision not to bring a case in 2005 may have also been influenced by the following factors, discussed in Section XII:  (1) the staff bureaucracy in Washington, DC, discouraged pursuing "novel" cases; (2) the pressure for "stats" resulted in an emphasis on pursuing "slam-dunk" cases; and (3) the "feeling that the Commission was … more receptive to clear-cut cases."  *See* January 26, 2010 Preuitt Testimony Tr. at 72-74; Addleman Testimony Tr. at 27.

## IX.    THE ENFORCEMENT STAFF REJECTED THE POSSIBILITY OF FILING AN ACTION AGAINST SGC'S BROKER-DEALER FOR VARIOUS VIOLATIONS OF THE FEDERAL SECURITIES LAWS

As discussed above, the Examination staff and the Enforcement staff had a fundamental disagreement for eight years regarding whether Stanford should be investigated.  However, they did agree that Stanford was probably operating a Ponzi scheme.  Cohen acknowledged that agreement and explained the staff's divergent views on the issue of whether an investigation was warranted as follows:

> Everybody, everybody believed that this was probably a Ponzi scheme.  We weren't entirely sure because there was no actual evidence of an imploding scheme.  But the examination people were very clear.  They said, "We're convinced this is a Ponzi scheme." … [A]nd nobody in the enforcement division disagreed with them.  They just said we've got to have proof.

Cohen Testimony Tr. at 24-25.[85]

On this point, Cohen and Preuitt agreed with each other.  Preuitt testified that no one in FWDO ever said, "I think you're wrong.  It doesn't look to be a Ponzi scheme to me.  It doesn't look to be a fraud."  January 26, 2010 Preuitt Testimony Tr. at 70.  Instead, "[t]he response was this is indicia of fraud.  You can't take that into court, indicia of fraud, you must be able to prove it."  *Id.*  Wright also testified that "[i]t was obvious for years that [Stanford] was a Ponzi scheme."  Wright Testimony Tr. at 51.

In a November 7, 2005 memorandum to Addleman and Clarkson, Wright and Preuitt expressed their view about the situation as follows:

> In light of the earmarks of fraud noted above, it is troubling to imagine the Commission failing to resolve its concerns regarding the legitimacy of the product offered because the

---

[85]  ENF Staff Atty 5 testified that when she became involved in the Stanford investigation, it was generally thought that the CD returns were too good to be true and it was pretty clear that there was some fraud or Ponzi scheme going on but it was a question of how to attack it. ENF Staff Atty 5 Testimony Tr. at 32-33.

**App. 761**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> relevant parties either refuse to or cannot provide the
> requested, necessary information to confirm or dispel those
> concerns.  Just as troubling, is to imagine the Commission
> to continue allowing a U.S. registered broker-dealer to offer
> a product about which it does not have the necessary
> information to make a reasonable basis for a
> recommendation.

Exhibit 143 at 2-3.

The Examination staff advocated that the Enforcement investigation focus on SGC and that the SEC pursue any viable legal theories to support an action against SGC. As Preuitt explained:

> [M]y suggestion -- we had so many different theories.
> Instead of going after the big thing which we may not be
> able to get to in Antigua, why can't you do something
> about the broker-dealer?  We have a US-registered broker-
> dealer selling something that we don't know what it is.
> And, you know, why can't we be a little bit -- you know,
> pursue all our legal theories related to that and at least stop
> them from selling it?

Preuitt Interview Tr. at 19.

Similarly, [IA Examiner 1] described how he had envisioned Enforcement pursuing an action against SGC as follows:

> My thought at the time was -- is that we've got SEC-
> registered entities selling an investment. …  My idea …
> was … that the enforcement staff would … send out a
> voluntary request for information from the registered
> entities, we want information about what's happening to
> the money offshore, and probably they would not provide
> it.  At that point, you get a formal order.
>
> Then you subpoena the information from those regulated
> entities.  They say, we don't have it, we can't get it.  At that
> point, now you can file a public subpoena enforcement
> action in a federal court and lay out all of your suspicions
> about those CDs for the entire world to know.  It would be
> about two weeks after that you found out whether there was
> a Ponzi [scheme] or not.

[IA Examiner 1] Testimony Tr. at 57.

**App. 762**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

[IA Examiner 1] attributed the fact that the Enforcement staff never pursued that course of action to the following:

> [I]t seemed that there was a preoccupation with the fact
> we're dealing with an Antigua bank, and I was always
> saying forget the bank.  We've got a [broker-dealer] and an
> [investment adviser].  Focus on them.

*Id.* at 58.

Addleman agreed that filing an action against Stanford alleging violations of the federal securities laws unrelated to a Ponzi scheme would have been one way to overcome Stanford's refusal to provide documents that the staff needed to prove the SIB CDs were a Ponzi scheme.  Addleman Testimony Tr. at 14-16.  In fact, as discussed above, she decided in November 2005 to continue the investigation because of "the possibility of a Ponzi scheme and a pretty significantly-sized one."  *Id.* at 26.

The potential violations that the Examination staff advocated that Enforcement pursue included:

- Section 10(b) of the Exchange Act and Rule 10b-5:  In 1997, and again in 2005, the Examination staff argued that SGC was making misrepresentations regarding the safety of the CDs.  The Examination staff noted the consistently high returns on the SIB CDs, and observed, "Based on the amount of interest rate and referral fees paid, SIB's statements indicating these products to be safe appear to be misrepresentations. … SIB must be investing in products with higher risks than are indicated in its brochures and other written advertisements."  Exhibit 49 at 2-3.  The 2005 Enforcement Referral noted that the CD sales brochures provided by SGC included representations of a "guaranteed" interest rate and claimed that the CD "provide[d] a secure way" to participate in the growth of equity markets.  Exhibit 101 at 5-6.  The 2005 Enforcement referral stated that "[u]se of the terms CD, 'interest,' 'secure' and 'guaranteed' are misleading and suggest a degree of safety that is not inherent in the product being offered."  *Id.* at 6.

- Rule 17a-4 of the Exchange Act:  In 1997, the Examination staff referred SGC for possible violations of Rule 17a-4 of the Exchange Act for failing to maintain books and records.  Exhibit 49 at 4.  The Examination staff found that SGC recommended the SIB CDs to clients without maintaining any records pertaining to the client's financial information or investment objectives, or any records such as order tickets or confirmations relating to the CD purchase by the client.  *Id.*

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

- <u>NASD Rule 2310 (Suitability)</u>:  In 2005, the Examination staff encouraged the Enforcement staff to consider bringing a suitability case against SGC.  On April 18, 2005, Prescott e-mailed Cohen the following:

> In one of our conversations--either this morning or last Friday--I mentioned the possibility of taking a somewhat novel approach and naming Stanford for violating the NASD Rule pertaining to suitability, which seems easier to prove than our standard 10b-5 approach.  Specifically, NASD Rule 2310 "Recommendations to Customers (Suitability)" provides that
>
>> "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."
>
> It is hard to see how Stanford the broker-dealer can, on the one hand, claim that it does not know any details about the "CDs," and on the other hand, make a determination that these are suitable investments.
>
> Exchange Act Section 21, dealing with investigations and actions, is helpful with respect to charging violations of NASD rules.  Specifically, Section 21(d)(1) and Section 21(f).  I think we can make a strong argument that it is in the public interest and for the protection of investors to charge Stanford with violations of NASD Rule 2310.

April 18, 2005 E-mail from Victoria Prescott to Jeffrey Cohen *et al.*, attached as Exhibit 150.[86]

---

[86]    Cohen testified that the SEC could not bring an action to enforce NASD rules, such as the suitability rule.  Cohen Testimony Tr. at 91.  In fact, the SEC can enforce NASD's rules, as Prescott's e-mail explained, if to do so "is in the public interest and for the protection of investors."  Exhibit 150; *see also* Testimony Tr. at 22.

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

- <u>Section 5 of the Securities Act</u>:  In 2002, and again in 2005, the Examination staff referred SGC for a potential unregistered offering of securities.  Exhibit 70 at 1, 15; Exhibit 101 at 3-4.  In 2002, the Examination staff argued that SGC was generally soliciting investors for the SIB CDs in violation of its Regulation D exemption.  Exhibit 70 at 11-12.  The 2005 Enforcement Referral stated:

> [I]t appears that SIB is relying upon Regulation D Rule 506 to exempt its CD offerings from registration. Rule 506 requires SIB to comply with the prohibitions against a general solicitation and the limitations upon unaccredited investors.  The Staff has not found evidence of sales by SGC to non-accredited investors who are U.S. citizens.  It does appear that SGC sold CDs to more than 35 unaccredited foreign investors.  In fact, it appears that SGC made no attempt to limit sales to accredited foreign investors.

Exhibit 101 at 3.

- <u>Exchange Act Rule 10b-10</u>:  In 2005, the Examination staff referred potential violations of Rule 10b-10 by SGC.  The 2005 Enforcement Referral stated that the rule required SGC to disclose the source and amount of remuneration it received in connection with its referred customers' purchase of the SIB CDs.  Exhibit 101 at 6.  The 2005 Enforcement Referral observed that the SIB brochure given to foreign investors did not contain any information regarding the 3% trailer fee paid to SGC by SIB.  *Id.*

- <u>Section 7(d) of the Investment Company Act of 1940 ("Investment Company Act")</u>:  In 2005, the Examination staff also referred potential violations of Section 7(d) of the Investment Company Act by SIB.  *Id.* at 4.  The referral noted that, "Although banks are ordinarily excluded from the registration requirements of the Investment Company Act, SIB's own disclosure documents suggest that it fails to meet the definition of a foreign bank …" *Id.*

Furthermore, Cohen recommended in November 2005, that the Stanford investigation be [DPP, LE, WP] [DPP, LE, WP] However, in 2006, the Enforcement staff circulated a draft formal order action memorandum that [DPP, LE, WP] [DPP, LE, WP]. *See* Exhibit 146.  As part of the formal order action memorandum review process in 2006, the SEC's Division of Corporation Finance [DPP, LE, WP] [DPP, LE, WP] [DPP, LE, WP] *See* Exhibit 147 at 3.

**App. 765**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

However, in 2005, the Enforcement staff decided that attacking Stanford's Ponzi scheme indirectly by filing an action at that time against SGC for any of the above-listed violations would not be worthwhile. [ENF Staff Atty] Testimony Tr. at 33-34. [ENF Staff Atty] explained the Enforcement staff's rationale for that decision in the following exchange:

> Q: … [W]as there any thought to trying to find any hook to bring a case against Stanford even if you didn't necessarily have all of your ducks in a row so you could kind of start the process of stopping the fraud?
> A: Yeah. … We talked to market reg. We talked to IM. We talked to – I mean, I feel like a lot of heads looked at it, and … the aim was what can we do, what can we really do to get this when we don't have what we would normally need to bring [a Ponzi scheme case] -- typically when we bring a Ponzi scheme case, we would have bank records or we would know that the money was being misappropriated.
>
> Here we had this kind of legitimate looking operation with a lawyer [Thomas Sjoblom[87]] that used to be with the SEC and he's making these representations to us, and there was just so much that we didn't have. So what kind of case could we bring?  I know we talked about maybe a 10b-10 case or some kind of a sales practice case and thought it's going to be really lame. Like we looked at the remedies on some of these things, and the one in particular -- I don't remember the provision or what it was, but it was like a FINRA violation, and it just seemed like so small potatoes, who cares.  So there was sort of a weighing of if we're going to get this, we should get it and not be wasting our time with a sales practice case.

*Id.*

As noted earlier, the initial Complaint filed by the SEC on February 17, 2009, did not include allegations that Stanford was operating a Ponzi scheme.  However, it did attack the Ponzi scheme indirectly by asserting other claims including a claim that SGC and SIB violated Section 7(d) of the Investment Company Act.  Exhibit 149 at ¶¶ 128-

---

[87] Stanford was represented by Thomas Sjoblom, a partner at Proskauer Rose LLP, in connection with the SEC's investigation.  Sjoblom was an "assistant chief litigation counsel in the SEC's enforcement division for 12 years before going into private practice."  *See* Amir Efrati, *The Stanford Affair: Another Bad Day for Proskauer*, The Wall Street Journal Law Blog, August 27, 2009, attached as Exhibit 151.

**App. 766**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

131.  The SEC's Complaint alleged that SIB was an unregistered investment company that offered or sold securities it had issued, and that SGC acted as an underwriter for SIB. *Id.*  The public revelation that the SEC failed to uncover the Madoff Ponzi scheme changed the Enforcement staff's view of the risks and benefits of filing an action against Stanford without direct evidence that he was operating a Ponzi scheme.

## X.   THE ENFORCEMENT STAFF DID NOT CONSIDER FILING AN ACTION UNDER THE INVESTMENT ADVISERS ACT THAT COULD HAVE POTENTIALLY SHUT DOWN SGC'S SALES OF THE SIB CDs

[ENF.BC 3] testified that there were very significant obstacles that hampered any effort by the SEC to gather direct evidence that SIB was operating a Ponzi scheme:  "[G]etting the bank records was … an important piece of the puzzle, and to the extent we were unable to get those bank records either from the bank or from the regulator because it was a foreign bank, that it was going to make a case very difficult." [ENF.BC 3] Testimony Tr. at 56. [ENF.BC 3] testified that without being able to get the SIB bank records, it was "probably impossible to bring a Ponzi scheme case or extremely difficult to bring that kind of case without having some documentation about … where the money was going."  *Id.* at 57.  Moreover, the FWDO Enforcement staff believed that they would have faced opposition from the staff in Washington, DC had they recommended bringing any action predicated on the argument that [DPP, WP]                 and would certainly have had to successfully litigate that issue had they brought such an action.

The Examination staff advocated that the SEC attack the Ponzi scheme indirectly by filing an action against SGC for violations of various securities laws, including selling unregistered securities and making inadequate disclosures to foreign investors regarding the referral fees SIB paid SGC.  However, the Enforcement staff felt that bringing an action against SGC for those violations would have been "lame."  *See* [ENF Staff Atty 5] Testimony Tr. at 34.  In addition, the legal remedies for those violations would have fallen short of stopping the CD sales.  The remedies available for the violations that the staff considered were "small potatoes."  *Id.*  Consequently, the Enforcement staff believed that if they could not bring a case for "offering fraud, [the Stanford investigation was] not worth pursuing."  Exhibit 141.

However, the greatest obstacle to the SEC's efforts to investigate its suspicions that the SIB CDs were a Ponzi scheme, *i.e.*, the complete lack of information produced by SGC regarding the SIB portfolio that supposedly generated the CDs returns, also presented the SEC with an opportunity to bring a significant "offering fraud" action against SGC for violation of Section 206.  Simply, the filing of such an action against SGC could have potentially given investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  As a practical matter, many of Stanford's victims would not have purchased the CDs with such notice.  Moreover, had the SEC successfully prosecuted such an action against SGC, SGC could have been permanently enjoined and barred from selling the CDs as an investment adviser.

**App. 767**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

A.      **The Issue of Whether the Stanford CDs Were Securities Was Irrelevant to an Action Against SGC For Violations of the Anti-Fraud Provisions of the Investment Advisers Act**

All of the possible causes of action considered by the FDWO Enforcement staff in 2005 required that the SEC establish that the SIB CDs were securities.  The Cohen Memorandum's discussion of a possible emergency action included the following assertion,  Exhibit 144 at 4.  Cohen then noted:

*Id.* at 4, n. 11 (emphasis in original).

confirmed that there was a long period of time during which the Stanford matter was analyzed and discussed. Testimony Tr. at 37. described these discussions as follows:

> [A] lot of the discussion [before requesting and obtaining the formal order in October 2006] was on like how -- you know, is this going to be -- What if we get to this point and So we lose on something like that.  And there was definitely, you know, a feeling that

*Id.*

In the context of the Enforcement staff's request for a formal order in the Stanford matter, the SEC's Office of General Counsel commented:



**App. 768**

This document is subject to the provisions of the **Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



October 24, 2006 Memorandum to the Commission from the SEC's Office of General Counsel, attached as Exhibit 152, at 2-3.

More recently, in response to a question from Mark Adler, Deputy Chief Litigation Counsel in the SEC's Enforcement Division, about whether the SEC could have filed an action against SGC earlier, Kimberly Garber, Associate District Administrator for Examinations in FWDO, explained that the SEC had been unable to take action against SGC because 

May 6, 2009 E-mail from Kimberly Garber to Mark Adler, attached as Exhibit 153. Specifically, Garber stated:

> There may be legal theories as to how we could have stopped them from doing business in the US, and we considered a number of approaches along the way, however

*Id.*

As the SEC stated in its brief filed in support of its February 16, 2009 action against Stanford, fraud claims brought under Section 206 of the Investment Advisers Act do not require that the fraud involve a security. *See* Exhibit 149 at 26. The SEC expressly argued:

> Through their deceitful and fraudulent conduct in selling the CDs and SAS, Defendants violated the antifraud provisions of the Investment Advisers Act. *This is true, even if the Court, for the sake of argument, determines that the defendants' fraud was not in connection with the offer, sale or purchase of securities for purposes of Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act.*

*Id.* (emphasis added). The SEC further argued in its brief:

> Section 206 establishes federal fiduciary standards to govern the conduct of investment advisers. The fiduciary duties of investment advisers to their clients include … the duty to employ reasonable care to avoid misleading clients.

**App. 769**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> An adviser has "an affirmative obligation to employ
> reasonable care to avoid misleading [his or her] clients."

*Id.* at 27 (citations omitted).[88]

Had the FWDO Enforcement staff considered pursuing a fraud case against
Stanford under Section 206, the perceived obstacles to filing an action could have been
eliminated.

### B.    The Enforcement Staff Did Not Consider Filing a Section 206 Case or Conducting a Section 206 Investigation

#### 1.    The 2005 Referral Did Not Mention Section 206

The 2005 Enforcement Referral did not discuss any potential violations of the
Investment Advisers Act, including Section 206.  *See* Exhibit 101.  In fact, it did not even
mention that SGC was a registered investment adviser.  *Id.*  It did not contain any
reference to the previous examinations, including the 1998 and 2002 investment adviser
examinations, which would have necessarily included the information that SGC was a
registered investment adviser.  *Id.*

Prescott explained that she did not reference the prior examinations because she
thought the 2004 Examination gave Enforcement enough information to act upon.
Prescott Testimony Tr. at 14.[89]  Although the 2005 Enforcement Referral did not
specifically discuss Section 206 of the Investment Advisers Act, it did state:

---

[88]    A former FWDO Examination branch chief who asked not to be identified testified that, generally:

> Once the attorneys figured out that Section 206 of the Advisers Act, antifraud provision,
> does not contain the word "security," man, you can make a lot of hay out of 206 (1) and
> (2).  We'd make them look good bringing in a case and just charging 206(1) and (2).
> You don't even have to have a security involved.

Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 58.

[89]    Prescott testified that, while drafting her 2005 referral memorandum, she became aware that there had
been previous examinations, but she did not review them because she felt there was enough information in
the 2004 examination report to support a referral.  Prescott Testimony Tr. at 13-14.  However, she testified
that until 2009, she was unaware of the 1998 Stanford MUI, which was referenced in both the 1998 and
2002 investment adviser examination reports.  *Id.* at 12; Exhibit 70 at 2; Exhibit 55 at 1.  Wright testified
that Prescott's position in the Examination group was Senior Special Counsel to the B-D examiners, and,
thus, she would not have interacted with the investment adviser examiners.  Wright Testimony Tr. at 41,
59-60.  As discussed below, the failure to include information from the 1998 and 2002 investment adviser
examinations in the 2005 Enforcement Referral made by the B-D Examination staff may have had
significant consequences for the conduct of the Enforcement investigation.

As further evidence of the self-imposed wall between the two examination groups, ▆Staff Acct▆ the examiner
on the 1997 B-D Examination of SGC, testified that no one from the Investment Advisor examination
group contacted him in connection with the 1998 or 2002 exams ▆Staff Acct 1▆ Testimony Tr. at 28, 38-39. ▆Staff Acct 1▆
testified that the Investment Advisor and B-D Examination groups "just kind of never talked to each

(Footnote continued on next page.)

**App. 770**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> SGC claims that it keeps no records regarding the portfolios into which SIB places investor funds and that it can not get this information from SIB.  Indeed, SGC has related to the Staff that SIB claims it cannot divulge the specifics of how it has used customers' deposits, based (variously) upon the bank secrecy laws of Antigua and SIB's own internal "Chinese Wall" policies with SGC.

Exhibit 101 at 2 (footnotes omitted).

### 2.   Neither Cohen's nor Preuitt's November 2005 Memorandum Discussed a Section 206 Violation

Similar to the 2005 Enforcement Referral, the Preuitt and Cohen Memoranda did not discuss a potential Section 206 claim, nor did they reference the fact that SGC was a registered investment adviser.  Cohen's memorandum did state:



Exhibit 144 at 6.  Cohen then discussed SGC's and concluded that the SEC would . *Id.* at 7.  According to the Cohen Memorandum:



---

*Id.* at 39. testified that, in connection with the 1998 SGC examination that he conducted, he gained some familiarity with the 1997 B-D Examination, "but not a great deal." Testimony Tr. at 15-16.

**App. 771**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**



*Id.* at 6-7 (emphasis in original).

Cohen concluded that it was [DPP, WP] [AC, DPP, WP] regarding the SIB CDs:



*Id.* at 8-9.[90]

### 3. When the FWDO Staff Met With Addleman, She Was Unaware That SGC Was an Investment Adviser

Addleman testified that she was "unaware" that the Investment Adviser Examination staff had done an examination of SGC in Houston in 1998 and 2002. Addleman Testimony Tr. at 40.  In fact, Addleman testified that she was not aware that SGC was a registered investment adviser when the staff briefed her on the matter in November 2005.  *Id.* at 34-35.  Addleman only learned that SGC had been a registered investment adviser during her OIG testimony.  *Id.* at 40-41.  Her reaction to that information was striking, as evidenced by the following exchange:

> Q:  [T]he fact is … that Stanford was a dual registrant, a broker-dealer and an investment adviser.  You didn't know that, correct?
>
> A:  As I sit here, it's a surprise.

---

[90] [IA Examiner 2] testified that, in his experience, the Enforcement attorneys in FWDO were not "very familiar with the Investment Advisors Act." [IA Examiner 2] Testimony Tr. at 77.

**App. 772**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> …
>
> Q:  I take it … that you were unaware that the Investment
> Adviser exam staff had done an exam of Stanford
> Group Company in Houston in 1998 and 2002. ….
>
> A:  I was not aware of that.
>
> …
>
> Q:  …  And I assume that you were unaware that the 2002
> exam had resulted in a referral to enforcement to bring,
> among other things, a [Section] 206 case.  …
>
> A:  I didn't know that, no.

*Id.*

Because the Enforcement staff was not familiar with any of the findings of the
investment adviser examinations, bringing a Section 206 case against SGC for its
admitted failure to conduct any due diligence regarding Stanford's investment portfolio
was never considered.  As discussed below, that option would have been "a potentially
straightforward way to have attempted to approach [the Ponzi scheme]."  *Id.* at 45-46.

> **C.**     **The Enforcement Staff Could Have Filed a Section 206 Case With the
> Potential For Shutting Down SGC's Sales of the SIB CDs and/or
> Discovering Evidence of the Ponzi Scheme**

As discussed above, the 2002 Examination Report discussed SGC's failure to
conduct any due diligence regarding the SIB CDs.  █ IA Examiner 2 █ testified about that failure as
follows:

> [F]or all of [SGC's] investment advisory clients they were
> [a] fiduciary and whenever they refer that client to some
> other investment product, whether it's a security or not,
> they were supposed to do some due diligence into doing
> that.  So we asked them:  Give us the due diligence file for
> this offshore bank.  We want to see [] everything you
> looked at before you made this recommendation to refer
> these clients over.  The only thing we got if I remember
> right was just the file with the financial statements and
> maybe a couple other things in there.  So █ IA Examiner 1 █
> and I took the position that that wasn't enough.

█ IA Examiner 2 █ Testimony Tr. at 48-49.

█ IA Examiner 1 █ explained SGC's failure to conduct the required due diligence as follows:

115

**App. 773**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> Q: [SGC] needed to know what SIB's portfolio was that supported the CD rates, right?
>
> A: Right.  I mean, they did that with all of their managers in the Schedule A in the wrap program.  They were constantly reviewing to make sure these managers were complying with their investment mandates, staying within their universe and all those things.  They didn't do any of that with Stanford International.

IA Examiner 1 Testimony Tr. at 113.

Had the SEC successfully prosecuted an injunctive action against SGC for violations of Section 206, an anti-fraud provision, it could have completely stopped the sales of the SIB CDs through the SGC investment adviser.  Moreover, as a practical matter it could have significantly impacted the sales of the CDs through the SGC broker-dealer.  As Prescott described in the 2005 Enforcement Referral:

> Certainly, the ability to sell through a U.S. based broker-dealer gives SIB an *imprimatur* of legitimacy to foreign investors.  It is quite possible that action by the Commission against SGC for its role in the CD offering could cause the entire scheme to collapse.

Exhibit 101 at 6 (emphasis in original).  ENF BC 3 acknowledged that a case against SGC that would have stopped its sales of the SIB CDs would have been worth bringing in 2005. ENF BC 3 Testimony Tr. at 71-72.[91]

As noted above, Addleman was not aware that SGC was a registered investment adviser until her OIG testimony.  During that testimony, Addleman testified regarding the missed opportunity to have filed a Section 206 action against SGC, in the following exchange:

> Q: …  [The examiners' Section] 206 argument was focused on the fact that the Investment Adviser in

---

[91]   Basagoitia had stated in her November 18, 2004 e-mail to Exam Sr Cnsl

> Most Clients open accounts because they believe the B-D's clearing agreement with Bear Stearns provides them with account protection. They also believe in the soundness of US laws. Should the Bank not have US representation, clients would not invest as they do at the Bank.

Exhibit 106.

**App. 774**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> Houston would not provide them any information about
> … what [SIB] was investing the proceeds in to generate
> these returns.  And, in fact, affirmatively represented
> that they had no such information, alternatively saying
> that there was a prohibition in Antiguan bank secrecy
> laws that prevented SGC from getting that information
> and then secondly … claiming there was a Chinese wall
> between the entities.  And so the theory that they
> proposed in essence was that … the investment adviser
> did not have enough due diligence to satisfy its
> fiduciary duty to its clients under either [Sections]
> 206(1) [or] 206(2). …  [D]o you have an opinion on
> the viability of that case?

> A: As I sit here, I have a bit of a pit in my stomach,
> because I wish I had known that. …  Adviser cases are
> always easier than broker-dealer cases because of the
> heightened fiduciary duty standard.  And it always does
> give an alternative way to look at facts.  If I knew that
> and I overlooked it, I apologize.  If I didn't know it, I'm
> a little frustrated but.

> Q: But if you had known that at that time, would that have
> been a very good avenue to bring a case against
> Stanford under Section 206 of the Advisers Act?

> A: Well, I don't want to overstate it, but it would have
> been an alternative theory that has some potential, yeah.

Addleman Testimony Tr. at 40-43.

The OIG then asked Addleman to review the 2002 Examination Report.  *See Id.* at
43-44.  After reviewing that report, Addleman testified in the following exchange:

> Q: … [D]o you have a sense of the viability or the
> potential for bringing a Section 206 case in order to get
> into court and if nothing else shut down the sale of the
> CDs by the Investment Adviser entity until they had
> adequate due diligence and perhaps through the civil
> discovery process … obtain the evidence of a Ponzi
> scheme.  Do you have an opinion about that?

> A: I do.  I think that the issue when you're dealing with an
> adviser versus a broker-dealer here gives the ability to
> sort of add on that due diligence component ….  [W]hen
> you put it in the fiduciary realm and you have, for

117

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> example, the chart in here that shows the difference
> between what the U.S. CDs were paying and this
> purportedly Antiguan CD, there's reason to raise a red
> flag that would require additional fiduciary duties upon
> an adviser that wouldn't or might not be there with
> respect to a broker.  *So, yes, I see that as a potentially
> straightforward way to have attempted to approach it.*[92]

*Id.* at 45-46 (emphasis added).

## XI.   HAD THE SEC FILED AN ACTION EARLIER, SIGNIFICANT INVESTOR LOSSES COULD POTENTIALLY HAVE BEEN AVOIDED

The 1998 Examination Report estimated that "SGC brokerage and advisory
clients may have invested as much as $250 million in the CDs."  Exhibit 55 at 1.  The
2002 Examination Report stated, "SIB's financial statements for the year ended
December 31, 2001, discussed in more detail below, indicated total 'certificates of
deposit' of $1.1 billion."  Exhibit 70 at 10.  The 2002 Examination Report estimated that
$640 million of those outstanding CDs were attributable to SGC.  *Id.* at 2.  The 2004
Examination Report indicated that SIB had $1.5 billion of outstanding CDs, of which
$227 million were held by U.S. citizens.  Exhibit 98 at 4.

The growth in sales of the fraudulent CDs continued to increase at an alarming
rate after the 2004 Examination.  The SEC's brief filed in support of its February 16,
2009 action against Stanford described that growth as follows:

> SIB sold more than $1 billion in CDs per year between
> 2005 and 2007, including sales to U.S. investors.  The
> bank's deposits increased from $3.8 billion in 2005, to $5
> billion in 2006, and $6.7 billion in 2007.  SIB markets CDs
> to investors in the United States exclusively through SGC
> advisers pursuant to a Regulation D private placement.  In
> connection with the private placement, SIB filed a Form D
> with the Commission.

---

[92]   In contrast to Addleman, Cohen testified that a Section 206 claim would have been just as difficult to
bring as a Section 10b-5 claim.  Cohen Testimony Tr. at 80-86.  However, it should be noted:  (1) a Section
206 claim would not have posed the jurisdictional question of whether the SIB CDs were securities; (2)
SGC's lack of due diligence regarding its sales of the SIB CDs would have more easily supported a Section
206 fiduciary-based claim than a claim that those sales violated the NASD suitability rule; and (3) Section
206(2) has a lower scienter standard in which only a showing of negligence is necessary for a successful
action.  *See* Exhibit 149 at 26-27.

**App. 776**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Memorandum of Law in Support of Motion for Ex Parte Temporary Restraining Order,
Preliminary Injunction and Other Emergency Relief ("SEC Brief"), filed on February 17,
2009, attached as Exhibit 149 at 7.  In its Complaint filed on February 16, 2009, the SEC
alleged that "SIB, acting through a network of SGC financial advisors, has sold
approximately $8 billion of self-styled 'certificates of deposits' …"  Exhibit 1 at ¶ 2.

A Stanford Victims Coalition survey indicated that losses could have potentially
been minimized for a significant percentage of investors had the investors been aware of
an investigation or examination of Stanford in 1997, when SEC examiners first raised
concerns about the fund.[93]  Nearly a third of the Stanford investors who responded to the
survey indicated that they invested with Stanford prior to 2005.  *See* Exhibit 154 at 1.
Approximately 95% of the 211 responding Stanford investors stated that knowledge of an
SEC inquiry would have affected their decision to invest.  *See id*. at 4.  One Stanford
victim, who invested the money that she "saved through several years of business, nights
working late and skipping vacations [she] could have taken with [her] family," said that
had she "known that Stanford Group was ever under investigation by the SEC, [she]
would not have bought at all."  *See* February 2010 Inspector General Survey Response
Excerpts, attached as Exhibit 155 at 1; February 2010 Stanford Victims Coalition Survey
Response Excerpts, attached as Exhibit 156 at 1.[94]  Two other investors said that an SEC
investigation "would have been a very large red flag" and they "would have transferred
out of that bank immediately."  Exhibit 156 at 2.

Indeed, over 99 percent of the surveyed investors had no knowledge of the SEC's
inquiry at the time they first invested. Exhibit 154 at 3.  One Stanford investor stated, "[I]
[h]ad no knowledge of any prior SEC complaints or inquiries.  I researched on [the]
internet and could find no registered complaints against Stanford.  Obviously, [I] would
not have invested with Stanford if there was any sign of trouble."  Exhibit 155 at 2.

The action taken by SEC Enforcement as part of its investigation in June 2005 in
sending a questionnaire out to Stanford investors in an attempt to identify clear
misrepresentations by Stanford, as discussed in Section VII.A of this report, raised
significant concerns among the investors.  Rawl and Tidwell Interview Tr. at 8.  Mark
Tidwell, a vice president and financial adviser at Stanford from 2004 through 2007 who
later contacted the SEC with concerns about Stanford, said that his phone "lit up like a
Christmas tree the morning [the questionnaire] went out."  *Id.*  This flurry of phone calls
from his clients led Tidwell to believe that had the SEC sent clients questionnaires prior
to 2005, it would have "absolutely" raised red flags with clients, and made them more

---

[93]   In February 2010, at the request of the OIG, the Stanford Victims Coalition, an organization of
Stanford investors, sent a survey to investors in the SIB CDs.  The Stanford Victims Coalition received 211
responses to its survey.  *See* February 2010 Inspector General Survey Summary, attached as Exhibit 154.
Respondents to the survey certified that all answers provided were correct to the best of their knowledge.

[94]   The Stanford Victims Coalition conducted its own survey of Stanford investors in February 2010.

119

**App. 777**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

hesitant to invest in Stanford at earlier dates.  *See id.* at 7, 8.  Rawl also testified that the
2005 SEC investor questionnaire led to "significant concerns" by investors in the CDs.
*See id.* at 7.

However, even after investors received the questionnaire about Stanford in June
2005, many continued to invest because financial advisers told them that the fund had
been given a "clean bill of health" by the SEC.  Exhibit 155 at 3.  Advisers told their
investors that the inquiry was "routine," a result of a "disgruntled employee," and that
"the investigation was complete and fined SGC a very small amount for some 'sloppy
accounting'…."  *Id.* at 29, 37.  In fact, financial advisers used the fact that the SEC had
previously examined Stanford to reassure investors about the fund's safety.  One investor
said that her broker told her that "regulators came constantly" and everything at Stanford
was "perfect."  Stanford Victim Interview Memorandum, attached as Exhibit 157.
Investors were told that the SEC  regulated Stanford and Stanford had "always passed
with flying colors."  Exhibit 155 at 4.  Ironically, this gave investors "comfort knowing
that [Stanford was] being watched."  *Id.* at 5.  Tidwell noted that he was told "there was
never an issue with any regulatory body," that there may have been some regulatory
"grumbling here or there, but all those matters were closed" and that anything that a
governmental agency had looked into was "fine," and there was "nothing ongoing."
Rawl and Tidwell Interview Tr. at 10-12.

Tidwell stated that it gave him comfort when he was told by Stanford
management that nothing was found by any regulatory inquiries, and that his
understanding that regulatory entities looked into Stanford and found nothing was an
"endorsement."  *Id.* at 12-13.  Stanford officials were able to persuasively represent that
Stanford had been given a "clean bill of health" by the SEC because, in fact, Stanford had
been examined on multiple occasions and only been issued routine deficiency letters;
deficiencies that they purportedly remedied.  The 1997, 1998, 2002 and 2004 SEC
examinations of SGC all resulted in deficiency letters sent from the FWDO examiners to
SGC.  SGC responded to each of these deficiency letters in a manner that would allow
them to claim that they had responded to and addressed the SEC's concerns.  *See, e.g.,*
October 17, 1997 Letter from Lena Stinson to `Staff Acct 1` ("[T]he deficiencies have
been noted and your recommendations implemented."), attached as Exhibit 158.

Some even increased their investments due to confidence in the SEC's audits.
One investor stated, "[I]n late 2008 I increased my CD investment by 150% due to the
confidence in the SEC audit … and the approval of the SEC."  Exhibit 155 at 2.[95]

---

[95]    Ironically, Enforcement branch chief `ENF BC 3` testified that he was concerned that if the SEC
brought a technical violation against SGC, that could do more harm than good in the sense that SGC would
publicize that the SEC has been investigating them and all that was wrong was a minor issue. `ENF BC 3`
Testimony Tr. at 70.

**App. 778**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

One investor reported that her husband contacted the SEC to inquire about
Stanford's stability.  *See* Stanford Victim Interview Memorandum.  This investor said
that SEC representative stated the fund was "very solid," "the most solid group in Texas."
*Id.*  She said that the SEC confirmed that Stanford was a "prestigious" fund that had been
"functioning well for 18 years."  *Id.*

In addition, investors reported that they relied on favorable remarks concerning
Stanford by Federal government leaders, including a 2008 commendation from President
George W. Bush, in making their decision to invest in Stanford.  *See* February 20, 2008
letter from George W. Bush, attached as Exhibit 159.  For example, one investor stated:
"[T]here was nothing but praise by our congressmen, senators, and our own President
Bush [as to] how wonderful [t]his company and man was and the safest sound company."
Exhibit 155 at 6.  Another investor stated that "SGC had an impec[c]able record and had
received many awards and commendations[,] one even from President Bush commending
Allen Stanford for his exemplary conduct in the business community."  *Id.* at 7.

## XII.   THE SEC ENFORCEMENT STAFF'S FAILURE TO BRING AN ACTION AGAINST STANFORD EARLIER WAS DUE, IN PART, TO THE STAFF'S PERCEPTION THAT THE CASE WAS DIFFICULT, NOVEL, AND NOT THE TYPE OF CASE FAVORED BY THE COMMISSION

### A.   Senior Enforcement Management Emphasized the Need For "Stats"

Degenhardt told the OIG that he "absolutely felt that it was important to convey to
the Commission the number of cases that his office brought."  Degenhardt Interview
Memorandum at 2.  He said the regional offices were "heavily judged" by the number of
cases they brought when he first came to the SEC.  *Id.*  Degenhardt stated that after 1997,
the FWDO brought more cases than any other regional office on a per-capita basis.  *Id.*
He said the FWDO, the third-smallest regional office, was always in the "top three" for
overall number of cases brought from 1997 through 2005, and in 2001, the FWDO
brought the highest number of cases of any regional or district office.  *Id.*  He emphasized
that this was a "source of great pride" for himself, Spencer Barasch as the head of
Enforcement in the FWDO, and the FWDO as a whole.  *Id.*

Degenhardt described himself as having been "very outspoken" while he was at
the SEC, but felt he was "bullet proof" because of the high number of cases that the
FWDO brought and, as a result, the Commission "could not get rid of him."  *Id.* at 4.
Degenhardt said he would often "fight with the bureaucrats in DC" and would tell the
staff, "You are my shield, because of the high numbers of cases you are bringing, so if
you like me working here, keep bringing a lot of cases."  *Id.*

According to Degenhardt, Barasch was even more concerned about "stats" than
Degenhardt was, stating that "it was very important to Barasch that the FWDO bring a
high number of cases."  *Id.* at 4.  Degenhardt stated that the FWDO's high number of
cases "was a feather in Barasch's cap."  *Id.*

121

**App. 779**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Barasch told the OIG:

> [E]very regional and district office was very motivated to
> bring as many cases as possible, because that's --you were
> judged by the number of cases you brought and then the
> quality of the cases you brought.  And it was both.  And the
> number of cases was extremely important. …

Barasch Interview Tr. at 28.  Like Degenhardt, Barasch told the OIG that there was one
year in which the FWDO brought more cases than any other regional or district SEC
office.  Barasch Interview Tr. at 28-29.

Cohen also acknowledged the primacy of "stats" as follows:

> Everybody was mindful of stats. …  Stats were recorded
> internally by the SEC in Washington. …  I think when I
> was assistant director, there was a lot of pressure to bring a
> lot of cases.  I think that was one of the metrics that was
> very important to the home office and to the regions.

Cohen Testimony Tr. at 105.  Cohen testified that the pressure to bring a lot of cases
came from Barasch and Degenhardt, and that Barasch and Degenhardt would compare
the FWDO's stats with those of other offices.  *Id.* at 108-109.  Cohen testified that the
FWDO was "very proud" of its productivity.  *Id.* at 109 ENF BC 3 also testified that he
understood that there was pressure on regional offices to show that they had brought "X"
number of cases per year in order to show that they were productive. ENF BC 3 Testimony
Tr. at 75-76 ENF BC 3 also testified that the FWDO was well-known for bringing a lot of
cases and that its reputation for doing so was a source of pride within the office.  *Id.* at
78.

Wright observed that after he left FWDO's Enforcement group, "Barasch [put] a
lot more pressure on people to produce numbers."  Wright Testimony Tr. at 18.  Wright
testified that the pressure to produce numbers also came from Degenhardt, stating:

> [Degenhardt] came from a big law firm, and he quickly
> decided the way to impress people was to come up with
> lots of numbers.  And Spence, of course, was part of that.

*Id.* at 18-19.  Wright testified that Barasch "was pretty upfront" with the Enforcement
staff about the pressure to produce numbers and communicated to the Enforcement staff,
"I want numbers.  I want these things done quick."  *Id.* at 21-22.

Wright also observed a change in emphasis when Addleman replaced Barasch as
Associate District Director for Enforcement.  Wright Testimony Tr. at 49-50.  Wright
testified that Addleman was not so enamored with the numbers like Barasch and

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Degenhardt were and that Addleman "was much more concerned about the kind of cases you're bringing and why you're bringing cases."  *Id.*

Addleman acknowledged that before she became the Associate District Director for Enforcement, "there was some internal pressure within the Fort Worth office to generate numbers … of cases."  Addleman Testimony Tr. at 27.  By contrast, she agreed that while obviously it's important to have numbers, it's also important to have substantial cases, and even cases that are complicated or difficult or that may involve some work to get through the Commission.  *Id.*  Addleman described this "culture shift" as follows:

> My emphasis was less on numbers than the [Degenhardt and Barasch] administration … where people were of the belief that the numbers were the only thing that mattered … And there needed to be some, in my opinion, reality brought back to what the enforcement program is supposed to be.  … So, yes, I think there's definitely a culture shift and Jeff [Cohen] had a little trouble with some of that I will admit. …  He had some tougher cases.  I won't say that he only had easy things, but in a way that he could sort of charge ahead on the things that he knew were going to be fruitful and give rise to a number as opposed to a case that didn't have that degree of certainty, if you will, would be a factor in his analysis.

*Id.* at 28-29.

Walter Ricciardi, former Deputy Director of Enforcement from 2005 through 2008, was quoted in the April 16, 2009 Bloomberg article, *Stanford Coaxed $5 Billion as SEC Weighed Powers*, as follows:

> SEC enforcement offices were evaluated on the number of cases, or "stats," they brought in, rather than on the seriousness or difficulty of action, said Walter Ricciardi, the agency's deputy chief of enforcement from 2005 through 2008, in a speech April 1 in New York.  "So if you brought an Enron, that's one," Ricciardi said.  "If you brought a WorldCom, that's two."  Delisting 135 defunct companies in a week for failing to file annual reports gave an enforcer 135 cases to count, he said.  "Maybe certain investigations would have gotten put in the right place and in the right posture" with a different evaluation system, he said.

**App. 781**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Alison Fitzgerald and Michael Forsythe, *Stanford Coaxed $5 Billion as SEC Weighed Powers*, Bloomberg, April 16, 2009, attached as Exhibit 160 at 4.  *See also* Judith Burns, *SEC's Near-Record Enforcement Results Raise Questions*, Dow Jones, October 9, 2008, attached as Exhibit 161.

### B.      The Pressure For "Stats" May Have Discouraged the Staff From Pursuing Difficult Cases

Wright testified that the pressure for numbers incentivized the Enforcement staff to focus on easier cases, the "quick hits."  Wright Testimony Tr. at 18.  According to Wright, as a result of the "pressure on people to produce numbers[,] … anything that didn't appear … likely … to produce a number in a very short period of time got pretty short shrift."  *Id.* at 18.[96]  A former FWDO Examination branch chief, who asked not to be identified, agreed that the FWDO Enforcement staff "were concerned about the number of cases that they were making and that perhaps if it wasn't a slam-dunk case, they might not want to take it because they wanted to make sure they had enough numbers because that's what they felt the Commission wanted them to do."  Unidentified Former FWDO Examination Branch Chief Testimony Tr. at 86-87.

[BD Examiner 1] testified that "examiners will refer great cases to Enforcement, and they just sit there … for a variety of reasons." [BD Examiner] Testimony Tr. at 54 [BD Examiner] testified that one reason that great cases "sit" in Enforcement is that the Enforcement staff takes the approach that, "Yes, there may be some fraud here, but it is not a slam dunk, [and] we are not going to try to go to court if it is not a slam dunk."  *Id.*  Similarly [IA Examiner 2] testified that he "got the sense that [the Enforcement staff] did not want to lose any cases.  So if there was a high risk of losing a case, there was a reluctance for them to take it." [IA Examiner 2] Testimony Tr. at 77.

Addleman acknowledged that when she became the Associate District Director for Enforcement in the FWDO, there was a feeling that the Commission was possibly more receptive to clear-cut cases, in which you have clear victims already losing money,

---

[96]   Wright recalled one case that he had assigned to Prescott when Barasch was her branch chief that he later learned Barasch had instructed her not to work on because it was not going to be a quick hit.  Wright Testimony Tr. at 22-24.  Ironically, that case bore many similarities to the Stanford matter.  *Id.*  Wright testified that the matter "involved insurance, and while presumably they were selling insurance, it was really a Ponzi scheme."  *Id.* at 23.  Wright believes that Barasch told Prescott not to work on it [DPP, WP] [DPP, WP]

But, as Wright explained, "the case got transferred [to another SEC office]. … [T]hey did a little research and came up with the idea that what they were selling was not an insurance contract but really a security. … [A]nd it became one of these [cases] where you rush to the courthouse to get a temporary injunction and restraining order and all the rest."  *Id.* at 23.  Wright reflected on the parallels between that case and Stanford, stating, "Again, you get back to the number aspect, you know.  If you got a problem with determining whether or not something is a security, just like in Stanford, then it's going to be harder to do.  It's not going to be a quick hit.  You're not going to get a number quicker."  *Id.* at 24.

**App. 782**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

and that if they were going to bring a case, they should bring a case that is more clear-cut and has potential victims, so it's easier to get through the Commission and generate their numbers.  Addleman Testimony Tr. at 27.  Similarly, Preuitt testified:

> [Stanford] was also a very difficult case.  It was going to use a lot of resources, and that was unappealing.
>
> And very much during the Cox administration, there was concern that the Commission wasn't going to take anything unless it was just nailed down and perfect and beautiful and that you might receive a lot of negative feedback unless you had a case like that.  And people wanted to avoid that sort of negative response. …

December 14, 2009 Preuitt Testimony Tr. at 55-56.

As discussed below, at some point, FWDO management was instructed to focus less on Ponzi scheme cases.  However, as Preuitt explained, the FWDO was willing to bring Ponzi scheme cases if they were *easy* cases:

> [T]o be fair, the Fort Worth office has been one of the most aggressive offices in terms of Ponzi schemes.
>
> … But most of those are really quite easy to prove, and you can get into court quickly.  And we were just very aggressive on doing those.
>
> So during Hal and Spence's tenure, we did many Ponzi schemes; but they were small in comparison.  They were much -- you know, very easily proven.  Once they start to break and you can get some bank records, I mean, in comparison, the difficulty of those cases is, you know – it doesn't compare.

*Id.* at 56-57.

Wright testified that Stanford "was not going to be a quick hit.  It was going to be a dogfight."  Wright Testimony Tr. at 18.  Accordingly, Wright explained that Stanford was not considered as high priority of a case as easier cases.  *Id.* at 18-19.  Similarly, Preuitt told the OIG that Cohen did not want to pursue the investigation "[b]ecause it was going to be hard to prove…."  Preuitt Interview Tr. at 18-19.  Preuitt testified that Cohen only wanted to bring cases that were slam dunk, easy cases.  January 26, 2010 Preuitt Testimony Tr. at 42.

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Preuitt testified that no one in Enforcement ever disagreed with her conclusion that Stanford was probably a fraud.  December 14, 2009 Preuitt Testimony Tr. at 45. According to Preuitt, Enforcement's unwillingness to investigate Stanford "was always about … barriers. … [Stanford] was seen [by Enforcement] as a fantastically difficult case, and I couldn't convince them to do it."  *Id.* at 45-46.[97]

The Enforcement staff perceived the Stanford case was difficult, in part, because there was no evidence that the Ponzi scheme was collapsing.  The Cohen Memorandum included the following observation:



Exhibit 144 at 3-4 (emphasis in original).[98]

On October 25, 2004, while the 2004 examination was ongoing, Wright forwarded to Preuitt an e-mail chain from early-June 2003 that discussed Enforcement staff's view at that time that a Stanford investigation was too difficult to undertake. October 25, 2004 E-mail from Hugh Wright to Julie Preuitt, attached as Exhibit 162.

---

[97]    Degenhardt and Barasch vigorously denied that the FWDO was averse to difficult investigations during their tenure.  Degenhardt told the OIG that, in addition to doing "kick in the door and grab" cases, the FWDO had worked on complex cases.  Degenhardt Interview Memorandum at 2.  He added that he felt the FWDO "worked very hard in his tenure on all types of cases (including big cases)…."  *Id.* at 6. Barasch told the OIG that he had brought several cases against broker-dealers and investment advisers. Barasch Interview Tr. at 30-35.  Barasch also stated that he was instructed to "focus[] on working what would be deemed to be good core cases for the Commission."  *Id.* at 13.

[98] ENF Staff Atty 5 testified that she believed it was difficult to bring a Ponzi scheme case before the scheme began to unravel because "you don't have anybody complaining about anything going wrong, everybody is happy, so they are not particularly cooperative ENF Staff Atty Testimony Tr. at 18-19.  The belief that the SEC could not act against a suspected Ponzi scheme was shared by the staff in the SEC's failed Bernard Madoff investigation.  Doria Bachenheimer, the Assistant Director responsible for a 2005-2006 investigation of Madoff that was closed without any action, testified in the OIG's investigation of that matter that she viewed circumstantial evidence that Madoff was running a Ponzi scheme as only "theories," stating, "[the red flags of a Ponzi scheme that were presented to the Enforcement staff] weren't evidence.  You know, it wasn't something we could take and bring a lawsuit with."  *See* the OIG's September 30, 2009 Report of Investigation, Case No. 509, entitled "Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme," at 247.  Bachenheimer further explained her view that "[i]t's very challenging to develop evidence [about a Ponzi scheme] until the thing actually falls apart."  *Id.*

**App. 784**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Preuitt responded:

> I love this stuff.  We all are confident that there is illegal
> activity but no easy way to prove.[99]  Before I retire the
> Commission will be trying to explain why it did nothing.
> Until it falls apart all we can do is flag it every few years.

October 25, 2004 E-mail from Julie Preuitt to Hugh Wright, attached as Exhibit 162.

But Preuitt and [IA Examiner 1] testified that after the revelation that the SEC failed to uncover the Bernard Madoff Ponzi scheme, the staff's view about recommending an Enforcement action without clear evidence that it was a Ponzi scheme changed.  [IA Examiner 1] explained the change as follows:

> I have a general recollection that our office, after the
> Madoff situation, said, hey, is there anything that we have
> any concern about that we haven't done something about,
> and I believe Stanford was one of them. …
>
> And, so, we decided we need to pick this up and run with it
> and see if we can do something because, you know, *the
> game has changed.  The risk of losing is a whole lot less
> now.  We -- we're going to be punished more for not doing
> something than for doing something and ending up being
> unsuccessful or whatever*.  That was my general feeling,
> that we couldn't let that sleep anymore.

[IA Examiner 1] Testimony Tr. at 136 (emphasis added).  Similarly, Preuitt testified:

> Well, clearly when Madoff broke, that changed everything.
> People felt like now … maybe … the Commission will not
> turn us down if we bring to them, you know, an imperfect
> case where we don't have all of the documents.

December 14, 2009 Preuitt Testimony Tr. at 87-88.  The OIG found in its earlier report regarding the Stanford investigation as follows, "Immediately after the revelations of the Madoff Ponzi scheme became public in December 2008, the Stanford investigation became more urgent for the FW[D]O and, after ascertaining that the DOJ investigation was in its preliminary phase, the FW[D]O staff asked DOJ if it could move forward with the Stanford investigation."  Report of Investigation, Case No. OIG-516, entitled

---

[99]  [IA Examiner 1] testified that Stanford was "a subject of common discussion in the office."  [IA Examiner 1] Testimony Tr. at 122.

**App. 785**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

"Investigation of Fort Worth Regional Office's Conduct of the Stanford Investigation" at
10.

### C.    Ponzi Scheme Cases Were Disfavored by Senior Enforcement Officials

Degenhardt told the OIG that Enforcement Director Richard Walker was critical
that the FWDO was bringing too many Temporary Restraining Order (TRO), Ponzi, and
prime bank cases, which Walker referred to as "kick in the door and grab" cases or
"mainstream" cases.  Degenhardt Interview Memorandum at 2.  According to
Degenhardt, Walker told him that the FWDO needed to bring more Wall Street types of
cases, like accounting fraud cases.  *Id.*  Degenhardt recalled a meeting with Walker in
which Walker said, "[G]ive the Ponzi scheme-type cases to the states."  *Id.* at 4.
Degenhardt said that he replied, "[T]he states are not capable of doing these cases," to
which Walker reiterated, "[G]ive them to the states."  *Id.*

Barasch told the OIG that when he was hired to be the director of Enforcement for
the FWDO, senior management in the Enforcement Division in Washington, DC, as well
as in the Denver Regional Office (which supervised the FWDO at that time), told him to
clean up the FWDO's inventory and repeatedly told him that the FWDO's emphasis
should be on accounting fraud cases.  Barasch Interview Tr. at 12-14.  Barasch told the
OIG that the pressure to focus on accounting fraud cases exponentially increased after
Enron filed for bankruptcy on December 2, 2001, and revelations of massive accounting
fraud followed.  Barasch Interview Tr. at 24.

Barasch further told the OIG that he was told that the FWDO was spending way
too much of its resources on Ponzi-scheme kinds of cases, and that those resources would
be better deployed on accounting fraud cases.  Barasch Interview Tr. at 34.[100]  Barasch
specifically recalled that in November 2000, after the FWDO brought several Ponzi
scheme cases, he was told by a senior official in the Enforcement Division (whom
Barasch declined to name): "Spence, you know you got to spend your resources and time
on financial fraud.  What are you bringing these cases for[?]"  Barasch Interview Tr. at
31-33.

Preuitt also testified that the FWDO "actually received a great deal of pushback
from all of the Ponzi schemes that we were doing."  December 14, 2009 Preuitt
Testimony Tr. at 57.  Preuitt explained her view that "the Commission is very interested
in a fraud of the day.  And [Stanford] wasn't ever the fraud of the day."  *Id.* at 55.

---

[100]    In the context of another Ponzi scheme matter investigated by the FWDO, [NYRO Counsel], a [PII]
[PII] Counsel in the SEC's New York office, e-mailed a FWDO attorney on January 14, 2004, "[O]f
course [the SEC] should get out of the business of burning resources to chase Ponzi schemes …."  E-mail
dated January 14, 2004 from [NYRO Counsel] at Exhibit 163.

**App. 786**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

According to Preuitt, Ponzi scheme cases "became the fraud of the day after Madoff." *Id.*
at 56.

### D.     The SEC Bureaucracy May Have Discouraged the Staff From Pursuing Novel Legal Cases

Degenhardt told the OIG that the arduous process of getting the SEC staff's
approval in Washington, DC to recommend an Enforcement action to the Commission
was a factor in deciding which investigations to pursue.  Degenhardt Interview
Memorandum at 5.  Degenhardt recalled one matter in late-2000 in which the FWDO
staff invested a lot of time in an investigation involving ████████ ███
████████ and felt strongly that the matter warranted an Enforcement action.  *Id.*
at 5-6; February 11, 2001 E-mail from Harold Degenhardt to Annette Nazareth and
Robert Colby, attached as Exhibit 164.  However, staff in the Division of Market
Regulation took the position that ████████████████ and consequently
prevented the FWDO staff from bringing the matter to the Commission's attention.  *Id.*

Barasch also recalled the FWDO's unsuccessful efforts to convince the staff in
Washington, DC, to recommend an Enforcement action ████████████████.
Barasch Interview Tr. at 37-39.  Barasch said his experience in that matter was a factor in
his view that the Stanford matter was not worth investigating.  *Id.* at 39.  According to a
former FWDO Examination branch chief, the Enforcement staff in Washington, DC –
specifically the staff in the Branch of Regional Office Assistance ("BROA")[101] – would
not have let an Enforcement recommendation on Stanford go to the Commission because
of its novel characteristics.  Unidentified Former FWDO Examination Branch Chief
Testimony Tr. at 79-80.  He described the process of trying to get Enforcement
recommendations to the Commission through BROA as "very frustrating."  *Id.* at 80.

Wright testified that "[o]ver a period of time when I was here, [the bureaucracy]
got a lot worse. … [Y]ou've got so many layers between what you do in Fort Worth
before it ever gets to the Commission.  It's got to go through what was called BROA at
that time.  I don't know what it's called now.  And you have a lot of people second-
guessing everything, and so, you know, what we thought were good reasons weren't
necessarily accepted by anybody else."  Wright Testimony Tr. at 13-14.

Addleman testified that the process of obtaining a formal order in the Stanford
matter, in particular, involved a "ridiculous" amount of review by various staff in DC,
stating:

> As I recall, it took a longer period than was appropriate, in
> my opinion, to get the formal order done, both in terms of
> getting the written product out the door and then getting it

---

[101]    BROA has been renamed the Office of Chief Counsel.

**App. 787**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

>through the Commission.  I mean, it was something
>ridiculous like two months of review in DC before it got on
>a Commission calendar, those kinds of things.  So there
>were a lot of time delays that are, I suppose, different
>points in my career more frustrating than others and this
>might have been one of those points where I was frustrated.

Addleman Testimony Tr. at 33. [ENF Staff Atty 5] also recalled that the process of getting the staff's
request for a formal order before the Commission took a particularly long time because of
jurisdictional issues and comments and pushback from other offices within the SEC.
[ENF Staff Atty 5] Testimony Tr. at 47-48.

Preuitt testified that she believed that the desire of the Enforcement staff to avoid
difficult cases was partly due to the realities of dealing with the Commission's
bureaucracy.  Preuitt described the challenges posed by that bureaucracy in the following
exchange:

>A:  [T]he gauntlet, even before you get to the part of the
>Commission, is nightmarish, to get through market reg,
>to get through IM, to get through general counsel. …
>And it's just like hitting your head against the wall
>repeatedly over and over and over. …
>
>Q:  So is it your impression that in general … the harder
>cases, more challenging cases are going to be difficult
>to get through the bureaucratic process in
>Washington?
>
>A:  A nightmare.  Difficult is an understatement.  It is a
>horrific miserable process. …
>
>…
>
>A:  [N]ot only do [the Enforcement staff] have to worry
>about criticism if [a case] finally gets to the
>Commission ….  First [the Enforcement staff] have to
>deal with a year or two of nightmarish difficulties, so it
>really was no small thing for [the Examination staff] to
>ask them to try to bring this on a more novel case.  Did
>I think it was worth it?
>Did I think that the senior people then should have
>supported and helped that process and protected their
>staff in some way from the misery to make it happen, I
>did.  But I don't want to give the impression I thought
>this was easy to do and they could just go do it and they

**App. 788**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> were stubborn.  Nobody wanted to face the people in
> Washington.  They didn't and for good reason.

January 26, 2010 Preuitt Testimony Tr. at 72-74.

   As discussed above, for seven years the SEC Enforcement staff did not open an
investigation into Stanford although every member of the staff that had examined
Stanford believed the CDs were a Ponzi scheme.  That failure was due in part to repeated
decisions by Barasch to quash the matter.  Immediately after he left the SEC, an
investigation of Stanford was opened.  While that investigation proceeded haltingly, beset
by feuding among the staff that at times consumed more of the staff's time and energy
than the actual investigation, as discussed below, Barasch repeatedly attempted to
represent Stanford in connection with the investigation he had blocked for seven years.

**XIII.   AFTER LEAVING THE SEC, BARASCH SOUGHT TO REPRESENT
STANFORD IN CONNECTION WITH THE SEC INVESTIGATION ON
THREE SEPARATE OCCASIONS AND DID REPRESENT STANFORD
FOR A LIMITED PERIOD OF TIME**

   **A. In June 2005, Two Months After Leaving the SEC, Barasch Sought to
Represent Stanford and Was Advised He Could Not Do So**

   Barasch left the SEC on April 14, 2005, and joined the law firm of Andrews
Kurth, LLP later that month.  *See* March 9, 2005 Andrews Kurth press release, attached
as Exhibit 165.  On June 1, 2005, Jane Bates, SGC's Chief Compliance Officer, asked an
Investment Adviser consultant who was working with SGC for an attorney
recommendation as follows:

> Would you give me names of some very good attorneys
> you would recommend that we might want to hire if
> necessary for this SEC inquiry[?]  SEC Enforcement is
> involved and I want to be prepared.  This is informal now,
> but that could change.

June 1, 2005 E-mail from Jane Bates to [Stanford Empl 6] attached as Exhibit 166.  On June 2,
2005, the consultant responded and recommended Barasch specifically because of his
FWDO experience, saying,

> . . . [R]ight off the bat my instinct would say to call
> [Barasch] because of his specific experience in dealing with
> the FWDO enforcement staff.

June 2, 2005 E-mail from [Stanford Empl 6] to Jane Bates, attached as Exhibit 166.

**App. 789**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

On June 6, 2005, Bates e-mailed Yolanda Suarez, Stanford Financial Group
("SFG") Chief of Staff, and Mauricio Alvarado, SFG General Counsel, as follows:

> … I talked to our [investment adviser] consultant who used
> to be a Branch Chief at OCIE in DC and asked him if he
> knew any individuals who knew the SEC Enforcement staff
> in Fort Worth.  He gave me the name of the following
> individual [Barasch] who recently left the SEC and is at
> Andrews Kurth in Dallas.

June 6, 2005 E-mail from Jane Bates to Yolanda Suarez, attached as Exhibit 167 at 2.
Suarez immediately e-mailed Alvarado, "Lets [sic] talk to him."  June 6, 2005 E-mail
from Yolanda Suarez to Mauricio Alvarado, attached as Exhibit 167.

On or about June 11, 2005, Stanford Empl 1, a SFG compliance employee, forwarded
the recommendation of Barasch to Robert Allen Stanford.  *See* E-mail from Stanford Empl 1
to Robert Allen Stanford, attached as Exhibit 168.  Stanford replied, "This guy looks
good and probably knows everyone at the Fort Worth office. Good job." June 11,
2005 E-mail from Robert Allen Stanford to Stanford Empl 1 attached as Exhibit 168.

By June 17, 2005, Alvarado had contacted Barasch, presumably about
representing Stanford.  *See* June 17, 2005 E-mail from Spencer Barasch to Mauricio
Alvarado, attached as Exhibit 169.  On June 20, 2005, Barasch e-mailed Richard Connor,
Assistant Ethics Counsel in the SEC's Office of General Counsel, as follows:

> Hope all is well in this time of incredible change at the
> SEC.  I never believed that my departure would trigger so
> many others to abandon ship…
>
> I have been approached about representing an investment
> complex called Stanford Financial Group, of Houston,
> Texas, in connection with (what appears to be) a
> preliminary inquiry by the Fort Worth office.  The assigned
> attorneys are (I think) ENF Staff Atty 5 and ENF BC 3.
>
> *I am not aware of any conflicts* and I do not remember any
> matters pending on Stanford while I was at the
> [C]ommission. Would you please confirm this with the Fort
> Worth staff?[102]

---

[102]   Connor testified that he did not recall Barasch at any point telling him that in 1998, Barasch had
participated in a decision to close an inquiry regarding Stanford; in 2002, Barasch had participated in a
decision to refer a complaint about Stanford to the Texas State Securities Board; and in 2003, Barasch had
participated in a decision not to investigate Stanford after reviewing a complaint that Stanford was engaged
in a massive Ponzi scheme.  Connor Testimony Tr. at 14-15.  Barasch stated that he did not mention the
(Footnote continued on next page.)

**App. 790**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

June 20, 2005 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 170
(emphasis added).

Although Barasch claimed not to remember any matters pending on Stanford
while he was at the SEC, the OIG investigation found, as discussed more fully above, that
Barasch had played a significant role in the FWDO's inquiries and examinations of the
possibility of Stanford engaging in a Ponzi scheme or similar fraud, including:  (1) in
1998, deciding to close an inquiry regarding Stanford, *see* Section II.C; (2) in 2002,
deciding to forward the Complainant 1 letter to the TSSB and not respond to the letter or
investigate the issues it raised, *see* Section IV.E; (3) in 2002, deciding to not act on the
Examination staff's referral of Stanford for investigation, *see* Sections IV.H and I; (4) in
2003, participating in a decision not to investigate Stanford after receiving the Confidential Source
letter comparing Stanford's operations to the PII fraud, *see* Section V; and (5) in
2003, participating in a decision not to investigate Stanford after receiving the letter from
an anonymous insider alleging that Stanford was engaged in a "massive Ponzi scheme,"
*see* Section V.B.

Federal conflict-of-interest laws impose on former government employees a
lifetime ban on making a communication to or appearance before an employee of a
federal agency or court in connection with a particular matter (A) in which the United
States is a party or has a direct and substantial interest, (B) in which the former employee
was personally and substantially involved as a government employee, and (C) which
involved a specific party or parties at the time of the participation.  *See* 18 U.S.C §
207(a)(1); *see also* 17 C.F.R. § 200.735-8(a)(1).  Under federal ethics regulations, "[t]he
same particular matter may continue in another form or in part," and "[i]n determining
whether two particular matters involving specific parties are the same, all relevant factors
should be considered, including the extent to which the matters involve the same basic
facts, the same or related parties, related issues, the same confidential information, and
the amount of time elapsed."  5 C.F.R. § 2641.201(h)(5).  Moreover, "[a] particular
matter may involve specific parties prior to any formal action or filings by the agency or
other parties."  5 C.F.R. § 2641.201(h)(4).[103]

---

1998 inquiry or the 2002 matter to Connor when they spoke in 2006 because he "just didn't remember
anything" about these events.  Barasch Interview Tr. at 60.  Connor agreed that this conduct would be
pretty substantial involvement in a variety of Stanford-related matters over time, and that when an
individual is seeking ethics advice to represent a particular company before the Commission, that
individual should inform the Ethics Office of the roles he played previously while at the Commission.
Connor Testimony Tr. at 15.

[103]   One of the examples provided in 5 C.F.R. 2641.201 makes clear that a government employee can be
found to have participated in a particular matter even if the employee left the agency before charges were
filed.  Example 1 to paragraph (h)(4) of the regulation provides as follows:  "A Government employee
participated in internal agency deliberations concerning the merits of taking enforcement action against a
company for certain trade practices.  He has participated in a particular matter involving specific parties
and may not represent another person in connection with the ensuing administrative or judicial proceedings
against the company."

**App. 791**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Given that all of the instances listed above involved essentially the same parties
and the same underlying issue, *i.e.*, whether Stanford was engaging in a Ponzi scheme or
a similar fraud, in our view, Barasch had personal and substantial involvement over a
period of time in the Stanford Ponzi scheme matter that, under the applicable criminal
statute, precluded him from communicating to or appearing before the SEC regarding
Stanford.  In fact, Connor agreed that Barasch's earlier involvement in the 1998 inquiry,
the 2002 complaint referral and the 2003 Ponzi-scheme complaint, would have barred
Barasch from representing Stanford in the 2005 SEC investigation.  Connor Testimony
Tr. at 13-14.

In response to Barasch's request to confirm that he had no conflicts, Connor
contacted ENF Staff Atty 5 on June 20, 2005.  *See* June 20, 2005 E-mail from Richard Connor to
Spencer Barasch, attached as Exhibit 170.  After Connor contacted ENF Staff Atty 5, ENF BC 3
e-mailed several members of the FWDO regarding "Stanford Group Company" and
asked:

> Spence is looking to become engaged on the above
> referenced matter.  The matter was referred to Enforcement
> by [the Examination staff] via a memo dated March 14,
> 2005.  The memo was from Victoria, to Spence.  Does
> anyone know if Spence received the memo before his
> departure?  Did he read it?  Did anyone have any
> discussions with him about the matter?  I'll let the Ethics
> Office know.

June 20, 2005 E-mail from ENF BC 3 to Harold Degenhardt, *et al.*, attached as Exhibit
171.

On June 20, 2005, Prescott responded to ENF BC 3 e-mail:

> I had no discussions with Spence individually, but he was
> present (along with Hal, Julie, ENF Asst Dir 1 and Cohen) at a
> regulatory summit meeting in Austin earlier this spring at
> which the general facts of the case were presented.  I did
> not give Spence a copy of the memo.  Although it was
> prepared for him, Julie and ENF Asst Dir 1 had been discussing the
> case, and it is my understanding that Julie forwarded the
> memo directly to ENF Asst Dir 1 I do not know whether ENF Asst Dir 1
> discussed it with Spence or not, or whether Julie sent the
> memo to anyone but ENF Asst Dir 1

June 20, 2005 E-mail from Victoria Prescott to ENF BC 3, attached as Exhibit 171.

**App. 792**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

On June 20, 2005, Degenhardt responded to ███████ e-mail:

> This is really no different from the prior matter.[104]

> A memorandum was sent to Spence while here.  Whether he says that he received it, or not, is irrelevant.  He cannot represent them.  Please pass this to Ethics folks, though I would be amazed, if they had not reached this conclusion independently.

June 20, 2005 E-mail from Harold Degenhardt to ███████, attached as Exhibit 172.

On June 20, 2005, Cohen responded to Degenhardt's e-mail:

> I didn't discuss Stanford with Spence.  Anyway, I agree with your assessment Hal; even if Spence doesn't recall reading it, as preoccupied as he was at the time, it may have simply slipped his memory.  And optically, it would look very bad.

June 20, 2005 E-mail from Jeffrey Cohen to Harold Degenhardt, attached as Exhibit 172.

Connor then determined, based on the information he received from the Fort Worth staff, including Prescott, that Barasch could not represent Stanford on the basis of his attendance at a meeting with regulators in the district at which complaints about a Ponzi scheme at Stanford were discussed.  Connor Testimony Tr. at 16-18.  Connor stated, ". . . [U]pon learning more information from the staff in Fort Worth, we made the determination that Spence Barasch had participated in the Stanford matter and that he could not participate in these post-employment activities."  *Id.* at 16.[105]

On June 20, 2005, at 7:14 p.m., Alvarado e-mailed Robert Allen Stanford and Suarez about the news that Barasch could not represent Stanford:

> As you know, per your instructions, I was in the process of retaining the legal services of Spencer Barasch, the former

---

[104]   When interviewed by the OIG, Degenhardt did not recall this e-mail, but noted that Barasch would have been prevented from working on any Stanford matter that his group had worked on.  Degenhardt Interview Memorandum at 6.

[105]   Connor explained that Barasch's actions in attending a meeting at which it was discussed whether Stanford was a Ponzi scheme "would constitute participation, and that matter, whether it had been assigned a particular number or not, would be considered a continuation of . . . whatever the Fort Worth number that was assigned to it that ultimately became the Enforcement investigation.  So it would be the issues, the parties are all the same, and so that initial participation would continue right on up until a formal investigation was opened and a Fort Worth number was assigned to it."  Connor Testimony Tr. at 20.

**App. 793**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

> head of enforcement of the Dallas SEC office, currently
> with Andrews and Kurth.  However, he called me today to
> inform me that he was unable to assist us in the referenced
> matter as he was conflicted out.  It appears that he did not
> receive the okay from the office of the General Counsel of
> the SEC, as the matter started before he left the SEC.  He
> left the SEC six weeks ago.  Thus, we are not able to retain
> his services.  Thanks.

June 20, 2005 E-mail from Mauricio Alvarado to Robert Allen Stanford, attached as
Exhibit 173.  On July 2, 2005, Robert Allen Stanford reacted strongly to the news,
stating, "This is bs and I want to know why the SEC would /could conflict him out."  July
2, 2005 E-mail from Robert Allen Stanford to Mauricio Alvarado, attached as Exhibit
173.

We note that apart from Barasch's involvement in Stanford matters while he was
at the FWDO, at the time Barasch sought to represent Stanford in June 2005, he was
prohibited by the federal conflict-of interest statutes from communicating to or appearing
before the SEC on *any* matter until April 13, 2006, one year after his departure.[106]
During his OIG interview, Barasch stated that he did not recall having contacted the SEC
in 2005 about representing Stanford, but did acknowledge he was subject to the one-year
ban.  Barasch Interview Tr. at 53-54.  In fact, when the OIG first asked Barasch about his
effort to represent Stanford in 2005, his immediate response was as follows:

> 2005 I had my one-year ban.  Okay.  I had a one-year
> ethical ban, because I was an SES or [Senior Officer], or
> whatever they're called.  So I couldn't practice before the
> Commission for a year.

*Id.* at 53.

---

[106]  18 U.S.C. § 207(c)(1) prohibits certain senior government officials from "knowingly mak[ing], with
the intent to influence, any communication to or appearance before any officer or employee of the
department or agency in which such person served within 1 year before" termination from senior service, if
that communication or appearance is made "on behalf of any other person (except the United States), in
connection with any matter on which such person seeks official action by any officer of employee of such
department or agency . . . ."  *See also* 5 C.F.R. § 2641.204; 17 C.F.R. § 200.735-8(a)(4).  This one-year ban
is not in any way limited to matters in which the former employee participated as a government employee;
rather, it is "a one year across the board" prohibition on appearing before the individual's former agency.
Connor Testimony Tr. at 36-37.  Connor confirmed that Barasch was subject to the one-year ban.  *Id.* at 37.

**App. 794**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

### B.   In September 2006, Stanford Retained Barasch to Represent it in Connection With the SEC's Investigation of Stanford, and Barasch Performed Legal Work on Behalf of Stanford

Approximately one year after the SEC's Ethics Office determined that Barasch's conflicts, not the one-year ban, prevented him from representing Stanford in connection with the SEC investigation, Stanford retained Barasch to do just that.  On September 29, 2006, Robert Allen Stanford e-mailed Alvarado and James Davis, SIB's Chief Financial Officer, the following:

> The former sec [D]allas lawyer we spoke about in [S]t [C]roix.  Get him on board asap.

September 29, 2006 E-mail from Robert Allen Stanford to Mauricio Alvarado, attached as Exhibit 174.  Alvarado responded to Robert Allen Stanford approximately one hour later:

> I have already spoken to Spencer Barasch.  I have scheduled a meeting for next Tuesday in Miami in the afternoon.  For your information, Spencer is a partner at Andrews Kurth and was previously the Associate Director in the SEC's Fort Worth office where he headed up the agency's enforcement program in the Southwest.

September 29, 2006 E-mail from Mauricio Alvardo to Robert Allen Stanford, attached as Exhibit 174.

Also on September 29, 2006, Barasch e-mailed Alvarado:

> Thanks for the call this morning – I look forward to the opportunity to be of service to Stanford going forward.
>
> I will await instructions about where and when to meet in Miami on [T]uesday. . . .

September 29, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 175.  On Monday, October 2, 2006, Alvarado notified Robert Allen Stanford and Davis, "Fyi.  I will be meeting with Spencer Barasch, former SEChead [sic] of enforcement tomorrow at 3:00 PM at our offices in Miami (21st floor conference room)." October 2, 2006 E-mail from Mauricio Alvarado to James Davis and Robert Allen Stanford, attached as Exhibit 175.

On October 3, 2006, Barasch met with Alvarado in Stanford's Miami office.  *See* Andrews Kurth billing records, attached as Exhibit 176; Barasch Interview Tr. at 52-53, 55-57.  Barasch told the OIG that, after sitting in the lobby of the Miami office for "over

**App. 795**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

an hour," he met with Alvarado "for 15 minutes, and all [Alvarado] did was hand[] [him]
a stack of Stanford promotional documents . . . ." Barasch Interview Tr. at 56.  Barasch
billed 4.5 hours for the meeting and preparation for the meeting which, according to his
billing records, did not include time related to travel or review of publicly available
company information to prepare on the day before for the meeting.  *See* Exhibit 176.

On October 4, 2006, the day after the meeting in Miami, Barasch followed up
with Alvarado by e-mail as follows:

> I enjoyed finally meeting you yesterday.  Some follow-up
> thoughts/questions?
>
> (1)  Any more news from the SEC or from Antigua?  Did
> you actually make the trip to Antigua this morning?
>
> (2)  How is the progress on the response to the NASD?  . . .

October 4, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit
177.

Alvarado responded to Barasch's e-mail, stating:

> Likewise, I am very glad that we finally met.  Responding
> to your questions, we have not heard anything else from the
> SEC today.  We are nonetheless, working on the draft
> response to the NASD. . . .
>
> As soon as I get back to Houston [from Antigua], I will
> give you a call to discuss further, and plan a strategy to
> follow.
>
> I am glad that you are now part of our team. I look forward
> to our working together.

October 5, 2006 E-mail from Mauricio Alvarado to Spencer Barasch, attached as Exhibit
177.  Barasch billed 6.5 hours to Stanford on October 4, 2006, for return travel from
Miami and "review [of] documentation received from company about SEC and NASD
inquiries."  Exhibit 176.

On October 12, 2006, Barasch billed Stanford 0.7 hours for, *inter alia*, a
"[t]elephone conference with Mauricio Alvarado regarding status of SEC and NASD
matters."  *Id.*  On October 12, 2006, Alvarado e-mailed Barasch and Thomas Sjoblom, a

**App. 796**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

partner at Proskauer Rose LLP who represented Stanford on the SEC's investigation, the
following regarding the "NASD CD Inquiry," as follows:

> Spence/Tom,
>
> Per our conversation, I am attaching for your review our
> proposed response to the latest NASD letter dated
> September 27, 2006.  Please review it and send me your
> comments, if any, by the end of the day tomorrow.  . . .

October 12, 2006 E-mail from Mauricio Alvarado to Spencer Barasch and Thomas
Sjoblom, attached as Exhibit 178.

Barasch responded to Alvarado's request for comments the next day, October 13,
2006, stating:

> As much as I would like to offer you some brilliant
> suggestions, and show off my wisdom, I have nothing of
> substance to add.  I think the content of the response, and
> its tone, are excellent.
>
> I suspect that the NASD will just go through the motions to
> satisfy the SEC.

October 13, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as
Exhibit 179.  Alvarado forwarded Barasch's comments to Robert Allen Stanford on
October 13, 2006, with the introduction, "FYI.  This is the feedback from the former SEC
person in Fort Worth in relation to our proposed draft letter to the NASD."  October 13,
2006 E-mail from Mauricio Alvarado to Robert Allen Stanford, attached as Exhibit 180.

In his SEC interview, Barasch told the OIG that Alvarado had asked him to
review a draft letter to the NASD, but that he had only "looked at it for two minutes."
Barasch Interview Tr. at 59.  Barasch stated that he wrote him back and said "something
like . . . , 'Hey, as much as I'd like to tell you I have pearls of wisdom, I have nothing to
add.'"  *Id.*  Barasch said that his two-minute review of the draft letter "was the extent of
[his] involvement with Stanford."  *Id.* at 59-60.[107]

On October 16, 2006, Barasch e-mailed Bernerd Young, SGC's Chief
Compliance Officer, stating, "Get back to me on dates for Antigua – if not too far out,

---

[107]   In fact, as demonstrated in this section of the report, the OIG found evidence that, in addition to
reviewing the draft letter to the NASD, Barasch had met with Stanford General Counsel Alvarado,
reviewed documentation received from the company, and participated in conference calls with Alvarado,
and in connection with this work billed a total of approximately 12 hours to Stanford.

**App. 797**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

week of November 13th would be great."  October 16, 2006 E-mail from Spencer Barasch to Bernerd Young, attached as Exhibit 181.  In response, Young e-mailed a Stanford employee the same day as follows:

> I was speaking to Mauricio [Alvarado] at the Jean Gilstrap awards Friday night and he would like me to bring our outside counsel, Spencer Barasch to visit the Bank. Mauricio would like this done in the next few months if possible.  Please send me your availability through the end of the year, I will coordinate with Mr. Barasch and then coordinate with your staff.

October 16, 2006 E-mail from Bernerd Young to Juan Rodriguez-Tolentino, attached as Exhibit 182.  Four days later, on October 20, 2006, Young e-mailed another Stanford employee to arrange for Barasch's visit as follows:

> As you can see below, I have been requested by Mauricio Alvarado to bring our securities outside counsel to view your fine facilities.  On Tuesday, Mauricio again requested (in Mr. Stanford's presence no less) that this meeting be accomplished ASAP.
>
> If you or Juan can provide me with a couple of available dates, I will run it by Mr. Barasch and let you know.
>
> If you are not the right person, I apologize, and please point me in the right direction.

October 20, 2006 E-mail from Bernerd Young to Stanford Empl 7 , attached as Exhibit 183.

On October 26, 2006, the Commission issued a formal order of investigation in the Stanford matter.  Exhibit 148.  On November 20, 2006, the SEC staff had a conference call with Sjoblom.  *See* November 21, 2006 E-mail from Spencer Barasch to Mauricio Alvarado, attached as Exhibit 184.  The next day, November 21, 2006, at 11:07 a.m., Stanford counsel Sjoblom sent Alvarado an e-mail with the subject "Spencer Barasch."  November 21, 2006 E-mail from Thomas Sjoblom to Mauricio Alvarado, attached as Exhibit 185.  Sjoblom's e-mail stated:

> . . . [D]o you have Spencer's phone number and name of his law firm.  I am sending the letter to the SEC requesting formal order.  So that I get the formal order, I need to also tell them that I will accept service, but will not be back until late next week.  So, don't send subpoenas until then.

**App. 798**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

*Id.*  Approximately one hour later, at 12:20 p.m., Alvarado sent Sjoblom the requested
contact information for Barasch.  November 21, 2006 E-mail from Mauricio Alvarado to
Thomas Sjoblom, attached as Exhibit 185.

An e-mail sent later that day, at 2:57 p.m., from Barasch to Alvarado suggests that
Barasch and Sjoblom may have discussed the SEC investigation after Sjoblom received
Barasch's contact information.  In that e-mail, Barasch stated:

> Would you ask Tom [Sjoblom] if he recalls who the other
> SEC person was that called him yesterday?  *[M]ay be
> somebody I know well and can call for info.*

Exhibit 184 (emphasis added).  Alvarado responded a few minutes later, "He told me that
the call was from [ENF Staff Atty 5] and the new Chief."  November 21, 2006 E-mail from
Mauricio Alvarado to Spencer Barasch, attached as Exhibit 184.  Barasch replied, "'New
chief' could mean a number of people -- if he has the name, it would help. [I]f not, no big
deal."  Exhibit 184.  Alvarado then asked Sjoblom, "What are the names of the SEC folks
who called you yesterday?"  November 21, 2006 E-mail from Mauricio Alvarado to
Thomas Sjoblom, attached as Exhibit 186.  Alvarado e-mailed Barasch, "He did not get
the name."  November 21, 2006 E-mail from Mauricio Alvarado to Spencer Barasch,
attached as Exhibit 184.[108]

On or about November 27, 2006, Barasch spoke with Cohen about Stanford.  *See*
November 27, 2006 E-mail from Spencer Barasch to Jeffrey Cohen, attached as Exhibit
187.  Barasch told the OIG that he had called and talked to [ENF Staff Atty 5] or left a voice-mail for
[ENF Staff Atty 5] and Cohen called him back.  Barasch Interview Tr. at 64.  Barasch said he knew
he "talked to [Cohen.]"  *Id.*  Barasch stated that Cohen asked him during the
conversation, "Spence, can you work on this?"  *Id.*  According to Barasch, Cohen told
him, ". . . I'm not sure you're able to work on this[,]" and Barasch replied, "I'm already
talking to Rick Connor about it."  *Id.*  Cohen testified that Barasch may have called him,
but that he did not remember any "specifics" of the conversation, although he said he
thought that he remembered talking to Barasch "about the prospects of his getting
involved in the case . . . ."  Cohen Testimony Tr. at 111-112.[109]

---

[108]  Barasch's Stanford billing records do not have an entry for November 21, 2006.  *See* Exhibit 176.  The
last date in November 2006 that Barasch billed time to the Stanford account was November 13, 2006.  *Id.*
On November 13, 2006, Barasch billed Stanford 0.3 hours for a "[t]elephone conference with Mauricio
Alvarado regarding status of SEC and NASD inquiries."  *Id.*

[109]  If Barasch did, in fact, discuss the substance of the SEC's investigation of Stanford in the telephone
call with Cohen, Barasch could have made a communication to his former agency with intent to influence
in violation of 18 U.S.C. § 207(a)(1).  Under 5 C.F.R. 2641.201(d), "[a] former employee makes a
communication when he imparts or transmits information of any kind, including facts, opinions, ideas,
questions or direction, to an employee of the United States, whether orally, in written correspondence, by
electronic media, or by any other means."  A communication "is made with the intent to influence when
made for the purpose of… (ii) Affecting government action in connection with an issue or aspect of a
(Footnote continued on next page.)

**App. 799**

Case 3:09-cv-00724-N-BG   Document 1399-10   Filed 11/20/15   Page 202 of 210   PageID
21349

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**


C.   **In Late November 2006, After He Had Already Performed Legal Work on Stanford's Behalf, Barasch For the Second Time Sought SEC Approval to Represent Stanford and Was Again Told He Could Not Do So**

On November 27, 2006, Barasch belatedly sought permission from the SEC's Ethics Office to represent Stanford.  *See* November 27, 2006 E-mail from Spencer Barasch to Jeffrey Cohen, copying Richard Connor, attached as Exhibit 187.  On November 27, 2006, Barasch e-mailed Cohen the following:

> Jeff –
>
> FYI, I just talked to Rick Connor in the GCs office and shared with him our conversation about Stanford -- I am sure he will be following up with you soon.

*Id.*[110]  Also on November 27, 2006, Preuitt e-mailed ENF Staff Atty 5:

> March 22[nd] 2005 -- the last summit meeting that Spence attended.  It was in Austin and Victoria made a presentation regarding Stanford.  I cannot find my notes, but I would swear in court that he was in attendance at that meeting and that Victoria discussed Stanford.  He was familiar enough with the issue that he was negative on the case and the idea that we would ever be able to do anything about Stanford during the meeting.  Victoria will be back tomorrow and she may have notes regarding the specifics of what she discussed regarding Stanford.  Spence was very aware of the firm and its activities, but some of that may have been from our earlier attempt to get enforcement to take action against the firm in either 1997 or 1998.  I will look to see if Spence was e-mailed the Stanford report and referral memo.  I'm not certain he ever saw that because it was given to ENF Asst Dir 1 to discuss with us.[111]

---

matter which involves an appreciable element of actual or potential dispute or controversy." 5 C.F.R. § 2641.201(e).  However, we found no specific evidence that such a violation occurred.

[110]   As discussed above, Barasch had already been denied permission from the SEC's Ethics Office to represent Stanford in the SEC investigation in June 2005.

[111]   Five minutes after sending this e-mail, Preuitt forwarded to ENF Staff Atty 5 her April 5, 2005 e-mail to ENF Asst Dir.1 with the referral memorandum and stated:

> The e-mail below suggests strongly that Spence had not looked at the memo.  I really don't think that he did.

(Footnote continued on next page.)

142


**App. 800**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

November 27, 2006 E-mail from Julie Preuitt to [ENF Staff Atty 5], attached as Exhibit
189.[112]

> On December 13, 2006, Prescott e-mailed Connor and copied Preuitt the
following:

>> I have been out of the office, and this morning received
>> your voice mail inquiry about the location of the meeting in
>> which Stanford was discussed as a possible enforcement
>> matter.  My recollection is that this was at one of the
>> meetings among regulators in our district that occurs
>> quarterly, and that this particular meeting was in Austin,
>> Texas.

December 13, 2006 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit
190.  Preuitt responded to Prescott, stating:

>> I gave him the same information yesterday.  Spence had
>> told them that he didn't recall the meeting and wanted to
>> know where it was held.

December 13, 2006 E-mail from Julie Preuitt to Victoria Prescott, attached as Exhibit
191.

> Sometime after Connor was reminded by Preuitt and Prescott about Barasch's
prior involvement in the Stanford matter, Connor called Barasch and told him that he
could not represent Stanford on the SEC investigation and made reference to Barasch's
attendance at Prescott's presentation during the March 2005 meeting of regulators.
Barasch Interview Tr. at 58; *see also* Connor Testimony Tr. at 16.  Barasch told the OIG
that he asked Connor to reconsider as follows:

>> . . . [S]o I said, "Rick, if that's the sole basis for me to
>> hav[e] a conflict on this, I have to tell you, one I don't
>> remember it.  Two, the discussions at these meetings, these
>> roundtables, are so superficial, and at such a high level, you

---

I don't know that discussions at a meeting about a situation he was already familiar with
would preclude him or not.

November 27, 2006 E-mail from Julie Preuitt to [ENF Staff Atty 5] attached as Exhibit 188.

[112]   Preuitt testified that the SEC Ethics Office requested information about how much involvement
Barasch had with SEC investigations of Stanford while he was with the SEC, and she "specifically referred
them to . . . a summit meeting with the other regulators in the district," at which they discussed Stanford at
length.  Preuitt December 14, 2009 Testimony Tr. at 77-78.

**App. 801**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> know, I can't imagine that anything of any significance
> there would have been [discussed]."  I said, "Would you
> please reconsider[?]"  I needed the work.  But I wanted it to
> be ethical work.

Barasch Interview Tr. at 58-59.  Barasch stated that Connor called him back again and
told him that he could not represent Stanford on the SEC investigation, and that Barasch
then called Alvarado and relayed that decision.  *Id.* at 59-60.

Barasch further told the OIG that when Connor informed him that he was
prohibited from working on the Stanford investigation, Barasch "had done absolutely
nothing to that point," and that Alvarado had not yet asked him to do anything.  *Id.* at 59.
Barasch told the OIG that, as discussed above, what he described as a two-minute review
of a draft letter to the NASD "was the extent of [his] involvement with Stanford."  *Id.* at
59-60.[113]  As shown above, by the time he contacted Connor on November 27, 2006,
Barasch had already met with Stanford's General Counsel, participated in telephone
conferences with him and reviewed pertinent documentation, resulting in billings to
Stanford of approximately 12 hours.  *See* Exhibit 176.

It appears to the OIG that Barasch's representation of Stanford may have violated
the District of Columbia and Texas Bar rules of professional conduct.[114]  As discussed
above, the DC Bar's Rules of Professional Conduct state that "[a] lawyer shall not accept
other employment in connection with a matter which is the same as, *or substantially
related to*, a matter in which the lawyer participated personally and substantially as a
public officer or employee."  District of Columbia Rule of Professional Conduct 1.11
(emphasis added).  *See* Exhibit 48.[115]  The Texas Disciplinary Rules of Professional
Conduct state that "a lawyer shall not represent a private client in connection with a
matter in which the lawyer participated personally and substantially as a public officer or

---

[113]   Barasch told the OIG that Alvarado had set up a phone call with Sjoblom and him "to talk about the
case, "but he was in Dubai on a case and couldn't make the call."  Barasch Interview Tr. at 59.  So,
according to Barasch, they "never had the call."  *Id.*  Sjoblom sent an e-mail to Barasch and Alvarado on
December 6, 2006, containing dialing instructions for a conference call.  December 6, 2006 E-mail from
Thomas Sjoblom to Spencer Barasch and Mauricio Alvarado, attached as Exhibit 192.  Barasch replied,
"What day?  I am in [D]ubai through [F]riday," and Alvarez responded, "Please call me when you come
back."  *Id.*

[114]   Barasch is admitted to practice law in both the District of Columbia and the State of Texas.  *See*
Barasch biography, attached as Exhibit 193.

[115]   The inquiry under Rule 1.11 "is a practical one asking whether the two matters substantially overlap."
*In re Sofaer*, 728 A.2d 625, 628 (D.C. 1999)(footnote omitted).  The D.C. Court of Appeals noted as
follows regarding the language of Rule 1.11:  "By announcing an approach that deems transactions
substantially related if the former government attorney may have had access to any information that could
be useful – not just legally relevant – in the later transaction . . . we have broadened the scope of the
substantially related test for revolving door purposes."  *Brown v. District of Columbia Board of Zoning
Adjustment*, 486 A.2d 37 (D.C. 1984)(quotations and parenthetical omitted).

**App. 802**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General.  Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

employee, unless the appropriate government agency consents after consultation." *See* Exhibit 47.[116]  Accordingly, the OIG is referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Office of Bar Counsel for the District of Columbia and the Chief Disciplinary Counsel for the State Bar of Texas.

### D.    Immediately After the SEC Sued Stanford on February 17, 2009, Barasch Again Sought to Represent Stanford, This Time in the Litigation

Despite having had significant responsibility for delaying the initiation of an SEC investigation into Stanford's Ponzi scheme for seven years and having been advised by the SEC's Ethics Office on two separate occasions that he could not represent Stanford in connection with the SEC's investigation, on the very day that the SEC filed its action against Stanford, Barasch contacted the SEC's Ethics Office a third time in an effort to represent Stanford.

On February 17, 2009, Barasch sent an e-mail to Connor, stating:

> I hope this e-mail finds you well and that you are surviving all the turmoil on Wall Street.
>
> I have a conflict related question [f]or you, where time is of the essence.  It involves the Stanford matter filed by the Fort Worth office today that has been all over the news.
>
> Would you please call me the first chance you get:  if I am not in my office you can try my cell anytime, . . . .

February 17, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 194.

Connor stated that he could not recall another occasion on which a former SEC employee contacted his office on three separate occasions trying to represent a client in the same matter.  Connor Testimony Tr. at 27.

---

[116]   In contrast to the Texas and District of Columbia rules of professional conduct, with the exception of the one-year ban, federal conflicts-of-interest statutes do not *per se* prohibit a former SEC employee from representing a party in connection with a matter in which he or she participated while employed at the SEC. Instead, the federal statutes impose a narrower ban on former government employees against knowingly make a communication or appearance before an officer or employee of a federal agency or court on behalf of another person in connection with a particular matter (A) in which the United States is a party or has a direct and substantial interest, (B) in which the person participated personally and substantially as an officer or employee, and (C) which involved a specific party or parties at the time of the participation.  18 U.S.C. § 207(a)(1).  "Behind-the-scenes assistance" is not prohibited, "provided that the assistance does not involve a communication to or an appearance before an employee of the United States."  5 C.F.R. § 2641.201(d)(3).

**App. 803**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

Connor testified:

> [I]t struck me as unusual that [Barasch] would be coming
> back for a matter that obviously he would have known that
> he had been told he couldn't participate in the matter . . .
> on two [previous] occasions.

*Id.* at 44-45.

Barasch described the circumstances of his third request to represent Stanford as follows:

> 2009 the whole thing[] blows up.  Every lawyer in Texas
> and beyond is going to get rich over this case.  Okay?  And
> I hated being on the sidelines.  And I was contacted right
> and left by people [to] represent them.

Barasch Interview Tr. at 61.[117]

On February 19, 2009, Prescott e-mailed Connor, "I tried to return your call last evening, but missed you.  Since then, I found an old e-mail that I think pertains to the question being raised. I will forward it to you."  *See* February 19, 2009 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit 195.  Prescott then forwarded to Connor the e-mail she had sent him on December 13, 2006, in connection with the last time Barasch had sought clearance to represent Stanford.  February 19, 2009 E-mail from Victoria Prescott to Richard Connor, attached as Exhibit 196.  Connor replied to Prescott, "Thanks for your help. This is all we need for now."  February 19, 2009 E-mail from Richard Connor to Victoria Prescott, attached as Exhibit 196

Connor testified that ". . . Barasch was upset with [the Ethics Office's] decision [that he could not represent Stanford]. . . .  He . . . strongly argued that the matter currently in 2009 was new and was different and unrelated to the matter that had occurred before he left."  Connor Testimony Tr. at 27.  In a February 23, 2009 e-mail to Connor, Barasch disagreed with the SEC's position that he could not represent Stanford in the SEC litigation because of his past involvement in the SEC matter.  *See* February 23, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 197.  Barasch cited statements in the press by Stephen Korotash, Associate Regional Director of the FWDO Enforcement group, that "[t]he current S.E.C. charges stem from an inquiry opened in

---

[117]   Barasch explained that "this [was] four years after he left the Commission" and he did not think "this would be a matter that would still be lingering…"  Barasch Interview Tr. at 61.

**App. 804**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before
disclosure to third parties.  No redaction has been performed by the Office of Inspector General.
Recipients of this report should not disseminate or copy it without the Inspector General's approval.

October 2006 after a routine examination of Stanford Group"[118] in support of his
argument as follows:

> Please review the information noted below, and then I
> would like to talk with you as soon as reasonably possible.
> With all due respect to the persons with whom you are
> dealing in the FWDO, I don't think they have their facts
> and information correct.  I left the Commission on April 15,
> 2005, more than one year before the SEC's Associate
> Director in charge of "this matter" has publicly
> acknowledged that "this matter" arose. (although irrelevant
> here, I reiterate that to the extent that there was a "prior
> matter," I had no involvement in it, either).
>
> Rick, the Commission seems to be taking a different
> position on the date of "this matter" with me than it appears
> to be taking publicly.  Maybe I am missing something, but
> it seems pretty self-evident to me that there is no conflict in
> this matter.  I have copied my firm's General Counsel, who
> is in agreement with me.

*Id.*

In his OIG interview, Barasch described the basis for his belief at the time that the
SEC action must have been unrelated to any matters that he had been involved with while
at the SEC, as follows:

> . . . I said, "Hey, Rick.  This is a new matter.  I'd like to
> work on it.  I don't know how or what, yet, but I'm getting
> lots and lots of calls." . . .  And then somewhere right about
> that time, right then the staff is getting slammed in Fort
> Worth for, you know, why did it take so long.  And the
> question was when did this thing start.  When did this
> matter start, and Steven Korotash . . . [was] quoted in the
> "Journal" and the "Times."  "This matter didn't start until
> 2006."  There's a quote.  . . .  So I send [the articles] to
> Rick, and I go, "Hey, here's my proof, and this is a new
> matter.  It's right there."  Steve [Korotash] says, "This

---

[118]  *See* Clifford Krauss, Phillip L. Zweig and Julie Creswell, *Texas Firm Accused of $8 Billion Fraud*, The
New York Times, February 17, 2009, attached as Exhibit 198.  Barasch also cited a Wall Street Journal
article in support of his argument that he did not have a conflict representing Stanford in the SEC litigation.
*See* Glenn R. Simpson, Dionne Searcey and Kara Scannell, *Madoff Case Led SEC to Intensify Stanford
Probe*, Wall Street Journal, February 19, 2009, attached as Exhibit 199.

**App. 805**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

> matter started in '06."  That was a year after I left.  So the way I see it, I could work on it.

Barasch Interview Tr. at 61-62.  Barasch told the OIG that Connor called him and responded:

> . . . I don't remember the words he used, but it was something along the lines that Steven misspoke. . . .  And that the matter really did go back before that . . . .  So what was left out there in the press was '06, but he was telling me it was something earlier, and I wasn't going to argue with him.  I didn't want to embarrass his staff or Steve, or anything, so I just absolutely dropped it.

*Id.* at 62-63.[119]

> Subsequently, on March 9, 2009, Barasch e-mailed Connor as follows:

> Based on our last conversation on this issue, it is my understanding that the Commission's position is that I have a conflict and should not participate in "the SEC matter" in which I allegedly participated back in 2005.  To the extent that my firm participates in "that SEC matter," I will be walled off ….  I am writing to let you know that I am intending to participate, on behalf of one or more former Stanford employees (who, by the way, joined Stanford after 2005), in different matters, specifically private litigation and/or regulatory inquiries by a State securities regulator. Please advise asap if you believe that this presents any issues.

March 9, 2009 E-mail from Spencer Barasch to Richard Connor, attached as Exhibit 200.

---

[119]    Connor disagreed with Barasch's position that the matter began in 2006, testifying as to his perspective as follows:

> [T]he matter did not start in 2006, and I don't know exactly what the basis was for [Korotash] to say that it did.  But from our perspective, from the ethics perspective, the matter had clearly started long before that.  It had started back when Mr. Barasch was here, and it was a continuation of the same matter.  It was a matter involving, among other things, a Ponzi scheme by Stanford, and that . . . matter had started much earlier and had continued as the same matter right up to the time we were talking.

Connor Testimony Tr. at 26.

**App. 806**

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

Connor responded:

> Your participation in the other Stanford matters does not
> violate the post-employment laws.  Your prohibition
> applies only to appearing before or communicating with the
> federal government in connection with the same matter that
> you participated in while at the SEC.

March 10, 2009 E-mail from Richard Connor to Spencer Barasch, attached as Exhibit 200.

## CONCLUSION

The OIG investigation found that the SEC's Fort Worth office was aware since 1997 that Robert Allen Stanford was likely operating a Ponzi scheme, having come to that conclusion a mere two years after SGC, Stanford's investment adviser, registered with the SEC in 1995.  We found that over the next eight years, the SEC's Fort Worth Examination group conducted four examinations of Stanford's operations, finding in each examination that its sale of CDs through SIB could not have been "legitimate," and that it was "highly unlikely" that the returns Stanford claimed to generate could have been achieved with its purported conservative investment approach.  While the Fort Worth Examination group made multiple efforts after each examination to convince Enforcement to open and conduct an investigation of Stanford, no meaningful effort was made by Enforcement to investigate the potential fraud, or to bring an action to attempt to stop it, until late 2005.

Moreover, the OIG investigation found that even at that time, Enforcement missed an opportunity to bring an action against SGC for its admitted failure to conduct any due diligence regarding Stanford's investment portfolio, which could have potentially completely stopped the sales of the SIB CDs through the SGC investment adviser, and provided investors and prospective investors notice that the SEC considered SGC's sales of the CDs to be fraudulent.  The OIG investigation found that this particular type of action was not considered, partially because the new head of Enforcement in Fort Worth was not apprised of the findings in the investment advisers' examinations in 1998 and 2002, or even that SGC had registered as an investment adviser, a fact she learned for the first time in the course of this OIG investigation in January 2010.

The OIG did not find that the reluctance on the part of the SEC's Fort Worth Enforcement group to investigate or recommend an action against Stanford was related to any improper professional, social or financial relationship on the part of any former or current SEC employee.  We found evidence, however, that SEC-wide institutional influence within Enforcement did factor into the repeated decisions not to undertake a full and thorough investigation of Stanford, notwithstanding staff awareness that the potential fraud was growing.  We found that senior Fort Worth officials perceived that

**App. 807**

**This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties.  No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.**

they were being judged on the numbers of cases they brought, so-called "stats," and communicated to the Enforcement staff that novel or complex cases were disfavored.  As a result, cases like Stanford, which were not considered "quick-hit" or "slam-dunk" cases, were not encouraged.

The OIG's findings during this investigation raise significant concerns about how decisions were made within the SEC's Division of Enforcement with regard to the Stanford matter.  We are providing this Report of Investigation ("ROI") to the Chairman of the SEC with the recommendation that the Chairman carefully review its findings and share with Enforcement management the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, if applicable) is taken, on an employee-by-employee basis, to ensure that future decisions about when to open an investigation and when to recommend that the Commission take action are made in a more appropriate manner.

The OIG is also recommending that the Chairman and the Director of Enforcement give consideration to promulgating and/or clarifying procedures with regard to:

     (1)    the consideration of the potential harm to investors if no action is taken as a factor when deciding whether to bring an enforcement action, including consideration of whether this factor, in certain situations, outweighs other factors such as litigation risk;

     (2)    the significance of bringing cases that are difficult, but important to the protection of investors, in evaluating the performance of an Enforcement staff member or a regional office;

     (3)    the significance of the presence or absence of United States investors in determining whether to open an investigation or bring an enforcement action that otherwise meets jurisdictional requirements;

     (4)    coordination between the Enforcement and OCIE on investigations, particularly those investigations initiated by a referral to the Enforcement by OCIE;

     (5)    the factors determining when referral of a matter to state securities regulators, in lieu of an SEC investigation, is appropriate;

     (6)    training of Enforcement staff to strengthen their understanding of the laws governing broker-dealers and investment advisers; and

     (7)    emphasizing the need to coordinate with the Office of International Affairs and the Division of Risk, Strategy, and Financial Innovation, as appropriate, early

**App. 808**