This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.

in the course of investigations in which relevant documents, individuals, or entities are located abroad.

    The OIG investigation also found that the former head of Enforcement in Fort Worth, Spencer Barasch, who played a significant role in multiple decisions over the years that quashed the investigations of Stanford, sought to represent Stanford on three separate occasions after he left the Commission, and in fact represented Stanford briefly in 2006 before he was informed by the SEC Ethics Office that it was improper to do so. Because the OIG found that Barasch's representation of Stanford appeared to violate state bar rules that prohibit a former government employee from working on matters in which that individual participated as a government employee, we are referring this Report of Investigation to the Commission's Ethics Counsel for referral to the Bar Counsel offices in the two states in which he is admitted to practice law.

**Submitted:** [OIG Staff 1 redacted]     **Date:** [PII redacted]

**Concur:** [OIG Staff 2 redacted]     **Date:** [PII redacted]

**Approved:** /s/ H. David Kotz     **Date:** 3·31·10

# KVT-7

This document is subject to the provisions of the Privacy Act of 1974, and may require redaction before disclosure to third parties. No redaction has been performed by the Office of Inspector General. Recipients of this report should not disseminate or copy it without the Inspector General's approval.



# REPORT OF INVESTIGATION

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
OFFICE OF INSPECTOR GENERAL

Case No. OIG-526

Investigation of the SEC's Response to Concerns
Regarding Robert Allen Stanford's Alleged Ponzi Scheme

Appendix, Volume III

March 31, 2010

# EXHIBIT 49

STANFORD GROUP COMPANY
5056 Westheimer, Suite 605
Tel. No. (713) 964-8300
Houston, Texas 77056

File No. 8-48611   CRD No. 39285
Examination No. 06-D-97-037

EXECUTIVE SUMMARY

Rule 17a-4   Failure to maintain books and records.

Rule 10b-5    Possible misrepresentation and misapplication of customer funds.

COMMENTS

Stanford Group Company ("Stanford Group"), a member of the NASD Regulation, Inc., has been registered with the Commission since September 1995. The firm is also a registered investment advisor (File no. 801-50374). Stanford Group is owned by Allen Stanford ("Stanford") who also owns several affiliated companies. Two such companies include Stanford International Bank ("SIB"), an offshore bank located in St. John's, Antigua, West Indies, and Stanford Financial Group ("SFG") headquartered in Houston, Texas. Stanford is not involved in the day to day operations of the firm and is not registered as a principal. [b)(6), (b)(7)c] is the firm's president and one of six registered principals of the firm.

Stanford Group operates pursuant to the (k)(2)(ii) exemption to Rule 15c3-3 and is required to maintain net capital of $250,000. As of July 31, 1997, the firm had net capital of $9,011,027 with excess net capital of $8,761,027. Aggregate indebtedness totaled $532,485.

Stanford Group conducts a general securities business through a fully disclosed clearing arrangement with Bear Stearns Securities Corp. The firm also offers two money management programs to its clients.[1] The firm has generated $6,101,346 in revenues from January 1, 1997 through July 31, 1997. The three primary sources of revenue include referral fees from SIB (68%), advisory fees (8%) and gains on investments (4%). The firm has five branch offices and 66 employees, of which 25 are registered representatives. The firm has approximately 2,000 (1,200 foreign) customer accounts and writes approximately 250 tickets each month.

---

[1]The Master Fund Program ("MFP") offers discretionary managed accounts for those clients invested in mutual funds the Master Manager Program ("MMP") offers discretionary managed accounts by outside third-party managers.

**App. 813**

EXAMINATION

The FWDO conducted a surveillance examination of Stanford Group in August 1997. Four and one half staff days were spent in the field. Three staff days were spent on the review of sales practices.

We conducted an entrant interview with [(b)(6), (b)(7)c] chief executive officer, and [(b)(6), (b)(7)c], operations manager. We furnished them with the FOIA and Privacy Act Notices. The signed receipt of acknowledgement is included in the work papers.

FINDINGS

Possible Misrepresentations - Rule 10b-5

As noted earlier, Stanford Group is affiliated through common ownership with SIB, an offshore investment bank. Stanford Group has a written agreement with SIB wherein Stanford Group refers its foreign customers to SIB. SIB pays a recurring annual 3.75% referral fee to Stanford Group on all deposits referred to SIB.[2] SIB offers several types of products including the FlexCD Account which makes up 96% of all cash deposits at SIB. The FlexCD Account requires a minimum balance of $10,000, has maturities and annual interest rates ranging from 1 month at 7.25% to 36 months at 10%, and withdrawals of up to 25% of the principal amount are allowed without penalties with a five day advance notice. As of July 31, 1997, Stanford Group was due referral fees of $958,424 which is based on customer deposits at SIB of $306,695,545 (75% of all deposits at SIB).

SIB promotes its products as being safe and secure. A brochure regarding the products offered through SIB, including the FlexCD Account, states that "[F]unds from these accounts are invested in investment-grade bonds, securities and Eurodollar and foreign currency deposits." The brochure indicates a high level of safety for customer deposits. For example: "banking services which ensure safety of assets, privacy, liquidity and high yields", "...protects its clients' money with traditional safeguards", "placing deposits only with banks which have met Stanford's rigorous credit criteria", "depository insolvency bond", "bankers' blanket bond", and "portfolio managers follow a conservative approach". Based on the amount of interest rate and referral fees paid, SIB's statements indicating these products to be safe appear to be misrepresentations.

SIB pays out in interest and referral fees between 11% and 13.75% annually. To consistently pay these returns, SIB must be

---

[2]During 1996, the referral fee was 5%.

investing in products with higher risks than are indicated in its brochures and other written advertisements.

Because SIB is a foreign entity, we were unable to gain access to SIB's records.

### Item of Interest - Addition to Capital

During 1996, Stanford made a cash contribution of $19,000,000 to Stanford Group. We are concerned that the cash contribution may have come from funds invested by customers at SIB. We noted that SIB had loaned Stanford $13,582,579. In addition, we noted that SFG had borrowed $5,447,204 from SIB for a total receivable at SIB of $19,029,783 directly and indirectly from Stanford. We contacted the general counsel for the Stanford companies regarding our concerns. The general counsel stated that the cash contribution came from personal funds and not from the above loans; however, it seems at least questionable whether Stanford has access to $19,000,000 in personal funds.

### Maintenance of Books and Records - Rule 17a-4

Stanford Group failed to maintain books and records as they relate to the offer and sale of SIB products. Lena Stinson ("Stinson"), senior vice president and administrative officer, stated that the firm only refers clients to SIB and receives a referral fee. Stinson stated that the client is the customer of SIB and not Stanford Group. From our discussions with Stinson, the RR informs the client of the SIB products (usually the FlexCD) and prepares an application which is sent to SIB for their approval. Once approved, the client sends the funds directly to SIB who then confirms the deposit. Stinson stated that once the application is sent, the RR is no longer involved (other than receiving a referral fee) and all paperwork is maintained by SIB. It appears that the RR is recommending a particular product of SIB's and therefore should have a basis for making that recommendation (i.e., a new account form containing, among other things, financial information and investment objectives). In addition, since the RR is recommending the purchase of a product, an order ticket, confirmation, and purchase and sales blotter should be maintained.

### OTHER ITEMS REVIEWED

### Customer Account Review

We reviewed the activity in 35 customer accounts for suitability, churning, and profit and loss. Our review noted no discrepancies.

3

**App. 815**

Chinese Wall Procedures

We examined the adequacy of the firm's Chinese Wall and overall supervisory procedures to prevent and detect insider trading by accounts of the firm, employees and customers. The firm's procedures appear to be reasonably designed to prevent such misuse given the nature of the firm's business.

Currency and Foreign Transactions

Prior to our examination, we accessed the IRS CTR database and found no reports on file for the firm. Our on-site review of the firm's bank statements, bank reconciliations, deposit slips and checks received and delivered blotter from February 1997 through July 1997 disclosed no currency transactions. We found no foreign accounts involving the receipt/delivery of securities or currency from/to foreign locations.

RECOMMENDATION

We will send a deficiency letter to the firm citing their failure to maintain adequate books and records.

We will provide a copy of our report to the FWDO Division of Enforcement for their review and disposition.

4

# KVT-8

# EXHIBIT 5

Page 1

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:        )
                         ) File No. OIG-526
OIG-526                  )

WITNESS:  Witness No. 1
PAGES:    1 through 95
PLACE:    Securities & Exchange Commission
          801 Cherry Street
          Burnett Plaza, Suite 1900
          Fort Worth, Texas   76102

DATE:     Monday, December 14, 2009

The above-entitled matter came on for hearing, pursuant to notice, at 10:50 a.m.

Diversified Reporting Services, Inc.
(202) 467-9200

COPY

```
                                                           Page 2
 1   APPEARANCES:
 2
 3
 4   On behalf of the Securities and Exchange Commission:
 5
 6        H. DAVID KOTZ, Inspector General
 7        [redacted (b)(6), (b)(7)c]
 8        [redacted]
 9        [redacted]
10        Securities and Exchange Commission
11        100 F Street, NE
12        Washington, D.C.  20549
13        (202) 551-6037
14
15
16
17
18
19
20
21
22
23
24
25
```

1  Q   Okay. And do you remember how you first heard
2  about that in August of '97?
3  A   Yes. I had taken it upon myself, and I became the
4  branch chief to become familiar with all of the registrants
5  in the area. And so this was going to be really a two-fold
6  process that was -- I thought was going to be very helpful
7  for selecting examinations and becoming familiar.
8       And one of those is -- and policy to review all of
9  the annual audits as they came in. One, you got to know what
10 the firm was like; and, two, you identified problems that --
11 in their annual audits, a wealth of information that would
12 target -- would make them a good target for examinations.
13      So Stanford -- I think their fiscal year-end is in
14 June, or at least it used to be. Anyway, it came in -- I was
15 reviewing the audit and became very concerned in terms it had
16 only been open for two years; and the firm had gone from very
17 little revenue to an incredible amount of revenue in a very
18 short time period, which is very unusual.
19      MR. [redacted]: I'm sorry, which audit were you
20 reviewing?
21      THE WITNESS: This is -- there is an annual audit
22 that's reviewed to be filed, and I can't remember the form
23 name.
24      MR. [redacted] Okay.
25      THE WITNESS: X5A. I don't know.

1    But all broker-dealers have to file an annual
2 audit, and we get a copy of every one of these in the office.
3 So in reviewing that, I noticed that it was very odd to have
4 the revenues go like that.
5    Secondly, in CD's -- I mean, CD's typically --
6 people get $10 for selling a CD. I had seen a few jumbo CD's
7 where people had gotten $50. But usually when a
8 broker-dealer sells a CD, it's a come-on to get people in the
9 door. And they try to then steer them to some other product
10 either in addition to or instead of the CD. So all of those
11 revenues from CD's was extraordinary, so I scheduled an exam.
12    BY MR. KOTZ:
13 Q    Uh-huh. So did you suspect that these matters that
14 you found which were unusual or extraordinary could be
15 related to fraud?
16 A    Yes.
17 Q    Okay. So was this a cause examination?
18 A    I'm not sure that we -- I mean, I have to look at
19 it. I'm not sure if it was cause because usually if I found
20 a reason to do an exam, I would also then look to see if
21 there was a potential oversight of FINRA or NASD at the time
22 because you would need to do so many of those. So you would
23 try to -- even if I had a cause reason, try to also do an
24 oversight of FINRA'S activities.
25    THE WITNESS: You're looking like there's something

1  nonsensical about my answer.

2  MR. [b)(6), (b)(7)c]: Oh, me? Oh, I wouldn't take my
3  expression to mean anything. No, no, I'm just thinking in
4  general.

5  THE WITNESS: Well, I may not be explaining enough
6  about the background. That's why I wanted to make sure of
7  it.

8  MR. [b)(6), (b)(7)c]: Yeah, not at all. Not at all.

9  THE WITNESS: Yeah.

10  BY MR. KOTZ:

11  Q  **They call it a surveillance exam.**

12  A  Oh.

13  Q  Is that --

14  A  Well, then surveillance -- when I did a
15  surveillance, that means that there was no oversight. I
16  didn't know if it was fraud or not. Usually at that time, if
17  it were fraud -- if we called it cause, I'd have a specific
18  complaint.

19  Q  Uh-huh.

20  A  This, I didn't have a complaint. I didn't have any
21  information like that. It just looked, for lack of a better
22  word, "hinky." It looked like that there was a problem, so I
23  called it a surveillance.

24  Q  Okay. But, I mean, it was clear it was not kind of
25  a routine exam. It was an exam that you initiated because

1  you were concerned about possible fraud?

2  A  Yes.

3  Q  Okay. Okay.

4  A  Very undefined and indistinct, but there was
5  something unusual here that we needed to look at.

6  Q  Okay. Now, were you aware at the time that there
7  had been a Texas State Securities Board examination --

8  A  No.

9  Q  -- as well? Okay. Did you learn that later?

10  A  Actually, I learned that last week.

11  Q  Okay. And so in the end, it was your decision to
12  initiate this examination?

13  A  Yes.

14  Q  Okay. And did you have to run that by anybody?

15  A  No.

16  Q  Okay. And how did you decide -- or did you decide
17  who would be conducting the examination?

18  A  I am the one that decided who was going to go, and
19  this is where it becomes uncomfortable; but I had the most
20 * confidence in [(b)(6), (b)(7)c] for the examiners. He probably was
21  also available, and that helped; but he was a very good
22  examiner.

23  Q  Okay. And was it based on his experience that you
24  had the most confidence in him or his general work?

25  A  Well, experience is helpful. But many people have

1   a lot of experience, but they don't necessarily have very
2   good judgment. And [(b)(6), (b)(7)c] had excellent judgment.
3       Q    Okay. Great.
4       MR. [(b)(6), (b)(7)c]: So why did that make you
5   uncomfortable? I guess, it seems --
6       THE WITNESS: Because I don't want to be impugning
7   the other examiners. That's not something I'm anxious to
8   see.
9       MR. KOTZ: Okay. Well, let's focus just on the
10  fact that you wanted [(b)(6), (b)(7)c]. Okay. We're going to show you
11  a copy of the exam report and then ask you some questions
12  about it.
13      I'll mark this as Exhibit 2. This is -- it says on
14  the top, "Stanford Group Company, 5056 Westheimer, Suite
15  605." And it's a four page document, marked as Exhibit 2.
16                      (Exhibit Number 2 was marked
17                       for identification.)
18      BY MR. KOTZ:
19      Q    Do you recognize this document?
20      A    Yes, I do.
21      Q    Okay. And is it the exam report for the exam we
22  were just discussing?
23      A    Yes, it is.
24      Q    Okay. Who drafted this report?
25      A    [(b)(6), (b)(7)c].

```
 1      Q    Okay.  Did you review it?
 2      A    Yes.
 3      Q    Okay.  You signed off on it?
 4      A    Yes.
 5      Q    And what about Mary Lou Felsman?  Did she look at
 6   it at all?  Did she play a role?
 7      A    She would also look at the examinations.  I would
 8   review it and sign off on it and give it to Mary Lou.  And
 9   sometimes she had comments, and sometimes not.
10      Q    Okay.  You don't remember what happened in this
11   case?
12      A    No, I don't.
13      Q    Okay.  Do you remember if you and (b)(6), (b)(7)c had any
14   differences of opinion or substantial comments or --
15      A    No.  His judgment was wonderful.  I remember
16   looking at the documents because this was very serious, and I
17   wanted to feel very comfortable with what -- what we were
18   alleging in here.  So we did definitely spend time reviewing
19   the documents that he used to come to these conclusions so
20   that we could prepare to discuss it with Mary Lou.
21      Q    Okay.  And did anybody in the SEC Washington's
22   office, would they get a copy or look at this report?
23      A    They would when it was completed.  We would send
24   them a copy.
25      Q    Okay.  Do you know who in Washington might have
```