1    sales practices," what exactly does that mean?

2        A    Well, that can be very broad.  It can be really

3    anything besides looking at the financials, essentially.

4    Much of that would involve looking at the activity and

5    customer accounts, the supervision of the activity in those

6    accounts, the type of products that were being sold, the

7    appropriateness of those products.

8        Q    Okay.  Was the Stanford Group Company cooperative

9    in connection with his examination?

10       A    I don't specifically recall except for from reading

11   the report.  You know, we didn't feel like we could get any

12   information regarding the actual bank.

13       Q    And how come you felt that way?

14       A    The specifics as to why I felt that way, I --

15       Q    Okay.

16       A    -- I don't recall.  I remember feeling that way,

17   but I don't remember why.

18       Q    Okay.  Were there any specific documents or

19   information that you were trying to get in the examination

20   that they were unable to get or that was refused?

21       A    Is that mentioned in the report?  I don't

22   specifically recall that.

23       Q    Okay.

24       A    Oh, well, we did want more information, I believe,

25   regarding the -- the money, the addition to capital.  And I'm

Page 23

1    sure you'll have discussion with [redacted], and he could

2    probably -- he was down there talking with them.  So he

3    reme- -- may remember the specifics, but we were really

4    concerned about this.  And we didn't feel like we could get

5    the information regarding the origins of those funds.

6         Q    Okay.  And why were you unable to get that

7    information?  The company wouldn't give it to you?

8         A    I don't recall the specifics.  I assume that's why

9    but --

10        Q    Okay.  Let me ask you some questions about the

11   specifics of this report --

12        A    Okay.

13        Q    -- Exhibit 2.  So under "Findings, Possible

14   Misrepresentations, Rule 10b-5," it talks about the fact that

15   SIB pays a recurring annual 3.75 percent referral fee to

16   Stanford Group.  And then there is a footnote that says

17   "During 1996, the referral fee was 5 percent."

18             And then the last line of Page 2 of Exhibit 2, it

19   says "SIB pays out in interest and referral fees between 11

20   percent and 13.5 percent annually."

21             Do you know for how long a period that this was

22   going on where they were paying out on these CD's between 11

23   percent and 13.75 percent annually?

24        A    I don't recall.  I do know the firm started a

25   business in 1995, so I assumed it was related from 1995 on

Page 24

1    because --

2         Q    Okay.

3         A    -- that was my focus.

4         Q    Okay.  And it says in this report, again, on Page 2

5    of Exhibit 2, "SIB promotes its products as being safe and

6    secure."  And then it references the brochure which talks

7    about investment-grade bonds, ensure safety of assets,

8    traditional safeguards, a conservative approach.

9              And then it says here, "Based on the amount of

10   interest rate and referral fees paid, SIB's statements

11   indicating these products to be safe appear to be

12   misrepresentations."

13             So was the conclusion of this examination that SIB

14   could not be paying out fees between 11 percent and 13.75

15   percent annually using such safe and secure investments?

16        A    That's correct.

17        Q    And so did you or [redacted] contemplate the

18   responsibility that SIB was not actually investing these

19   monies in these CD's but perhaps was engaged in some sort of

20   Ponzi scheme or other fraud?

21        A    That's correct.

22        Q    Okay.  I mean, we -- do you have a sense at the

23   time of how unusual it was to have a CD with 11 percent to

24   13.75 percent of returns?

25        A    I don't recall what returns were at 1997, but I do

1    recall thinking this was absolutely ludicrous.

2        Q    Okay.  And why -- why do you say it was ludicrous?

3        A    Because legitimate CD's do not pay that much over

4    market.

5        Q    Okay.

6        A    And the legitimate CD's do not also pay continuing

7    ongoing referral fees and certainly not ones of this size and

8    volume.  It was, in my mind, impossible that this was a CD.

9        Q    Okay.

10            MR. [(b)(6), (b)(7)c]:  Do you know what the market return

11   rate was at the point of comparison around that time?

12            THE WITNESS:  No.

13            BY MR. KOTZ:

14       Q    But you understood that these CD's that were paying

15   out between 11 percent and 13.75 percent was significantly

16   above market at that time?

17       A    Yes.  Well, this is interest and referral fees

18   together --

19       Q    Right.

20       A    -- meaning it would have to pay 11.  Yes, I -- I

21   understood that to be, as I said, ludicrous, fantastical,

22   impossible.

23       Q    Right.  And isn't it the case that if they were

24   paying the customers between 11 percent and 13.75 percent,

25   they must have been generating more than that for them to

1    make money, right, so in fact that returns were at least a

2    few percent above 11 and 7 -- 13.75?

3       A    Well, the interest rate -- again, when we use the

4    11 to 13.75, that's the interest rate plus referral fee to

5    the broker, correct.  And then the bank itself would have to

6    make even more.  You know, what are they -- I don't know what

7    a spread is for a bank; but if it was just even one percent,

8    now you're looking nearly 15 percent annually on a

9    conservative investment, which is -- I can't think of enough

10   words to describe how --

11      Q    It's -- would you say it's impossible?

12      A    Yeah.

13      Q    And then there's another item if you look on Page 3

14   of Exhibit 2, it says "Item of interest, Addition to Capital.

15   During 1996, Stanford made a cash contribution of $19 million

16   to Stanford Group.  We are concerned that the cash

17   contribution may have came from funds invested by customers

18   at SIB."

19           This fact that there was this very large cash

20   contribution and that the cash contribution may have come

21   from funds invested by customers, was that a red flag, as

22   well?

23      A    Yes.  I assumed he was possibly stealing from

24   investors.

25      Q    Okay.  And that -- would that be a -- an attribute

1    of Enforcement to investigate this company for possible fraud

2    based on what you found in the examination?

3        A    That's correct.

4        Q    And that fraud would potentially include a Ponzi

5    scheme, but it wouldn't necessarily be limited to a Ponzi

6    scheme?

7        A    That's correct.

8        Q    Okay.  Let me show you another document.

9            MR. KOTZ:  I'm going to mark it as Exhibit 3.

10                              (Exhibit Number 3 was marked

11                               for identification.)

12           BY MR. KOTZ:

13       Q    This is an Office of Compliance Inspection and

14   Examinations Super Tracking and Reporting Systems, STARS.

15   And it's a five page document.  Do you recognize this

16   document, Exhibit 3?

17       A    I have seen a document like this before.

18       Q    Okay.  Do you know what it is?  It looks like some

19   kind of printout.

20       A    Yes, just a printout giving some basic information

21   regarding particulars on the examination.

22       Q    Okay.  So what is the STARS system?

23       A    It's just a system where we keep track of exams

24   that we started, when they were closed, a disposition, you

25   know, various different statistics that would want to keep

Page 32

1    regarding each examination.

2         Q    Okay.  It looks like there's a -- just a mistake

3    there on the front page where it says "Afghanistan"?

4         A    Yeah, there were -- there were a while where there

5    was a -- some kind of glitch in it.  And if you -- and it

6    would just stick in Afghanistan.  We had a number at the time

7    that did that.  It was --

8         Q    But it was --

9         A    -- fantastical.  We didn't -- we live in Texas.  We

10   had no idea that we had be seated to Afghanistan.

11        Q    Okay.  So that was just a mistake; is that right?

12        A    Yes.

13        Q    Okay.  All right.  If you look at the last page,

14   Page 5 of this document, the STARS printout, Exhibit 3, it

15   says "Violations Description, possible misrepresentation,

16   possible Ponzi scheme."  Do you see that?

17        A    Yeah.

18        Q    Do you know who would have put that in?  Would that

19   have been you or (b)(6), (b)(7)c ?

20        A    It probably wouldn't have been (b)(6), (b)(7)c .  I don't --

21   I don't remember.

22        Q    Okay.  And it might have been you?

23        A    It might have been me.

24        Q    Okay.  A question for you, if you look at the exam

25   report, which we marked as Exhibit 2, it talks about possible

Page 35

1      A      In discussions with Enforcement, they seemed to

2   believe that that was a concern and maybe limited our

3   interests.

4      Q      **Why was that?**

5      A      It was never clear to me.

6      Q      **So in your view, if there is a company of which the**

7   **SEC has jurisdiction, then they are engaged in fraud of**

8   **people outside the United States, that would still be**

9   **something that the SEC should look at?**

10     A      Absolutely.  I -- I don't -- people may have tried

11  to explain it to me; but at the end, I -- I couldn't

12  understand, why would it matter; we have a U.S. broker-dealer

13  engaged in fraud.

14     Q      **We want to stop him from ripping everybody off,**

15  **even if they're not only ripping U.S. citizens, right?**

16     A      Absolutely.

17     Q      **Okay.  And do you remember who -- who did you have**

18  **those conversations with?**

19     A      No.  And that's why I've been crazy the last week

20  trying to remember the conversations.  I do -- and I

21  explained to ████████ , I go in and out.  And so my

22  memory --████████████████ , and this was sort

23  of one of the first big projects I worked on when I came back

24  after ████████ .  Not an excuse, but there's some things

25  I don't remember very well.

Page 42

1  examination?  We can give you the names of a couple of people

2  who worked on the investigation if that would help.

3       A    I know that the people that worked on the

4  investigation, and I -- it's like this blankness in my mind.

5  I remember when it was closed and that discussion.  I

6  remember multiple discussions with Mary Lou regarding the

7  fraud and the impossibility; but I don't recall talking about

8  this with ▓(b)(6), (b)(7)c▓        or ▓(b)(6), (b)(7)c▓ .

9       Q    Okay.  Let me ask you this.  How quickly after the

10  exam ended was the matter referred; do you remember?

11      A    It was referred immediately, but you'll see that

12  they didn't open anything for a long time.  Mary Lou actually

13  retired in January of 1998.  And I was a very young branch

14  chief that had virtually no experience managing people and

15  going through ▓(b)(6), (b)(7)c▓      , and I remember being very

16  scared that I was left alone to try to make this happen.

17      Q    Okay.

18      A    And after she left, I obviously kept pushing.  I

19  just can't recall because it took a long time to get anybody

20  to open something.  Was it March of '98 before they even

21  opened it?

22      Q    I believe it was May.  Let me ask you this.  You

23  said it was referred immediately.  So the examination start

24  date was August 25th, 1997.  The letter that was sent out

25  with the deficiencies was September 25th, 1997.  So when you

1    say immediately, during what time frame do you think it was

2    referred?

3        A    Either at or before September 25th.

4        Q    Okay.  And so how does it work when you refer

5    something?  What do you do, make a phone call, send a memo,

6    send an e-mail?

7        A    I live through many different administrations here

8    in terms of how that's handled.  I have --

9        Q    How was it handled then in 1997?

10       A    Yeah.  You call the head of Enforcement and send

11   them over a report, go down there and talk to them about it,

12   sell it.  If you can find an attorney that seemed interested,

13   that was usually the best way, to go get an attorney excited

14   about the case.  And then you could go present it to the head

15   of Enforcement; and not only do we have this great case, we

16   have an attorney that wants to work it.

17       Q    Uh-huh.  And so do you remember about how it worked

18   with respect to the referral that took place either on or

19   before September 25th, 1997 of the Stanford exam findings?

20       A    No.

21       Q    Okay.

22       A    I can tell you what I learned.

23       Q    Okay.

24       A    I learned about the process.  This is my first one

25   after I became branch chief, and I learned that you can't

Page 44

1    just send it over and periodically check or ask.  I learned

2    you have to be a tiger.

3         Q    Okay.  But at that time frame, you at least

4    remember that you sent it over and periodically --

5         A    They --

6         Q    -- asked about it?

7         A    They -- they had it.  And I know that I was more

8    aggressive than periodically asking about it.  I just -- I

9    mean, I do remember talking to [b)(6), (b)(7)c]          ; but I -- I

10   don't remember if it was about this case.  I -- I just don't

11   have memory.  I'm sorry.

12        Q    That's okay.  Do you remember what the reaction was

13   from the Enforcement folks?  Initially you said you had to

14   kind of -- you were pushing it.  So what was their -- what

15   was their pushback?

16        A    Well, I remember the concerns being that they were

17   non-U.S. citizens.  I remember -- I can't even tell you if I

18   remember them being concerned about it being a CD and them

19   calling it a CD.  I don't recall that.  The most significant

20   thing I remember at the time was it was a non-U.S. citizen.

21        Q    And so that was the reason that some folks in the

22   Enforcement gave for not wanting to conduct an investigation

23   of the Stanford findings?

24        A    Yes.

25        Q    Okay.

Page 45

1         A     Mary Lou Felsman has excellent memory at this time,

2    so she'll be a lot more helpful with you --

3         Q     Okay.

4         A     -- on this.

5         Q     Do you remember if there was any discussions about

6    the possibility that this was a Ponzi scheme with the folks

7    in Enforcement at that time?

8         A     I don't recall the specifics.  We all thought it

9    was a fraud.  It didn't matter if it was a Ponzi scheme, was

10   it a money laundering scheme.

11        Q     Now --

12        A     It was a scheme.

13        Q     All right.

14        A     And there was just no question in our minds it was

15   a scheme, and there was nobody that we ever didn't express

16   our opinion like that to.  Just the specifics, I --

17        Q     And do you remember if anyone in Enforcement ever

18   expressed to you that they didn't think it was a fraud?  Or

19   was it these -- these other considerations, like it didn't

20   affect U.S. citizens?

21        A     It was always about other barriers.  I don't recall

22   anybody saying it wasn't a fraud.  Maybe -- I thought maybe I

23   was overly aggressive sometimes in my thought about it being

24   a fraud.  Of course, that, I dismissed.  But it was more

25   related to barriers.  This was a -- seen as a fantastically