# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Case No. 3:09-CV-0724-N-BG |
| v. | § § | |
| JAMES R. ALGUIRE, ET AL., | § § | |
| Defendants. | § § | |

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL., | § § § § § | |
| Plaintiff, | § § | Case No. 3:10-CV-0366-N-BG |
| v. | § § | |
| MIGUEL VENGER, ET AL., | § § | |
| Defendants. | § § | |

## APPENDIX IN SUPPORT OF RECEIVER'S RESPONSE TO DEFENDANTS' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT REGARDING CERTAIN DEFENDANTS' GOOD FAITH AFFIRMATIVE DEFENSE

Dated: December 11, 2015

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler
    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Scott D. Powers
    Texas Bar No. 24027746
    scott.powers@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    98 San Jacinto Blvd., Suite 1500
    Austin, Texas 78701-4039
    512.322.2500
    512.322.2501 (Facsimile)

**ATTORNEYS FOR**
**RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On December 11, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all counsel or pro se parties of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler

# EXHIBIT 1

*Receiver's Response to Defendants'*
*Cross-Motions for Partial Summary Judgment*

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS      )
     CAPACITY AS COURT-APPOINTED  )
 4   RECEIVER FOR THE STANFORD    )
     INTERNATIONAL BANK, LTD.     )
 5   ET AL.                       )   Case No. 03:09-CV-0724-N
          Plaintiff,             )
 6   v.                           )
     JAMES R. ALGUIRE, ET AL.     )
 7      Defendants.               )
     _____)
 8
     RALPH S. JANVEY, IN HIS      )
 9   CAPACITY AS COURT-APPOINTED  )
     RECEIVER FOR THE STANFORD    )
10   INTERNATIONAL BANK, LTD.     )
     ET AL.                       )   Case No. 03:10-CV-0366-N
11        Plaintiff,             )
     v.                           )
12   MIGUEL VENGER, ET AL.        )
          Defendants.            )
13   _____)

14   RALPH S. JANVEY, IN HIS      )
     CAPACITY AS COURT-APPOINTED  )
15   RECEIVER FOR THE STANFORD    )
     INTERNATIONAL BANK, LTD.     )
16   ET AL.                       )   Case No. 03:10-CV-1002-N
          Plaintiff,             )
17   v.                           )
     JOSE MANUEL FERNANDEZ,       )
18   ET AL.                       )
          Defendants.            )
19   _____)

20
                   VIDEOTAPED DEPOSITION OF
21                  M. RAY PERRYMAN, Ph.D.
                        AUSTIN, TEXAS
22                   SEPTEMBER 16, 2015

23
     ATKINSON-BAKER, INC.    REPORTED BY:  CYNTHIA VOHLKEN,
24   COURT REPORTERS                CSR NO. 1059
     (800) 288-3376          FILE NO.:  A90A3D9
25   www.depo.com
```

**App. 2**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3   RALPH S. JANVEY, IN HIS      )
     CAPACITY AS COURT-APPOINTED  )
 4   RECEIVER FOR THE STANFORD    )
     INTERNATIONAL BANK, LTD.     )
 5   ET AL.                       )   Case No. 03:09-CV-0724-N
          Plaintiff,             )
 6   v.                           )
     JAMES R. ALGUIRE, ET AL.     )
 7       Defendants.             )
     _____)
 8
     RALPH S. JANVEY, IN HIS      )
 9   CAPACITY AS COURT-APPOINTED  )
     RECEIVER FOR THE STANFORD    )
10   INTERNATIONAL BANK, LTD.     )
     ET AL.                       )   Case No. 03:10-CV-0366-N
11        Plaintiff,             )
     v.                           )
12   MIGUEL VENGER, ET AL.        )
          Defendants.            )
13   _____)

14   RALPH S. JANVEY, IN HIS      )
     CAPACITY AS COURT-APPOINTED  )
15   RECEIVER FOR THE STANFORD    )
     INTERNATIONAL BANK, LTD.     )
16   ET AL.                       )   Case No. 03:10-CV-1002-N
          Plaintiff,             )
17   v.                           )
     JOSE MANUEL FERNANDEZ,       )
18   ET AL.                       )
          Defendants.            )
19   _____)

20

21              Deposition of M. RAY PERRYMAN, Ph.D.,

22   taken on behalf of Plaintiff, at Baker Botts, LLP, 98

23   San Jacinto Boulevard, Suite 1500, Austin, Texas,

24   commencing at 1:04 p.m., Wednesday, September 16, 2015,

25   before Cynthia Vohlken, CSR No. 1059.
```

**App. 3**

```
 1                    A P P E A R A N C E S :

 2        FOR THE PLAINTIFFS:

 3        BAKER BOTTS, LLP
          BY:  DAVID ARLINGTON, Esq.
 4             SHERWIN FARIDIFAR, Esq.
          98 San Jacinto Boulevard
 5        Suite 1500
          Austin, Texas 78701
 6        (512) 322-2500
          sherwin.faridifar@bakerbotts.com
 7        david.arlington@bakerbotts.com

 8
          FOR THE DEFENDANTS JAMES BROWN, SR, ET AL.:
 9
          PREIS GORDON, APLC
10        BY:  CHARLES GORDON, Esq.
          450 Laurel Street
11        Suite 2150
          Baton Rouge, Louisiana  70801-1817
12        (225) 387-0707
          chuck@preislaw.com
13

14        ALSO PRESENT:

15        Sam Swain, Videographer

16

17                        *-*-*-*-*

18

19

20

21

22

23

24

25
```

**App. 4**

```
1                        I N D E X

2   WITNESS:  M. RAY PERRYMAN, Ph.D.

3   EXAMINATION                                    PAGE

4         By Mr. Arlington                          5

5

6                      E X H I B I T S

7   NUMBER                DESCRIPTION              PAGE

8    1      Receiver's Notice of Oral
            Deposition of M. Ray Perryman           6
9
     2      Defendants' Rule 26(a)(2)(B)
10          Expert Disclosures                      7

11   4      Expert Report of M. Ray Perryman, PhD  15

12   5      M. Ray Perryman, Ph.D. Vita            50

13

14

15

16                INFORMATION REQUESTED:
                        (None)
17

18

19

20

21

22

23

24

25
```

4

**App. 5**

```
 1      AUSTIN, TX; WEDNESDAY, SEPTEMBER 16, 2015; 1:04 p.m.

 2               THE VIDEOGRAPHER:  Stand by, please.  We

 3   are on the record September 16, 2015.  The time is 1:04

 4   p.m.  This begins Videotape Number 1.

 5               THE REPORTER:  Counsel, would you prefer   01:04

 6   to have me or the videographer read the script for a

 7   federal deposition and then introduce yourselves or

 8   would you prefer to waive this?

 9               MR. ARLINGTON:  The plaintiff waives.

10               MR. GORDON:  Defendants waive.            01:04

11               M. RAY PERRYMAN, Ph.D.

12            having first been duly sworn, was

13             examined and testified as follows:

14

15                    EXAMINATION

16   BY MR. ARLINGTON:

17      Q.   Good afternoon, sir.

18      A.   Good afternoon.

19      Q.   Could you just give us your name and address,

20   please?                                               01:05

21      A.   My name is Ray Perryman.  Business or home?

22      Q.   Business is fine.

23      A.   Okay.  My business address is 510 North Valley

24   Mills Drive, Suite 300, Waco, Texas, 76710.

25      Q.   Okay.  And you've give -- you've given        01:05
```

5

**App. 6**

```
 1    depositions before, right, sir?

 2         A.   I have, yes, sir.

 3         Q.   Just approximately how many?  I know it's -- I

 4    think it's a lot but --

 5         A.   I'm not certain.  I would say maybe 150.       01:05

 6         Q.   Okay.

 7         A.   Something like that.

 8         Q.   All right.  Does that include trial testimony

 9    as well?

10         A.   No.  Probably maybe 30, 35 trial testimonies    01:05

11    probably.

12         Q.   Okay.

13         A.   And those are estimates.

14         Q.   I'm going to hand you what I've marked as

15    Deposition Exhibit Number 1 and just ask you to take a    01:05

16    look at that.  I'll represent to you that's the notice

17    for your deposition today.  Have -- have you seen this

18    document before?

19         A.   You know, I don't believe I have.

20         Q.   Okay.  You understand that you are -- have been 01:05

21    designated as an expert by certain defendants in the

22    lawsuit that we're here about today, don't you?

23         A.   Yes, sir, I do.

24         Q.   Okay.  And that's the reason you are here to

25    testify, to tell the jury about your opinions in this    01:06
```

6

**App. 7**

```
 1   case?
 2       A.   That's correct, yes, sir.
 3       Q.   Do you know which defendants have retained and
 4   designated you in this case?
 5       A.   Not by name, no.                              01:06
 6       Q.   Do you know approximately how many of them
 7   there are?
 8       A.   I think about 34, maybe, but I'm not sure.
 9       Q.   Okay.  And just generally speaking do you
10   understand who they are and what the case is about?    01:06
11       A.   Yes, sir.  I'm not an attorney to give a legal
12   definition on it, but generally I understand, yes, sir.
13       Q.   Okay.  Can you just tell me what your
14   understanding is of what this case is about and -- and
15   who the defendants are?                                01:06
16       A.   My understanding is that the defendants are
17   certain individuals who held investments from the
18   Stanford International Bank and were -- and withdrew
19   them between October 1st of 2008 and February 19th of
20   2009 and that the lawsuit is about whether or not that 01:07
21   was appropriate.
22       Q.   I'm going to hand you what's been marked as
23   Deposition Exhibit Number 2 --
24       A.   Yes, sir.
25       Q.   -- and I would ask you the same question I did 01:07
```

7

**App. 8**

```
 1   with regard to the other document.  Have -- have you

 2   seen that before?

 3        A.   I have not, no, sir.

 4        Q.   Okay.  I will represent to you that this is a

 5   designation of you as an expert in this lawsuit by       01:07

 6   certain defendants.

 7        A.   Yes, sir.

 8        Q.   If you would take a look at Footnote Number 1

 9   of that document.

10        A.   Yes, sir.                                      01:07

11        Q.   Do you recognize the names that are listed

12   there?

13        A.   In the sense that I've seen them on some other

14   documents, yes, sir.  Again, I haven't met any of them

15   or anything of that nature.                              01:07

16        Q.   Okay.  Do you understand that those are the

17   defendants in this case that have retained and

18   designated you as their expert?

19        A.   Not having compared the list line by line I

20   certainly accept your representation of that.           01:08

21        Q.   Okay.  And just looking at that list, and take

22   a moment if you need to, it's your testimony that you

23   haven't spoken with any of those individuals?

24        A.   That's correct, yes, sir.

25        Q.   Okay.  How were you first contacted about this  01:08
```

8

**App. 9**

1   it was a time of unprecedented uncertainty in the

2   marketplace and any time you have that -- and I -- I

3   went back a century or so to give some context to that,

4   a few major things that had happened along the way.

5   Investors move to safety and investors throughout the          01:25

6   world were moving to safety at this point in time.

7              Another thing that happened specifically

8   in this time period is that the -- as part of -- of the

9   legislative and regulatory process to try to resolve the

10  matter the -- and this is all covered in the report, but   01:25

11  the -- the Federal Deposit Insurance Corporation

12  increased their insurance coverage from $100,000 to a

13  hundred -- $250,000 on deposits.  That raised the

14  relative attractiveness of the safer U.S. bank insured

15  certificates of deposit even more and provided even          01:26

16  greater incentive.

17             So in that context it's very reasonable

18  for investors to move out of obligations that -- that

19  were foreign in nature.  There was a big exodus of all

20  types of foreign investment at the time, uninsured         01:26

21  investments, less safe investments and into safer

22  investments and -- and the Stanford defendants acted

23  very consistent with this approach.

24       Q.   So it is your opinion that the Stanford

25  investors acted reasonably in light of what was going on   01:26

22

**App. 10**

1   in the general marketplace at the time they redeemed; is

2   that accurate?

3       A.   That's a broad generalization, but yes, sir.

4   The marketplace certainly indicated that that was a

5   prudent thing for any investor to consider and do at          01:26

6   that point in time.

7       Q.   Okay.  But you have not considered any specific

8   facts and circumstances around why any particular

9   Stanford investor actually withdrew their funds from

10  Stanford International Bank, have you?                        01:27

11      A.   I haven't talked to any of the individual

12  investors at all.  What they did was just very much

13  indicative of what millions of people were doing all

14  over the world at the time.

15      Q.   And so just back to my question.  You haven't     01:27

16  considered any specific facts and circumstances around

17  specific withdrawals made by the Stanford investors at

18  the time they took their money out from Stanford

19  International Bank?

20              MR. GORDON:  Object to the form.               01:27

21      A.   Not beyond what I've already addressed in my --

22  in my prior answer and in the report.  Again, I've

23  looked at the patterns that -- that drove investment

24  behavior at the time and -- and Stan -- these particular

25  Stanford investors behavior was very consistent with      01:27

**App. 11**

1    that.  I haven't examined individual transactions,

2    individual withdrawals, and that sort of thing.  I think

3    that's the crux of what you're asking me.  I have not

4    examined that issue.

5        Q.   (BY MR. ARLINGTON)  Okay.  And I think you are    01:28

6    accurately interpreting what I'm -- what I'm inartfully

7    trying to get at, and that is:  In terms of what a

8    particular investor -- well, let me back up and start

9    that over.

10            Why a particular Stanford investor            01:28

11   withdrew a particular sum at a particular time was not

12   part of the analysis that you performed in arriving at

13   your opinions that you're giving in this case; is that

14   right?

15       A.   Let me try it this way.  We'll try and get to    01:28

16   the same place here.

17            The analysis I did would be -- would --

18   would be indicative of why any investor, including the

19   Stanford investors, might make -- might take an action

20   of that nature.  I have not examined these specific       01:28

21   transactions and the specific dates and specific amounts

22   and specific motivations behind them beyond what I've

23   already talked about in terms of the -- the incentives

24   the marketplace was sending at that time and the

25   circumstances under which they occurred.                  01:28

24

**App. 12**

1    answer that question?

2         A.   The answer I would give that question is beyond

3    what I've stated in my report and stated previously.

4    I'm not aware of any -- any other factor specifically.

5         Q.   Okay.  And what you have stated in your report    01:30

6    and what you have stated previously relates to what was

7    going on in the marketplace and your understanding of

8    how that impacted investors generally at the time?

9         A.   In a broad sense, yes.  Again, I would -- I

10   would let the report speak to that.                         01:30

11        Q.   So circling back to one other question just to

12   make sure we are -- are clear --

13        A.   Yes, sir.

14        Q.   -- on the record.  You don't have an opinion

15   and won't be offering an opinion at trial as to whether     01:30

16   any particular Stanford investor received payments from

17   Stanford in good faith?

18              MR. GORDON:  Object to the form.

19        A.   Again, that sounds like a legal conclusion to

20   me and I won't be giving any legal conclusions.  I will     01:31

21   not be -- I will -- I will not be addressing individual

22   specifics of individual transactions.  I think that's

23   the best way to say it.

24        Q.   (BY MR. ARLINGTON)  Prior to your getting

25   involved in this case had you heard of the Stanford         01:31

26

**App. 13**

1    International Bank as of February of 2009?

2        A.    I've seen some documents indicating there were

3    about I think $7 billion in investments, so that would

4    indicate there were a large number but I haven't

5    investigated the number, no, sir.                          02:25

6        Q.    Does any of that matter to your opinions in

7    this case?

8        A.    No, sir.

9        Q.    So we've talked about the fact that you haven't

10   interviewed any of the Stanford investors and talked to   02:25

11   them about why they redeemed when they did.  I assume

12   that means that as to any particular Stanford investor

13   you don't know what specifically motivated them to

14   redeem their Stanford CDs, do you?

15       A.    I haven't talked to any of the investors,       02:26

16   that -- that's absolutely correct.  The circumstances at

17   the time led millions of people to make similar types of

18   decisions.  As far as assigning a specific was it this,

19   that or the other that caused this particular defendant

20   to make this particular decision, I have not done that    02:26

21   analysis.

22       Q.    Okay.  So you don't know why any particular

23   Stanford investor specifically redeemed their CDs when

24   they did, correct?

25       A.    Not apart from what I've said previously and     02:26

63

**App. 14**

1    Q.   So your opinions are about what reasonable

2    investors might have done under the circumstances, not

3    about why these specific investors redeemed their CDs,

4    correct?

5    A.   I think we are getting close.  The only          02:28

6    hesitation I'm having with that is I -- I feel like the

7    opinions I've given about the marketplace do indicate

8    why specific investors would make the decisions they

9    made.  What I have not done is go and talk to the

10   individual investors and know why a certain individual  02:28

11   made a decision, was it -- was it one of these -- one of

12   these major events that happened, was it the

13   accumulation of events, I have not made that type of

14   determination.

15            The determination I have made is that          02:29

16   it -- that -- that it was certainly a prudent and

17   reasonable thing to do.  It was very much indicative of

18   what other people were doing at the time.  I haven't

19   drilled down to talking to individual investors.

20   Q.   And I get that you haven't talked to them and      02:29

21   I -- I just want to -- I'm struggling to understand

22   why -- why -- it seems like you're struggling to -- to

23   answer the question and -- and what I really am just

24   trying to find out is:  Do you know why any specific

25   investor redeemed their CD when they did?               02:29

**App. 15**

1   A.   As far as specific precise knowledge of an

2   individual and what was in that individual's mind versus

3   another investor's mind, I do not know that.  I have not

4   talked to them individually.

5   Q.   Okay.  And you don't know what specific          02:30

6   knowledge any particular Stanford investor had at the

7   time they redeemed their CDs, right?

8   A.   I don't know the specifics of -- of -- of their

9   knowledge level, I do not.

10   Q.   And you don't know why an investor, one of the  02:30

11   Stanford investors, would have thought that it was

12   important enough to them to redeem their CDs that they

13   were willing to pay penalties, do you?

14   A.   Well, that's where you get into the analysis I

15   did do.  A lot of people paid penalties to redeem things  02:30

16   at that point in time because of the nature of the

17   market, the desire for safety and liquidity and that

18   sort of thing.  So -- so that's where you get back into

19   what -- what my analysis is -- is about.

20   But as far as the specific knowledge of  02:30

21   individuals making that decision, as we've said, I -- I

22   haven't spoke with these individuals and I don't know

23   what those individual motivations precisely were.

24   Q.   So you can't say why any specific Stanford

25   investor was willing to pay penalties to withdraw their  02:31

**App. 16**

1   CDs?

2       A.   Not beyond what I said in the previous answer.

3       Q.   And you don't know whether any of the Stanford

4   investors suspected that Stanford International Bank

5   might be insolvent, do you?                                02:31

6       A.   I don't have knowledge regarding that one way

7   or the other.

8       Q.   And you don't know whether any of them

9   suspected that Stanford International Bank or the

10  Stanford entities were part of a Ponzi scheme, right?      02:31

11      A.    I don't have knowledge of that one way or the

12  other.

13      Q.   As to any of these specific investors do you

14  have any knowledge about what the news about the Madoff

15  Ponzi scheme, what impact that had on their decision to    02:31

16  redeem CDs?

17      A.   Not -- not -- again, not from an individual

18  perspective.  I am aware that that information came

19  out -- I believe it was December 2008 was when the story

20  broke, right in the middle of this period, and that        02:32

21  was -- that would have been cumulative to all the other

22  things that were going on out there in the marketplace

23  at the time.  But as far as -- as impact to individual

24  investors, I haven't -- again, I haven't talked to them

25  and asked that question.                                   02:32

**App. 17**

1   Stanford CD, you would need to talk to them, right?

2       A.   More than likely depending on what documentary

3   evidence I had or what -- or other things, but it's

4   certainly a possibility that I would, yes, sir.

5       Q.   Okay.  And speaking of documentary evidence,      02:44

6   that's not something you have looked at as to any

7   specific investor in coming up with your opinions,

8   correct?

9       A.   That's correct.  Again, I didn't need to for

10  the -- for the opinion I was asked to analyze and -- and  02:44

11  review and determine.

12      Q.   Because you weren't asked to give an opinion

13  about why any of those specific investors made decisions

14  to redeem their CDs, correct?

15      A.   Not on an individual basis.  I was simply asked  02:44

16  was it reasonable investor behavior for them to do that

17  during this time period and it certainly was.

18      Q.   Now, one of the things you also say here is

19  that they "responded to the uncertainty and panic caused

20  by the financial crisis by withdrawing their resources    02:44

21  from risker investments and putting them instead in

22  safer, more liquid investments."

23          Just focusing on that last piece what have

24  you done to determine that any of the Stanford investors

25  took the money they redeemed from Stanford CDs and put    02:45

1       A.   Well, I'm not saying that at all.   I'm saying

2   some people might choose to do it, some people might not

3   choose to do it.   I can only speak for myself.   That's

4   something I think I probably would do.

5       Q.   Now, do you know whether any of the Stanford        03:19

6   investors read any news articles or publications about

7   former financial advisors selling the Stanford CDs who

8   were accusing Stanford of illegal and unethical conduct?

9       A.   I'm not aware one way or the other.

10      Q.   And does that matter to your opinion?               03:19

11      A.   It does not.   Again, my opinion is that given

12  the financial situation at the time it was reasonable

13  for people to move towards safer investments, including

14  the Stanford investors.

15      Q.   Now, do you know whether any of the Stanford        03:19

16  investors had concerns about the CD because Stanford was

17  an offshore bank?

18      A.   I don't have knowledge one way or the other.   I

19  mean, it is a basic fact that an uninsured CD is less

20  risky -- or is more risky than an insured CD.   And       03:20

21  typically a -- a bank in Antigua would be viewed in --

22  in the marketplace as -- as more risky than a bank in

23  the United States that did have the insurance

24  protection, but -- but I don't have specific knowledge

25  again.                                                      03:20

**App. 19**

1      Q.   Whether or not a Stanford investor had such

2   suspicions or concerns, does that matter to your

3   opinion?

4      A.   Well, again, not -- not to the opinion that I'm

5   expressing because the opinion I'm expressing is is this   03:20

6   a reasonable thing for -- for one of these Stanford

7   investors to do under the circumstances of the

8   marketplace and I concluded that indeed it was.

9      Q.   Now, the opinions that we have talked about

10   today, as well as those that are contained in your      03:20

11   report, hopefully we have covered most of them, are

12   those all of your opinions that you have in this

13   lawsuit?

14      A.   Certainly these are the issues I have been

15   asked to address, yes, sir.                             03:21

16      Q.   Okay.  And as of right now you have not issued

17   another expert report and you have not been asked to do

18   so?

19      A.   That's correct.

20      Q.   And as of right now you've been -- you have not 03:21

21   been asked to form any additional opinions that you

22   would be presenting at trial; is that true?

23      A.   That is true.  I have not been asked to -- to

24   provide any additional opinions.

25              MR. ARLINGTON:  We'll pass the witness.     03:21

**App. 20**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3    RALPH S. JANVEY, IN HIS   )
      CAPACITY AS COURT-APPOINTED )
 4    RECEIVER FOR THE STANFORD  )
      INTERNATIONAL BANK, LTD.   )
 5    ET AL.                     )  Case No. 03:09-CV-0724-N
      v.                         )
 6    JAMES R. ALGUIRE, ET AL.   )
      _____)
 7
      RALPH S. JANVEY, IN HIS    )
 8    CAPACITY AS COURT-APPOINTED )
      RECEIVER FOR THE STANFORD   )
 9    INTERNATIONAL BANK, LTD.    )
      ET AL.                      )  Case No. 03:10-CV-0366-N
10    v.                          )
      MIGUEL VENGER, ET AL.       )
11    _____)

12    RALPH S. JANVEY, IN HIS     )
      CAPACITY AS COURT-APPOINTED )
13    RECEIVER FOR THE STANFORD   )
      INTERNATIONAL BANK, LTD.    )
14    ET AL.                      )  Case No. 03:10-CV-1002-N
      v.                          )
15    JOSE MANUEL FERNANDEZ,      )
      ET AL.                      )
16    _____)

17
                    REPORTER'S CERTIFICATION
18                    ORAL DEPOSITION OF
                     M. RAY PERRYMAN, Ph.D.
19                    SEPTEMBER 16, 2015

20

21          I, CYNTHIA VOHLKEN, Certified Shorthand

22    Reporter in and for the State of Texas, hereby certify

23    to the following:

24                That the witness, M. RAY PERRYMAN, Ph.D.,

25    was duly sworn by the officer and that the transcript of
```

1    the oral deposition is a true record of the testimony

2    given by the witness;

3                   I further certify that pursuant to FRCP

4    Rule 30(f)(1) that the signature of the deponent:

5                   _____ was requested by the deponent or a

6    party before the completion of the deposition and

7    returned within 30 days from date of receipt of the

8    transcript.  If returned, the attached Changes and

9    Signature Page contains any changes and the reasons

10   therefor;

11                  __X__ was not requested by the deponent or

12   a party before the completion of the deposition.

13                  I further certify that I am neither

14   attorney nor counsel for, related to, nor employed by

15   any of the parties to the action in which this testimony

16   was taken.  Further, I am not a relative or employee of

17   any attorney of record in this cause, nor am I

18   financially or otherwise interested in the outcome of

19   the action.

20                  Subscribed and sworn to on this the

21   29thday of September, 2015.

22

23

24   ------------------------------------------
     Cynthia Uohlken, Texas CSR 1059

25   Expiration Date:  12/31/2016

**App. 22**