## BAKER BOTTS LLP

1001 PAGE MILL ROAD.
BUILDING ONE, SUITE 200
PALO ALTO, CA 94303-1007
78701-4078

TEL  +1 650.739.7500
FAX  +1 650.739.7699
BakerBotts.com

ABU DHABI
AUSTIN
BEIJING
BRUSSELS
DALLAS
DUBAI
HONG KONG

HOUSTON
LONDON
MOSCOW
NEW YORK
**PALO ALTO**
RIYADH
WASHINGTON

Kevin M. Sadler
TEL  +1 650.739.7518
FAX  +1 650.739.7618
kevin.sadler@bakerbotts.com

January 27, 2016

079716.0127

**BY E-FILING**

The Honorable David C. Godbey
United States District Court
Northern District of Texas
1100 Commerce Street
Room 1358
Dallas, Texas 75242

      Re:    *Janvey v. Alguire*, Case No. 3:09-CV-0724-N
               *Janvey v. Venger*, Case No. 3:10-CV-0366-N

Dear Judge Godbey:

      I am writing to advise the Court of a recent decision by the U.S. Court of Appeals for the Seventh Circuit that is relevant to the Receiver's and certain defendants' pending cross-motions for partial summary judgment regarding TUFTA's good-faith affirmative defense.[1]

      *Grede v. Bank of New York Mellon Corp.* (*In re Sentinel Mgmt. Group, Inc.*), No. 15-1039, 2016 WL 98601, -- F.3d -- (7th Cir. Jan. 8, 2016) is a fraudulent-transfer case under Section 548 of the Bankruptcy Code. Sentinel, a cash-management firm, obtained more than $300 million in loans from BNYM, and improperly used securities that belonged to its customers to secure those loans. *Id.* at *1. After Sentinel declared bankruptcy, BNYM sought to liquidate the security collateral, and Sentinel's trustee filed fraudulent-transfer claims against BNYM. *Id.* The District Court ruled, following a 17-day trial, that BNYM was entitled to Section 548(c)'s good-faith affirmative defense. It concluded that because BNYM did not know or believe that Sentinel had acted wrongfully, BNYM "was entitled to accept that security for its loans without any investigation." *Id.* at *2.

---

[1] *Janvey v. Alguire*, Case No. 3:09-CV-0724-N, Docs. 1392, 1396, 1397, 1400, 1402, 1425, 1426, 1427 and 1429; *Janvey v. Venger*, Case No. 3:10-CV-0366-N, Docs. 570, 575, 578, 579, 580, 583, 584, 607, 608, 609, 611, 614 and 619.

**BAKER BOTTS** LLP

Hon. David C. Godbey            - 2 -                    January 27, 2016

The Seventh Circuit reversed, holding that the District Court had erred by failing to apply an objective, reasonable person standard in evaluating whether BNYM was on "inquiry notice" and therefore required to undertake a diligent investigation. Whether BNYM actually knew or believed that Sentinel was acting improperly was beside the point, Judge Posner explained, "because inquiry notice is not knowledge of fraud or other wrongdoing but merely knowledge that would lead a reasonable, law-abiding person to inquire further—would make him in other words suspicious enough to conduct a diligent search for possible dirt." *Id.* at *2.

BNYM knew that Sentinel had pledged $300 million in collateral but had less than $20 million in capital. *Id.* One of the bank's officers expressed puzzlement about this oddity to a co-worker and received a "nonresponsive answer." *Id.* at *2-3. "There was no further inquiry." *Id.* at 3. The officer's "puzzlement was enough," the Court held, "to place the bank on inquiry notice and thus require it to conduct an investigation of what Sentinel was using to secure [the] debt"—a requirement that was not satisfied by the officer's exchange with his colleague. *Id.* at *2-3. In overturning the District Court's judgment, the Court emphasized that the bar for inquiry notice is low. "Knowing or turning a blind eye (refusing to look because of what you fear to see) would have made the bank guilty of fraud, but was not required to establish inquiry notice. And while mere negligence—or ineptitude—is insufficient to establish inequitable conduct, it would suffice for inquiry notice." *Id.* at *3. Because good faith is measured under an objective standard, the Court also held that it was irrelevant that BNYM's officer did not know or believe Sentinel was engaged in a fraud. "Notice that because of the recipient's obtuseness fails to trigger suspicion is nonetheless sufficient to create inquiry notice because all that is required to trigger it is information that would cause a *reasonable* person to be suspicious enough to investigate." *Id.* (emphasis in original). Finally, Judge Posner observed that an investigation into Sentinel's claims would likely have revealed them to be false, but did not hold that BNYM could have salvaged its good-faith affirmative defense merely by showing that an investigation would have been futile. Instead, the Court found that BNYM's failure to investigate the suspicious facts before it "was a failure to act on inquiry notice," and fatal to BNYM's defense as a matter of law. *Id.* at *3, *5.

*In re Sentinel* supports the Receiver's cross-motions for summary judgment. The defendants in this litigation had notice of facts and circumstances that would have caused a reasonable person to inquire further into Stanford's possible fraud or insolvency. Because the defendants failed to do so, they cannot establish good faith under TUFTA as a matter of law.

A courtesy copy of the Seventh Circuit's opinion is enclosed with this letter.

Sincerely,

*[signature]*

Kevin M. Sadler
Counsel for Plaintiff, Receiver Ralph S. Janvey

**BAKER BOTTS** LLP

Hon. David C. Godbey — - 3 - — January 27, 2016

Enclosure: *Grede v. Bank of New York Mellon Corp. (In re Sentinel Mgmt Grp., Inc.)*, Case No. 15-1039 (7th Cir. Jan. 8, 2016)

cc: Counsel of Record via ECF filing in *Janvey v. Alguire*, Case No. 3:09-CV-0724-N (N.D. Tex.) and *Janvey v. Venger*, Case No. 3:10-CV-0366-N (N.D. Tex.).

2016 WL 98601
Only the Westlaw citation is currently available.
United States Court of Appeals,
Seventh Circuit.

In re SENTINEL MANAGEMENT GROUP, INC., Debtor.
Frederick J. Grede, as Liquidation Trustee of the Sentinel Liquidation Trust, Plaintiff–Appellant,
v.
Bank of New York Mellon Corp. and Bank of New York, Defendants–Appellees.

No. 15–1039.
|
Argued Nov. 10, 2015.
|
Decided Jan. 8, 2016.

**Synopsis**
**Background:** Liquidating trustee appointed under debtor's confirmed Chapter 11 plan brought adversary proceeding to avoid alleged fraudulent or preferential transfers and equitably subordinate bank's claim. The United States District Court for the Northern District of Illinois, James B. Zagel, J., 441 B.R. 864, granted judgment for bank. Trustee appealed. The Court of Appeals, Tinder, Circuit Judge, 728 F.3d 660, affirmed in part, reversed in part, and remanded. On remand, the District Court again entered judgment in favor of bank, 2014 WL 6990322, and trustee appealed.

**Holdings:** The Court of Appeals, Posner, Circuit Judge, held that:

[1] note written by bank's Managing Director of Financial Institutions Credit was sufficient to show that bank was on inquiry notice of possible problems with assets that firm had deposited in accounts used to secure loan, such that bank did not qualify as "good faith" transferee for value of these assets, and its $312 million secured claim had to be reclassified as unsecured, but

[2] bank was not guilty of any inequitable conduct, of kind warranting equitable subordination of its unsecured claim.

Affirmed in part and reversed in part; case remanded.

West Headnotes (9)

[1]     **Bankruptcy**  Avoidance Rights and Limits Thereon, in General

"Inquiry notice," such as will prevent transferee from qualifying as "good faith" transferee for value of kind insulated, to the extent of any value given, from trustee's fraudulent transfer avoidance powers, signifies an awareness of suspicious facts that would have led reasonable person, acting diligently, to investigate further and by doing so discover wrongdoing. 11 U.S.C.A. § 548(c).

Cases that cite this headnote

[2]     **Bankruptcy**  Avoidance Rights and Limits Thereon, in General

"Inquiry notice," such as will prevent transferee from qualifying as "good faith" transferee for value of kind insulated, to the extent of any value given, from trustee's fraudulent transfer avoidance powers, is not knowledge of fraud or other wrongdoing, but merely knowledge that would lead a reasonable, law-abiding person to inquire further, in other words, that would make him suspicious enough to conduct a diligent search for possible dirt. 11 U.S.C.A. § 548(c).

Cases that cite this headnote

[3]     **Bankruptcy**  Avoidance Rights and Limits Thereon, in General

Note written by bank's Managing Director of Financial Institutions Credit, questioning how a cash management firm with capital of no more than $3 million could be pledging assets sufficient to secure $300 million loan, and whether the assets pledged were held for "somebody else's" benefit, was sufficient to show, in light of the author's position with bank, that bank was on inquiry notice of possible problems with assets that firm had deposited in accounts used to secure loan, such that bank did not qualify as "good faith" transferee for value of these assets, which represented property of the firm's customers, and which firm was obligated to maintain in segregated accounts; accordingly, when firm later filed for bankruptcy relief, $312 million secured claim filed by bank had to be reclassified as unsecured claim. 11 U.S.C.A. § 548(a)(1)(A), (c).

Cases that cite this headnote

[4]     **Bankruptcy**  Avoidance Rights and Limits Thereon, in General

Notice that, because of the recipient's obtuseness, fails to trigger suspicion is nevertheless sufficient to create inquiry notice, of kind sufficient to prevent transferee from qualifying as "good faith" transferee of fraudulent transfer, because all that is required to place one on inquiry notice is information that would cause a reasonable person to be suspicious enough to investigate. 11 U.S.C.A. § 548(c).

Cases that cite this headnote

[5]     **Bankruptcy**  Avoidance Rights and Limits Thereon, in General

While knowing or turning a blind eye to fraudulent nature of transfer may make transferee guilty of participating in the fraud, it is not required to establish inquiry notice, of kind affecting transferee's status as "good faith" transferee. 11 U.S.C.A. § 548(c).

Cases that cite this headnote

[6]     **Bankruptcy**  Inequitable Conduct

In order to warrant equitable subordination of creditor's claim, creditor's conduct must be, not only inequitable, but seriously so, and must harm other creditors. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[7]     **Bankruptcy**  Inequitable Conduct

While bank, in failing to investigate how a cash management firm with capital of no more than $3 million could be pledging assets sufficient to secure $300 million loan, may have been negligent, it was not, absent evidence that it actually knew or turned blind eye to fact that firm was improperly pledging assets of customers that it was required

to maintain in segregated accounts, guilty of any fraudulent conduct, such as would permit equitable subordination of its $312 million general unsecured claim in bankruptcy case later filed by firm. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[8]   **Bankruptcy**   Avoidance Rights and Limits Thereon, in General

Statutory "good faith" defense to recovery of assets from transferee on avoided transfer had no application where trustee was not seeking to recover any assets, but to avoid lien possessed by bank in assets improperly pledged by debtor. 11 U.S.C.A. § 550(b)(1).

Cases that cite this headnote

[9]   **Bankruptcy**   Avoidance Rights and Limits Thereon, in General

Allowing trustee to set aside bank's lien in customer assets improperly pledged by bankrupt cash management firm, on ground that asset pledge was actually fraudulent to creditors and that bank was on inquiry notice that debtor did not have sufficient assets to secure loan and did not qualify as "good faith" transferee for value, would not violate statutory prohibition against double recovery to trustee; bank still had claim for the $300 million borrowed by firm, just general unsecured, as opposed to secured, claim. 11 U.S.C.A. §§ 548(a)(1)(A), (c), 550(d).

Cases that cite this headnote

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 08 C 2582—James B. Zagel, Judge.

Before POSNER, EASTERBROOK, and ROVNER, Circuit Judges.

**Opinion**

POSNER, Circuit Judge.

 **\*1**  The plaintiff in this case, now in its eighth year, is the trustee of a bankrupt firm named Sentinel Management Group, Inc. Sentinel was what is called a cash-management firm: it invested cash, which had been lent it by persons or firms, in liquid low-risk securities. It also traded on its own account, using money borrowed from Bank of New York Mellon Corp. and Bank of New York (affiliates usually referred to jointly as BNYM) to finance the trades. BNYM required that its loans be secured by its borrowers, of whom Sentinel was one. Not owning enough assets to provide the required security, however, Sentinel pledged securities that it had bought for its customers with their money even though its loans from BNYM were used for trading on its own account—improperly. Federal law (7 U.S.C. §§ 6d(a)(2), 6d(b)), as well as the contracts between Sentinel and its customers, required the securities to be held in segregated accounts, that is, accounts separated from Sentinel's own assets. Sentinel was forbidden to pledge the assets in the segregated accounts to BNYM as security for BNYM's loans to it.

In August 2007, with the securities markets becoming shaky (the following year, the year of the financial crash, segments of these markets would be even shakier), Sentinel experienced trading losses that prevented it from both maintaining its collateral with BNYM and meeting the demands of its customers for redemption of the securities that Sentinel had bought with their assets. Sentinel used its line of credit with BNYM to meet those demands. By June 2007 its loan balance with BNYM was $573 million; two months later it halted redemptions to its customers and declared bankruptcy, owing BNYM $312 million. A BNYM executive notified Sentinel that because of its inability to repay the bank's loan the bank planned to liquidate the collateral that Sentinel had pledged to secure the loan. The bankruptcy trustee (Grede, the plaintiff in our case) believed that the liquidation would deny Sentinel's customers more than $500 million in redemptions. He refused to classify the bank as a senior

secured creditor with respect to the $312 million that the bankrupt Sentinel owed it. He considered the transfers of customer assets to accounts that Sentinel could (and did) use to collateralize its loans from BNYM to be fraudulent transfers, unlawful under 11 U.S.C. § 548(a)(1)(A).

 **[1]**  The bank would have been in the clear had it accepted the pledge of the assets "in good faith," 11 U.S.C. § 548(c), but it would not have been acting in good faith had it had what's called "inquiry notice." *In re Sentinel Management Group, Inc.,* 728 F.3d 660, 668 n. 2 (7th Cir.2013). The term signifies awareness of suspicious facts that would have led a reasonable firm, acting diligently, to investigate further and by doing so discover wrongdoing. *In re M & L Business Machine Co.,* 84 F.3d 1330, 1335–38 (10th Cir.1996); *In re Sherman,* 67 F.3d 1348, 1355 (8th Cir.1995); *In re Agricultural Research & Technology Group, Inc.,* 916 F.2d 528, 535–36 (9th Cir.1990). The trustee believed that officials of BNYM had been aware of suspicious facts that should have led them to investigate, and that an investigation would have revealed that the bank could not in good faith accept assets of Sentinel's customers as security for the bank's loans to Sentinel.

 ***2**  The district judge conducted a seventeen-day bench trial that convinced him that Sentinel was in the clear—that it had not been shown to have intended to defraud its customers, in violation of 11 U.S.C. § 548(a)(1)(A), when it transferred their segregated funds into clearing accounts, where they became collateral for the bank's loans to Sentinel. He therefore dismissed the trustee's claim against the bank. A panel of this court reversed, however, holding that Sentinel had made fraudulent transfers and instructing the district judge to decide on remand whether BNYM had been on inquiry notice in its dealings with Sentinel. *In re Sentinel Management Group, Inc., supra,* 728 F.3d at 666–68.

But on remand the judge neither conducted an evidentiary hearing nor made additional findings. Instead he issued what he called a "supplemental opinion" intended merely to "clarify" his "prior opinion and findings of fact." He "incorporate[d] by reference [his] earlier opinion on the merits and the Seventh Circuit's opinion" that had reversed the earlier decision, without explaining how he could incorporate both an opinion that had been reversed and the opinion reversing it.

 **[2]**  The supplemental opinion reveals a misunderstanding of the concept of inquiry notice. The opinion suggests that the bank, as long as it did not believe that Sentinel had pledged customers' assets to secure its loans without the customers' permission, was entitled to accept that security for its loans without any investigation. That's incorrect, because inquiry notice is not knowledge of fraud or other wrongdoing but merely knowledge that would lead a reasonable, law-abiding person to inquire further—would make him in other words suspicious enough to conduct a diligent search for possible dirt. See *In re Sentinel Management Group, Inc., supra,* 728 F.3d at 668 n. 2; *In re M & L Business Machine Co., Inc., supra,* 84 F.3d at 1338.

 **[3]**  That the bank had information that should have created the requisite suspicion is illustrated by a note of Mark Rogers, the bank's Managing Director of Financial Institutions Credit, to other employees of the bank who like him worked on the Sentinel account. Rogers was responding to a message, from one of those other employees, that had listed Sentinel's collateral. The list puzzled Rogers. He responded: "How can they [i.e., Sentinel] have so much collateral? With less than $20MM [i.e., 20 million dollars] in capital I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" (Actually the "$20MM in capital" to which Rogers referred was incorrect; the correct figure was between $2 and $3 million.) The "somebody else" is an obvious reference to Sentinel's customers, owners of the accounts held by Sentinel; it was their money that was being used—improperly—to secure the bank's loans to Sentinel. Rogers' puzzlement was enough, given his position in the bank, to place the bank on inquiry notice and thus require it to conduct an investigation of what Sentinel was using to secure a $300 million debt when it had capital of no more than $3 million.

 ***3**  He received a nonresponsive answer to the question in his note: "We have a clearing agreement [with Sentinel] which gives us a full lien on the box position outlined below." There was no further inquiry.

 **[4]**  The district judge said that "Rogers did not claim he knew or believed that all the collateral was for somebody else's benefit." True, but he was suspicious, and that was enough to place him on notice of a possible fraud and so require that he or others at the bank investigate. In fact it was more than enough. Notice that because of the recipient's obtuseness fails to trigger

suspicion is nevertheless sufficient to create inquiry notice because all that is required to trigger it is information that would cause a *reasonable* person to be suspicious enough to investigate.

The district judge acknowledged that the bank had in its possession documents that would show, on even a casual perusal, that Sentinel lacked authority to pledge all the assets that it pledged to the bank to secure the bank's loans to it. But he said that the bank wasn't required to conduct an investigation because there were no "grounds to believe that [the] bank should have known of the misconduct of its borrower."BNYM had Sentinel's assurances that it "was allowed to use client[s'] segregated funds as collateral," and on the basis of those assurances the judge concluded that "any inquiry BNYM might have made would likely have been fruitless, as BNYM believed, even to its own detriment, the lies" told by Sentinel's CEO. But Rogers had a *reason* to disbelieve Sentinel's assurances, and an investigation would have discovered their falsity.

The district judge noted that Rogers "came closer to an affirmative statement when he 'assumed' that most of the collateral was for somebody else's benefit, but this too was not an assertion of belief or knowledge."But the assumption was at least a suspicion, based on evidence, and it should have prompted an investigation.

 **[5]**   The judge went on to say that "assuming *arguendo* that Rogers knew, rather than guessed, that some portion of the collateral was posted for the benefit of insiders, he did not assume that all of it came from the accounts of Sentinel's clients."But if some of it did, and Rogers knew it, he knew there was fraud. Again the judge missed the point when he said that the bank "neither knew nor turned a blind eye to the improper actions of Sentinel."Knowing or turning a blind eye (refusing to look because of what you fear to see) would have made the bank guilty of fraud, but was not required to establish inquiry notice. And while the judge may have been correct when he said that "mere negligence—or ineptitude—is insufficient to establish inequitable conduct," it would suffice for inquiry notice.

He said there was no evidence that anyone agreed with Rogers that there was something fishy about the security for the bank's loan to Sentinel. We don't believe it. The bank had lent approximately $300 million to a company that had capital equal to roughly 1/150th of that amount. Yet the company had been able to secure the entire loan. Where could that security have come from? The obvious place was the company's customer accounts. The bank's failure to follow this obvious lead was a failure to act on inquiry notice.

 ***4***  Recall that the district judge in the opinion under review incorporated his earlier opinion—the one this court had re-versed—and by incorporating it adopted the findings in it. Those findings actually *prove* inquiry notice. We quote a few passages from the opinion, *Grede v. Bank of New York Mellon,* 441 B.R. 864 (N.D.Ill.2010):

"[T]he evidence at trial revealed the Bank's knowledge that Sentinel insiders were using at least some of the loan proceeds for their own purposes."*Id.* at 883.

"BNYM had Sentinel's audited financial statements.... [T]he 2005 financial statements showed customer securities 'segregated and held in trust' to be approximately $1.14 billion, but that approximately $156 million of this total was pledged as collateral for a $280 million short-term bank loan. [Terence] Law [a BNYM client executive] and [Joseph] Ciacciarelli [who oversaw BNYM's relationship with Sentinel], both of whom reviewed these monthly statements [and were recipients of Rogers' note], admitted that securities pledged as collateral could not simultaneously be held in segregation. Moreover ... the difference between the amount of assets listed as 'funds segregated or in separate accounts ...' and Sentinel's total assets was never more than approximately $15 million. Therefore, in order for Sentinel to pledge collateral in excess of that difference, it would have to use assets that had been held in segregation and then removed from segregation to allow them to be pledged."*Id.* at 889 (footnote omitted).

"Rogers' [note] is certainly evidence that he had a suspicion that the securities were not Sentinel's to pledge and he shared this suspicion with Law," who of course did nothing. *Id.* at 890.

"The team [Rogers et al.] knew that same-day liquidity was part of Sentinel's agreement with its customers, which also suggests that Sentinel may not have had the right to pledge customer assets."*Id.* (That's an understatement; had Sentinel pledged customer assets to secure its loan from the bank, how could it transfer those assets to the customers in a day?)

"It is clear to me that before June 13, 2009, certain BNYM employees had suspicions that Sentinel may not have rights to the collateral" for the bank's loan. *Id.* (What more need be said?) "Members of the Sentinel team also had access to forms ... which, with relatively cursory review, revealed that Sentinel was violating its segregation [of customer assets] requirements."*Id* .

"I have little doubt that BNYM should have looked further into whether Sentinel had the right to pledge the securities. BNYM employees were careless in protecting their own interests."*Id.* at 891.

"The facts demonstrate that by the middle of June, at least one BNYM employee [Rogers] was suspicious, and others should have known that Sentinel was violating segregation requirements. In light of such notice, it is difficult to see how reliance on Sentinel's representations and warranties contained in the clearing agreement is objectively appropriate."*Id.* at 892.

**\*5** Enough! As we said, the district judge found inquiry notice—over and over again—without realizing it. But in fairness to the judge, the first panel's opinion may have been unduly deferential in remanding this issue rather than reversing outright. The panel had noted correctly that "11 U.S.C. § 548(a)(1)(A) allows the avoidance of any transfer of an interest in the debtor's property if the debtor made the transfer 'with actual intent to hinder, delay, or defraud' another creditor," and that "Grede claims that the transfers of customer assets out of segregation and into the lienable accounts (which Sentinel used as collateral for its overnight loans from Bank of New York) in June and July 2007 constituted fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) & 544(b), and should thus be avoided."*In re Sentinel Management Group, Inc., supra,* 728 F.3d at 666–67. But even though the panel agreed with Grede that Sentinel had made fraudulent transfers, it remarked in a footnote that "the district court needs to clarify on remand what exactly the Bank knew before Sentinel's collapse. But based on the record currently before us, we suspect that the Bank will have a very difficult time proving that it was not on inquiry notice of Sentinel's possible insolvency."*Id.* at 668 n. 2. The district judge had, as we've seen, found fact after fact showing that the bank had indeed been on inquiry notice. There was no need to remand for further findings on that issue.

The second issue, to which we now turn, presented by the trustee's appeal is whether the bank's conduct was sufficiently egregious to justify application of the doctrine of equitable subordination, which allows a bankruptcy court to reduce the priority of a claim in bankruptcy. *Id.* at 669–72; 11 U.S.C. § 510(c)(1). Even though the bank's secured claim goes down the drain because it was on inquiry notice of Sentinel's fraud, it still has an unsecured claim in bankruptcy—a claim for the money it lost when Sentinel failed to repay the bank's loan to it of $312 million. The question is whether its claim is to be subordinated to other claims, which would normally be subordinate to its claim. The first panel's opinion wrestled inconclusively with the question of how serious the bank's misconduct had to be to justify reducing the priority of the bank's bankruptcy claim. It reversed the district judge's rejection of the trustee's argument for equitable subordination and remanded the case for the district judge to clarify his factual findings regarding the extent of the bank's knowledge of wrongdoing. On remand the district judge adhered to his original position.

 **[6]**  **[7]**  The statute authorizing equitable subordination does not indicate what conduct justifies that Draconian remedy, but there is general agreement in the case law that the defendant's conduct must be not only "inequitable" but seriously so ("egregious," "tantamount to fraud," and "willful" are the most common terms employed) and must harm other creditors. See, e.g., *Carhart v. Carhart–Halaska Int'l, LLC,* 788 F.3d 687, 692 (7th Cir.2015); *In re Kreisler,* 546 F.3d 863, 866 (7th Cir.2008); *In re Granite Partners, L.P.,* 210 B.R. 508, 515 (Bankr.S.D.N.Y.1997). Other creditors (that is, creditors other than the bank) were harmed by the bank's accepting the accounts of Sentinel's customers as security for its loan. Could that acceptance be thought tantamount to fraud, thus justifying the remedy of equitable subordination? That would require that the bank believed there was a high probability of fraud and acted deliberately to avoid confirming its suspicion. E.g., *Global–Tech Appliances, Inc. v. SEB S.A.,* 563 U.S. 754, 131 S.Ct. 2060, 2070–71, 179 L.Ed.2d 1167 (2011). But we agree with the district judge that the trustee has not satisfied that high standard. To suspect potential wrongdoing yet not bother to seek confirmation of one's

suspicion is negligent, and negligence has not been thought an adequate basis for imposing equitable subordination. See, e.g., *In re Franklin Bank Corp.,* 526 B.R. 527, 534 (D.Del.2014). For it is not "*purposeful* avoidance of the truth." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (emphasis added); see also *Bullock v. Bankchampaign, N.A.,* –––U.S. ––––, ––––  – ––––, 133 S.Ct. 1754, 1759–60, 185 L.Ed.2d 922 (2013); *United States v. Macias,* 786 F.3d 1060, 1061–64 (7th Cir.2015). Rogers had suspicions that he should have followed up, as we said earlier. But he may have thought he'd done so when he communicated his suspicions to colleagues at the bank, and if so then at worst he was negligent.

**\*6** The trustee argues that refusing to decree equitable subordination "would permit BNYM to lien securities it knew Sentinel was improperly pledging from segregation."The key word is "knew," and BNYM has not been proved to have *known* that Sentinel was securing the bank's loans with customers' money without their consent. The trustee also argues that "a duty of inquiry arises when a bank has notice of facts 'sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated.' " True, but that's the inquiry-notice argument for forbidding the bank to retain its secured creditor status when it should have investigated Sentinel's fraudulent use of its customer accounts to secure the bank's loan to it; it is not proof of fraud.

 [8]  We close by noting briefly two more defenses to losing its status as a secured creditor that the bank presses on us. Section 550(b)(1) of the Bankruptcy Code creates a defense against the trustee's recovering property from a firm that received a transfer otherwise avoidable under other sections of the Code but that gave value for the transfer in good faith. That provision has no application to this case. The transfer was the bank's acquisition of a lien, consisting of the customers' assets pledged by Sentinel to the bank, in violation of section 548. The trustee is not seeking recovery of those assets. See *In re Burns,* 322 F.3d 421, 427–28 (6th Cir.2003).

 [9]  Section 550(d), the basis of the bank's second defense, limits a trustee in bankruptcy to a single satisfaction of a debt owed the bankrupt estate. The district judge thought that granting the trustee the requested relief would result in "a windfall recovery of the millions loaned to Sentinel by BNYM plus the entire collateral that secured these loans," because the trustee would have both the value of the loans that remained and the collateral (the customers' assets that Sentinel pledged to the bank). No. The bank is still owed Sentinel's debt to it. It has just lost its security interest. This does not give the trustee a double recovery. See *In re Sky-walkers, Inc.,* 49 F.3d 546, 549 (9th Cir.1995). The bank remains a creditor in the bankruptcy proceeding, but is an unsecured creditor because it was on inquiry notice that the assets that Sentinel had used to secure the bank's loans had been fraudulently conveyed to the bank.

The judgment of the district court is affirmed in part and reversed in part, and the case remanded for further proceedings consistent with this decision.

**All Citations**

--- F.3d ----, 2016 WL 98601

**End of Document**　　© 2016 Thomson Reuters. No claim to original U.S. Government Works.